**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AUGUST CABRERA, *et al*., | |
| Plaintiffs, | |
| v. | Case No. 19-cv-3835-JDB |
| ISLAMIC REPUBLIC OF IRAN, | |
| Defendant. | |
| MARK ZAMBON, *et al*., | |
| Plaintiffs, | |
| v. | Case No. 18-cv-02065-JDB |
| ISLAMIC REPUBLIC OF IRAN, | |
| Defendant. | |

**PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 4

I.     BELLWETHER EVIDENTIARY HEARING ............................................... 5

       A.   Overarching Liability Testimony ...................................................... 5

       B.   Attack-Specific Testimony ............................................................... 7

II.    LEGAL FRAMEWORK ................................................................................ 9

III.   SUBJECT-MATTER JURISDICTION ......................................................... 10

       A.   Extrajudicial Killing or Hostage Taking ......................................... 11

       B.   Iran's Material Support ................................................................... 15

       C.   The Taliban-led Syndicate Committed Each of the Bellwether Attacks ................. 16

       D.   Personal Injury or Death ................................................................. 17

       E.   Causation ........................................................................................ 18

       F.   Additional Requirements for a Federal Court to Hear Claims ................................ 22

IV.    PERSONAL JURISDICTION ...................................................................... 23

V.     FEDERAL CAUSE OF ACTION AND DAMAGES ................................... 25

CONCLUSION ............................................................................................................. 26

## TABLE OF AUTHORITIES[*]

**CASES**

*Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39 (D.D.C. 2008) ................................10

*Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71 (D.D.C. 2017)........................................11

*Est. of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107(D.D.C. 2018)................21, 22

*Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186 (D.D.C. 2017) ..................................... 21-22

*\*Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. 2020)........17, 18, 19, 20, 21, 25

*Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran*, 313 F. Supp. 3d 50 (D.D.C. 2018) .....9

*Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) ....................................25

*Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88 (D.D.C. 2017)                ...................12

*Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044 (D.C. Cir. 2014) ................9

*Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019)................................12, 25

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123 (D.C. Cir. 2004).............18

*Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136 (D.D.C. 2010)....................................25

*Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475 (D.D.C. 2021) ...........................................13

*Owens v. Republic of Sudan*, 826 F. Supp. 2d 128 (D.D.C. 2011)................................................20

*Owens v. Republic of Sudan*, 174 F. Supp. 3d 242 (D.D.C. 2016),
    *aff'd*, 864 F.3d 751 (D.C. Cir. 2017), *vacated and remanded on*
    *other grounds by Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020) ......................11, 13

*\*Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017),
    *vacated and remanded on other grounds by*
    *Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020)............................. 9-10, 18, 19, 21, 22

*Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002)....................23

*Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204 (D.D.C. 2012) ..........................................9

---

[*] Authorities on which counsel chiefly relies are denoted with an asterisk, per Local Civil Rule 7(a).

*Sotloff v. Syrian Arab Republic*, No. 18-CV-1625, 2021 WL 965882 (D.D.C. Mar. 15, 2021)....20

*Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22 (D.D.C. 2016) ......................................10

*Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52 (D.D.C. 2010) ......................................23

*Van Beneden v. Al-Sanusi*, 709 F.3d 1165 (D.C. Cir. 2013) .................................................. 12-13

*Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84, 94 (D.D.C. 2014),
   *aff'd in part, vacated in part sub nom. Owens v. Republic of Sudan*,
   864 F.3d 751 (D.C. Cir. 2017) ...........................................................................................25

## STATUTES

Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891
   (codified as 28 U.S.C. §§ 1602-1611):

   *28 U.S.C. § 1605A ......................................................................................... *passim*

   28 U.S.C. § 1608 ............................................................................................23, 24

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992)
   (codified at 28 U.S.C. § 1350 note) ...........................................................11, 13

18 U.S.C. § 2339A ...............................................................................................15

28 U.S.C. § 1330(a) ............................................................................................10

28 U.S.C. § 1330(b) ............................................................................................23

## LEGISLATIVE MATERIALS AND OTHER AUTHORITIES

H.R. Rep. No. 104-383 (1995)...............................................................................13

United Nations, International Convention Against the Taking of Hostages,
   No. 21931, Art. I (Dec. 17, 1979).......................................................................14

Under this Court's Revised Case Management Order, Dkt. 45[1], Plaintiffs file this motion for default judgment against the Islamic Republic of Iran ("Iran").  Iran has been in default since October 16, 2020.  *See* Dkt. 21.  The Court has scheduled an evidentiary hearing, to begin on October 18, 2021, at which Plaintiffs will present evidence establishing Iran's liability.  In this motion, Plaintiffs preview the evidence they will present at that upcoming hearing and explain how that evidence will satisfy the legal requirements for a default judgment.

## INTRODUCTION

This is a civil action against Iran under the terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A ("FSIA").  Plaintiffs are American service members and civilians, and their family members, who were killed or wounded in terrorist attacks while serving in Afghanistan between 2007 and 2019.  Members of a terrorist syndicate in Afghanistan, led by the Taliban, committed each of those attacks.  This Syndicate comprised the Taliban, including a Taliban component and designated Foreign Terrorist Organization known as the Haqqani Network; al-Qaeda; and other terrorist groups operating in and around Afghanistan.  The Syndicate's constituent members jointly attacked U.S. and Coalition targets throughout Afghanistan.  The Syndicate's goal, which it has now achieved, was to expel American and Coalition forces from Afghanistan and overthrow Afghanistan's democratically elected government.

Iran, which has been designated as a State Sponsor of Terrorism since 1984, sponsored those terrorist attacks to further its own anti-American policies and eliminate the U.S. presence along its eastern border.  Iran has a long history of supporting radical Islamist and anti-American

---

[1] Unless otherwise specified, citations to "Dkt." are to the docket entries in *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835-JDB.

terrorist groups through the Iranian Revolutionary Guard Corps ("IRGC") – a paramilitary state institution responsible for implementing Iranian foreign policy.  The IRGC, which is a designated Foreign Terrorist Organization, regularly uses terrorist groups as proxies to achieve these goals, particularly in areas where Iran has strategic reasons to avoid open warfare.  In Afghanistan, Iran supported the Taliban and other members of the Syndicate by, among other things, training the terrorists to attack Americans more effectively – both within Afghanistan and at training camps in Iran – and recruiting and paying terrorists who killed U.S. forces.  Iran also provided members of the Syndicate with countless sophisticated weapons.  The Taliban-led Syndicate used this support to attack Plaintiffs or their family members.

The evidence of Iran's role in sponsoring the Taliban-led Afghan insurgency is overwhelming.  It includes U.S. State Department and Treasury Department terror designations; official U.S. State Department and Defense Department reports; U.S. military intelligence records; scholarly analyses; press reports; primary-source documents and photographs taken in Afghanistan; and statements from the terrorists themselves.  Plaintiffs' experts will synthesize all this evidence and explain that Taliban-led terrorists killed and injured Plaintiffs – and that Iran intentionally helped them do it.  That is more than enough to establish Iran's liability under the FSIA's terrorism exception.

## I.        BELLWETHER EVIDENTIARY HEARING

### A.        Overarching Liability Testimony

At the bellwether evidentiary hearing, Plaintiffs will first present expert testimony about the overarching liability issues relevant to all of the attacks in *Cabrera* and the Afghanistan-based *Zambon* attacks, which were consolidated for purposes of the evidentiary hearing.  *See Zambon et al. v. Islamic Republic of Iran, et al.*, 18-cv-02065 (May 27, 2021), Dkt. 30.  As Plaintiffs have previously explained (Dkt. 27 at 5), they have retained two experts – Mr. William

F. Roggio and Dr. Colin P. Clarke – to address those broader liability topics.  In developing their expert opinions on these issues, Mr. Roggio and Dr. Clarke have relied on a variety of evidence – including many government reports that are independently admissible.  Mr. Roggio and Dr. Clarke have also reviewed and relied upon an array of recently declassified government documents produced by the Department of Defense and State Department in response to Plaintiffs' subpoenas in this case.

Mr. Roggio will first testify about the structure of the Taliban-led Syndicate operating in Afghanistan, including the operations of and relationships between each of the Syndicate's component members.  He will then testify about Iran's material support for these terrorist groups and their attacks.  The testimony will show Iran's history of sponsoring terrorist groups to further its foreign-policy agenda and Iran's specific support for the Taliban and affiliated groups in Afghanistan.  As Mr. Roggio will explain in detail – based in substantial part on his own contemporaneous analysis he developed over more than a decade studying the Afghan insurgency – there is overwhelming evidence of Iran's support for the Taliban and al-Qaeda in Afghanistan.  That support included Iran's provision of weapons, explosives, lodging, transportation, training, expert advice, personnel, and funding.  Authoritative U.S. government reports have confirmed the existence of that support.  Mr. Roggio will analyze those reports and a bevy of additional declassified evidence that Plaintiffs have obtained in this case.  In Mr. Roggio's expert opinion, Iran's material support for the Taliban-led Syndicate achieved its desired goal of maiming and killing U.S. soldiers, eventually driving the United States from Afghanistan.

Dr. Clarke will also testify about Iran's support for the Taliban, focusing on its support of the Taliban's drug trafficking – one major source of the Taliban's revenue.  His discussion of the

Taliban-led Syndicate will concentrate on its tactics, techniques, and procedures and its areas of operational dominance within Afghanistan.  In Dr. Clarke's expert opinion, these factors indicate the Taliban likely carried out all of the attacks on Plaintiffs in this case.

### B.       Attack-Specific Testimony

After establishing the broader principles applicable to every attack in this case, Plaintiffs' presentation will turn to the specific bellwether attacks.  Although the final bellwether attack list will be submitted to the Court on October 4, 2021, Plaintiffs currently plan to present eleven bellwether attacks at the hearing.  *See* Dkt. 45.  Plaintiffs selected these attacks to represent each of the regions where members of the Taliban-led Syndicate had operational dominance and each type of attack committed by the Syndicate.  Dkt. 27 at 6-8.  Thus, Plaintiffs anticipate that their evidence about the bellwether attacks will provide the Court with a framework for later analyzing the non-bellwether attacks too.

*First*, the Court will hear from a retired U.S. Army Colonel who was deployed from August 2007 to August 2008 in Kandahar Province as the Taliban was re-emerging as a formidable terrorist threat in the area.  He will testify about his first-hand experience of the Taliban's operational dominance and tactics, techniques, and procedures – particularly its use of Improvised Explosive Devices ("IEDs") – in Helmand and Kandahar Provinces and the surrounding area.  This testimony will bear directly on the two IED attacks in that area that Plaintiffs anticipate presenting as bellwether attacks, but it will also be more widely applicable: almost half of the direct victims in this case were attacked in Helmand or Kandahar Provinces. Moreover, more than 60% of the direct victims suffered IED attacks.

*Second*, three individual plaintiffs will testify about the details of the attacks in which they were injured.  Two of these individuals are former American service members who were injured in terrorist attacks while deployed to Afghanistan.  The third witness is an American

citizen who was kidnapped while working in Kabul and held hostage by the Taliban for more than three years.  Each of these Plaintiffs will also testify about the mental and physical suffering they have experienced as a direct result of the terrorist attacks.

*Third*, Plaintiffs will offer expert testimony from LTC Steven Wood (Ret.).  *See* Dkt. 27 at 8-9.  LTC Wood (Ret.) will evaluate the eleven bellwether attacks in detail and offer his expert opinion that the Taliban-led Syndicate committed each one.  In reaching his expert opinion, LTC Wood (Ret.) will examine each attack's location and date; the tactics, techniques, and procedures the attack employed; any terrorist claims of responsibility; any U.S. government or Coalition attribution findings; and additional information from eyewitnesses or other individuals with knowledge of the theater.  In employing his methodology for analyzing these attacks, LTC Wood (Ret.) will rely on his extensive knowledge and experience, the factual testimony presented at the hearing, his interviews of or affidavits by eyewitness, and independently admissible government reporting about the attacks.

LTC Wood (Ret.) will explain that, for most of the bellwether attacks, he has obtained significantly more evidence than is necessary to attribute the attack to members of the Syndicate. In fact, in certain geographies during specific time periods, members of the Syndicate almost certainly committed every terrorist attack that took place against Coalition forces.  After concluding that the Syndicate was responsible for each bellwether attack, LTC Wood (Ret.) will opine that Iran's support contributed to the Syndicate's ability to commit each of them.

*Finally*, one of the Plaintiffs, the widow of an American service member, will testify to the effect of her husband's murder on her life and family.  Following the hearing, Plaintiffs will submit additional damages evidence, in the form of affidavits, from the other family members of the four Plaintiffs who testify live at the hearing. Dkt. 45 at 2.  As noted in previous

submissions, Plaintiffs plan to submit damages evidence for other Plaintiffs associated with bellwether attacks to Special Masters later in the litigation. *See*, *e.g.*, *id.*

## II.   LEGAL FRAMEWORK

Plaintiffs seek money damages via the private right of action in the FSIA's terrorism exception, 28 U.S.C. § 1605A(c). "In the FSIA context, default judgment may be entered if: (1) the court has subject matter jurisdiction over the claims; (2) personal jurisdiction is properly exercised over Defendant; and (3) Plaintiff has presented satisfactory evidence to establish its claim against Defendant." *Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran*, 313 F. Supp. 3d 50, 56 (D.D.C. 2018).

Plaintiffs do not have the same evidentiary obligations present in other civil cases. As the D.C. Circuit has recognized, "courts have the authority—indeed, we think, the obligation—to adjust evidentiary requirements to differing situations." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014) (alterations and quotations omitted). In FSIA terrorism cases, courts liberally construe the Rules of Evidence so as not to permit defaulting state sponsors of terrorism to "effectively immunize themselves by killing their victims, intimidating witnesses, and refusing to appear in court." *Id.*

This Court should follow that practice here. At the evidentiary hearing, the Court "may not unquestioningly accept a complaint's unsupported allegations as true," *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012), but "[u]ncontroverted factual allegations that are supported by admissible evidence are taken as true," *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016). Indeed, the D.C. Circuit has held that Plaintiffs may prove their FSIA claims "using evidence that might not be admissible in a trial"; this Court is not required "to step into the shoes of the defaulting party and pursue every possible evidentiary challenge." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017),

*vacated and remanded on other grounds by Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).

The D.C. Circuit has further sanctioned the liberal use of experts in these cases, explaining that

"reliance upon secondary materials and the opinions of experts is often critical in order to

establish the factual basis of a claim under the FSIA terrorism exception." *Id.* at 787. "As long

as the evidence itself is admissible, as expert testimony certainly may be, and the court finds it

satisfactory, its form or type is irrelevant." *Id.* at 788. Finally, this court may also "take judicial

notice of related proceedings and records." *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp.

2d 39, 43 (D.D.C. 2008).

As explained below, the evidence Plaintiffs plan to adduce at the hearing will satisfy each

of the statute's legal requirements.

### III.        SUBJECT-MATTER JURISDICTION

This Court has "original jurisdiction" over this claim under the FSIA. 28 U.S.C.

§ 1330(a) (conferring jurisdiction over claims from "which the foreign state is not entitled to

immunity"). That is because § 1605A of the FSIA divests Iran of sovereign immunity and

creates a private right of action for Plaintiffs. *See* 28 U.S.C. § 1605A(c). The terrorism

exception provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United
> States or of the States in any case not otherwise covered by this chapter in which
> money damages are sought against a foreign state for personal injury or death that
> was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage
> taking, or the provision of material support or resources for such an act if such act
> or provision of material support or resources is engaged in by an official,
> employee, or agent of such foreign state while acting within the scope of his or
> her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). Plaintiffs satisfy the initial requirements because they are seeking

money damages from the foreign state of Iran. *See* Second Am. Compl. Prayer for Relief (Dkt.

30). Plaintiffs also will demonstrate that each of the bellwether attacks was an act of

"extrajudicial killing" or "hostage taking" as defined in the statute.  The evidence will further show that Iranian officials, employees, or agents – acting within the scope of their authority – provided "material support" for the Taliban-led Syndicate, which committed each of the bellwether attacks.  Finally, Iran's material support proximately caused Plaintiffs' injuries. Plaintiffs address each of these requirements in additional detail below.

### A.      Extrajudicial Killing or Hostage Taking

At the evidentiary hearing, Plaintiffs will demonstrate that ten of the eleven bellwether attacks were "extrajudicial killings" and that the eleventh was a "hostage taking."  28 U.S.C. § 1605A(a)(1).  An extrajudicial killing is a "deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.  Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation."  Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note); *see* 28 U.S.C. § 1605A(h)(7) (applying the definition of extrajudicial killing "in section 3 of the Torture Victim Protection Act of 1991").

LTC Wood (Ret.) will testify – based on official government reporting that is independently admissible – that nine of the attacks killed one or more U.S. soldiers.  Some Plaintiffs were severely injured in these attacks (which killed others).  As this Court and other courts in this District have recognized, sovereign immunity is waived for claims brought by those physically injured in an attack that killed others because "the same <u>act</u> of killing one person can quite obviously injure another."  *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 266 (D.D.C. 2016) *aff'd*, 864 F.3d 751, 788 (D.C. Cir. 2017), *vacated and remanded on other grounds by Opati*, 140 S. Ct. 1601 (emphasis in original).  *See also Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017) ("Plaintiffs need only establish that the bombing here

was unauthorized, deliberate, and that there were casualties.  It is not necessary, however, for one of the plaintiffs to have died in the attack in order for the state-sponsor-of-terrorism exception to apply.").

In the tenth bellwether attack, the Syndicate planted an IED that severely wounded a U.S. soldier without killing anyone.  As other courts in this District have recognized, Iran lacks sovereign immunity over claims based on this attack, and other similar non-bellwether attacks, for three reasons.  *First*, as a textual matter, § 1605A strips sovereign immunity for claims for "personal injury *or* death that was caused by an act of . . . extrajudicial killing. . . *or the provision of material support or resources for such an act*.  28 U.S.C. § 1605A(a)(1) (emphasis added).  "Nothing on the face of Section 1605A(a)(1) requires that the material support or resources for an intended extrajudicial killing actually result in someone's death, as long as the victim represented in the case was injured."  *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 57 (D.D.C. 2019).  As discussed below, the evidence will show that Plaintiffs' injuries were proximately caused by Iran's material support for an intend act of extrajudicial killing; therefore, Iran does not have immunity.

*Second*, "the Torture Victim Protection Act's definition of extrajudicial killing allows plaintiffs to assert liability for a defendant's attempted extrajudicial killing, even if no one died as a result of that attempt."  *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017).  LTC Wood (Ret.) will testify that the planting and arming of an IED reflects significant planning and an intent to kill whoever triggered it.  It thus constitutes an attempt, which is an extrajudicial killing under the FSIA.

*Third*, to the extent any ambiguity remains, the Court should interpret the statute "flexibly and capaciously" to promote its purpose.  *Van Beneden v. Al-Sanusi*, 709 F.3d 1165,

1167-68 (D.C. Cir. 2013).  The legislative history characterizes the exceptions to sovereign

immunity as allowing recovery "where Americans and/or their loved ones suffer *injury* or death

at the hands of the terrorist states," H.R. Rep. No. 104-383, at 62 (1995), and it does not evince

Congress's intent to require that someone die in each attack.

 Next, LTC Wood (Ret.) will explain that the nature of the tactics used in these attacks

indicates that they were "deliberated" – or "undertaken with careful consideration, not on a

sudden impulse." *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 491 (D.D.C. 2021)

(quoting *Salzman v. Republic of Iran*, No. 17-cv-2475 (RDM), 2019 WL 4673761, at *13

(D.D.C. Sept. 25, 2019)).  The tactics used in the bellwether attacks included planting IEDs for

U.S. soldiers to encounter them, launching rockets at U.S. military bases, and driving car bombs

into transport vehicles.  Such tactics require significant advanced planning.  Even with respect to

those attacks where the terrorists may not have known in advance that they would have a specific

opportunity, such as to fire at a convoy or shoot down a helicopter, LTC Wood (Ret.) will testify

that the terrorists were relying on significant advanced training to execute pre-studied tactics as

part of a deliberately planned terrorist campaign.  In other words, the terrorists were acting "in a

cool state of blood, in furtherance of a fixed design . . . and not under the influence of a violent

passion." *Owens*, 174 F. Supp. 3d at 263 (citation omitted).  Even for these more opportunistic

attacks, the terrorists planned in advance how they would respond to such an opportunity, and

they "intended those actions to result in death." *Id.* at 260.

 Finally, these attacks were not "authorized by a previous judgment pronounced by a

regularly constituted court."  Pub. L. No. 102-256 § 3(a), 106 Stat. 73 (codified at 28 U.S.C.

§ 1350 note).  Nor were any of the attacks "lawfully carried out under the authority of a foreign

nation." *Id.*  As Mr. Roggio will testify, the pre-2001 Taliban had *de facto* control of

Afghanistan, but it did not function as a government.  Only three countries – Saudi Arabia, Pakistan, and the United Arab Emirates – ever recognized the Taliban as the rightful government of Afghanistan, and all withdrew their recognition by November 2001, after the Taliban fled Kabul.  The evidence will demonstrate that by the time the earliest attack at issue in this case occurred – in 2007 – the United States had declared an end to major combat operations in Afghanistan, the Afghan people had ratified a new constitution forming the Islamic Republic of Afghanistan, and the first presidential election had occurred.  The Taliban was not a foreign nation, it was a regenerating terrorist insurgency that routinely violated the laws of war by not wearing uniforms and engaging in indiscriminate violence towards civilians.  Therefore, these ten attacks constitute an extrajudicial killing within the meaning of the statute.

Plaintiffs will then show that the eleventh attack was a "hostage taking."  Section 1605A – adopting the definition in Article 1 of the International Convention Against the Taking of Hostages, *see* 28 U.S.C. § 1605A(h)(2) – defines a hostage taking as occurring when one "seizes or detains and threatens to kill, to injure or to continue to detain another person ( . . . 'hostage') in order to compel a third party, namely, a State . . . to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage."  United Nations, International Convention Against the Taking of Hostages, No. 21931, Art. I (Dec. 17, 1979).  The hostage from this attack will testify that he was kidnapped by the Taliban, held for more than three years, and repeatedly informed that he had been kidnapped so that the Taliban could negotiate with the United States to release him in exchange for the release of Taliban prisoners.  That hostage was eventually released as part of a direct exchange for multiple Taliban leaders.  This attack constituted a "hostage taking" that supports liability under the statute.  28 U.S.C. § 1605A(a)(1).

### B.    Iran's Material Support

Iran does not have sovereign immunity for claims arising from "material support or resources" provided "by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A(a)(1). The term "material support or resources" is defined as:

> [A]ny property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

See 18 U.S.C. § 2339A(b)(1); 28 U.S.C. § 1605A(h)(3) (adopting the definition of material support in 18 U.S.C. § 2339A(b)(1)). The expert testimony – based on an array of public and non-public evidence – will show that Iran provided the Syndicate with many types of material support. In Mr. Roggio's expert opinion, Iran gave the Taliban a wide range of "weapons, lethal substances, [and] explosives" including AK-47s, explosives and other materials to make suicide vests and car bombs, IEDs, explosively formed penetrators, 107mm rockets, mortars, rocket-propelled grenades and launchers, recoilless rifles, PKM machine guns, light machine guns, anti-tank mines, and ammunition. Iran also provided the Taliban with critical training, including by running training programs in Afghanistan and bringing Taliban fighters to extensive training camps in Iran. Iranian officials traveled to Afghanistan and provided expert advice to Taliban leaders. And Iran permitted the Taliban to establish offices in Iran from which it could plan attacks. Mr. Roggio will also discuss Iran's direct financial support for the Taliban, including providing lump sums to Taliban leadership to fund their operations and directly paying Taliban fighters for killing U.S. soldiers or destroying military vehicles. Mr. Roggio will then testify about Iran's material support of al-Qaeda. Finally, Dr. Clarke will testify about Iran's

facilitation of the Taliban's lucrative drug trade, a "service" within the definition of material support.

Mr. Roggio will also testify that the Iranian government provided material support for multiple members of the Taliban-led Syndicate through members of the IRGC and Qods Force – a special foreign division of the IRGC.  Mr. Roggio will discuss the IRGC's history of implementing Iran's foreign policy by backing anti-American terrorist organizations.  Mr. Roggio will explain, based on open sources and declassified military intelligence reports, that the Qods Force is broken into regional commands with specific areas of focus, including the Fourth Corps that focuses on operations in Afghanistan, including supporting the Taliban.  Indeed, many of the primary sources identify the IRGC, Qods Force, or Fourth Corps as the source of the support.  In Mr. Roggio's opinion, the upper echelons of the Iranian government directed the material support Iran provided to the Taliban and associated groups.  Thus, the members of the IRGC and Qods Force who directly provided the material support to the Taliban were officials or employees of Iran "acting within the scope of his or her office, employment, or agency." Similarly, Dr. Clarke will testify that Iranian intelligence officers, IRGC members, and other government officials acted in their official capacities in facilitating the Taliban's drug trafficking.

### C.    The Taliban-led Syndicate Committed Each of the Bellwether Attacks

The evidence will show that the Taliban-led Syndicate committed each of the eleven bellwether attacks.  First, Mr. Roggio will explain that a terrorist syndicate existed in Afghanistan during the relevant time period.  Mr. Roggio will testify that this Syndicate comprised the Taliban, including the Haqqani Network; al-Qaeda; and other terrorist groups working together to attack Americans and overthrow Afghanistan's democratically elected government.  The members of the Syndicate met as a group to plan their joint terrorist campaign

throughout Afghanistan, and their cooperation was particularly pronounced in the capital, Kabul, where the U.S. government referred to the Syndicate as the "Kabul Attack Network."  The members of the Syndicate shared training, money, and resources, and they regularly worked together to commit individual attacks.

Dr. Clarke will discuss the tactics, techniques, and procedures used by the Taliban and other members of the Syndicate, including those used in the bellwether attacks.  Dr. Clarke will also explain his conclusion that the Taliban-led Syndicate had operational dominance in each of the particular Afghan provinces where the attacks at issue – both bellwether and non-bellwether – occurred during the relevant time period.

LTC Wood (Ret.) will then examine each of the eleven bellwether attacks and explain his expert opinion that the Taliban-led Syndicate committed each one.  As discussed above, LTC Wood (Ret.) reaches his conclusion about the perpetrator of each attack by considering the location, the time period, the tactics, techniques, and procedures the attackers used, terrorist claims of responsibility, official U.S. government or Coalition attributions of responsibility, and observations made by eyewitnesses or other individuals with knowledge of operations in the area.

### D.      Personal Injury or Death

The evidence will show that each Plaintiff associated with the bellwether attacks suffered personal injury or death satisfying § 1605A(a)(1).  Three Plaintiffs will testify at the hearing about the physical and mental injuries they have suffered as a result of the bellwether attacks.  An additional Plaintiff who was wounded in one of the bellwether attacks will submit a declaration establishing his physical and mental injuries stemming from the attack.

The statute also "encompass[es] claims by family members of those injured or killed for the distress caused by their relative's injuries, also known as solatium actions."  *Force v. Islamic*

*Republic of Iran*, 464 F. Supp. 3d 323, 359 (D.D.C. 2020).  Such claims "also satisfy the personal injury requirement of § 1605A(a)(1)."  *Id.*  The Court will hear live testimony about such mental and emotional injuries from one Plaintiff – the widow of an American service member.  In accordance with the Case Management Order, Dkt. 45 at 2, Plaintiffs will later submit affidavits proving such injuries from the family members of the four Plaintiffs who testify at the hearing.  Additional Plaintiffs associated with the bellwether attacks will submit such evidence to Special Masters rather than directly to the Court.  *Id.*

        **E.**     **Causation**

      Plaintiffs must demonstrate that their "personal injury or death . . . was *caused by*" Iran's "material support or resources *for*" the acts of "extrajudicial killing" and "hostage taking."  28 U.S.C. § 1605A(a)(1)(emphasis added).  The D.C. Circuit has long rejected the argument that "a state's material support must go directly for the specific act."  *Owens*, 864 F.3d at 799 (quoting *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004)) (examining identical textual language in § 1605(a)(7)).  Such a limitation "would likely render . . . [the] material support provision ineffectual because material support is fungible and terrorist organizations can hardly be counted on to keep careful bookkeeping records."  *Id.* (internal quotations omitted).  In other words, the FSIA strips of immunity both a foreign state that "specifically instructs" a terrorist organization "to carry out an attack against a U.S. citizen" and one that "only provides general support, but was not involved with the act giving rise to the suit."  *Kilburn*, 376 F.3d at 1128.

      Nor does the statutory text require Plaintiffs to show that Iran's material support for the Taliban-led Syndicate was a "but for" cause of their injuries.  Instead, Plaintiffs need show only that Iran's support proximately caused their injuries.  *See Owens*, 864 F.3d at 799.  Proximate causation has two elements:  (1) "the defendant's actions must be a substantial factor in the

sequence of events that led to the plaintiff's injury" and (2) "the plaintiff's injury must have been reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct."  *Id.* at 794 (internal quotations omitted).

        *1.*    *Iran's Material Support for the Syndicate Was a Substantial*
            *Factor in the Attacks*

The provision of weapons, funding, safe harbor, and training to a terrorist group, thereby increasing the group's capabilities, is a substantial factor in subsequent attacks committed by that group.  In *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. 2020), Judge Moss considered claims against Iran and Syria for their material support of two terrorist organizations – Hamas and Palestinian Islamic Jihad ("PIJ") – stemming from eight attacks committed by one of those organizations.  Similar to the evidence Plaintiffs described above, the *Force* plaintiffs presented expert testimony that Iran provided Hamas with "cash, weapons, and training" as well as "logistical support to Hamas and military training to its members," including "oversee[ing] training camps in its own territory and in Lebanon for the purpose of training Hamas members." *Id.* at 338 (internal quotations omitted).  They offered similar evidence of Iran's support for PIJ, including expert testimony about Iran instituting "an incentive system . . . for successful attacks" and the interception of a shipment of "mortars, bullets and rockets" in containers with "seals of the Iranian postal company."  *Id.* at 340.  The *Force* plaintiffs demonstrated that Syria supported Hamas by permitting it to establish an operation base in Syria from which it could "conduct its foreign relations, communicate to the world, host its military leaders, and plan its violent operations and fundraise."  *Id.* at 342 (internal quotation omitted).  And Syria supported PIJ by allowing it to conduct "a vast array of communication, political, fundraising, and operational activities" as well as "maintain[] a training facility" within its borders.  *Id.*

The court in *Force* recognized that there was no evidence that "either Iran or Syria's support was tied to each of the attacks that caused [the plaintiffs'] injuries," but reasoned that "such a 'nexus' is not necessary." *Id.* at 368. Instead, Iran's support was a substantial factor in the eight attacks because "Iran's financial and military aid to the two groups was essential to each group's operating capacity and . . . , without Iran's backing, both groups would be substantially weakened." *Id.* Similarly, and even though Syria had withdrawn support more than four years before the first attack, the earlier support "contributed to giving the group the military edge and sophistication it needed to be able to conduct and carry out successful violent operations for many years thereafter." *Id.*

This Court, affirmed by the D.C. Circuit, similarly concluded that proximate cause existed when "Sudan provided the safe harbor necessary to allow al Qaeda to train and organize its members for acts of large-scale terrorism [. . . and] facilitated its safe harbor through constant vigilance by its security services and the provision of documentation required to shelter al Qaeda from foreign intelligence services and competing terrorist groups," even though there was no evidence that support was for the specific attack. *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 151 (D.D.C. 2011). Iran's multifaceted support for the Syndicate's terrorist campaign exceeds the support this Court found sufficient in *Owens*. Moreover, multiple other courts have reached similar conclusions about causation. *See*, *e.g.*, *Sotloff v. Syrian Arab Republic*, No. 18-CV-1625, 2021 WL 965882, at *12 (D.D.C. Mar. 15, 2021) ("Syria's material support to ISIS — its release of prisoners, financial relationship with ISIS, and military coordination with it — was a substantial factor in its development into a wealthy proto-state with sophisticated, battle-hardened leadership that controlled large swaths of territory" and was able to hold two prisoners "hostage in multiple locations, torture them for extended periods, behead them outdoors, and use

their deaths for propaganda purposes"); *Est. of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 120 (D.D.C. 2018) (concluding that Iran's provision of "weaponry, munitions, training, and millions of dollars in financial support" was a substantial factor in a Hamas attack at a school in Jerusalem).

As explained above, the evidence will demonstrate that Iran provided weapons, training, transport, safe haven, expert advice, and financial support for the Taliban-led Syndicate that committed these attacks.  Mr. Roggio will further opine that the U.S. invasion in 2001 largely destroyed the Taliban, and that Iran's material support was crucial to enabling the Taliban to reconstitute itself as a powerful terrorist organization able to mount an effective insurgency against Coalition forces.  LTC Wood (Ret.) will also testify that, in his opinion, Iran's material support contributed to the Syndicate's ability to conduct each of the bellwether attacks at issue in this case.  The Court should thus conclude that Iran's support was a substantial factor in causing the resulting injuries.

### 2.   *The Results Were Reasonably Foreseeable to Iran*

To establish proximate cause, Plaintiffs must also demonstrate that their injuries were "reasonably foreseeable or anticipated as a natural consequence" of Iran's material support for the Taliban-led Syndicate.  *Owens*, 864 F.3d at 794.  Mr. Roggio's expert testimony will show that Iran expressly *intended* for its material support for the Taliban-led Syndicate to injure and kill Americans, including both service members and civilians.  Iran provided this aid to the Taliban as part of its broader campaign to support anti-American terrorist groups in the area. Iran wanted to inflict casualties on Coalition forces and eliminate the U.S.'s presence in the entire region.  When Iran's support for a terrorist organization is "part of a broader geopolitical strategy, . . . . [t]he death and injury to innocent people and the suffering of their families was, by any measure, foreseeable."  *Force*, 464 F. Supp. 3d at 369.  *See also Foley v. Syrian Arab*

*Republic*, 249 F. Supp. 3d 186, 204 (D.D.C. 2017) (finding the foreseeability prong satisfied

when Plaintiffs presented expert testimony that "Syria's support for the Zarqawi Terrorist

Organization was given for the purpose of allowing this group to commit precisely the types of

terrorist attacks at issue, so as to cause unrest in Syria's neighboring countries which Syria

viewed as being to its political advantage").  Plaintiffs do not need to show that Iran intended the

Taliban-led Syndicate to commit the *particular* bellwether attacks:  "a state sponsor of

terrorism . . . may not avoid liability for supporting known terrorist groups by professing

ignorance of their specific plans for attacks."  *Owens*, 864 F.3d at 799.

## F.    Additional Requirements for a Federal Court to Hear Claims

Plaintiffs must further must establish that:  (1) "the foreign state was designated as a state

sponsor of terrorism at the time the act . . . occurred," 28 U.S.C. § 1605A(a)(2)(A)(i)(I); (2) "the

claimant or the victim" was, at the time of the attack, "a national of the United States," "a

member of the armed forces," or a U.S. Government employee or contractor, *id.*

§ 1605A(a)(2)(A)(ii); and (3) that if the attack occurred in the defendant foreign state, the

plaintiff has offered to arbitrate the claims, *id.* § 1605A(a)(2)(A)(iii).  The evidence presented at

the hearing will show that Plaintiffs meet these three requirements.  *First*, to prove that Iran "was

designated as a state sponsor of terrorism at the time the act . . . occurred," *id.*

§ 1605A(a)(2)(A)(i)(I), Plaintiffs will submit the U.S. government designation of Iran as a state

sponsor of terrorism in January 1984 and other government records showing Iran has remained

designated at all times since.  The Court can also take judicial notice of the countless other

decisions establishing this fact.  *See*, *e.g.*, *Est. of Hirshfeld,* 330 F. Supp. 3d at 133.  *Second*,

Plaintiffs will submit evidence that, at the time of the act, each direct victim or family member

plaintiff was "a national of the United States," "a member of the armed forces," or a U.S.

government employee or contractor.  The vast majority of the victims were members of the

armed forces, as demonstrated by numerous government records.  And most Plaintiffs are U.S. citizens who will submit documentary proof of their citizenship – in the form of a U.S. passport or birth certificate – or attest to their citizenship in an affidavit.  *Third*, because the acts of extrajudicial killing and hostage taking did not take place in Iran, Plaintiffs were not required to offer to arbitrate these claims.

## IV.        PERSONAL JURISDICTION

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of this title."  28 U.S.C. § 1330(b).  The Court does not need to consider whether exercising personal jurisdiction is consistent with due process because "foreign states are not 'persons' protected by the Fifth Amendment."  *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002).  As explained above, this Court has subject matter jurisdiction over these claims.  The Court thus can exercise jurisdiction as long as service was proper.  Section 1608 prescribes four methods of service on a foreign state.  *See* 28 U.S.C. § 1608(a).  "Plaintiffs must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on."  *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 69 (D.D.C. 2010).

On April 14, 2020, this Court granted the *Cabrera* Plaintiffs leave to proceed with service of the First Amended Complaint under 28 U.S.C. § 1608(a)(4) because they had exhausted the first three methods.  *See* April 14, 2020 Minute Order.  The *Cabrera* Plaintiffs properly effectuated service of the First Amended Complaint on Iran under § 1608(a)(4) by having the Clerk of the Court send by certified mail "two copies of the summons, complaint and a notice of suit, together with a translation of each into the official language of the foreign state" to the Secretary of State.  Dkt. 18; *see also* Dkt. 16.  The State Department delivered the documents to

the Foreign Interests Section of the Embassy of Switzerland in Tehran, which delivered them to

the Iranian Ministry of Foreign Affairs on August 16, 2020.  Dkt. 19.  The State Department then

"sen[t] to the clerk of the court a certified copy of the diplomatic note indicating when the papers

were transmitted," 28 U.S.C. § 1608(a)(4).  *See* Dkt. 19.  Because service was proper, the Court

has personal jurisdiction over Iran for the claims by the *Cabrera* Plaintiffs.[2]

The Court also has personal jurisdiction over Iran for the claims brought by the

Afghanistan-based *Zambon* Plaintiffs.  The *Zambon* Plaintiffs were able to attempt service under

28 U.S.C. § 1608(a)(3) on December 12, 2018.  *See Zambon*, Dkt. 9.  More than 30 days later, on

February 13, 2019, the *Zambon* Plaintiffs initiated service via diplomatic channels.  *See Zambon,*

Dkt. 12.  The Clerk of the Court sent the State Department the necessary documents on February

22, 2019.  *Zambon*, Dkt. 14.  On June 7, 2019, the State Department informed the Clerk that the

Embassy of Switzerland in Tehran had served the documents on the Iranian Ministry of Foreign

Affairs on April 28, 2019.  *Zambon*, Dkt. 16.  As a result, the Court also has personal jurisdiction

over Iran for the claims by the Afghanistan-based *Zambon* Plaintiffs.

---

[2] With the Court's leave, the *Cabrera* Plaintiffs filed a Second Amended Complaint on
February 23, 2021.  Dkt. 30.  The Second Amended Complaint is identical to the First Amended
Complaint except for adding claims from additional plaintiffs who were killed or injured as a
result of terrorist attacks by the Taliban-led Syndicate in Afghanistan.  Service of this complaint
followed a similar trajectory.  *See* Dkts. 33, 40, and April 15, 2021 Minute Order.  At Plaintiffs'
request, the Clerk's Office dispatched the required documents to the State Department on April
19, 2021 for service under § 1608(a)(4).  Dkt. 42.  On August 17, 2021, the State Department
informed Plaintiffs' counsel that the diplomatic note was on its way back from Tehran (*see* Dkt.
47 at 4), and on September 14, 2021, the State Department informed Plaintiffs' counsel that it
had sent the certified copy to the Clerk of the Court.  The Clerk noted receipt of the service
package, indicating that Iran was served on August 2, 2021, on the docket on September 17,
2021.  Dkt. 50.  Although the Clerk did not file a certified copy of the diplomatic note on the
Docket, Plaintiffs' counsel believes that the Clerk has received the required copy and will place
it on the Docket shortly.  The Court can thus exercise personal jurisdiction over Iran for the
claims added in the Second Amended Complaint.

## V.       FEDERAL CAUSE OF ACTION AND DAMAGES

Plaintiffs bring claims solely pursuant to the private right of action under 28 U.S.C.

§ 1605A(c).  The elements for satisfying Iran's liability in this case are "essentially the same" as

the elements necessary to establish the waiver of sovereign immunity discussed above.  *Kilburn*

*v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010).  "In other words,

[§ 1605A(c)] creates a cause of action for the same conduct that gives rise to subject-matter

jurisdiction under the terrorism exception to sovereign immunity."  *Karcher v. Islamic Republic*

*of Iran*, 396 F. Supp. 3d 12, 59 (D.D.C. 2019).  Thus, "a plaintiff that offers proof sufficient to

establish a waiver of foreign sovereign immunity under § 1605A(a) has also established

entitlement to relief as a matter of federal law."  *Force*, 464 F. Supp. 3d at 369.  Under the

federal cause of action, "damages may include economic damages, solatium, pain and suffering,

and punitive damages."  28 U.S.C. § 1605A(c)(4).

The federal cause of action, § 1605A(c), does require that the plaintiff – rather than the

plaintiff *or* the victim – be a national of the United States, a member of the armed forces, or a

government employee or contractor.  28 U.S.C. § 1605A(c).  Further, as this Court has

recognized, generally "only immediate family members — parents, siblings, spouses, and

children — are entitled to solatium awards."  *Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84, 94

(D.D.C. 2014), *aff'd in part, vacated in part sub nom. Owens v. Republic of Sudan*, 864 F.3d 751

(D.C. Cir. 2017).  However, "immediate family members may include members of the victim's

household who are viewed as the functional equivalents of immediate family members."  *Fritz v.*

*Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) (internal quotations omitted).

The family member Plaintiffs thus must prove that they meet these additional requirements.

The Court has permitted some of the direct victim and family member Plaintiffs to

present damages evidence, both through testimony at the hearing and supplemental affidavits,

directly to the Court.  *See* Dkt. 45 at 2.  Each of these family member Plaintiffs will also present the required eligibility evidence – typically by offering documentary proof or a declaration– along with their evidence of damages.  As detailed in Plaintiffs' concurrently filed Motion for a Revised Case Management Order, Plaintiffs propose filing a supplemental brief concerning damages, proposed findings of fact and conclusions of law, and proposed damages awards for each of these family member Plaintiffs.  Other Plaintiffs associated with bellwether attacks will provide this eligibility and damages evidence to Special Masters at a later date.

## CONCLUSION

The Court should enter default judgment against Iran as to liability for claims associated with the eleven bellwether attacks following the evidentiary hearing.

Dated: September 20, 2021

Respectfully submitted,

/s/ Joshua D. Branson

Robert W. Cowan
DC Bar No. TX0148
Katie R. Caminati
TX Bar No. 24098079
Bailey Cowan Heckaman PLLC
Four Oaks Place
1360 Post Oak Blvd., Suite 2300
Houston, Texas 77056
Telephone: (713) 425-7100
Facsimile: (713) 425-7101
rcowan@bchlaw.com
kcaminati@bchlaw.com

*Counsel for Zambon Afghanistan-Based
Plaintiffs*

Joshua D. Branson (D.C. Bar No. 981623)
Andrew E. Goldsmith (D.C. Bar No. 1007074)
Grace W. Knofczynski (D.C. Bar No. 15000407)
James A. Ruck (D.C. Bar No. 1739309)
Kellogg, Hansen, Todd,
  Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com
gknofczynski@kellogghansen.com
jruck@kellogghansen.com

Ryan R. Sparacino (D.C. Bar No. 493700)
Sparacino PLLC
1920 L Street, NW, Suite 535
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com

Michael J. Gottlieb (D.C. Bar No. 974960)
Randall Jackson (D.C. Bar No. 490798)
Nicholas Reddick (D.C. Bar No. 1670683)
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, DC 20006-1238
Tel: (202) 303-1000
Fax: (202) 303-2000
MGottlieb@willkie.com
RJackson@willkie.com
NReddick@willkie.com

*Counsel for Cabrera Plaintiffs and Zambon
Afghanistan-Based Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of September, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

*/s/ Joshua D. Branson*

Joshua D. Branson
