**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AUGUST CABRERA, *et al*., | |
| Plaintiffs, | |
| v. | Case No. 19-cv-3835-JDB |
| ISLAMIC REPUBLIC OF IRAN, | |
| Defendant. | |
| MARK ZAMBON, *et al*., | |
| Plaintiffs, | |
| v. | Case No. 18-cv-02065-JDB |
| ISLAMIC REPUBLIC OF IRAN, | |
| Defendant. | |

<u>**PROPOSED FINDINGS OF FACT**</u>

# TABLE OF CONTENTS

I.      THE TERRORIST SYNDICATE OPERATING IN AFGHANISTAN ........................... 1

    A.      The Taliban ..................................................................................................... 2

    B.      The Haqqani Network ..................................................................................... 9

    C.      The Kabul Attack Network ........................................................................... 15

    D.      Al-Qaeda ....................................................................................................... 16

II.     IRAN'S SUPPORT FOR GLOBAL TERRORISM ........................................... 19

    A.      The Islamic Revolutionary Guard Corps ..................................................... 19

    B.      Qods Force .................................................................................................... 20

III.    IRAN'S MATERIAL SUPPORT FOR THE TALIBAN-LED TERRORIST
        SYNDICATE .................................................................................................... 22

    A.      Iran Provided the Taliban with Weapons and Explosives ............................ 24

    B.      Iran Provided the Taliban with Training ....................................................... 26

    C.      Iran Provided the Taliban with Financial Support ....................................... 27

    D.      Iran Provided the Taliban with a Safe Haven ............................................... 29

    E.      Iran Aided the Taliban's Drug-Trafficking Operations ................................ 30

IV.     IRAN'S RELATIONSHIP WITH AL-QAEDA ............................................... 32

V.      IRAN'S MATERIAL SUPPORT SUBSTANTIALLY CONTRIBUTED TO
        THE TERRORIST ATTACKS THAT KILLED AND INJURED PLAINTIFFS ......... 35

VI.     TALIBAN-LED SYNDICATE HAD OPERATIONAL DOMINANCE IN
        EACH OF THE PROVINCES WHERE AN ATTACK OCCURRED
        IN THIS CASE .................................................................................................. 37

VII.    BELLWETHER ATTACK TYPES ................................................................... 47

VIII.   BELLWETHER ATTACKS ............................................................................. 52

    A.      July 13, 2008 Complex Attack in Waygul District, Nuristan Province ....... 52

    B.      August 16, 2009 IED-Triggered Complex Attack in Siawashan Village,
           Herat Province ............................................................................................... 56

C.      April 11, 2010 IED in Arghandab District, Kandahar Province ................................... 58

D.      August 6, 2011 Attack on Helicopter in Tangi Valley, Wardak Province ................. 61

E.      October 29, 2011 Vehicle-Borne Suicide Bombing in Kabul City ............................. 63

F.      May 20, 2012 Suicide Vest Bomber in Tarin Kowt, Uruzgan Province ..................... 66

G.      May 31, 2012 IED in Zombalay District, Helmand Province ...................................... 69

H.      June 18, 2013 Indirect Fire Attack on Bagram Airfield, Parwan Province ................. 71

I.      July 15, 2013 82mm Recoilless Rifle Attack in Paktia Province ................................. 74

J.      August 7, 2016 Kidnapping in Kabul City .................................................................. 76

K.      June 10, 2017 Insider Attack in Pekha Valley, Nangarhar Province ........................... 80

IX.     EXPERT QUALIFICATIONS AND METHODOLOGY ............................................. 83

A.      Mr. William F. Roggio ................................................................................................. 83

B.      Dr. Colin Clarke ........................................................................................................... 88

C.      LTC (Ret.) Steven Wood .............................................................................................. 92

In accordance with the Court's Revised Case Management Order (Dkt. 54),[1] Plaintiffs submit the below proposed findings of fact.

## I.     THE TERRORIST SYNDICATE OPERATING IN AFGHANISTAN

1.      During the 2006 to 2019 time period, multiple terrorist groups operated in Afghanistan.  Tr. 25:24-26:21 (Roggio).[2]  This included — most prominently — the Taliban. Tr. 26:2-3 (Roggio); PX-1 at 15-27.  But there were other terrorist groups active in Afghanistan as well, including the Haqqani Network, which was an integral part of the Taliban, Tr. 26:4-5 (Roggio); 143:8-17 (Clarke); 191:22-192:1 (McGrath); PX-1 at 28-41; and al-Qaeda, Tr. 26:3-10 (Roggio); PX-1 at 41-61.

2.      These groups collectively made up a Taliban-led terrorist Syndicate in Afghanistan.  Tr. 26:11 (Roggio); PX-1 at 12.  U.S. government officials labeled these Afghanistan terrorist groups a "syndicate."  Tr. 26:24-27:7 (Roggio); PX-1 at 12.  For example, in 2009, Secretary of State Hillary Clinton testified before the U.S. Senate Committee of Foreign Relations and characterized these Afghan terrorist groups "as part of a syndicate of terrorism." Tr. 27:12-28:4 (Roggio); PX-1 at 14.  Secretary Clinton went on to state that "at the head of the table, like an old mafia kind of diagram, sits al-Qaeda."  Tr. 28:3-4 (Roggio); PX-1 at 14.

3.      The U.S. government described these groups as a "syndicate" because of the close strategic, tactical, and operational coordination between them.  Tr. 26:22-28:7 (Roggio); PX-1 at 12-15.  In structure and approach, they resembled a traditional mafia syndicate.  Tr. 26:22-28:7

---

[1] Unless otherwise specified, citations to "Dkt." are to the docket entries in *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835-JDB.

[2] Citations to "Tr." are to the transcripts of the bellwether hearing before Judge Bates on October 18-20, 2021 (Dkts. 62-63, 65-67), in the above-captioned cases.

(Roggio); PX-1 at 13-14.  Much as in an organized crime syndicate, the coordination enabled

each terrorist group to magnify the lethality of its operations.  Tr. 28:12-24 (Roggio).

4.     The Taliban-led Syndicate had an overarching goal in Afghanistan:  to re-

establish the Islamic Emirate.  Tr. 27:2-3 (Roggio).  The Syndicate sought to achieve this goal by

driving the United States and its allies from Afghanistan.  Tr. 26:11-18 (Roggio).  The

Syndicate's primary means for driving the United States and Coalition forces out of Afghanistan

was to kill and wound American service members, American citizens, and Coalition forces there.

Tr. 26:17-21; 28:21-24; 37:1-6; 44:23-25; 59:9-13 (Roggio); 162:11-15 (Clarke).

5.     To achieve this goal of driving the United States out of Afghanistan, the

Syndicate's component terrorist groups shared resources, personnel, and financing; trained

together; and held joint meetings in order to plan operations and carry out attacks in Afghanistan.

Tr. 27:3-5; 28:1-4; 28:15-24 (Roggio).

6.     The Syndicate remained operational up to and through the Taliban's successful

overthrow of the Afghan government in August 2021.  PX-1 at 14.

### A.     The Taliban

7.     From at least 2006 to 2019, the Taliban was a Sunni jihadist organization that was

seeking to regain control of Afghanistan.  Tr. 30:1-2 (Roggio); PX-1 at 15.  It was originally

founded in 1994, Tr. 137:25-138:1 (Clarke); PX-1 at 15, in the aftermath of the Soviet

occupation of Afghanistan, Tr. 30:6-7 (Roggio); PX-1 at 15.  Competing warlords and

mujahedeen commanders — who had fought the Soviet Union — all vied for power in

Afghanistan, Tr. 30:7-9 (Roggio); PX-1 at 15-16, which resulted in a civil war, Tr. 30:7-9

(Roggio); 138:7-10 (Clarke); PX-1 at 16.

8.     Originally, the Taliban was a group of students who studied in madrassas in

Pakistan.  Tr. 138:11-13 (Clarke); PX-1 at 15.  Mullah Mohammed Omar formally organized

these students into a fighting force:  the Taliban.  Tr. 30:10-11 (Roggio); 137:25-138:1 (Clarke); PX-1 at 15-16.  Mullah Omar mobilized Taliban fighters to overthrow the lawful Afghan government and impose Sharia law on the people of Afghanistan.  Tr. 30:1-4 (Roggio); PX-1 at 16.

9.      From its traditional homeland in Kandahar Province, Tr. 30:14-15 (Roggio); 138:3-4 (Clarke), the Taliban seized control of large swaths of the country, Tr. 30:16-17 (Roggio); PX-1 at 16.  In 1996, the Taliban captured the Afghan capital of Kabul and proclaimed the Islamic Emirate of Afghanistan.  Tr. 30:16-17 (Roggio); PX-1 at 16.

10.      Expelled from Sudan in 1996, Osama bin Laden and al-Qaeda returned to Afghanistan under the express protection of the Taliban.  Tr. 139:21-140:1 (Clarke); PX-1 at 43. The Taliban provided al-Qaeda safe haven at this time in exchange for financial support offered by al-Qaeda.  Tr. 140:1-3 (Clarke); PX-1 at 43-44.

11.      Shortly before September 11, 2001, the Taliban wielded de facto control over approximately 90% of Afghanistan.  Tr. 30:17-19 (Roggio); PX-1 at 16.  But the Taliban did not function as a government.  It neglected critical infrastructure, education, and healthcare.  PX-1 at 16.  It persecuted women and minorities.  *Id.*  It prioritized growing opium over food, which created a humanitarian crisis.  *Id.* at 16-17.  The Taliban also refused to allow international aid to reach Afghans in areas under its control.  *Id.* at 17.

12.      After al-Qaeda's terrorist attacks on September 11, 2001, the United States demanded that the Taliban surrender bin Laden.  PX-1 at 17.  But the Taliban refused.  *Id.*; Tr. 50:7-18 (Roggio).  Consequently, on September 23, 2001, President George W. Bush amended Executive Order 13224 to list both the Taliban and Mullah Omar as designated

terrorists.  PX-1 at 17.  Although Mullah Omar died in 2013, Tr. 45:9-12 (Roggio), the Taliban's

designation as Specially Designated Global Terrorists has remained in place since 2001.[3]

13.     On October 7, 2001, the United States invaded Afghanistan.  Tr. 140:15-18

(Clarke); PX-1 at 17.  By November 2001, the Taliban withdrew from Kabul, and by December

2001, the Taliban abandoned its traditional stronghold of Kandahar and was effectively defeated.

PX-1 at 17.

14.     Following the Taliban's defeat in Afghanistan — at the hands of U.S. forces and

other Afghan militias like the Northern Alliance — the Taliban's leadership and fighters fled to

other countries, including Iran and Pakistan.  Tr. 140:19-23 (Clarke); PX-1 at 17-18.

15.     After the Taliban's defeat in late 2001, the United Nations passed Resolution

1386 in December 2001, which authorized the formation of International Security Assistance

Force ("ISAF").  PX-1 at 18.  ISAF was initially tasked with maintaining security in Kabul and

the surrounding area in an effort to support the Afghan Government's efforts to rebuild the

country.  *Id.*  The U.S. military declared an end to major combat operations against the Taliban

in May 2003, while the international community worked with Afghan stakeholders to create a

national government.  *Id.*  In August 2003, NATO took command of ISAF.  *Id.*

16.     Afghanistan ratified a new constitution in January 2004, and the Taliban was not

asked to participate in the process of drafting the constitution or forming the new government,

which was called the Islamic Republic of Afghanistan.  *Id.*  Hamid Karzai, a Pashtun who

---

[3] The United States government still lists the Taliban as Specially Designated Global Terrorists.  *See* U.S. Treasury Dep't, Office of Foreign Assets Control, *Sanctions List Search* (last accessed Nov. 23, 2021), https://sanctionssearch.ofac.treas.gov/Details.aspx?id=6636.  "A court may take judicial notice of any fact 'not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'"  *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 58 (D.D.C. 2010) (quoting Fed. R. Evid. 201(b)).

supported the U.S. military's effort to defeat the Taliban, was elected as the first President of the Islamic Republic of Afghanistan. *Id.*

17.     Neither the United Nations nor the United States has ever recognized the Taliban as the lawful government of Afghanistan; Tr. 31:4-12 (Roggio); PX-1 at 17.  During the 2006 to 2019 time period, the lawful government of Afghanistan was the Islamic Republic of Afghanistan.  Tr. 31:10-12 (Roggio).

18.     Prior to September 11, 2001, only Pakistan, Saudi Arabia, and the United Arab Emirates had ever recognized the Taliban as the government of Afghanistan.  PX-1 at 17. Neither the United States nor the United Nations afforded the Taliban such recognition.  *Id.* Instead, before September 11, 2001, the United States and United Nations recognized the Islamic State of Afghanistan as the official government.  *Id.*  By late November 2001, Saudi Arabia, the United Arab Emirates, and Pakistan had all withdrawn recognition of the Taliban.  *Id.*

19.     During the 2006 to 2019 time period, the lawful government of Afghanistan, the Islamic Republic of Afghanistan, did not authorize any Taliban-led Syndicate terrorist attacks against U.S. forces.  Tr. 31:13-15 (Roggio).  Nor did any regularly constituted Afghan court ever authorize any of the Taliban-led Syndicate's terrorist attacks against U.S. forces.  Tr. 31:16-18 (Roggio).

20.     The Taliban has never conducted itself like a lawful military force.  Tr. 31:19-21 (Roggio).  Its fighters did not wear uniforms, and it employed terrorist tactics to defeat the Afghan government and Coalition forces.  Tr. 31:19-32:7 (Roggio).  The Taliban repeatedly targeted civilians in Afghanistan to achieve its goals, by conducting suicide attacks, IED attacks, and other types of attacks against civilian targets including mosques, schools, hospitals, shopping malls, restaurants, hotels, non-governmental organizations, and individual civilians.  Tr. 31:25-

32:5 (Roggio).  The Taliban also targeted Afghan government officials and civilians in an

attempt to seize control of Afghanistan.  Tr. 32:3-7 (Roggio).

21.     At all relevant times, the Taliban's leadership structure had an "emir," or leader of

the faithful, who led the organization.  Tr. 141:5-7 (Clarke).  As of 2010, the Taliban emir was

Mullah Mohammad Omar, the founder of the Taliban.  Tr. 32:14-18 (Roggio); PX-1 at 15.

Today, the emir is Mullah Hibatullah Akhundzada.  Tr. 32:19-21 (Roggio); PX-1 at 48.

22.     Below the emir sat the Rahbari Shura, the Taliban's leadership council.

Tr. 141:7-8 (Clarke); PX-1 at 24.  The Rahbari Shura was also known as the Quetta Shura.

Tr. 32:23-24 (Roggio); 141:11-15 (Clarke); PX-1 at 24.  It was the top consultative council for

the Taliban, and it provided guidance to the lower-level organizations.  Tr. 32:23-33:1 (Roggio);

PX-1 at 24-25.  It made consensus-based decisions based on input from the Taliban's emir.

Tr. 33:1-2 (Roggio).  It did so by translating the emir's guidance into its own form of strategic

guidance.  Tr. 145:2-5 (Clarke).  The Rahbari Shura then disseminated the Taliban's policy to the

lower-level elements within the Taliban organization — primarily to the regional shuras — to

execute.  Tr. 33:1-4 (Roggio); 142:8-12; 145:2-6; 146:8-20; 150:2-13; 162:16-21 (Clarke); PX-1

at 25-27.

23.     Not only did the Rahbari Shura provide guidance to the shuras, but it also was the

centralized organization that determined how funds and resources would be allocated to the

regional shuras.  Tr. 145:7-12 (Clarke); PX-1 at 26.  But it did not only disseminate funds.  The

Rahbari Shura also expected the regional shuras and Taliban commanders to send money back to

the Rahbari Shura, which would then determine where these funds were needed in the greater

Taliban organization.  Tr. 145:17-146:4 (Clarke); PX-1 at 26.

24.     Through this structure, the Rahbari or Quetta Shura exerted significant centralized control over the Taliban organization.  Tr. 33:5-8 (Roggio); PX-1 at 24-26.  When the Quetta Shura issued directives; for example, on how to fight or on how to implement Sharia law, the entire Taliban organization obeyed these centralized commands.  Tr. 33:5-16 (Roggio); PX-1 at 24-26.  Similarly, when the Quetta Shura has issued short-term cease-fires, the entire Taliban has complied with its directives.  Tr. 34:11-16 (Roggio); PX-1 at 26-27.  The Taliban's centralized organization enabled it to plan, gather resources, and then systematically take control of Afghanistan in 2021.  Tr. 33:17-34:5 (Roggio); PX-1 at 27.

25.     Below the leadership council sit various Taliban regional shuras.  Tr. 141:8-10 (Clarke); PX-1 at 24-25.  Leaders from the Rahbari Shura would typically lead the regional shuras.  Tr. 35:12-15 (Roggio); PX-1 at 24-25.  As the name suggests, these regional shuras had responsibility for certain regions of Afghanistan.  Tr. 35:17-18 (Roggio); PX-1 at 24-25.  These regional shuras wielded control over Taliban operations in several respects:  they would resource and direct military operations in their regions; appoint shadow provincial and district-level governors; and also appoint Taliban commanders.  Tr. 36:17-25 (Roggio); PX-1 at 25.  Importantly, the Rahbari Shura was responsible for developing strategic guidance, in accordance with the emir, and then would pass along strategic political and military guidance to the regional Taliban shuras for execution.  Tr. 142:8-12 (Clarke); PX-1 at 25-26.

26.     The first regional shura to form was the Miramshah[4] Shura in the 2002-2003 timeframe.  Tr. 141:20-21 (Clarke).  It pledged fealty or allegiance to the Rahbari Shura — cementing the Rahbari Shura's place within the Taliban as the supreme decision-making body below the emir.  Tr. 142:1-5 (Clarke).  Run by the Haqqani Network, the Miramshah Shura was

_____

[4] Miramshah is also referred to as "Miranshah" by certain sources.  PX-2 at 16.

based out of the town of Miramshah in North Waziristan, Pakistan.  Tr. 39:22-24 (Roggio);

141:22-23 (Clarke).  It directed Taliban political and terrorist operations primarily in eastern and

southeastern Afghanistan.  Tr. 39:24-25 (Roggio); 148:14-18 (Clarke).  Over time, the

Miramshah Shura's presence became more pronounced outside of the Haqqani Network's

traditional homeland in Loya Paktia and extended into Ghazni, Logar, and Wardak Provinces.

Tr. 148:14-18 (Clarke); 192:10-15 (McGrath); PX-2 at 58-62; PX-3 at 44-46 & Fig. 11.  Its

influence over Taliban operations also extended into central Afghanistan, including Kabul.

Tr. 40:1-5 (Roggio); 148:19-24 (Clarke).

      27.     For many years, Jalaluddin Haqqani, the founder of the Haqqani Network,

Tr. 37:18-19 (Roggio); PX-1 at 28, ran the Miramshah Shura.  Tr. 142:23-143:1 (Clarke).

Eventually, as Jalaluddin grew older, he groomed his son, Sirajuddin ("Siraj") Haqqani, to serve

as the next leader of the Miramshah Shura.  Tr. 143:2-7 (Clarke); 38:13-14 (Roggio).

      28.     In 2005, the Syndicate formed the Peshawar Shura to coordinate the Taliban's

operations in eastern and northeastern Afghanistan and the greater Kabul region.  PX-2 at 18, 33,

35.  Sirajuddin installed his brother Khalil Haqqani to serve as the leader of the Peshawar Shura,

which cemented Sirajuddin's control over Taliban operations throughout Afghanistan.  PX-2 at

20.  The Peshawar Shura eventually controlled Taliban operations in Nangarhar, Laghman,

Kunar, Nuristan, Wardak, Parwan, and Kapisa Provinces.  Tr. 148:5-10 (Clarke); PX-2 at 35.

The Peshawar Shura also exerted influence in Kabul in cooperation with the Haqqani Network-

led Miramshah Shura.  *Id.*

      29.     Founded two years after the formation of the Peshawar Shura, the Mashhad Shura

initially opened in 2007 as an office of the Rahbari Shura in Mashhad, Iran.  Tr. 142:13-17

(Clarke); PX-2 at 37; PX-1 at 100.  The Mashhad Office had a diplomatic and terrorist function

— serving as a liaison between the Taliban and the Islamic Revolutionary Guard Corps. Tr. 155:4-19 (Clarke); PX-2 at 37; PX-1 at 100.  However, this Office eventually became its own regional shura, and Iranian support substantially bolstered the office through financing, training, provision of weapons, and the opening of Taliban bases in the Iranian cities of Zahedan and Sistan.  Tr. 105:14-24 (Roggio); PX-2 at 37.  The Mashhad Shura reported directly to the Taliban's Quetta Shura.  PX-1 at 100.  It became a key node for the Taliban's operations in western and northwestern Afghanistan.  Tr. 105:14-24 (Roggio).

30.     In late 2015, an element of the Peshawar Shura broke off to form the Shura of the North under Qari Baryal, the former head of Peshawar's military commission.  PX-2 at 38.  This Shura received significant financial support from Iran.  *Id.*  This Shura claimed authority over northeastern Afghanistan and Kapisa Province but also expanded operations into Laghman, Nangarhar, and northern Afghanistan.  Tr. 155:20-24 (Clarke); PX-2 at 38.  The Shura of the North worked extensively with the Rahbari Shura.  PX-2 at 38.

31.     There were also various committees within the Taliban's leadership structure. The committees consisted of functional organizations such as defense, justice, finance, and intelligence committees.  Tr. 34:21-35:8 (Roggio); PX-1 at 25.  The purpose of these committees was to implement strategy and directives in specific areas.  Tr. 35:8-12 (Roggio).

### B.     The Haqqani Network

32.     The Haqqani Network is the Taliban's most powerful terrorist faction.  Tr. 37:16-17 (Roggio); 139:2-4 (Clarke); 191:22-25 (McGrath).  The Haqqani Network planned and executed the Taliban's terrorist attacks throughout Afghanistan, including most prominently in Paktia, Paktika, and Khost Provinces in eastern and southeastern Afghanistan.  Tr. 37:9-15 (Roggio).

33.     In September 2012, the U.S. State Department designated the Haqqani Network as a Foreign Terrorist Organization ("FTO").  Tr. 46:5-9 (Roggio); PX-1 at 28; PX-106.  That designation has remained in place ever since.[5]

34.     At all relevant times, the Haqqani Network was part of the Taliban.  Tr. 39:5-15 (Roggio); 143:13-144:20 (Clarke); PX-1 at 28-37; PX-2 at 7, 25-29; PX-3 at 19, 38-40.  The Taliban remained a singular, cohesive organization that encompassed the Haqqani Network. Tr. 143:13-17 (Clarke); PX-2 Part I.  In fact, all of the regional shuras were part of the Taliban and never functioned as separate organizations.  Tr. 150:18-22 (Clarke).

35.     There are multiple indications that there was "no difference between the Haqqani Network and the Taliban.  They are one and the same."  Tr. 39:8-9 (Roggio).  *First*, not only do the Haqqanis share the same Deobandi religious underpinnings as the Taliban, PX-1 at 28-29, but the Haqqani Network and the Taliban also shared personnel.  The Haqqani Network's leaders served as some of the most influential Taliban leaders and commanders.  Tr. 37:16-18 (Roggio); PX-1 at 29-30, 33-36.  Jalaluddin Haqqani served as a minister within the Taliban's first purported government from 1996 to 2001.  Tr. 38:1-2 (Roggio); PX-1 at 29.  He later served as the Taliban's defense minister, Tr. 38:3-6 (Roggio); PX-1 at 29, and was a member of the influential Rahbari Shura.  Tr. 38:9-10 (Roggio); PX-1 at 29.

36.     Jalaluddin's son, Sirajuddin Haqqani, also became an influential Taliban leader. Designated as a Specially Designated Global Terrorist by the United States government, Tr. 38:10-13 (Roggio); PX-1 at 28, Sirajuddin became the Taliban's top terrorist commander and

---

[5] *See* U.S. Dep't of State, Bureau of Counterterrorism, *Foreign Terrorist Organizations* (last accessed Nov. 23, 2021), https://www.state.gov/foreign-terrorist-organizations/.

one of the Taliban's two deputy emirs, Tr. 38:16-18 (Roggio); 143:21-144::11 (Clarke); PX-1 at 30, after first assuming a prominent role in the Taliban as early as 2007, Tr. 143:21-25 (Clarke).

37.     Today, Sirajuddin serves as the interior minister within the current Taliban regime. Tr. 144:12-15 (Clarke); PX-1 at 37.  Sirajuddin's position means that he is one of the highest-ranking members of the Taliban and wields significant decision-making power over the organization.  Tr. 38:18-21 (Roggio); 144:16-20 (Clarke).  In fact, in this capacity as interior minister, Sirajuddin retains the ability to appoint Taliban governors across Afghanistan. Tr. 38:21-22 (Roggio).  He also controls Taliban fighters across the country and issues documents like passports.  Tr. 38:23-25 (Roggio).  While serving in this capacity, Sirajuddin remains head of the Miramshah Shura and is the operational leader of the Haqqani Network. Tr. 38:13-15 (Roggio).  Given these multi-faceted roles, Sirajuddin is de facto the most influential and powerful Taliban leader.  Tr. 39:1-4 (Roggio).  He was instrumental in the Taliban's victory in Afghanistan.  Tr. 39:3-4 (Roggio).  And after seizing control of Kabul, the Taliban appointed senior Haqqani commander and principal emissary to al-Qaeda's leadership, Khalil Al-Rahman Haqqani, brother of Jalaluddin Haqqani, as the Taliban's chief of security for Kabul.  PX-1 at 36-37.  In September 2021, the Taliban also appointed Khalil to serve as acting minister for refugees.  *Id.* at 37.  Anas Haqqani, son of Jalaluddin Haqqani, served as a member of the Taliban's negotiating team, whereby he interfaced, on behalf of the Taliban, with persons such as former President of Afghanistan Hamid Karzai as recently as mid-August 2021.  *Id.*

38.     *Second*, for years, both the Taliban and the Haqqani Network have repeatedly disclaimed any distinctions between the two.  Tr. 39:12-14 (Roggio); PX-1 at 31.  For example, in 2008, Jalaluddin Haqqani participated in an interview with an official Taliban publication. Tr. 40:8-10 (Roggio); PX-1 at 31.  Jalaluddin was asked to comment on reports that the Haqqani

Network was an independent group from the Taliban.  Jalaluddin denied that there were any

differences between the Taliban and the Haqqani Network.  Tr. 41:1-24 (Roggio); PX-1 at 31.

He stated that they fight under a unified leadership, and during the interview he twice noted that

he pledged an oath of loyalty to Taliban emir Mullah Omar.  Tr. 41:17-23 (Roggio); PX-1 at 31.

Jalaluddin also observed that he was a member of the Taliban's high council or the Quetta Shura.

Tr. 41:25-42:4 (Roggio); PX-1 at 31.  In an interview in 2010, Sirajuddin also denied reports

there was any divide between the two groups.  PX-1 at 31.  Another influential Haqqani Network

leader, Mullah Sangeen Zadran, also denied that the Taliban and Haqqanis were separate.  *Id.*

Mullah Sangeen Zadran stated:  "I assure you with all confidence that all the mujahideen of the

Emirate are united under the leadership of the Emir of the Believers Mullah Muhammad Omar . .

. he is the one who guides this battle in all the land."  *Id.*

      39.     In February 2020, Sirajuddin Haqqani wrote an op-ed in *The New York Times*,

entitled "What We, the Taliban, Want."  Tr. 43:1-15 (Roggio); PX-1 at 31.  The subtitle of the

op-ed itself noted that Sirajuddin was the deputy emir of the Taliban.  Tr. 43:1-4 (Roggio); PX-1

at 31.  This op-ed was written nine days before the February 2020 Doha agreement between the

Taliban and the United States, which facilitated the American withdrawal from Afghanistan.

Tr. 43:4-8 (Roggio).

      40.     *Third*, U.S. terrorist designations also note the relationship between the Taliban

and the Haqqani Network.  Tr. 39:14-15 (Roggio); PX-1 at 33-36.  Between 2008 and 2015,

sixteen Haqqani leaders were listed as Specially Designated Global Terrorists.  PX-1 at 33-36.

Many of these designations highlight the deep ties between the Taliban and the Haqqani

Network.  *Id.*  For example, the Haqqani Network's subordination to the Taliban was evident

from the Taliban shadow governments in the Haqqani strongholds in Paktia, Paktika, and Khost

Provinces.  PX-1 at 32.  In each of these regions, the Taliban Shadow Governor was typically a Haqqani leader.  *Id.*  When the United States government listed Mullah Sangeen Zadran, a senior lieutenant to Sirajuddin Haqqani, as a Specially Designated Global Terrorist in August 2011, he was described as the Taliban's Shadow Governor for Paktika Province and as a commander of the Haqqani Network.  *Id.*  Similarly, in its designation of Abdul Aziz Abbasin, the U.S. Treasury Department described him as a key commander in the Haqqani Network, who received orders from and was appointed by Sirajuddin Haqqani, and who served as the Taliban Shadow Governor of Orgun district, Paktika Province.  PX-1 at 32; PX-83.  The Taliban's selection of Haqqani leaders to serve as shadow governors confirms that the Taliban viewed the Haqqani Network as a part of its organization.  PX-1 at 33.[6]

41.     The Haqqani Network is a designated Foreign Terrorist Organization.  Tr. 46:8-9 (Roggio); PX-1 at 28; PX-106.  Although the Taliban is only a Specially Designated Global Terrorist organization and not designated as a Foreign Terrorist Organization, Tr. 46:10-12 (Roggio); PX-1 at 28, the different designations do not suggest the two entities are distinct groups.  In response to the U.S. government's announcement that it was designating the Haqqani Network as a Foreign Terrorist Organization, the Taliban again denied claims that the Haqqani Network was a distinct entity from the Taliban.  PX-1 at 32.

42.     The U.S. government often designates a terrorist group's element before the entire group itself.  Tr. 46:20-24 (Roggio); PX-1 at 38.  For example, the Islamic Revolutionary Guard

---

[6] High-profile prisoner exchanges between the Taliban and the U.S. and Afghan governments also illustrate that the Haqqani Network is simply part of the Taliban.  PX-1 at 36. For example, the Taliban freed American University of Afghanistan professors Kevin King (a plaintiff in this case) and Timothy Weeks in exchange for three senior Haqqani Network leaders — Anas Haqqani, Sirajuddin's brother; Haji Mali Khan, Sirajuddin's uncle; and Qari Abdul Rasheed Omari — who were in Afghan government custody.  *Id.*

Corps' Qods Force was designated as a Specially Designated Global Terrorist organization in 2007.  Tr. 47:10-15 (Roggio); PX-1 at 38; PX-80.  But its parent organization, the Islamic Revolutionary Guard Corps, was not designated as a Specially Designated Global Terrorist organization until 2017.  Tr. 47:15-18 (Roggio); PX-1 at 38; PX-91.  By 2019, both groups were named Foreign Terrorist Organizations.  Tr. 47:17-18; 79:15-80:15 (Roggio); PX-1 at 66-67, 70; PX-74.

43.     In many instances, the decision to designate a person or entity has a political component.  Tr. 46:13-24 (Roggio); PX-1 at 37.  The U.S. government likely did not designate the Taliban as an FTO because the U.S. government sought to negotiate a withdrawal from Afghanistan.  An FTO designation would have made such negotiations virtually impossible. Tr. 48:9-17 (Roggio).

44.     As a key element of the Taliban, the Haqqani Network has played a significant role in the Taliban Syndicate's terrorist operations.  The Taliban-led Syndicate benefited greatly from the Haqqani Network's overall terrorist expertise, and it relied heavily on these capabilities during its 2021 offensive to capture Afghanistan.  Tr. 45:5-8 (Roggio).

45.     The Haqqani Network not only lent its terrorist expertise to the Syndicate, it also helped maintain the stability of the Taliban.  After Mullah Omar died in 2013, there were some internal fissures within the Taliban.  Tr. 45:8-16 (Roggio).  Both Jalaluddin and Sirajuddin Haqqani played a key role in unifying the Taliban and ensuring that the Taliban eventually swore allegiance to the new Taliban emir.  Tr. 45:16-18 (Roggio).

46.     The Haqqani Network learned various attack techniques from al-Qaeda — including suicide tactics.  Tr. 44:9-14 (Roggio); PX-1 at 39-41.  The Haqqani Network then

employed these suicide tactics in complex attacks across Afghanistan.  Tr. 44:14-22 (Roggio); PX-1 at 39-41.

### C.      The Kabul Attack Network

47.      The Haqqani Network also played the key role in the Kabul Attack Network, which was a microcosm of the Syndicate.  Tr. 44:23-25; 59:6-8 (Roggio); 149:13-19 (Clarke); PX-1 at 61-62; PX-2 at 17, 19, 25.  The Syndicate — consisting of terrorist groups including the Taliban (including the Haqqani Network) and al-Qaeda — decided it needed to conduct effective attacks in and around Kabul in order to drive the United States out of Afghanistan and to weaken the Afghan government.  Tr. 59:8-13 (Roggio); PX-1 at 62.

48.      Consequently, the Taliban-led terrorist Syndicate pooled its resources, sharing leadership, personnel, equipment, and safe houses, and planning high-profile operations in and around Kabul.  Tr. 59:14-17 (Roggio); PX-1 at 61-62.  The Kabul Attack Network's targets included — but were not limited to — hotels, schools, mosques, restaurants, military headquarters, Afghan government buildings, and military convoys in order to make headline news with its attacks.  Tr. 59:23-60:4 (Roggio); PX-1 at 62.  The Kabul Attack Network's attacks played a key role in de-legitimizing the Afghan government by spreading doubt the Afghan government could secure its own capital and inflicting casualties on American and allied forces.  Tr. 44:23-25; 60:4-7 (Roggio); PX-1 at 62.  Both raised the cost to the United States of keeping forces in Afghanistan and contributed to the U.S. withdrawal in 2021.  *Id*.

### D.      Al-Qaeda

49.      Al-Qaeda was another key member of the Syndicate.  It is a Sunni jihadist organization with ambitions to use jihad to establish a global caliphate.  Tr. 48:21-23 (Roggio). Founded by Osama bin Laden and Abdullah Azzam (towards the end of the Soviet occupation of Afghanistan), al-Qaeda was established to harness the massive network of mujahedeen fighters with the goal of reviving the caliphate.  PX-1 at 41-42; Tr. 48:24-49:8 (Roggio).

50.      Al-Qaeda proclaimed that it was at "war" with the United States and Israel in two fatwas in 1996 and 1998.  Tr. 49:15-17 (Roggio); PX-1 at 43, 44.  In support of its asserted efforts to establish a caliphate, the unification of Muslim lands ruled under Islamic law, PX-1 at 42, al-Qaeda has carried out numerous terrorist attacks around the world.  Its most notable terrorist attacks include the 1998 bombing of the U.S. embassies in Kenya and Tanzania, the attack on the U.S.S. Cole in October 2000, and the September 11, 2001 attacks on the United States.  Tr. 49:14-20 (Roggio); 140:6-11 (Clarke); PX-1 at 44-45.

51.      On October 8, 1999, the U.S. State Department designated al-Qaeda as a Foreign Terrorist Organization.  PX-1 at 45; PX-75.

52.      After September 11, 2001, the bond between the Taliban and al-Qaeda grew stronger.  Tr. 49:23-50:1 (Roggio).  In the aftermath, the Taliban refused to hand over bin Laden or other senior al-Qaeda leaders to the U.S. government.  Tr. 50:7-18 (Roggio); PX-1 at 45-46. Each group helped the other:  Al-Qaeda played a pivotal role in helping the Taliban terrorist Syndicate re-capture Afghanistan, and the Taliban provided safe haven and support for al-Qaeda inside of Afghanistan.  Tr. 50:1-6 (Roggio); PX-1 at 46-61.

53.      The existence of many dual-hatted terrorists — fighting on behalf of both the Taliban and al-Qaeda — illustrates the strong ties between the Taliban and al-Qaeda.  Tr. 51:1-18 (Roggio); PX-1 at 49-50.  Most prominent among them was Sirajuddin Haqqani.  Tr. 51:19-

22 (Roggio); PX-1 at 50-51.  Recently, the United Nations Sanctions and Monitoring Team described Sirajuddin as an al-Qaeda leader.  Tr. 52:5-7 (Roggio); PX-1 at 50; PX-161.  In April 2010, Sirajuddin said that cooperation with al-Qaeda "is at the highest limits."  PX-1 at 47.  And as recently as late 2018, al-Qaeda referred to Sirajuddin as one of its rulers or "emirs in the Islamic Emirate."  *Id.* at 50-51.

54.     Sirajuddin also serves as the operational commander of the Haqqani Network, the head of the Miramshah Shura, deputy emir of the Taliban, and the Taliban's interior minister.  Tr. 52:7-13 (Roggio); PX-1 at 28, 30, 37.  Sirajuddin's roles in both the Taliban and al-Qaeda highlight the close bonds between the two terrorist groups.  PX-1 at 50-51; PX-220.

55.     There are other examples of dual-hatted Taliban and al-Qaeda commanders.  Mullah Sangeen Zadran was a lieutenant to Sirajuddin Haqqani, a senior Haqqani commander, and closely linked to al-Qaeda.  Tr. 54:6-18 (Roggio); PX-1 at 52.  Badruddin Haqqani, Sirajuddin's brother, was another operational commander for the Haqqani Network.  Tr. 55:2-4 (Roggio); PX-1 at 34, 52.  He was a leader in the Miramshah Shura and he helped lead al-Qaeda fighters and other insurgents in attacks in southeastern Afghanistan.  Tr. 55:5-11 (Roggio); PX-1 at 34, 52.

56.     Sheikh Aminullah was a leader of the Taliban's Peshawar Shura, Tr. 55:16-23 (Roggio); PX-1 at 49-50; PX-90, and he helped run the Ganj Madrassa, Tr. 55:25-56:11 (Roggio); PX-1 at 49-50; PX-90.  The Ganj Madrassa was used as a recruiting center and a training camp for the Taliban, al-Qaeda, and other terrorist organizations.  Tr. 56:4-11 (Roggio); PX-1 at 49-50; PX-90.  Sheikh Aminullah also furnished suicide vests to al-Qaeda and paid the families of al-Qaeda suicide bombers.  Tr. 56:12-19 (Roggio); PX-1 at 48, 49-50; PX-90.  Both

Sheikh Aminullah and the Ganj Madrassa were listed as Specially Designated Global Terrorists. Tr. 56:5-7 (Roggio); PX-1 at 50; PX-90.

57.     Finally, Ahmed Jan Wazir was a leader in the Haqqani Network and a deputy to Sirajuddin Haqqani.  Tr. 57:20-58:3 (Roggio); PX-1 at 35.  According to his terrorist designation, Wazir also led both Taliban and al-Qaeda units in Ghazni Province.  Tr. 58:4-58:21 (Roggio); PX-1 at 51; PX-78.  Notably, al-Qaeda was able to operate in Ghazni Province due to the provision of safe haven by the Taliban.  Tr. 58:22-59:2 (Roggio).

58.     Three of the Taliban's four regional councils were also run by leaders with close ties to al-Qaeda.  Tr. 57:1-12 (Roggio).

59.     Al-Qaeda played a key operational role in planning and authorizing the Taliban's terrorist attacks.  Al-Qaeda aided the Taliban in developing new terror tactics, particularly suicide bombings, by providing ideological and technical expertise to the Taliban.  Tr. 44:7-14 (Roggio); PX-1 at 48; PX-2 at 43.  Al-Qaeda convinced the Taliban leadership that suicide bombings were both religiously acceptable and an effective tactic against Coalition forces.  PX-1 at 48.  For example, Osama bin Laden called for suicide attacks in Afghanistan, and the Taliban answered the call.  *Id.*  But al-Qaeda did not merely provide ideological and technical expertise, it also paid the families of Taliban suicide bombers.  *Id.*  In addition, al-Qaeda's Brigade 055, which fought alongside the Taliban against the Northern Alliance, re-organized into the Shadow Army and embedded itself within the Taliban's terrorist structure.  *Id.* at 49.  Al-Qaeda's Shadow Army fielded small conventional units in Afghanistan, embedded military trainers within the Taliban, and provided instruction to the Taliban on how to wage a successful terrorist insurgency.  *Id.*

## II.     IRAN'S SUPPORT FOR GLOBAL TERRORISM

60.     Iran has long been one of the primary state sponsors of anti-American terrorism throughout the world.  Tr. 61:1-8 (Roggio); PX-1 at 65; PX-7 at 172.  It has supported a variety of terrorist militias, proxies, and affiliates in order to attack and counter U.S. forces or interests abroad.  Tr. 61:7-18 (Roggio); PX-1 at 65.

61.     In 1984, the United States designated Iran as a state sponsor of terrorism, Tr. 79:2-11 (Roggio); PX-1 at 65, shortly after Iranian-linked Hezbollah attacked the U.S. Marine Corps barracks in Beirut, Lebanon, Tr. 79:8-11 (Roggio).  That designation has remained in place ever since.  Tr. 79:12-14 (Roggio); PX-1 at 65.  In 2007, the U.S. State Department characterized Iran as "the most active state sponsor of terrorism" in the world and "a threat to regional stability and U.S. interests in the Middle East because of its continued support for violent groups."  PX-1 at 65.

62.     Iran provides four primary types of material support for its terrorist proxies: weapons; training; financial support; and safe haven for terrorists.  Tr. 61:15-18; 62:23-24 (Roggio); PX 198 at 68.

63.     Iran's main motivation for providing material support to a wide variety of groups is to promote its Islamic revolution throughout the Middle East.  Tr. 62:25-63:3 (Roggio); PX-1 at 65.  For that reason, Iran seeks to defeat local governments that it considers to be threats to this goal.  Tr. 63:2-5 (Roggio); PX-1 at 65.  It also seeks to drive U.S. and Coalition forces out of the Middle East.  Tr. 63:5-7 (Roggio); PX-1 at 65.

### A.     The Islamic Revolutionary Guard Corps

64.     The Islamic Revolutionary Guard Corps ("IRGC") is the primary driver of Iran's terror activities.  PX-1 at 66.  It is tasked with protecting the Islamic clerical regime and exporting Iran's Islamic revolution.  *Id.*  The IRGC is particularly powerful in Iran's political

system, and many senior political leaders have ties to the IRGC. *Id.* It performs a variety of functions, including providing military forces to Iran, directing large swathes of the Iranian economy, and implementing Iran's global terrorist campaign. *Id.*

65.    Although the Islamic Revolutionary Guard Corps exists in parallel to the regular Iranian military, the Islamic Revolutionary Guard Corps is considered to be "the military vanguard of Iran," and the real power within Iran. *Id.*; PX-80.

66.    The Islamic Revolutionary Guard Corps has been directly involved in terrorist plotting to achieve the regime's goals. Tr. 70:13-23 (Roggio); PX-1 at 66-67. The Islamic Revolutionary Guard Corps' support for terrorism is foundational to its existence, and the Islamic Revolutionary Guard Corps has killed U.S. citizens. Tr. 70:18-20 (Roggio); PX-1 at 67; PX 74.

### B.    Qods Force

67.    The Qods Force is the special operations branch of the Islamic Revolutionary Guard Corps. Tr. 69:22 (Roggio); PX-1 at 67. Its main job is to export the Iranian revolution abroad. Tr. 69:23 (Roggio); PX-1 at 67; PX-15 at 300.

68.    The Qods Force maintains a wide and varied network of non-state partners, proxies and affiliates primarily in the Middle East to achieve these goals. Tr. 62:20-22 (Roggio); PX-198 at 68.

69.    In 2007, the Qods Force Commander was General Qasem Soleimani. Tr. 72:7-16 (Roggio); PX-1 at 67; PX 221 at 27. The United States government assessed that he reported directly to Iran's supreme leader Grand Ayatollah Ali Khomeini. Tr. 72:17-19 (Roggio); PX-1 at 67; PX-221 at 27. The Qods Force did not take action without the approval of Iran's central government and specifically Iran's Supreme leader. Tr. 72:20-73:16; 82:5-17 (Roggio); PX-221

at 27.  Iran's supreme leader was not only aware of Qods Force material support for the Taliban, but he approved this material support.  Tr. 82:5-17 (Roggio).

70.     Hezbollah is Iran's most notorious terrorist proxy.  Tr. 63:8-12 (Roggio); PX-1 at 70-71; PX-46 at 3; PX-198 at 68.  Hezbollah was responsible for the 1983 bombing of the U.S. Marine barracks in Beirut, Lebanon, among other attacks.  Tr. 63:12-14 (Roggio); PX-1 at 71.

71.     Iran has also supported a variety of Sunni terrorist groups, including Hamas and the Palestinian Islamic Jihad.  Tr. 63:18-20 (Roggio); PX-1 at 73; PX-198 at 68.

72.     In Yemen, Iran supports the Houthis, a group which routinely launches attacks neighbors using drones and ballistic missiles.  Tr. 64:6-10 (Roggio); PX-1 at 72.  Iran also supports small terror groups in Bahrain.  Tr. 64:11-13 (Roggio).

73.     Within Iraq, Iran has supported a wide range of Shia militants, including Jaysh al-Mahdi and the Hezbollah Brigades.  Tr. 63:23-64:3 (Roggio); PX-1 at 72-73; PX-69.  These terrorist groups — bolstered by Iran — have targeted and killed hundreds of American soldiers in Iraq.  Tr. 64:3-5 (Roggio).  The U.S. government has estimated that Iran-backed Shia militants were responsible for killing at least 603 U.S. personnel in Iraq from 2003 to 2019.  Tr. 68:13-69:13 (Roggio); PX-1 at 73; PX-199.  In Iraq, the Qods Force's Ramazan Corps provided Iran's material support to these terrorists.  Tr. 73:17-20 (Roggio); PX-1 at 69 & Fig. 6; PX-221 at 27.

74.     Although Iran is a Shia regime, its support for terrorism transcends sectarian lines.  Tr. 64:15-65:7 (Roggio); PX-1 at 73-74.  That principle applies to Afghanistan.  There were no major Shia organizations available for Iran to support that opposed the Afghan government and sought to drive U.S. forces out of Afghanistan.  Tr. 65:2-5 (Roggio).  Accordingly, Iran chose to partner with the Taliban in order to achieve a common goal:  forcing the United States to leave Afghanistan.  Tr. 65:5-7 (Roggio); 160:9-17 (Clarke).

75.     The Qods Force — through its Ramazan Corps — was Iran's primary agency for delivering material support to the Shia militias in Iraq Qods Force.  Tr. 69:17-20 (Roggio); PX-1 at 68, 69.

76.     In Afghanistan, the Qods Force was Iran's primary instrument for providing lethal support to the Taliban.  Tr. 80:16-81:7, 81:5-7 (Roggio); PX-1 at 70; PX-80 at 3.  Iran's intent was to inflict casualties on U.S. and NATO forces.  Tr. 81:18-23 (Roggio); PX-1 at 70; PX-80 at 3.  Iran held this intention from the day the U.S. entered Afghanistan to the day the Taliban declared victory on August 15, 2021.  Tr. 82:1-4 (Roggio).

77.     The Qods Force's Afghanistan branch was known as the Fourth Corps, or the Ansar Corps.  Tr. 74:15-20 (Roggio); PX-1 at 69, 76 & Fig. 6; PX-221 at 27.  The Ansar Corps was analogous to the Ramazan Corps in Iraq.  Tr. 74:20-22 (Roggio).  It directed terrorist and political operations — on behalf of Iran — inside Afghanistan.  Tr. 74:22-25 (Roggio); PX-1 at 76-77; PX-194 at 6.

78.     The Ansar Corps's headquarters was in Mashhad, Iran.  Tr. 75:1-5 (Roggio); PX-1 at 76.  The Qods Force placed the Ansar Corps's headquarters in Mashhad, in the northeastern part of Iran, to ensure it was close to Iran's border with Afghanistan.  Tr. 75:10-15 (Roggio); PX-1 at 76; PX-207 at 5.  This would enable the Ansar Corps to wield greater control over operations in Afghanistan.  Tr. 75:15-20 (Roggio); PX-1 at 76-77; PX-194 at 6.

### III.    IRAN'S MATERIAL SUPPORT FOR THE TALIBAN-LED TERRORIST SYNDICATE

79.     Iran, through the Qods Force, provided significant material support for the Taliban in Afghanistan.  Tr. 75:24-76:8; 76:17-18 (Roggio); PX-1 at 70; PX-80.  Iran's material support was crucial to the Taliban's ultimate victory in Afghanistan, as it enabled the Taliban to

force the U.S. withdrawal from Afghanistan after the Syndicate imposed significant casualties on U.S. troops in Afghanistan. Tr. 76:19-24 (Roggio).

80.     Iran provided five main categories of material support to the Taliban:  weapons, financial support, training, safe haven, and assistance with drug trafficking.  Tr. 76:18-19 (Roggio); 152:12-15 (Clarke).

81.     Iran provided this material support to the Taliban because it shared the same goal as the Taliban:  to inflict casualties on Americans and drive U.S. forces out of Afghanistan. Tr. 77:3-11 (Roggio); PX-1 at 75.  Iran feared that an American presence in Afghanistan — as it had in Iraq — would be used as a base to overthrow the Iranian regime.  Tr. 77:5-9 (Roggio); PX-1 at 75.

82.     The Qods Force's desired end state in Afghanistan aligned with the Taliban-led Syndicate's goal of driving U.S. forces from Afghanistan.  Tr. 77:3-5 (Roggio).  Given the lack of alternative organizations opposing the U.S. presence in Afghanistan, Iran turned to providing material support to the Taliban.  Tr. 77:12-20 (Roggio).

83.     An array of evidence confirms that Iran provided material support to the Taliban-led Syndicate from at least 2006 to 2019.  Tr. 77:21-25 (Roggio).  That evidence includes many U.S. terror designations.  For example, in August 2010, the U.S. Treasury Department designated the Ansar Corps Commander, General Hossein Musavi, as a Specially Designated Global Terrorist.  PX-1 at 76, 81; PX-73.  The U.S. Treasury Department explained that his responsibilities included Qods Force activities in Afghanistan.  PX-1 at 76; PX-73.  He also provided financial and other material support to the Taliban.  Tr. 78:12-23 (Roggio); PX-1 at 76. In his role as Ansar Corps Commander, General Musavi was directly responsible for the killing

and wounding of U.S. troops in Afghanistan through his support for the Syndicate.  Tr. 78:24-79:1 (Roggio).

84.     The U.S. Treasury Department also designated Colonel Hasan Mortezavi, a senior Qods Force officer, as a Specially Designated Global Terrorist, for providing financial and material support to the Taliban.  PX-1 at 76, 81; PX-73.  This same designation noted that the Qods Force provided select members of the Taliban with weapons, funding, logistical support and training.  PX-1 at 81; PX-73.

85.     Iran's material support for the Taliban-led Syndicate began shortly after the U.S. invasion of Afghanistan.  Tr. 83:5-8 (Roggio).  It began with the provision of safe haven, in Iran, to Taliban (and al-Qaeda) members who were driven from the battlefield after the U.S. invasion.  Tr. 83:7-12 (Roggio); PX-1 at 78.

### A.     Iran Provided the Taliban with Weapons and Explosives

86.     Iran provided a wide array of weapons to the Taliban-led Syndicate.  Tr. 83:14-84:1 (Roggio); PX-1 at 87-100.  This included small arms like AK-47s and assault rifles.  Tr. 83:17-18 (Roggio); PX-1 at 88.  It also included anti-tank missiles, rocket-propelled grenades, surface-to-air missiles, improvised explosive devices ("IEDs"), explosively formed penetrators, rockets, mortars, indirect fire weapons, recoilless rifles, PKM machine guns, ammunition, and component materials for suicide attacks (*e.g.*, triggers and detonators) to the Taliban-led Syndicate.  Tr. 83:17-84:1; 85:6-14 (Roggio); 165:1-7 (Clarke); PX-1 at 80-81, 87-88, 96-97.  Iran's provision of lethal weapons to the Taliban in Afghanistan has occurred since at least 2006.  Tr. 84:8-85:14 (Roggio); PX-9 at 192.

87.     Iran provided lethal weapons to Afghan terrorists for the same reason it funneled weapons to terrorists in Iraq:  to develop, fund and arm proxy networks to leverage them against the perceived U.S. aim of regime change.  Tr. 86:17-87:12 (Roggio); PX-207 at 7.  Just as it did

with Shia terrorists in Iraq, Iran partnered with the Taliban-led Syndicate and provided it a range of material support, including a variety of lethal weapons.  Tr. 87:10-12 (Roggio).

88.     Iran provided weapons to the Taliban-led Syndicate throughout Afghanistan. Tr. 87:13-88:8 (Roggio).  The flow of Iranian weapons into Afghanistan was not restricted to one specific region of Afghanistan; rather, Iranian weapons flowed to provinces across the country. Tr. 87:24-88:8 (Roggio).

89.     Declassified intelligence reporting establishes the flow of Iranian weapons to the Taliban-led Syndicate across Afghanistan.  Tr. 88:1-8 (Roggio).  The Islamic Revolutionary Guard Corps provided weapons and munitions — including IEDs — to the Taliban's Shadow Governor of Farah Province.  Tr. 90:6-91:4 (Roggio); PX-227 at 6.  For example, the Islamic Revolutionary Guard Corps gave Farah Province Shadow Governor Haji Yusouf 180 machine guns.  Tr. 91:5-92:1 (Roggio); PX-227 at 6.  The Taliban Shadow Governor took these weapons and then disseminated them to his subordinate commanders throughout Farah Province. Tr. 90:22-91:4; 91:22-25 (Roggio); PX-227 at 6.  These Iranian supplied weapons were used to carry out attacks against Afghan and Coalition forces.  Tr. 91:25-92:1 (Roggio).  Iran's provision of lethal weapons to a key Taliban leader, who then distributed the weapons across his network, amplified Iran's impact by enabling fighters across Farah Province to execute attacks.  Tr. 90:22-91:4 (Roggio); PX-227 at 6.

90.     Another example of Iranian provision of lethal weapons to the Taliban was its distribution of weapons to the Taliban's Shadow Governor of Helmand, Mullah Naim Barich. Tr. 92:22-93:17 (Roggio); PX-228 at 19.  Declassified intelligence reporting described Mullah Naim Barich as the Taliban's main representative to Iran.  Tr. 93:5-13 (Roggio); PX-228 at 19. He worked closely with the Islamic Revolutionary Guard Corps to facilitate specialized training,

equipment, and weapons from Iran into Helmand and Nimroz Provinces.  Tr. 93:5-13 (Roggio); PX-228 at 19.  After receiving these Iranian weapons, Mullah Naim Barich disseminated them to his lower-level commanders for use in attacks against U.S. and Coalition forces.  Tr. 93:14-17 (Roggio); PX-228 at 19.

91.     Iran's provision of weapons to the Taliban extended to Helmand and Kandahar Provinces.  Tr. 88:9-12 (Roggio).  Those provinces were important because Kandahar, adjacent to Helmand, was the historic birthplace of the Taliban organization.  Tr. 88:13-17 (Roggio).  The Taliban used these regions as hubs to grow and ship opium, a significant source of revenue for the Taliban.  Tr. 88:17-20 (Roggio).  Controlling these two provinces was strategically important to controlling Afghanistan.  Tr. 88:21-89:4 (Roggio).

### B.     Iran Provided the Taliban with Training

92.     Iran also provided a wide range of training to Taliban fighters.  Tr. 94:17-19 (Roggio); PX-1 at 100-107.  This included training on small unit tactics, infantry style tactics, and techniques for executing more complex attacks (*e.g.*, initiating an attack with a suicide bomb).  Tr. 94:18-95:2 (Roggio); 163:20-164:1; 164:19-20 (Clarke); PX-1 at 100-107.  Iran also trained the Taliban on how to gather intelligence and plan operations.  Tr. 95:2-4 (Roggio); PX-1 at 100-107.  The Qods Force provided such training to the Taliban in Afghanistan in connection with a variety of weapons, including small arms, explosives, and indirect-fire weapons. Tr. 95:10-22 (Roggio); PX-1 at 102; PX-9 at 192.

93.     The Qods Force sent trainers into Afghanistan to train Taliban units there in areas under Taliban control.  Tr. 95:23-96:6 (Roggio); PX-1 at 102-103; PX-9 at 192; PX-12 at 196.

94.     Iran also trained Taliban fighters inside of Iran.  Tr. 96:7-10 (Roggio); PX-1 at 101-102. From roughly 2005-2006 until the fall of the Afghan government in 2021, Iran operated training camps within its borders.  Tr. 96:11-97:4 (Roggio); PX-1 at 101-107.  Those

camps included training sites in Tehran, Mashhad, Zahedan and in the province of Kerman.  PX-1 at 105.

95.    Iran's provision of training inside its own borders was especially effective.  Tr. 97:5-9 (Roggio).  Unobstructed from the threat of Afghan or Coalition force targeting, Iranian-based training occurred over longer periods of time.  Tr. 97:7-25 (Roggio).  From the safe haven in Iran, the Islamic Revolutionary Guard Corps was able to train the Taliban not just in simple infantry tactics but also in complex-attack techniques.  *Id.*  This Iran-based training was important to Taliban fighters.  Tr. 97:23-25 (Roggio); PX-1 at 101-102.

96.    Iran tailored its training to enable Taliban fighters to overcome American defenses.  Tr. 98:1-4 (Roggio).  Iran's goal — just like the Taliban — was to kill and wound U.S. troops in Afghanistan.  Tr. 98:5-8 (Roggio).  In training the Taliban in a variety of tactics, Iran aimed to help the Taliban achieve that goal through terrorist attacks.  Tr. 98:5-8 (Roggio); PX-1 at 101-102.

97.    In what became a "train-the-trainer" model, the Taliban fighters who trained in Iran returned to Afghanistan and in turn trained additional Taliban members in the lessons learned from Iran, such as how to conduct infantry tactics, complex attacks, and how to build and employ IEDs.  Tr. 98:9-16 (Roggio); PX-1 at 101-102.  This increased the effectiveness of Iran's training — it was not limited to those Taliban fighters who traveled to Iran but spread to numerous Taliban fighters across Afghanistan — exponentially increasing the Taliban's effectiveness and lethality.  Tr. 98:17-19 (Roggio); PX-1 at 101-102.

### C.    Iran Provided the Taliban with Financial Support

98.    Iran also provided the Taliban with funding.  Tr. 98:20-99:4 (Roggio); PX-1 at 107-111.  This occurred in two main ways: *first*, Iran provided cash to Taliban fighters so that the Taliban could buy whatever weapons, ammunition, or other resources it needed to enable its

insurgency.  Tr. 98:23-99:2 (Roggio); PX-1 at 107.  Iran identified key Taliban leaders and distributed cash to them for dissemination to these leaders' networks.  Tr. 99:18-22 (Roggio); PX-1 at 107.

99.     For example, the Iranians provided the Taliban's Shadow Governor of Helmand, Mullah Naim Barich, financial support, which he used to resource his fighters.  Tr. 100:3-101:1 (Roggio); PX-1 at 111; PX-228 at 19.

100.     In another illustrative example of Iran's financial support to the Taliban, it also provided direct financial payments to a key Taliban commander who operated in the central Afghan provinces of Kabul, Parwan, and Kapisa.  Tr. 102:8-21 (Roggio); PX-229 at 15.  This senior Taliban commander, Amanullah, then took Iran's money and disbursed it to his key commanders so they could carry out the network's terrorist attacks.  Tr. 102:22-103:2 (Roggio); PX-1 at 109; PX-229 at 15.  One recipient of Amanullah's funding — which he received from Iran — was Qari Baryal, a leader of the Kabul Attack Network.  Tr. 102:22-103:5 (Roggio); PX-1 at 109; PX-229 at 15.  Qari Baryal participated in attacks against U.S. forces in and around the capital, including Bagram Air Base.  Tr. 103:5-8 (Roggio); PX-1 at 109.

101.     Iran did not merely finance Taliban-led Syndicate operations along its western border.  Tr. 103:11-14 (Roggio); PX-1 at 109.  Instead, Iran provided financial support to the Syndicate in the heart of Afghanistan.  Tr. 103:11-16 (Roggio); PX-1 at 109.  The Kabul Attack Network received financing directly from Iran and carried out numerous attacks, which wounded or killed American soldiers, in and around Kabul.  Tr. 103:11-21 (Roggio); PX-1 at 109.

102.     *Second*, Iran also issued bounties on U.S. and Afghan forces.  Tr. 99:3-4 (Roggio); PX-1 at 107-108.  For example, Iran would pay the Taliban various sums of money if the Taliban killed or wounded U.S. troops or damaged U.S. equipment.  Tr. 99:7-9 (Roggio);

PX-1 at 107-108.  While the Taliban did not need financial motivation to attack U.S. forces, these cash bounties helped resource the Taliban for future attacks.  Tr. 99:11-17 (Roggio).

103.     Iran's financing was significant.  Tr. 103:22-24 (Roggio); PX-1 at 108.  Iran's financial support enabled the Taliban to resource its fight against U.S. forces, including by allowing Taliban fighters to purchase weapons and other supplies.  Tr. 103:22-104:2 (Roggio).  And in receiving a steady stream of cash from Iran, the Syndicate had less of a need to independently fundraise.  Tr. 103:24-104:2 (Roggio); 160:18-161:8 (Clarke).  That was an important contributor in enabling the Taliban-led Syndicate to effectively execute its attacks against U.S. forces.  Tr. 103:24-104:2 (Roggio); PX-1 at 107-111.

### D.     Iran Provided the Taliban with a Safe Haven

104.     Iran also provided the Taliban-led Syndicate with safe haven.  Tr. 104:3-21 (Roggio); PX-1 at 100.  In the beginning, Iran provided Taliban fighters with shelter from U.S. forces in the wake of the U.S. invasion after September 11.  Tr. 105:8-13 (Roggio).

105.     The Taliban later established a more formal presence within Iran.  Tr. 105:14-16 (Roggio).  In 2007, the Taliban opened an office in Mashhad, Iran, which was also the headquarters of the Ansar Corps.  Tr. 105:14-24 (Roggio); PX-1 at 100.  It initially opened as a liaison office between the Taliban and the Islamic Revolutionary Guard Corps.  PX-1 at 100.  This office eventually became the Mashhad Shura, one of the Taliban's regional commands.  Tr. 105:18-24 (Roggio); 155:4-19 (Clarke); PX-1 at 100.  From this Mashhad Shura in Iran, the Taliban plotted operations in Afghanistan.  Tr. 105:18-24 (Roggio).

106.     The Taliban also opened up a formal office in the Iranian city of Zahedan.  Tr. 105:25-126:3 (Roggio); PX-1 at 106-107; PX-194 at 6.  In or around November 2009, five Taliban Shadow Governors — from the provinces of Helmand, Nimruz, Kandahar, Farah, and Uruzgan — traveled to Zahedan, Iran for the opening of an official Taliban office in Zahedan.

29

Tr. 106:4-107:25 (Roggio); PX-1 at 106-107; PX-194 at 6.  Zahedan is in southeastern Iran, right

along the border with Afghanistan.  Tr. 107:23-25 (Roggio).  Iran knew that safe haven for the

Taliban-led Syndicate was crucial to the Syndicate's success.  Tr. 108:3-5 (Roggio).

Accordingly, it permitted the Taliban to open a regional office in Zahedan, Iran, which was close

to Afghanistan.  Tr. 108:3-7 (Roggio); PX-1 at 106-107; PX-194 at 6.  From these official offices

in Iran, the Taliban planned, resourced and executed terror attacks inside of Afghanistan.

Tr. 108:3-7 (Roggio); PX-1 at 106-107; PX-194 at 6.

  107. Iran's safe haven was critical to the Taliban's terrorist insurgency.  Tr. 104:3-21

(Roggio).  Most importantly, in Iran, the Taliban enjoyed refuge from American targeting.

Tr. 104:24-105:13 (Roggio).  Free from the threat of American targeting, the Taliban was able to

organize, plan attacks, fundraise, and obtain resources in an uninhabited manner.  Tr. 104:14-21;

105:8-13 (Roggio).

### E. Iran Aided the Taliban's Drug-Trafficking Operations

  108. Iran also played a significant role in the Taliban's drug-trafficking operations.

Tr. 152:12-15 (Clarke); PX-2 at 80-88.  Drug trafficking was highly lucrative for the Taliban

insurgency.  Tr. 152:21-23 (Clarke); PX-2 at 82-83.

  109. Initially, the Taliban taxed farmers who were growing poppy.  Tr. 153:1-3

(Clarke); PX-2 at 82.  But over time, the Taliban became involved in every step of the

production process once it realized how much money could be made along the way.  Tr. 153:3-9

(Clarke); PX-2 at 82.  For example, the Taliban became involved in refining and manufacturing

poppy into heroin, the transportation of the drugs, and ultimately moving it to sale.  Tr. 153:4-9

(Clarke); PX-2 at 82.  At each step, the Taliban took a cut of the profits.  Tr. 153:8-9 (Clarke);

PX-2 at 81-83.

110.     Iran facilitated the Taliban's drug trafficking in several respects.  First, Iran permitted the Taliban's drugs to pass through the Iran-Afghanistan border.  Tr. 153:18-21; 157:20-158:8 (Clarke); PX-2 at 84-87.  The Taliban was interested in transporting drugs through Iran, because it provided passage to major markets — including to Europe, Central Asia, and to the Persian Gulf.  Tr. 156:1-157:13 (Clarke); PX-2 at 83.  Iranian government officials helped the Taliban facilitate drug trafficking across the border into Iran by providing the Taliban with special license plates for the Taliban vehicles.  Tr. 158:24-159:7 (Clarke); PX-2 at 85.  Once these Taliban vehicles approached the Iranian border, Iranian Border Patrol would not search these vehicles.  Tr. 159:1-7 (Clarke); PX-2 at 85.  This enabled the Taliban to have unrestricted access into Iran to transport drugs to other markets.  Tr. 159:1-7 (Clarke); PX-2 at 85.

111.     Iran also sent weapons back with drug traffickers to give to the Taliban in Afghanistan.  Tr. 153:21-23 (Clarke); PX-2 at 80, 85-86.  And in some instances, Iran also worked directly with drug smugglers to plan attacks on U.S. soldiers.  Tr. 153:23-25 (Clarke); PX-2 at 83, 85, 87, 88.

112.     Iran's support of the Taliban's drug trafficking mimicked its support to other terrorist groups similarly involved in drug trafficking.  For example, Iran also supported Hezbollah's drug trafficking operations in multiple continents.  Tr. 159:12-19 (Clarke); PX-2 at 88.  Despite domestic problems with drugs in Iran, the regime was willing to support the Taliban's drug trafficking, because it understood that the upside of driving the U.S. out of Afghanistan outweighed the potential collateral damage within its country.  Tr. 159:20-160:8 (Clarke); PX-2 at 81.

113.     From 2006 to 2019, roughly 80 to 90 percent of the world's supply of heroin came from Afghanistan.  Tr. 157:14-19 (Clarke).  During this time period, the Taliban made

between $50 million and $500 million per year from its drug trafficking.  Tr. 153:10-13 (Clarke); PX-2 at 82-83.

114.    Iran's support of the Taliban's drug trafficking provided the Taliban with important financial resources.  Tr. 160:18-23 (Clarke); PX-2 at 88.  This support enriched the Taliban and allowed the Taliban to allocate additional resources to its terrorist operations. Tr. 160:24-161:6 (Clarke); PX-2 at 88.  This drug-trafficking support provided the Taliban with a level of financial flexibility that few insurgent groups enjoy.  Tr. 161:7-8 (Clarke).

## IV.    IRAN'S RELATIONSHIP WITH AL-QAEDA

115.    Al-Qaeda and Iran have long had a close relationship.  Tr. 108:8-11 (Roggio); PX-1 at 111-118.  Iran has given material support to al-Qaeda across the globe — including in Afghanistan.  Tr. 108:16-109:21 (Roggio); PX-1 at 111.  Iran provided al-Qaeda this support because they share a common goal of driving the U.S. from the Middle East — including both Iraq and Afghanistan.  Tr. 108:16-109:1 (Roggio); PX-1 at 111-118.

116.    For example, Iran and its proxy, Hezbollah, provided key material aid to al-Qaeda ahead of the terrorist group's 1998 bombings of the U.S. embassies in Tanzania and Kenya. Tr. 109:2-7 (Roggio).  Specifically, Iran and Hezbollah assisted al-Qaeda by teaching it how to build and employ suicide vehicles.  Tr. 109:7-9 (Roggio); PX-1 at 112.

117.    The relationship between al-Qaeda and Iran continued after September 11, 2001. Tr. 109:10-13 (Roggio); PX-1 at 112-113.  Al-Qaeda and Iran had a secret deal through which Iran served as a key location for al-Qaeda to base its operations.  Tr. 109:10-21 (Roggio); PX-1 at 113-114.  Internal al-Qaeda communication from Osama bin Laden to former head of al-Qaeda in Iraq, Abu Ayyub al-Masri, revealed that bin Laden chastised al-Masri for threatening the Shia.  Tr. 110:1-14 (Roggio); PX-1 at 114; PX-252 at 1.  Bin Laden observed that it was

important for al-Qaeda to maintain the relationship with the Shia in order to avoid not alienating
Iran.  Tr. 110:13-14 (Roggio); PX-1 at 114; PX-1 at 252.

118.    Bin Laden observed in 2007 that "Iran is our main artery for funds, personnel, and
communication, as well as the matter of hostages."  Tr. 111:12-16 (Roggio); PX-1 at 114; PX-
252 at 1.  Bin Laden expressly identified Iran as a key supporter of al-Qaeda operations for
funding, personnel, safe haven, and general facilitation.  Tr. 111:17-20 (Roggio); PX-1 at 114;
PX-252 at 1.  Iran's support for al-Qaeda's operations extended to Afghanistan.  Tr. 111:21-23
(Roggio).

119.    Much like it did with the Taliban, Iran provided al-Qaeda with safe haven within
Iran's borders.  Tr. 108:11-12 (Roggio); PX-1 at 112-113.  After September 11, 2001, numerous
senior al-Qaeda leaders and their families fled Afghanistan and went to Iran for protection.
Tr. 112:1-3 (Roggio); PX-1 at 112-113.  The Islamic Revolutionary Guard Corps provided al-
Qaeda safe houses and protection, which enabled al-Qaeda to continue planning and resourcing
future operations.  Tr. 112:1-4 (Roggio); PX-1 at 112-113.  Senior al-Qaeda operatives retained
the flexibility to travel to and from Iran — highlighting the freedom Iran offered these al-Qaeda
operatives.  Tr. 112:5-12 (Roggio); PX-1 at 112-113.

120.    There are multiple examples of senior al-Qaeda leaders living and operating out
of Iran.  For example, Hamza bin Laden married inside of Iran in 2007.  Tr. 112:15-23 (Roggio);
PX-1 at 113.  Senior al-Qaeda leader Mohammed Islambouli attended this wedding inside of
Iran, and Iranian intelligence was likely aware of this marriage and permitted senior al-Qaeda
leaders to gather.  PX-1 at 113.

121.    Saif al-Adel, al-Qaeda's deputy emir, also traveled to and from Iran.  Tr. 113:11-
13 (Roggio); PX-1 at 113.  He served as al-Qaeda's military chief and was a member of al-

Qaeda's central shura or consultative council.  Tr. 113:13-15 (Roggio); PX-1 at 113.  He is

believed to reside in Iran today.  Tr. 113:16-17 (Roggio); PX-1 at 117.

122.    Senior al-Qaeda commander Abu Mohammed al-Masri, the previous deputy emir

of al-Qaeda, was killed in Tehran, Iran in August 2020.  Tr. 113:19-114:5 (Roggio); PX-1 at 117.

He played a significant role in the 1998 al-Qaeda bombings of the U.S. embassies in Kenya and

Tanzania.  Tr. 113:19-21 (Roggio); PX-1 at 117.  Although he had an Islamic Revolutionary

Guard Corps bodyguard, he was able to set aside his security detail the day he was killed.

Tr. 113:19-114:5 (Roggio).  He operated openly inside in Iran.  *Id.*; PX-1 at 117.  Iran's

government provided all of these al-Qaeda senior leaders safe haven within their borders.

Tr. 114:6-11 (Roggio); PX-1 at 114-118.

123.    The United States government has designated multiple al-Qaeda leaders for

linkages to Iran.  For example, Yasin Al-Suri was characterized as al-Qaeda's main

representative in Iran.  Tr. 115:10-15 (Roggio); PX-1 at 114.  Al-Suri transported money and al-

Qaeda recruits from across the Middle East into Iran.  Tr. 115:17-20 (Roggio).  His designation

also referenced the strategic agreement between al-Qaeda and Iran.  Tr. 115:15-17 (Roggio).

124.    Another United States government designation involved Atiyah Abd al-Rahman,

al-Qaeda's then general manager.  Tr. 115:25-116:1 (Roggio).  As al-Qaeda's general manager,

al-Rahman communicated directly with bin Laden and disseminated those communications to al-

Qaeda branches or other key al-Qaeda leaders.  Tr. 116:2-13 (Roggio); PX-1 at 51, 63.  He also

was al-Qaeda's leader in North and South Waziristan and traveled to and from Pakistan from

Iran with the permission of Iranian officials.  Tr. 116:15-118:7 (Roggio).

125.    Finally, Abdul Al-Rahman al-Maghrebi, son-in-law to al-Qaeda's emir Ayman al-

Zawahiri, is believed to live in Iran and was known to have operated in Iran at least as of the

summer of 2021.  Tr. 118:8-22 (Roggio); PX-1 at 118.  Al-Maghrebi previously directed al-Qaeda's propaganda arm and now serves as al-Qaeda's general manager and had previously been al-Qaeda's general manager in both Afghanistan and Pakistan.  Tr. 118:10-20 (Roggio); PX-1 at 118.

126.    Iran was clearly aware that it was hosting and facilitating al-Qaeda leaders in Iran. Tr. 119:3-6 (Roggio).  Al-Qaeda's deputy emir and general manager are likely operating out of Iran today.  Tr. 119:3-10 (Roggio).  This enables al-Qaeda to plan, resource, and carry out global operations.  Tr. 119:3-10 (Roggio).  Al-Qaeda clearly recognizes that it can rely on Iran for safe haven, which is critical for the terrorist group's ability to conduct terrorist attacks.  Tr. 119:11-19 (Roggio).

127.    Iran's support of al-Qaeda was significant.  Tr. 119:20-120:9 (Roggio); PX-1 at 111-118.  Iran's safe haven enabled al-Qaeda to flourish largely undisturbed.  Tr. 120:2-3 (Roggio); PX-1 at 113-118.  Al-Qaeda, in turn, provided its tactical and operational expertise to the Taliban-led Syndicate, which amplified the Syndicate's effectiveness in killing and injuring U.S. forces.  Tr. 120:2-9 (Roggio).

## V.    IRAN'S MATERIAL SUPPORT SUBSTANTIALLY CONTRIBUTED TO THE TERRORIST ATTACKS THAT KILLED AND INJURED PLAINTIFFS

128.    In providing material support to the Taliban-led Syndicate, Iran's desired end state was to empower the Syndicate to kill and wound as many American soldiers in Afghanistan as possible to force the U.S. to evacuate Afghanistan.  Tr. 120:10-18 (Roggio); PX-1 at 118.  Iran successfully achieved this goal when the U.S. officially left Afghanistan on August 31, 2021. Tr. 120:19-121:1 (Roggio); PX-1 at 123.

129.    Iran's support to the Taliban-led Syndicate significantly contributed to the Syndicate's ability to carry out terrorist attacks against Americans in Afghanistan.  Tr. 121:2-5

35

(Roggio); PX-1 at 118-123.  Without Iran's support as a state sponsor of terrorism, the Taliban-led Syndicate would have had greater difficulty obtaining the funds, weapons, materials, and safe haven needed to plan and execute terrorist attacks.  Tr. 121:6-21 (Roggio); PX-9 at 191.

130.    After September 11, 2001, the United States largely defeated the Taliban. Tr. 122:4-10 (Roggio); PX-1 at 118-119.  Iran's material support to the Taliban-led Syndicate was critical to enabling the Taliban to reconstitute its forces.  Tr. 122:4-7 (Roggio); PX-1 at 119. Iran provided the Syndicate weapons, training, financing, and safe haven — all critical components for the insurgency to regenerate.  Tr. 122:7-9 (Roggio); PX-1 at 119-120.  This material support enabled the Taliban to kill and wound numerous Americans in Afghanistan. Tr. 122:9-10 (Roggio); PX-1 at 119-120.

131.    Iran was successful in orchestrating American casualties in Afghanistan because of its long history supporting terrorists around the globe.  Tr. 122:11-24 (Roggio); PX-1 at 123. When it came to Afghanistan, the Islamic Revolutionary Guard Corps and Qods Force had an existing blueprint, which it imported into Afghanistan.  Tr. 122:14-16 (Roggio).  Iran internalized lessons it learned in other theaters and applied them to Afghanistan, which helped Iran successfully empower the Taliban-led Syndicate to kill and injure Americans.  Tr. 122:19-24 (Roggio).

132.    Iran's cross-cutting support for multiple facets of the Taliban-led Syndicate enhanced the effectiveness of its assistance.  Tr. 123:5-13 (Roggio).  Components of the Syndicate did not have to compete with each other for resources, and it reduced the Syndicate's need to constantly search for weapons, financing, and training.  Tr. 123:11-13 (Roggio). Supporting one Syndicate component thus benefited the broader Syndicate and empowered the

Syndicate to more effectively carry out attacks against U.S. and Coalition forces.  Tr. 123:14-20 (Roggio).

133.    Iran's support for the Syndicate was fungible.  Tr. 123:21-124:13 (Roggio); PX-1 at 122.  Its broad support for the Taliban, including the Haqqani Network, and al-Qaeda thus benefited the Syndicate as an organization and enhanced the Syndicate's ability to conduct all of the attacks it carried out.  Tr. 123:21-124:13 (Roggio); PX-1 at 122.  Iran's contribution to those attacks did not require its direct involvement in the details of individual attacks.  Tr. 123:21-124:13 (Roggio).  Indeed, the support Iran provided to the Syndicate not only directly aided the terrorists in ongoing endeavors, but it also freed up resources for the Syndicate to dedicate to other terrorist objectives.  Tr. 160:18-161:8 (Clarke); PX-1 at 122.  Through this cross-cutting organizational support, Iran substantially contributed to every terrorist attack at issue in this case.  Tr. 124:7-13 (Roggio); PX-1 at 115-120.

## VI.    TALIBAN-LED SYNDICATE HAD OPERATIONAL DOMINANCE IN EACH OF THE PROVINCES WHERE AN ATTACK OCCURRED IN THIS CASE

134.    Geography and time period are fundamental pieces of information for attributing an attack to a particular terrorist group.  Tr. 366:16-20; 367:9-10; 367:20-23 (Wood).  Based on the history of attacks, patterns on how these terrorist groups typically act in various regions can be catalogued.  Tr. 366:21-367:2 (Wood).  It is often possible to attribute an attack to a particular terrorist group based solely on the geography and time period.  Tr. 375:17-20 (Wood); PX-3 at 9.

135.    The Taliban very likely carried out all attacks in this case that occurred in Southern Afghanistan.  Tr. 168:22-169:2; 169:16-25 (Clarke); 178:1-16; 183:8-10; 184:1-7; 186:18-187:1 (McGrath); 421:14-22 (Wood); PX-2 at 50.  This region comprises Kandahar and Helmand Provinces, which have traditionally been Taliban strongholds.  Tr. 168:22-169:9 (Clarke); PX-2 at 51.  The Taliban was also the most dominant insurgent organization in that

area of operations during the 2006 to 2019 time period.  Tr. 169:6-8 (Clarke).  Furthermore, the

attacks in this case that occurred in Southern Afghanistan reflected the tactics, techniques, and

procedures typically employed by the Taliban.  Tr. 168:22-169:9 (Clarke).

136.    Not only did the Taliban originate in Kandahar Province, but it operated in

Kandahar Province since the beginning of the insurgency.  PX-2 at 51.  Kandahar was the center

of gravity for the Taliban's efforts in Afghanistan.  Tr. 189:3-18 (McGrath); PX-2 at 51.  No

other terrorist group had a meaningful presence in Kandahar during at least the 2007 to 2014

time period, when the attacks were carried out in this case.  PX-2 at 52.  The Taliban claimed

numerous attacks on U.S. and Coalition forces in Kandahar during this time period.  PX-2 at 51-

52.  For example, the Taliban had different strongholds in Kandahar Province, where large

numbers of Taliban fighters would not only conduct training but launch attacks against Coalition

forces.  Tr. 186:21-191:6 (McGrath).  Particular strongholds in Kandahar Province included the

districts of Zhari, Arghandab, and Panjwai.  Tr. 189:3-18 (McGrath).

137.    The Taliban was also the main group in Helmand Province capable of challenging

the former Afghan government, because large parts of Helmand Province were Taliban-

controlled.  Tr. 187:2-188:17 (McGrath); 375:21-376:3; 421:7-22 (Wood); PX-2 at 52.

Particular strongholds in Helmand Province included the districts of Lashkar Gah, Sangin, Musa

Qala, and Nawzad.  Tr. 187:2-188:2 (McGrath).

138.    Second, the Taliban claimed responsibility for numerous attacks on U.S. and

Coalition forces in Helmand Province during the 2007 to 2019 time period, when the attacks

were carried out in this case.  PX-2 at 53.  Finally, no other insurgent group came close to

challenging the Taliban's control of Helmand Province.  PX-2 at 54.

139.     In Loya Paktia, the Haqqani Network very likely carried out all attacks in this case that occurred in this region.  Tr. 170:16-20 (Clarke).  Loya Paktia encompasses Khost, Paktia, and Paktika Provinces.  PX-2 at 54.

140.     Loya Paktia is a culturally Pashtun area in southeastern Afghanistan that has been the traditional stronghold of the Haqqani Network.  *Id.*  The Haqqani Network's traditional tribal areas extend throughout Loya Paktia and across the border with Pakistan into North Waziristan.  Tr. 37:7-15 (Roggio).  The locals in Loya Paktia were members of the same tribe as the Haqqani Network leaders and generally supported the Haqqani Network and broader Taliban.  Tr. 488:14-17 (Wood).  The Taliban's Haqqani-led Miramshah Shura was responsible for overseeing attacks within Loya Paktia.  Tr.148:14-18 (Clarke); PX-2 at 33; PX-3 at 39.  During the time period when attacks were carried out in this case, the Haqqani Network was the dominant terrorist group in this area of operations.  Tr. 170:21-171:1 (Clarke).  Furthermore, the attacks in this case that occurred in Loya Paktia reflected the tactics, techniques, and procedures typically employed by the Haqqani Network.  Tr. 170:24-171:1 (Clarke).

141.     Khost Province has been a stronghold of the Haqqani Network.  PX-2 at 54.  In Febraury 2005, Sirajuddin Haqqani identified himself as the head of the Taliban military committee for Paktia, Paktika, Khost, Ghazni, and Logar Provinces.  *Id.*  The Taliban also claimed responsibility for several attacks in Khost Province during the 2007 to 2012 time period.  *Id*.  Finally, no other terrorist group had a meaningful presence in Khost during the time period when attacks were carried out in this case.  *Id.* at 55.

142.     From at least the 2007 to 2013 time period, the Haqqani Network maintained area-of-operations dominance in Paktia Province.  *Id.*  Taliban statements made clear that Paktia Province was a Haqqani stronghold*.  Id.* at 55-56.  For example, in February 2005, Sirajuddin

Haqqani identified himself as the head of the Taliban military committee for Paktia, Paktika, Khost, Ghazni, and Logar Provinces. *Id.* at 56.  The Taliban also claimed responsibility for attacks on U.S. troops in this province.  *Id.*  Finally, no other terrorist group had a meaningful presence in Paktia during the time period when attacks were carried out in this case.  *Id.* at 57.

143.    Throughout at least the 2007 to 2013 time period, the Haqqani Network maintained area-of-operations dominance in Paktika Province.  *Id.*  Taliban statements made clear that Paktika Province was a Haqqani stronghold.  *Id.*  For example, in February 2005, Sirajuddin Haqqani identified himself as the head of the Taliban "military" committee for Paktia, Paktika, Khost, Ghazni, and Logar Provinces.  *Id.*  The Taliban also claimed responsibility for attacks on U.S. troops in this province.  *Id.* at 57-58.  No other terrorist group had a meaningful presence in Paktika during the time period when attacks were carried out in this case.  *Id.* at 58.

144.    In Kabul, members of the Kabul Attack Network very likely carried out all attacks in this case that occurred in this Province.  Tr. 171:9-17 (Clarke).  Those attacks were carried out jointly by the Taliban, including the Haqqani network, al-Qaeda, and other terrorist groups.  PX-2 at 69.

145.    During the time period when attacks were carried out in this case, the Kabul Attack Network was responsible for the most spectacular attacks in and around Kabul. Tr. 171:9-16 (Clarke), 444:5-13 (Wood); PX-2 at 69.  Furthermore, the attacks in this case that occurred in Kabul reflected the tactics, techniques, and procedures typically employed by the Kabul Attack Network.  Tr. 171:9-17 (Clarke).

146.    Until ISIS-Khorasan's first attack in Kabul in 2016, the Taliban-led Syndicate very likely faced no challenges to its area-of-operations dominance.  PX-2 at 69.  The Kabul

Attack Network, led by the Haqqani Network, also claimed responsibility for numerous attacks on U.S. and Coalition targets in Kabul prior to ISIS-Khorasan's formation. *Id*. at 69-71.

147.    Only one attack at issue in this case occurred following ISIS-Khorasan's first attack in Kabul. *Id.* at 71. That attack, which occurred on January 14, 2019, was claimed by the Taliban and not claimed by ISIS-Khorasan. *Id.* The Kabul Attack Network was the dominant group in Kabul prior to the emergence of competition from ISIS-Khorasan. *Id.* After the emergence of competition, the Taliban very likely conducted the only attack at issue in Kabul in this case. *Id.*

148.    In N2KL, the Taliban, with direct participation by al-Qaeda, likely carried out all attacks in this case. Tr. 171:18-24 (Clarke). N2KL is an area in eastern Afghanistan, which includes Nangarhar, Nuristan, Kunar, and Laghman Provinces. PX-2 at 64. The Taliban, with the assistance of al-Qaeda, was the dominant terrorist organization in that area of operations during the time period when attacks were carried out in this case. Tr. 171:25-172:3 (Clarke). Furthermore, the attacks in this case that occurred in N2KL reflected the tactics, techniques, and procedures typically employed by the Taliban and al-Qaeda. Tr. 172:3-6 (Clarke).

149.    In N2KL, al-Qaeda had its most robust presence in Afghanistan. Tr. 172:7-11 (Clarke). Al-Qaeda also had a safe haven in Pakistan, right across the border, which allowed al-Qaeda to carry out attacks in N2KL. Tr. 172: 7-16 (Clarke).

150.    Throughout at least the 2007 to 2012 time period, the Taliban maintained area-of-operations dominance in Kunar Province. PX-2 at 65. The Taliban also claimed responsibility for attacks on U.S. troops in this province. *Id*. at 65-66. Finally, although the Islamist group Hezb-e-Islami Gulbuddin[7] ("HIG") had a presence in Kunar Province, the Taliban worked to co-

---

[7] HIG also participated in the Syndicate. *See* PX-1 at 12-13.

opt important elements of HIG, and many HIG fighters defected to the Taliban — bolstering the Taliban's dominance in this province.  *Id.*

151.    Throughout at least the 2009 to 2011 time period, the Taliban likely maintained area-of-operations dominance in Laghman Province.  *Id*. at 66.  First, multiple sources point to the Taliban as the strongest insurgent group in the area.  *Id.*  The Taliban also claimed responsibility for attacks on U.S. troops in this province.  *Id.*  Finally, the HIG presence in Laghman Province was relatively weak, and it is more likely than not that the Taliban was the dominant insurgent group in Laghman Province when the attacks in this case occurred.  *Id*. at 67.

152.    Throughout at least the 2008 to 2015 time period, the Taliban likely maintained area-of-operations dominance in Nangarhar Province.  *Id.*  HIG had defected to the Taliban in March 2005, which empowered the Taliban to become dominant in eastern Afghanistan — including Nangarhar Province.  *Id.*  Although ISIS-Khorasan established a presence in Nangarhar Province in 2015, only one attack at issue in this case occurred following 2015.  *Id.*  It appears the Taliban was responsible for that June 10, 2017 attack, which killed three American soldiers. *Id*.  The Taliban subsequently claimed responsibility for this insider attack in Nangarhar Province.  *Id*. at 68

153.    During the time period attacks occurred in this case, the Taliban likely maintained area-of-operations dominance in Nuristan Province.  *Id.*  HIG had defected to the Taliban in March 2005, which empowered the Taliban to become dominant in eastern Afghanistan — including Nuristan Province.  *Id.*  The Taliban also claimed responsibility for a joint 2008 Taliban and al-Qaeda attack on U.S. troops in this province.  *Id.*

154.     In North Central Afghanistan, the Taliban likely carried out all attacks in this case that occurred in this region.  Tr. 172:17-20 (Clarke).  This region comprises the areas north of Kabul of Parwan, Kapisa, Baghlan, and Kunduz Provinces.  PX-2 at 71.

155.     Throughout at least the 2008 to 2011 time period, the Taliban very likely maintained area-of-operations dominance in Baghlan Province.  *Id*. at 71-72.  Although HIG also operated in Baghlan Province, the Taliban displaced HIG and enabled the Taliban to assert dominance in Baghlan Province.  *Id.* at 72-74.

156.     Throughout at least the 2007 to 2009 time period, the Taliban likely maintained area-of-operations dominance in Kapisa Province.  *Id*. at 74.  Although HIG also operated in Kapisa Province, the Taliban displaced HIG and enabled the Taliban to assert dominance in Kapisa Province.  *Id*. at 74-75.  The Taliban also claimed responsibility for a joint July 2008 attack on Coalition forces in this Province.  *Id.* at 75.

157.     Throughout at least the 2009 to 2010 time period, the Taliban likely maintained area-of-operations dominance in Kunduz Province.  *Id.*  Although HIG also operated in Kunduz Province, the Taliban displaced HIG and enabled the Taliban to assert dominance in Kunduz Province.  *Id.*  By the time the attacks at issue occurred, the Taliban had established itself as a formidable group in this Province.  *Id.*  Finally, the Taliban seized Kunduz City in 2015, which suggests the group was deeply entrenched in Kunduz Province in preceding years.  *Id.* at 76.

158.     Throughout at least the 2008 to 2016 time period, the Taliban very likely maintained area-of-operations dominance in Parwan Province.  *Id.*  First, multiple sources indicate that the Taliban was not only stronger relative to other insurgent groups in Parwan Province, but the Taliban was also stronger than the Afghan government in this Province.  *Id.*  The Taliban also claimed responsibility for at least one attack against U.S. soldiers and another

attack against Bagram Airfield, during the 2008 to 2016 time period, in this Province. *Id.* at 76-77. Additionally, none of the Taliban's competitors had a significant presence in Parwan Province during this time period. *Id.* at 77.

159. In Western Afghanistan, the Taliban very likely carried out all attacks in this case. Tr. 173:22-174:1 (Clarke). This region includes Nimruz, Farah, Herat, Baghdis, Ghor, and Faryab Provinces. PX-2 at 77.

160. Throughout at least the 2010 to 2011 time period, the Taliban very likely maintained area-of-operations dominance in Badghis Province. *Id.* First, multiple sources indicate that the Taliban controlled parts of Badghis Province around the time when the attacks at issue occurred. *Id.* By 2009, the Taliban controlled or gained the freedom to operate in large parts of the Province. *Id.* The Taliban also claimed responsibility for at least two attacks in 2010 and 2011 in Badghis Province. *Id.* at 77-78. Additionally, there was no other known insurgent presence in Badghis Province during the 2010 to 2011 time period. *Id.* at 78.

161. Throughout at least 2011, when the attack at issue occurred, the Taliban very likely maintained area-of-operations dominance in Farah Province when the attack at issue occurred. *Id.* The Taliban also claimed responsibility for an attack in Farah Province in 2012. *Id.* Additionally, there was no other known insurgent presence in Farah Province during at least 2011. *Id.*

162. Throughout at least the 2010 to 2012 time period, the Taliban very likely maintained area-of-operations dominance in Faryab Province when the attacks at issue occurred. *Id.* at 79. Multiple sources indicate that the Taliban launched attacks in Faryab Province during this time. *Id.* The Taliban also claimed responsibility for at least one attack in Faryab Province during the 2010 to 2012 time period: a suicide bombing in April 2012, which killed three U.S.

soldiers. *Id.* Additionally, there was no other known insurgent presence in Faryab Province during the 2010 to 2012 time period. *Id.*

163.     Throughout at least 2009, when the attacks at issue occurred, the Taliban very likely maintained area-of-operations dominance in Herat Province. PX 2 at 79. Multiple sources indicate that the Taliban was the dominant terrorist group controlling Herat Province as of 2009. *Id.* The Taliban also claimed responsibility for at least one attack in Herat Province during the relevant time period: a 2009 attack in Karukh District. *Id.* Additionally, although HIG was trying to reorganize itself in Herat Province, it only had a small footprint in the Province at this time. *Id.* at 79-80.

164.     In Southeastern Afghanistan, the Taliban, including the Haqqani Network, very likely carried out all attacks in this case that occurred in this region. Tr. 170:1-7 (Clarke); 178:1-16; 183:8-10; 184:1-7; 186:18-187:1 (McGrath). This region includes Ghazni, Logar, Uruzgan, Wardak, and Zabul Provinces. PX-2 at 58. Not only was the Taliban the most dominant insurgent organization in this region during the relevant time period, but the attacks in this case in Southeastern Afghanistan reflected the tactics, techniques, and procedures of how the Taliban typically operated. Tr. 170:8-15 (Clarke).

165.     Throughout at least the 2007 to 2012 time period, the Haqqani Network very likely maintained area-of-operations dominance in Ghazni Province. PX-2 at 58. Multiple sources indicate that the Haqqani Network controlled this Province. *Id.* In February 2005, Sirajuddin Haqqani identified himself as the head of the Taliban military committee for Paktia, Paktika, Khost, Ghazni, and Logar Provinces. *Id.* Additionally, the Rahbari Shura assigned responsibility for Ghazni Province to the Haqqani-dominated Miramshah Shura. *Id.* at 59. The Taliban also claimed responsibility for at least one attack in Ghazni Province during the 2007 to

2012 time period: a 2012 suicide bombing, which killed three U.S. troops, in Ghazni Province. *Id.* Finally, HIG only maintained a limited presence in Ghazni Province. *Id.*

166. Throughout at least the 2008 to 2013 time period, the Taliban very likely maintained area-of-operations dominance in Logar Province. *Id.* In February 2005, Sirajuddin Haqqani identified himself as the head of the Taliban military committee for Paktia, Paktika, Khost, Ghazni, and Logar Provinces. *Id.* The Taliban's Quetta regional military shura also influenced operations in Logar Province. *Id.* The Taliban also claimed responsibility for several attacks on U.S. troops in this province during the 2008 to 2013 time period. *Id.* at 60. Finally, although HIG maintained a presence in Logar, the Taliban was the strongest insurgency in the Province. *Id.*

167. Throughout 2007 to 2012 and in 2019, the Taliban very likely maintained area-of-operations dominance or a stronghold in Uruzgan Province. Tr. 190:4-9 (McGrath); PX-2 at 61. In particular, the district of Tarin Kowt was a Taliban stronghold. Tr. 190:4-9 (McGrath). The Taliban has a deep historical connection to this area, as its former deputy leader, Mullah Baradar, was from Uruzgan Province. PX-2 at 61. Multiple sources indicate that the Taliban was the dominant insurgent force in this Province. *Id.* The Taliban also claimed responsibility for at least one attack in Uruzgan Province during the relevant time period: a 2009 suicide bombing attack. *Id.* Finally, there was no evidence of a significant presence of other insurgent forces during the relevant time period. *Id.*

168. Throughout at least the 2009 to 2013 time period, the Taliban very likely maintained area-of-operations dominance in Wardak Province. *Id.* Multiple sources indicate that the Taliban possessed a robust presence in this Province when the attacks in this case occurred. *Id.* at 61-62. The Taliban also claimed responsibility for numerous attacks on U.S.

troops in this Province. *Id*. at 62.  Although HIG had a presence in Wardak, HIG fighters

defected to the Taliban, which allowed the Taliban to gain the upper hand in the Province by the

time the attacks at issue in this case occurred. *Id.* at 63.

169.    Throughout at least the 2008 to 2012 time period, the Taliban very likely

maintained area-of-operations dominance in Zabul Province.  Tr. 190:10-23 (McGrath); PX-2 at

63.  Particular strongholds in Zabul Province included the districts of Qalat and DayChopan.

Tr. 190:10-23 (McGrath).  Multiple sources indicate that the Taliban was the dominant insurgent

group in the Province. PX-2 at 63.  The Taliban also claimed responsibility for numerous attacks

in this Province. *Id.* at 63-64.

## VII.    BELLWETHER ATTACK TYPES

170.    Complex attacks are attacks involving advanced tactics.  PX-3 at 34.  This can

include attacks conducted by separate units working together at an objective, using multiple

weapon systems with phased operations, and using sophisticated maneuvers.  Tr. 378:25-379:7

(Wood); PX-3 at 34.

171.    The Taliban often executed complex attacks in conjunction with major Taliban

offensives.  Complex attacks often involved Taliban fighters hiding weapons and equipment

ahead of time and then moving into position to attack using these items.  Insurgents would

conduct reconnaissance and surveillance ahead of time and filmed attack locations before and

during these engagements.  Complex attacks against Coalition forces involved rockets, mortars,

and small arms fire by hundreds of Taliban fighters lasting for several days.  PX-3 at 34.

172.    IED attacks involved the use of a bomb to destroy, incapacitate, harass, or

distract. *Id.* at 27.  The Taliban used IEDs as a disruptive method of attack to attrit and delay

Coalition forces and to allow the Taliban to cause casualties without the need to engage

Coalition forces directly. *Id.*; Tr. 417:5-11 (Wood).  For example, the Taliban used IEDs

extensively in the Helmand River Valley.  PX-3 at 34.  As the IED became the most effective weapon against the Coalition, the Taliban began to use them more frequently and more widely across the country.  *Id.* at 32.  IEDs were the most prevalent attack tactic and the greatest casualty-producing weapon system used against Coalition forces in Afghanistan.  Tr. 195:23-196:23 (McGrath); 216:14-17 (Lemon); PX-3 at 27.

173.    Ammonium nitrate-based explosives were one of the most common ingredients for Taliban IEDs.  PX-3 at 28.  Ammonium nitrate was also favored due to its relative stability when moving and emplacing as part of an IED.  Tr. 423:24-424:3 (Wood); PX-3 at 29.  But following an ammonium nitrate ban, the Taliban began to use chlorate, provided by the Haqqani Network.  PX-3 at 29.  By 2013, more than 65 percent of identified explosives in Afghanistan were listed as chlorate-based.  *Id.*

174.    During the 2006 to 2019 time period, the Taliban used several different types of IEDs in Afghanistan, including victim-operated pressure-plates, command-wire detonated IEDs, remote controlled IEDs, vehicle-borne IEDs, and suicide vest, or person-borne, IEDs.  *Id.* at 30.  The use of different IED types reflected the Syndicate's innovation and evolution of techniques against U.S. and Coalition force tactics and protective measures.  *Id.*

175.    Indirect fire is the use of rockets or mortars to attack an objective.  Tr. 473:4-8 (Wood).  Rockets and mortars provided the Taliban insurgency with indirect fire systems — systems that did not rely on a direct line of sight with the target — that they employed against heavily fortified Coalition bases to harass and cause casualties.  PX-3 at 35.

176.    Insurgents typically directed a rocket by placing it on sandbags, rocks, or metal rails aiming it in the general direction of Coalition forces in the hopes of hitting something or

someone. *Id.* Instances of more accurate rocket fire indicate outside training or advising from transnational terrorists such as al-Qaeda or clandestine state support from Iran and Pakistan. *Id.*

177.    Mortar attacks, particularly 82mm mortars, were more frequent than rocket attacks. *Id.* Taliban mortar attacks were also typically ineffective due to a lack of training. *Id.* Individuals who had training and an understanding of the basic geometry of a mortar attack often received outside training and were able to deploy the weapons more effectively. *Id.*

178.    The Taliban also inflicted casualties through traditional infantry-style attacks including small arms, rocket propelled grenades ("RPGs"), and recoilless rifle or anti-aircraft attacks. Tr. 426:4-6 (Wood); PX-3 at 36. All of these attacks are employed by an individual using a trigger. Tr. 426:7-11 (Wood). For example, a small group of Taliban terrorists would use AK-47s in direct fire mode from distances under 300 meters (the effective range of an AK-47) to engage U.S. forces directly. PX-3 at 36.

179.    The Taliban commonly used RPGs against groups of Coalition troops, lightly armored vehicles, or dug in defensive positions. *Id.* The RPG is a shoulder-fired weapon that launches a small fin-stabilized rocket with an explosive warhead. *Id.* The Taliban often attacked Coalition aircraft using RPGs as they landed or maneuvered in difficult terrain. *Id.*

180.    The recoilless rifle or SPG-9 is a tripod mounted, man-portable, 73mm recoilless gun used in direct fire attacks by the Taliban, normally against vehicular targets although it could be used directly on personnel as well. *Id.*

181.    Insider attacks or "green-on-blue" attacks were another technique practiced by the Taliban, beginning around 2011, to demoralize and sow distrust among Coalition forces and Afghan National Security forces. *Id.* at 37. In an insider attack, a Taliban member infiltrated the

target as an alleged member of an Afghan security force before turning on Coalition or other Afghan forces.  Tr. 498:19-25 (Wood); PX-3 at 37.

182.    In planning insider attacks, the Taliban often targeted young men who joined the Afghan National Security forces from contested or Taliban controlled areas.  PX-3 at 37.  Once these men finished training and were in a unit with access to Coalition forces, the Taliban would typically harass and threaten the soldier's family.  *Id*. at 37-38.  In fact, when the Afghan solder would return home on leave, the Taliban would often directly approach him for recruitment to conduct an attack on Coalition forces in exchange for his family's safety.  *Id*. at 38.  The Taliban would then provide the new recruit with training and a means of communicating with the Taliban after the attack.  *Id.*

183.    As of 2017, insider attacks had killed at least 157 Coalition troops and more than 557 Afghan troops.  *Id.*

184.    The Haqqani Network was particularly known for carrying out suicide attacks against U.S. and Coalition forces.  *Id*. at 40.  A suicide bombing involves a terrorist personally delivering an explosive to an intended target, detonating the explosive and killing himself in the process.  Tr. 439:23-440:1 (Wood).  Although the use of suicide bombers was contrary to Islamic teachings and the Pashtunwali code, the Haqqani Network successfully incorporated the technique into the broader Taliban by importing foreign fighters seeking martyrdom from other countries.  PX-3 at 40.  The Haqqani Network also published a document, which provided religious justification for the use of suicide bombers in 2011.  *Id.*

185.    The Taliban-led Syndicate primarily used two types of suicide IEDS:  person-borne and vehicle-borne ("VBIED").  *Id.*  Person-borne IEDs — also referred to as suicide vest IEDs — were typically constructed of cloth vests with explosives sewn into the fabric and worn

around the chest of the bomber.  Tr. 453:22-454:3 (Wood); PX-3 at 40.  The vest had nails or

ball bearings outside the explosive material but inside the fabric, which the detonation then

projected into the target.  PX-3 at 40.  Person-borne IEDs were typically designed to penetrate

secure areas and assassinate key individuals or to detonate in crowds to kill a broader group.  *Id.*

at 41.

186.     A VBIED is a car, van, or truck loaded with explosives.  *Id.*  VBIEDs enabled

terrorists to transport large amounts of explosive to a target, which in theory could create a larger

and more devastating attack.  *Id.*  The Syndicate would use VBIEDs for perimeter penetration in

complex attacks, to attack a large group, and to attack armored vehicles.  *Id.*  VBIEDs were used

to create mass casualties, which garnered media attention.  *Id.*  The Haqqani Network often

employed vehicle borne explosive attacks as part of the Kabul Attack Network to target senior

government and Coalition officials while traveling around the city of Kabul.  *Id.*

187.     The Taliban also frequently used kidnapping to gain political or economic

advantage, with over 100 confirmed kidnappings of Westerners since 2001.  *Id.* at 125.  For

example, the Taliban kidnapped Americans to negotiate the release of Taliban fighters detained

by the U.S. or Afghanistan.  Tr. 491:23-492:1 (Wood); PX-3 at 125.

188.     In planning a kidnapping, the Taliban would typically use persistent surveillance

of the target in order to determine the target's pattern of life.  PX-3 at 126.  The Taliban typically

rehearsed the attack to succeed in isolating the target, confuse the target, and then apply

overwhelming force and speed in exiting the abduction area.  *Id.*

## VIII.   BELLWETHER ATTACKS

### A.   July 13, 2008 Complex Attack in Waygul District, Nuristan Province

189.   The Taliban committed a July 13, 2008 complex attack in the Waygul District of Nuristan Province.  Tr. 389:22-390:1 (Wood); PX-3 at 47.

190.   Al-Qaeda likely assisted the Taliban directly in conducting this attack. Tr. 389:22-390:1 (Wood); PX-3 at 47.

191.   This July 13, 2008 attack was a complex attack in the N2KL bellwether geography.  A complex attack is an attack involving multiple elements.  Tr. 378:25-379:7 (Wood); PX-3 at 47.  N2KL is an acronym that stands for Nangarhar, Nuristan, Kunar, and Laghman Provinces.  Tr. 378:20-24 (Wood).

192.   SSG Jonathan Benton, CPL Jason M. Bogar, 1LT Jonathan P. Brostrom, SGT Israel Garcia, SPC Jason D. Hovater, CPL Pruitt A. Rainey, and CPL Gunnar Zwilling were all members of U.S. armed forces at the time of the attack.  PX-3 at 47; PX-256 at 94 (describing SSG Benton as the 2d Platoon's 2d Squad leader); PX-53 at 25 (listing military units for the 48 U.S. Service members occupying Vehicle Patrol Base Wanat at the time of the attack).

193.   In this attack, the Taliban and al-Qaeda targeted a vehicle patrol base named Wanat, which was also referred to as Combat Outpost Kahler.  Tr. 382:13-17 (Wood); PX-3 at 49, Fig. 12; PX-256 at 109.

194.   The Taliban and al-Qaeda initiated the complex attack on Wanat with a burst of machine gun fire at 4:20 a.m. local time on July 13, 2008.  Tr. 385:14-25 (Wood); PX-3 at 48; PX-256 at 151.  The initiation signal was followed by machine gun and rocket-propelled grenade fire from multiple elevated positions around the base and was focused on key weapons positions. Tr. 385:14-25 (Wood); PX-3 at 48-50; PX-53 at 10-12; PX-256 at 151.

195.    SSG Jonathan Benton was originally located on the main vehicle patrol base and was injured in the rocket-propelled grenade attacks.  Tr. 386:7-11 (Wood).

196.    An Observation Post ("OP"), called OP Topside, was located a short distance from the main base.  Tr. 386:14-16 (Wood); PX-3 at 50 & at 51, Fig. 13; PX-256 at 111.

197.    OP Topside received incoming fire from multiple sides at the same time as the attack on the main base and everyone on OP Topside was killed or injured.  Tr. 387:8-17 (Wood); PX-3 at 51-52; PX-256 at 111, 163-165, 167-169; PX-53 at 10, 15-18.

198.    CPL Jason M. Bogar, CPL Pruitt A. Rainey, CPL Gunnar Zwilling were originally located on OP Topside and were killed in the attack on OP Topside.  PX-3 at 51-52; PX-256 at 111, 163-165, 167-169; PX-53 at 10, 15-18.

199.    One individual on OP Topside contacted the main base and requested reinforcements.  Tr. 387:18-388:7 (Wood); PX-3 at 51-52; PX-256 at 166-167.  1LT Jonathan P. Brostrom and SPC Jason D. Hovater reached the Observation Post from the main base but an insurgent who had infiltrated the Observation Post shot and killed them.  Tr. 388:1-16 (Wood); PX-3 at 52; PX-256 at 111, 163-165, 167-169; PX-53 at 10, 15-18.

200.    SGT Israel Garcia led a second wave of reinforcements to the Observation Post. Tr. 388:19-24 (Wood); PX-3 at 52; PX-53 at 17.  He was severely injured in the continuing firefight and died of his wounds.  Tr. 388:19-389:9 (Wood); PX-3 at 52; PX-53 at 17.

201.    SSG Benton was part of a third wave of reinforcements to the Observation Post. Tr. 389:16-21 (Wood); PX-256 at 173.

202.    The Taliban and al-Qaeda's goal was to overrun the vehicle patrol base, kill the Americans inside, and drive U.S. personnel out of the Waygul Valley.  Tr. 390:2-6 (Wood); PX-3 at 53, 59; PX-53 at 26-27; PX-256 at 126.

53

203.    The Waygul Valley is one of a series of narrow valleys among high mountain ranges located close to the border with Pakistan.  Tr. 391:8-13; 392:8-25 (Wood); PX-3 at 54-55. The difficult terrain and proximity to Pakistan made the area a particular focus for Taliban and al-Qaeda terrorist activities at the time.  Tr. 392:8-25; 394:8-11 (Wood); PX-3 at 55-56.  At the time of this attack, there was a significant Taliban and al-Qaeda presence in the area.  Tr. 392:8-25 (Wood); PX-3 at 54-56; PX-256 at 216.

204.    The Taliban and al-Qaeda planned the attack in advance.  Tr. 395:19-20 (Wood); PX-3 at 56; PX-256 at 122-123, 128; PX-53 at 7-9.  They conducted significant surveillance of the area in the days leading up to the attack, including observing the base and U.S. soldiers from the nearby village and within the mountains.  Tr. 395:21-396:25 (Wood); PX-3 at 56; PX-256 at 122-123, 128; PX-53 at 7-9.  They attempted to hide the advance planning by holding meetings without the American leaders present and diverting water into a nearby irrigation canal to disguise sounds.  Tr. 397:1-398:5 (Wood); PX-3 at 56; PX-256 at 122-123; PX-53 at 7-9.  On the day of the attack, there were no civilians present in Wanat.  Tr. 397:19-23 (Wood); PX-3 at 56.

205.    Complex attacks like this were a Taliban tactic, technique, and procedure, but the attack was more sophisticated than a typical Taliban attack.  Tr. 400:21-421:5 (Wood); PX-3 at 56-57.

206.    Al-Qaeda likely directly participated in the attack.  Tr. 401:14-402:5 (Wood); PX-3 at 57-58.  Al-Qaeda was active in the area at the time and, following the attack, the U.S. military discovered the body of an Arab male wearing civilian clothes over a camouflage uniform, which was almost certainly an al-Qaeda fighter.  Tr. 401:14-402:5 (Wood); PX-3 at 58; PX-256 at 193; PX-53 at 22, 27.

207.    The deputy leader of the Taliban cell active in the area posted a video online

claiming responsibility for the attack, which included details corroborating the claim.  Tr. 402:6-

403:9 (Wood); PX-3 at 59; PX-256 at 84.

208.    The Army Regulation 15-6 Investigation[8] into the attack concluded that it was

committed by Anti-Afghan Forces.  Tr. 403:10-16 (Wood); PX-3 at 59.  Anti-Afghan Forces was

a term used to refer to members of the Taliban-led Syndicate and not other terrorist groups.

Tr. 403:17-21 (Wood); PX-3 at 59.  The U.S. Government and former government of

Afghanistan frequently avoided the term Taliban because it means "student" and is understood to

denote a "student of Islam" — an honor they did not want to bestow on terrorists.  Tr. 372:3-14

(Wood).

209.    The 2010 Study into Wanat by the U.S. Combat Studies Institute, which was

prepared two years later and for a different audience, identifies the Taliban by name.  Tr. 403:22-

404:11 (Wood); PX-256 at 19-21, 53, 97.

210.    SGT Garcia's Silver Star stated:  "For Gallantry.  In action on 13 July 2008,

during an enemy attack on Vehicle Patrol Base Wanat in Kunar Province, Afghanistan, in

support of Operation Enduring Freedom, Sergeant Garcia's fearless reinforcement of the

observation post was pivotal in preventing the decisive terrain from being overrun, and in

allowing C Company to repel the determined enemy assault."  PX-282 at 9.  Based solely on the

---

[8] Following the death of an active duty U.S. soldier, the U.S. Army typically
commissions an official investigation into the nature and circumstances of the death.  PX-3 at 11.
This is known as the Army Regulation 15-6 Investigation.  *Id.*  The result of the investigation
constitutes the final assessment of the facts and conclusions of the military chain of command.
*Id.*  Frequently, the Army Regulation 15-6 Investigation alone provides more than sufficient
information to attribute the attack to a particular terrorist group.  *Id.*

information about the attack in this award, it is more likely than not that the Taliban committed the attack.  Tr. 405:16-407:8 (Wood).

211.    Iran's material support for the Taliban, including the provision of finances, training, and weapons and ammunition, substantially contributed to the Taliban's ability to conduct this attack.  Tr. 407:9-15 (Wood); PX-3 at 60.

###    B.    August 16, 2009 IED-Triggered Complex Attack in Siawashan Village, Herat Province

212.    The Taliban committed an August 16, 2009 IED-initiated complex attack in Siawashan Village, Herat Province.  Tr. 411:5-7 (Wood); PX-3 at 60.

213.    The August 16, 2009 attack was a complex attack involving an IED followed by an ambush in the Western Afghanistan bellwether geography.  Tr. 407:22-408:3 (Wood); PX-3 at 60.  Western Afghanistan is a large geographic region near Afghanistan's western border with Iran.  PX-3 at 62-63.

214.    CPL Roush was a member of the U.S. armed forces at the time of the attack.  PX-3 at 60; PX-51 at 9.

215.    At the time of the attack, CPL Nicholas R. Roush's unit was assisting in counteracting Taliban efforts to interfere with the Afghanistan elections.  Tr. 408:18-409:9 (Wood); PX-3 at 61.

216.    After arriving in Siawashan, the unit incurred well-aimed AK-47 fire from multiple individuals that they were able to drive off.  Tr. 409:10-18 (Wood); PX-3 at 61; PX-51 at 9.

217.    On the road back to their base, an improvised explosive device placed in a mud wall struck CPL Roush's vehicle as it was driving in a narrow area past the wall as part of the convoy.  Tr. 409:25-410:6 (Wood); PX-3 at 61; PX-51 at 9.

218.     CPL Roush was killed in the IED blast.  Tr. 410:8-15 (Wood); PX-3 at 61; PX-51 at 9.

219.     The blast was followed by AK-47 and rocket-propelled grenade fire from behind the mud wall, which lasted for 1.5 kilometers as the American soldiers tried to make their way out.  Tr. 410:16-411:4 (Wood); PX-3 at 61; PX-51 at 9.

220.     The Taliban's goal was to kill American soldiers leaving Siawashan village. Tr. 411:7-10 (Wood); PX-3 at 62.

221.     Herat borders Iran and the culture and economy have close ties to Iran.  Tr. 412:3-22 (Wood); PX-3 at 63.

222.     In 2009, the Taliban often entered Herat to conduct attacks on U.S. forces. Tr. 413:3-9 (Wood).  Over time, the Taliban's presence became more active.  Tr. 413:10-15 (Wood).

223.     The Taliban planned the attack in advance.  Tr. 414:5-6 (Wood).  They made the improvised explosive device well in advance.  Tr. 414:7-17 (Wood).  On the day of the attack, they engaged the U.S. forces to distract them, and then emplaced the IED in a mud wall and staged the ambush along the American's route back to their base.  Tr. 414:13-17 (Wood); PX-3 at 64; PX-51 at 9, 19, 24, 27; PX-63 at 3.

224.     Complex attacks like this were a Taliban tactic, technique, and procedure, but the attack was more sophisticated than a typical Taliban attack in that geography and time period. Tr. 415:1-12 (Wood); PX-3 at 64-65.

225.     The Army Regulation 15-6 Investigation into the attack concluded that it was committed by "insurgents."  PX-3 at 66; PX-63 at 3.  U.S. government documents typically used the term "insurgents" to refer to members of the Taliban-led Syndicate.  Tr. 416:1-10 (Wood).

The U.S. government and former government of Afghanistan frequently avoided the term Taliban because it means "student" and is understood to denote a "student of Islam" — an honor they did not want to bestow on terrorists.  Tr. 372:3-14 (Wood).

226.    Iran's material support for the Taliban, including the provision of finances, training, weapons, and ammunition, substantially contributed to the Taliban's ability to conduct this attack.  Tr. 416:11-19 (Wood); PX-3 at 66.  Iran was involved directly with the Taliban in Herat.  Tr. 412:15-24; 416:11-19 (Wood); PX-3 at 66.  Iran also directly supported the Taliban's efforts to disrupt democratic elections in Afghanistan.  Tr. 415:15-25 (Wood); PX-3 at 66.  IRGC members very likely trained the Taliban cell involved in the attack and they may have participated directly in the attack.  Tr. 416:11-19 (Wood); PX-3 at 66.

### C.    April 11, 2010 IED in Arghandab District, Kandahar Province

227.    The Taliban committed an April 11, 2010 IED attack in the Arghandab District, Kandahar Province.  Tr. 418:12-14 (Wood); PX-3 at 67.

228.    The April 11, 2010 attack was an IED attack in the Southern Afghanistan bellwether geography.  Tr. 417:1-6 (Wood); PX-3 at 67.  An IED attack is an improvised explosive device attack, an attack with a homemade bomb.  Tr. 354:3-7 (Wood).  Southern Afghanistan consists of Helmand and Kandahar Provinces.  Tr. 417:1-4 (Wood); PX-2 at 51-52.

229.    SGT Lemon and SPC Caron were members of the U.S. armed forces at the time of the attack.  Tr. 212:16-18, 213:3-5 (Lemon); PX-3 at 67; PX-58 at 11.

230.    At the time of the attack, SGT Lemon and SPC Caron were moving from their home base to an observation post.  Tr. 219:14-25 (Lemon); PX-3 at 68.

231.    SGT Lemon and SPC Caron were moving to the observation post as part of an 11-man foot patrol moving in single file.  Tr. 219:22-220:16 (Lemon).  SGT Lemon was the tenth

person in the patrol and SPC Caron was the eleventh.  Tr. 219:23-25 (Lemon); PX-3 at 68; PX-58 at 18.

232.    The patrol reached a wall and decided to pass over the wall.  Tr. 221:4-8 (Lemon); PX-3 at 68; PX-58 at 18.  SGT Lemon crossed the wall.  Tr. 221:17-18 (Lemon).  He then turned around and took SPC Caron's machine gun from him.  Tr. 221:18-19 (Lemon).  SPC Caron used both hands to cross the wall and SGT Lemon gave him back his machine gun. Tr. 221:20-22 (Lemon).  SGT Lemon had turned around and taken two steps when SPC Caron stepped on the IED.  Tr. 221:23-222:2 (Lemon).

233.    SGT Lemon was severely injured in the attack.  A large chunk of shrapnel pulverized the bone in his right arm so that it was only connected to the rest of his body by soft tissue.  Tr. 225:11-20 (Lemon); PX-292 at 2.

234.    SGT Lemon had multiple limb salvage operations on his right arm, including having a muscle cut out of his back and used to cover his missing tricep and metal braces to hold his arm together.  Tr. 227:2-13 (Lemon); PX-292 at 2; PX-293 at 1.

235.    SGT Lemon's right arm was eventually amputated as a result of his injuries. Tr. 233:2-3 (Lemon); PX-292 at 2; PX-293 at 2.  The amputation required using his thigh as a donor site for the skin graft to repair his arm.  Tr. 240:2-6 (Lemon); PX-293 at 2.

236.    SGT Lemon experiences phantom limb pain and heterotopic ossification because of his arm injury and amputation.  Tr. 235:9-237:23 (Lemon); PX-292 at 1-2; PX-293 at 3.

237.    SGT Lemon was at Walter Reed Medical Center for four and a half years. Tr. 233:9-10 (Lemon).

238.     As a result of the blast, SGT Lemon also experienced shrapnel injuries on the back right side of his body, a traumatic brain injury, post-traumatic stress disorder, depression, and suicidal thoughts.  Tr. 234:7-235:8; 240:15-241:24 (Lemon); PX-292 at 1-6.

239.     SPC Caron was killed in the IED blast.  Tr. 222:11-20 (Lemon); PX-3 at 68; PX-58 at 18.

240.     The Taliban's goal was to kill U.S. soldiers traveling on foot in the area. Tr. 418:15-16 (Wood); PX-3 at 68.

241.     The Arghandab River Valley is an agricultural area located northwest of Kandahar City in Kandahar Province.  Tr. 419:3-20 (Wood); PX-3 at 69.

242.     Kandahar is the second-largest city in Afghanistan and an important economic and cultural hub.  Tr. 419:23-420:4; 420:16-21 (Wood); PX-3 at 69.  It is close to the birthplace of the Taliban and is culturally significant.  Tr. 420:20-21 (Wood).

243.     In 2010, the Taliban was very active in the Arghandab River Valley.  Tr. 420:16-421:6 (Wood); PX-3 at 69-71.  The Taliban was working to encircle the city of Kandahar to isolate it from the rest of the country.  Tr. 420:16-421:6 (Wood); PX-3 at 69-71.  Additionally, logistics corridors in the area were important to the Taliban's overall insurgency.  Tr. 420:16-421:6 (Wood); PX-3 at 69-71.

244.     IED attacks like this were a common Taliban tactic, technique, and procedure. Tr. 195:23-196:9 (McGrath); PX-3 at 21-23.  The IED used in this attack was a "toe-popper" initiated IED.  PX-3 at 71-72 & Figs. 22-23.  A toe-popper, or PFM-1 mine, is a Russian made mine designed to maim individuals that was brought by the Soviets to Afghanistan.  Tr. 422:6-424:3 (Wood); PX-3 at 71-72 & Figs. 22-23.  The Taliban connected a PFM-1 mine to a detonation cord, which ran to a blasting cap located in a large jug of improvised explosives,

likely ammonium nitrate, which exploded when SPC Caron stepped on the PFM-1 mine.
Tr. 422:6-424:3 (Wood); PX-3 at 71-72 & Figs. 22-23; PX-58 at 18.

245.     The Taliban planned the attack in advance.  Tr. 424:4-5 (Wood).  They mixed the
explosive and assembled the device in advance.  Tr. 424:6-11 (Wood).  They also watched U.S.
forces, deliberately selected their target, and decided where to place the device.  Tr. 424:4-425:2
(Wood); PX-3 at 72.

246.     Iran's material support for the Taliban, including the provision of finances and
explosives training, substantially contributed to the Taliban's ability to conduct this attack.
Tr. 425: 13-19 (Wood); PX-3 at 73.

> **D.     August 6, 2011 Attack on Helicopter in Tangi Valley, Wardak Province**

247.     The Taliban committed an August 6, 2011 attack on a helicopter in the Tangi
Valley, Wardak Province.  Tr. 432:22-24 (Wood); PX-3 at 73-74.

248.     The August 6, 2011 attack was a small arms, rocket-propelled grenade, and anti-
aircraft attack in the Southeastern Afghanistan bellwether geography.  Tr. 426:2-6 (Wood); PX-3
at 73-74.  Small arms, rocket-propelled grenades, and attacks against aircraft are generally
conducted by individuals using a trigger.  Tr. 426:7-11 (Wood).  Southeastern Afghanistan is a
small group of provinces in that area of the country.  PX-2 at 54.

249.     SO1 SEAL Darrik C. Benson, PO1 Christopher Campbell, CW2 Bryan J. Nichols,
PO1 Jesse Pittman, CPO (SEAL) Thomas A, Ratzlaff, SCPO Heath Robinson, PO2 Nicholas
Spehar, PO1 Michael Strange, CPO Aaron C. Vaughn, and SCPO Kraig Vickers were members
of the armed forces at the time of the attack.  PX-3 at 73-74.  They were all part of a SEAL team
on the helicopter and were killed in the crash when the Taliban shot it down.  *Id.*

250.     On August 5, 2011, an American unit sought to interdict a senior Taliban
commander in the Tangi Valley named Qari Tahir.  Tr. 428:2-14 (Wood).  U.S. intelligence

forces identified him as Objective Lefty Grove.  Tr. 428:4-6 (Wood).  U.S. forces had received intelligence indicating that he was located in a particular compound in the valley.  PX-3 at 74-75; PX-60 at 37, 50, 588.

251.    The operation to interdict Qari Tahir involved a ground assault force that made its way to the compound where the intelligence indicated Qari Tahir was located.  Tr. 430:2-7 (Wood); PX-60 at 37.  The American forces who entered the compound did not locate Qari Tahir.  Tr. 431:4-9 (Wood); PX-3 at 76.  Support helicopters identified individuals, likely enemy, moving away from the compound.  Tr. 430:21-431:3 (Wood); PX-3 at 76; PX-60 at 15-16, 37-38.  Intelligence indicated that Qari Tahir was among them.  Tr. 431:6-13 (Wood); PX-3 at 75-76; PX-60 at 15-16, 37-38.

252.    The helicopter containing the immediate reaction force, called Extortion 17, was nearing the location of the expected enemy when the Taliban fired two rocket-propelled grenades at the helicopter from the roof of a two-story building.  Tr. 431:21-432:14 (Wood); PX-3 at 77; PX-60 at 38-39.  One rocket-propelled grenade struck the helicopter and it crashed, killing everyone on board.  Tr. 431:21-432:14 (Wood); PX-3 at 77; PX-60 at 38-39.

253.    The Taliban's goal was to strike the helicopter with the rocket-propelled grenade, causing it to crash and kill the occupants.  Tr. 432:25-433:4 (Wood); PX-3 at 78.

254.    The Tangi Valley is located in Wardak Province.  Tr. 433:11-23 (Wood); PX-3 at 78-79 & Fig. 26.  In 2011, it was strategic terrain for the Taliban because it connected Pakistan and the Loya Paktia area with Wardak Province, which the Taliban-led Syndicate used as a staging area for attacks into Kabul.  Tr. 433:19-434:7 (Wood); PX-3 at 78-80.  The area was also used for growing poppy, and was inhabited by traditional Pashtun tribe members generally supportive of the Taliban.  Tr. 434:8-24 (Wood).

255.    The Taliban planned the attack in advance.  Tr. 435:4-5 (Wood).  They were aware that U.S. forces would often move into the Tangi Valley using helicopter, and often climbed to an elevated position at the top of the building in order to better aim at any helicopter.  Tr. 435:6-16. (Wood); PX-3 at 80-81; PX-60 at 38-39, 1098.

256.    Shooting rockets at helicopters was a Taliban tactic, technique, and procedure.  PX-3 at 36.  The Taliban had attempted to shoot down helicopters in the same manner in the same valley in previous months.  Tr. 435:13-16 (Wood); PX-3 at 80 & Fig. 27; PX-60 at 1098.

257.    The rocket-propelled grenade used an OG-7 antipersonnel round.  Tr. 436:11-17 (Wood); PX-3 at 81; PX-60 at 1121, 1125.  Iran produced OG-7s and regularly provided them to the Taliban.  Tr. 436:11-22 (Wood); PX-3 at 81.

258.    The Taliban publicly claimed responsibility for shooting down the aircraft and provided details about the attack.  Tr. 436:23-437:1 (Wood); PX-3 at 82.  U.S. forces also intercepted Taliban communications claiming that Qari Tahir had committed the attack and planning his escape from Afghanistan.  Tr. 437:2-20 (Wood); PX-3 at 82; PX-60 at 190-191.

259.    The U.S Army Regulation 15-6 Investigation attributed the attack to the Taliban.  PX-60 at 23, 31; Tr. 437:21-438:9 (Wood); PX-3 at 83-84.

260.    Iran's material support for the Taliban, including the provision of finances, training, weapons, and ammunition, substantially contributed to the Taliban's ability to conduct this attack.  Tr. 425: 13-19 (Wood); PX-3 at 84.

**E.    October 29, 2011 Vehicle-Borne Suicide Bombing in Kabul City**

261.    The Kabul Attack Network committed an October 29, 2011 vehicle-borne suicide bombing in Kabul City.  Tr. 444:2-13 (Wood); PX-3 at 84.

262.     The October 29, 2011 attack was a suicide bombing attack in the Kabul bellwether geography.  Tr. 439:17-440:1 (Wood); PX-3 at 84.  Kabul Provinces contains the capital.  Tr. 439:17-20 (Wood).

263.     LTC David Cabrera, SGT James Darrough, and SSG Christopher Newman were all members of U.S. armed forces at the time of the attack.  PX-3 at 84; PX-52 at 2.

264.     LTC David Cabrera, SGT James Darrough, and SSG Christopher Newman were killed in the suicide bombing.  Tr. 440:2-8 (Wood); PX-3 at 84.

265.     On the morning of October 29, 2011, an armored bus, called a Rhino, was moving between American bases in Kabul.  Tr. 441:11-442:2 (Wood); PX-3 at 84-85; PX-52 at 7, 39, 57, 83.  A car loaded with explosives made contact with the bus.  Tr. 442:25-443:3 (Wood); PX-3 at 85-86 & Figs. 29-30; PX-52 at 7; PX-190 at 3, 6, 12.  The explosives detonated and destroyed the bus.  Tr. 442:25-443:3 (Wood); PX-3 at 85-86 & Figs. 29-30; PX-52 at 7; PX-190 at 3, 6, 12.

266.     The Kabul Attack Network's goal was to kill high-level American officials they believed were located in the bus.  Tr. 444:14-18 (Wood); PX-3 at 87.

267.     The city of Kabul is the capital of Afghanistan and is the cultural, economic, and social hub for the country.  Tr. 445:5-12 (Wood).  The American and coalition forces had an extensive presence in Kabul in 2011.  Tr. 445:13-18 (Wood); PX-3 at 87.  The Taliban led-Syndicate attempted to counter this presence by entering Kabul in order to conduct terrorist attacks.  Tr. 445:19-24 (Wood); PX-3 at 87-88.

268.     The Kabul Attack Network planned the attack in advance.  Tr. 446:5-11 (Wood); PX-3 at 87-88; PX-190 at 3.  The Haqqani Network-led Miramshah Shura likely decided to conduct this attack, then trained a suicide bomber, and gathered the materials for the vehicle-borne suicide bomb in Miramshah, Pakistan.  Tr. 447:7-14 (Wood); PX-3 at 88-89.  They then

brought the materials into Afghanistan using historical Haqqani Network smuggling routes, assembled the weapons in staging areas outside of Kabul, and then brought the weapons into Kabul for the attack.  Tr. 446:12-447:6 (Wood); PX-3 at 88 & Fig. 32.  Within Kabul, the Network identified potential targets, surveilled the target, and then executed the attack. Tr. 447:15-24 (Wood); PX-3 at 88-89.

269.    Suicide bombings, particularly vehicle-borne suicide bombings like this, were a common Kabul Attack Network tactic, technique, and procedure.  PX-3 at 88-89.

270.    The attack very likely involved chlorate-based explosives.  Tr. 447:25-448:3 (Wood); PX-3 at 90-91.  Eyewitnesses identified the smoke cloud as initially light, which is consistent with chlorate-based explosives.  Tr. 449:12-18 (Wood); PX-3 at 90-91.  Additionally, chlorate is extremely friction-shock-sensitive.  Tr. 448:17-21 (Wood); PX-3 at 91.  In this instance, the suicide bomber drove the vehicle into the side of the bus at which point the explosives ignited.  Tr. 448:22-449:10 (Wood); PX-3 at 91; PX-52 at 268, 277, 281, 309. Terrorists often used chlorate-based explosives because they would ignite upon impact, insuring a successful attack even if the bomber did not trigger the explosion.  Tr. 449:2-10 (Wood); PX-3 at 91.  Finally, the Haqqani Network had significant access to chlorate because it is the primary ingredient used in match factories located in Waziristan.  Tr. 448:4-16 (Wood); PX-3 at 90.

271.    The Taliban publicly claimed responsibility for the suicide bombing on a website called Al-Amara 1, which was a media outlet for the Taliban at the time.  Tr. 449:22-450:3 (Wood); PX-3 at 91-92.  The Taliban would typically claim responsibility for attacks that American forces identified as committed by the Kabul Attack Network cell.  Tr. 450:4-24 (Wood).  In this claim of responsibility, the Taliban identified the suicide bomber, and his name

indicated he was a member of a Haqqani-affiliated tribe.  Tr. 450:25-451:4 (Wood); PX-3 at 91-92; PX-52 at 29, 404-405.

272.    The U.S. Army Regulation 15-6 Investigation attributed the attack to the Taliban. Tr. 451:12-18 (Wood); PX-52 at 7, 30, 41; *see also* Tr. 372:3-14, 416:8-10 (Wood).

273.    A declassified U.S. military storyboard prepared following the attack identified the attack as a "planned Taliban operation."  Tr. 452:11-14 (Wood); PX-3 at 92; PX-190 at 1. The storyboard was not initially intended for public release; thus, the U.S. government was willing to identify the Taliban by name.  Tr. 451:19-452:16 (Wood).

274.    Iran's material support for the Taliban, including the provision of finances, training, weapons material, and intelligence support, substantially contributed to the Taliban's ability to conduct this attack.  Tr. 453:5-12 (Wood); PX-3 at 93.

**F.    May 20, 2012 Suicide Vest Bomber in Tarin Kowt, Uruzgan Province**

275.    The Taliban-led Syndicate committed a May 20, 2012 suicide vest bombing in Tarin Kowt, Uruzgan Province.  Tr. 454:24-455:4 (Wood); PX-3 at 93.

276.    The May 20, 2012 attack was a suicide bombing in the Southeastern Afghanistan bellwether geography.  Tr. 453:20-23 (Wood); PX-3 at 93.  Suicide bombings involve someone personally delivering an explosive to a target, detonating the explosive, and killing himself. Tr. 439:17-440:1; 453:24-454:3 (Wood).  Southeastern Afghanistan comprises a small group of provinces in that area of the country.  PX-2 at 54.

277.    CPT Timoney was a member of the armed forces at the time of the attack. Tr. 309:6-15; 310:18-311:3 (Timoney); PX-3 at 93.

278.    On May 20, 2012, CPT Timoney was part of a key leader engagement during which an outgoing unit was going to introduce members of his unit to the Afghan police chief in Tarin Kowt, Uruzgan.  Tr. 313:24-314:7 (Timoney); PX-3 at 93-94; PX-59 at 13.

279.    Prior to the mission, there were reports that two suicide bombers were present in the Tarin Kowt area.  Tr. 314:8-25 (Timoney); 460:2-6 (Wood); PX-3 at 98; PX-59 at 15, 16, 108.

280.    The police station was located near the market in Tarin Kowt.  Although it was not a market day, there were some shacks set up in the market, which was unusual.  Tr. 315:16-23 (Timoney).

281.    When the American units arrived at the police station, the police chief was not present.  Tr. 314:14-25 (Timoney).

282.    The units waited one hour and 35 minutes for the police chief to arrive. Tr. 315:20-22 (Timoney).

283.    When the police chief arrived, he was very angry at the American units and ordered them to immediately leave the station.  Tr. 317:7-10 (Timoney).

284.    After the police chief ordered the American soldiers to leave, they formed a line and began exiting the compound headed south to where they were parked.  Tr. 318:21-24 (Timoney).

285.    As the soldiers were leaving the station, a man called out to them.  Tr. 318:23-319:24 (Timoney).  The translator responded.  *Id.*  The man approaching yelled "Allah Akbar" and then detonated his suicide vest.  *Id.*

286.    CPT Ryan Timoney was injured in the attack.  Tr. 319:18-320:11 (Timoney); PX-3 at 98; PX-300; PX-301.  CPT Jesse Ozbat and 2LT Tobias Alexander were killed in the attack. Tr. 317:11-25 (Timoney); PX-59 at 13.

287.    CPT Timoney's left side was facing the bomber during the explosion.  Tr. 322:4-21 (Timoney); PX-300 at 3.  He sustained numerous injuries from the ball bearings that were

used as shrapnel in the bomb.  *Id.*  His lower left leg bone was entirely shattered and was only

connected to the rest of his leg by soft tissue.  *Id.*  One ball bearing entered his upper left leg, two

ball bearings entered his abdomen, and one entered his left bicep.  *Id.*  Another ball bearing went

through his chest and hit his spine between the T3 and T4 vertebrae.  *Id.*  And another ball

bearing went through the left side of his skull, through his brain, damaging his optic nerve.  *Id.*

288.    As a result of his significant injuries, CPT Timoney was unconscious and on a

ventilator for a significant period of time.  Tr. 324:2-24 (Timoney); PX-300 at 3; PX-301 at 1, 3.

Doctors also removed a portion of his skull to help relieve the swelling in his brain.  Tr. 324:14-

24 (Timoney); PX-300 at 3.

289.    CPT Timoney had a metal brace screwed into his shattered arm, called an ex fix,

to help his leg to heal.  Tr. 332:1-18 (Timoney); PX-301 at 1-2.  Eventually, after multiple

surgeries, his leg became too infected and had to be amputated.  Tr. 332:19-334:5 (Timoney);

PX-300 at 3.

290.    CPT Timoney began having seizures as a result of the injuries to his brain,

requiring additional medication and treatment and limiting his ability to use certain screens or

lighting.  Tr. 336:13-338:12 (Timoney); PX-300 at 3.

291.    The Taliban-led Syndicate's goal was to kill the American soldiers who had been

visiting the Afghan police station.  Tr. 455:5-7 (Wood); PX-3 at 96.

292.    Tarin Kowt is in north of Kandahar City in a highly agricultural area transitions

from the plains of southern Afghanistan to the mountains of northern Afghanistan.  Tr. 456:3-14

(Wood); PX-3 at 97-98.

293.    One of the Pashtu tribes living in the area is closely affiliated with the Taliban,

and the Taliban presence in the area was very high in 2012.  Tr. 456:15-25 (Wood); PX-3 at 98.

294.    Suicide bombings, like this, were a Taliban tactic, technique, and procedure by 2012.  PX-3 at 31.  The Taliban's use of suicide attacks increased over time.  Tr. 457:20-23 (Wood); PX-3 at 99.  The Taliban is primarily made of Pasto tribal members who follow the Pashtunwali, which condemns suicide.  Tr. 457:24-458:4 (Wood); PX-3 at 99.  Other groups began to introduce suicide bombings to the Taliban, and they were highly successful.  Tr. 458:5-9 (Wood); PX-3 at 99.  However, the Taliban frequently used other syndicate members as the actual suicide bombers.  Tr. 462:1-5 (Wood); PX-3 at 99.

295.    The Taliban planned the attack in advance.  Tr. 458:10-11 (Wood).  The Taliban had to make the suicide vest, find a bomber willing to commit suicide, and identify and surveil the target.  Tr. 458:12-24 (Wood).  The attack was carefully timed for right as the soldiers were leaving the police station.  Tr. 458:25-459:13 (Wood); PX-3 at 98.  Additionally, there were no civilians in the area, which indicates that they may have been warned in advance.  Tr. 459:14-460:1 (Wood); PX-3 at 98-99.

296.    The suicide vest likely was made by placing ball bearings into hot glue on a sheet of paper.  Tr. 460:22-461:10 (Wood); PX-3 at 98-99 & Fig. 37.  The ball bearing sheet would then be placed on the outside of the explosives so that the metal ball bearings would be thrown during the explosion.  Tr. 460:22-461:10 (Wood); PX-3 at 98-99 & Fig. 37.

297.    Iran's material support for the Taliban, including the provision of finances, training, and weapons material, substantially contributed to the Taliban's ability to conduct this attack.  Tr. 462:6-12 (Wood); PX-3 at 100.

**G.    May 31, 2012 IED in Zombalay District, Helmand Province**

298.    The Taliban, likely with outside assistance, committed a May 31, 2012 IED attack in Zombalay District, Helmand Province.  Tr. 466:9-18 (Wood); PX-3 at 100.

299.     The May 31, 2012 attack was an IED attack in the Southern Afghanistan bellwether geography.  Tr. 417:1-6 (Wood); PX-3 at 100.  An IED attack is an improvised explosive device attack, an attack with a homemade bomb.  PX-3 at 27.  Southern Afghanistan consists of Helmand and Kandahar Provinces.  Tr. 417:1-6 (Wood).

300.     SGT Eric M. Hunter was a member of the U.S. armed forces at the time of the attack. PX-3 at 100; PX-163 at 1.

301.     SGT Hunter was a cook assigned to a special forces unit located in a remote part of Helmand, and he would go on missions with the special forces units in a support role. Tr. 464:22-465:4 (Wood); PX-163 at 1.

302.     On the day of the attack, SGT Hunter was participating in a mission that involved American forces moving out in two different columns to converge on the same village. Tr. 464:22-465:15 (Wood); PX-3 at 101-102; PX-163 at 1-2.  SGT Hunter was located in the eastern column.  Tr. 465:14-15 (Wood); PX-3 at 102.  The other column started to receive direct fire as they neared the village.  Tr. 465:16-22 (Wood); PX-3 at 102-103 PX-163 at 2.  SGT Hunter ran to climb to the top of a roof in the village to provide suppressive fire.  Tr. 465:24-466:3 (Wood); PX-3 at 102-103; PX-163 at 2.

303.     SGT Hunter stepped on a pressure plate IED located beneath a path in the village, which detonated.  Tr. 466:4-8; 468:15 (Wood); PX-3 at 103; PX-163 at 2.

304.     The explosion from the IED wounded SGT Hunter; it did not kill anyone. Tr. 463:5-9; 466:7-8 (Wood); PX-3 at 103; PX-163 at 2.

305.     Zombalay is located in Helmand Province, not far from the provincial capital of Lashkar Gah, and that area had a significant Taliban activity.  Tr. 187:2-188:5 (McGrath); 467:13-468:8 (Wood); PX-3 at 103-105.

306.     IEDs, like this, were a common Taliban tactic, technique, and procedure.  PX-3 at 27-30.  The trigger device on the IED that injured SGT Hunter was significantly more sophisticated than typically found in the area.  PX-3 at 106-107.  It was designed to compress only under the weight of a fully-laden soldier, allowing the Taliban to place it beneath a commonly used path without injuring local civilians.  Tr. 468:15-469:6 (Wood); PX-3 at 105-107 & Fig. 41.  It was likely built with assistance from someone outside the Taliban.  Tr. 466:13-18 (Wood).

307.     The Taliban's goal in this IED attack was to kill American soldiers.  Tr. 466:19-20.  The explosive low order detonated, resulting in a less significant explosion than was intended.  Tr. 469:21-470:6 (Wood); PX-3 at 105-107.

308.     The Taliban-led Syndicate planned this attack in advance by constructing and placing the IED.  Tr. 468:12-23 (Wood); PX-3 at 107.

309.     SGT Hunter received the Purple Heart, and the award states:  "While conducting presence patrols in Helmand Province, member suffered an improvised explosive blast injury resulting in damage to both legs."  PX-285 at 2.  Based solely on the information contained in this award, it is more likely than not that the Taliban-led syndicate conducted this attack.  Tr. 471:7-25 (Wood).

310.     Iran's material support for the Taliban, including the provision of finances, training in advanced IED tactics, and weapons material, substantially contributed to the Taliban's ability to conduct this attack.  Tr. 472:15-19 (Wood); PX-3 at 108.

### H.     June 18, 2013 Indirect Fire Attack on Bagram Airfield, Parwan Province

311.     The Taliban committed a June 18, 2013 indirect fire attack on Bagram Airfield in Parwan Province.  Tr. 475:16-18 (Wood); PX-3 at 108.

312.     The June 18, 2013 attack was an indirect fire attack in the North Central

Afghanistan bellwether geography.  Tr. 473:2-5 (Wood); PX-3 at 108.  An indirect fire attack

involves the use of rockets or mortars to attack an objective.  Tr. 473:6-8 (Wood).  North Central

Afghanistan is a group of provinces in that area of the country, including Parwan, Kapisa,

Baghlan, and Kunduz Provinces.  PX-2 at 71.

313.     SPC Robert W. Ellis was a member of the armed forces at the time of the attack.

PX-3 at 108; PX-56 at 10.

314.     On June 18, 2013, SPC Ellis had just completed a training with his unit at Bagram

Airfield and was waiting at a bus stop for transportation back to their sleeping area.  Tr. 474:4-18

(Wood); PX-3 at 108-109 & Figs. 42-43; PX-56 at 9, 15.

315.     Rockets were fired at Bagram Airfield and one struck the bus stop where SPC

Ellis was standing.  Tr. 474:4-22 (Wood); PX-3 at 108-109 & Figs. 42-43; PX-56 at 9, 39.  The

rocket exploded upon impact, killing SPC Ellis.  Tr. 475:14-15 (Wood); PX-3 at 108; PX-56 at

15.

316.     Bagram Airfield has a warning system that typically detects incoming rockets and

warns those on base.  PX-56 at 9.  In this instance, the warning system malfunctioned and did not

issue a warning ahead of time.  Tr. 474:23-475:13 (Wood); PX-3 at 108; PX-56 at 6.

317.     The Taliban's goal in launching rockets at Bagram Air Base was to destroy

aircraft and kill Americans.  Tr. 475:19-21 (Wood); PX-3 at 110.

318.     Bagram Airfield is in the southern part of Parwan province, north of Kabul City.

Tr. 476:1-12 (Wood); PX-3 at 110-111 & Fig. 44.  It was a logistics and military command and

control hub for the period covered by this case.  Tr. 476:13-23 (Wood); PX-3 at 110-111 & Fig.

45.

319.     Bagram Airfield is in a large, wide valley — with room for a very large airfield — surrounded by high mountains.  Tr. 477:1-6 (Wood); PX-3 at 110-111 & Figs. 44-45.

320.     The population in the area around Bagram is largely pro-American.  Tr. 477:7-9 (Wood); PX-3 at 110.

321.     In 2013, Taliban terrorists would enter this area of Parwan province to conduct attacks, focusing on Bagram Airfield.  Tr. 477:10-18 (Wood); PX-3 at 110.

322.     The Taliban planned this attack in advance by procuring the rockets, modifying them to fire without the original ignition system, and then emplacing and firing them.  Tr. 477:23-478:3 (Wood); PX-3 at 112; PX-56 at 11.

323.     The Taliban used a 107mm rocket in this attack.  Tr. 478:16-479:2 (Wood); PX-3 at 112; PX-56 at 9, 18.  Many of the 107mm rockets found in Afghanistan were made in Iran.  Tr. 479:3-7 (Wood); PX-3 at 112.

324.     Firing rockets at American targets was a common Taliban tactic, technique, and procedure.  PX-3 at 35.  The Taliban regularly launched rockets at Bagram Airfield during this time period.  Tr. 478:4-9 (Wood); PX-3 at 112.

325.     The Army Regulation 15-6 Investigation into the attack concluded that it was committed by "enemies of Afghanistan."  PX-56 at 9.  Enemies of Afghanistan was not a common term, but it referred to members of the Taliban-led Syndicate and not other terrorist groups.  Tr. 479:8-15 (Wood); PX-3 at 113.

326.     The report of casualty for the attack on SPC Ellis, provides the following pieces of information:  (1) the casualty was hostile; (2) SPC Ellis died of wounds; (3) the wounds were caused by "blast injuries;" (4) the casualty was homicide; and (5) the incident occurred on

Bagram Airfield.  PX-279 at 1.  Based solely on this information, it is more likely than not that SPC Ellis was killed in a Taliban attack.  Tr. 479:16-481:18 (Wood).

327.     Iran's material support for the Taliban, including the provision of finances and weapons, particularly 107 mm rockets like the one used in this attack, substantially contributed to the Taliban's ability to conduct this attack.  Tr. 481:19-25 (Wood); PX-3 at 113.

**I.     July 15, 2013 82mm Recoilless Rifle Attack in Paktia Province**

328.     The Haqqani Network, a part of the Taliban, committed a July 15, 2013 recoilless rifle attack in Paktia Province.  Tr. 486:8-12 (Wood); PX-3 at 114.

329.     The July 15, 2013 attack was a small arms, rocket-propelled grenade, and anti-aircraft attack in the Loya Paktia bellwether geography.  Tr. 482:8-17 (Wood); PX-3 at 114.  Small arms, rocket-propelled grenades, and attacks against aircraft are generally conducted by individuals using a trigger.  Tr. 426:2-11 (Wood).  Loya Paktia includes Paktia, Paktika, and Khost Provinces and is the traditional homeland for the Haqqani Tribe.  Tr.  486:20-23 (Wood).

330.     SSG Sonny C. Zimmerman was a member of the armed forces at the time of the attack.  PX-3 at 114; PX-57 at 6.

331.     SSG Zimmerman was stationed at Champkani Assistance Platform in the area.  Tr. 483:2-5 (Wood); PX-3 at 114.  On the afternoon of July 15, 2013, his unit traveled to train an Afghan unit in a nearby village.  Tr. 483:6-10 (Wood); PX-3 at 114-115; PX-57 at 7.  On the way to the training, they were engaged by a small number of individuals shooting at them.  Tr. 483:11-15 (Wood); PX-3 at 114-115; PX-57 at 7-8.  After determining that the attacking individuals were too far away to engage, SSG Zimmerman's unit continued on to the training.  Tr. 483:16-23 (Wood); PX-3 at 114-115; PX-57 at 8-9.

332.     That night, following the training, SSG Zimmerman's unit departed in a serial movement to return to their base.  Tr. 484:4-8 (Wood).  SSG Zimmerman was in a truck in the

second movement to depart.  Tr. 484:9-11 (Wood).  On the way back, his movement saw a white flash near the movement in front of them.  Tr. 484:12-20 (Wood); PX-3 at 115; PX-57 at 9-10. They called forward, but the first movement had not seen or heard anything.  Tr. 484:19-20 (Wood); PX-3 at 115; PX-57 at 9-10.  The white flash was the recoilless rifle firing at the vehicles.  Tr. 484:21-25 (Wood); PX-3 at 115.

333.    Both movements continued forward.  Tr. 485:1-3 (Wood).  When the second movement reached the same location, the Haqqani Network terrorists fired the recoilless rifle at SSG Zimmerman's vehicle.  Tr. 485:2-5 (Wood); PX-3 at 115; PX-57 at 6, 10, 12.  The round pierced the bulletproof glass on the passenger side of the vehicle, striking SSG Zimmerman, and killed him.  Tr. 485:6-10 (Wood); PX-3 at 115; PX-57 at 6, 10, 12.

334.    The Haqqani Network's goal in firing the recoilless rifle at the vehicle was to kill Americans.  Tr. 486:24-487:1 (Wood); PX-3 at 115.

335.    The attack occurred along a road through a mountainous region in Paktia Province.  Tr. 487:11-19 (Wood); PX-3 at 116-117 & Figs. 46-47.  The road leads directly into Pakistan, which borders Paktia Province.  Tr. 487:20-488:2 (Wood); PX-3 at 116-117 & Figs. 46-47.

336.    Paktia Province, and the broader Loya Paktia area, is home to Haqqani tribesman who are distance cousins of the founder of the Haqqani Network.  Tr. 488:14-17 (Wood).

337.    The area of Pakistan that border Paktia is a safe haven for the Haqqani Network. Tr. 488:1-8 (Wood); PX-3 at 116-117.  The Haqqani Network had extensive activities throughout the Loya Paktia area and the terrorist threat profile was consistently high. Tr. 489:10-12 (Wood); PX-3 at 116-117.

338.    The restrictive terrain also benefits the Haqqani Network's activities.  Tr. 488:9-13 (Wood); PX-3 at 117, 119.

339.    The Haqqani Network had previously used a recoilless rifle against these American units in the area around Chamkani.  Tr. 489:17-20 (Wood); PX-3 at 119; PX-57 at 8.

340.    The Haqqani Network planned this attack in advance.  Tr. 489:21-22 (Wood). The rifle was placed in the brush so as to provide a clear line of fire but to obscure the rifle's location.  Tr. 489:23-490:4 (Wood); PX-3 at 119-120.  The Haqqani Network attempted to use the rifle on the American forces immediately prior to making contact with SSG Zimmerman's vehicle.  Tr. 489:21-490:4 (Wood); PX-3 at 119-120.

341.    The correct use of an unusual sophisticated weapon to fire on a passing convoy and avoid detection is a Haqqani Network tactic, technique, and procedure.  Tr. 490:5-11 (Wood); PX-3 at 120.

342.    The Army Regulation 15-6 Investigation into the attack concluded that it was committed by the Taliban.  PX-3 at 120; PX-57 at 6; Tr. 490:12-18 (Wood).

343.    Iran's material support for the Taliban, including the provision of finances, weapons, and training, substantially contributed to the Taliban's ability to conduct this attack. Tr. 490:19-23 (Wood); PX-3 at 121.

**J.    August 7, 2016 Kidnapping in Kabul City**

344.    The Taliban, including its Haqqani Network subgroup, committed an August 7, 2016 kidnapping in Kabul City.  Tr. 491:19-22 (Wood); PX-3 at 121.

345.    The August 7, 2016 attack was a kidnapping in the Kabul bellwether geography. Tr. 491:6-9 (Wood); PX-3 at 121.

346.    Mr. Kevin King was a U.S. citizen at the time of the attack and remains a U.S. citizen today.  Tr. 274:14-15 (King).

76

347.    Mr. King was an English teacher at the American University of Afghanistan in Kabul.  Tr. 273:18-274:13 (King); PX-3 at 122.  He had taught English in Afghanistan multiple times, and his last trip began in October 2014.  *Id*.

348.    Mr. King lived in a guesthouse that was part of a compound for employees of the University of Afghanistan and traveled back and forth to campus in a university-provided van. Tr. 274:23-275:10 (King).  The compound, van, and University all used guards.  Tr. 275:11-19 (King).

349.    On August 7, 2016, Mr. King finished teaching classes at the University of Afghanistan around 7:30 pm.  Tr. 276:22-25 (King).  Shortly thereafter, Mr. King and another teacher, Mr. Timothy Weeks, boarded the van to return to the guesthouse.  Tr. 277:1-6 (King); PX-3 at 123.

350.    While the van was passing through an alley headed out of the University, another van pulled up and cut the University van off, and individuals dressed in Afghan military uniforms got out and pointed machine guns at the University van.  Tr. 277:8-278:5 (King); PX-3 at 123, 126.

351.    The Afghan guard and driver unlocked the doors of the University van, and the individuals wearing Afghan military uniforms forced Mr. King and Mr. Weeks to the other van at gunpoint.  Tr. 278:6-16 (King); PX-3 at 123, 127.  The kidnappers searched Mr. King and Mr. Weeks for phones or similar devices and then forced them into the second row and the back of the van.  Tr. 278:17-279:6 (King); PX-3 at 123, 127.  They were made to lie down with a blanket covering them.  Tr. 279:5-6 (King).

352.     The kidnappers then drove Mr. King and Mr. Weeks around Kabul, passing

through a checkpoint, and then to a place outside the city where they were taken from the van

and handed to a second group of individuals.  Tr. 279:7-280:4 (King); PX-3 at 123, 127.

353.     The new individuals were dressed in traditional garb, and the leader wore a

turban.  Tr. 280:5-13 (King).  They were all carrying guns and wore vests with explosives.

Tr. 280:14-17 (King).  Mr. King and Mr. Weeks were then marched to a new van and driven to a

different location.  Tr. 280:18-282:8 (King).

354.     Mr. King and Mr. Weeks were then forced to make a video identifying

themselves and stating that they had been kidnapped by the Taliban, who wanted to trade them

for Taliban prisoners.  Tr. 282:19-283:2 (King); PX-288.  Mr. King and Mr. Weeks were forced

to make multiple videos by their captors during which they were ordered to identify their captors

as the Taliban and to ask the U.S. and Afghan government to release Taliban prisoners in

exchange for their release.  Tr. 288:9-289:24 (King); PX-3 at 128; *see generally* PX-288, PX-

289, PX-290, PX-291.  The videos were published by the Taliban, in one case on the Taliban's

media network Al-Amara.  Tr. 167:19-168:5 (Clarke); 495:12-496:7 (Wood); PX-3 at 118; *see

generally* PX-288, PX-289, PX-290, PX-291.

355.     Mr. King and Mr. Weeks were held captive for three years, three months, and

twelve days and were moved to multiple locations during that time period.  Tr. 283:20-21

(King); PX-124, 127.

356.     Mr. King's captors identified themselves to him as the Taliban.  Tr. 287:19-25

(King); PX-3 at 127-128.

357.     For the first two years of his captivity, Mr. King was bound at the wrists and

ankles for 23 hours a day and chained to Mr. Weeks at night.  Tr. 286:12-18 (King).  He was not

permitted to go outdoors except for moving from place to place.  Tr. 287:9-18 (King).  He was given the bare minimum necessary for food and began to lose weight.  Tr. 298:24-299:5 (King).  For the final year, the guards were a bit more lenient.  Tr. 286:16-18 (King).

358.    Mr. King was threatened — including at gunpoint — beaten, kicked, dragged through the snow, and used as a medical test subject by some of his captors.  Tr. 293:18-295:15 (King).

359.    Mr. King and Mr. Weeks were released in exchange for three high-ranking Taliban prisoners, including Anas Haqqani, Sirajuddin Haqqani's brother.  Tr. 300:14-19 (King); 496:8-16 (Wood); PX-3 at 128.

360.    Mr. King suffered from malnourishment and muscle loss, severe vitamin D deficiency causing other effects, hypomagnesemia, heart issues, scurvy, decreased visual acuity, posterior 10th-12th rib fractures, parasitic work infections, hematuria, insomnia, constipation, peripheral neuropathy, and sensorineural hearing loss as a result of his captivity.  Tr. 304:2-307:25 (King); PX-286 at 1.

361.    The Taliban's goal in this attack was to kidnap westerners in order to negotiate a prisoner exchange for Taliban prisoners being held by Afghanistan and the United States. Tr. 491:23-492:1 (Wood); PX-3 at 125, 127-128.

362.    Kidnapping westerners and holding them hostage was a common Taliban tactic, technique, and procedure.  PX-3 at 125.

363.    The Taliban and Haqqani Network planned this kidnapping in advance. Tr. 493:15-17 (Wood).  A successful kidnapping requires significant advance surveillance of the target.  Tr. 492:21-24, 493:18-494:4 (Wood); PX-3 at 126-127.  The kidnappers used Afghan Army uniforms to allow them to get close to the target with weapons before raising any alarm

and were prepared for various possibilities, such as one of the victims having a trackable device or being stopped at a checkpoint.  Tr. 494:5-18 (Wood); PX-3 at 126-127.

364.     Following the prisoner exchange, Secretary of State Michael Pompeo announced that the Taliban had released the prisoners as a goodwill gesture.  Tr. 496:17-497:23 (Wood); PX-3 at 128.

365.     Iran's material support for the Taliban, including the provision of finances, intelligence, and advanced training for sophisticated operations, substantially contributed to the Taliban's ability to conduct this attack.  Tr. 498:2-7 (Wood); PX-3 at 130.

### K.     June 10, 2017 Insider Attack in Pekha Valley, Nangarhar Province

366.     The Taliban committed a June 10, 2017 insider attack in Nangarhar Province. Tr. 502:12-15 (Wood); PX-3 at 130.

367.     The June 10, 2017 attack was an insider attack in the N2KL bellwether geography.  Tr. 498:16-20 (Wood); PX-3 at 130.  An insider attack, also called a green-on-blue attack, is when an individual within an Afghan unit murders members of his own unit or coalition forces.  Tr. 498:21-25 (Wood).  N2KL is composed of Nuristan, Nangarhar, Kunar, and Laghman Provinces.  Tr. 498:17-18 (Wood).

368.     SGT Dillon C. Baldridge and SGT William M. Bays were members of the U.S. armed forces at the time of the attack.  Tr. 499:1-6 (Wood); PX-3 at 130; PX-55 at 13.

369.     SGT Baldridge and SGT Bays were part of a unit that was assigned to a security post called Radio Ridge in the Pekha Valley of Nangarhar.  Tr. 499:11-20 (Wood); PX-3 at 130-131; PX-55 at 13, 19, 79.

370.     Radio Ridge was on top of a mountain in restrictive terrain.  Tr. 499:21-24 (Wood).  The lack of available space meant that the American and Afghan soldiers slept in the

same area with no separation or security, which was unusual.  Tr. 499:25-500:4 (Wood); PX-3 at 131; PX-55 at 29, 79, 96.

371.    The U.S. military unit was scheduled to rotate off of Radio Ridge the afternoon of June 10, 2017.  The members of the unit had already packed their equipment and were relaxing while awaiting for transportation.  Tr. 500:5-13 (Wood); PX-3 at 131; PX-55 at 29, 219-220.

372.    Sergeant Obaidullah was a member of an Afghan commando unit that was stationed at Radio Ridge.  PX-3 at 130.  On the afternoon of June 10, 2017, he was walking around the area, pacing, and using his prayer beads more than usual.  Tr. 500:17-501:2 (Wood); PX-3 at 131; PX-55 at 220.  He was described by eyewitnesses as agitated.  Tr. 501:3-4 (Wood).  He also made a call on his radio.  Tr. 501:5-12 (Wood); PX-3 at 131; PX-55 at 29, 219-220.

373.    Sergeant Obaidullah entered an office that had a window into the sleeping area, picked up his AK-47, shouted "Allah Akbar," and began shooting the American soldiers.  Tr. 501:13-23 (Wood); PX-3 at 131; PX-55 at 29-32, 220-221.  He struck and killed SGT Baldridge and SGT Bays.  Tr. 501:24-25 (Wood); PX-3 at 131; PX-55 at 29-32, 220-221.

374.    An American soldier and an Afghan commando returned fire wounding Sergeant Obaidullah.  After checking on the American soldiers, they saw that Sergeant Obaidullah was still alive and was reaching for his rifle so they shot him twice, killing him.  Tr. 502:2-11 (Wood); PX-3 at 131; PX-55 at 29-32, 220-221.

375.    The Taliban's goal in the insider attack was to kill Americans.  Tr. 502:16-17 (Wood); PX-3 at 132.

376.    The attack occurred in a very mountainous area of Nangarhar Province near the border with Pakistan.  Tr. 503:1-13 (Wood).  The proximity to Pakistan and the restrictive terrain

allowed terrorist groups to move freely in the area.  Tr. 503:14-21 (Wood); PX-3 at 132-133 &
Fig. 53.

377.    In 2017, the Taliban, al-Qaeda and ISIS-Khorasan all had a presence in Nangarhar
province.  Tr. 503:22-504:2 (Wood); PX-3 at 133.

378.    An insider attack, like the one by Sergeant Obaidullah, was a common Taliban
tactic, technique, and procedure.  Tr. 504:13-505:12 (Wood); PX-3 at 133.  The Taliban
announced an intention to commit insider attacks as part of its spring offensive each year since
2011.  Tr. 504:23-25 (Wood).

379.    The Taliban planned the attack in advance.  Tr. 506:4-5 (Wood).  They recruited
Sergeant Obaidullah to join the Afghan commandos in order to be able to commit an insider
attack on Americans or Afghan commandos, who were an elite Afghan unit.  Tr. 506:6-507:3
(Wood).  Sergeant Obaidullah had been a part of the Afghan Army previously and was forced to
leave the Army following a screening during which he expressed sympathy for the Taliban
movement.  Tr. 506:9-14 (Wood); PX-3 at 134-135; PX-55 at 73.  He then returned in order to
join the Afghan commandos.  Tr. 506:15-21 (Wood); PX-3 at 134-135; PX-55 at 15, 223-224.
And he committed the attack right as his window of opportunity to attack Americans was
closing.  Tr. 506:22-507:3 (Wood); PX-3 at 134-135; PX-55 at 49.

380.    ISIS-Khorasan was also active in the area and committed terrorist attacks killing
American Soldiers.  Tr. 507:9-508:7 (Wood); PX-3 at 135.  However, at the time, ISIS-Khorasan
did not use insider attacks as a tactic.  Tr. 507:17-18 (Wood); PX-3 at 135.  Additionally, ISIS
had not existed in Afghanistan long enough at that point to recruit, train, and plant individuals
like Sergeant Obaidullah to commit attacks.  Tr. 507:21-24 (Wood); PX-3 at 135.

381.     In the immediate aftermath of the attack, the Taliban claimed responsibility for the attack, identifying the attacker by name and providing details about the attack. Tr. 508:8-21 (Wood); PX-3 at 136.

382.     The Army Regulation 15-6 Investigation into the attack concluded that it was committed for unknown personal reasons.  PX-55 at 13, 15, 51, 224, 227.  The U.S. government may have been hesitant to admit that the Taliban was able to plant an insider in the Afghan commandos, who were the premier Afghan fighting force.  Tr. 508:22-509:20 (Wood); PX-3 at 136-137.

383.     Iran's material support for the Taliban, including the provision of finances, weapons, and training, substantially contributed to the Taliban's ability to conduct this attack. Tr. 510:3-7 (Wood); PX-137.

## IX.     EXPERT QUALIFICATIONS AND METHODOLOGY

### A.     Mr. William F. Roggio

384.     Mr. William F. Roggio is a Senior Fellow at the Foundation for Defense of Democracies ("FDD").  Tr 17:4-13 (Roggio); PX-1 at 4.  Mr. Roggio has been a Senior Fellow at FDD since May 2010.  Tr. 17:14-15 (Roggio); PX-1 at 4.  As a Senior Fellow, Mr. Roggio serves as editor of FDD's *Long War Journal*, which provides original reporting and analysis on state sponsors of terrorism and on the Global War on Terror.  Tr. 17:16-18; 18:18-23 (Roggio); PX-1 at 4.  Mr. Roggio began publishing the *Long War Journal* in 2007.  PX-1 at 4.

385.     From 1991 to 1997, Mr. Roggio served as a signalman and infantryman in the U.S. Army and New Jersey National Guard.  PX-1 at 4.  In the 1990s, Mr. Roggio began to track the Taliban and al-Qaeda.  Tr. 17:19-22 (Roggio).  Mr. Roggio recognized the unique threat that al-Qaeda, a global jihadist group, posed to the world, and was concerned about the problems the Taliban presented by providing al-Qaeda safe haven. Tr. 17:22-25 (Roggio).  In 2003, Mr.

Roggio started a personal blog, which analyzed the Global War on Terror using open-source information. Tr. 18:1-2 (Roggio); PX-1 at 4.

386.    In 2005, the 2nd Regimental Combat Team — a Marine Corps unit fighting in Anbar Province, Iraq — invited Mr. Roggio to embed with them as a reporter after reading and relying on Mr. Roggio's blog for their operations.  PX-1 at 4.  During that embed, Mr. Roggio wrote multiple articles for *The Weekly Standard*.  *Id.*  Mr. Roggio also embedded with the U.S. U.S. Army and Iraqi forces in Iraq as they fought al-Qaeda between 2005 and 2008.  Tr. 18:2-5, 13-15 (Roggio); PX-1 at 4.  Mr. Roggio also embedded with the Canadian Army in Kandahar, Helmand, and Uruzgan Provinces in Afghanistan in 2006, as the Canadian Army fought the Taliban.  PX-1 at 4.  In addition, Mr. Roggio embedded with a private contractor in Kabul and Zabul Provinces as the contractor provided security for Western businesses in Afghanistan.  *Id.*

387.    Mr. Roggio has written over 5,000 *Long War Journal* articles since the publication's inception.  Tr. 19:3-5 (Roggio).  Roughly 35 to 40 percent of those articles focused on terrorism in Afghanistan.  Tr. 19:6-8 (Roggio).  Approximately 75 percent of Mr. Roggio's 5,000-plus articles for the *Long War Journal* concerned Iran-backed terrorism.  Tr. 19:9-11 (Roggio).

388.    Multiple sources have cited Mr. Roggio's analysis in the *Long War Journal*.  PX-1 at 5.  The Chief of Staff of the Army's Operation IRAQI FREEDOM Study Group published a 1,300-page analysis of the Iraq War, entitled "The U.S. Army in the Iraq War," which cited the *Long War Journal*.  Tr. 19:12-18 (Roggio); PX-1 at 5.  This was the seminal report on the Iraq War.  Tr. 19:16-18 (Roggio).  The independent assessment of the Afghan National Security Forces ordered by Congress in 2013 also cited Mr. Roggio's analysis from the *Long War Journal*.  PX-1 at 5.  In 2021, the United Nations Sanctions and Monitoring team's report on the

Taliban and al-Qaeda cited the *Long War Journal*.  Tr. 19:18-20 (Roggio).  Numerous U.S. media sources, including *The New York Times*, *The Wall Street Journal*, and *The Washington Post*, regularly cite Mr. Roggio's analysis from the *Long War Journal*.  Tr. 19:22-23 (Roggio): PX-1 at 5.

389.     Beginning in 2014, Mr. Roggio developed and maintained a map of Afghanistan, which depicted the Taliban's degree of control at a provincial and district level.  Tr. 20:1-5 (Roggio); PX-1 at 5.  In creating this map, Mr. Roggio used contemporaneous reporting to systematically track the geographies that the Taliban controlled or contested.  PX-1 at 5. Mainstream news outlets regularly cite Mr. Roggio's map of Taliban control.  PX-1 at 5.  For example, Mr. Roggio's map has been featured on the *CBS Evening News*, *Meet the Press*, ABC News, PBS, CNN, Fox, and NBC.  Tr. 20:5-12 (Roggio); PX-1 at 5.  It was also featured — in print — in the *The New York Times*, *The Wall Street Journal*, Reuters, and the *Associated Press*. Tr. 20:5-12 (Roggio); PX-1 at 5.  U.S. military and North Atlantic Treaty Organization personnel have also requested the data that underpins Mr. Roggio's map.  PX-1 at 5.

390.     Aside from his *Long War Journal* articles, Mr. Roggio has also written full-length articles published in *The New York Times*, *The Weekly Standard*, *The Daily Beast*, *National Review*, *Politico*, and *The New York Post*, among other publications.  PX-1 at 5.

391.     Mr. Roggio has testified before Congress on terrorism-related issues on five occasions.  Tr. 20:20-23 (Roggio); PX-1 at 6.  For example, in 2017, Mr. Roggio testified before the House Committee on Foreign Affairs, Subcommittee on Terrorism, Nonproliferation, and Trade about the Taliban's rising strength in Afghanistan.  Tr. 21:1 (Roggio); PX-1 at 6.  In July 2016, Mr. Roggio testified at a joint hearing of the House Subcommittee on Terrorism,

Nonproliferation, and Trade and the Subcommittee on Asia and the Pacific about Pakistan's support for terrorist groups, including al-Qaeda and the Taliban.  Tr. 21:2-3 (Roggio); PX-1 at 6.

392.     Mr. Roggio has provided expert testimony in one prior matter, *United States v. Harroun*, No. 13-cr-00272-CMH (E.D. Va. July 2, 2013), Dkt. 29-3.  Tr. 21:4-5 (Roggio); PX-1 at 6.  In that case, the United States Attorney's Office for the Eastern District of Virginia retained Mr. Roggio in the criminal prosecution of Eric Harroun to provide an expert opinion on the terrorist group Jabhat al-Nusra and its cooperation with the Free Syrian Army.  Tr. 21:4-12 (Roggio); PX-1 at 6.

393.     In this case, Mr. Roggio used a wide array of sources to reach his conclusions.  Tr. 23:4-8 (Roggio); PX-1 at 6.  Mr. Roggio relied on primary-source information, particularly information provided by the terrorist groups themselves.  Tr. 23:7-9 (Roggio); PX-1 at 7.  Mr. Roggio examined statements and social media postings by terrorist groups, which provide information about the group's goals, operations, interactions with other terrorist groups, and sources of support.  Tr. 23:7-12 (Roggio); PX-1 at 7.  Examples of this include statements from official propaganda websites and social media postings on Twitter and Facebook.  Tr. 23:10-12 (Roggio).  For example, Taliban and al-Qaeda leaders regularly published fatwas (religious decrees) and made other public statements about their organizations' goals.  Tr. 23:16-17 (Roggio); PX-1 at 7.  Both terrorist groups also claimed responsibility for specific attacks through their propaganda arms.  PX-1 at 7.  Mr. Roggio analyzed these statements and checked them against other sources of information — particularly against government reporting.  PX-1 at 7.

394.     When possible, Mr. Roggio also relied on private statements of terrorists.  Tr. 23:13-14 (Roggio); PX-1 at 7.  For example, Mr. Roggio analyzed files obtained by the U.S.

military in the May 2011 raid on Osama bin Laden's compound.  Tr. 23:13-16 (Roggio); PX-1 at

7.  Mr. Roggio considered these internal statements valuable sources of information, because

they were not intended for a public audience, and so Mr. Roggio did not need to separate the

truth from the outward propaganda.  PX-1 at 7.

395.    Mr. Roggio also relied on primary reporting from the area about the operations of

these terrorist groups.  Tr. 23:25-24:2 (Roggio); PX-1 at 7.  This included information from

journalists and other analysts interviewing individuals on the ground in the various theaters.  PX-

1 at 7.

396.    Mr. Roggio also relied on U.S. government official reports and documents.

Tr. 23:18 (Roggio); PX-1 at 8-10.  This includes declassified raw intelligence reporting and other

government documents, which provided real-time evidence about the terrorist groups.  Tr. 23:20-

24 (Roggio); PX-1 at 8-9.  Mr. Roggio also relied on U.S. government terrorist designations

from the U.S. State Department and Treasury Department.  Tr. 23:18-20 (Roggio); PX-1 at 10.

397.    Mr. Roggio also relied on secondary sources — such as reports — from other

scholars.  PX-1 at 10.  These sources provided historical background information; enabled Mr.

Roggio to compare his analysis with the conclusions of other respected scholars in the field; and

summarized primary sources for Mr. Roggio to review.  *Id.*

398.    Mr. Roggio analyzed all documents for likely sources of bias and cross-checked

claims from both primary and secondary sources against facts on the ground.  PX-1 at 7; 10-11.

Mr. Roggio layered together individual facts provided from particular sources to build a picture

of the overall terrorist environment.  Tr. 24:11-15 (Roggio); PX-1 at 7; 10-11.  This array of

sources enabled Mr. Roggio to construct a reliable set of opinions about Iran's material support

for the Afghan insurgency.  PX-1 at 7.

399.    Mr. Roggio was admitted by this Court as an expert in the field of Middle Eastern terrorism.  Tr. 21:21-25 (Roggio).

**B.    Dr. Colin Clarke**

400.    Dr. Colin Clarke serves as the Director of Policy and Research at The Soufan Group.  Tr. 130:22-131:9 (Clarke); PX-2 at 9.  The Soufan Group is an intelligence consulting firm, which provides consulting for private-sector clients concerning terrorism, insurgency, smuggling, trafficking, disinformation, and other national-security topics.  Tr. 130:24-131:7 (Clarke).  In this role, Dr. Clarke works on concept notes and works with clients to develop analytical frameworks.  Tr. 131:11-14 (Clarke).

401.    Dr. Clarke also conducts research projects — focusing closely on terrorist and insurgent groups, including the Taliban.  PX-2 at 8.  At The Soufan Center, Dr. Clarke led a team that published a report in the summer of 2019 titled *Iran's Playbook:  Deconstructing Iran's Regional Strategy*, that looked at Iranian support for terrorist groups across the world.  *Id.*

402.    Dr. Clarke has a Ph.D. in international security policy from the University of Pittsburgh's Graduate School of Public and International Affairs.  Tr. 131:23-132:1 (Clarke); PX-2 at 7.  Dr. Clarke's dissertation focused on why some insurgent groups enter negotiations while others continue to fight.  PX-2 at 7.  The dissertation included an analysis of factors and variables related to state support of terrorist and insurgent groups, one of the five case studies in the dissertation was the Taliban.  *Id.* at 7-8.

403.    Dr. Clarke has served as an adjunct professor at several institutions, including the University of Pittsburgh, Duquesne University, and the RAND Corporation, and as an assistant professor at Carnegie Mellon University's Institute for Politics and Strategy.  Tr. 132:2-8 (Clarke); PX-2 at 8.  Dr. Clarke has taught courses on terrorism and insurgency, the future of

warfare, U.S. grand strategy, social media technology and conflict.  Tr. 132:9-13 (Clarke); PX-2 at 8-9.

404.    Dr. Clarke is an adjunct senior political scientist at the RAND Corporation.  PX-2 at 8.  Dr. Clarke has served in this position for ten years.  Tr. 132:14-17 (Clarke); PX-2 at 8.  In this role, Dr. Clarke worked on numerous projects for the Office of the Secretary of Defense, the U.S. military's combatant commands, and the U.S. intelligence community related to Afghanistan, terrorism, state sponsors of terrorism, and transnational criminal networks.  Tr. 132:18-24 (Clarke); PX-2 at 8.

405.    In 2011, the RAND Corporation sent Dr. Clarke to Kabul, Afghanistan to serve as a senior analyst with U.S. Forces-Afghanistan's Combined Joint Interagency Task Force *Shafafiyat*.  Tr. 133:6-13 (Clarke); PX-2 at 8.  The task force — led by then-Brigadier General H.R. McMaster — analyzed the links between corruption, organized crime, and insurgency in Afghanistan.  Tr. 133:9-22 (Clarke); PX-2 at 8.  This experience provided Dr. Clarke the opportunity to conduct real-time analysis about the Taliban and the Haqqani Network.  PX-2 at 8.

406.    In his career, Dr. Clarke has been the author or co-author of dozens of research reports and several books on a range of topics related to national and international security.  PX-2 at 8-9.  In some of these publications, Dr. Clarke looked specifically at Afghanistan and nation-state support for terrorists and insurgents.  *Id.*  For example, in 2015, Dr. Clarke published *Terrorism Inc.:  The Financing of Terrorism, Insurgency, and Irregular Warfare*, which examined seven cases of how terrorist and insurgent groups fund their organizations and operations.  Tr. 134:11-16 (Clarke); PX-2 at 8.  One of the case studies was of the Afghan

Taliban, and this case study included an in-depth analysis of how the Haqqani Network operated and its interactions with both violent non-state actors and state sponsors of terrorism. *Id.*

407.    Dr. Clarke has presented his research all over the world, including at the U.S. Army War College, Air Force Special Operations Command, the Society for Terrorism Research, and the Counter ISIS Financing Group. Tr. 133:2-5 (Clarke); PX-2 at 10.

408.    Dr. Clarke also serves as an Associate Fellow at the International Centre for Counter-Terrorism at The Hague. PX-2 at 9. Dr. Clarke is a non-resident Senior Fellow in the Program on National Security at the Foreign Policy Research Institute. *Id.* Dr. Clarke is also an Associate Fellow at the Global Network on Extremism and Technology and a member of the "Network of Experts" at the Global Initiative Against Transnational Organized Crime. *Id.* Dr. Clarke is a member of the research advisory council at the RESOLVE Network, a global network of researchers and policymakers led by the United States Institute of Peace that focuses on violent extremism, and a member of the advisory board at the International Counter-Terrorism Review, a leading student publication on terrorism. *Id.*

409.    Dr. Clarke also serves on the editorial boards of three of the leading scholarly journals in the field of terrorism studies: *Studies in Conflict and Terrorism*, *Terrorism and Political Violence*, and *Perspectives on Terrorism*. Tr. 134:4-10 (Clarke); PX-2 at 9.

410.    Dr. Clarke has testified before Congress on numerous occasions as an expert witness on a range of terrorism-related issues. PX-2 at 9. For example, he testified before the House Financial Services Committee, Subcommittee on Terrorism and Illicit Finance on a topic entitled: *An Overview of Current Trends in Terrorism and Illicit Finance: Lessons from the Islamic State in Iraq and Syria and Other Emerging Threats.* PX-2 at 9.

411.    In this case, Dr. Clarke employed a comparative analysis method for understanding violent non-state actors.  PX-2 at 10.  This analysis method has been validated multiple times in written opinions by U.S. courts.  *Id.*

412.    Dr. Clarke relied mainly on primary-source information, including statements and social media postings by violent extremist groups and their supporters.  Tr. 135:1-3 (Clarke); PX-2 at 10.  Dr. Clarke also relied on the intercepted internal documents of these terrorist groups.  PX-2 at 10.  Dr. Clarke also relied on U.S. government sources — such as U.S. Department of the Treasury press releases — which offered novel and highly credible insights. Tr. 135:4-9 (Clarke); PX-2 at 10.

413.    Dr. Clarke relied on secondary sources of information, including newspaper accounts, think tank reports, and journal articles.  Tr. 135:10-11 (Clarke).  These sources often synthesize large amounts of information, including primary-source information.  PX-2 at 11. Secondary sources also provide important historical information.  *Id.*  Secondary sources can also contain new, original information.  *Id.*

414.    Dr. Clarke cross-checked primary sources and secondary sources against other primary sources of information, against information about events on the ground in relevant theaters, and against relevant secondary sources of information.  PX-2 at 10-11.  This process enabled Dr. Clarke to determine whether his conclusions were consistent with those of other scholars and practitioners.  *Id.* at 10.  If sources conflicted, Dr. Clarke attempted to triangulate them — comparing primary sources against secondary sources, with sources that Dr. Clarke has relied upon, and with new sources that Dr. Clarke considered reliable.  Tr. 135:20-136:1 (Clarke).

415.    Dr. Clarke's experience working in Afghanistan helped Dr. Clarke gain a better feel for the culture, context, and relevant issues in Afghanistan.  PX-2 at 11.

416.    Dr. Clarke was admitted by this Court as an expert in the field of Middle Eastern terrorism.  Tr. 136:19-23 (Clarke).

**C.    LTC (Ret.) Steven Wood**

417.    Lieutenant Colonel ("LTC") Wood retired from the United States Army after 22 years as a LTC.  Tr. 353:8-15 (Wood).

418.    During his military career, LTC Wood was assigned to the Joint Improvised Explosive Device Defeat Organization ("JIEDDO") — a U.S. military organization founded in 2006 to counteract IEDs, which were becoming increasingly common in Iraq and Afghanistan.  Tr. 353:16-354:7 (Wood); PX-3 at 7.  While at JIEDDO, LTC Wood deployed to Afghanistan as the Senior Intelligence Officer for Combined Joint Task Force Paladin, where he was responsible for counter-IED and intelligence operations.  Tr. 354:13-355:9 (Wood); PX-3 at 7.

419.    LTC Wood was the Director of Operations for the Advanced Geospatial Intelligence Office at the National Geospatial-Intelligence Agency ("NGA") — a federal agency tasked with providing geospatial intelligence to U.S. intelligence agencies, the Department of Defense, and other government organizations.  Tr. 355:12-356:13 (Wood); PX-3 at 7.

420.    LTC Wood spent approximately a year as the Senior U.S. Military Operations and Intelligence Advisor to Afghan Ground Forces Command in Kabul, Afghanistan.  Tr. 357:4-18 (Wood); PX-3 at 7.  In that role, LTC Wood was fully embedded with the Afghan unit and provided operational and intelligence advice to three Afghan generals.  *Id.*

421.    LTC Wood also served as a Senior Defense Intelligence Officer at the Defense Intelligence Agency ("DIA"), where he advised on national intelligence priorities.  Tr. 357:20-358:3 (Wood); PX-3 at 7.

422. After retiring from the U.S. military, LTC Wood was a Technical Project Manager for the U.S. Navy, where he researched insurgent bomb manufacturing processes. Tr. 358:7-18 (Wood); PX-3 at 7.

423. LTC Wood also returned to Afghanistan as a contractor, where he provided operations and intelligence advice to military units and civilians. Tr. 358:19-359:3 (Wood); PX-3 at 7.

424. LTC Wood has a Bachelor of Arts from Ohio University, a Master of Arts in global organizational leadership from Gonzaga University, and a Master of Business Administration from Syracuse University. Tr. 359:9-16 (Wood); PX-3 at 8. He has also completed numerous military courses including the Military Intelligence Captains Career Course and Command and General Staff College. Tr. 359:17-23 (Wood).

425. LTC Wood is proficient in French, Persian, and Dari. Tr. 359:24-360:2 (Wood); PX-3 at 8.

426. In this case, LTC Wood applied a well-accepted attack attribution methodology that considers the location and time period of the attack, the tactics, techniques, and procedures used, terrorist claims of responsibility, and official U.S. government or Coalition attributions of responsibility. Tr. 366:8-15; 374:19-375:2 (Wood). This methodology is taught at the Sherman Kent School of Intelligence and the United States Army Intelligence Center and School. Tr. 374:15-19 (Wood); PX-3 at 10-11. LTC Wood has previously applied this methodology during his career and taught it to others. Tr. 374:20-375:2 (Wood).

427. The location and time period of the attack and the tactics, techniques, and procedures used are particularly important for making an attack attribution. Tr. 366:16-20 (Wood). Geography and time period are important for identifying the responsible group because

different groups will commit attacks in certain ways in particular terrains.  Tr. 366:21-367:10
(Wood).  Tactics, techniques, and procedures are important for attributing an attack to a
particular group because groups tend to reuse the same successful attack methodologies.
Tr. 367:24-368:7, 369:14-370:8 (Wood).

428.   LTC Wood gathered information about these four factors by reviewing available
government reporting about the attack, particularly Army Regulation 15-6 investigations, which
the Army conducts whenever a soldier is killed in action.  Tr. 364:25-365:20 (Wood).

429.   LTC Wood attributed an attack to a particular group if it was more likely than not
that the group committed the attack.  Tr. 375:3-12 (Wood)

430.   LTC Wood had far more information about each of the bellwether attacks than he
needed to conclude that a member of the Taliban Syndicate committed the attack. Tr. 377:11-16
(Wood).  As a result of the available detail, LTC Wood was more certain about his conclusions
that members of the Taliban-led Syndicate committed each of these attacks than he often was
when making attributions during his military career.  Tr. 377:5-10 (Wood).

431.   LTC Wood concluded with 90-95 percent certainty that members of the Taliban-
led Syndicate committed each of the eleven bellwether attacks.  Tr. 376:24-377:4 (Wood).

432.   LTC Wood was admitted by this Court as an expert in terrorist attack attribution.
Tr. 362:2-8 (Wood).

Dated:  November 23, 2021

Respectfully submitted,

*/s/ Joshua D. Branson*

Robert W. Cowan                                    Joshua D. Branson (D.C. Bar No. 981623)
DC Bar No. TX0148                                Andrew E. Goldsmith (D.C. Bar No. 1007074)
Katie R. Caminati                                    Grace W. Knofczynski (D.C. Bar No. 15000407)
TX Bar No. 24098079                            James A. Ruck (D.C. Bar No. 1739309)
Bailey Cowan Heckaman PLLC               Kellogg, Hansen, Todd,
Four Oaks Place                                       Figel & Frederick, P.L.L.C.
1360 Post Oak Blvd., Suite 2300             1615 M Street, N.W., Suite 400
Houston, Texas 77056                            Washington, D.C. 20036
Telephone: (713) 425-7100                      Tel:  (202) 326-7900
Facsimile: (713) 425-7101                       Fax:  (202) 326-7999
rcowan@bchlaw.com                             jbranson@kellogghansen.com
kcaminati@bchlaw.com                          agoldsmith@kellogghansen.com
                                                              gknofczynski@kellogghansen.com
                                                              jruck@kellogghansen.com
*Counsel for Zambon Afghanistan-Based*
*Plaintiffs*
                                                              Ryan R. Sparacino (D.C. Bar No. 493700)
                                                              Sparacino PLLC
                                                              1920 L Street, NW, Suite 535
                                                              Washington, D.C. 20036
                                                              Tel:  (202) 629-3530
                                                              ryan.sparacino@sparacinopllc.com

                                                              Michael J. Gottlieb (D.C. Bar No. 974960)
                                                              Randall Jackson (D.C. Bar No. 490798)
                                                              Nicholas Reddick (D.C. Bar No. 1670683)
                                                              Willkie Farr & Gallagher LLP
                                                              1875 K Street, N.W.
                                                              Washington, DC 20006-1238
                                                              Tel:  (202) 303-1000
                                                              Fax:  (202) 303-2000
                                                              MGottlieb@willkie.com
                                                              RJackson@willkie.com
                                                              NReddick@willkie.com

                                                              *Counsel for Cabrera Plaintiffs and Zambon*
                                                              *Afghanistan-Based Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of November, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

*/s/ Joshua D. Branson*
Joshua D. Branson

96