# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AUGUST CABRERA, *et al*., | |
| Plaintiffs, | |
| v. | Case No. 19-cv-3835-JDB |
| ISLAMIC REPUBLIC OF IRAN, | |
| Defendant. | |
| MARK ZAMBON, *et al*., | |
| Plaintiffs, | |
| v. | Case No. 18-cv-02065-JDB |
| ISLAMIC REPUBLIC OF IRAN, | |
| Defendant. | |

## <u>PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW</u>

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................ ii

INTRODUCTION  ............................................................................................................. 1

I.      EVIDENTIARY STANDARDS  ............................................................................ 3

II.     SUBJECT-MATTER JURISDICTION ................................................................. 4

        A.   Iran's Material Support ................................................................................. 6

             1.   Iran's Material Support for the Taliban-led Syndicate ..................... 9

             2.   The IRGC and Qods Force Provided the Material Support ............. 12

        B.   Acts of Extrajudicial Killing and Hostage Taking ................................... 13

             1.   Extrajudicial Killing ...................................................................... 13

             2.   Hostage Taking  ............................................................................. 18

        C.   The Taliban-led Syndicate Committed Each of the Bellwether Attacks  ................ 19

             1.   Geographies  .................................................................................. 19

             2.   Tactics, Techniques, and Procedures  ............................................ 22

             3.   Bellwether Attacks ........................................................................ 25

        D.   Personal Injury or Death  ........................................................................... 28

        E.   Causation ................................................................................................... 29

             1.   Iran's Material Support for the Syndicate Was a Substantial Factor
                  in the Attacks  ................................................................................ 30

             2.   The Results Were Reasonably Foreseeable to Iran ......................... 33

        F.   Additional Requirements for a Federal Court to Hear Claims  ................. 34

III.    PERSONAL JURISDICTION .............................................................................. 35

IV.     FEDERAL CAUSE OF ACTION AND DAMAGES .......................................... 37

CONCLUSION ................................................................................................................. 38

# TABLE OF AUTHORITIES[*]

Page(s)

**Cases**

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) .................................. 4

*Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39 (D.D.C. 2008) ..................... 3, 35, 36

*Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71 (D.D.C. 2017) ......................................... 14

*Est. of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107 (D.D.C. 2018) ............... 31, 34

*Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236 (D.D.C. 2020) ......................................... 7

*Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186 (D.D.C. 2017) ............................................ 33

*Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. 2020)............................. *passim*

*Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54 (D.D.C. 2018) ........................................... 37

*Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88 (D.D.C. 2017) ............................................ 14

*Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85 (D.D.C. 2019)...................... 8, 31, 33, 36

*Han Kim v. Democratic People's Republic of Korea*,
   774 F.3d 1044 (D.C. Cir. 2014)....................................................................................... 3, 17

*Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019).................... 2, 8, 15, 37

*Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136 (D.D.C. 2010)................................... 37

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
   376 F.3d 1123 (D.C. Cir. 2004)............................................................................................ 29

*Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475 (D.D.C. 2021) ................................... 16, 34

*Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44 (D.D.C. 2012) ...................................... 28

*Owens v. Republic of Sudan*, 174 F. Supp. 3d 242 (D.D.C. 2016),
   *aff'd*, 864 F.3d 751 (D.C. Cir. 2017), *vacated and remanded on
   other grounds by Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020) ............................14, 17

---

[*] Authorities on which counsel chiefly relies are denoted with an asterisk, per Local Civil Rule 7(a).

*Owens v. Republic of Sudan*, 412 F. Supp. 2d 99 (D.D.C. 2006),
  aff'd and remanded, 531 F.3d 884 (D.C. Cir. 2008). ............................................ 10

*Owens v. Republic of Sudan*, 826 F. Supp. 2d 128 (D.D.C. 2011) ............................................ 30

\*Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017),
  vacated and remanded on other grounds by
  Opati v. Republic of Sudan, 140 S. Ct. 1601 (2020) ........................................4, 29, 33

*Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002) ................. 35

*Sotloff v. Syrian Arab Republic*, 2021 WL 965882 (D.D.C. Mar. 15, 2021) .............................. 31

*Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22 (D.D.C. 2016) ........................................ 3

*Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52 (D.D.C. 2010) ...................................... 35

*Van Beneden v. Al-Sanusi*, 709 F.3d 1165 (D.C. Cir. 2013) ....................................... 15

*Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84 (D.D.C. 2014),
  aff'd in part, vacated in part sub nom. Owens v. Republic of Sudan,
  864 F.3d 751 (D.C. Cir. 2017) ........................................................................ 37

**Statutes, Rules and Regulations**

18 U.S.C. § 2339A ............................................................................................................ 10

18 U.S.C. § 2339A(b)(1) .................................................................................... 6, 9, 10, 11

28 U.S.C. § 1330 ............................................................................................................. 4

  28 U.S.C. § 1330(b) ...................................................................................................... 35

28 U.S.C. § 1350 ..................................................................................................... 13, 17

28 U.S.C. § 1604 ............................................................................................................. 4

Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A ..................................... *passim*

  28 U.S.C. § 1605A(a) .................................................................................................. 37

  28 U.S.C. § 1605A(a)(1) ..................................................................................... *passim*

  28 U.S.C. § 1605A(a)(2) ............................................................................................... 5

  28 U.S.C. § 1605A(a)(2)(A)(i)-(iii) .............................................................................. 34

  28 U.S.C. § 1605A(c) ........................................................................................... 3, 4, 37

28 U.S.C. § 1605A(c)(4) ................................................................................ 37

28 U.S.C. § 1605A(h)(2) ................................................................................ 19

28 U.S.C. § 1605A(h)(3) .................................................................................. 6

28 U.S.C. § 1605A(h)(7) ................................................................................ 13

28 U.S.C. § 1608(a) .................................................................................. 3, 34

28 U.S.C. § 1608(a)(1) ............................................................................ 35, 36

28 U.S.C. § 1608(a)(2) ............................................................................ 35, 36

28 U.S.C. § 1608(a)(3) ........................................................................ 35, 36, 37

28 U.S.C. § 1608(a)(4) ............................................................................ 36, 37

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992) ............... 13, 17

**Other Authorities**

H.R. Rep. No. 104-383 (1995), ...................................................................... 15

H.R. Rep. 104-518 (1996) ............................................................................ 15

Under this Court's Revised Case Management Order, Dkt. 54[1], as extended by the November 3, 2021 Minute Order, Plaintiffs file these proposed conclusions of law.

## INTRODUCTION

Plaintiffs are American service members and civilians — and their family members — who were killed or wounded in attacks by a terrorist syndicate in Afghanistan between 2006 and 2019. The Taliban led this terrorist Syndicate, which also included the Haqqani Network, a Taliban subgroup and designated Foreign Terrorist Organization; al-Qaeda; and other terrorist groups operating in and around Afghanistan. Members of the Syndicate committed these attacks to advance the Syndicate's broader goal of expelling U.S. forces from Afghanistan and overthrowing Afghanistan's democratically elected government. The Syndicate achieved that goal in August 2021.

Plaintiffs' claims arising from these attacks are against Iran under the terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A ("FSIA"). Iran, which has been designated as a State Sponsor of Terrorism since 1984, provided material support for the Syndicate's terrorist attacks to further its own anti-American policies and eliminate the U.S. presence near its borders. As courts throughout this District have found repeatedly, Iran has long supported radical Islamist and anti-American terrorist groups in the Middle East, particularly those operating along its borders. Iran here provided similar support to the Taliban-led Syndicate, which operated just across Iran's eastern border. It gave the Taliban and its Haqqani Network subgroup sophisticated weapons, critical training, financial assistance, safe haven, and assistance with drug trafficking. Iran also gave safe haven to al-Qaeda, another member of the

---

[1] Unless otherwise specified, citations to "Dkt." are to the docket entries in *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835-JDB.

Syndicate that planned and authorized the Taliban's attacks.  Iran provided all this support through its Islamic Revolutionary Guard Corps ("IRGC") — a paramilitary state institution responsible for implementing the Islamic Revolution — and the IRGC's subgroup, the Qods Force.  Both the IRGC and the Qods Force are designated Foreign Terrorist Organizations.

The evidence documenting Iran's support for the Syndicate, as Mr. William Roggio put it at trial, "is extremely strong.  It's almost overwhelming."  Tr. 77:24-25 (Roggio).  Plaintiffs now have submitted a wide array of liability evidence, both documentary and testimonial.  The evidence includes a panoply of U.S. terror designations — including the Qods Force's original 2007 designation, which it received in part because of "the Iranian regime's . . . lethal support to the Taliban."  Tr. 81:1-7 (Roggio).  It also includes official U.S. government studies; declassified intelligence reporting; open-source analysis; and the terrorists' own statements.  All told, as Plaintiffs' experts explained, Iran's multifaceted support for the Taliban and other Syndicate members in Afghanistan was comparable to its support for the Shia terrorists in Iraq.  This Court should now hold it liable for the former, just as other courts have repeatedly held it liable for the latter.  *See*, *e.g.*, *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019).

Iran's support for the Syndicate enhanced the Syndicate's ability to commit terrorist attacks against U.S. targets, and Iran intended for its support to accomplish just that.  The potency of Iran's cross-cutting material support — combined with its specific intent to kill Americans — makes for a causation showing even stronger than those this Court has previously sustained in FSIA cases.  And the Taliban-led Syndicate used Iran's support to attack Plaintiffs or their family members, committing each of the eleven bellwether attacks included in the October 2021 evidentiary hearing — and likely every attack in this case.  That is more than

enough to establish that Iran lacks sovereign immunity under the FSIA's terrorism exception and that this Court has subject-matter jurisdiction.

The Court also has personal jurisdiction over Iran.  Plaintiffs successfully served each of the three operative complaints under 28 U.S.C. § 1608(a), which establishes personal jurisdiction under the FSIA.

Finally, Plaintiffs bring claims pursuant to the private right of action in 28 U.S.C. § 1605A(c).  This private right of action gives U.S. national plaintiffs a cause of action for any claim where the defendant is not entitled to sovereign immunity under § 1605A.  It extends to both the individuals physically injured and killed in the attacks and their immediate family members.  Plaintiffs will prove their citizenship and family relationships as part of the damages phase of this case.  Because the Plaintiffs have established that Iran lacks sovereign immunity for claims associated with the eleven bellwether attacks, the Court should enter default judgment against Iran as to liability for these attacks.

## I.   EVIDENTIARY STANDARDS

In this default action, Plaintiffs do not have the same evidentiary obligations present in other civil cases.  As the D.C. Circuit has recognized, "courts have the authority — indeed, we think, the obligation — to adjust evidentiary requirements to differing situations." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014).  In default-judgment terrorism cases, courts liberally construe the Rules of Evidence to prevent defaulting state sponsors of terrorism from "effectively immuniz[ing] themselves by killing their victims, intimidating witnesses, and refusing to appear in court." *Id.*

The Court may thus accept "[u]ncontroverted factual allegations that are supported by admissible evidence . . . as true." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016).  Plaintiffs may also prove their claims "using evidence that might not be

admissible in a trial," because the Court is not required "to step into the shoes of the defaulting party and pursue every possible evidentiary challenge." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated and remanded on other grounds by Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).

Additionally, the Court may rely heavily on Plaintiffs' experts. As the D.C. Circuit has recognized, "reliance upon secondary materials and the opinions of experts is often critical in order to establish the factual basis of a claim under the FSIA terrorism exception." *Id.* at 787. "As long as the evidence itself is admissible, as expert testimony certainly may be, and the court finds it satisfactory, its form or type is irrelevant." *Id.* at 788.

Finally, the Court may also "take judicial notice of related proceedings and records." *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 43 (D.D.C. 2008).

## II.      SUBJECT-MATTER JURISDICTION

The FSIA is the sole basis for obtaining jurisdiction in U.S. courts over a foreign state like Iran. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Although foreign states are generally "immune from" jurisdiction, the FSIA provides for certain exceptions in "sections 1605 to 1607." 28 U.S.C. § 1604. Federal district courts have "original jurisdiction" over claims brought within these exceptions. 28 U.S.C. § 1330.

The Court has subject-matter jurisdiction here because Plaintiffs' claims fall within the FSIA's terrorism exception, 28 U.S.C. § 1605A(c). The terrorism exception provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).  To satisfy the terrorism exception, Plaintiffs must show that the relevant "personal injur[ies] or death" were "caused by" an "act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the material support or resources for such an act."  *Id*.  They further must show that the material support was provided by "an official, employee, or agent" of the foreign state acting within the scope of their official position.  *Id.*

Once those threshold jurisdiction-stripping elements are satisfied, Plaintiffs then must meet the requirements for a court to hear claims in § 1605A(a)(2).  Those three latter requirements are that:  (1) the Defendant was a designated state sponsor of terrorism; (2) the claimant or victim was — at the time of the attack — a U.S. national, a member of the armed forces, or a U.S. government employee or contractor; and (3) if the attack took place within the Defendant's borders, the Defendant received an opportunity to arbitrate the claims.

The evidence at the bellwether hearing satisfied each of these elements.  Plaintiffs satisfy the initial requirements because they are seeking money damages from the foreign state of Iran.  *See* Second Am. Compl. Prayer for Relief (Dkt. 30).  IRGC and Qods Force operatives — acting within the scope of their authority and with the approval of Iran's central government — provided "material support" for terrorist attacks committed by the Taliban-led Syndicate, in particular the bellwether attacks that caused Plaintiffs' personal injuries or deaths.  Those attacks were "extrajudicial killing[s]" or "hostage taking[s]" as defined in the statute, and Iran's material support proximately caused Plaintiffs' injuries or deaths.  Plaintiffs also meet the additional requirements in § 1605A(a)(2).  Iran was a designated state sponsor of terrorism at all relevant times.  Each of the victims was a member of the armed forces or a U.S. citizen at the time of the attack.  And the attacks all took place within Afghanistan — not Iran.  Plaintiffs address each of these requirements below.

### A.      Iran's Material Support

Iran lacks sovereign immunity for claims arising from the provision of "material support or resources" for enumerated acts, including extrajudicial killings and hostage takings, when that support or resources is provided "by an official, employee, or agent of [Iran] while acting within the scope of his or her office, employment, or agency."  28 U.S.C. § 1605A(a)(1).  The term "material support or resources" is defined as:

> [A]ny property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

*See* 18 U.S.C. § 2339A(b)(1); 28 U.S.C. § 1605A(h)(3) (adopting the definition of material support in 18 U.S.C. § 2339A(b)(1)).  Iran provided many types of "material support" for the acts of extrajudicial killing and hostage taking at issue in this case.

Iran has a long history of providing material support and resources to terrorist organizations that kill and maim Americans in the Middle East.  Iran backs these groups in hopes of advancing the Islamic Revolution throughout the Middle East by driving out American and other Western interests and overthrowing local governments it considers to be a threat.  *See* PFOF[2] ¶ 63.  The below map from the Defense Intelligence Agency's 2019 Report on Iran's Military Power shows numerous terrorist groups that Iran supports in the Middle East.[3]

---

[2] PFOF refers to the Proposed Findings of Fact filed concurrently in this matter.

[3] *See* PX-198 at 68; Tr. 62:15-68:10 (Roggio) (testifying about this map).



*Selected Iranian Partners, Proxies, and Affiliates*

As shown on the map, Iran sponsored an array of terrorist proxies to its west.  For example, Iran provided material support for Hezbollah in Lebanon, Hamas and the Palestinian Islamic Jihad in Palestine, the Houthis in Yemen, and various Shia terrorist groups in Iraq.  *See id.* ¶¶ 70-73.  As the map demonstrates, although Iran is a Shia regime, it regularly supports Sunni terrorists, like Hamas, when it shares common goals with them.  *See id.* ¶¶ 71, 73-74.  Other courts in this District have sustained claims under the FSIA against Iran arising from its material support for virtually all of the depicted terrorist groups on this map that reside to Iran's west.[4]

---

[4] *See, e.g.*, *Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 241 (D.D.C. 2020) (entering judgment against Iran for its material support of Hezbollah's bombing of the U.S. embassy in Beirut, Lebanon); *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 337 (D.D.C. 2020) (entering judgment against Iran for its material support of eight attacks committed

A similar result is warranted here.  Iran provided comparable support to the Taliban in Afghanistan, which is denoted in green on the DIA map above.[5]  During the relevant period, the Taliban was operating as part of a terrorist Syndicate in Afghanistan.  This Syndicate — which the U.S. government first identified — comprised the Taliban, including its subgroup the Haqqani Network; al-Qaeda; and other terrorist groups.[6]  *See* PFOF ¶¶ 1-3.  The Syndicate's overarching goal was to reestablish its Islamic Emirate of Afghanistan by overthrowing Afghanistan's democratically elected government and driving the United States from the country.  *See id.* ¶ 4.  The members of the Syndicate shared resources, personnel, and financing; trained together; jointly planned operations; and regularly coordinated in executing attacks in Afghanistan.  *See id.* ¶ 5.  Their cooperation was particularly pronounced in the capital, Kabul, where the Syndicate focused efforts on conducting spectacular attacks.  *See id.* ¶¶ 47-48.  The U.S. government referred to this Kabul-area manifestation of the Syndicate as the "Kabul Attack Network."  *See id.*

---

by Hamas and Palestinian Islamic Jihad in Israel); *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 14 (D.D.C. 2019) (entering judgment against Iran based on its material support of attacks by Shia terrorist groups in Iraq); *Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85, 89 (D.D.C. 2019) (entering judgment against Iran for its material support of two kidnappings and a murder by the Houthis in Yemen).

[5] As the Court observed at trial, this map does not denote al-Qaeda as an Iranian proxy. That is because, although Iran provided al-Qaeda with substantial support, al-Qaeda did not function as an Iranian "proxy" or "affiliate."  Tr. 66:18-24 (Roggio).  With the other proxies listed, Iran exercised a degree of operational control.  *Id.*  With respect to al-Qaeda and Iran, by contrast, it was "a mutually beneficial relationship, but it's not a relationship wherein Iran is a controlling partner, say, within the organization."  *Id.* 68:8-10 (Roggio).

[6] Plaintiffs discuss each of the members of the Syndicate in additional detail in the Proposed Findings of Fact.  *See generally* PFOF § I (PFOF ¶¶ 1-59).

### 1.   *Iran's Material Support for the Taliban-led Syndicate*

Iran provided six different types of material support for the Taliban Syndicate's terrorist

acts.  *First*, Iran gave the Taliban a wide range of "weapons, lethal substances, [and] explosives"

for terrorist attacks.  *See* 18 U.S.C. § 2339A(b)(1).  These included AK-47s, 107mm rockets,

mortars, rocket propelled grenades ("RPGs"), recoilless rifles, PKM machine guns, light

machine guns, anti-tank missiles, ammunition, improvised explosive devices ("IEDs"),

explosively formed penetrators, and explosives and other materials to make suicide vests and car

bombs.  *See* PFOF ¶ 86.  The flow of Iranian weapons into Afghanistan was not concentrated

solely in Western Afghanistan, which shares a border with Iran; instead, Iran supplied weapons

to the Taliban across the whole country.  *See id.* ¶ 88.  For example, declassified intelligence

reporting indicated that Iran provided weapons directly to the Taliban's shadow governor in

Helmand Province, a key Taliban stronghold in Southern Afghanistan, who then disseminated

the weapons to his commanders for use in terrorist attacks throughout the province.  *See id.* ¶ 90.

*Second,* Iran provided the Taliban with critical "training, expert advice [and] assistance,"

including by running training programs in Afghanistan and bringing Taliban fighters to training

camps in Iran.  *See* 18 U.S.C. § 2339A(b)(1).  Iranian trainers entered Afghanistan and directly

trained Taliban terrorists in Taliban-controlled areas.  *See* PFOF ¶ 93.  These trainers gave the

Taliban expert advice on conducting attacks, and, at times, assisted directly with attacks.  *See id.*

¶ 226.  Iran also operated at least four Taliban training camps inside Iran — in the cities of

Tehran, Mashhad, and Zahedan, and in the province of Kerman.  *See id.* ¶ 94.  Iran could provide

more advanced training to the Taliban within the relative safety of these camps, thereby

empowering the Taliban to commit even more sophisticated and lethal attacks.  *See id.* ¶ 95.

*Third*, Iran supported the Taliban's attacks financially by providing the Taliban with

"currency."  *See* 18 U.S.C. § 2339A(b)(1).  Iran gave key Taliban leaders cash so that they could

buy the weapons, ammunition, explosives, and other resources that the Taliban needed to sustain its terrorist insurgency.  *See* PFOF ¶ 98.  For example, according to a declassified military intelligence report, Iran provided direct financial payments to an important Taliban commander who operated in Kabul, Parwan, and Kapisa Provinces.  *See id.* ¶ 100.  This senior Taliban commander in turn disbursed Iran's funds to his key commanders, including commanders associated with the Kabul Attack Network, so they could carry out the Syndicate's terrorist attacks.  *See id.*  Iran also paid bounties directly to Taliban terrorists who killed or wounded American troops or damaged American equipment.  *See id.* ¶ 102.  Iran's financial support further contributed to Syndicate's ability to execute terrorist attacks.  *See id.* ¶ 103.

*Fourth*, Iran provided the Taliban with "safehouses" within Iran.  *See* 18 U.S.C. § 2339A(b)(1).  As this Court has recognized:  "Insofar as [a government] affirmatively allowed and/or encouraged [terrorist groups] to operate their terrorist enterprises within its borders, and thus provided a base of operations for the planning and execution of terrorist attacks," it "provided a 'safehouse' within the meaning of 18 U.S.C. § 2339A."  *Owens v. Republic of Sudan*, 412 F. Supp. 2d 99, 108 (D.D.C. 2006), *aff'd and remanded*, 531 F.3d 884 (D.C. Cir. 2008).  Other courts in this District have reached similar conclusions.  *See*, *e.g.*, *Force*, 464 F. Supp. 3d at 366 (holding that "'safehouse,' as used in the material support statute, includes foreign governmental encouragement or assent to terrorist organizations setting up shop within their borders").

In the immediate aftermath of the U.S. invasion of Afghanistan, many Taliban leaders received shelter within Iran.  *See* PFOF ¶ 104.  This Iranian safe haven was instrumental in helping the Taliban regroup after its initial battlefield defeat at the hands of the U.S. military. *See id.* ¶ 107.  In 2007, the Taliban opened a formal office in Mashhad, Iran, which is near Iran's

border with Afghanistan.  *See id.* ¶ 105.  The Taliban's Mashhad office eventually became the

Mashhad Shura, one of the Taliban's regional commands, and the Taliban used it to plot its

operations in western and northwestern Afghanistan from safety.  *See id.*  Iran then permitted the

Taliban to open a second formal office in late 2009 in Zahedan — in southeastern Iran near the

border with Afghanistan.  *See id.* ¶ 106.  The Taliban also planned terrorist attacks in

Afghanistan from this office.  *See id.*

 *Fifth*, Iran supported the Taliban's drug trade, providing a "service" within the definition

of material support.  *See* 18 U.S.C. § 2339A(b)(1).  Drug trafficking was highly lucrative for the

Taliban insurgency:  the Taliban made between $50 million and $500 million per year from drug

trafficking between 2006 and 2019.  *See* PFOF ¶¶ 108, 113.  The Iranian government helped

facilitate the Taliban's drug trafficking by permitting the Taliban's drugs to pass over the Iranian

border en route to major markets in Europe, Central Asia, and the Persian Gulf.  *See id.* ¶ 110.

Specifically, Iran provided the Taliban with special license plates for Taliban vehicles that

alerted the Iranian Border Patrol not to search vehicles bearing them.  *See id.*  Iran also gave

Taliban drug smugglers weapons and occasionally planned attacks on U.S. soldiers using the

smugglers.  *See id.* ¶ 111.  This drug-related assistance reinforced Iran's other modes of support

by providing additional financial resources and independently strengthened the Taliban's

terrorist operations.  *See id*. ¶ 114.

 *Finally*, Iran provided material support to other members of the Taliban-led Syndicate,

particularly al-Qaeda.  Al-Qaeda and Iran have long had a particularly close relationship, and

Iran served as a key base for al-Qaeda's operations.  *See id.* ¶ 117.  In fact, in a letter the U.S.

government seized from Osama bin Laden's compound, bin Laden identified Iran as al-Qaeda's

"main artery for funds, personnel, and communication, as well as the matter of hostages."  *See*

*id.* ¶ 118.  Iran's support of al-Qaeda extended to its operations in Afghanistan.  *See id.*  In the immediate aftermath of 9/11, some senior al-Qaeda leaders and their families fled to Iran for safe haven.  *See id.* ¶ 119.  Iran permitted these al-Qaeda leaders to move freely.  *See id.* ¶¶ 120-122.  The U.S. government has recognized this close relationship and regularly documents connections to Iran when designating al-Qaeda leaders.  *See id.* ¶¶ 123-126.

2.     *The IRGC and Qods Force Provided the Material Support*

The evidence further established that Iran provided this material support to the Taliban-led Syndicate through members of its IRGC and the Qods Force.  The IRGC is responsible for spreading the Islamic Revolution and implementing Iran's anti-American foreign policy goals, and it uses support for violent terrorist groups to achieve these aims.  *See id.* ¶¶ 64, 66.  The Qods Force — a special operations branch of the IRGC — directs IRGC operations outside of Iran.  *See id.* ¶ 67.  The United States has long recognized the IRGC's and Qods Force's terrorist activities.  It designated the Qods Force as a Specially Designated Global Terrorist organization in 2007 and the IRGC as one in 2017.  *See id.* ¶ 42.  In 2019, the United States designated both the IRGC and the Qods Force as Foreign Terrorist Organizations.  *See id.*

As Iran did in other countries, it used the Qods Force to support the Taliban-led Syndicate in Afghanistan.  The Qods Force is broken into regional commands with specific areas of focus.  The Fourth Corps — or Ansar Corps — focuses on Iran's operations in Afghanistan, including supporting the Taliban.  *See id.* ¶ 77.  The Qods Force placed the Ansar Corps's headquarters in Mashhad, Iran — near the border with Afghanistan — to promote its control over operations in Afghanistan.  *See id.* ¶ 78.  Indeed, many of the primary sources that detail Iran's material support for the Taliban identify the IRGC, Qods Force, or Fourth Corps as the source of the support.  *See, e.g.*, *id.* ¶ 89.

At all times, Iran's central government controlled the Qods Force and approved its support for terrorist proxies.  General Qasem Soleimani was the Qods Force Commander until the U.S. government killed him in Baghdad in 2020.  *See id.* ¶ 69.  Soleimani reported directly to Iran's Supreme Leader Grand Ayatollah Ali Khomeini, and the Qods Force did not act without approval.  *See id.*  Iran's Supreme Leader was not only aware of Qods Force material support for the Taliban, but he intentionally directed it.  *See id.*  Each member of the Qods Force who provided material support to the Taliban was an "official, employee, or agent of [Iran] acting within the scope of his or her office, employment, or agency."  28 U.S.C. § 1605A(a)(1).

### B.    Acts of Extrajudicial Killing and Hostage Taking

The terrorism exception applies if Iran's material support was for an "act of torture, extrajudicial killing, aircraft sabotage, [or] hostage taking."  28 U.S.C. § 1605A(a)(1).  Plaintiffs satisfy this requirement for each of the eleven bellwether attacks:  ten were extrajudicial killings and the eleventh was a hostage taking.

### 1.    Extrajudicial Killing

The ten attacks that injured or killed members of the armed forces were "extrajudicial killing[s]" under 28 U.S.C. § 1605A(a)(1).  An extrajudicial killing is a "deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."  Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).[7]  It does not include a killing "that, under international law, is lawfully carried out under the authority of a foreign nation."  *Id.*

---

[7] *See* 28 U.S.C. § 1605A(h)(7) (applying the definition of extrajudicial killing "in section 3 of the Torture Victim Protection Act of 1991").

Plaintiffs proved that ten bellwether attacks (all except the kidnapping of Mr. Kevin King) were extrajudicial killings. *First,* each of these attacks constituted a "killing." In nine of those ten attacks, one or more individuals died. *See* PFOF ¶¶ 198, 199, 200, 218, 239, 249, 264, 286, 315, 333, 373. Most of the Plaintiffs associated with the nine bellwether attacks are family members of the individuals who were killed. Two more Plaintiffs who testified at the hearing were wounded in these attacks. SGT Jared Satoshi Lemon was severely injured in an April 11, 2010 IED attack in Kandahar that killed SPC Joseph T. Caron, whose family members are also Plaintiffs in this case. *See id.* ¶¶ 233-239. CPT Ryan Gregory Timoney was severely injured in a May 20, 2012 suicide vest bombing attack in Uruzgan Province that killed CPT Jesse Ozbat and 2LT Tobias Alexander. *See id.* ¶¶ 286-290.

SGT Lemon and CPT Timoney, and their families, have standing to bring claims as victims of "extrajudicial killings." As this Court and others have recognized, there is no sovereign immunity for claims brought by those physically injured in an attack that killed others, because "the same <u>act</u> of killing one person can quite obviously injure another." *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 266 (D.D.C. 2016) *aff'd*, 864 F.3d 751, 788 (D.C. Cir. 2017), *vacated and remanded on other grounds by Opati*, 140 S. Ct. 1601 (emphasis in original). CPT Timoney and his family have standing even though the individuals who died in the attack are not Plaintiffs here. "Plaintiffs need only establish that the [attacks were] unauthorized, deliberate, and that there were casualties. It is not necessary, however, for one of the plaintiffs to have died in the attack in order for the state-sponsor-of-terrorism exception to apply." *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017).

In the tenth bellwether attack, the Taliban planted an IED that severely wounded SGT Eric M. Hunter without killing anyone. *See* PFOF ¶ 304. As other courts in this District have

14

recognized, Iran also lacks sovereign immunity with respect to such attacks because they were *attempted* killings.  As a textual matter, § 1605A strips sovereign immunity for claims for "personal injury *or* death that was caused by an act of . . . extrajudicial killing . . . *or the provision of material support or resources for such an act*.  28 U.S.C. § 1605A(a)(1) (emphasis added).  "Nothing on the face of Section 1605A(a)(1) requires that the material support or resources for an intended extrajudicial killing actually result in someone's death, as long as the victim represented in the case was injured."  *Karcher*, 396 F. Supp. 3d at 57.  Similarly, "the Torture Victim Protection Act's definition of extrajudicial killing allows plaintiffs to assert liability for a defendant's *attempted* extrajudicial killing, even if no one died as a result of that attempt."  *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017) (emphasis added).

The attack on SGT Hunter was an attempted killing.  The Taliban-led Syndicate planned the attack in advance by constructing the IED and placing it along a path where American or Coalition forces would likely trigger it.  *See* PFOF ¶¶ 303, 306, 308.  The Taliban's goal in constructing and placing this IED was to kill American soldiers.  *See id.* ¶ 307.

If any ambiguity remains about whether the statute includes attempted killings, it should be interpreted "flexibly and capaciously" to promote its purpose of compensating injured soldiers like SGT Hunter.  *Van Beneden v. Al-Sanusi*, 709 F.3d 1165, 1167-68 (D.C. Cir. 2013).  Congress intended to strip sovereign immunity "where Americans and/or their loved ones suffer *injury* or death at the hands of the terrorist states," H.R. Rep. No. 104-383, at 62 (1995), without any intent to require that someone die in each terrorist attack.  *See also* H.R. Rep. 104-518, at 112 (1996) (Conf. Rep.) (similarly discussing proposed jurisdiction over claims arising from "personal injury or death").

*Second*, the tactics used in these attacks indicate that they were "deliberated." A deliberated attack is one "undertaken with careful consideration, not on a sudden impulse." *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 491 (D.D.C. 2021). LTC Steven A. Wood testified that the Taliban-led Syndicate planned each of these bellwether attacks in advance. *See* PFOF ¶¶ 204, 223, 245, 255, 268, 295, 308, 322, 340, 379. For example, the August 16, 2008 IED-triggered complex attack in Herat Province reflected deliberated planning. *See id.* ¶ 223. The Taliban made the IED well in advance of the attack. *See id.* On the day of the attack, they initially engaged the American forces in the village of Siawashan as a distraction. They then hid the IED in a mud wall and staged the ambush in a narrow area along the road the American convoy was likely to use on its way back to the base. *See id.* ¶¶ 216-217, 223.

For some bellwether attacks, the Taliban-led Syndicate may not have known in advance that it would have a specific opportunity to conduct the particular attack — such as the August 6, 2011 RPG attack on a helicopter that killed everyone on board. This attack was still "deliberated" because the Taliban planned the tactics in advance with the intent to kill Americans should the opportunity arise. LTC Wood testified that the Taliban climbed to an elevated position at the top of the building to better aim at any helicopter that approached because they were aware that American forces often moved into the Tangi Valley via helicopter. *See id.* ¶ 255. The terrorists were relying on significant advanced training to execute pre-studied tactics during a kinetic action. The Taliban had attempted — unsuccessfully — to shoot down helicopters in the same manner in the Tangi Valley multiple times in previous months. *See id.* ¶ 256. The Taliban's goal in shooting at the helicopter was to cause it to crash and kill everyone on board. *See id.* ¶ 253. In other words, although the terrorists may not have known in advance that they would be able to kill Americans on that particular day, they were acting "in a cool state

of blood, in furtherance of a fixed design . . . and not under the influence of a violent passion"
when they initiated the attack. *Owens*, 174 F. Supp. 3d at 263.

Further, each of the bellwether — and non-bellwether — attacks was part of a deliberate
terrorist campaign to kill American service members. As the D.C. Circuit has recognized, a
"deliberated" killing occurs when the killers "planned their actions carefully and intended those
actions to result in death." *Id.* at 260. The Taliban-led Syndicate's overall goal was to drive the
United States from Afghanistan by wounding and killing American service members and other
American citizens in Afghanistan. *See* PFOF ¶ 4. Throughout the insurgency, the Taliban-led
Syndicate systematically planned attacks and trained terrorists to commit attacks, like the ones at
issue in this case, to kill Americans. *See generally id.* § VIII (¶¶ 189-383). And the Syndicate's
goal in each bellwether attack was to kill American and Coalition forces. *See id.* ¶¶ 202, 220,
240, 253, 266, 291, 307, 317, 334, 375.

*Third*, these attacks were not "authorized by a previous judgment pronounced by a
regularly constituted court." Pub. L. No. 102-256 § 3(a), 106 Stat. 73 (codified at 28 U.S.C.
§ 1350 note). As Mr. Roggio testified, no regularly constituted Afghan court ordered these
attacks. *See* PFOF ¶ 19. The D.C. Circuit has previously held that, "[w]ith respect to
extrajudicial killing, the [plaintiffs] need demonstrate only that the [defendant] killed the [victim]
without due process." *See Han Kim*, 774 F.3d at 1050. The Taliban never afforded due process
to the service members whom they killed and injured in their terrorist attacks.

*Finally*, the attacks were not "lawfully carried out under the authority of a foreign
nation." Pub. L. No. 102-256 § 3(a), 106 Stat. 73 (codified at 28 U.S.C. § 1350). The Taliban
was never the lawful government of Afghanistan. As Mr. Roggio testified, the pre-2001 Taliban
controlled about 90 percent of Afghanistan, but it did not function as a government. *See* PFOF

¶ 11.  It failed to provide essential government services — such as healthcare, education, and infrastructure — and it persecuted many of its citizens, particularly women and minorities.  *See id.*  The international community did not recognize the Taliban as the rightful government of Afghanistan due, in part, to these failures.  *See id.* ¶¶ 11, 18.  Only three countries — Saudi Arabia, Pakistan, and the United Arab Emirates — ever recognized the Taliban as the government of Afghanistan, and all withdrew their recognition by November 2001.  *See id.* ¶ 18.

By 2006, the start of the period at issue here, the Islamic Republic of Afghanistan was the rightful government in Afghanistan.  The United States declared an end to major combat operations in Afghanistan in 2003.  *See id.* ¶ 15.  In 2004, the Afghan people ratified a new constitution forming the Islamic Republic of Afghanistan and elected Hamid Karzai the first president.  *See id.* ¶ 16.  During the relevant period, the Islamic Republic of Afghanistan never authorized any of the Taliban's terrorist attacks against U.S. forces.  *See id.* ¶ 19.  In fact, the Taliban regularly *targeted* the Afghan government in terrorist attacks.  *See id.* ¶ 20.

The Taliban therefore was neither a foreign nation nor a lawful military force.  *See id.* ¶¶ 17-20.  Instead, it was at all times a designated terrorist group that routinely violated the laws of war, refused to wear uniforms, and targeted civilians indiscriminately.  *See id.* ¶ 20, 41.  Accordingly, each of these ten Taliban attacks constitutes an "extrajudicial killing" under 28 U.S.C. § 1605A(a)(1).

### 2.      Hostage Taking

The eleventh attack — the August 7, 2016 kidnapping of Mr. King — was a "hostage taking."  Section 1605A defines a hostage taking as occurring when one "seizes or detains and threatens to kill, to injure or to continue to detain another person ( . . . 'hostage') in order to compel a third party, namely, a State . . . to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage."  United Nations, International Convention

Against the Taking of Hostages, No. 21931, Art. I (Dec. 17, 1979).[8]  Mr. King testified that the Taliban kidnapped him and held him for more than three years.  *See* PFOF ¶ 355.  Mr. King's captors informed him that they had kidnapped him so that the Taliban could trade him for the release of Taliban prisoners, and they forced him to make multiple hostage videos encouraging the U.S. government to make such a trade.  *See id.* ¶ 354.  As LTC Wood explained, Mr. King's kidnapping advanced the Taliban's goal of securing the release of Taliban prisoners by kidnapping Westerners and using hostages as leverage.  *See id.* ¶ 361.  Mr. King and another prisoner who was held with him, Mr. Timothy Weeks, were eventually released in a direct exchange for high-ranking Taliban prisoners, including Anas Haqqani — the current Haqqani Network leader's brother.  *See id.* ¶¶ 37, 359.  This attack thus constituted a "hostage taking" that supports a waiver of immunity under the statute.  28 U.S.C. § 1605A(a)(1).

### C.  The Taliban-led Syndicate Committed Each of the Bellwether Attacks

The Taliban-led Syndicate committed each of the eleven bellwether attacks.  The evidence at the hearing not only confirmed the Taliban's responsibility for each bellwether attack, but also indicated that the Taliban committed every attack at issue in this case.  *See generally* PFOF ¶¶ 134-169, 189, 212, 227, 247, 261, 275, 298, 311, 328, 344, 366.

### 1.  Geographies

The geography in which an attack occurs, along its timing, is a key factor for attributing an attack to a particular group because different terrorist groups were active in particular areas at certain times.  *See id.* ¶ 134.  Dr. Colin Clarke concluded that the Taliban-led Syndicate had operational dominance in each of the particular Afghan provinces where the attacks at issue —

---

[8] *See* 28 U.S.C. § 1605A(h)(2) (adopting the definition in Article 1 of the International Convention Against the Taking of Hostages).

both bellwether and non-bellwether — occurred during the relevant time period.  *See generally id.* § VI (¶¶ 134-169).  That geography-based analysis alone confirms that the Taliban-led Syndicate more likely than not committed every terrorist attack at issue in the case.  *See id.* ¶¶ 135, 139, 144, 148, 154, 159, 164.

The evidence established that the Taliban-led Syndicate *very* likely carried out *all* attacks — both bellwether and non-bellwether — in this case that occurred in five of the seven bellwether geographies.  The first of these bellwether geographies, Southern Afghanistan, comprises Helmand and Kandahar Provinces.  *See id.* ¶ 135.  The Taliban was originally founded in Southern Afghanistan, and it was a key area for the Taliban from 2006-2019.  *See id.* ¶ 135-136.  The Taliban had particular strongholds within Helmand and Kandahar Provinces, and it used these strongholds to launch attacks throughout the area.  *See id.* ¶ 135-137.  Two bellwether attacks — the April 11, 2010 and May 31, 2012 IED attacks — occurred in Southern Afghanistan.  *See id.* ¶¶ 228, 299.

The Haqqani Network — a radical subgroup within the Taliban and a designated Foreign Terrorist Organization, *see id.* ¶¶ 32-34 — very likely carried out all of the attacks within the Loya Paktia bellwether geography.  *See id.* ¶¶ 41, 139.  That geography comprises Khost, Paktia, and Paktika Provinces.  *See id.* ¶ 139.  This area, along with neighboring territory across the border in Pakistan, is the Haqqani Network's traditional homeland.  *See id.* ¶ 140.  Thus, many locals are members of the same tribe as the Haqqani Network's leaders and support the Haqqani Network and the broader Taliban.  *See id.*  The Miranshah Shura, the Talban regional shura led by the Haqqani Network, was responsible for overseeing attacks within Loya Paktia.  *See id.* ¶ 26, 140.  The July 15, 2013 recoilless rifle attack occurred in the Loya Paktia bellwether geography.  *See id.* ¶ 329.

The Taliban (including the Haqqani Network) very likely carried out all attacks in this case in Southeastern Afghanistan, which includes Ghazni, Logar, Uruzgan, Wardak, and Zabul Provinces.  *See id.* ¶ 164.  It borders Loya Paktia, and over time the Haqqani Network's influence extended into these provinces, particularly Ghazni, Logar, and Wardak.  *See id.* ¶ 26. The August 6, 2011 attack on a helicopter and the May 20, 2012 suicide vest bombing both occurred in Southeastern Afghanistan.  *See id.* ¶¶ 248, 276.

In the bellwether geography of Kabul, members of the Kabul Attack Network, a manifestation of the Taliban-led Syndicate, very likely carried out all attacks in this case.  *See id.* ¶ 144.  The Taliban, including the Haqqani network, al-Qaeda, and other terrorist groups, carried out attacks in the capital city and surrounding area jointly, focusing on so-called spectacular attacks.  *See id.* ¶¶ 47-48, 144.  Terrorist groups outside the Taliban-led Syndicate were not known to be active in Kabul until 2016.[9]  *See id.* ¶ 146.  The October 29, 2011 vehicle-borne suicide bombing occurred in Kabul.  *See id.* ¶ 262.  And Mr. King was kidnapped on August 7, 2016 in Kabul.  *See id.* ¶ 345.

Finally, the Taliban very likely carried out all attacks in this case that occurred in Western Afghanistan.  *See id.* ¶ 159.  This region borders Iran and includes Nimruz, Farah, Herat, Baghdis, Ghor, and Faryab Provinces.  *See id.* ¶ 159.  The Mashhad Shura, the Taliban regional shura based in Iran, was responsible for the Taliban's operations in this area.  *See id.* ¶ 29.  In much of this area, there was no other known insurgent presence during the relevant time period.  *See id.* ¶¶ 160-163.  The August 16, 2009 IED-triggered complex attack took place in this bellwether geography.  *See id.* ¶ 213.

---

[9] The only attack in this case in Kabul after 2016 was a January 14, 2019 attack that was claimed by the Taliban.  *See* PFOF ¶ 147.

In two of the bellwether geographies — N2KL and North Central Afghanistan — the Taliban-led Syndicate likely carried out all attacks in this case. *See id.* ¶¶ 148, 154. N2KL is located in eastern Afghanistan and includes Nangarhar, Nuristan, Kunar, and Laghman Provinces. *See id.* ¶ 148. Al-Qaeda had a particularly robust presence in N2KL and likely jointly committed many of the attacks in this area. *See id.* ¶ 148-149. Although there were other terrorist groups operating in this area, the Taliban Syndicate was the dominant group and was likely the group responsible for all terrorist attacks. *See id.* ¶ 150-153. Two bellwether attacks occurred in N2KL: the July 13, 2008 complex attack on Vehicle Patrol Base Wanat and the June 10, 2017 insider attack. *See id.* ¶¶ 191, 367.

Similarly, the Taliban likely carried out all attacks in this case in North Central Afghanistan. *See id.* ¶ 154. This region comprises the provinces north of Kabul: Parwan, Kapisa, Baghlan, and Kunduz. *See id.* Although there were other terrorist groups active in the area, the Taliban was also the dominant terrorist group there and likely responsible for the attacks in each of these provinces. *See id.* ¶¶ 155-158. The June 18, 2013 rocket attack occurred in North Central Afghanistan. *See id.* ¶ 312.

2. *Tactics, Techniques, and Procedures*

Tactics, techniques, and procedures are also important for attributing an attack to a particular group because groups tend to reuse the same successful attack methodologies. *See id.* ¶ 427. Each of the bellwether attacks is typical of Taliban tactics, techniques, and procedures used throughout Afghanistan.

The Taliban frequently attacked American forces with IEDs, which are essentially homemade bombs. *See id.* ¶ 172. Because IEDs proved highly effective against U.S. and Coalition forces, the Taliban used them frequently. *See id.* The Taliban also selected different types of IEDs to evade U.S. and Coalition forces tactics and protective measures. *See id.* ¶ 174.

22

Ultimately, IEDs were the greatest casualty-producing weapon system used against Coalition forces in Afghanistan. *See id.* ¶ 172. The bellwether attacks included two IED attacks, which occurred in Southern Afghanistan on April 11, 2010 and May 31, 2012. *See id.* ¶ 228, 299.

The Taliban sometimes followed IED attacks with an ambush on the American forces injured in the explosion, which is classified as a "complex attack." *See id.* ¶¶ 172, 213. The Taliban-led Syndicate also committed more advanced complex attacks that involved multiple groups of terrorists, multiple weapons systems, and sophisticated maneuvers. *See id.* ¶ 170. The Taliban often executed complex attacks in conjunction with major Taliban offensives, and some of these attacks could last for several days. *See id.* ¶ 171. The August 16, 2009 attack in Herat Province was an IED-triggered complex attack. *See id.* ¶ 213. And the July 13, 2008 attack on Vehicle Patrol Base Wanat was a more sophisticated complex attack. *See id.* ¶ 191.

The Taliban-led Syndicate also attacked Coalition forces with indirect fire weapons, such as rockets and mortars. *See id.* ¶ 175. These weapons do not require a direct line of sight to the target, and the Taliban could use them to attack Coalition bases from out of sight. *See id.* The Taliban frequently improvised firing systems for these weapons and did not have sufficient training to aim them accurately. *See id.* ¶ 176. Accurate rocket and mortar fire typically indicated outside training or assistance. *See id.* The June 18, 2013 rocket attack on Bagram Airfield represents this bellwether attack type. *See id.* ¶ 312.

The Taliban-led Syndicate also inflicted casualties through traditional infantry-style attacks including small arms, RPGs, and recoilless rifles. *See id.* ¶ 178. Taliban fighters could fire these weapons using a trigger, and they regularly used them on both vehicles and ground personnel. *See id.* The Taliban also fired them at helicopters in an attempt to cause the helicopter to crash, killing its occupants. *See id.* ¶¶ 179, 256. There were two bellwether attacks

of this type: the August 6, 2011 RPG attack on a helicopter in Wardak Province and the July 15, 2013 recoilless rifle attack in Paktia Province. *See id.* ¶¶ 248, 329.

Members of the Taliban-led Syndicate also committed suicide bombings — when a bomber detonates an explosive near a target killing himself or herself in the explosion. *See id.* ¶ 184. Initially, the Taliban did not use suicide attacks because suicide is against the Pashtunwali code followed by members of the Taliban. *See id.* The Haqqani Network then imported the tactic. *See id.* When it proved successful against American forces, the entire Syndicate began to use suicide bombers more regularly. *See id.* The Taliban-led Syndicate primarily used two types of suicide bombs: person-borne and vehicle-borne. *See id.* ¶ 185. The Taliban typically made person-borne IEDs — also referred to as suicide vest IEDs — by sewing explosives on the inside and gluing ball bearings or other shrapnel on the outside of a cloth vest worn by the bomber. *See id.* A vehicle-borne IED is a vehicle loaded with explosives, and the Syndicate often used this type of suicide bomb to cause mass-casualties. *See id.* ¶ 186. The May 20, 2012 attack in Uruzgan involved a person-borne suicide bomb, and the October 29, 2011 attack in Kabul involved a vehicle-borne suicide bomb. *See id.* ¶¶ 262, 276.

Beginning around 2011, the Taliban began using insider attacks, or "green-on-blue" attacks, to demoralize and sow distrust among Coalition forces and Afghan National Security forces. *See id.* ¶ 181. These attacks involved Taliban terrorists infiltrating the Afghan security forces and then attacking Coalition or other Afghan forces. *See id.* The June 10, 2017 attack in Nangarhar Province was a Taliban insider attack. *See id.* ¶ 367.

Finally, the Taliban-led Syndicate often kidnapped Americans and other Westerners. Since 2001, the Taliban has kidnapped more than 100 Westerners. *See id.* ¶ 187. The Taliban frequently used kidnapping to gain political or economic advantage, such as to negotiate the

release of detained Taliban fighters.  *See id.*  The August 7, 2016 kidnapping of Mr. King illustrates this tactic.  *See id.* ¶¶ 345, 354.

### 3. Bellwether Attacks

LTC Wood concluded with 90-95 percent certainty that members of the Taliban-led Syndicate committed each of the eleven bellwether attacks.  *See id.* ¶ 431.  LTC Wood attributed each attack to the Syndicate by applying a well-accepted methodology that considers the location and time period of the attack; the tactics, techniques, and procedures used; terrorist claims of responsibility; and official U.S. government or Coalition attributions of responsibility.  *See id.* ¶ 426.  LTC Wood gathered information about these four factors from available government reporting about the attack, particularly Army Regulation 15-6 investigations, which the U.S. Army conducts whenever a soldier is killed in action.  *See id.* ¶ 428.  For each of the eleven attacks, LTC Wood had more information than he needed to conclude that a member of the Syndicate likely committed the attack.  *See id.* ¶ 430.  As a result of the available detail, LTC Wood was more certain about his conclusions that members of the Taliban-led Syndicate committed each of these attacks than he often was when making attributions during his military career.  *See id*.

LTC Wood concluded that the Taliban committed five of the bellwether attacks:  (1) the August 16, 2009 IED-initiated complex attack in Herat Province, *see id.* ¶ 212; (2) the April 11, 2010 IED attack in Kandahar Province, *see id.* ¶ 227; (3) the August 6, 2011 attack on a helicopter in Wardak Province, *see id.* ¶ 247; (4) the June 18, 2013 indirect fire attack in Parwan Province, *see id.* ¶ 311; and (5) the June 10, 2017 insider attack in Nangarhar Province, *see id.* ¶ 366.  Each of these attacks occurred in areas where the Taliban had operational dominance and was consistent with Taliban tactics, techniques, and procedures in those areas.  *See id.* ¶¶ 222, 224, 243-44, 254, 256, 321, 324, 377-78.

LTC Wood further concluded that the Haqqani Network directly participated in three additional bellwether attacks. *First*, the Haqqani Network committed the July 15, 2013 recoilless rifle attack in Paktia Province. *See id.* ¶ 328. Paktia Province is in the traditional Haqqani stronghold of Loya Paktia, and the Haqqani Network is generally responsible for Syndicate attacks in that area. *See id.* ¶ 329. Additionally, the attack involved using a sophisticated weapon and repeatedly avoiding detection, which is consistent with Haqqani Network involvement. *See id.* ¶ 341. *Second*, the Taliban and the Haqqani Network jointly kidnapped and held Mr. King. The kidnapping, which showed sophisticated planning, was consistent with Haqqani Network tactics, *see* ¶¶ 362, 363; Mr. King's captors directed him to ask in hostage videos that the U.S. government negotiate with the Taliban for his release, *see id.* ¶ 354; the Taliban published these hostage videos and broadcast one on a Taliban network, *see id.*; and Mr. King's captors agreed to release him and Mr. Weeks in exchange for three high-ranking Taliban prisoners, including Anas Haqqani — Sirajuddin Haqqani's brother, *see id.* ¶ 359. *Third*, the Kabul Attack Network — a name given by the U.S. government to the manifestation of the Syndicate focused on spectacular attacks in Kabul — committed the October 29, 2011 vehicle-borne suicide bombing in Kabul. *See id.* ¶¶ 47, 261. The Haqqani Network played a key role in the Kabul Attack Network and was likely responsible for training the suicide bomber, gathering the explosives and other materials for the vehicle-borne IED, and smuggling everything from Pakistan to Kabul. *See id.* ¶ 268.

Finally, LTC Wood concluded that other Syndicate members directly participated in the Taliban's commission of three remaining bellwether attacks: (1) the July 13, 2008 complex attack in the Waygul District of Nuristan Province, *see id.* ¶¶ 189-190; (2) the May 20, 2012 Suicide Vest bombing in Tarin Kowt, Uruzgan Province, *see id.* ¶ 275; and (3) the May 31, 2012

IED attack in Zombalay District, Helmand Province, *see id.* ¶ 298.  Specifically, LTC Wood concluded that al-Qaeda directly participated in the July 13, 2008 complex attack because al-Qaeda had a significant presence in the area at the time and the Americans found a deceased Arab male among the terrorists after the attack.  *See id.* ¶¶ 191, 206.  Although LTC Wood could not specifically identify the source of outside assistance for the other two attacks, he concluded that the suicide bomber in the May 20, 2012 suicide bombing attack in Uruzgan was from outside the Taliban and that individuals outside the Taliban assisted with the highly sophisticated triggering device used in the May 31, 2012 IED attack in Helmand.  *See id.* ¶¶ 294, 306.

The Taliban typically sources suicide bombers from other members of the Syndicate because the Pashtunwali code generally forbids suicide.  *See supra* at 24.  Thus, LTC Wood opined that the Taliban's suicide attacks typically entailed direct participation by other Syndicate members, including al-Qaeda.  *See* PFOF ¶ 294.  LTC Wood concluded that other members of the Syndicate also participated in the 2008 complex attack and 2012 IED attack because of the extensive amount of information available about each attack from the 15-6 investigation or eyewitness interviews.  LTC Wood also reviewed awards given to a soldier as a result of the 2008 complex attack and 2012 IED attack, which included far less information about the attack. Based solely on the information in those awards, LTC Wood still would have concluded that the Taliban most likely committed both attacks, but he would not have reached a conclusion that the Taliban had additional assistance from other members of the Syndicate. *See id.* ¶¶ 210, 309.

In short, the record establishes — with a high degree of certainty — that members of the Syndicate committed each of the eleven bellwether attacks.  And the Syndicate was most likely responsible for each and every attack in this case.

D.      **Personal Injury or Death**

Each Plaintiff associated with the bellwether attacks also suffered "personal injury or death." *See* 28 U.S.C. § 1605A(a)(1).  LTC Wood testified, based on government reporting and first-hand interviews, that each of the 30 direct victims at issue was injured or killed in one of the 11 bellwether attack.  *See* PFOF ¶¶ 198, 199, 200, 218, 233-239, 249, 264, 286-290, 303-304, 315, 333, 357-358, 360, 373.  Additionally, SGT Lemon, CPT Timoney, and Mr. King testified about the significant physical and mental injures they have suffered because of the attacks.  *See id.* ¶¶ 233-239, 286-290, 357-358, 360.

The statute also "encompass[es] claims by family members of those injured or killed for the distress caused by their relative's injuries, also known as solatium actions." *Force*, 464 F. Supp. 3d at 359.  Such claims satisfy the personal-injury requirement in two ways.  *First*, the family members' solatium claims seek "damages . . . for [the] personal injury or death" of the direct victim.  *See*, *e.g.*, *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 49, 51 (D.D.C. 2012) (concluding that claims by grandson of murdered individual "clearly involve 'personal injury or death' under FSIA § 1605A(a)(1)").  *Second*, the family-member Plaintiffs themselves have suffered mental and emotional injuries, which "also satisfy the personal injury requirement of § 1605A(a)(1)." *Force*, 464 F. Supp. 3d at 359.  Nothing in 28 U.S.C. § 1605A(a)(1) requires that the "personal injury" be a physical injury.

August Wildman (formerly Cabrera) also testified about the mental and emotional injuries she and her minor children suffered as a result of the October 29, 2011 suicide bombing that killed her husband.  Such evidence about the emotional and mental suffering of family-member Plaintiffs primarily goes to damages.  In accordance with the Revised Case Management Order, Dkt. 54 at 2, Plaintiffs will submit affidavits proving such injuries from the family members of SGT Lemon, CPT Timoney, and Mr. King, and the additional family members of

28

LTC David Cabrera, along with proposed findings of fact and conclusions of law about damages on December 17, 2021.  Additional Plaintiffs associated with the bellwether attacks will then submit such damages evidence to Special Masters at the appropriate time.

### E.   Causation

Plaintiffs must demonstrate that each "personal injury or death . . . was *caused by*" Iran's provision of "material support or resources for" the acts of "extrajudicial killing" and "hostage taking."  28 U.S.C. § 1605A(a)(1) (emphasis added).  There is no requirement that "a state's material support must go directly for the specific act."  *Owens*, 864 F.3d at 799 (quoting *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004)).  Such a limitation "would likely render . . . [the] material support provision ineffectual because material support is fungible and terrorist organizations can hardly be counted on to keep careful bookkeeping records."  *Id.*  For that reason, the terrorism exception strips immunity for both a foreign state that "specifically instructs" a terrorist organization "to carry out an attack against a U.S. citizen" and one that "only provides general support, but was not involved with the act giving rise to the suit."  *Kilburn*, 376 F.3d at 1128.

Nor does the statutory text require Plaintiffs to show that Iran's material support was a "but for" cause of their injuries.  Instead, Plaintiffs need show only that Iran's support proximately caused their injuries.  *See Owens*, 864 F.3d at 799.  Proximate causation has two elements:  (1) "the defendant's actions must be a substantial factor in the sequence of events that led to the plaintiff's injury" and (2) "the plaintiff's injury must have been reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct."  *Id.* at 794.  Plaintiffs satisfy both prongs of that proximate-cause test.

1.   *Iran's Material Support for the Syndicate Was a Substantial
     Factor in the Attacks*

Material support for a terrorist group is a substantial factor for an attack when the support

enhances the group's capability to commit that type of attack.  In *Owens*, this Court concluded

that Sudan's material support to al-Qaeda caused the East Africa Embassy bombings when

"Sudan provided the safe harbor necessary to allow al Qaeda to train and organize its members

for acts of large-scale terrorism [. . . and] facilitated its safe harbor through constant vigilance by

its security services and the provision of documentation required to shelter al Qaeda from foreign

intelligence services and competing terrorist groups."  *Owens v. Republic of Sudan*, 826 F. Supp.

2d 128, 151 (D.D.C. 2011).  Iran's multifaceted support for the Syndicate's terrorist campaign

here exceeds the support this Court found sufficient in *Owens*.  *See generally* PFOF § III (¶¶ 79-

114).  It did not matter that, like Iran's support here, Sudan's support was not directly traceable

to the specific Embassy attacks, because "the safe haven that Al Qaeda had in Sudan was

absolutely integral for its capability" to execute the attacks.  *Owens*, 826 F. Supp. 2d at 146.

"Sudan's support thus facilitated and enabled the 1998 terrorist bombings on the two U.S.

embassies in East Africa."  *Id.*

In *Force*, Judge Moss considered claims against Iran and Syria for their material support

of two terrorist organizations — Hamas and Palestinian Islamic Jihad ("PIJ") — stemming from

eight attacks committed by one or the other of those organizations.  Like Plaintiffs here, the

*Force* plaintiffs presented expert testimony that Iran provided Hamas with "cash, weapons, and

training" and "overs[aw] training camps in its own territory and in Lebanon for the purpose of

training Hamas members."  464 F. Supp. 3d at 338.  They offered similar evidence of Iran's

support for PIJ, including expert testimony about Iran instituting "an incentive system . . . for

successful attacks" and the interception of a shipment of "mortars, bullets and rockets" in

containers with "seals of the Iranian postal company." *Id.* at 340.  The *Force* plaintiffs further

demonstrated that Syria provided material support to Hamas and PIJ under § 1605A by providing

it with "safe haven," defined as "encourag[ing] or assent[ing] to terrorist organizations setting up

shop within their borders." *Id.* at 366.

Judge Moss recognized that there was no evidence that "either Iran or Syria's support

was tied to each of the attacks that caused [the plaintiffs'] injuries," but he reasoned that "such a

'nexus' is not necessary." *Id.* at 368.  Instead, Iran's support was a substantial factor in the eight

attacks because "Iran's financial and military aid to the two groups was essential to each group's

operating capacity and . . . , without Iran's backing, both groups would be substantially

weakened." *Id.*  Syria, in turn, provided "safe haven [that] assisted both the growth and

development of the two groups generally and their capacities to carry out the attacks at issue."

*Id.* at 365.  Judge Moss concluded that, even though Syria had withdrawn support from Hamas

more than four years before the first attack, its earlier support "contributed to giving the group

the military edge and sophistication it needed to be able to conduct and carry out successful

violent operations for many years thereafter." *Id.* at 368.

Multiple other courts have reached similar conclusions about causation.  *See*, *e.g.*, *Sotloff

v. Syrian Arab Republic*, 2021 WL 965882, at *12 (D.D.C. Mar. 15, 2021) ("Syria's material

support to ISIS — its release of prisoners, financial relationship with ISIS, and military

coordination with it — was a substantial factor in its development into a wealthy proto-state with

sophisticated, battle-hardened leadership that controlled large swaths of territory" and was able

to hold two prisoners "hostage in multiple locations, torture them for extended periods, behead

them outdoors, and use their deaths for propaganda purposes."); *Hamen*, 401 F. Supp. 3d at 103,

104 (Iran's provision of "weapons, financial support, and training" was a substantial factor in

two kidnappings and a murder because it "put the Houthis in a position of power to commit acts of terrorism like the ones at issue in this case.")  *Est. of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 120 (D.D.C. 2018) (concluding that Iran's general provision of "weaponry, munitions, training, and millions of dollars in financial support" was a substantial factor in a Hamas attack on a Jerusalem school).

The same conclusion is justified here.  As explained above, Iran provided the Taliban-led Syndicate with weapons and explosives, training, expert assistance and advice, financial support, safe haven, and support for the Taliban's lucrative drug trade.  *See generally* PFOF § III (¶¶ 79-114).  That material support substantially contributed to the Syndicate's ability to execute terrorist attacks against Americans in Afghanistan.  *See id.* ¶ 129.  In particular, Iran's material support to the Taliban was critical to enabling the Taliban to regenerate its forces after the U.S. invasion in 2001.  *See id.* ¶ 130.  Iran's support both aided the Taliban's ongoing efforts and enabled the Taliban to dedicate resources to additional terrorist attacks and objectives.  *See id.* ¶ 133.  That support was fungible — aid to one part of the Taliban benefited the entire organization — which ensured that Iran substantially contributed to all of the attacks at issue.  *Id.* That includes the attacks that the Taliban executed through the Haqqani Network, which was an integral part of the Taliban and likewise benefited from Iran's support for the Taliban more broadly.  *See id.* ¶¶ 34, 44, 133.  And Iran's support for other groups within the Syndicate — like al-Qaeda — benefited the entire Syndicate because the different groups did not have to compete with each other for resources.  *See id.* ¶ 132.  This multifaceted support empowered the Syndicate to carry out attacks against U.S. and Coalition forces more effectively.

Without Iran's support, the Taliban-led Syndicate would have had greater difficulty in obtaining the funds, weapons, materials, and safe haven needed to plan and execute the terrorist

attacks at issue in this case.  *See id.* ¶ 129.  And in LTC Wood's opinion, Iran's material support

for the Taliban substantially contributed to the Taliban's ability to commit each bellwether

attack.  *See id.* ¶¶ 211, 226, 246, 260, 274, 297, 310, 327, 343, 365, 383.

> 2.    *The Results Were Reasonably Foreseeable to Iran*

To establish proximate cause, Plaintiffs must also demonstrate that their injuries were

"reasonably foreseeable or anticipated as a natural consequence" of Iran's material support for

the Taliban-led Syndicate.  *Owens*, 864 F.3d at 794.  Here, Plaintiffs' injuries were not just

foreseeable; they were the intended result of Iran's support.  *See* PFOF ¶ 128.  Iran was well

aware that supporting anti-American terrorist groups resulted in the injury and death of

Americans.  *See id.* ¶ 131.  Indeed, attacks on Americans were "not only a reasonably

foreseeable natural consequence, but a desired result of Iran's training and directives."  *Hamen*,

401 F. Supp. 3d at 105-06.  Similarly, when Iran's support for a terrorist organization is "part of

a broader geopolitical strategy, . . . . [t]he death and injury to innocent people and the suffering

of their families was, by any measure, foreseeable."  *Force*, 464 F. Supp. 3d at 369; *see also*

*Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 204 (D.D.C. 2017) (finding foreseeability

prong satisfied when plaintiffs presented expert testimony that "Syria's support for the Zarqawi

Terrorist Organization was given for the purpose of allowing this group to commit precisely the

types of terrorist attacks at issue, so as to cause unrest in Syria's neighboring countries which

Syria viewed as being to its political advantage").

Plaintiffs do not need to show that Iran intended the Taliban-led Syndicate to commit the

*particular* attacks at issue in this case:  "a state sponsor of terrorism . . . may not avoid liability

for supporting known terrorist groups by professing ignorance of their specific plans for attacks."

*Owens*, 864 F.3d at 799.  Because Iran intended for its material support to enable the Taliban's

attacks on American and Coalition forces, Plaintiffs' deaths and injuries were foreseeable.

## F.       Additional Requirements for a Federal Court to Hear Claims

Plaintiffs further must establish that:  (1) "the foreign state was designated as a state sponsor of terrorism at the time the act . . . occurred," (2) "the claimant or the victim" was, at the time of the attack, "a national of the United States," "a member of the armed forces," or a U.S. government employee or contractor, and (3) if the attack occurred within the defendant foreign state's borders, the plaintiff offered to arbitrate the claims.  28 U.S.C. § 1605A(a)(2)(A)(i)-(iii).

There is no dispute that Iran "was designated as a state sponsor of terrorism at the time the act . . . occurred." *Id.* § 1605A(a)(2)(A)(i)(I).  Iran was designated as a state sponsor of terrorism in January 1984, shortly after Hezbollah attacked the U.S. Marine Corps barracks in Beirut, Lebanon.  *See* PFOF ¶ 61.  Iran has remained designated as a state sponsor of terrorism at all times since.  *See id.*  In 2007, the U.S. State Department characterized Iran as "the most active state sponsor of terrorism" in the world and "a threat to regional stability and U.S. interests in the Middle East because of its continued support for violent groups."  *See id.*  The Court can also take judicial notice of the countless other decisions establishing this fact.  *See*, *e.g.*, *Est. of Hirshfeld,* 330 F. Supp. 3d at 133.

*Second*, the evidence established that, at the time of the attacks, each direct victim was "a national of the United States" or "a member of the armed forces."  Ten of the eleven bellwether attacks killed or injured direct victims who were members of the U.S. armed forces.  *See* PFOF ¶¶ 192, 214, 229, 249, 263, 277, 300, 313, 330, 368.  And Mr. King was a U.S. citizen, and therefore a national of the United States, at the time of his kidnapping.  *See id.* ¶ 346.

*Third*, because the acts of extrajudicial killing and hostage taking did not take place in Iran, Plaintiffs were not required to offer to arbitrate these claims.  *See*, *e.g.*, *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 491 (D.D.C. 2021) ("[A]ll of the acts Plaintiffs

complained of occurred in Iraq, not Iran, so the requirement to afford Iran the opportunity to arbitrate is not implicated here.").

### III.        PERSONAL JURISDICTION

"Personal jurisdiction over a foreign state shall exist . . . where service has been made under section 1608 of this title."  28 U.S.C. § 1330(b).  The Court does not need to consider whether exercising personal jurisdiction is consistent with due process because "foreign states are not 'persons' protected by the Fifth Amendment."  *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002).  The Court thus can exercise jurisdiction as long as service was proper.  Section 1608 prescribes four methods of service on a foreign state.  *See* 28 U.S.C. § 1608(a).  "Plaintiffs must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on."  *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 69 (D.D.C. 2010).

With the Court's leave, the *Cabrera* Plaintiffs filed a Second Amended Complaint on February 23, 2021.  *See* Dkt. 30.  "Service under § 1608(a)(1) was unavailable because plaintiffs had no 'special arrangement' for service with Iran.  Likewise, because Iran is not party to an 'international convention on service of judicial documents,' service under § 1608(a)(2) was impossible."  *Ben-Rafael*, 540 F. Supp. 2d at 52.  Plaintiffs attempted service under § 1608(a)(3), which requires sending the service packet via any form of mail requiring a signed receipt.  Plaintiffs initially requested that the Clerk's office dispatch the documents via DHL, with signed return receipt requested, to the Minister of Foreign Affairs for Iran.  *See* Dkts. 33, 33-1, and 34.  DHL could not deliver the documents to Iran.  *See* Dkt. 40 at 2.  The Clerk's office then informed Plaintiffs that they also could not send documents to Iran via U.S. certified mail or FedEx, and there was no other means by which Plaintiffs could accomplish service by mail.  *See id.*

On April 15, 2021, this Court granted the *Cabrera* Plaintiffs leave to proceed with service of the Second Amended Complaint under 28 U.S.C. § 1608(a)(4) because they had exhausted the first three methods.  *See* Dkt. 40, and April 15, 2021 Minute Order.  The *Cabrera* Plaintiffs properly effectuated service of the First Amended Complaint on Iran under § 1608(a)(4) by having the Clerk of the Court send by certified mail "[t]wo copies of the summons, complaint and a notice of suit, together with a translation of each into the official language of the foreign state" to the Secretary of State.  Dkt. 42.  The State Department delivered the documents to the Foreign Interests Section of the Embassy of Switzerland in Tehran, which delivered them to the Iranian Ministry of Foreign Affairs on August 2, 2021.  *See* Dkt. 50 at 1.  The State Department then "sen[t] to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted," 28 U.S.C. § 1608(a)(4).  *See id.*  Iran did not respond.  "Because Plaintiffs accomplished service under 28 U.S.C. § 1608(a)(4) on the Islamic Republic of Iran, the Court possesses personal jurisdiction over Defendant."  *Hamen*, 401 F. Supp. 3d at 108.

The Court also has personal jurisdiction over Iran for the claims brought by the Afghanistan-based *Zambon* Plaintiffs.  Service on Iran under § 1608(a)(1) and (a)(2) was similarly unavailable.  *See Ben-Rafael*, 540 F. Supp. 2d at 52.  The *Zambon* Plaintiffs were able to have the Clerk's office mail the service packet under 28 U.S.C. § 1608(a)(3) on December 12, 2018, *see Zambon*, Dkt. 9, but Iran rejected receipt and the service packet was returned to the Clerk's Office, *see Zambon*, Dkt. 17.  More than 30 days after the attempt, on February 13, 2019, the *Zambon* Plaintiffs initiated service via diplomatic channels.  *See Zambon*, Dkt. 12.  The Clerk of the Court sent the State Department the necessary documents on February 22, 2019.  *See Zambon*, Dkt. 14.  On June 7, 2019, the State Department informed the Clerk that the Embassy of Switzerland in Tehran had served the documents on the Iranian Ministry of Foreign Affairs on

April 28, 2019.  *See Zambon*, Dkt. 16.  Because the *Zambon* Plaintiffs served Iran under § 1608(a)(4), the Court also has personal jurisdiction over Iran for these claims.[10]

## IV.        FEDERAL CAUSE OF ACTION AND DAMAGES

Plaintiffs bring claims solely pursuant to the private right of action in 28 U.S.C. § 1605A(c).  The elements for establishing Iran's liability are "essentially the same" as the elements necessary to establish the waiver of sovereign immunity discussed above.  *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010).  "In other words, [§ 1605A(c)] creates a cause of action for the same conduct that gives rise to subject-matter jurisdiction under the terrorism exception to sovereign immunity."  *Karcher*, 396 F. Supp. 3d at 59.  Thus, "a plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law." *Force*, 464 F. Supp. 3d at 369.  Under the federal cause of action, "damages may include economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c)(4).

The federal cause of action, § 1605A(c), does require that the plaintiff — rather than the plaintiff *or* the victim — be a national of the United States, a member of the armed forces, or a government employee or contractor.  28 U.S.C. § 1605A(c).  Further, as this Court has recognized, generally "only immediate family members — parents, siblings, spouses, and children — are entitled to solatium awards."  *Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84, 94

---

[10] On December 23, 2020, this Court consolidated *Blunt, et al. v. Iran*, 19-cv-1696, with *Zambon*.  *See Blunt*, December 23, 2020 Minute Order.  The *Blunt* Plaintiffs initially attempted service under § 1608(a)(3) on August 2, 2019.  *See Blunt*, Dkt. 6.  When that failed, they proceeded with service under § 1608(a)(4) more than thirty days later — on January 16, 2020. *See Blunt*, Dkt. 10.  Service was completed on May 3, 2020.  *See Blunt*, Dkt. 13.  The Court also has personal jurisdiction over Iran with respect to these Plaintiffs' claims.

(D.D.C. 2014), *aff'd in part, vacated in part sub nom. Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017).  However, "immediate family members may include members of the victim's household who are viewed as the functional equivalents of immediate family members."  *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018).  The family-member Plaintiffs thus must prove that they meet these additional requirements.

SGT Lemon, CPT Timoney, Mr. King, and Ms. Wildman — LTC Cabrera's widow — testified about these requirements and their damages at the evidentiary hearing.  The Court has permitted the family members of SGT Lemon, CPT Timoney, and Mr. King, and the other family members of LTC Cabrera to present their eligibility evidence along with their proof of damages by December 17, 2021.  *See* Dkt. 54 at 2.  Plaintiffs will submit proposed findings of fact and conclusions of law about these Plaintiffs' eligibility and damages on the same day.  *See id.*  Other Plaintiffs associated with bellwether attacks will provide eligibility and damages evidence to Special Masters at a later date.

## CONCLUSION

The Court should enter default judgment against Iran as to liability for claims associated with the eleven bellwether attacks.

Dated:  November 23, 2021

Respectfully submitted,

/s/ Joshua D. Branson

| | |
|---|---|
| Robert W. Cowan | Joshua D. Branson (D.C. Bar No. 981623) |
| DC Bar No. TX0148 | Andrew E. Goldsmith (D.C. Bar No. 1007074) |
| Katie R. Caminati | Grace W. Knofczynski (D.C. Bar No. 15000407) |
| TX Bar No. 24098079 | James A. Ruck (D.C. Bar No. 1739309) |
| Bailey Cowan Heckaman PLLC | Kellogg, Hansen, Todd, |
| Four Oaks Place | Figel & Frederick, P.L.L.C. |
| 1360 Post Oak Blvd., Suite 2300 | 1615 M Street, N.W., Suite 400 |
| Houston, Texas 77056 | Washington, D.C. 20036 |
| Telephone: (713) 425-7100 | Tel:  (202) 326-7900 |
| Facsimile: (713) 425-7101 | Fax:  (202) 326-7999 |
| rcowan@bchlaw.com | jbranson@kellogghansen.com |
| kcaminati@bchlaw.com | agoldsmith@kellogghansen.com |
| | gknofczynski@kellogghansen.com |
| | jruck@kellogghansen.com |

*Counsel for Zambon Afghanistan-Based Plaintiffs*

Ryan R. Sparacino (D.C. Bar No. 493700)
Sparacino PLLC
1920 L Street, NW, Suite 535
Washington, D.C. 20036
Tel:  (202) 629-3530
ryan.sparacino@sparacinopllc.com

Michael J. Gottlieb (D.C. Bar No. 974960)
Randall Jackson (D.C. Bar No. 490798)
Nicholas Reddick (D.C. Bar No. 1670683)
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, DC 20006-1238
Tel:  (202) 303-1000
Fax:  (202) 303-2000
MGottlieb@willkie.com
RJackson@willkie.com
NReddick@willkie.com

*Counsel for Cabrera Plaintiffs and Zambon Afghanistan-Based Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of November, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

*/s/ Joshua D. Branson*
Joshua D. Branson
