**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AUGUST CABRERA, *et al*., | |
| Plaintiffs, | |
| v. | Case No. 19-cv-3835-JDB |
| ISLAMIC REPUBLIC OF IRAN, | |
| Defendant. | |
| MARK ZAMBON, *et al*., | |
| Plaintiffs, | |
| v. | Case No. 18-cv-02065-JDB |
| ISLAMIC REPUBLIC OF IRAN, | |
| Defendant. | |

**PLAINTIFFS' SUPPLEMENTAL BRIEF AND PROPOSED
<u>CONCLUSIONS OF LAW CONCERNING DAMAGES</u>**

TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

    I.      FEDERAL CAUSE OF ACTION ...................................................................... 3

    II.     THEORIES OF RECOVERY ............................................................................ 4

         A.     Survivor Plaintiffs ................................................................................... 5

         B.     Family-Member Plaintiffs ....................................................................... 6

    III.    DAMAGES AWARDS ....................................................................................... 9

         A.     Survivor Plaintiffs ................................................................................. 10

              1.     SGT Jared Lemon ....................................................................... 12

              2.     CPT Ryan Timoney ..................................................................... 13

              3.     Mr. Kevin King ........................................................................... 16

         B.     Family-Member Plaintiffs ..................................................................... 18

              1.     Spouses ....................................................................................... 19

              2.     Children ...................................................................................... 21

              3.     Parents ........................................................................................ 24

              4.     Siblings ....................................................................................... 27

          C.     Prejudgment Interest ............................................................................. 30

         D.     Punitive Damages .................................................................................. 32

CONCLUSION ...................................................................................................................... 34

# TABLE OF AUTHORITIES[*]

Page(s)

**Cases**

*Abedini v. Gov't of Islamic Republic of Iran*,
  422 F. Supp. 3d 118 (D.D.C. 2019) ..................................................................... 17

*Acosta v. Islamic Republic of Iran*,
  574 F. Supp. 2d 15 (D.D.C.2008) ............................................................. 18, 32, 33

*Amduso v. Republic of Sudan*,
  61 F. Supp. 3d 42 (D.D.C. 2014) ........................................................................ 19

*Belkin v. Islamic Republic of Iran*,
  667 F. Supp. 2d 8 (D.D.C. 2009) .......................................................................... 6

*Bluth v. Islamic Republic of Iran*,
  203 F. Supp. 3d 1 (D.D.C. 2016) .......................................................................... 5

*Campuzano v. Islamic Republic of Iran*,
  281 F. Supp. 2d 258 (D.D.C. 2003) ................................................................ 11, 32

*Est. of Doe v. Islamic Republic of Iran*,
  943 F. Supp. 2d 180 (D.D.C. 2013) ..................................................... 11, 30-31, 33

*Est. of Hirshfeld v. Islamic Republic of Iran*,
  330 F. Supp. 3d 107 (D.D.C. 2018) ................................................................... 4, 6

*Est. of Brown v. Islamic Republic of Iran*,
  872 F. Supp. 2d 37 (D.D.C. 2012) ...................................................................... 24

*Est. of Heiser v. Islamic Republic of Iran*,
  466 F. Supp. 2d 229 (D.D.C. 2006) ("*Heiser I*") ........................................... 1, 19, 20

*Est. of Heiser v. Islamic Republic of Iran*,
  659 F. Supp. 2d 20 (D.D.C. 2009) ("*Heiser II*") ................................................. 6, 8

*Ewan v. Islamic Republic of Iran*,
  466 F. Supp. 3d 236 (D.D.C. 2020) ............................................................... passim

*Foley v. Syrian Arab Republic*,
  249 F. Supp. 3d 186 (D.D.C. 2017) ..................................................................... 29

---

[*] Authorities on which counsel chiefly relies are denoted with an asterisk, per Local Civil Rule 7(a).

*Foley v. Syrian Arab Republic,*
   281 F. Supp. 3d 153 (D.D.C. 2017) ................................................................. 19, 29

*Force v. Islamic Republic of Iran,*
   464 F. Supp. 3d 323 (D.D.C. 2020) ..................................................................... 3

*Forman v. Korean Air Lines Co.,*
   84 F.3d 446 (D.C. Cir. 1996) ............................................................................ 31

*Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affs.,*
   892 F.3d 348 (D.C. Cir. 2018) ......................................................................... 9, 20

*Fritz v. Islamic Republic of Iran,*
   324 F. Supp. 3d 54 (D.D.C. 2018) ...........................................................7-8, 30, 33

*Fritz v. Islamic Republic of Iran,*
   2018 WL 5046229 (D.D.C. Aug. 13, 2018), *report and recommendation*
   *adopted as modified*, 324 F. Supp. 3d 54 (D.D.C. 2018) ...................................... 29

*Haim v. Islamic Republic of Iran,*
   425 F. Supp. 2d 56 (D.D.C. 2006) ..................................................................... 11

*Hekmati v. Islamic Republic of Iran,*
   278 F. Supp. 3d 145 (D.D.C. 2017) ................................................................. 16, 17

*Hill v. Republic of Iraq,*
   328 F.3d 680 (D.C. Cir. 2003) ............................................................................ 9

*Holland v. Islamic Republic of Iran,*
   496 F. Supp. 2d 1 (D.D.C. 2005) ....................................................................... 22

*Karcher v. Islamic Republic of Iran,*
   396 F. Supp. 3d 12 (D.D.C. 2019) ...................................................................... 3

*Kerr v. Islamic Republic of Iran,*
   245 F. Supp. 2d 59 (D.D.C. 2003) ..................................................................... 19

*Kilburn v. Islamic Republic of Iran,*
   699 F. Supp. 2d 136 (D.D.C. 2010) ..................................................................... 3

*Moradi v. Islamic Republic of Iran,*
   77 F. Supp. 3d 57 (D.D.C. 2015) .................................................................... 10, 18

*Mousa v. Islamic Republic of Iran,*
   238 F. Supp. 2d 1 (D.D.C. 2001) ....................................................................... 11

*Mwila v. Islamic Republic of Iran,*
   33 F. Supp. 3d 36 (D.D.C. 2014) ....................................................................... 21

*Opati v. Republic of Sudan,*
   60 F. Supp. 3d 68 (D.D.C. 2014) ........................................................................ 11

*Opati v. Republic of Sudan,*
   140 S. Ct. 1601 (2020) ................................................................... 19, 21, 32

*Oveissi v. Islamic Republic of Iran,*
   768 F. Supp. 2d 16 (D.D.C. 2011) ("*Oveissi I*")....................................... 18, 22

*Oveissi v. Islamic Republic of Iran,*
   879 F. Supp. 2d 44 (D.D.C. 2012) ("*Oveissi II*") ........................ 4, 30, 32, 33

*Owens v. Republic of Sudan,*
   826 F. Supp. 2d 128 (D.D.C. 2011) ...................................................... 4

*Owens v. Republic of Sudan,*
   71 F. Supp. 3d 252 (D.D.C. 2014) ....................................................... 21

*Owens v. Republic of Sudan,*
   864 F.3d 751 (D.C. Cir. 2017) .......................................................... 19,

*Owens v. Republic of Sudan,*
   924 F.3d 1256 (D.C. Cir. 2019) ...................................................... 19, 21

*\*Peterson v. Islamic Republic of Iran,*
   515 F. Supp. 2d 25 (D.D.C. 2007) ("*Peterson II*").......................... 10, 19, 20

*Price v. Socialist People's Libyan Arab Jamahiriya,*
   384 F. Supp. 2d 120 (D.D.C. 2005) ...................................................... 16

*Republic of Sudan v. Owens,*
   194 A.3d 38 (D.C. 2018) ............................................................... 19, 21

*Roth v. Islamic Republic of Iran,*
   78 F. Supp. 3d 379 (D.D.C. 2015) ....................................................... 7, 18

*Salazar v. Islamic Republic of Iran,*
   370 F. Supp. 2d 105 (D.D.C. 2005) .................................................. 7, 19, 20

*Selig v. Islamic Republic of Iran,*
   2021 WL 5446870 (D.D.C. Nov. 22, 2021) .......................................... 4, 7, 21, 33

*Sheikh v. Republic of Sudan,*
   485 F. Supp. 3d 255 (D.D.C. 2020)................................................... 10, 17, 33

*Sutherland v. Islamic Republic of Iran,*
   151 F. Supp. 2d 27 (D.D.C. 2001) ...................................................... 16

*Thuneibat v. Syrian Arab Republic*,
   167 F. Supp. 3d 22 (D.D.C. 2016) ................................................................................ 22, 28

*\*Valore v. Islamic Republic of Iran*,
   700 F. Supp. 2d 52 (D.D.C. 2010) ................................................................................ passim

*Wamai v. Republic of Sudan*,
   60 F. Supp. 3d 84 (D.D.C. 2014), *aff'd in part, vacated in part sub nom.*
   *Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017) .............................................. 7, 33

## Statutes

28 U.S.C. § 1605A ........................................................................................................ 32

28 U.S.C. § 1605A(a) ................................................................................................... 3

28 U.S.C. § 1605A(c) ................................................................................................... passim

28 U.S.C. § 1608(e) ...................................................................................................... 20

34 U.S.C. § 20144(j)(3) ................................................................................................. 31

## Other Authorities

Restatement (Second) of Torts § 46(1) .......................................................................... 6

Restatement (Second) of Torts § 46(2)(a)-(b) ............................................................... 7

Bd. of Governors of the Fed. Reserve Sys., Data Download Program, available at
   https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15).................................. 3

Under this Court's Revised Case Management Order, Dkt. 54,[1] Plaintiffs file this supplemental brief and proposed conclusions of law concerning damages.

## INTRODUCTION

Plaintiffs are American service members and civilians, and their family members, who were killed or wounded in terrorist attacks by the Taliban-led terrorist syndicate in Afghanistan between 2006 and 2019.  Plaintiffs previously established Iran's liability for those attacks under the FSIA's terrorism exception.  *See* Dkt. 70-2 at 4-35.  They make this submission now to establish their entitlement to damages.  This submission focuses on 23 Plaintiffs:  the four bellwether Plaintiffs who testified at the evidentiary hearing and 19 of their family members. The Court should award damages to each of these Plaintiffs, which will provide a framework for Special Masters to receive evidence and recommend damages for the remaining Plaintiffs.

As explained below, each of the 23 Plaintiffs at issue is entitled to recover pain-and-suffering or solatium damages.  The Court should calculate their damages using the well-settled framework that governs FSIA cases in this District, with upward adjustments as appropriate. *See*, *e.g.*, *Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006) ("*Heiser I*").  The Court should also award prejudgment interest and punitive damages.  The resulting damages that the Court should award are as follows:

---

[1] Unless otherwise specified, citations to "Dkt." are to the docket entries in *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835-JDB.

**Table A: Proposed Damages Awards**

| Plaintiff | Pain and Suffering | Solatium | Compensatory Damages with Pre-Judgment Interest | Punitive Damages | Total Damages |
|---|---|---|---|---|---|
| August Wildman | n/a | $10,000,000 | $14,662,000 | $14,662,000 | $29,324,000 |
| Corbin Cabrera | n/a | $6,250,000 | $9,163,750 | $9,163,750 | $18,327,500 |
| Gillian Cabrera | n/a | $6,250,000 | $9,163,750 | $9,163,750 | $18,327,500 |
| M.G.C. | n/a | $6,250,000 | $9,163,750 | $9,163,750 | $18,327,500 |
| R.X.C. | n/a | $6,250,000 | $9,163,750 | $9,163,750 | $18,327,500 |
| Robert Cabrera | n/a | $5,000,000 | $7,331,000 | $7,331,000 | $14,662,000 |
| Daniel Cabrera | n/a | $2,500,000 | $3,665,500 | $3,665,500 | $7,331,000 |
| Ronald Paul Hopkins | n/a | $2,500,000 | $3,665,500 | $3,665,500 | $7,331,000 |
| Susan Rene Martinez | n/a | $2,500,000 | $3,665,500 | $3,665,500 | $7,331,000 |
| JD Prosser | n/a | $2,500,000 | $3,665,500 | $3,665,500 | $7,331,000 |
| Gloria Diane Trelfa | n/a | $2,500,000 | $3,665,500 | $3,665,500 | $7,331,000 |
| Jared Lemon | $12,000,000 | n/a | $18,489,600 | $18,489,600 | $36,979,200 |
| K.L. | n/a | $3,125,000 | $4,815,000 | $4,815,000 | $9,630,000 |
| Frank Lemon | n/a | $2,500,000 | $3,852,000 | $3,852,000 | $7,704,000 |
| Jackie Lemon | n/a | $2,500,000 | $3,852,000 | $3,852,000 | $7,704,000 |
| Benjamin Lemon | n/a | $1,562,500 | $2,407,500 | $2,407,500 | $4,815,000 |
| Matthew Lemon | n/a | $1,250,000 | $1,926,000 | $1,926,000 | $3,852,000 |
| Nathan Lemon | n/a | $1,250,000 | $1,926,000 | $1,926,000 | $3,852,000 |
| Ryan Timoney | $12,000,000 | n/a | $17,283,600 | $17,283,600 | $34,567,200 |
| Diane Timoney | n/a | $2,500,000 | $3,600,750 | $3,600,750 | $7,201,500 |
| Gregory Timoney | n/a | $2,500,000 | $3,600,750 | $3,600,750 | $7,201,500 |
| Kevin King | $15,000,000 | n/a | $18,849,000 | $18,849,000 | $37,698,000 |
| Stephanie Miller | n/a | $2,000,000 | $2,513,200 | $2,513,200 | $5,026,400 |
| **Total** | **$39,000,000** | **$71,687,500** | **$160,090,900** | **$160,090,900** | **$320,181,800** |

Each Plaintiff in this case served his or her country in Afghanistan and suffered greatly because of it.  Some Plaintiffs were attacked directly by Taliban terrorists; others had family members who were so attacked.  Some of their injuries were physical; others emotional.  All experienced incalculable loss.  Indeed, this Court received live testimony from four Plaintiffs and heard firsthand about their pain and suffering.  As that testimony made clear, no amount of money will ever fully compensate these Plaintiffs for their losses.  But Congress has determined

that awarding damages to terrorist victims like Plaintiffs at least partially redresses their injuries and serves vital national-security purposes.  Large damages awards serve both purposes here. The Court should enter a default judgment against Iran, find that the bellwether Plaintiffs are entitled to damages, and award them the full amounts to which they are entitled.

## I.        FEDERAL CAUSE OF ACTION

Plaintiffs bring claims under the private right of action in 28 U.S.C. § 1605A(c).  That private right of action provides that a "state sponsor of terrorism . . . shall be liable . . . for personal injury or death caused by acts described in subsection (a)(1) of that foreign state . . . for which the courts of the United States may maintain jurisdiction under this section for money damages."  28 U.S.C. § 1605A(c).  The elements for establishing Iran's liability are "essentially the same" as the elements necessary to establish its waiver of sovereign immunity.  *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010).  "In other words, [§ 1605A(c)] creates a cause of action for the same conduct that gives rise to subject-matter jurisdiction under the terrorism exception to sovereign immunity."  *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 59 (D.D.C. 2019).  Thus, "a plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law."  *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 369 (D.D.C. 2020).  Because Iran lacks sovereign immunity for the reasons Plaintiffs have explained, *see* Dkt. 70-2 at 4-35, Plaintiffs have proven the elements of their claim.

The federal cause of action, § 1605A(c), also requires that the plaintiff — rather than the plaintiff *or* the victim — be a national of the United States, a member of the armed forces, or a government employee or contractor.  *See* 28 U.S.C. § 1605A(c).  The 23 Plaintiffs addressed here meet that test.  SGT Jared Lemon, CPT Ryan Timoney, Mr. Kevin King, and Ms. August Wildman (LTC David Cabrera's widow) all testified that they are U.S. citizens and have been

citizens since birth.  *See* Damages PFOF[2] ¶¶ 2, 132, 215, 268.  The 19 other Plaintiffs from these four families now submit similar evidence of their own citizenship.  *See id.* ¶¶ 22, 35, 52, 58, 68, 83, 90, 100, 112, 124, 152, 158, 176, 186, 198, 207, 242, 253, 290.  The Court should thus conclude that these 23 Plaintiffs may bring claims under the private right of action under § 1605A(c).

## II.        THEORIES OF RECOVERY

Damages under the federal private right of action "include economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c).  Although "§ 1605A(c) provides a private right of action, it does not provide guidance on the substantive bases for liability to determine Plaintiffs' entitlement to damages."  *Est. of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 137 (D.D.C. 2018).  Because § 1605A(c) "does not spell out the elements of these claims," the Court must "apply general principles of tort law."  *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 157 n.3 (D.D.C. 2011) (Bates, J.).  In other words, Plaintiffs must "prove a theory of liability which justifies holding the defendants culpable for the injuries that the plaintiffs allege to have suffered."  *Selig v. Islamic Republic of Iran*, 2021 WL 5446870, at *12 (D.D.C. Nov. 22, 2021) (quoting *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 53-54 (D.D.C. 2012) ("*Oveissi II*")).  As the D.C. Circuit has explained, "a district court may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)."  *Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affs.*, 892 F.3d 348, 353 (D.C. Cir. 2018); *see also Ewan v. Islamic Republic of Iran,* 466 F. Supp. 3d 236, 245 (D.D.C. 2020)

---

[2] "Damages PFOF" refers to the Proposed Finding of Fact Concerning Damages filed December 17, 2021.

(Bates, J.) (similar).  Under those principles, each of the 23 Plaintiffs at issue is entitled to pain-and-suffering, solatium, and punitive damages.[3]

### A.        Survivor Plaintiffs

SGT Lemon, CPT Timoney, and Mr. King bring claims for their physical and emotional pain and suffering as a result of the terrorist attacks in which they were physically injured.  *See* First Am. Compl. ¶¶ 1015, 1556, 1708-09, Dkt. 8; Second Am. Compl. ¶ 2118, Dkt. 30.  These Plaintiffs can recover for pain and suffering from physical injuries based on general tort-law principles governing battery.  "The Iranian Defendants are liable for battery if, when they provided material support and resources to [the Taliban-led Syndicate], they acted 'intending to cause a harmful or offensive contact with, or an imminent apprehension of such a contact by, those attacked and a harmful contact with those attacked directly or indirectly resulted.'" *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 20-21 (D.D.C. 2016) (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76-77 (D.D.C. 2010)).  As Plaintiffs have explained, Iran provided material support to the Taliban-led Syndicate intending to kill Americans in attacks just like the ones that targeted SGT Lemon, CPT Timoney, and Mr. King.  *See* Dkt. 70-2 at 33.  And SGT Lemon, CPT Timoney, and Mr. King have all shown that a harmful contact actually occurred.  Shrapnel from an improvised explosive device struck SGT Lemon, and, as a result, his right arm was amputated.  *See* Damages PFOF ¶¶ 133, 139.  Similarly, shrapnel from a suicide bomb struck CPT Timoney, forcing the eventual amputation of his left leg.  *See id* ¶¶ 216, 230.  And Mr. King was seized by his kidnappers, beaten, and handcuffed or otherwise held captive for more than three years.  *See id*. ¶¶ 269-280.  All three plaintiffs are entitled to damages for those physical injuries.

---

[3] Plaintiffs do not seek economic damages at this time.

The Survivor Plaintiffs can also recover for their emotional injuries under § 1605A(c) under a theory of intentional infliction of emotional distress if the defendant "by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Est. of Heiser v. Islamic Republic of Iran,* 659 F. Supp. 2d 20, 26 (D.D.C. 2009) ("*Heiser II*") (quoting Restatement (Second) of Torts § 46(1)).  This Court has previously held that emotional injuries to the survivors of terrorist attacks are "compensable by analogy under the tort of intentional infliction of emotional distress" because terrorist acts are "by their definition extreme and outrageous conduct." *Ewan,* 466 F. Supp. 3d at 245 (Bates, J.).  Iran's material support for the Taliban-led Syndicate's terrorist attacks was extreme and outrageous conduct, and Iran intended to cause severe emotional distress. *See id.*  And SGT Lemon, CPT Timoney, and Mr. King all testified about the extreme emotional distress they have experienced as a result of the terrorist attacks.  *See* Damages PFOF ¶¶ 136, 145-148, 150, 227, 233, 238-239, 241, 271, 276, 280-281, 283, 285, 288-289.  Thus, the three Survivor Plaintiffs are entitled to damages for those emotional injuries.

### B.       Family-Member Plaintiffs

Ms. Wildman and the 19 other Plaintiffs submitting evidence who are family members of SGT Lemon, CPT Timoney, Mr. King, and LTC Cabrera bring claims for solatium damages resulting from four terrorist attacks on their family members.  Solatium is "the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009).  It also includes mental suffering as a result of an injury to a loved one.  *See, e.g.*, *Valore*, 700 F. Supp. 2d at 85.  A claim for solatium under § 1605A(c) is "indistinguishable" from a claim for intentional infliction of emotional distress.  *Hirshfeld*, 330 F. Supp. 3d at 140.

Courts have applied the elements of intentional infliction of emotional distress outlined in the Second Restatement of Torts to solatium claims under § 1605A(c).  *See Selig*, 2021 WL 5446870, at *12.  Under the Restatement, members of a victim's immediate family may recover for intentional infliction of emotional distress if they were present at the time of the attack.  *See* Restatement (Second) of Torts § 46(2)(a)-(b).  In the context of § 1605A(c), however, the immediate family-member plaintiff need not be present at the attack because "a terrorist attack — by its nature — is directed not only at the victims but also at the victims' families."  *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005) (Bates, J.); *see also Valore*, 700 F. Supp. 2d at 80 (concluding that a family member "need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result").

For that reason, "immediate family members — parents, siblings, spouses, and children — are entitled to solatium awards."  *Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84, 94 (D.D.C. 2014) (Bates, J.) (footnote omitted), *aff'd in part, vacated in part sub nom. Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017).  Seventeen of the family-member Plaintiffs are the spouse or biological parent, child, or sibling of SGT Lemon, CPT Timoney, Mr. King, or LTC Cabrera.  *See* Damages PFOF ¶¶ 3, 23, 36, 53, 59, 101, 113, 125, 153, 159, 177, 187, 199, 208, 243, 254, 291.  Each of these family-member Plaintiffs is entitled to recover solatium damages.  *See*, *e.g.*, *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 401 (D.D.C. 2015) ("Each has established by uncontroverted affidavits that they are [decedent's] immediate family members.").

The class of plaintiffs who can recover solatium damages also "include[s] members of the victim's household who are viewed as the functional equivalents of immediate family members," even though they are not legally or biologically related.  *Fritz v. Islamic Republic of*

*Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018).  The functional equivalent of an immediate family member generally "lived in the victim's immediate household and ha[s] been in other important respects like a spouse, parent, sibling, or child to the victim."  *Heiser II*, 659 F. Supp. 2d at 29. Three of the family-member Plaintiffs are the functional equivalent of an immediate family member.  Each is addressed in turn below.

*First*, Robert Cabrera[4] is the foster father of LTC David Cabrera and the functional equivalent of his biological father.  *See* Damages PFOF ¶¶ 69, 75.  LTC David Cabrera was born David Hopkins.  *Id.* ¶ 69.  David moved in with Robert when David was eleven years old by David's biological mother, who had full custody of him and sent him to live with Robert, a friend of hers.  *Id.* ¶ 70.  David lived with Robert until he left for college.  *Id.*  During that time, Robert provided for David without any financial compensation.  *Id.* ¶ 72.  David grew up as a part of Robert's family, and Robert and David spent time together, including camping, fishing, coaching little league, and going to rock concerts.  *Id.* ¶ 71.  When he was 18 years old, David legally changed his last name to Cabrera in honor of Robert.  *Id.* ¶ 73.  They remained close once David was an adult and living with his own family, visiting each other frequently.  *Id.* ¶ 74. Robert Cabrera considered LTC Cabrera his son in every way.  *Id.* ¶ 75.  And LTC Cabrera listed Robert Cabrera as his father on the license for his marriage to August Wildman.  *Id.* ¶ 69.

*Second*, Gloria Diane Trelfa — born Gloria Diane Cabrera — is the foster sister of LTC David Cabrera and the functional equivalent of a biological sister.  *Id.* ¶¶ 124, 128.  She was 13 when David moved in with her father, Robert Cabrera.  *Id.* ¶ 126.  Gloria lived with her father and David for part of the year for the rest of Gloria's childhood.  *Id.*  Gloria then lived with

---

[4] This case involves multiple Plaintiffs who share a last name.  To avoid confusion, Plaintiffs at times refer to individual Plaintiffs by their first names.

David again from 1989-1990 when they were both in college. *Id.* ¶ 127. Gloria and David always had a good relationship and stayed in touch once he joined the military and was frequently overseas. *Id.* Gloria considers David her brother. *Id.* ¶ 128.

*Third*, Daniel Cabrera is the foster brother of LTC David Cabrera and the functional equivalent of a biological brother. *Id.* ¶ 84. Daniel is Robert Cabrera's son. *Id.* ¶ 85. Daniel was seventeen years old when he began living with David, and they lived together for three years. *Id.* ¶¶ 85-86. Although their relationship was strained at first, Daniel soon began to treat David as his little brother and protected him in high school and in the neighborhood. *Id.* ¶ 86. They also spent significant time together when David and Gloria were living together during college. *Id.* ¶ 87. Daniel considers David his brother. *Id.* ¶ 86.

Because Robert Cabrera, Gloria Diane Trelfa, and Daniel Cabrera are the functional equivalent of LTC David Cabrera's father and siblings, they satisfy the immediate-family test and are entitled to recover solatium damages. *See*, *e.g.*, *Valore*, 700 F. Supp. 2d at 80 (awarding solatium damages to step-father who "would hunt and fish" with the direct victim and "treated [him] as his own son").

### III.      DAMAGES AWARDS

"Upon obtaining a default judgment, successful plaintiffs may recover damages by proving 'that the projected consequences are reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate.'" *Fraenkel*, 892 F.3d at 353 (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003)). Iran's material support was reasonably certain to result in terrorist attacks killing, maiming, and kidnapping American citizens. *See* Dkt. 70-2 at 29-33; *Ewan*, 466 F. Supp. 3d at 246 (Bates, J.) (explaining that plaintiffs "have proven that the consequences of Iran's conduct were reasonably certain to — and indeed intended to — cause injury to members of the U.S. military"). The Court should

therefore enter damages awards based on the estimates proposed below.  Each proposed award follows the framework that this Court and many others in this District have long applied in calculating damages under the FSIA's terrorism exception.  *See*, *e.g. Ewan*, 466 F. Supp. 3d at 249 (Bates, J.) (applying the "frameworks" developed in this District for evaluating pain and suffering and solatium damages").

### A.        Survivor Plaintiffs

Plaintiffs request $12 million in pain-and-suffering damages for each of SGT Lemon and CPT Timoney, and $15 million for Mr. King.  Quantifying pain and suffering of survivors is difficult, and the court's "primary consideration is to ensure that individuals with similar injuries receive similar awards."  *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 70 (D.D.C. 2015).  As this Court has explained, "[i]n light of the need for uniformity, judges in this district have developed a general framework for assessing pain and suffering damages for direct victims of terrorist attacks."  *Sheikh v. Republic of Sudan*, 485 F. Supp. 3d 255, 268 (D.D.C. 2020) (Bates, J.).  Under this framework, which is sometimes referred to as the *Peterson II* framework for *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007) ("*Peterson II*"), the baseline award for surviving direct victims of a terrorist attack is $5 million.  *See id.* at 54.  Courts "depart upward from this baseline to $7–$12 million in more severe instances of physical and psychological pain."  *Valore*, 700 F. Supp. 2d at 84.  A substantial upward adjustment is warranted for all three of the Survivor Plaintiffs.

In *Peterson II* itself, the Court awarded $7.5 million to an individual who suffered "loss of sight in one eye, a perforated right eardrum resulting in some hearing loss," "a shrapnel injury to the back of his right thigh," and "severe psychological problems," and $12 million to an individual rendered a quadriplegic.  *Peterson II*, 515 F. Supp. 2d at 54-55.  This Court has awarded $7 million to a plaintiff who "remained in the hospital for eight months and underwent

several surgeries for head injuries" and "to reconstruct her face." *Est. of Doe v. Islamic Republic of Iran,* 943 F. Supp. 2d 180, 187 (D.D.C. 2013) (Bates, J.).  It also awarded $7 million to a victim who was trapped for eleven hours before being rescued, required several surgeries, and ultimately had his leg amputated.  *See id.*  And it awarded $7.5 million to an individual with severe burns to her face and head, total vision loss in one eye and severe impairment in the other, and shrapnel injuries, who spent "two years recovering in hospitals" and "never regained full use of her right hand."  *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 78 (D.D.C. 2014) (Bates, J.).

Other courts in this District have awarded $11-12 million to individuals who had lengthy hospitalizations and multiple surgeries, leaving them with disfiguring scarring, vision impairment, and significant brain injuries — resulting in difficulty concentrating, headaches, and other neurological effects.  For example, in *Haim v. Islamic Republic of Iran*, the court awarded $11 million to a survivor of a terrorist bombing who spent several weeks in the hospital and suffered permanent vision loss, scars that remained painful to the touch, recurring headaches, and neurological deficits.  425 F. Supp. 2d 56, 73-75 (D.D.C. 2006); *see also Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 274-75 (D.D.C. 2003) (awarding $12 million to individual who suffered "severe burns and blast injuries, scarring, permanent hearing loss, walking difficulties, difficulty breathing, and PTSD"); *Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 12-13 (D.D.C. 2001) (awarding $12 million to survivor who suffers blindness in one eye; loss of hearing in both ears; substantial loss of use of her right hand; extensive, disfiguring burns; skull fractures; lung blast injury; and post-traumatic stress disorder).  Comparable awards are warranted here.

### 1.  SGT Jared Lemon

Plaintiffs request $12 million in pain and suffering for SGT Lemon, which is in line with other awards for individuals with a combination of severe physical and mental injuries requiring lengthy hospitalizations and resulting in lifelong pain and suffering.  As a result of the explosion, a large chunk of shrapnel shattered the bone in SGT Lemon's right arm such that it was only connected to the rest of his body by soft tissue.  *See* Damages PFOF ¶ 133.  SGT Lemon had multiple limb salvage surgeries and extensive treatment to clear infection in an attempt to save his right arm, including a surgery that involved cutting his right lat muscle from his back and attaching it over his missing right tricep.  *Id.* at ¶ 134.  He also had a large metal brace with pins into the bone placed on the outside of his arm to hold it together.  *Id.*

SGT Lemon's right arm was eventually amputated above the elbow as a result of his injuries.  *Id.* ¶ 139.  After the amputation, doctors took skin from a donor site on his thigh for a skin graft, which was even more painful than the amputation.  *Id.* ¶ 141.  SGT Lemon also developed heterotopic ossification — or abnormal bone growth at the amputation site — including painful, knife-like bone spurs that stabbed into him.  *Id.* ¶ 140.  The heterotrophic ossification required multiple additional surgeries.  *Id.*  SGT Lemon also suffers from phantom limb pain in the arm that was amputated.  *Id.* ¶ 143.  He has constant low-level pain, which can flare up to extreme pain at times.  *Id.*  All told, SGT Lemon spent four and a half years at Walter Reed attempting to recover.  *Id.* ¶ 142.

SGT Lemon has also suffered mentally and emotionally as a result of his injuries.  *Id.* ¶¶ 136, 146-148, 150.  SGT Lemon was right handed.  *Id.* ¶ 146.  Before joining the military, SGT Lemon studied art in college for two years and was a professional jeweler for five years.  *Id.*  SGT Lemon had been creating art since he was five years old and art was his passion.  *Id.*  As SGT Lemon testified, he had his "identity stripped" as a result of the loss of his right hand.

Tr. at 240:22 (Lemon).[5]  SGT Lemon suffers from post-traumatic stress disorder.  *See* Damages PFOF ¶ 145.  He was suicidal on multiple occasions during his recovery and sees a therapist weekly.  *Id.* ¶ 147.  He also is still experiencing effects of the traumatic brain injury, which affects his memory and makes concentrating more difficult, causing him to struggle with returning to school.  *Id.* ¶ 144.  Finally, SGT Lemon's wife left him at Walter Reed and returned to Alaska with their daughter, and he has been unable to see his daughter as much as he would like since that time.  *Id.* ¶ 151.

SGT Lemon was only 29 years old when he was injured in the terrorist attack.  *Id.* ¶ 132. He has experienced significant physical and mental pain and suffering as a result of his injuries, which will likely continue for the remainder of his life.  *Id.* ¶¶ 145-146, 148.  He should recover $12 million in damages for his past and future pain and suffering.

### 2.  *CPT Ryan Timoney*

CPT Timoney also experienced severe physical and mental injuries in line with other victims who have received damages awards of around $12 million.  CPT Timoney's left side was closest to the suicide bomber during the explosion and he sustained numerous injuries from the ball bearings that were used in the suicide vest.  *See* Damages PFOF ¶ 216.  One ball bearing went through his chest and lodged in his spine between the T3 and T4 vertebrae.  *Id.*  Another ball bearing went through the left side of his skull and traveled through his brain, damaging his optic nerve and affecting his vision.  *Id.* ¶¶ 216, 223.  His lower left leg bone was shattered by the explosion.  *Id.* ¶ 216.

---

[5] Citations to "Tr." are to the transcripts of the bellwether hearing before this Court on October 18-20, 2021 (Dkts. 62-63, 65-67), in the above-captioned cases.

CPT Timoney was unconscious for a significant period of time following the explosion. *Id.* ¶ 221.  His left lung collapsed and he was unable to breathe on his own, requiring his medical team to perform a tracheotomy and place him on a ventilator.  *Id.* ¶ 218.  The team placed a metal brace around the outside of his left leg in an attempt to salvage the leg.  *Id.* ¶ 217.  The ball bearing in his brain caused CPT Timoney's brain to swell, and treatment required removing part of his skull.  *Id.* ¶ 219.  CPT Timoney regained consciousness at Walter Reed Hospital, but he does not remember anything from the time he was there.  *Id.* ¶ 221.  Eventually, CPT Timoney was transferred to a VA facility in Florida for recovery, which he is able to remember.  *Id.* ¶ 222.  During his recovery he had significant cognitive problems:  he was unable to finish sentences, he could not read well, and he had problems with short-term memory.  *Id.* ¶¶ 224-226.  For example, he did not recognize his girlfriend who moved to Florida to be with him during his recovery, and he was unable to remember her name.  *Id.* ¶ 226.  Once the missing portion of CPT Timoney's skull was replaced with an implant, his cognitive abilities began to improve.  *Id.* ¶ 228.

The metal brace around the outside of his left leg continued to get infected, however, which was particularly dangerous because of the risks of an infection traveling to his skull implant.  *Id.* ¶ 229.  CPT Timoney's medical team removed the external brace and performed surgeries to attempt to clear the infection in his leg and replace the missing bone with a permanent metal rod.  *Id.*  But the permanent metal rod in his leg also became infected, and the VA medical team advised returning to Walter Reed for an amputation.  *Id.* ¶ 230.  CPT Timoney described the aftermath of the amputation as the "second worst pain" of his life.  Tr. 334:9 (Timoney).  The night of the amputation he called the anesthesiologist, who gave him two doses of the second strongest pain killer available at Walter Reed, which made no difference to CPT

Timoney's pain.  *See* Damages PFOF ¶ 230.  Over time the pain has improved, but he is still in constant pain.  *Id.* ¶¶ 235, 237, 239.

Following the amputation, CPT Timoney remained at Walter Reed and began to improve more quickly.  *Id.* ¶ 231.  He became interested in becoming a software developer and took up computer coding.  *Id.*  Then, in February 2014, CPT Timoney had a post-traumatic seizure while working at his computer.  *See* Damages PFOF ¶ 232.  The medication he received to help control his seizures slowed down his brain, decreasing his vocabulary and negatively affecting his short-term memory.  *Id.* ¶ 233.  After trying multiple medications, CPT Timoney settled on a low dose of medication that left him with some risk of seizures but had less effect on his cognitive ability.  *Id.*  He has had approximately nine or ten seizures since February 2014.  *Id.*  Throughout his recovery, CPT Timoney spent about ten months in a hospital.  *Id.* ¶ 234.

CPT Timoney has also suffered mentally and emotionally as a result of his injuries.  *Id.* ¶¶ 227, 233, 238-239, 241.  He suffers from PTSD and recently had a significant episode when attempting to interview for a job at a company that makes software for the U.S. military.  *Id.* ¶ 236.  He can only walk for short periods of time and generally has to rely on a wheelchair.  *See* Damages PFOF ¶ 237.  He cannot engage in certain high-impact activities, which he used to enjoy, because of the ball bearing lodged in his spine.  *Id.* ¶ 239.  Fluorescent lighting and certain computer screens trigger his seizures, which makes spending time in public places difficult.  *Id.* ¶ 238.  And his traumatic brain injury, combined with the medication to help manage his seizures, causes cognitive impairment, which negatively affects his work opportunities and his relationship with his family.  *Id.* ¶¶ 236, 240.  CPT Timoney is married and has two young daughters, and he cannot be the kind of husband and father he wants to be because of his injuries.  *Id.* ¶ 241.  For example, because of his vision and cognitive impairments, he struggles with

reading bedtime stories to his children.  *Id.*  Similar to SGT Lemon, CPT Timoney was only 26

years old when he was injured in the terrorist attack.  *Id.* ¶ 215.  His mental and physical pain

and suffering is likely to continue through the rest of his life.  *Id.* ¶¶ 239, 241.  He should recover

$12 million in damages for his past and future pain and suffering.

### 3.  *Mr. Kevin King*

Plaintiffs request damages of $12 million for the time that Mr. King was in captivity.  Mr.

King was held hostage from August 7, 2016 to November 19, 2019 — a total of 1,200 days.  In

many cases involving extended periods of captivity, courts in this District have awarded

"approximately $10,000 per day for the pain and suffering they experienced while captive."

*Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 134 (D.D.C. 2005).

This includes plaintiffs whose suffering "ranged from lack of hygiene to loneliness to severe

beatings."  *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 51 (D.D.C. 2001); *see*

*also Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 163-64 (D.D.C. 2017) (awarding

$10,000 per day and identifying seven earlier cases in this District applying the same formula).

Similar to other plaintiffs who have been awarded $10,000 a day, Mr. King was regularly

threatened — including at gunpoint — beaten, kicked, and dragged by his captors.  Dkt. 70-1,

¶ 358; Damages PFOF ¶¶ 271, 275, 280.  On multiple occasions, Mr. King's captors forced him

to make hostage videos pleading with the U.S. and Afghan governments to release Taliban

prisoners in exchange for his release.  *See* Damages PFOF ¶ 276.  While making one of these

videos, his captors decided that Mr. King was not showing sufficient emotion, and they pointed a

machine gun at him, ordering him to cry.  *Id.*  Mr. King was in such a state of shock that he still

could not cry.  *Id.*  Instead, he asked for some water to put on his eyes to make it look like he was

crying.  *Id.*  As Mr. King testified, he lived under "a nonstop threat of being beaten if [h]e did

anything wrong."  Tr. 292:20 (King).  For approximately two of the three years Mr. King spent

in captivity, he was bound at the wrists nearly constantly, kept indoors — typically without windows — except when moving between holding places, and given the bare minimum necessary food to remain alive.  *See* Damages PFOF ¶¶ 272-274, 277, 279, 284.  On occasion, Mr. King was forced to live in below-ground tunnels with limited oxygen for days at a time.  *Id.* ¶ 283.  As a result of his captivity, Mr. King suffered from malnourishment and muscle loss, severe vitamin D deficiency causing other effects, hypomagnesemia, heart issues, scurvy, decreased visual acuity, posterior 10th-12th rib fractures, parasitic worm infections, hematuria, insomnia, constipation, peripheral neuropathy, and sensorineural hearing loss.  Dkt. 70-1 at ¶ 360.  He weighed only 135 pounds when he was released.  *See* Damages PFOF ¶ 284.

Additionally, Mr. King requests $3 million to compensate for the pain and suffering he has experienced, and will continue to experience, following his release.  In cases where hostages are released, courts generally award additional damages to compensate for post-release damages, including the plaintiff's likely future suffering.  *See, e.g.*, *Abedini v. Gov't of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 137 (D.D.C. 2019).  "[T]he victim's age at the time of release (the length of time he will be experiencing pain and suffering) and the extent of the victim's long-term injuries (the level of pain and suffering)" are key for determining post-release pain and suffering.  *Hekmati*, 278 F. Supp. 3d at 164.  Courts in this District generally award $1.5-3 million to survivors of terrorist attacks who, like Mr. King, suffered moderate physical injuries along with emotional pain and suffering.  *See, e.g.*, *Sheikh*, 485 F. Supp. 3d at 268 (Bates, J.).

Mr. King was 62 years old when he was released in November 2019.  For more than eighteen months following his release, Mr. King's blood work consistently showed continued vitamin deficiencies and other negative effects from his captivity.  *See* Damages PFOF ¶ 286.  He lost some of the feeling in his feet and ankles, and has only recently begun to regain some of

that feeling.  *Id.*  His left calf is swollen and is likely to stay that way for the rest of his life.  *Id.*

¶ 287.  The lack of feeling and swelling make running, which Mr. King had done regularly since

he was ten years old, much more difficult.  *Id.*  He was only able to begin running again more

than a year after he was released and has since experienced accidents while running related to the

lack of feeling in his feet.  *Id.* ¶¶ 286-287.  Mr. King has also suffered mentally and emotionally.

*Id.* ¶¶ 285, 288-289.  His mother died while the Taliban was holding him hostage, and he was

never able to say goodbye.  *Id.* ¶ 288.  He has generally coped by trying to block the memories of

his captivity, but he began experiencing PTSD symptoms, including nightmares, in August 2021

in response to the news reports about Kabul falling to the Taliban.  *Id.* ¶ 289.

A total award of $15 million — $12 million for the more than three years he spent in

captivity, and $3 million for his ongoing pain and suffering — is appropriate for Mr. King and in

line with damages awards for previous kidnapping victims in this District.

### B.        Family-Member Plaintiffs

Damages for solatium "are by their very nature unquantifiable."  *Moradi*, 77 F. Supp. 3d

at 72.  Although courts may "presume that those in direct lineal relationships with victims of

terrorism suffer compensable mental anguish" and accept "testimony proving a close emotional

relationship" between siblings as sufficient for solatium damages, the 20 family-member

Plaintiffs have presented evidence of mental pain and suffering as a result of the death or injury

of their immediate family members.  *Roth*, 78 F. Supp. 3d at 403.  In calculating solatium

awards, courts again generally "look to prior decisions."  *Acosta v. Islamic Republic of Iran*, 574

F. Supp. 2d 15, 29 (D.D.C.2008).  Because solatium damages are awarded to the immediate

family members of both deceased and surviving victims, courts in this District have developed

two frameworks for calculating these awards.  *See Oveissi v. Islamic Republic of Iran*, 768 F.

Supp. 2d 16, 26 n.10 (D.D.C. 2011) ("*Oveissi I*").  For family members of deceased victims, the

baseline framework is $8-12 million for spouses; $5 million for parents and children; and $2.5 million for siblings.  *See Heiser I*, 466 F. Supp. 2d at 269; *Peterson II*, 515 F. Supp. 2d at 52. For family members of surviving victims, these numbers are typically halved.  *See*, *e.g.*, *Valore*, 700 F. Supp. 2d at 85.

### 1.  Spouses

Plaintiffs request a solatium award of $10 million for August Wildman, the widow of LTC Cabrera, who was killed in the October 29, 2011 vehicle-borne suicide bombing in Kabul. The spouses of individuals who are killed in terrorist attacks generally recover "between $8 million and $12 million" in solatium damages.  *Heiser I*, 466 F. Supp. 2d at 270.  For example, this Court awarded $10 million to the widow of a soldier killed in the 1983 Embassy bombing in Beirut, who was left to raise their thirteen-month-old daughter alone.  *See Salazar*, 370 F. Supp. 2d at 111, 116; *see also Foley v. Syrian Arab Republic*, 281 F. Supp. 3d 153, 157 (D.D.C. 2017) (adopting a baseline of $10 million for spouses and awarding a 25% enhancement in specific instance); *Kerr v. Islamic Republic of Iran*, 245 F. Supp. 2d 59, 64 (D.D.C. 2003) (awarding $10 million to widow of university president who was assassinated by Hizbollah).

Plaintiffs acknowledge that this Court has previously awarded a baseline of $ 8 million to spouses of deceased victims of terrorism.  *See*, *e.g.*, *Amduso v. Republic of Sudan*, 61 F. Supp. 3d 42, 50 (D.D.C. 2014) (Bates, J.) (rejecting some recommended awards of $10 million for the "spouses of deceased victims" and awarding $8 million based on "the *Peterson II* guidelines").[6] But Plaintiffs believe that a $10 million baseline is warranted in this case for three reasons. *First*, in *Peterson II* the Court found "the damages framework set forth in *Heiser* to be an

---

[6] *Aff'd in part, vacated in part sub nom. Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), *certified question answered Republic of Sudan v. Owens*, 194 A.3d 38 (D.C. 2018), and *vacated and remanded sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020), and *aff'd sub nom. Owens v. Republic of Sudan*, 924 F.3d 1256 (D.C. Cir. 2019).

appropriate measure of damages for those family members of victims who died in this attack."
*Peterson II*, 515 F. Supp. 2d at 51.  And the *Heiser* framework recognized that the case law
supported a range of $8 to $12 million in solatium damages for spouses.  466 F. Supp. 2d at 269.
As discussed above, this Court, and other courts in this District, have awarded $10 million in
damages for spouses.  *Second*, the *Peterson II* and *Heiser* frameworks provide guidance to this
Court, but they are almost fifteen years old and do not set forth mandatory awards.  The D.C.
Circuit has explained that "*Heiser* may serve as a useful reference point, but it is not binding
precedent."  *Fraenkel*, 892 F.3d at 351.  Even just accounting for inflation since September 2007,
when *Peterson II* was decided, an $8 million award would now be equivalent to a more than
$10.5 million award.[7]  This Court should exercise its "discretion under 28 U.S.C. § 1608(e) to
grant solatium awards" of $10 million to all spouses of individuals killed in the terrorist attacks
at issue here.  *Id.  Third*, even if this Court adopts a baseline of $8 million for spouses, it should
award $10 million to Ms. Wildman and other spouses left to raise a minor child (or children) on
their own due to the unique hardships of raising a child, particularly one who has suffered the
trauma of losing a parent, alone.  *See, e.g.*, *Salazar*, 370 F. Supp. 2d at 111, 116 (describing
widow's difficulty finding employment and raising daughter, who was only 13 months old).

Ms. Wildman testified about the profound effects of her husband's death on her life.
Although Ms. Wildman had premonitions that her husband was gone, she entered a state of total
shock when the Army formally notified her of his death.  *See* Damages PFOF ¶¶ 10, 13.  She
described the excruciating process of collecting her husband's body and telling her two sons,
who were only 5 and 7 years old, that their father was dead and would not be coming home.  *Id.*
¶¶ 15, 54, 60.  Ms. Wildman had defined herself in relationship to her husband and was

---

[7] *See* Ex. A, Declaration of G. Knofczynski (describing inflation calculation).

completely lost when he was killed.  *Id.* ¶ 16.  As a result, she made some decisions to try to care

for her family that she now regrets.  *Id.* ¶ 17.  Ms. Wildman suffers from PTSD and has received

regular therapy since her husband's death, particularly to work through her feelings of guilt

around letting her husband volunteer for the deployment where he was killed.  *Id.*  Only recently,

ten years after her husband's death, has she been able to truly grieve.  *Id.*  Although nothing can

fully compensate Ms. Wildman for the loss of her husband, the Court should award her $10

million in solatium damages.

### 2.  *Children*

Plaintiffs request solatium awards of $6.25 million for Corbin Cabrera, Gillian Cabrera,

M.G.C., and R.X.C. — the four children of LTC Cabrera.  All four children were minors at the

time of their father's murder.  *See* Damages PFOF ¶¶ 24, 37, 54, 60.  "Courts in this district have

differed somewhat on the proper amount awarded to children of victims."  *Mwila v. Islamic

Republic of Iran*, 33 F. Supp. 3d 36, 44 (D.D.C. 2014) (Bates, J.).[8]  This Court has generally

awarded "$5 million where the victim died, and $2.5 million where the victim suffered injury,"

reasoning that "children who lose parents are likely to suffer as much as parents who lose

children."  *Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 260 (D.D.C. 2014) (Bates, J.).[9]

Plaintiffs seek an upward adjustment of 25%, to $6.25 million, because of the additional

suffering of minor children, who depend on their parent "for financial, emotional, and spiritual

support, unlike adult children."  *Selig*, 2021 WL 5446870, at *19-20 (awarding $6.25 million

---

[8] *Aff'd in part, question certified Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), *certified question answered*, *Republic of Sudan v. Owens*, 194 A.3d 38 (D.C. 2018), and *vacated and remanded sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020), and *aff'd sub nom. Owens v. Republic of Sudan*, 924 F.3d 1256 (D.C. Cir. 2019).

[9] *Aff'd in part, question certified*, 864 F.3d 751 (D.C. Cir. 2017), *aff'd*, 924 F.3d 1256 (D.C. Cir. 2019).

based on an upward adjustment).  Indeed, "courts have recognized the particularly devastating

effect that the loss of a parent can have on minors" and so routinely give them larger awards.  *Id.*

at *23.[10]  This Court should follow suit.

Corbin Cabrera, Gillian Cabera, M.G.C., and R.X.C. have all suffered as a result of their

father's death.  Although Corbin and Gillian were not living with their father at the time of his

death, they both described a close and loving relationship with him.  *See* Damages PFOF ¶¶ 25-

26, 38-39.  Corbin described his father as the "highlight of [my] life" and Gillian described him

as "[my] hero" and the "best man she's ever known."  *Id.* ¶¶ 26, 38, 44.  Corbin does not

remember much from the first few months after his father's death.  *Id.* ¶ 32.  He became suicidal,

attempting to take his life on one occasion.  *Id.* ¶ 33.  He attended counseling, but the counselor

was not a good fit.  *Id.*  Eventually Corbin switched to a different counselor who helped him to

better understand his depression, and he began taking antidepressants.  *Id.* ¶ 34.  Gillian

remembers being in a state of shock when she first learned that her father was gone.  *Id.* ¶ 45.

She has struggled with her mental health since her father's murder and is in counseling for

depression, anxiety, and grief.  *Id.* ¶ 47.  She attempted to stop counseling during her freshman

year of college, but experienced significant setbacks.  *Id.*  Her father's death has also affected her

relationship with her older brother.  *Id.* ¶ 49.

---

[10] *See also Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 52-53 (D.D.C. 2016) (awarding a 25% upward adjustment to two brothers, aged 6 and 12, following their sister's death); *see also Oveissi I*, 768 F. Supp. 2d at 29-30 (awarding 50% upward departure to less than six-year-old child for unexpected murder of grandfather who was the equivalent of a father); *Holland v. Islamic Republic of Iran*, 496 F. Supp. 2d 1, 35 (D.D.C. 2005) (awarding two minor children $12 million each for state-law solatium claim based on their loss of their "father at an[] extremely young age, a loss that was exceedingly detrimental to their upbringing and well-being").

M.G.C. and R.X.C. were only 7 and 5 years old when their father died, and they have had to grow up without their father's guidance. *Id.* ¶¶ 54, 60. When M.G.C. first learned about his father's death, huge tears rolled down his face but he did not say anything. *Id.* ¶ 56. His response has stayed much the same, dealing with his father's death by not confronting it. *Id.* ¶ 57. M.G.C. has moved 8 times in less than 16 years, and has been a top student at school. *Id.* ¶¶ 55, 57. He only recently began seeing a counselor. *Id.* ¶ 57.

When R.X.C. first learned of his father's death he burst into tears and began screaming. *Id.* ¶ 61. He has struggled with his loss for the last ten years, and his mental health began to deteriorate significantly a few years ago. *Id.* ¶ 63. He became suicidal and began to act out. *Id.* ¶¶ 64-65. In March 2020, he was enrolled for 104 days in a wilderness intervention program where he stayed in the mountains hiking and living out of a tent. *Id.* ¶ 63. He then entered a therapeutic boarding school — which provided wrap-around therapy services — where he completed his freshman year of high school. *Id.* The wilderness intervention program and therapeutic boarding school have cost more than $230,000 but are R.X.C.'s best chance at living a healthy life. *Id.* ¶ 66. Following returning home from therapeutic boarding school, R.X.C. became suicidal again and returned to the wilderness intervention program for seven additional weeks, costing an additional $25,000. *Id.* ¶ 67. He has since returned and seems more stable. *Id*.

In light of the trauma LTC Cabrera's minor children have experienced as a result of the loss of their father when they were still young, an award of $6.25 million for each child — reflecting a 25% enhancement — is appropriate.

Plaintiffs request a solatium award of $3.125 million for K.L., SGT Lemon's minor daughter. This also represents an upward departure of 25% from the baseline award of $2.5

million for children of individuals injured in terrorist attacks.  *See Owens*, 71 F. Supp. 3d at 260.

K.L. was only four years old when her father was injured.  *See* Damages PFOF ¶ 155.  Before

the attack, she lived with both her parents and had a solid, loving relationship with her father.  *Id.*

¶ 154.  Following the attack, she was nervous around her father and was afraid to touch him.  *Id.*

¶ 155.  She spent her fifth birthday at Walter Reed.  *Id.*  Her mother then informed SGT Lemon

that she was divorcing him and returned to Alaska with K.L.  *Id.* ¶ 156.  Even after SGT Lemon

was able to leave Walter Reed, he had to move to California so his parents could continue to help

him as he recovered.  *Id.*  As a result, K.L. only sees her father during the summers and the

occasional holiday.  *Id.* ¶ 157.  Because K.L. has been largely deprived of her father's presence

during her formative years as a result of his injuries, an upward departure of 25% is appropriate.

### 3. Parents

Plaintiffs request a solatium award of $5 million for Robert Cabrera, the foster father of

LTC Cabrera.  As described above, Robert Cabrera is the functional equivalent of LTC Cabrera's

biological father and is entitled to solatium damages.  *See supra* p. 8.  Parents of individuals who

were killed in terrorism attacks generally receive $5 million in solatium damages.  *See, e.g.,*

*Estate of Brown v. Islamic Republic of Iran,* 872 F. Supp. 2d 37, 44 (D.D.C. 2012) (explaining

that in accordance with the established framework, plaintiff "should have received a $5 million

solatium award as the father of a deceased serviceman").  Robert Cabrera has experienced

significant pain as a result of his son's death.  He initially felt numb with grief when the Army

formally notified him of his son's death.  *See* Damages PFOF ¶ 78.  He described his particular

pain at being unable to see his son's body to say goodbye because the casket was closed at the

funeral.  *Id.*  Robert Cabrera has dealt with insomnia and anxiety since his son's death, and he

takes prescription medication to help with anxiety attacks.  *Id.* ¶ 79.  He sought counseling from

a priest to help him come to terms with his grief and rely on his faith for strength.  *Id.* ¶ 80.

Plaintiffs also request solatium awards of $2.5 million for Frank Lemon and Jackie Lemon — the parents of SGT Lemon — and for Gregory Timoney and Diane Timoney — the parents of CPT Timoney. Awards of $2.5 million are consistent with solatium damages generally awarded to the parents of individuals wounded in terrorist attacks. *See*, *e.g.*, *Peterson II*, 515 F. Supp. 2d at 52. Both sets of parents have suffered mentally and made drastic changes to their lives to help care for their wounded sons.

Jackie Lemon was numb when she first learned about Jared's injuries while at work, and she was unable to cry until she arrived home that evening. *See* Damages PFOF ¶ 179. She quit her job as a special education aide and moved to Walter Reed to care for her son full time. *Id.* ¶¶ 179, 181-182. Caring for SGT Lemon and watching him suffer left Jackie Lemon physically and mentally exhausted. *Id.* ¶ 181. Frank Lemon described his initial relief at learning that his son was alive, followed by difficulty not crying when he arrived at Walter Reed, which angered SGT Lemon. *Id.* ¶ 169. Frank Lemon worried about finding someone to live with SGT Lemon at Walter Reed for the years that he was there in recovery, as both he and Jackie Lemon needed to work in California. *Id.* ¶¶ 170-172. Once SGT Lemon was able to leave Walter Reed, he moved to California to be near his parents. *Id.* ¶ 151. His parents struggled to help with his opioid addiction. *Id.* ¶ 174. Frank Lemon lashed out at SGT Lemon's doctors and was told that he was also suffering from PTSD. *Id.* ¶ 173. Jackie Lemon sees a psychologist to help her process her emotions about her son's injuries. *Id.* ¶ 183. To this day, they provide for SGT Lemon and his family more physically, emotionally, and financially than they would have absent the attack. *Id.* ¶ 184.

CPT Timoney's parents were informed of their son's injuries on the evening of May 20, 2012. *Id.* ¶ 257. His mother, Diane Timoney, had to go to the emergency room that night due to

her physical response to the stress. *Id.* CPT Timoney's parents then traveled to Walter Reed, where they were informed that CPT Timoney had a 12% chance of survival and that, if he did survive, he would likely have no quality of life. *Id.* ¶¶ 260-261. Gregory Timoney recalled sitting in the lobby of Walter Reed writing his son's eulogy — a memory he believes will haunt him for the rest of his life. *Id.* ¶ 260. Diane Timoney quit her job as a teacher and remained at Walter Reed with her son for four months. *Id.* ¶¶ 251-252. She saw little of her husband during that time, because he had to return to work. *Id.* ¶ 252. Eventually, Diane Timoney returned home, because CPT Timoney's then-girlfriend remained with him full-time. *Id.* ¶ 247. However, once CPT Timoney began having seizures, Diane and Gregory Timoney moved to the Austin, Texas area (where CPT Timoney had moved) to support their son and his family. *Id.* ¶¶ 251-252. Gregory Timoney had to quit his job in Florida, where he had expected to remain until he retired. *Id.* ¶ 267. He was only able to find a lower-paying job in Fort Worth, which required the Timoneys to again maintain separate households and only see each other on weekends for more than three years. *Id.* The reduced income and additional expenses have harmed Diane and Gregory Timoney financially. *Id.* Diane Timoney has developed a heart condition called Premature Ventricular Contractions, requiring daily medication, which her cardiologist attributed to increased adrenaline following CPT Timoney's injuries. *Id.* ¶ 248. She also suffers increased anxiety about the safety of her family members. *Id.* ¶ 249. And Gregory Timoney particularly misses the physical activities he once enjoyed with his son. *Id.* ¶ 263.

Awards of $5 million for Robert Cabrera, and $2.5 million for each of Frank Lemon, Jackie Lemon, Gregory Timoney, and Diane Timoney, are in line with solatium awards for other parents of victims of terrorist attacks and are appropriate in this case.

4.  *Siblings*

Plaintiffs request solatium awards of $2.5 million for LTC Cabrera's five siblings:
Daniel Cabrera, Ronald "Paul" Hopkins, Suzanne "Rene" Martinez, JD Prosser, and Gloria
"Diane" Trelfa.  This is consistent with the amount typically recovered by the sibling of an
individual killed in a terrorist attack.  *See Valore*, 700 F. Supp. 2d at 85.  As discussed above,
Daniel Cabrera and Gloria Trelfa are the foster siblings of LTC Cabrera and the functional
equivalent of biological siblings.  They are thus entitled to recover as siblings.  Each of LTC
Cabrera's siblings provided evidence of a close relationship with their brother and pain and
suffering as a result of his death.  *See generally* Damages PFOF ¶¶ 86-89, 92-99, 102-104, 108-
111, 114-123, 126-130.  Daniel Cabrera and Gloria Trelfa described their shock at their brother's
death and the sorrow they have experienced since — in particular difficulties in supporting their
father, Robert Cabrera, through his grief.  *Id.* ¶¶ 89, 131.  Gloria Trelfa has also received grief
counseling from her church and still cries about LTC Cabrera's death, particularly during family
gatherings and significant life events.  *Id.* ¶ 130.

Ronald Hopkins, Suzanne Martinez, and JD Prosser described the close bond the four
biological siblings shared as young children in an abusive household.  *Id.* ¶¶ 92, 102, 114.
Although LTC Cabrera was the youngest child, each of them had relied on him for counseling
and advice as adults, and he was the one that held the four siblings together.  *Id.* ¶¶ 114, 116.
Ronald Hopkins recalled the weeks following LTC Cabrera's death as being a blur.  *Id.* ¶ 96.
Since LTC Cabrera's death, Ronald Hopkins has been diagnosed with depression and, at times,
been suicidal.  *Id.* ¶ 97.  Suzanne Martinez was initially in complete denial about her brother's
death, refusing to answer the phone or speak to her family.  *Id.* ¶ 106.  She still misses him
horribly and is angry about his death every day.  *Id.* ¶¶ 107-109.  Immediately after hearing
about LTC Cabrera's death, JD Prosser — LTC Cabrera's oldest sister — could not speak.  *Id.*

¶¶ 114, 118.  She then began screaming and crying uncontrollably.  *Id.* ¶ 119.  She was unable to function, but her co-workers were able to get her on a plane.  *Id.* ¶ 120.  She arrived at the Cabrera home about five hours later.  *Id.*  Her mental state worsened drastically after LTC Cabrera's death, and she had a nervous breakdown four years later.  *Id.* ¶ 122.  She is on long-term disability and has not worked since the nervous breakdown.  *Id.* .

Plaintiffs request solatium awards of $1.25 million for Matthew Lemon and Nathan Lemon — the brothers of SGT Jared Lemon.  This is the standard award for the siblings of an individual injured in a terrorist attack.  *See Valore*, 700 F. Supp. 2d at 85.  Plaintiffs seek an upward departure of 25% — to $1,562,500 — for Benjamin Lemon who was still a minor living at home when his brother was injured.  *See*, *e.g.*, *Thuneibat*, 167 F. Supp. 3d at 52-53 (awarding upward departure of 25% to two siblings who were still minors when their sister was killed).  SGT Lemon's three brothers describe a close relationship with their brother prior to the attack, with his younger brothers — Matthew and Benjamin — looking up to him.  *See* Damages PFOF ¶¶ 190, 200.  His older brother, Nathan Lemon, is close in age to SGT Lemon, and they grew up together as best friends.  *Id.* ¶ 209.  Nathan Lemon took time off work to care for his brother at Walter Reed for about one month.  *Id.* ¶ 172.  He is pained by his brother's difficulties and he worries about him.  *Id.* ¶ 214.  Matthew Lemon delayed going to college to live with his brother at Walter Reed for about six months.  *Id.* ¶¶ 172, 204.  He was emotionally traumatized by SGT Lemon's struggles and experienced significant anger.  *Id.* ¶¶ 205-206.  Benjamin Lemon was still in high school when SGT Lemon was injured.  *Id.* ¶ 191.  He was left living with his grandmother while his parents rushed to Walter Reed.  *Id.*  He subsequently delayed his appointment to West Point for a year to deal with his anger and grief surrounding his brother's injuries.  *Id.* ¶ 195.

Plaintiffs request a solatium award of $2 million, reflecting a 60% upward departure, for Stephanie Miller, Mr. King's sister.  Courts in this District have previously departed upward in similar percentages from the standard solatium frameworks for family members of individuals who are kidnapped, to compensate for the additional pain and suffering experienced.  "The anguish of not knowing [the family member's] fate, of waiting every day for news, of seeking out information and pleading with the terrorists for mercy is indescribable." *Fritz v. Islamic Republic of Iran,* 2018 WL 5046229, at *23 (D.D.C. Aug. 13, 2018), *report and recommendation adopted as modified*, 324 F. Supp. 3d 54 (D.D.C. 2018) (awarding $8 million to parents and $4.5 million to siblings of individual who was held hostage for years before being killed).  "[G]reater awards are justified because the afflicted party not only had to cope with the grief that follows the loss of a loved one, but — at the time of the event — was also forced to endure unending anxiety and an extended period of extreme distress over the health and safety of their captive family member." *Oveissi I*, 768 F. Supp. 2d at 27; *see also Foley,* 281 F. Supp. 3d 153 at 158 (departing upward and awarding solatium damages of $7 million to parents of soldier who was kidnapped); *Foley v. Syrian Arab Republic,* 249 F. Supp. 3d 186, 197 (D.D.C. 2017) (explaining that kidnapped soldier was missing for four years before his body was found).

Before the attack, Ms. Miller saw her brother whenever he visited home and otherwise kept in touch through email.  *See* Damages PFOF ¶ 293.  She initially learned of Mr. King's kidnapping from the FBI and recalled almost collapsing from the shock.  *Id.* ¶ 294.  She subsequently met regularly with the FBI Hostage Recovery Fusion Cell and became obsessed with having constant access to her phone and the internet.  *Id.* ¶ 298.  At the time, Ms. Miller was caring for their mother who was in her nineties and suffering from progressing dementia.  *Id.* ¶¶ 293, 296.  Ms. Miller believed that telling their mother about Mr. King's captivity would kill

her and so she decided not to tell her mother. *Id.* ¶ 296.   For Ms. Miller, the worst part was when her mother entered hospice. *Id.* ¶ 299.  Ms. Miller had been holding out hope that their mother would live until Mr. King returned. *Id.*  But she died first. *Id.*  After Mr. King was released, he moved in with Ms. Miller and her husband. *Id.* ¶ 300.  During his first several months home, Ms. Miller arranged his medical care, took care of things he needed, and accompanied him to all appointments. *Id.*  Mr. King has become more independent over time, but he is still living with Ms. Miller. *Id.*  Although Ms. Miller has grown closer to Mr. King, she has experienced multiple challenges stemming from his dependence and the impacts of his time in captivity. *Id.* ¶¶ 300-301.

Because each of LTC Cabrera's, SGT Lemon's, and Mr. King's siblings has established a close sibling relationship and mental suffering as a result of the terrorist attacks, each sibling is entitled to recover solatium damages in the requested amounts.

## C.   Prejudgment Interest

Courts have "discretion, subject to equitable considerations," to award prejudgment interest on compensatory damages, and this Court should do so here. *Oveissi II*, 879 F. Supp. 2d at 58.  As this Court has explained in previous § 1605A(c) cases, "an award for prejudgment interest here is appropriate" because "[a]wards for pain and suffering and solatium are calculated without reference to the time elapsed since the attack." *Ewan*, 466 F. Supp. 3d at 250 (Bates, J.).  Because "solatium is a payment that treats the loss of a close family member as a harm that arises at the moment of the tort," Plaintiffs should receive prejudgment interest to account for the delay as part of full compensation. *Fritz*, 324 F. Supp. 3d at 64.  Prejudgment interest also prevents defendants from "profit[ing] from the use of the money" since the attack. *Doe*, 943 F.

Supp. 2d at 184 n.1.  The Court should thus award prejudgment interest on all pain and suffering and solatium awards in this case.[11]

The D.C. Circuit has approved calculating prejudgment interest using the prime rate, reasoning that it is "*more* appropriate" than the Treasury Bill rate because it is "a market-based estimate" of what the victim would have had to pay to borrow the money.  *Forman v. Korean Air Lines Co.*, 84 F.3d 446, 450-51 (D.C. Cir. 1996) (emphasis in original).  Using "the prime rate for each year between the [attack] and the entry of judgment" results in a more precise award than alternative calculation methods.  *Id.*  This Court has previously calculated the appropriate multiplier for compensatory damages awards in FSIA cases "using the Federal Reserve's data for the average annual prime rate in each year," which is available on the Federal Reserve's website.  *Ewan*, 466 F. Supp. 3d at 250 n.3 (Bates, J.) (citing Bd. of Governors of the Fed. Reserve Sys., Data Download Program, *available at* https://www.federalreserve.gov/datadownload/ Choose.aspx?rel=H15).  Using this data and the process the Court has applied previously, Plaintiffs have calculated the below multipliers to calculate the full compensatory damages awards for the 23 individuals with damages claims currently before the Court.[12]

---

[11] Although Plaintiffs anticipate recovering a portion of any final compensatory damages award from the United States Victims of State Sponsored Terrorism Fund, the Fund does not allow the recovery of prejudgment interest.  *See* 34 U.S.C. § 20144(j)(3) ("The term 'compensatory damages' does not include pre-judgment or post-judgment interest or punitive damages.").  Because the Fund offers Plaintiffs the only realistic near-term prospect for collecting on any judgment against Iran, they do not expect to actually collect prejudgment interest (or punitive damages).  Thus, from Plaintiffs' perspective, the compensatory-damages figures are by far the most important part of any award, and the theoretical availability of prejudgment interest should not dissuade the Court from awarding Plaintiffs the full amount of compensatory damages to which they are entitled.

[12] *See* Ex. A, Declaration of G. Knofczynski (describing calculation method and attaching spreadsheet supporting calculations).

**Table B: Prejudgment Interest Multipliers**

| Plaintiffs | Attack Date | Multiplier |
|---|---|---|
| SGT Lemon and family members | 4/11/2010 | 1.5408 |
| Family members of LTC Cabrera | 10/29/2011 | 1.4662 |
| CPT Timoney and family members | 5/20/2012 | 1.4403 |
| Mr. King and family members | 8/7/2016 | 1.2566 |

### D.  Punitive Damages

The Court should also award Plaintiffs punitive damages against Iran.  The private right of action in § 1605A(c) authorizes "punitive damages."[13]  A punitive damages award serves to "punish and deter" Iran's actions here.  *Valore*, 700 F. Supp. 2d at 87.

Courts calculate the appropriate punitive damages award based on four factors:  "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants."  *Oveissi II*, 879 F. Supp. 2d at 56 (quoting *Acosta*, 574 F. Supp. 2d at 30).  All four factors weigh strongly in favor of awarding punitive damages.  *First*, Iran provided material support to the Syndicate's terrorist campaign, which included numerous heinous terrorist attacks on American service members and civilians serving their country in Afghanistan.  And Iran has a "demonstrated policy" of funding such terrorist campaigns.  *Campuzano,* 281 F. Supp. 2d at 278. *Second,* Iran intentionally caused Plaintiffs' severe physical and psychological trauma.  As Plaintiffs explained in their proposed conclusions of law concerning liability, Iran's goal in supporting the members of the Taliban-led Syndicate was to cause terrorist attacks maiming and killing Americans.  *See* Dkt. 70-2 at 33.  This is consistent with the holding of other courts in this

---

[13] Much of Iran's support for the Taliban occurred after § 1605A was enacted in 2008, but punitive damages are also available for conduct that occurred before the enactment of § 1605A.  *See Opati*, 140 S. Ct. at 1609.

District that "Iran's intention, in supporting terrorist groups such as the one involved here, is to create maximum harm through terrorist acts."  *Acosta*, 574 F. Supp. 2d at 31.  *Third*, the Court should deter Iran's repeated support for anti-American terrorist groups by awarding punitive damages in this case.  In light of this history of support, "only a large punitive damage award will serve as an effective deterrent against future terrorist acts." *Id.*  *Fourth*, as numerous courts in this District have found, "Iran is a foreign state with substantial wealth and has expended significant resources sponsoring terrorism." *Oveissi II*, 879 F. Supp. 2d at 56.

Courts in this District have calculated punitive damages awards using different methodologies.  Initially, courts tended to calculate punitive damages as a multiplier of "Iran's annual expenditures on terrorism."  *Valore*, 700 F. Supp. 2d at 88; *see also Doe*, 943 F. Supp. 2d at 190.  But courts struggled with how to award punitive damages in subsequent cases involving the same conduct.  *See Doe*, 943 F. Supp. 2d at 190.  More recently, courts in this District — including this Court — have awarded "punitive damages in an amount equal to the total compensatory damages awarded in [each] case." *Sheikh*, 485 F. Supp. 3d at 273 (Bates, J.).  "An amount of punitive damages equal to compensatory damages . . . is commensurate with the character of Defendants' acts and the nature and extent of the harm caused." *Selig*, 2021 WL 5446870, at *24; *see also Fritz*, 324 F. Supp. 3d at 65 (applying a "multiplier of two" to the compensatory damages).  The multiplier approach "has the virtue of straightforwardly scaling as additional sets of plaintiffs come forward — punitive damages will continue to grow as the full scope of the harm done by Iran's material support [for the Syndicate] becomes evident."  *Sheikh*, 485 F. Supp. 3d at 273 (Bates, J.).  Punitive damages based on compensatory damages are calculated "by reference to the entire compensatory award," including pre-judgment interest. *Wamai*, 60 F. Supp. 3d at 98; *see also Ewan*, 466 F. Supp. 3d at 252 n.4 (Bates, J.).

Plaintiffs thus request that the Court award punitive damages in an amount equal to the total compensatory damages award under § 1605A(c), thereby deterring Iran's further support of terrorist organizations like the Taliban-led Syndicate.

## CONCLUSION

The Court should enter damages awards for each of the 23 Plaintiffs who have presented evidence of eligibility and damages to the Court in the amounts requested above.

Dated:  December 17, 2021

Respectfully submitted,

/s/ Joshua D. Branson

Robert W. Cowan
DC Bar No. TX0148
Katie R. Caminati
TX Bar No. 24098079
Bailey Cowan Heckaman PLLC
Four Oaks Place
1360 Post Oak Blvd., Suite 2300
Houston, Texas 77056
Telephone: (713) 425-7100
Facsimile: (713) 425-7101
rcowan@bchlaw.com
kcaminati@bchlaw.com

*Counsel for Zambon Afghanistan-Based
Plaintiffs*

Joshua D. Branson (D.C. Bar No. 981623)
Andrew E. Goldsmith (D.C. Bar No. 1007074)
Grace W. Knofczynski (D.C. Bar No. 15000407)
James A. Ruck (D.C. Bar No. 1739309)
Kellogg, Hansen, Todd,
 Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com
gknofczynski@kellogghansen.com


Ryan R. Sparacino (D.C. Bar No. 493700)
Sparacino PLLC
1920 L Street, NW, Suite 535
Washington, D.C. 20036
Tel:  (202) 629-3530
ryan.sparacino@sparacinopllc.com


*Counsel for Cabrera Plaintiffs and Zambon
Afghanistan-Based Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 17th day of December, 2021, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system, which will then send a

notification of such filing (NEF) to all counsel of record.

*/s/ Joshua D. Branson*

Joshua D. Branson
