**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AUGUST CABRERA, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 19-3835 (JDB)** |
| **ISLAMIC REPUBLIC OF IRAN,** | |
| **Defendant.** | |
| **MARK ZAMBON, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 18-2065 (JDB)** |
| **ISLAMIC REPUBLIC OF IRAN,** | |
| **Defendant.** | |

## MEMORANDUM OPINION (FINDINGS AND CONCLUSIONS)

Between 2006 and 2019, a terrorist syndicate comprising, among other groups, al-Qaeda, the Taliban, and the Haqqani Network perpetrated numerous terrorist attacks against American servicemembers and civilians in Afghanistan. Some of these victims and their family members have now brought this series of coordinated suits against the Islamic Republic of Iran ("Iran") under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A. Plaintiffs allege that Iran provided material support for the terrorist syndicate responsible for these attacks and accordingly seek compensatory damages from Iran.

After Iran was properly served and it defaulted, the Court held a three-day evidentiary hearing regarding the entry of default judgment against Iran. The evidence presented at the hearing concerned eleven "bellwether" attacks and the claims of twenty-three "bellwether plaintiffs," all

of whom were injured in the bellwether attacks or were family members of direct victims. After the hearing, plaintiffs submitted declarations and supplemental argument regarding the damages of the bellwether plaintiffs. Guided by the findings and conclusions in this Memorandum Opinion, the Court will refer the claims of the other plaintiffs to a Special Master, who will prepare a report and recommendation. At that time, the Court will issue additional instructions for liability and damages proceedings concerning non-bellwether attacks.

This Memorandum Opinion will proceed in three steps. First, it will present the Court's findings as to the connections between Iran and the eleven bellwether attacks; the Court will also briefly describe the personal histories and accounts of the four plaintiffs who testified at the evidentiary hearing. Next, the Court will set forth its legal conclusions regarding Iran's liability for the plaintiffs' injuries.[1] Finally, the Court will set forth its conclusions regarding the bellwether plaintiffs' damages.

## I.   Background

Plaintiffs filed these consolidated suits on August 31, 2018 (Zambon) and December 27, 2019 (Cabrera). As relevant to this Memorandum Opinion, plaintiffs generally allege that Iran provided material support, in the form of "sophisticated weapons, critical training, financial assistance, safe haven, and assistance with drug trafficking," to a "terrorist syndicate" operating in Afghanistan from 2006 to 2019. Pls.' Proposed Conclusions of Law [ECF No. 70-2] ("Proposed Conclusions") at 1.[2] Plaintiffs assert that the broad goal of the syndicate was to "expel[] U.S. forces from Afghanistan and overthrow[] Afghanistan's democratically elected government"—a

---

[1] The Court enters the findings and conclusions pursuant to 28 U.S.C. § 1608(e). That provision requires plaintiffs under the FSIA to "establish[] [their] claim or right to relief by evidence satisfactory to the court" even where, as here, the defendant has failed to appear after proper service.

[2] Unless otherwise indicated, all docket entry citations will refer to the filings in Cabrera v. Islamic Republic of Iran, No. 19-cv-3835. The Court will cite filings in Zambon v. Islamic Republic of Iran as "Zambon ECF No. #."

goal it ultimately achieved in August of 2021.  Id.  Plaintiffs seek damages for the personal injuries of surviving victims of the syndicate's attacks, the personal injuries and deaths of victims who were killed, and for loss of consortium, solatium, and the emotional distress suffered by the families of those injured or killed.  See Second Am. Compl. [ECF No. 30] ¶¶ 1702–09; Compl. [Zambon ECF No. 1] ¶¶ 188–91, 193–95.

## A.  Service and Entry of Default

The FSIA sets forth the requirements for serving a foreign state.  Section 1608(a) provides four methods for effecting service:  (1) by delivering a copy of the summons and complaint "in accordance with any special arrangement for service between the plaintiff and the foreign state," (2) by delivering a copy of the summons and complaint "in accordance with an applicable international convention on service," (3) by sending copies of the summons and complaint, as well as translations thereof, "by any form of mail requiring a signed receipt," or (4) by sending the documents to the Secretary of State, who then transmits them "through diplomatic channels to the foreign state."  A plaintiff must move through the four service methods sequentially and may use the fourth method only if the first three methods fail or are impossible.  See id. § 1608(b); Barot v. Embassy of the Republic of Zambia, 785 F.3d 26, 27 (D.C. Cir. 2015).

Because neither a "special arrangement," 28 U.S.C. § 1608(a)(1), nor an international convention, id. § 1608(a)(2), was available for effecting service in this case, see Karcher v. Islamic Republic of Iran, 396 F. Supp. 3d 12, 15 (D.D.C. 2019), plaintiffs attempted to serve Iran by mail under § 1608(a)(3), see Affidavit Requesting Foreign Mailing [Zambon ECF No. 7]; Affidavit Requesting Foreign Mailing [ECF No. 13].  When those attempts at service failed, see Suppl. Praecipe Regarding Service [Zambon ECF No. 11] (explaining that plaintiffs could not find a carrier that would deliver to Iran); Min. Order, Apr. 14, 2020 (permitting plaintiffs to skip service

3

by mail because no carrier would deliver to Iran), plaintiffs transmitted their requests to the Secretary of State for service through diplomatic channels pursuant to § 1608(a)(4), see Affidavit Requesting Foreign Mailing/Diplomatic Service [Zambon ECF No. 12]; Affidavit Requesting Foreign Mailing/Diplomatic Service [ECF No. 16].  Those attempts to serve Iran succeeded.  See Return of Service [Zambon ECF No. 16] ("Zambon Return of Service"); Return of Service [ECF No. 19] ("Cabrera Return of Service").  After Iran failed to respond, plaintiffs sought an entry of default, which the Clerk of Court entered on August 12, 2020 in Zambon, see Entry of Default [Zambon ECF No. 20], and on October 16, 2020 in Cabrera, see Entry of Default [ECF No. 21]. In February 2021, the Cabrera plaintiffs amended their complaint to include additional plaintiffs who were victims or family members of victims.  See generally Second Am. Compl.  Plaintiffs sought an entry of default as to that amended complaint, which the Clerk of Court entered on June 6, 2022.  See Entry of Default [ECF No. 76].

### B. Pre-Hearing Proceedings

Shortly after the Clerk's entry of default in October 2020, plaintiffs proposed a multiphase case management plan, whereby they would move for a default judgment as to all plaintiffs, but then present evidence of only certain bellwether claims to the Court, which would enter findings and conclusions on liability as to those claims.  See Pls.' Mot. for Entry of Case Management Order [ECF No. 22] at 2–10.  Plaintiffs then proposed submitting additional liability evidence as to a further subset—the bellwether plaintiffs—and appointing Special Masters to make liability and damages determinations as to the remaining plaintiffs.  See id. at 9–11.  Put differently, the Court would make findings of fact and liability conclusions on eleven bellwether attacks, and would then make damages conclusions as to a subset of the victims injured in those attacks.

The Court largely accepted this proposal and ordered an evidentiary hearing, ultimately set for October 18, 2021, see Revised Case Management Order [ECF No. 54] ("Second Revised Order") at 2, on a set of bellwether attacks that occurred in Afghanistan to be selected by plaintiffs, see Case Management Order [ECF No. 28] at 2.  These attacks were to "represent[] each of the geographies and each of the attack types" at issue in this case.  Id.; see also Revised Case Management Order [ECF No. 45] at 2; Second Revised Order at 2.  In advance of the hearing, plaintiffs submitted the following list of bellwether attacks:

1. July 13, 2008 Complex Attack in Waygul District, Nuristan Province
2. August 16, 2009 IED-Triggered Complex Attack in Siawashan Village, Herat Province
3. April 11, 2010 IED in Arghandab District, Kandahar Province
4. August 6, 2011 Attack on Helicopter in Tangi Valley, Wardak Province
5. October 29, 2011 Vehicle-Borne Suicide Bombing in Kabul City
6. May 20, 2012 Suicide Vest Bomber in Tarin Kowt, Uruzgan Province
7. May 31, 2012 IED in Zombalay District, Helmand Province
8. June 18, 2013 Indirect Fire on Bagram Airfield, Parwan Province
9. July 15, 2013 82mm Recoilless Rifle Attack in Paktia Province
10. August 7, 2016 Kidnapping in Kabul City
11. June 10, 2017 Insider Attack in Pehka Valley, Nangarhar Province

List of Bellwether Attacks [ECF No. 57] ("Attack List") at 2–4.  At the bellwether hearing, plaintiffs would present evidence on liability issues relevant to the specific attacks and to all attacks generally.  Second Revised Order at 2.  After the Court coordinated litigation of the Afghanistan-based claims in Zambon with the claims in Cabrera, see Order, May 27, 2021 [Zambon ECF No. 30],[3] plaintiffs moved for an entry of default judgment on September 20, 2021, see generally Motion for Default Judgment [ECF No. 52] ("Default Motion").

_____

[3] Zambon is also consolidated with Blunt v. Islamic Republic of Iran, No. 19-1696.  See Min. Order, Dec. 23, 2020 (Zambon).

### C. Bellwether Hearings

After granting plaintiffs' motion to pre-admit 152 exhibits, see Order, Oct. 1, 2021 [ECF No. 56], the Court held a three-day evidentiary hearing from October 18 to 20, 2021, where plaintiffs presented evidence supporting Iran's liability in each of the eleven bellwether attacks. Plaintiffs put on five fact witnesses and three expert witnesses.  The expert witnesses were Mr. William F. Roggio, Dr. Colin Clarke, and Lt. Col. Steven Wood (Ret.).  The fact witnesses were Col. Thomas McGrath (Ret.), commander of the Afghan Regional Security Integration Command from May 2007 to August 2008; two servicemembers injured in bellwether attacks, Sgt. Jared Satoshi Lemon and Cpt. Ryan Gregory Timoney; one civilian kidnapping victim, Mr. Kevin King; and Ms. August Wildman, the wife of a servicemember killed in a bellwether attack.

During the bellwether hearings, the Court admitted an additional 24 exhibits, including reports from each of the three experts, military service records, and sealed medical records of some testifying plaintiffs.  Plaintiffs subsequently submitted proposed findings of fact, see generally Proposed Findings of Fact [ECF No. 70-1] ("Proposed Findings"), conclusions of law, see generally Pls.' Proposed Conclusions of Law [ECF No. 70-2] ("Proposed Conclusions"), and supplemental information and briefing on the damages of the bellwether plaintiffs, see generally Proposed Findings of Fact Concerning Damages [ECF No. 72] ("Proposed Damages Findings"); Pls.' Suppl. Br. & Proposed Conclusions of Law Concerning Damages [ECF No. 73] ("Proposed Damages Conclusions"), as well as a motion to adopt an administrative plan for litigation of non-bellwether claims, see generally Pls.' Mot. to Appoint Special Masters & Adopt Admin. Plan Concerning Special Masters [ECF No. 74] ("Special Masters Mot.").

### D.  Expert Qualifications and Methodology

Plaintiffs' three expert witnesses and their reports are important to this case because they form the backbone of plaintiffs' claim that Iran is responsible for plaintiffs' injuries, and because they provide important context for the bellwether attacks.  Accordingly, the Court will briefly summarize the experts' qualifications, the methodologies they employed, and the main topics they discussed and on which they reported.

#### 1.  *Mr. William F. Roggio*

The Court qualified Mr. Roggio as an expert "in the field of Middle Eastern terrorism." Tr. I [ECF No. 62] at 21:21–25.[4]  Roggio is a senior fellow at the Foundation for Defense of Democracies where he edits the Foundation's Long War Journal, a publication he established in 2007 to report on the global "war on terror."  Tr. I at 17:4–18, 18:13; see Expert Report of William F. Roggio [ECF No. 59-1] ("Roggio Report") ¶¶ 1–2.  He began tracking the Taliban and al-Qaeda in the 1990s, first as a servicemember, and then while embedded as a journalist with American, Canadian, and Iraqi military forces in Iraq.  Tr. I at 17:21–18:15; see Roggio Report ¶¶ 2–5.  The Long War Journal tracks state sponsors of terrorism, including Iran; Roggio has written or edited "well over 5,000" articles for the Journal, roughly 35–40 percent of which "focused on terrorism in Afghanistan" and 75 percent of which "involved Iran-backed terrorism."  Tr. I at 19:3–11. Roggio's work has also been published in various other publications including The New York Times, The National Review, and Politico, Roggio Report ¶ 4, and he has testified before Congress five times on terrorism-related issues, id. ¶ 6; Tr. I at 20:20–21:3.  At the hearing and in his report, Roggio addressed the history of the terrorist syndicate in Afghanistan, the history of Iran's support

---

[4] The transcripts of the bellwether hearings are continuously paginated.  For ease of reference, the Court will cite the transcripts both by volume (e.g., Tr. I, II) and by page and line number.

for global terrorism, and Iran's support for the terrorist syndicate operating in Afghanistan.  <u>See</u> Tr. I at 22:3–24; Roggio Report ¶¶ 8–10.  Roggio relied on a wide array of evidentiary sources, including proclamations from terrorist groups, U.S. government reporting, scholarly analyses, and contemporaneous press reporting.  Roggio Report ¶¶ 11–22; Tr. I at 23:7–24:4.

### 2. Dr. Colin Clarke

The Court qualified Dr. Clarke as an expert in "Middle Eastern terrorism."  Tr. II [ECF No. 63] at 136:19–23.  Dr. Clarke is the Director of Policy and Research at the Soufan Group, an intelligence consulting firm specializing in "[t]errorism, insurgency, . . . [and a] whole range of national-security-type topics and issues."  <u>Id.</u> at 130:22–131:9; <u>see</u> Expert Witness Report, Dr. Colin Clarke [ECF No. 59-2] ("Clarke Report") at 1–3.  Before his work at the Soufan Group, Dr. Clarke served as an adjunct and assistant professor teaching courses on terrorism and insurgency, worked as a political scientist for the RAND Corporation advising federal government actors, and presented research around the world, including to the U.S. military.  Tr. II at 132:2–133:5.  As a part of his work, Dr. Clarke travelled to Afghanistan to work on an interagency task force researching the confluence of Afghan officials and terrorists in corrupt activities such as drug trafficking.  <u>Id.</u> at 133:6–22.  In the present case, Dr. Clarke's research centered on providing "a history and overview of the Taliban, including its organizational structure . . . to describe the relationship between Iran and the Taliban," and assessing whether the Taliban was involved in particular attacks.  Tr. II at 134:19–25; Clarke Report at 1.  In rendering his opinion, Dr. Clarke examined primary and secondary sources and employed a "comparative analysis method" to determine whether his conclusions were "consistent with those of other scholars and practitioners."  Clarke Report at 4; <u>see</u> Tr. II at 135:1–136:1.

### 3. *Lt. Col. Steven Wood (Ret.).*

The Court qualified Lt. Col. Wood as an expert in "attack attribution analysis." Tr. IV [ECF No. 66] at 361:15–17, 362:2–8. Lt. Col. Wood is currently the Director of Corporate Development for Data Machines Corporation, an artificial intelligence company. Expert Report of Steven A. Wood, LTC, USA (Ret.) [ECF No. 59–3] ("Wood Report") ¶ 1. He has "extensive experience in intelligence and weapons analysis related to U.S. counterterrorism operations," especially in Afghanistan. Wood Report ¶ 1. Lt. Col. Wood served in the U.S. Army for 22 years, including service in the Joint Improvised Explosive Device Defeat Organization ("JIEDDO"), and in Combined Joint Task Force Paladin, a military command in Afghanistan "dedicated to the counter-IED fight." Tr. IV at 353:8–355:9; Wood Report ¶ 2. He also worked as Director of Operations for the Advanced Geospatial Intelligence office at the National Geospatial-Intelligence Agency, where he "developed and managed processes for targeting Afghan insurgent groups and their logistics supply chain." Wood Report ¶ 3; Tr. IV at 355:12–356:6. Throughout the mid-to-late 2010s, Lt. Col. Wood repeatedly deployed to Afghanistan to serve as an intelligence and operations advisor. Wood Report ¶ 3; Tr. IV at 356:14–357:18.

Lt. Col. Wood rendered opinions about the operations of the terrorist syndicate in Afghanistan from 2007 to 2019, the syndicate's responsibility for each of the eleven bellwether attacks, and whether Iran's support enhanced the syndicate's ability to commit its attacks. Wood Report ¶ 7. He relied on similar primary sources as those used by Mr. Roggio and Dr. Clarke, particularly information provided by terrorist groups and analysis from U.S. government reports, in addition to secondary sources like press reports and academic articles. Wood Report ¶ 9.

## II.   **Legal Standard**

Although a more thorough discussion of the legal framework applicable to default actions under the FSIA will follow, the Court will begin by setting out the relevant legal and evidentiary standards.   Federal Rule of Civil Procedure 55(b) provides that, where damages sought from a defaulting party are not for a sum certain or readily susceptible to computation, "the party must apply to the court for a default judgment."   The entry of a default judgment "is not automatic," Mwani v. bin Laden, 417 F.3d 1, 6 (D.C. Cir. 2005); in the context of the FSIA, a court may not enter a default judgment against a foreign state "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court," 28 U.S.C. § 1608(e); accord Roeder v. Islamic Republic of Iran, 333 F.3d 228, 232 (D.C. Cir. 2003).

"'[T]he FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide,' and '[u]ncontroverted factual allegations that are supported by admissible evidence are taken as true.'" Karcher, 396 F. Supp. 3d at 21 (alterations in original) (first quoting Han Kim v. Democratic People's Republic of Korea, 774 F.3d 1044, 1047 (D.C. Cir. 2014); and then quoting Thuneibat v. Syrian Arab Republic, 167 F. Supp. 3d 22, 33 (D.D.C. 2016)).   In default-judgment cases involving terrorism, courts should liberally construe the Federal Rules of Evidence to ensure that state sponsors of terrorism cannot "effectively immunize themselves by killing their victims, intimidating witnesses, and refusing to appear in court." Han Kim, 774 F.3d at 1048.   "[I]ndeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required." Owens v. Republic of Sudan, 864 F.3d 751, 785 (D.C. Cir. 2017) (internal citation omitted), vacated & remanded on other grounds sub nom. Opati v. Republic of Sudan, 140 S. Ct. 1601 (2020).

III.     **Findings of Fact**

At this stage in the litigation, the issue before the Court is whether Iran is liable for the eleven bellwether attacks against U.S. servicemembers and nationals in Afghanistan between 2008 and 2017.   The following findings of fact are based on testimony presented at the bellwether hearing and the evidence submitted before and during that hearing; the Court was also guided by plaintiffs' thorough proposed findings of fact.  The following findings will be divided into three major categories:  (A) the existence of a terrorist syndicate operating in Afghanistan during the relevant time period; (B) Iran's material support for that syndicate; and (C) the syndicate's responsibility for each of the bellwether attacks in this case.[5]

A.  **The Terrorist Syndicate Operating in Afghanistan**

From at least 2006 to 2019, multiple terrorist groups operated in Afghanistan, most prominently including the Taliban.  Tr. I at 25:24–26:21 (Roggio); see Roggio Report ¶¶ 27–28, 31, 33.  Many of these groups—including the Taliban, the Haqqani Network, the Kabul Attack Network, and al-Qaeda—made up a terrorist "syndicate," see, e.g., Tr. I at 25:24–26:21 (Roggio); Roggio Report ¶¶ 23, 32–33, which Dr. Clarke defined as "a group of terrorists or terrorist organizations combined to promote a common interest," Clarke Report at 12.  The syndicate at issue here "came together to attack Western and Afghan government targets."  Id.; accord Roggio Report ¶ 23 ("The Syndicate provided a superstructure that organized and facilitated a range of terrorist attacks in Afghanistan.").  In 2009, then-Secretary of State Hillary Clinton explained that the U.S. government saw these groups "not as separate independent operators that occasionally

_____

[5] The Court's subject-matter jurisdiction also depends in part upon these findings because a foreign state is not entitled to sovereign immunity against suits seeking damages for "the provision of material support or resources" for acts of "extrajudicial killing" or "hostage taking."  28 U.S.C. § 1605A(a)(1).  The Court will address its jurisdiction under 28 U.S.C. § 1605A & § 1330 below, after setting forth its findings of fact.

cooperate with one another, but as part of a syndicate of terrorism. . . . [T]he level of operational cooperation, training, equipping, financing has grown exponentially." <u>Afghanistan: Assessing the Road Ahead: Hearing Before the S. Comm. on Foreign Rels.</u>, 111th Cong. 24 (2009) (statement of Sec. Hillary Clinton, U.S. Dep't of State); <u>see</u> Roggio Report ¶ 28; Tr. I at 26:22–28:7, 50:19–51:6 (Roggio); Clarke Report at 12.

The members of the terrorist syndicate operating in Afghanistan ("the Syndicate")—the Taliban, al-Qaeda, the Haqqani Network, and the Kabul Attack Network—shared close strategic, tactical, and operational coordination, which enabled each group to make its operations more lethal for American forces.  Tr. I at 25:24–26:21 (Roggio).  And they shared a common goal:  re-establishing the Islamic Emirate by driving the United States and its allies out of Afghanistan by "driving up the cost for U.S. presence . . . by killing and wounding American troops."  <u>Id.</u> at 26:11–21; Roggio Report ¶ 23; <u>accord</u> Clarke Report at 82; Tr. II at 162:11–18 (Clarke); Wood Report ¶ 95.

There were four major players in the Syndicate:  the Taliban, the Haqqani Attack Network, the Kabul Attack Network, and al-Qaeda.

### 1.  *The Taliban*

The Taliban was originally founded in 1994, in the aftermath of the Soviet Union's occupation of Afghanistan, by a group of students who had studied at religious schools in Pakistan. Tr. II at 137:25–138:13 (Clarke); Roggio Report ¶¶ 36–37.  Mullah Mohammad Omar organized these students into a Sunni jihadist fighting force and mobilized them to overthrow the Afghan government and impose Sharia law.  Tr. I at 29:23–30:15 (Roggio); Roggio Report ¶ 37.  From its home in the Kandahar Province, in southeastern Afghanistan, the Taliban began to seize territory; in 1996, the group captured the capital city of Kabul and proclaimed the Islamic Emirate of

Afghanistan.  Tr. I at 30:16–17 (Roggio); Roggio Report ¶ 39.  After Osama bin Laden was expelled from Sudan in 1996, he returned to Afghanistan, where the Taliban provided him and the rest of al-Qaeda with a safe haven in exchange for financial support.  Tr. II at 139:21–140:3 (Clarke); see Roggio Report ¶¶ 86–89.  By September 2001, the Taliban de facto controlled the country, though they did not function as a government.  Roggio Report ¶ 39, 41.

After the terrorist attacks against the United States on September 11, 2001, the Taliban refused to surrender bin Laden to the United States.  Roggio Report ¶ 42; Tr. I at 49:23–50:18 (Roggio).  This ultimately led to the American invasion of Afghanistan on October 7, 2001.  Roggio Report ¶ 42; Tr. II at 140:15–18 (Clarke).  By December, the Taliban had withdrawn from Kabul and were effectively defeated; the group's leadership and fighting forces fled to countries including Iran and Pakistan. Tr. II at 140:16–23 (Clarke); Roggio Report ¶ 42.  In December 2001, the United Nations authorized the formation of the International Security Assistance Force ("ISAF" or "Coalition") to maintain security in Kabul and support the Afghan government's efforts to rebuild; NATO took command of ISAF in August 2003.  Roggio Report ¶ 43.  In January 2004, Afghanistan ratified a new constitution and formed the Islamic Republic of Afghanistan, led by President Hamid Karzai.  Id.

The Taliban was not invited to participate in the process of drafting the constitution or forming the government.  Roggio Report ¶ 43.  Neither the UN nor the United States ever recognized the Taliban as the lawful government of Afghanistan, and from 2006 to 2019 (the time period relevant to the attacks at issue in this litigation), the lawful government of Afghanistan was the Islamic Republic of Afghanistan.[6]  Roggio Report ¶ 41; Tr. I at 31:10–12 (Roggio).  Neither

---

[6] Indeed, even before September 11, 2001, only Pakistan, Saudi Arabia, and the United Arab Emirates ever recognized the Taliban as the government of Afghanistan.  By late November 2001, all three had withdrawn their recognition of the Taliban.  Roggio Report ¶¶ 41–42.

that lawful government nor any regularly constituted Afghan court ever authorized any Syndicate-led terrorist attack against U.S. forces. Tr. I at 31:10–18 (Roggio).

But as the lawful Afghan government took form, "the Taliban—with the help of Iran, Al Qaeda, Pakistan, and other jihadist allies—plotted its comeback." Roggio Report ¶ 44. Its three primary goals were to expel the United States and NATO forces, to undermine and defeat the new Afghan government, and to reestablish the Islamic Emirate of Afghanistan. Id. From its extensive infrastructure of training camps, command centers, and supply depots just across Afghanistan's southeastern border in Pakistan, the Taliban began to launch offensives against NATO, U.S., and Afghan forces. Id. These attacks increased in frequency and spread throughout the country: by 2006, ISAF was engaged in military operations across southern Afghanistan, and by 2008, Taliban insurgency was spreading across the country. Id. ¶¶ 44–45. In 2009, the United States responded with a troop surge, adding 30,000 troops to the almost-70,000 already present in Afghanistan. Id. ¶ 45. Although the surge was temporarily effective, the Taliban regained its foothold quickly after the United States began to withdraw forces in 2011. Id. ¶¶ 45–46.

The Taliban is organized under an emir, who also functions as a faith leader (originally Mullah Mohammad Omar, now Mullah Hibatullah Akhundzada). Tr. I at 32:15–20 (Roggio); Tr. II 141:4–7, 144:23–145:1 (Clarke). Under the emir is a leadership council called the Rahbari Shura, also known as the Quetta Shura. Tr. I at 32:22–33:4 (Roggio); Tr. II at 141:7–15 (Clarke). The Rahbari Shura provides strategic guidance to other, lower-level shuras and Taliban groups based on guidance from the emir. Tr. I at 32:22–33:4 (Roggio); Tr. II at 142:6–12 (Clarke); Roggio Report ¶¶ 51–57. During the times relevant to these events, the Rahbari Shura also collected and disseminated funds and resources to regional shuras and other groups. Tr. II at 145:7–12 (Clarke). The Rahbari Shura exerts "a significant or high level of control" over the Taliban; when it issues

14

"key directives on how to fight, on how to implement Sharia law or what to do with the courts, . . . these directives are followed."  Tr. I at 33:7–16 (Roggio).

Below the Rahbari Shura are other regional shuras, headed by leaders from the Rahbari Shura.  Tr. I at 34:21–35:6 (Roggio); Tr. II at 141:5–10 (Clarke).  Within their regions, these lower level shuras direct military and support operations and take political actions like appointing local governors.   Roggio Report ¶ 51; Tr. I at 35:12–25 (Roggio).   The Miranshah (also spelled "Miramshah") Shura, formed in 2002 or 2003, pledged fealty to the Rahbari Shura.  Tr. II at 141:20–142:5 (Clarke).  It was based in Pakistan, on the southeastern border of Afghanistan, but its influence spread over time to include Loya Paktia, Ghazni, Logar, and Wardak Provinces of Afghanistan, as well as Kabul.  Tr. I at 39:21–40:5 (Roggio); Tr. II at 148:13–24 (Clarke); Clarke Report at 49.  Among the leaders of the Miranshah Shura were Jalaluddin Haqqani and later his son, Sirajuddin ("Siraj") Haqqani, whose terrorist group, the Haqqani Network, is discussed further below.  Tr. II at 141:20–23 (Clarke).

In 2005, the Taliban formed the Peshawar Shura to exert control over the northern and northeastern regions of Afghanistan—specifically in Nangarhar, Laghman, Kunar, Nuristan, Wardak, Parwan, and Kapisa Provinces—as well as in Kabul in collaboration with the Miranshah Shura.  Clarke Report at 12–13, 29; Tr. II at 148:5–10 (Clarke).  Sirajuddin Haqqani installed his brother, Khalil Haqqani, as leader of the Peshawar Shura.  Clarke Report at 14.  Next, in 2007, the Mashhad Shura opened as an office of the Rahbari Shura in Iran.  Tr. II at 155:4–24 (Clarke).  This shura served both diplomatic and terrorist functions, liaising between the Taliban and the Islamic Revolutionary Guard Corps ("IRGC").  Clarke Report at 31.  The Mashhad Shura grew into its own regional shura and, with Iranian support, opened Taliban bases in Iran and began to operate in western and northwestern Afghanistan.  Id.; Tr. I at 105:14–24 (Roggio).  Finally, in 2015, an

element of the Peshawar Shura broke off to form the Shura of the North, headed by the former head of the Peshawar Shura's military commission.  Tr. II at 155:20–24 (Clarke); Clarke Report at 32.  By 2017, the Shura of the North claimed authority over northeastern Afghanistan and had expanded its operations into Laghman and Nangarhar Provinces.  Clarke Report at 32–33.  In addition, this shura received significant financial support from Iran.  Id.  Other groups within the Taliban's leadership structure worked as committees with specific tasks, including defense, finance, and intelligence, implementing strategy and directives in their topical areas.  Tr. I at 34:24–35:11 (Roggio).

### 2. The Haqqani Network

The Haqqani Network, led by Jalaluddin and Siraj Haqqani, is a terrorist faction of the Taliban which planned and executed terrorist attacks throughout Afghanistan, most prominently in the eastern and southeastern regions of the country, in Paktia, Paktika, and Khost Provinces.  Tr. I at 37:9–38:15, 46:25–47:6 (Roggio); Tr. II at 138:24–139:7 (Clarke), 191:22–192:15 (McGrath); Roggio Report ¶ 59.  In September 2012, the State Department designated the Haqqani Network as a Foreign Terrorist Organization ("FTO"), a designation that remains in place today.  Roggio Report ¶ 60; U.S. Dept' of State, Bureau of Counterterrorism, Foreign Terrorist Organizations, https://www.state.gov/foreign-terrorist-organizations/ (last accessed July 5, 2022).  In contrast, the Taliban itself is a Specially Designated Global Terrorist ("SDGT") organization.  Tr. I at 46:10–12 (Roggio).  But despite this apparent distinction, there is "no difference between the Haqqani Network and the Taliban.  They are one and the same."  Id. at 39:8–9.  They share leadership (including, as noted above, Jalaluddin and Sirajuddin Haqqani), id. at 37:16–20, 38:10–15, and the two groups reject any distinction between themselves, id. at 39:8–18; Roggio Report ¶¶ 60, 73–

74; see Tr. II at 143:8–20 (Clarke).[7]  For instance, in response to the designation of the Haqqani Network as an FTO, the Taliban specifically disclaimed the view that the two groups are distinct. Tr. I at 43:1–44:6 (Roggio); Roggio Report ¶¶ 65–67.  The Taliban and the rest of the Syndicate benefitted from the Haqqani Network's expertise in conducting acts of terrorism, some of which, like the use of suicide tactics, the Haqqani Network gleaned from al-Qaeda.  Tr. I at 44:9–46:4 (Roggio); Roggio Report ¶¶ 78–80.

### 3.  The Kabul Attack Network

The Kabul Attack Network, another subset of the Taliban and the greater Syndicate, focused on conducting effective attacks in and around Kabul to achieve the Syndicate's goal of expelling American and Coalition forces and weakening the lawful Afghan government.  Tr. I at 59:8–60:7 (Roggio); Tr. II at 149:6–12 (Clarke); Roggio Report ¶¶ 117–18.  The Haqqani Network and its leaders played a key role in the group.  Roggio Report ¶ 120; Tr. II at 149:15–19 (Clarke). In creating the Kabul Attack Network, the Syndicate "pooled its resources," gathering and sharing personnel, equipment, and safe houses to carry out high-profile attacks in Kabul "that would make the news [and] cause discomfort in the United States" with targets including hotels, schools, mosques, restaurants, military headquarters and convoys, and Afghan government buildings.  Tr. I at 59:23–60:7 (Roggio); see Roggio Report ¶¶ 118–22; Clarke Report at 12–13.

### 4.  Al-Qaeda

Al-Qaeda is a Sunni jihadist organization that seeks to establish a global caliphate.  Tr. I at 48:21–24 (Roggio).  Founded by Osama bin Laden and Abdullah Azzam as the Soviet occupation of Afghanistan ended, al-Qaeda sought to harness the network of Afghani mujahedeen fighters

---

[7] The U.S. government often designates one element of a terrorist group before the group itself, like the IRGC's Qods Force (designated as an SDGT organization in 2007) and its parent group, the IRGC (designated in 2017).  Roggio Report ¶ 76 & n.162.

into a unified force.  Id. at 48:24–49:8; see Roggio Report ¶¶ 81–82.  Al-Qaeda proclaimed that it was at war with the United States and Israel in 1996 and 1998.  Tr. I at 49:15–17 (Roggio); Roggio Report ¶ 86.  It has carried out terrorist attacks around the world, including the 1998 attacks on the U.S. embassies in Kenya and Tanzania and the September 11, 2001 attacks on the United States.  Tr. I at 49:17–20 (Roggio).  The U.S. State Department designated al-Qaeda as an FTO in October 1999.  Roggio Report ¶ 91; Pls.' Ex. 75[8] (press release on FTO designation of al-Qaeda).  After the events of September 11, 2001, the Taliban strengthened its ties to al-Qaeda by refusing to hand over bin Laden and other senior al-Qaeda leaders to the U.S. government.  Roggio Report ¶ 93.  In return for safe haven and support inside Afghanistan, al-Qaeda assisted the Taliban in recapturing Afghanistan.  Roggio Report ¶¶ 93–95; Clarke Report at 37–39; Tr. I at 49:25–50:18 (Roggio).

Like the other groups in the Syndicate, al-Qaeda shares personnel with the Taliban.  Tr. I at 51:1–6 (Roggio).  These so-called "dual-hatted terrorists," who fight for both the Taliban and al-Qaeda, include Sirajuddin Haqqani, who has described the Taliban's cooperation with al-Qaeda as "at the highest limits."  Roggio Report at ¶ 104 (citation omitted); Tr. I at 51:19–52:13 (Roggio).  Other dual-hatted terrorists include leaders and members of regional Taliban shuras and members of the Haqqani Network.  E.g., Tr. I at 51:2–5, 54:7–23, 55:12–24 (Roggio); Roggio Report ¶¶ 101–06.

Al-Qaeda provided significant operational support to the Taliban in planning and authorizing terrorist attacks.  This included aiding the Taliban in developing tactics, especially suicide bombings, by providing ideological and technical expertise; al-Qaeda also paid the families of Taliban suicide bombers.  Roggio Report ¶ 108; Tr. I at 56:14–24 (Roggio).  Taliban insurgents

---

[8] Plaintiffs provided paper and electronic copies of their exhibits to the Court during the evidentiary hearing. They are not available on the docket.

trained at al-Qaeda camps both within and outside Afghanistan.  Roggio Report ¶¶ 112–13.  And a component of al-Qaeda fought alongside the Taliban and later reorganized and embedded itself within the Taliban's structure, fielding small units and embedding military trainers who instructed Taliban fighters on waging a successful insurgency.  Roggio Report ¶ 108; see id. ¶¶ 109–11.

### B. Iran's Material Support for the Terrorist Syndicate

Iran is a major state sponsor of global terrorism, and particularly of terrorism against the United States.  Tr. I at 61:7–12 (Roggio); Roggio Report ¶ 123; see generally Pls.' Ex. 7 at 172–73 (U.S. Department of State's 2007 Country Reports of Terrorism describing Iran as "the most active state sponsor of terrorism" and citing its support for "Taliban fighters in Afghanistan" and al-Qaeda members detained in Iran).  The United States designated Iran as a state sponsor of terrorism in 1984, and that designation has remained in place ever since.  Tr. I at 79:2–14 (Roggio); Roggio Report ¶ 125.  Iran's efforts in Afghanistan are part of its mission "to promote its Islamic revolution throughout the Middle East" and expand its influence by defeating local governments it perceives as threats and "driv[ing] the U.S. and the West out of the Middle East."  Tr. I at 63:2–7 (Roggio).

The IRGC is "the primary driver of Iran's terror activities."  Roggio Report ¶ 126.  Founded by Iran's first Supreme Leader, it has become an official entity that reports directly to the current Supreme Leader, Ayatollah Ali Khamenei.  Id.  The IRGC protects Iran's regime and attempts to impose its clerical regime on other Muslim nations throughout the Middle East, providing military forces, directing much of Iran's economy, and implementing a global campaign of terrorist activity.  Id.  Although the IRGC exists in parallel to Iran's military, it is considered "the military vanguard of Iran."  Id. ¶ 127 (citation omitted).  The U.S. Department of State designated the IRGC as an FTO in 2019, citing its support for terrorist organizations including al-Qaeda.  Pls.' Ex. 74

at 1–3.  "The IRGC has been directly involved in terrorist plotting[, and] [i]ts support for terrorism is foundational and institutional . . . ."  Tr. I at 70:18–20 (Roggio) (quoting Pls.' Ex. 74 at 2).

The IRGC's special operations branch, the Qods Force, is "Iran's primary mechanism for cultivating and supporting terrorists abroad," and Iran uses it "to implement foreign policy goals, provide cover for intelligence operations, and create instability in the Middle East."  Pls.' Ex. 15 at 300 (State Department's 2015 Country Reports on Terrorism); see Tr. I at 69:17–25 (Roggio); Roggio Report ¶ 130.  The Qods Force was designated as an SDGT in October 2007.  Roggio Report ¶ 76; Tr. I at 47:14–15, 70:1–2 (Roggio).  Iran's Supreme Leader directly oversees the Qods Force's actions.  Tr. I at 72:7–12, 20–22 (Roggio); Roggio Report ¶¶ 131, 133; see also Pls.' Ex. 221 at 27 (declassified 2007 Counter-IED Operational Integration Center report providing organizational chart of Qods Force leadership).  The Qods Force works with non-Iranian partners, proxies, and affiliates, notably Hezbollah, which was responsible for, among other attacks, the 1983 bombing of the U.S. Marine barracks in Beirut.  Tr. I at 63:9–64:14 (Roggio); Roggio Report ¶¶ 139, 141–42; Pls.' Ex. 198 at 68 (2019 Defense Intelligence Agency report on Iran Military Power).

Although Iran is a Shia regime, the Qods Force allies with certain Sunni terrorist groups, including Hamas.  Tr. I at 64:15–65:1 (Roggio).  In places where there are no major Shia organizations with which to ally, Iran partners with other groups (like the Taliban in Afghanistan) that share its goals of expelling the United States and reinstating the Islamic Emirate.  Id. at 64:15–65:7.  The Qods Force's branch in Afghanistan is known as the Ansar Corps or the Fourth Corps.  Id. at 74:16–25; Roggio Report ¶¶ 132, 152–53.  From its headquarters in Mashhad, Iran, very close to Iran's border with Afghanistan, Roggio Report ¶ 152; Pls.' Ex. 207 at 7 (JIEDDO report listing locations of Qods Force command locations), the Ansar Corps directs terrorist and political

operations on Iran's behalf inside of Afghanistan, Tr. I at 75:1–20 (Roggio); Pls.' Ex. 194 at 6

(2011 Counter Insurgency Targeting Program report on Iran's activity in Afghanistan).[9]

In addition to its relationship with the Taliban, and by extension the rest of the Syndicate,

Iran shares a close relationship with al-Qaeda.  Tr. I at 108:9–11 (Roggio); see generally Roggio

Report ¶¶ 231–47.  Iran has supported al-Qaeda's activities around the world (for example, in the

1998 Hezbollah/al-Qaeda attacks on the U.S. embassies in Kenya and Tanzania).  Tr. I at 108:19–

109:9 (Roggio); Roggio Report ¶¶ 233–34.  After the September 11 attacks, Iran and al-Qaeda had

a "secret deal" that Iran would serve as al-Qaeda's base of operations and provide safe haven for

al-Qaeda terrorists and their families who were driven from Afghanistan.  Tr. I at 109:10–21

(Roggio); Roggio Report ¶¶ 235–37.   In 2007, Osama bin Laden described Iran as al-Qaeda's

"main artery for funds, personnel, and communication, as well as the matter of hostages."  Pls.'

Ex. 252 at 1 (translation of Osama bin Laden's statement); see Tr. I at 110:4–111:20 (Roggio)

(describing how the U.S. government came to possess that statement); Roggio Report ¶ 236.[10]

And the U.S. government has linked several high-ranking al-Qaeda officers to Iran in terrorist

designations and other reporting.  E.g., Tr. I at 115:2–118:24 (Roggio); Roggio Report ¶¶ 237–39,

247.  The same close relationship extended to al-Qaeda's operations in Afghanistan:  Iran's support

of al-Qaeda allowed it to exist insulated from the pressures of American and Coalition forces in

---

[9] The evidence confirming Iran's material support of the Syndicate includes the terror designations of
particular IRGC and Qods Force officers.  Tr. I at 77:21–78:5 (Roggio).  In August 2010, for example, the U.S.
Treasury Department designated the commander of the Ansar Corps, General Hossein Musavi, as an SDGT, in part
because of his responsibility for Qods Force activities in Afghanistan and provision of financial and other support to
the Taliban.  Id. at 78:15–79:1; Roggio Report ¶ 152 (also noting that another Qods Force senior officer, Colonel
Hasan Mortezavi, was designated as an SDGT for his provision of financial and material support to Taliban members);
see Pls.' Ex. 73 (Treasury Department press release on designations of Musavi, Mortezavi, and other Qods Force
senior officers).

[10] Indeed, bin Laden chided al-Qaeda subordinates for animosity towards the Shia, reasoning that a
relationship with Shia Muslims was important in maintaining al-Qaeda's relationship with Iran.  Pls.' Ex. 252 at 1–2;
Tr. I at 110:4–14 (Roggio); see Roggio Report ¶ 232.

Afghanistan and, in turn, al-Qaeda provided tactical and operational support to the Syndicate in Afghanistan.  Tr. I at 119:20–120:9 (Roggio).

Iran supports terrorist proxies as part of its overarching mission to promote Islamic revolution in the Middle East.  Tr. I at 62:25–63:7 (Roggio); Roggio Report ¶¶ 124–25.  In Afghanistan, Iran's goal—much like the Syndicate's—was to end the American and Coalition occupation by killing and wounding American soldiers.  Tr. I at 120:11–18 (Roggio); Roggio Report ¶ 248.  Iran's support significantly contributed to the Syndicate's success in this mission, Tr. I at 121:2–5 (Roggio); the United States nearly defeated the Taliban in 2001, but Iran's safe haven and support allowed the Taliban to regroup, and Iran's well-developed expertise in supporting terrorist insurgencies around the world enabled the Taliban to become stronger and more effective, see generally Roggio Report ¶¶ 241–49.  Iran's support was fungible:  although Iran, the IRGC, and the Qods Force may not have been involved in the details of individual attacks, the money, training, weapons, and expertise Iran provided were critical to the Syndicate's success.  Tr. I at 123:21–124:13 (Roggio).  Through cross-cutting organizational support, Iran substantially contributed to all eleven of the bellwether attacks at issue in this proceeding.  Id. at 122:25–123:21; Roggio Report ¶ 256.

Iran provided four main types of material support to the Syndicate:  weapons, training, financial support, and safe haven.  Tr. I at 61:15–18 (Roggio); see Pls.' Ex. 198 at 68.  Iran also assisted in the Taliban's drug-trafficking operations, which helped to finance the Syndicate's efforts to expel U.S. troops and restore the Islamic Emirate.  Tr. II at 152:12–153:17 (Clarke); Clarke Report at 82–83.

### 1.  *Weapons and Explosives*

Iran provided a range of weapons to the Syndicate including small arms (e.g., AK-47s and other assault rifles), anti-tank missiles, rocket-propelled grenades, surface-to-air missiles, improvised explosive devices ("IEDs"), explosively formed penetrators ("EFPs"), rockets, mortars, indirect fire weapons, recoilless rifles, PKM machine guns, ammunition, and components for suicide attacks (e.g., triggers and detonators).  Roggio Report ¶¶ 182–84; Tr. I at 83:15–84:1 (Roggio); Tr. II at 165:1–7 (Clarke); Pls.' Ex. 198 at 68.  Iran has provided lethal weapons to the Taliban in Afghanistan since at least 2006, Pls.' Ex. 7 at 192 (State Department's 2009 Country Reports on Terrorism), and its support has not been limited to a single region:  weapons from Iran flowed throughout all provinces, Tr. I at 87:13–17 (Roggio).  Iran's goal in providing these weapons was to increase the Syndicate's power, and in so doing, to combat the U.S. military presence in Afghanistan.  Roggio Report ¶ 186 (timeline and sources of Iranian exports of weapons to Afghanistan); Tr. I at 87:3–12 (Roggio); Pls.' Ex. 207 at 7 ("Iran provides arms and funding to Afghan insurgents . . . .  Iran's intentions are . . . to develop, fund, and arm proxy networks to leverage against the perceived U.S. aim of pursuing an active regime change doctrine in Iran.").[11]

### 2.  *Training*

Iran provided a variety of training to Taliban fighters, including on small unit and infantry tactics, techniques for executing complex attacks (for example, initiating an attack with a suicide

---

[11] For example, declassified intelligence reporting shows that the IRGC provided weapons, including IEDs, to the Taliban's shadow governors of various provinces.  The shadow governor of Farah Province, Haji Yusouf, received 180 machine guns, which he disseminated to subordinate commanders throughout the province to attack Afghan and Coalition forces, amplifying the impact of the Taliban and Iran across Farah Province.  Pls.' Ex. 227 at 6 (2011 National Ground Intelligence Center ("NGIC") reporting depicting and describing this distribution of weapons); see Tr. I at 89:12–22, 90:10–92:1 (Roggio).  And the shadow governor of Helmand Province, Mullah Naim Barich, the Taliban's main representative to Iran, received Iranian weapons which he disseminated throughout Helmand and Nimroz Provinces to attack U.S. and Coalition forces.  Pls.' Ex. 228 at 19 (2014 NGIC reporting depicting and describing this provision of weapons); see Tr. I at 92:2–93:17 (Roggio).

bomb), and intelligence gathering and planning.  Tr. I at 94:18–95:4 (Roggio); Tr. II at 163:15–

165:7 (Clarke); see generally Roggio Report ¶¶ 202–22.  The Qods Force sent trainers into

Afghanistan to teach Taliban fighters how to use various weapons like small arms, explosives, and

indirect-fire weapons.  Tr. I at 95:23–96:6 (Roggio); Roggio Report ¶¶ 211–13; Pls.' Ex. 9 at 192

(State Department's 2009 Country Reports on Terrorism describing Qods Force training in

Afghanistan).  Iran also trained Taliban fighters inside Iran, Tr. I at 96:7–10 (Roggio):  from 2005

or 2006 until the fall of the Afghan government in 2021, Iran operated training camps near its

border with Afghanistan, with sites in Tehran, Mashhad, Zahedan, and the province of Kerman,

id. at 96:15–24; Roggio Report ¶ 218 & fig. 11.  This training, free from the pressure of Afghan

and Coalition forces, allowed the IRGC to train Taliban fighters over a longer term and on more

complex tactics.  Tr. I at 97:5–25 (Roggio).  Taliban fighters who trained in Iran returned to

Afghanistan and trained additional Taliban fighters in the techniques they learned, magnifying the

effect of Iran's training and exponentially increasing the lethality and efficacy of Taliban attacks

in Afghanistan.  Id. at 98:9–19.

### 3. *Financial Support*

Iran provided two main forms of financial support to the Syndicate.  First, Iran provided

cash to key Taliban leaders so they could buy weapons and other materials to disseminate

throughout the regions where they operated.  Tr. I at 98:20–99:3 (Roggio); Roggio Report ¶ 223.

These regions included areas on both Iran's border with Afghanistan and central Afghanistan,

including Parwan and Kapisa Provinces.  Tr. I at 102:12–103:21 (Roggio); Pls.' Ex. 229 at 15;

Roggio Report ¶¶ 225–28.  Iran also funded the Kabul Attack Network to aid in its attacks in the

capital city.  Tr. I at 103:11–21 (Roggio).  Second, Iran issued bounties on U.S. and Afghan forces.

Roggio Report ¶ 224.  Iran paid the Taliban various sums of money for killing U.S. troops or

damaging U.S. equipment; this incentivized such attacks and also helped to provide resources for future Taliban attacks.  Id.; Tr. I at 99:3–17 (Roggio).  Iran's financing of the Syndicate was significant because it both facilitated attacks and reduced the Syndicate's need to raise its own funds. Tr. I at 103:22–104:2 (Roggio).

### 4. Safe Haven

Beginning shortly after the September 11 attacks and the American invasion of Afghanistan, Tr. I at 104:22–105:13 (Roggio), Iran provided a safe haven within its borders for Taliban fighters, id. at 104:3–21; Roggio Report ¶ 202.  This form of aid soon grew to a more formal practice after the Taliban opened a regional office in Mashhad, Iran (also the headquarters of the IRGC's Ansar Corps) in 2007, which later became the headquarters of the Taliban's Mashhad Shura, Tr. I at 105:14–106:3 (Roggio).   In November 2009, some of the Taliban's shadow governors—those responsible for the Helmand, Nimruz, Kandahar, Farah and Uruzgan Provinces—traveled to the Iranian city of Zahedan to open a formal office on the Iranian/Afghan border.  Roggio Report ¶ 221; Tr. I at 105:25–106:3, 107:4–25 (Roggio); Pls.' Ex. 194 at 6. From this strategic location, Iran was better able to provide other forms of support, including funding and training, to Syndicate fighters.  Tr. I at 108:1–7 (Roggio); see Pls.' Ex. 194 at 6.  These safe havens in Iran were critical to the Taliban's insurgency, especially because they allowed Taliban fighters to organize, plan, and fundraise free from threat of attack and without American interference.  Tr. I at 104:14–21 (Roggio).

### 5. Drug-Trafficking Operations

Finally, Iran facilitated the Taliban's drug-trafficking operations.  Tr. II at 152:12–15 (Clarke); see generally Clarke Report at 74–82.  Trafficking was "highly lucrative" for the Taliban insurgency, Tr. II at 152:18–23 (Clarke); see also id. at 153:10–17 (estimating that the Taliban

earned about $400 million from drug trafficking in 2021); Clarke Report at 76–77.  After recognizing the potential for income, the Taliban became involved in every step of the process, from taxing poppy farmers to refining and manufacturing poppies into heroin to transporting and selling the drugs.  Tr. II at 152:24–153:9 (Clarke); Clarke Report at 76.  Iran facilitated this drug trafficking by permitting drugs to pass through the Iranian/Afghan border, issuing special license plates to Taliban vehicles and declining to search those vehicles at border entry points.  Tr. II at 153:18–25, 156:1–159:7 (Clarke); Clarke Report at 77–82.  This route through Iran gave the Taliban access to major markets, including Europe and Central Asia.  Tr. II at 156:17–23, 157:5–13 (Clarke).  Iran also provided weapons to drug traffickers as they returned to Afghanistan, and in some instances even worked with smugglers to plan attacks on U.S. forces.  Id. at 153:18–25.[12] From 2006 to 2019, eighty to ninety percent of the world's heroin supply came from Afghanistan.  Id. at 157:14–19.  The scope of this income—in one expert's opinion, a level of financial flexibility "that few insurgent groups can enjoy"—allowed the Taliban to acquire resources for its terrorist operations, all with Iran's assistance.  Id. at 160:18–161:8; Clarke Report at 82.

### C.  The Syndicate's Areas of Operational Dominance (Bellwether Geographies)

Attributing a specific attack to a particular terrorist group—a central issue in this litigation—requires considering two key factors:  geography and the time period in which the attack took place.  Tr. IV at 366:16–367:23 (Wood); Wood Report ¶ 11; see Tr. II at 166:13–20 (Clarke); see generally Clarke Report at 43–44 (discussing which terrorist groups had "operational dominance" in specific provinces at particular times and, based on those conclusions, opining on which Syndicate group likely committed attacks in various provinces).  Indeed, it is often possible to attribute an attack to a particular group based solely on geography and time because, at certain

---

[12] Iran engaged in a similar model of drug-trafficking facilitation with Hezbollah.  Tr. II at 159:8–19 (Clarke).

times and in specific locations, one Syndicate group had such an overwhelming presence that it is highly likely that group carried out any attacks there.  Wood Report ¶ 15; Tr. IV at 375:17–376:3 (Wood).  Thus, before explaining its findings regarding the likely perpetrators of the eleven bellwether attacks, the Court will make findings regarding the Syndicate's areas of operational dominance in seven "bellwether regions" of Afghanistan during the time periods relevant to this case.  These findings will also be useful in later attack attributions of non-bellwether attacks.  The Court will adopt a "sliding scale" approach and use the terminology employed by the experts in this case to describe their levels of certainty, classifying the following geographical findings as "likely" or "very likely."  See Wood Report ¶ 15.

### 1.  Southern Afghanistan

The Taliban "very likely" carried out all the attacks in this case that occurred in the southern region of Afghanistan, which comprises Kandahar and Helmand Provinces.  Tr. II at 168:22–169:25, 178:2–16, 183:8–184:7, 186:10–187:11 (Clarke); Tr. IV at 421:7–22 (Wood); Clarke Report at 44; see generally Clarke Report at 45–48.  Those two provinces are traditional areas of Taliban control, Tr. II at 169:4–6 (Clarke)—indeed, the Taliban originated in Kandahar Province, Clarke Report at 45—and the Taliban was the most prominent insurgent group in the region from 2006 to 2019, with several different strongholds (including the districts of Zhari, Alakozai, and Panjwai, Tr. II at 189:3–18 (McGrath)) from which the group launched attacks, id. at 169:6–8 (Clarke).  The attacks that took place in southern Afghanistan reflected the Taliban's typical tactics, techniques, and procedures ("TTPs").  Id. at 168:22–169:9 (Clarke).  The Taliban was also the main group in Helmand Province, where it controlled large swaths of territory; its Helmand-based strongholds included the districts of Lashkar Gah, Sangin, Musa Qala, and Nowzad.  Id. at 187:2–188:2 (McGrath); Tr. IV at 375:21–376:3, 421:7–22 (Wood); Clarke Report at 46–48.  The

Taliban claimed responsibility for numerous attacks on U.S. and Coalition forces in both Kandahar and Helmand from 2008 to 2019.  Clarke Report at 45–47.  And although other insurgent groups were present in the area at the same time, "they came nowhere close to rivaling the Taliban's grip" on the region.  Id. at 48; see also id. at 47 (reaching similar conclusion as to Kandahar Province).

### 2.  *Loya Paktia*

In Loya Paktia, which comprises Khost, Paktia, and Paktika Provinces, the Haqqani Network "very likely" carried out all the attacks in this case.  Tr. II at 170:16–20 (Clarke); see generally Clarke Report at 44, 48–52.  Loya Paktia, a culturally Pashtun[13] area in southeastern Afghanistan, is a traditional stronghold of the Haqqani Network.  Clarke Report at 48; Tr. I at 37:7–15 (Roggio).  Locals of the region are members of the same tribe as Haqqani Network leaders, and they generally support the Network and the Taliban more broadly.  Tr. IV at 488:14–17 (Wood).  The Taliban's Miranshah Shura, led by Jalaluddin and Sirajuddin Haqqani, oversaw attacks within Loya Paktia.  Tr. II at 148:13–18 (Clarke); Clarke Report at 27; Wood Report ¶¶ 82–84.  Khost Province is a stronghold of the Haqqani Network, and in 2005 Sirajuddin Haqqani identified himself as the leader of the Taliban's military committee for Paktia, Paktika, Khost, Ghazni, and Logar Provinces.  Clarke Report at 48.  As with the Taliban in Kandahar and Helmand, the attacks carried out in Loya Paktia reflected the Haqqani Network's standard TTPs.  Tr. II at 170:16–171:8 (Clarke).  The Network also claimed responsibility for several attacks in the region during the 2007 to 2012 period, and no other group had a meaningful presence in the region.  Clarke Report at 48–49.

---

[13] The Pashtuns, the largest ethnic group in Afghanistan, are a group of ethnic Muslim tribes which were present in Afghanistan before the Soviet occupation; Pashtun members "are traditionally selected for senior role" in the Afghan government, and the group "is largely defined by" its language (Pashto), its Muslim faith, and its ethical code (Pashtunwali).  Wood Report ¶ 23(a); see Roggio Report ¶ 38; Wood Report at 43, 69; Tr. IV at 434:21–24, 456:16–19 (Wood).

### 3. *Kabul Province*

Members of the aptly named Kabul Attack Network, working jointly with the Taliban (including the Haqqani Network), al-Qaeda, and other Syndicate members, "very likely" carried out all the attacks in this case that occurred in Kabul Province.  Tr. II at 171:9–17 (Clarke); see generally Clarke Report at 63–65.  The attacks reflected the Kabul Attack Network's TTPs, Tr. II at 171:9–17 (Clarke), particularly its emphasis on "spectacular" attacks, id. at 149:2–150:1; Tr. IV at 444:5–13 (Wood).  The Kabul Attack Network likely faced no challenges to its operational dominance (at least until ISIS-Khorasan's first attack in Kabul in 2016), and it claimed responsibility for numerous attacks prior to the formation of ISIS-Khorasan.[14]  Clarke Report at 63–65.

### 4. *Eastern Afghanistan/"N2KL"*

In the eastern Afghanistan region comprising Nangarhar, Nuristan, Kunar, and Laghman Provinces—collectively known as "N2KL"—the Taliban, with participation from al-Qaeda, "likely" carried out all the attacks in this case.  Tr. II at 171:18–24 (Clarke); see generally Clarke Report at 44, 58–63.  The Taliban (with al-Qaeda, which had a strong presence in the region because of its safe haven just across the border in Pakistan, Tr. II at 172:7–16 (Clarke)) was the dominant terrorist group in the region during the relevant time period, and the tactics of these attacks reflect the TTPs it usually employed.  Id. at 171:25–172:6.

Based on contemporary reporting and the Taliban's own claims of responsibility for numerous attacks, it is likely that the Taliban was the dominant terrorist organization in Kunar Province from 2007 to 2012; in Laghman Province from at least 2009 to 2011; in Nangarhar

---

[14] One attack in this case occurred after ISIS-Khorasan's first Kabul attack, on January 14, 2019, but the Taliban claimed responsibility for it.  Clarke Report at 65.

Province from at least 2008 to 2015; and in Nuristan Province after 2005.  Clarke Report at 59–63.  Although another terrorist group, Hezb-e-Islami Gulbuddin ("HIG") was present in the same region during the same time periods, its responsibility is less likely:  in Kunar Province, the Taliban actively worked to coopt HIG, and many HIG fighters defected to the Taliban; in Laghman Province, HIG's presence was relatively weak; and in Nangarhar and Nuristan Provinces, HIG defected to the Taliban in 2005.[15]  Id. at 59, 61–63.

### 5. *North Central Afghanistan*

The Taliban "likely" carried out the attacks in this case that occurred in the north central region of Afghanistan, comprised of portions of the Parwan Province and Kapisa, Baghlan, and Kunduz Provinces.  Tr. II at 172:17–20 (Clarke); see generally Clarke Report at 44, 65–71.  Although HIG was also active in all of these provinces, the Taliban displaced it and established operational dominance.  Clarke Report at 65–68, 71.  The Taliban maintained operational dominance in Baghlan Province from 2008 to 2011, id. at 66; in Kapisa Province from 2007 to 2009 (even claiming responsibility for a joint attack on Coalition forces in July 2008), id. at 68–69; and in Kunduz Province from at least 2009 to 2010 (partially evidenced by its seizure of Kunduz City in 2015, suggesting that the group was already deeply entrenched in the area), id. at 69–70.  As to Parwan Province, the Taliban was dominant from at least 2008 to 2016:  multiple sources show that the Taliban was stronger than other insurgent groups, and the Taliban claimed responsibility for at least two attacks (including one on Bagram Airfield).  Id. at 70–71.  All the

---

[15] As in Kabul, ISIS-Khorasan established a presence in Nangarhar Province in 2015, see Clarke Report at 61, but only one attack at issue in this case occurred after 2015.  As discussed below, it appears that the Taliban was responsible for that June 10, 2017 attack, in part because the Taliban subsequently claimed responsibility for another insider attack in Nangarhar.  Clarke Report at 61–62; see infra Part III.d.12.

attacks in this case that occurred in the region displayed the Taliban's standard TTPs.  Tr. II at 172:21–25 (Clarke).

### 6.  *Western Afghanistan*

The Taliban "very likely" carried out all the attacks in this case that occurred in western Afghanistan, comprising Nimruz, Farah, Herat, Baghdis, Ghor, and Faryab Provinces.  Tr. II at 173:22–174:1 (Clarke); see generally Clarke Report at 44, 71–74.  The TTPs used in these attacks matched those used by the Taliban, Tr. II at 174:2–5 (Clarke), and there was no other known insurgent presence in any of those provinces other than Herat at times relevant to this case, Clarke Report at 72–74.  The Taliban very likely had dominance in Baghdis from 2010 to 2011:  by 2009, the Taliban controlled or was free to operate in large swaths of the region, and it claimed responsibility for at least two attacks in 2010 and 2011.  Id. at 71–72.  During at least 2011, the Taliban very likely dominated Farah Province as well, where it claimed responsibility for an attack in 2012.  Id. at 72.  From 2010 to 2012, the Taliban very likely dominated Faryab Province, and the group claimed responsibility for an April 2012 suicide bombing that killed three U.S. soldiers in the region.  Id. at 73.  And through at least 2009, the Taliban very likely dominated Herat Province, where it claimed responsibility for at least one attack in Karukh District in 2009; although HIG was attempting to reorganize itself in Herat Province, it had only a small presence at the relevant time.  Id. at 73–74.

### 7.  *Southeastern Afghanistan*

Finally, the Taliban and the Haqqani Network "very likely" maintained operational dominance and carried out all the attacks in southeastern Afghanistan, which includes Ghazni, Logar, Uruzgan, Wardak, and Zabul Provinces.  Tr. II at 170:1–7 (Clarke); see id. at 178:1–16, 183:8–184:7, 186:18–187:1 (McGrath); see generally Clarke Report at 44, 52–58.  The Taliban

was the most dominant terrorist group in the region, and the attacks in this case reflect the Taliban's TTPs.  Tr. II at 170:8–15 (Clarke).  In Ghazni Province, the Haqqani Network very likely maintained operational dominance during at least 2007 to 2012:  Sirajuddin Haqqani identified himself as the head of the Taliban's military committee for a region including Ghazni and Logar Provinces in February 2005.  Clarke Report at 52.  The Rahbari Shura assigned responsibility for Ghazni to the Haqqani-led Miranshah Shura, and the Taliban claimed responsibility for at least one attack in the province during this time period (a 2012 suicide bombing which killed U.S. troops).  Id. at 52–53.  From at least 2008 to 2013, the Taliban very likely dominated Logar Province.  Id. at 53.  The Taliban's regional shura influenced operations in Logar, and the Taliban claimed responsibility for several attacks there.  Id. at 53–54.  The Taliban also very likely dominated or maintained a stronghold in Uruzgan Province from at least 2007 to 2012 and again in 2019, particularly in the district of Tarin Kowt.  Id. at 55; Tr. II at 190:4–9 (McGrath); Wood Report ¶¶ 234–36.  The Taliban is historically connected to the region (Mullah Baradar, a former deputy leader of the Taliban, is from Uruzgan), and it claimed responsibility for at least one attack there, a 2009 suicide bombing.  Clarke Report at 55.  In Wardak Province, the Taliban very likely dominated from at least 2009 to 2013, claiming responsibility for numerous attacks on U.S. troops; although HIG was present in Wardak, HIG fighters had largely defected to the Taliban by the relevant time period.  Id. at 55–57.  And in Zabul Province, the Taliban very likely had operational dominance from 2008 to 2012, where it claimed responsibility for numerous attacks.  Id. at 57–58; Tr. II at 190:10–191:13 (McGrath).

### D.  Bellwether Attacks

In this section, the Court will explain its findings of fact regarding the eleven bellwether attacks in this case, including its attributions of those attacks to particular Syndicate member

groups.  In sum, the Court concludes that the Syndicate committed all eleven attacks, and that Iran's material support substantially contributed to the Syndicate's ability to do so.  Before delving into the details of each attack, though, the Court will briefly summarize the seven attack categories that the bellwether attacks represent.

### 1. *Attack Categories*

Complex attacks:  Complex attacks are those involving "advanced tactics," Wood Report ¶ 68, which includes the use of multiple units coordinated to achieve a single objective, multiple weapons with phased operations, or sophisticated maneuvers (e.g., commencing an attack with a suicide bomber before proceeding with small-arms fire), id.; Tr. IV at 378:25–379:7 (Wood).  The Taliban often used complex attacks in conjunction with its major offensives:  these attacks often included Taliban fighters hiding weapons and equipment, and later moving into position to use those items.  Wood Report ¶¶ 68–69.  Executing these strategies required reconnaissance and surveillance, and the Taliban often filmed their attack locations before and during these engagements.  Id. ¶ 68.  The Taliban launched complex attacks against Coalition forces using rockets, mortars, and small arms fire, sometimes with hundreds of fighters, and sometimes lasting for several days.  Id. ¶ 69.

IEDs:  In IED attacks, terrorists use homemade bombs to destroy, incapacitate, harass, or distract targets.  Wood Report ¶ 55.  The Taliban used IEDs to disrupt, delay, and damage Coalition forces, allowing the Taliban to inflict casualties without the need for direct engagement.  Id.  The Taliban used IEDs extensively in the Helmand River Valley, and as their efficacy became clear, it began to use them across Afghanistan.  Id. ¶¶ 64, 67.  The use of IEDs was the most prevalent tactic in Afghanistan and caused the greatest number of casualties among Coalition forces.  Tr. II at 195:23–196:9, 198:1–7 (McGrath); 216:14–218:4 (Lemon).   Ammonium nitrate-based

explosives were the most common ingredient in Taliban IEDs; ammonium nitrate is relatively stable, making it easier to move and place inside IEDs.  Wood Report ¶ 57.  But after a shortage, the Taliban began to use Haqqani-Network-provided chlorate and by 2013, more than 65% of identified explosives in Afghanistan were chlorate-based.  Id. ¶ 58.  Between 2006 and 2019, the Taliban used many types of IEDs, including victim-operated pressure plates, command-wire detonated IEDs, remote-controlled IEDs, vehicle-borne IEDs, and suicide-vest—or "person-borne"—IEDs.  Wood Report ¶ 60.  The development in delivery methods reflects the Syndicate's evolution and innovation in techniques as their attacks against U.S. and Coalition forces continued. Id.

Indirect fire attacks:  Indirect fire attacks involve the use of rockets or mortars against an objective.  Wood Report ¶ 71; Tr. IV at 473:5–8 (Wood).  These weapons gave the Taliban an attack method that did not require a direct line of sight on a target; as such, they were often deployed against fortified Coalition bases to harass forces and inflict casualties.  Wood Report ¶¶ 71–72.  Syndicate combatants generally directed indirect-fire weapons by placing them on rocks, sandbags, or metal rails, aimed in the general direction of Coalition targets.  Id. ¶ 72.  But there are examples of more accurate rocket fire, which indicates outside advice and training from more experienced transnational terrorist groups, like al-Qaeda, or state support from Iran or Pakistan.  Id.  More frequent than rocket attacks, though, were mortar attacks, particularly with 82mm mortars.  Id. ¶ 73.  Many mortar attacks were ineffective due to a lack of training, but Taliban insurgents who had trained on mortars (usually with outside groups) and therefore understood the basic mechanics and tactics of a mortar attack were able to use the weapons more effectively.  Id.

Infantry-style tactics:  The Taliban also used traditional infantry-style attacks, including small-arms fire, rocket-propelled grenades ("RPGs"), and recoilless rifle or anti-aircraft attacks. Wood Report ¶ 74; Tr. IV at 426:5–11 (Wood).  These attacks all involve the use of individuals pulling triggers (e.g., a small group of insurgents using AK-47s to fire directly on targets from distances under 300 meters).  Wood Report ¶ 74; Tr. IV at 426:5–11 (Wood).  The Taliban often used RPGs—shoulder-fired weapons that launch small, fin-stabilized rockets with explosive warheads—against Coalition troops, lightly armored vehicles, and "dug-in" defensive positions. Wood Report ¶ 75.  A recoilless rifle (or an SPG-9), by contrast, is a tripod-mounted, portable, 73mm recoilless gun generally used for attacks on vehicles, but it is occasionally used against personnel.  Id. ¶ 76.

Insider attacks:  Insider attacks (also described as "green-on-blue" attacks) became part of the Syndicate arsenal beginning around 2011.  Wood Report ¶ 77.  A Taliban member would feign membership in an Afghan security force before turning on Coalition or true Afghan forces.  Id. ¶ 78; Tr. IV at 498:19–25 (Wood).  To plan these attacks, the Taliban often targeted young men who joined the Afghan National Security forces from Taliban-involved areas.  Wood Report ¶ 78. Once the men finished training and were incorporated into units with access to Coalition forces, the Taliban would harass the planted soldier or threaten his family, in order to induce him to launch the attack.  Id.  When Afghan trainees returned home on leave, the Taliban would recruit them, provide additional training, and give them a way to communicate with the Taliban after the attack ended.  Id.  By 2017, insider attacks killed at least 157 Coalition troops and more than 557 Afghan troops.  Id. ¶ 79.

Suicide attacks:  Particularly favored by the Haqqani Network, suicide attacks involve a terrorist personally delivering an explosive to a target and detonating the explosive, killing himself

in the process.  Wood Report ¶¶ 88–89; Tr. IV at 439:23–440:1 (Wood).  Although suicide bombing is contrary to the Pashtunwali code (to which the Taliban, ethnically Pashtun, subscribes), the Haqqani Network incorporated the practice into the broader Taliban, first by importing foreign fighters seeking martyrdom, and later, in 2011, by publishing a document that provided a religious justification for the use of suicide bombers.  Wood Report ¶ 88.  The Syndicate used two primary types of suicide IEDs:  person-borne (or suicide vest) IEDs, and vehicle-borne IEDs ("VBIEDs").  Id. ¶ 89.  Person-borne IEDs were typically made up of a cloth vest, worn around the bomber's chest, with explosives sewn into the fabric and nails, ball bearings, or other fragments outside the explosive; when the vest detonated, the fragments would function as shrapnel, projecting into the target and inflicting injuries.  Id. ¶ 89–90; Tr. IV at 453:23–454:3 (Wood); e.g., Wood Report ¶ 239 & fig. 37.  The Taliban used person-borne IEDs to penetrate secure areas, assassinate key targets, or detonate in crowds to cause more deaths and injuries.  Wood Report ¶ 90.  VBIEDs, by contrast, are cars, vans, or trucks loaded with explosives.  Id. ¶ 91.  This delivery method allowed insurgents to transport large amounts of explosives, theoretically creating more devastating attacks.  Id.  The Syndicate used VBIEDs to penetrate perimeters during complex attacks, to attack large groups, and to attack armored vehicles.  Id.  VBIEDs frequently caused mass casualties and led to media attention.  Id.  The Kabul Attack Network often used VBIEDs to target Afghan and Coalition officials while they traveled around Kabul City.  Id.

Kidnapping:  The Taliban often kidnapped targets to gain political or economic advantages (e.g., to negotiate the release of detained Taliban fighters), with over 100 confirmed kidnappings of Westerners since 2001.  Wood Report ¶ 305.  To plan a kidnapping, the Taliban persistently surveilled its target to determine the person's pattern of life; rehearsed its attack to ensure its

success in isolating the target; and, at the time of execution, confused the target, applied overwhelming force, and quickly exited the area of the abduction.  See id. ¶¶ 308–311.

### 2.   July 13, 2008 Complex Attack in Waygul District, Nuristan Province

The Taliban, likely with direct assistance from al-Qaeda, committed the complex attack that occurred on July 13, 2008 in the Waygul District, which is in the N2KL bellwether region. Tr. IV at 378:9–379:1, 389:22–390:1 (Wood); Wood Report ¶ 109; see generally Wood Report ¶¶ 109–146.  The plaintiffs who were direct victims of the attack—SSG Jonathan Benton,[16] CPL Jason M. Bogar, 1LT Jonathan P. Brostrom, SGT Israel Garcia, SPC Jason D. Hovater, CPL Pruitt A. Rainey, and CPL Gunnar Zwilling—were all active members of the U.S. armed forces at the time of the attack.  Id. at 379:8–20; Wood Report ¶ 109; see Pls.' Ex. 53 at 25 (listing military units of the soldiers present at the attacks); Pls.' Ex. 256 at 94 (U.S. Army Combat Studies Institute Report on the attack at Wanat, describing SSG Benton as the platoon's "2d Squad leader").  Iran's material support for the Taliban substantially contributed to the Taliban's ability to conduct this attack.  Wood Report ¶ 146(e); see Tr. IV at 411:5–7 (Wood).

The attack occurred at a vehicle patrol base, VPB Wanat (also referred to as Combat Outpost Kahler).  Wood Report ¶¶ 111, 115 & fig. 12; see Pls.' Ex. 256 at 109 (map of Wanat and surrounding area).  It is located in the Waygul Valley, one of a series of narrow valleys between high mountain ranges near the Afghan/Pakistani border.  Tr. IV at 391:8–13 (Wood).  Al-Qaeda maintained a significant presence in the area at the time, and the difficult terrain and proximity to Pakistan made the area a particular point of focus for Taliban and al-Qaeda terrorist activities.  Id. at 392:16–25; Wood Report ¶ 132.  Leading up to the attack, the Taliban and al-Qaeda engaged in

---

[16] Although Col. Wood's report does not mention SSG Jonathan Benton, other sources confirm that he was a victim of this attack.  See, e.g., Pls.' Ex. 256 at 94.

substantial planning:  they surveilled the area in the days preceding the attack, observing the base and the U.S. soldiers from the mountains and a nearby village, Tr. IV at 395:19–398:5 (Wood); Wood Report ¶¶ 133–34; they sought to hide this planning by holding meetings without American leaders present, Tr. IV at 397:3–23 (Wood); Pls.' Ex. 53 at 8; and they diverted water into a nearby irrigation canal to disguise sounds and ensured that no civilians were present at Wanat on the day of the attack, Tr. IV at 397:24–398:5 (Wood); Pls.' Ex. 256 at 123; Pls.' Ex. 53 at 8–9.

The attack began with a burst of machine gun fire at 4:20 a.m. local time, followed by more machine gun and RPG fire from elevated positions around the base focused on key American weapons positions.  Tr. IV at 385:15–21 (Wood); see generally Wood Report ¶¶ 111–27; Pls.' Ex. 256 at 151–62.  SSG Benton was initially located in the main patrol base; he was injured in the RPG portion of the attack.  Tr. IV at 386:7–11 (Wood).  During the initial moments of the attack, all the occupants of an Observation Post ("OP") located a short distance from the base, called OP Topside, Tr. IV at 386:12–16 (Wood); Wood Report ¶ 120 & fig. 13, were either killed or injured; these victims included CPL Bogar and CPL Zwilling, both of whom were killed.  Wood Report ¶¶ 122, 124; Tr. IV at 387:4–17 (Wood); Pls.' Ex. 53 at 10, 15–18 (detailing events at OP Topside).  One individual located at OP Topside contacted the main base to request reinforcements.  Tr. IV at 387:18–24 (Wood); Wood Report ¶ 122.  1LT Brostrom, CPL Rainey, and SPC Hovater reached the OP from the base, but an insurgent who had infiltrated the OP shot and killed them.  Wood Report ¶¶ 123–24; Tr. IV at 387:25–388:16 (Wood).  SGT Garcia then led a second wave of reinforcements to the OP, but he was severely injured as the firefight continued and later died from his wounds.[17]  Tr. IV at 388:22–389:8 (Wood); Wood Report ¶ 125.  SSG Benton, who was part

---

[17] SGT Garcia posthumously received a Silver Star.  It states:  "For Gallantry:  in action on 13 July 2008, during an enemy attack on Vehicle Patrol Base Wanat in Kunar Province, Afghanistan, in support of Operation Enduring Freedom.  Sergeant Garcia's fearless reinforcement of the observation post was pivotal in preventing the

of a third wave of reinforcements, was also injured.  Pls.' Ex. 256 at 173; Tr. IV at 386:10–11, 389:10–21 (Wood).

The evidence supporting the attribution of this attack to the Taliban and al-Qaeda is strong. Complex attacks like this one were a standard Taliban TTP, but, as evidenced by its advance planning, this attack was more sophisticated than usual.  Tr. IV at 400:21–401:5 (Wood); Wood Report ¶¶ 133–39; see Pls.' Ex. 53 at 7–9; Pls.' Ex. 256 at 122–23.  Al-Qaeda, which was active in the region at that time, likely participated:  after the attack, the U.S. military discovered the body of an Arab male, wearing civilian clothes under a camouflage uniform, who was almost certainly an al-Qaeda fighter.  Wood Report ¶ 140; Tr. IV at 401:6–402:5 (Wood).  Moreover, the deputy leader of the local Taliban cell posted a video claiming responsibility for the attack, including corroborating details.  Tr. IV at 402:6–403:9 (Wood); Wood Report ¶¶ 141–42.  The Army Regulation 15-6 Investigation[18] into the attack concluded that it was committed by "Anti-Afghan Forces," Pls.' Ex. 53 at 26, a term used to refer to members of the Syndicate, Wood Report ¶¶ 143–44; Tr. IV at 403:10–21 (Wood).[19]  A further 2010 study of the attack on Wanat, conducted by the U.S. Combat Studies Institute, identifies the Taliban by name as the perpetrator of the attack.  Pls.' Ex. 256 at 19–21, 53, 87, 97; Tr. IV at 403:22–404:11 (Wood).

---

decisive terrain from being overrun, and in allowing C Company to repel the determined enemy assault."  Pls.' Ex. 282 at 9.

[18] After the death of an active-duty soldier, the U.S. Army typically conducts an official investigation of the nature and circumstances, sometimes called an "A.R. 15-6."  Tr. IV at 365:4–13 (Wood); see generally Wood Report ¶ 19(a).  The result of that investigation is the military chain of command's final assessment of the facts and circumstances of the death.  Tr. IV at 365:5–8, :16–20 (Wood).  A.R. 15-6s often provide more than enough information to attribute an attack to a particular terrorist group, even without additional evidence.  Wood Report ¶ 19(a); e.g., Tr. IV at 382:8–12 (Wood).

[19] The United States and the former Afghan government often avoided using the term "Taliban" because it means "student" or "student of Islam," an honor they did not want to bestow on terrorists.  Wood Report ¶ 144; Tr. IV at 372:3–18 (Wood).

### 3. August 16, 2009 IED-Triggered Complex Attack in Siawashan Village, Herat Province

The Taliban committed the IED-triggered complex attack that occurred on August 16, 2009 in Siawashan Village in the Western Afghanistan bellwether region.  Tr. IV at 411:5–7 (Wood); Wood Report ¶ 153; see generally Wood Report ¶¶ 147–67.  The attack involved an IED followed by an ambush.  Tr. IV at 407:16–408:3 (Wood); Wood Report ¶¶ 154–56, 158–60.  The plaintiff who was a direct victim—CPL Nicholas R. Roush—was an active member of the U.S. armed forces at the time.  Pls.' Ex. 51 at 9 (A.R. 15-6 investigation report into CPL Roush's death).  Iran's material support for the Taliban substantially contributed to the Taliban's ability to conduct this attack.  Tr. IV at 416:11–19 (Wood); Wood Report ¶¶ 162–63, 167(b)–(c).

CPL Roush's unit was working to counteract Taliban efforts to interfere with Afghanistan's lawful elections in Siawashan Village, Herat Province.  Tr. IV at 408:18–409:9 (Wood); Wood Report ¶ 149.  Herat borders on Iran, with which it shares cultural and economic ties; in 2009, the Taliban often entered Herat to attack U.S. forces.  Wood Report ¶¶ 154–55; Tr. IV at 413:3–9 (Wood).  After arriving in the village, CPL Roush's unit fell victim to well-aimed AK-47 fire from multiple attackers.  Tr. IV at 409:10–15 (Wood); Wood Report ¶ 150; see generally Pls.' Ex. 51 at 9.  The soldiers were able to repel the attacks and later sought to return to base along a road with a narrow area bounded by a mud wall.  Tr. IV at 409:19–410:6 (Wood); Wood Report ¶ 150.  As the convoy arrived at the narrow area, an IED planted in the wall exploded, killing CPL Roush.  Tr. IV at 410:2–15 (Wood); Wood Report ¶ 151; Pls.' Ex. 51 at 9.  The explosion was followed by AK-47 and RPG fire from behind the wall, which lasted for a few kilometers as the soldiers tried to retreat.  Tr. IV at 410:16–411:4 (Wood); Wood Report ¶ 152.  The Taliban's goal was to kill and maim U.S. soldiers leaving the village.  Tr. IV at 411:8–10 (Wood); Wood Report ¶ 153.

The Taliban planned the attack in advance.  Tr. IV at 414:5–6 (Wood).  They made and planted the IED before the attack, engaged U.S. forces to distract them, deployed the IED, and staged an ambush along the convoy's route back to base.  Id. at 414:7–17; Wood Report ¶¶ 158–60; Pls.' Ex. 51 at 9, 19, 24, 27; Pls.' Ex. 51 at 9.  Complex attacks like this were a standard Taliban TTP, but this attack was more sophisticated than usual at this time and in this region.  Wood Report ¶¶ 158–61; Tr. IV at 415:1–12 (Wood).  Iran directly supported the Taliban's efforts to disrupt elections in Afghanistan, and IRGC members very likely trained the Taliban cell involved in this attack; IRGC forces may also have participated directly in the ambush.  Wood Report ¶¶ 162–63; Tr. IV at 415:13–25 (Wood).  The A.R. 15-6 investigation concluded that the attack was committed by "insurgents," Pls.' Ex. 63 at 3, a term the U.S. government typically used to refer to the Syndicate members (to avoid the potentially honorary connotations of the term "Taliban"), Tr. IV at 416:3–10 (Wood).

### 4. April 11, 2010 IED in Arghandab District, Kandahar Province

The Taliban committed the April 11, 2010 attack in Arghandab District.  Tr. IV at 418:12–14 (Wood); Wood Report ¶ 168; see generally Wood Report ¶¶ 168–83.  This was an IED attack that occurred in the Southern Afghanistan bellwether region.  Tr. IV at 416:20–417:6 (Wood).  The plaintiffs who were direct victims of this attack—SGT Jared Satoshi Lemon and SPC Joseph T. Caron—were members of the U.S. armed forces at the time of the attack.  Tr. II at 212:16–18, 213:6–12 (Lemon); Pls.' Ex. 58 at 11 (A.R. 15-6 investigation report[20] into the death of SPC Caron).  The Arghandab River Valley is an agricultural area northwest of Kandahar City; it is an important economic and cultural hub close to the birthplace of the Taliban.  Wood Report ¶ 174–

---

[20] The A.R. 15-6 investigation report did not officially attribute the attack to any group, likely because "it would have been extremely unusual to have anything other than the Taliban conduct this attack at this time in the Arghandab District." Tr. IV at 425:3–12 (Wood).

75; Tr. IV at 419:17–420:4 (Wood).  The Taliban was very active in the Valley in 2010 and was working to encircle Kandahar City to cut it off from the rest of the country.  Wood Report ¶¶ 174–75; Tr. IV 420:5–25 (Wood).  The Valley also provided an important Syndicate logistics corridor. Tr. IV at 421:1–6 (Wood).

On the evening of April 11, 2010, SGT Lemon and SPC Caron were moving away from their home base and toward an OP as part of an 11-man foot patrol; SGT Lemon was tenth in line, and SPC Caron was eleventh.  Tr. II at 219:14–25, 220:4–8 (Lemon); Pls.' Ex. 58 at 18.  The group moved in single file because of the threat of IEDs in the area.  Id. at 220:13–16.  The patrol reached a wall and decided to cross it.  Tr. II at 221:5–8 (Lemon).  SGT Lemon crossed the wall, then turned around and took SPC Caron's machine gun from him so he could use both hands to climb the wall.  Id. at 221:9–21. SGT Lemon returned SPC Caron's gun, turned back around, and took two steps forward; it was then that SPC Caron stepped on the IED.  Id. at 221:21–222:1;  Wood Report ¶ 172.  The IED was initiated by a "toe-popper," or a Russian-made PFM-1 mine, which was first introduced into Afghanistan by the Soviets in the 1980s.  Tr. II at 217:10–17 (Lemon); Tr. IV at 422:3–423:3 (Wood); Wood Report ¶ 177.  The Taliban connected the mine, which functioned as a pressure plate, to a detonation cord, which ran to a blasting cap located in a large jug of explosives (likely ammonium nitrate).  Wood Report ¶ 177–79; Tr. IV at 423:6–23 (Wood). When SPC Caron stepped on the IED, it exploded.  Tr. II at 222:2–6 (Lemon).  SPC Caron was killed by the IED blast.  Id. at 222:2–18; Wood Report ¶ 172; Pls.' Ex. 58 at 18.  SGT Lemon was severely injured; his injuries are discussed in depth below.  See infra Part III.E.1.

IED attacks like the one that killed SPC Caron and wounded SGT Lemon were a common Taliban TTP.  Tr. II at 195:23–196:9 (Lemon); Wood Report ¶¶ 180–81, 183(b).  The Arghandab Valley has been noted for its "overwhelmingly dominant network of Taliban leaders" and the

frequency of successful IED attacks on American forces, Wood Report ¶ 175, and, at the time of the attack on SPC Caron and SGT Lemon, the Valley was "hotly contested by the Taliban and American forces," id. ¶ 174.  The Taliban's goal in this attack was to kill U.S. soldiers traveling on foot in the area, Tr. IV at 418:15–16 (Wood); Wood Report ¶¶ 179–80, and it used a form of IED, a "toe-popper," designed for that purpose:  to maim individuals who step on it, Tr. IV at 422:3–19 (Wood); Wood Report ¶ 177.  The Taliban planned this attack in advance:  they mixed explosives, assembled the device, and decided where to place it to inflict casualties on American and Coalition forces in the area.  Tr. IV at 424:4–425:2 (Wood); Wood Report ¶ 180.  Iran's material support for the Taliban, including its provision of finances and explosives training, substantially contributed to the Taliban's ability to conduct this attack.  Tr. IV at 425:13–19 (Wood); Wood Report ¶ 183(d).

### 5. *August 6, 2011 Attack on Helicopter in Tangi Valley, Wardak Province*

The Taliban committed the August 6, 2011 attack on a helicopter in the Tangi Valley.  Tr. IV at 432:22–24 (Wood); Wood Report ¶ 184; see generally Wood Report ¶¶ 184–208.  This was a small arms, RPG, and anti-aircraft attack in the Southeastern Afghanistan bellwether region.  Tr. IV at 426:2–6 (Wood).  The plaintiffs who were direct victims of this attack—SO1 SEAL Darrick C. Benson, PO1 Christopher Campbell, CW2 Bryan J. Nichols, PO1 Jesse Pittman, CPO (SEAL) Thomas A. Ratzlaff, SCPO Heath Robinson, PO2 Nicholas Spehar, PO1 Michael Strange, CPO Aaron C. Vaughn, and SCPO Kraig Vickers—were all part of a SEAL team on the helicopter, and were all members of the U.S. armed forces at the time of the attack.  Wood Report ¶¶ 184–85, 194.  All were killed when the Taliban shot down the helicopter.  Id. ¶ 184.  The Tangi Valley, in Wardak Province, was strategic terrain for the Taliban in 2011 because it connected Wardak Province, which the Taliban used as a staging area for attacks into Kabul, to Pakistan and Loya Paktia.  Tr.

IV at 433:19–434:7 (Wood); Wood Report ¶¶ 196–98 & fig. 26.  The area was also used for growing poppy and was inhabited by Pashtun tribe members who generally supported the Taliban. Tr. IV at 434:8–24 (Wood).

On August 5, 2011, an American unit was on its way to interdict a senior Taliban commander, Qari Tahir (identified in American intelligence as "Objective Lefty Grove"), in the Tangi Valley based on information that he was located in a particular compound in the Valley.  Tr. IV at 428:2–18 (Wood); Wood Report ¶ 186; see Pls.' Ex. 60 at 37, 50–51, 588 (A.R. 15-6 investigation report on the attack).  The operation involved a ground assault force and support helicopters.  Wood Report ¶ 187; Tr. IV at 430:2–12 (Wood); Pls.' Ex. 60 at 37.  When the ground force arrived at the compound, it did not find Qari Tahir; helicopter forces identified individuals moving away from the compound, however, and intelligence suggested that one of them was Qari Tahir.  Tr. IV at 431:6–13 (Wood); Wood Report ¶ 191; Pls.' Ex. 60 at 15–16, 37–38.  The helicopter containing the immediate reaction force, using the call-sign Extortion 17, was nearing the suspected location of Tahir when the Taliban fired two RPGs from the roof of a two-story building.  Wood Report ¶¶ 193–94; Tr. IV at 431:21–25 (Wood).  One RPG struck the helicopter: it crashed, killing everyone on board.  Wood Report ¶ 194; Tr. IV at 432:1–11 (Wood); Pls.' Ex. 60 at 38–39.  The RPG was an OG-7 antipersonnel round, Pls.' Ex. 60 at 1121, 1125; Iran produced OG-7 RPGs and regularly provided them to the Taliban, Wood Report ¶ 203; Tr. IV at 436:11–22 (Wood).

Shooting RPGs at helicopters was a Taliban TTP; the Taliban had attempted to shoot down helicopters in the same manner, in the same valley, in the months preceding the attack.  Wood Report ¶¶ 75, 199–200 & fig. 27; Tr. IV at 435:13–24 (Wood); Pls.' Ex. 60 at 38–39, 1098.  It appears the Taliban also planned this attack in advance.  Tr. IV at 435:4–5 (Wood).  They were

aware that U.S. troops often moved through the Valley using helicopters, and they often climbed to elevated positions (like the roof of a building) in order to get a clearer shot at airborne targets. Tr. IV at 435:6–16 (Wood).  Further, the Taliban publicly claimed responsibility for this attack and provided details about it.  Id. at 436:23–437:1; Wood Report ¶¶ 204–05.  U.S. forces also intercepted Taliban communications claiming that Qari Tahir had committed the attack and was planning his escape from Afghanistan.  Tr. IV at 437:2–20 (Wood); Pls.' Ex. 60 at 190–91.  The A.R. 15-6 investigation attributed the attack to the Taliban.  Pls.' Ex. 60 at 23, 31; Tr. IV 437:21–438:11 (Wood); Wood Report ¶ 206.  Iran's material support, including the provision of finances, training, and weapons, substantially contributed to the Taliban's ability to conduct this attack.  Tr. IV at 438:12–16 (Wood); Wood Report ¶ 208(i).

### 6.  *October 29, 2011 Vehicle-Borne Suicide Bombing in Kabul City*

The Kabul Attack Network committed an October 29, 2011 VBIED suicide bombing attack in Kabul City (i.e., Kabul bellwether geography).  Tr. IV 439:17–22, 444:2–4 (Wood); Wood Report ¶¶ 209, 213; see generally Wood Report ¶¶ 209–27.  LTC David Cabrera, SGT James Darrough, and SSG Christopher Newman, the plaintiffs who were victims of this attack, were all members of the U.S. armed forces at the time, and all three were killed in the suicide bombing. Tr. IV at 440:2–8 (Wood); Wood Report ¶¶ 209, 211; Pls.' Ex. 52 at 2 (A.R. 15-6 investigation report into the attack).  Kabul City is the capital of Afghanistan and the cultural, economic, and social hub of the country.  Tr. IV 445:5–12 (Wood).  American and Coalition forces had an extensive presence in Kabul in 2011, which the Taliban-led Syndicate attempted to counter by conducting terrorist attacks in the city.  Id. at 441:14–17, 445:13–24; Wood Report ¶ 214.

On the morning of October 29, 2011, an armored bus called a Rhino was moving between American bases in Kabul.  Tr. IV at 441:14–23 (Wood); Wood Report ¶¶ 211–12 & fig. 30; Pls.'

Ex. 52 at 7, 57, 83.   A car loaded with explosives made contact with the bus, detonating the explosives and destroying the bus.   Tr. IV at 442:25–443:3 (Wood); Wood Report ¶¶ 211–12 & figs. 29, 31; Pls.' Ex. 52 at 7; Pls.' Ex. 190 at 3, 6, 12 (story board summary of the attack from the investigating unit).   The attack very likely involved chlorate-based explosives, Tr. 447:25–448:3 (Wood); Wood Report ¶ 220; eyewitnesses described the smoke cloud as initially light in color (consistent with the use of chlorate), and chlorate is "extremely friction-shock sensitive," meaning that "any kind of jarring will cause it to ignite . . . [and] explode."   Tr. IV at 448:17–21 (Wood); see Wood Report ¶¶ 219–23.   Thus, the ignition of the explosive from the impact of the car into the bus suggests that the VBIED used chlorate.   Wood Report ¶¶ 220-23; see Pls.' Ex. 52 at 268, 277, 281, 309.[21]

The Taliban publicly claimed responsibility for this attack on a website called Al-Amara 1, a Taliban media outlet at the time.   Tr. IV at 449:19–450:3 (Wood); Wood Report ¶ 224.   The Taliban typically claimed responsibility for attacks that American forces considered to be committed by the closely related Kabul Attack Network.   Tr. IV at 450:9–24 (Wood).   In this particular claim of responsibility, the Taliban identified the suicide bomber, and his name indicated that he was a member of a Haqqani-affiliated tribe.   Id. at 450:25–451:11; Wood Report ¶ 224; Pls.' Ex. 52 at 29, 404–05.   The A.R. 15-6 investigation attributed the attack to "insurgents," Pls.' Ex. 52 at 7, 30, 41; Tr. IV at 451:12–18 (Wood), and a declassified military storyboard prepared after the attack described it as a "planned Taliban operation," likely using the Taliban's name because it was not initially intended for public release, Pls.' Ex. 190 at 1; see Tr. IV at 451:19–452:14 (Wood); Wood Report ¶ 225.

---

[21] Terrorists often used chlorate-based explosives to ensure an attack would be successful even if the operator did not trigger the explosion directly, as in this case.   Wood Report ¶ 221; Tr. IV at 448:22–449:10 (Wood).

Suicide bombings, and particularly VBIED suicide bombings, were a common TTP of the Kabul Attack Network.  Wood Report ¶¶ 216–17.  The Network had relatively easy access to chlorate because it is the primary ingredient used in match factories located in Waziristan, a traditional Haqqani stronghold.  Id. ¶ 219; Tr. IV at 448:6–13 (Wood).  The Network planned this attack in advance, likely based on direction and guidance from the Haqqani-led Miranshah Shura; the Syndicate trained the suicide bomber, gathered materials for the VBIED in Miranshah, Pakistan, and imported them into Afghanistan along historical Haqqani Network smuggling routes. Tr. IV at 446:5–11, 447:7–14 (Wood); Wood Report ¶¶ 215–216; Pls.' Ex. 190 at 3.  The group then assembled the weapon in staging areas outside Kabul before bringing it into the city for an attack.  Tr. IV at 446:12–447:6 (Wood); Wood Report ¶¶ 215–16 & fig. 32.  Once in Kabul, the Network identified potential targets and surveilled their routes before conducting the attack.  Wood Report ¶ 217–18; Tr. IV at 447:15–24 (Wood).  The Network's goal was to kill high-level American officials they believed were riding on the bus.  Tr. IV at 444:14–18 (Wood); see Wood Report ¶ 91.  Iran's material support for the Syndicate, including the provision of finances, training, weapons material, and intelligence support, substantially contributed to the Taliban's ability to conduct this attack.  Wood Report ¶ 227(f); Tr. IV at 453:5–12 (Wood).

### 7.  *May 20, 2012 Suicide Vest Bomber in Tarin Kowt, Uruzgan Province*

The Syndicate committed the May 20, 2012 suicide vest bombing attack in Tarin Kowt, in Southeastern Afghanistan.  Tr. IV at 453:13–23, 454:24–455:4 (Wood); Wood Report ¶¶ 228, 233; see generally Wood Report ¶¶ 228–42.  CPT Timoney, a plaintiff who was a direct victim of the attack, was a member of the armed forces at the time.  Tr. III at 309:5–15, 310:18–311:3 (Timoney); Wood Report ¶¶ 228, 230–32.  Tarin Kowt is north of Kandahar City, in a highly agricultural area that transitions from the plains of southern Afghanistan to the mountains in the

north.  Tr. IV at 456:3–14 (Wood); Wood Report ¶ 234.  One of the Pashto tribes in the area is closely affiliated with the Taliban, and Taliban presence in the area was substantial in 2012.  Tr. III at 313:9–12 (Timoney); Tr. IV at 456:15–25 (Wood); Wood Report ¶ 235.  The Taliban's goal in conducting this attack was to kill the American soldiers present in Tarin Kowt that day.  Wood Report ¶ 233; Tr. IV at 455:5–7 (Wood).

On May 20, 2012, CPT Timoney was part of a "key leader engagement," during which an outgoing unit was to introduce members of the unit to the Afghan police chief in Tarin Kowt.  Tr. III at 313:24–314:7 (Timoney); Wood Report ¶ 230; Pls.' Ex. 59 at 13–14 (A.R. 15-6 investigation report into the attack).  Before the mission, there were reports that two suicide bombers were present in the area.  Tr. III at 314:8–15 (Timoney); Tr. IV at 460:2–6 (Wood); Wood Report ¶ 237; Pls.' Ex. 59 at 15–16, 108. The police station was located near the market in Tarin Kowt; it was not market day, but there were some shacks set up in the market, which was unusual.  Tr. III at 316:16–23 (Timoney).  When American units arrived at the police station, the police chief was not present, so the units waited for one hour and 35 minutes for him to arrive.  Id. at 314:20–25, 315:20–316:3.  When he arrived, he was angry at the American units and demanded that they leave the station.  Id. at 317:1–10.  The soldiers formed a line and began to walk out of the compound headed south to where their trucks were parked.  Id. at 317:11–19, 318:9–22.  As they left the station, a man called out to them; the translator responded with concern in his voice, and the man approached.  Id. at 318:23–319:5.  He yelled, "Allah Akbar" and detonated his suicide vest.  Id. at 319:5–6, 319:12–24; Pls.' Ex. 59 at 17.  CPT Timoney was injured, Tr. III at 319:17–320:11 (Timoney); Wood Report ¶ 237; Pls.' Ex. 300 (sealed medical records reflecting CPT Timoney's injuries); Pls.' Ex. 301 (video of CPT Timoney depicting some of his injuries in the hospital), and

CPT Jesse Ozbat and 2LT Tobias Alexander were killed, Tr. III at 317:13–25 (Timoney); Pls.' Ex. 59 at 13.  CPT Timoney's injuries are discussed in depth below.  See infra Part III.E.3.

Suicide bombings like the one used in this attack were a Taliban TTP by 2012, Wood Report ¶ 63; Tr. IV at 457:9–23 (Wood), though the Taliban often used other Syndicate members as the actual suicide bombers due to the Pashtun's historical reticence about committing suicide, Wood Report ¶ 240.  The Taliban planned this attack in advance, constructing a suicide vest, identifying and surveilling the target, and timing the attack for the moment when soldiers left the police station.  Tr. IV at 458:10–460:9 (Wood); Wood Report ¶ 238.  That there were no civilians in the area further indicates advance warning.  Tr. IV at 459:14–460:1 (Wood).  The suicide vest used in this attack was likely made by placing ball bearings into hot glue on a sheet of paper. Wood Report ¶ 239 & fig. 37; Tr. IV at 460:19–461:3 (Wood).  The ball bearing sheet was placed on the outside of the explosives but inside the fabric of the vest, so the ball bearings would be thrown outwards during the explosion.  Wood Report ¶ 239; Tr. IV at 461:4–10 (Wood).  Iran's material support for the Syndicate, including the provision of finances, training, and weapons, substantially contributed to the Syndicate's ability to conduct this attack.  Tr. IV at 462:6–12 (Wood); Wood Report ¶ 242(d).

### 8.  *May 31, 2012 IED in Zombalay District, Helmand Province*

The Taliban, likely with outside assistance, committed the May 31, 2012 IED attack in Zombalay District, in the Southern Afghanistan bellwether geography.  Tr. IV at 462:13–24, 466:9–18 (Wood); Wood Report ¶¶ 243, 258; see generally Wood Report ¶¶ 243–59.  SGT Eric M. Hunter, the plaintiff injured in this attack, was a cook assigned to a special forces unit in a remote part of Helmand Province; he went on missions with the special forces unit in a support role, and he was a member of the U.S. armed forces at the time of the attack.  Wood Report ¶ 245;

Tr. IV at 462:25–463:7, 463:24–464:2 (Wood); Pls.' Ex. 163 at ¶¶ 1–3 (sealed Declaration of Sergeant Eric M. Hunter).  Zombalay is located in Helmand province, near the provincial capital of Lashkar Gah, and the area is a traditional Taliban stronghold with significant Taliban activity during this time period.  Tr. II at 187:2–188:5 (McGrath); Tr. IV at 467:13–468:5 (Wood); Wood Report ¶¶ 250–52.

On the day of the attack, SGT Hunter was participating in a mission where American troops were moving in two separate columns to converge on the village of Zombalay.  Tr. IV at 464:13–465:15 (Wood); Wood Report ¶¶ 245–46; Pls.' Ex. 163 at ¶ 4.  SGT Hunter was in the western column.  Tr. IV at 465:14–15 (Wood); Wood Report ¶ 247.  The other column began taking direct fire as they approached the village, and SGT Hunter ran to the top of a roof to provide suppressive fire.  Tr. IV at 465:19–466:3 (Wood); Wood Report ¶¶ 247–48; Pls.' Ex. 163 at ¶ 5.  He stepped on a pressure plate IED placed beneath a path in the village and the device detonated; the IED did not kill anyone, but it severely wounded SGT Hunter, ultimately requiring the amputation of his right leg below the knee, causing serious damage to his left leg, and resulting in a traumatic brain injury and post-traumatic stress disorder.  Tr. IV at 466:4–8 (Wood); Wood Report ¶ 248; Pls.' Ex. 163 at ¶¶ 5, 7–8.  SGT Hunter received the Purple Heart award, which states:  "While conducting presence patrols in Helmand Province[,] member suffered an improvised explosive blast injury resulting in damage to both legs."  Tr. IV at 470:7–471:13 (Wood); Pls.' Ex. 285 at 2 (sealed military record relating to SGT Hunter's Purple Heart).

IED attacks like this one were a common Taliban TTP.  Wood Report ¶¶ 55–57, 61, 259(b). The trigger device on the IED that injured SGT Hunter was significantly more sophisticated than the devices typically found in the area, Tr. IV at 468:24–469:6 (Wood):  it was designed to compress only under the weight of a fully armed soldier, allowing the Taliban to place it under a

commonly used path without injuring local civilians.  Id. at 468:11–20; Wood Report ¶¶ 255–56.
The sophistication of the weapon suggests that it was built with non-Taliban assistance.  Wood
Report ¶¶ 257, 259(c); Tr. IV at 466:13–18, 469:1–6 (Wood).  But despite this sophistication, the
device did not operate at its full efficacy; had it functioned as intended, it likely would have killed
SGT Hunter and others.  Tr. IV at 469:21–24 (Wood).  The Taliban's goal in conducting this IED
attack was to kill American soldiers, id. at 466:19–20, and the Syndicate planned the attack in
advance by building and placing the IED in the village, id. at 468:12–20.  Iran's material support
for the Taliban, including the provision of finances, training in advanced IED tactics, and weapons
materials, substantially contributed to the Taliban's ability to conduct this attack.  Wood Report
¶ 259(d); Tr. IV at 472:15–19 (Wood).

### 9.  June 18, 2013 Indirect Fire on Bagram Airfield, Parwan Province

The Taliban committed the June 18, 2013 indirect fire attack on Bagram Airfield, in North
Central Afghanistan.  Tr. IV at 472:20–473:5, 475:16–18 (Wood); Wood Report ¶¶ 260, 273; see
generally Wood Report ¶¶ 260–74.  SPC Robert W. Ellis, the plaintiff killed in this attack, was a
member of the armed forces at the time.  Tr. IV at 473:9–13 (Wood); Wood Report ¶ 260; Pls.'
Ex. 56 at 10 (A.R. 15-6 investigation report into the attack).  Bagram Airfield is in the southern
part of Parwan Province, approximately 64 kilometers north of Kabul City, Tr. IV at 473:18–21,
476:7–12 (Wood); Wood Report ¶¶ 264–65 & fig. 44, and it served as a logistics and military
command and control hub during the relevant time period.  Tr. IV at 476:17–23 (Wood); Wood
Report ¶¶ 264–65.  The airfield is in a large, wide valley surrounded by high mountains.  Tr. IV at
477:1–6 (Wood).  Although the population in the surrounding area was largely pro-American,
Taliban terrorists would enter the area to conduct attacks focusing on the airfield.  Id. at 477:7–18;
Wood Report ¶¶ 264–65.

On June 18, 2013, SPC Ellis had just finished training at Bagram Airfield and was waiting at a bus stop with other members of his unit to be transported back to their sleeping area.  Tr. IV at 474:4–18 (Wood); Wood Report ¶ 262; Pls.' Ex. 56 at 9.  Enemy combatants fired two rockets at the airfield, and although one missed entirely, the other rocket struck the bus stop where SPC Ellis was standing.  Tr. IV at 474:19–22 (Wood); Wood Report ¶ 262 & figs. 42–43; Pls.' Ex. 56 at 9, 15.  The rocket exploded on impact, instantly killing SPC Ellis.  Tr. IV at 475:14–15 (Wood); Pls.' Ex. 56 at 15; Wood Report ¶ 262.  The rocket used in this attack was a 107mm rocket; Iran manufactured many of the 107mm rockets that have been identified in Afghanistan.  Wood Report ¶¶ 262, 269–70; Pls.' Ex. 56 at 9, 18; Tr. IV at 478:16–479:7 (Wood).

Firing rockets at American targets was a common Taliban TTP, Wood Report ¶¶ 71–73, and Bagram Airfield was a regular target during this time period, id. ¶¶ 266–67; Tr. IV at 478:4–15.  Indeed, the fact that SPC Ellis was killed by an explosion at Bagram Airfield caused by enemy forces is sufficient to conclude that, more likely than not, SPC Ellis was killed by the Taliban.  Tr. IV at 481:9–18 (Wood); see also Pls.' Ex. 279 at 1 (sealed Report of Casualty on SPC Ellis's death).  The A.R. 15-6 investigation into this attack concluded that it was committed by "enemies of Afghanistan," Pls.' Ex. 56 at 9; this term, though not commonly used, referred to members of the Taliban-led Syndicate and not to other terrorist groups, Tr. IV at 479:8–15 (Wood); Wood Report ¶¶ 271–72.  The Taliban planned the attack in advance by procuring the rockets and modifying them to fire without their original ignition systems.  Tr. IV at 477:23–478:3 (Wood); Wood Report ¶¶ 267–69; see Pls.' Ex. 56 at 11.  Iran's material support for the Taliban, including the provision of finances and weapons—particularly 107mm rockets like this one—substantially contributed to the Taliban's ability to conduct the attack.  Wood Report ¶¶ 270, 274(c)–(d); Tr. IV

at 481:19–25 (Wood) ("It's very likely that [Iran is] where [the 107mm rockets used in this attack] came from.").

### 10. July 15, 2013 82mm Recoilless Rifle Attack in Paktia Province

The Haqqani Network, a Taliban subgroup, committed a recoilless rifle attack in Paktia Province on July 15, 2013.  Tr. IV at 486:8–12 (Wood); Wood Report ¶¶ 275, 297; see generally Wood Report ¶¶ 275–98.  This was a small-arms, RPG, and anti-aircraft attack in the Loya Paktia bellwether geography.  Tr. IV at 482:1–9, 15–17 (Wood); Wood Report at 114.  Loya Paktia is the traditional homeland of the Haqqani Tribe; the terrain is restrictive, favoring anti-U.S. and anti-Coalition forces, and the border with Pakistan rendered the area a safe haven for the Haqqani Network and the Taliban.  Tr. IV at 487:20–488:21 (Wood); Wood Report ¶¶ 284–85.  SSG Sonny C. Zimmerman, the plaintiff who was a direct victim of the attack, was a member of the armed forces at the time.  Wood Report ¶¶ 277–78; Pls.' Ex. 57 at 6 (A.R. 15-6 investigation report into the attack).

SSG Zimmerman was stationed at Chamkani Assistance Platform.  Tr. IV at 483:2–5 (Wood); Wood Report ¶ 278.  On the afternoon of July 15, 2013, his unit traveled to train an Afghan unit in a nearby village.  Wood Report ¶¶ 277–78; Tr. IV at 483:6–10 (Wood); Pls.' Ex. 57 at 7.  On the way to the training, the unit was engaged by a small number of individuals shooting at them, but the ambush failed and SSG Zimmerman's unit dispersed the insurgents with the help of American helicopters.  Tr. IV at 483:11–20 (Wood); Wood Report ¶ 280; Pls.' Ex. 57 at 8–9.  After the training that night, the unit returned to base in several smaller groups, a tactic intended to increase security.  Tr. IV at 483:24–484:8 (Wood).  SSG Zimmerman was in a truck in the second group to depart.  Id. at 484:9–11; Wood Report ¶ 277.  Along a road through a mountainous region, SSG Zimmerman's group saw a white flash near the group in front of them.  Tr. IV at

484:12–20 (Wood); Wood Report ¶ 281.  They called forward, but the first group had not seen or heard anything.  Tr. IV at 484:19–20 (Wood); Wood Report ¶ 281.  The white flash was likely a recoilless rifle firing at the vehicles.  Tr. IV at 484:21–25 (Wood).  Both groups continued forward, and when SSG Zimmerman's group reached the same location, Haqqani Network terrorists fired the recoilless rifle at SSG Zimmerman's vehicle.  Tr. IV at 485:1–5 (Wood); Wood Report ¶ 282; Pls.' Ex. 57 at 6, 10, 12.  The round, originally designed to combat tanks, Wood Report ¶ 279, pierced the bulletproof glass on the passenger side of the truck, killing SSG Zimmerman and injuring everyone else in his vehicle.  Tr. IV at 485:6–13 (Wood); Wood Report ¶¶ 282, 294; Pls.' Ex. 57 at 6, 10–11.

The Haqqani Network's goal in firing the recoilless rifle was to kill Americans.  Tr. IV at 486:24–487:1 (Wood); Wood Report ¶ 283.  The Haqqani Network planned this attack in advance: the rifle was placed in the brush to provide a clear line of fire while obscuring the rifle's location, and the attackers had fired on American forces multiple times in the weeks leading up to this attack.  Tr. IV at 489:17–490:4 (Wood); Wood Report ¶¶ 290–93.  And the correct use of an unusual, sophisticated weapon to fire on a passing convoy and avoid detection is a Haqqani Network TTP.  Tr. IV at 490:5–11 (Wood); Wood Report ¶ 294.  The A.R. 15-6 investigation into the attack concluded that it was committed by "insurgents," Pls.' Ex. 57 at 6, which likely referred to members of the Haqqani Network, Wood Report ¶¶ 295–96; Tr. IV at 490:12–18 (Wood).  Iran's material support for the Taliban-led Syndicate, including the provision of finances, weapons, and training, substantially contributed to the group's ability to conduct this attack.  Tr. IV at 490:19–23 (Wood); Wood Report ¶ 298(e).

### *11. August 7, 2016 Kidnapping in Kabul City*

The Taliban, including its Haqqani Network subgroup, committed the August 7, 2016 kidnapping attack in Kabul City. Tr. IV at 491:6–9, 19–22 (Wood); Wood Report ¶¶ 299, 318; see generally Wood Report ¶¶ 299–318. Mr. Kevin King, the plaintiff who was a direct victim of the kidnapping, was a U.S. citizen at the time of the attack and remains a U.S. citizen today. Tr. III at 274:11–15 (King).

Mr. King was an English teacher at the American University of Afghanistan in Kabul. Tr. III at 273:10–25 (King); Wood Report ¶ 301. He had taught English in Afghanistan several times, with his last trip beginning in October 2014. Tr. III at 273:19–20, 274:2–13 (King). Mr. King lived in a guest house at a compound for university employees, id. at 274:23–275:3; he traveled back and forth to campus with others who lived at the compound in a university-provided van, id. at 275:4–10. The van, the compound, and the university all used Afghan guards, some of whom were Afghan military personnel; at both the university and in the compound, guards admitted the van into secured facilities to pick up teachers, closing the gate while the teachers entered the van, and then reopening the gate to allow the van to depart. Id. at 275:7–19. On August 7, 2016, Mr. King had finished teaching classes at the university and, along with another teacher, Mr. Timothy Weeks, he boarded the van to return to the compound at around 7:50 p.m. Id. at 276:20–277:6. While the van was passing through an alley just outside of the university gates, another van pulled up and cut off the teachers' van. Id. at 277:8–19. Individuals dressed in Afghan military uniforms got out of the blocking van and pointed machine guns at the university van. Id. at 277:20–278:5. The Afghan guard and driver of the university van unlocked the doors, and the armed individuals forced Mr. King and Mr. Weeks into the other van at gunpoint. Id. at 278:6–16; Wood Report ¶ 302. The kidnappers searched the teachers for phones and forced them into the second and back

row of the van, where they were forced to lie down with a blanket covering them.  Tr. III at 278:17–279:6 (King).  The kidnappers then drove the teachers around Kabul, passing through a checkpoint, to a location outside the city.  Id. at 279:7–280:4; Wood Report ¶ 302.  Mr. Weeks and Mr. King were then taken from the van and handed off to a second group of individuals.  Tr. III at 280:2–4 (King).

The new captors were dressed in "standard local garb," with the leader wearing a turban, and they all carried guns or wore explosive vests.  Tr. III at 280:8–17 (King).  Mr. King and Mr. Weeks were bound, marched to a new van, and driven to another location.  Id. at 280:18–282:8; Wood Report ¶ 303.  They were forced to make a video identifying themselves and stating that they had been kidnapped by the Taliban, who wanted to exchange them for Taliban prisoners.  Tr. III at 282:19–283:2 (King).  This was the first of a series of such videos addressed to both the U.S. and Afghan governments.  See generally Pls.' Exs. 288–91 (hostage videos and transcripts of videos containing Mr. King and Mr. Weeks).  The Taliban published those videos, in one case on the Taliban's media network, Al-Amara.  Tr. II at 167:15–168:5 (Clarke); Tr. IV at 495:6–496:7 (Wood); see generally Tr. III at 288:11–293:6 (King).

Mr. King and Mr. Weeks were held captive for three years, three months, and twelve days.  Tr. III at 283:18–21 (King).  They were moved several times during the course of their captivity.  Wood Report ¶¶ 304, 312–14; Tr. III at 283:22–284:10 (King).  For the first two years, Mr. King was bound at the wrists and ankles for 23 hours a day and chained to Mr. Weeks at night; during what was ultimately his final year as a prisoner, the guards were slightly more lenient, sometimes only chaining the captives' wrists and not chaining them together at night.  Tr. III at 286:12–18 (King).  Mr. King was not permitted to go outdoors except while moving between locations for two years.  Id. at 287:8–12.  He was given minimal food and suffered from an infection, and he

began to lose weight.  Id. at 298:22–299:5.  He was beaten, kicked, dragged through the snow,

apparently used as a medical test subject,[22] and frequently threatened, including at gunpoint.  Id.

at 293:17–295:15.  Mr. King's health steadily deteriorated throughout his three-year captivity:

when he was examined after his release, he was diagnosed with malnourishment, severe vitamin

D deficiency, an electrolyte imbalance, heart issues, scurvy, posterior rib fractures, peripheral

neuropathy, and sensorineural hearing loss, among other conditions.  Id. at 299:6–14, 304:15–

307:25; see generally Pls.' Ex. 286 (Mr. King's sealed medical records).  The effects of his

prolonged captivity are discussed in more depth below.  See infra Part III.E.2.  Mr. King and Mr.

Weeks were ultimately released in exchange for three high-ranking Taliban prisoners including

Anas Haqqani, Sirajuddin Haqqani's brother.  Tr. IV at 496:8–16 (Wood); Wood Report ¶ 317.  In

announcing Mr. King's release, then-Secretary of State Michael Pompeo identified the Taliban as

his captor and characterized the release "as a goodwill gesture."  Tr. IV at 496:21–497:11 (Wood);

Wood Report ¶ 317.

 Mr. King's captors identified themselves as the Taliban, Tr. III at 287:19–25 (King) ("[I]t

was clear they were the Taliban.  They told us from the very beginning . . . we're the Taliban.");

Wood Report ¶ 315, and kidnapping Westerners was a common Taliban TTP, Wood Report ¶ 305.

The Taliban's goal in this attack was to kidnap prisoners to negotiate for a prisoner exchange.  Tr.

IV at 491:23–492:1 (Wood); Wood Report ¶¶ 305, 318(e).  The Taliban, and possibly the Haqqani

Network, planned this kidnapping in advance:  the kidnappers had clearly conducted advanced

surveillance of the target; they had obtained Afghan military uniforms, enabling them to approach

---

[22] Mr. King testified that some of his guards "were actually medical students, theoretically," and they would use him and Mr. Weeks "for their homework."  Tr. III at 295:5–7 (King).  On several occasions, those guards would "take an IV and nail it to the wall," then place the needle into Mr. King's vein.  Id. at 295:7–12.  Mr. King testified that he could not object to this and "would just have to lie there for 45 minutes while . . . whatever they were putting into me was in there."  Id. at 295:13–15.

the van with weapons without raising any alarm; and they were prepared for several possibilities (e.g., if one of the captives had a trackable device like a cell phone, if the van were stopped at a checkpoint).  Id. at 493:15–494:18; Wood Report ¶¶ 308–11.  Iran's material support for the Taliban, including the provision of money, intelligence, and advanced training in sophisticated operations, substantially contributed to the Syndicate's ability to conduct this attack.  Tr. IV at 498:2–7 (Wood); Wood Report ¶ 318(f).

### 12. June 10, 2017 Insider Attack in Pekha Valley, Nangarhar Province

The Taliban committed the June 10, 2017 insider attack in Nangarhar Province, in the N2KL bellwether geography.  Tr. IV at 498:10–20, 502:12–15 (Wood); Wood Report ¶ 319; see generally Wood Report ¶¶ 319–46.  An insider or "green-on-blue" attack occurs when an individual in an Afghan unit—often placed by a terrorist group—murders members of his unit or Coalition forces.  Tr. IV at 498:21–25 (Wood).  This insider attack occurred in a very mountainous region of Nangarhar Province, near the border with Pakistan; the proximity to the border and the restrictive terrain in the area allowed terrorist groups to move freely, and three groups—the Taliban, al-Qaeda, and ISIS-Khorasan—all had a presence in the area in 2017.  Id. at 503:2–504:2; Wood Report ¶ 327 & fig. 53.  SGT Dillon C. Baldridge and SGT William M. Bays, plaintiffs who were direct victims of this attack, were members of the U.S. armed forces at the time they were killed.  Tr. 499:1–6 (Wood); Wood Report ¶ 319; Pls.' Ex. 55 at 19 (A.R. 15-6 investigation report on the attack).

SGT Baldridge and SGT Bays were part of a unit assigned to a security post called Radio Ridge in the Pekha Valley.  Tr. IV at 499:11–20 (Wood); Wood Report ¶ 322.  Radio Ridge was built into the side of a mountain, meaning there was little open space and forcing American and Afghan soldiers to sleep in the same area with no separation or security, which was unusual.  Tr.

IV at 499:22–500:4 (Wood); Wood Report ¶ 322.  The U.S. unit was scheduled to rotate off of Radio Ridge on the afternoon of the attack and, at around 1:00 p.m., were relaxing while awaiting transport off the mountain.  Id. at 500:5–13 (Wood); Pls.' Ex. 55 at 29, 219–20.  Also at Radio Ridge was Sergeant Obaidullah Armani, a member of an Afghan commando unit stationed on Radio Ridge who was known to be "an extremely devout individual."  Tr. IV at 500:14–21 (Wood); Wood Report ¶ 321.  That afternoon, Armani was observed pacing and using his prayer beads more than usual, and eyewitnesses later described him as seeming agitated.  Tr. IV at 500:21–501:4 (Wood).  He also made a call on his radio, unusual during Ramadan.  Id. at 501:5–12; Pls.' Ex. 55 at 220.  Armani then entered an office with a window that looked into the sleeping area, picked up an M4 assault rifle, shouted "Allahu Akbar," and began shooting the American soldiers.  Tr. IV at 501:14–23 (Wood); Pls.' Ex. 55 at 220; Wood Report ¶¶ 323–24.  An American soldier and an Afghan commando quickly returned fire, but not before Armani struck and killed SGT Baldridge and SGT Bays.  Tr. IV at 501:22–501:6 (Wood); Wood Report ¶ 325.  Upon observing that Armani, though wounded, was reaching for his rifle, the responders shot and killed him.  Tr. IV at 502:7–11 (Wood); Wood Report ¶ 325; Pls.' Ex. 55 at 220–21.

Insider attacks like this one were a common Taliban TTP:  "The Taliban-led Syndicate considers insider attacks a key tactic," and the Syndicate even "announces them as a planned attack type each spring," including in 2017.  Tr. IV at 504:13–505:12 (Wood); Wood Report ¶¶ 329–30.  Indeed, the Taliban claimed responsibility for this attack in the immediate aftermath, identifying the attacker by name and providing details.[23]  Tr. IV at 508:8–21 (Wood); Wood Report ¶ 344.

---

[23] Although ISIS-Khorasan was also active in the area and committed terrorist attacks against American soldiers, ISIS-Khorasan did not use insider attacks at this time, likely because it had not existed in Afghanistan for a long enough time to recruit, train, and plant individuals like Sergeant Armani.  Tr. IV at 507:9–508:7 (Wood); Wood Report ¶ 339.

The Taliban's goal in this attack was to kill Americans. Tr. IV at 502:16–17 (Wood); Wood Report ¶ 326. The Taliban likely planned the attack in advance, recruiting Armani to join the Afghan commandos so he would be able to commit an insider attack on this elite unit. Tr. IV at 506:4–507:8 (Wood); Wood Report ¶¶ 334–38. Armani had been part of the Afghan Army previously but was forced to leave after a screening where he expressed sympathy for the Taliban movement, Tr. IV at 506:9–17 (Wood); Wood Report ¶¶ 334–35; Pls.' Ex. 55 at 73, and he committed this attack just as his window of opportunity to kill American soldiers was closing (as they were transferring out of the Pehka Valley that afternoon), Tr. IV at 506:21–507:3 (Wood); Wood Report ¶¶ 336, 338. Finally, it is likely that Armani's radio call that afternoon communicated to the Taliban that his attack was beginning when he made the radio call shortly before he fired on the soldiers. Wood Report ¶ 338; Tr. IV at 507:4–8 (Wood). Although the A.R. 15-6 investigation concluded the attack was committed for "personal motivations that are unknown," Pls.' Ex. 55 at 13, 15, 51, 224, 227, the considerations above strongly suggest that, rather than a killing arising from a personal affront, this attack was planned in advance by the Taliban, see Tr. IV at 505:13–506:3 (Wood). It is possible that the U.S. Army may have been reluctant to admit the Taliban was able to plant an insider in the Afghan commandos, the premier Afghan fighting force. Id. at 508:22–509:20; Wood Report ¶¶ 340–43. And in this litigation, where "the quantum and quality of evidence that might satisfy a court can be less than that normally required," Owens, 864 F.3d at 785, the Court finds that the Taliban was responsible for this insider attack. Iran's multifaceted material support for the Taliban facilitated its recruitment of Armani and substantially contributed to the Taliban's ability to conduct this attack. Tr. IV at 510:3–7 (Wood); Wood Report ¶ 346(e).

### E.  Testifying Plaintiffs

Before turning to its conclusions of law, the Court will briefly discuss the testimony of each testifying plaintiff in this litigation.

#### 1.  Sgt. Jared Satoshi Lemon

SGT Lemon was a victim of the April 11, 2010 IED attack in Kandahar Province.  Tr. II at 219:14–23 (Lemon); see generally Wood Report ¶¶ 168–83.  He deployed to Afghanistan in August 2009—his second tour—to serve in the airborne infantry.  Tr. II at 212:3–4, 212:19–213:12 (Lemon).  At the time of the attack, SGT Lemon was 29 years old; he was married and had a daughter.  Id. at 213:21–214:1; Pls.' Ex. 292 at 1.  Before joining the military, SGT Lemon had worked as a jewelry maker for five years.  Tr. II at 210:10–17 (Lemon).  Jewelry making "was [his] passion . . . [a]nd being a jeweler was . . . working in that passion."  Id. at 210:25–211:5.  But after witnessing the collapse of the Twin Towers on September 11, 2001, SGT Lemon decided to "go serve [his] country and then . . . come back to" jewelry making.  Id. at 211:6–20.

At the bellwether hearing, SGT Lemon testified about the IED attack:

> I turned around.  I took two steps.  And I hear this really loud ping like someone taking a baseball bat and hitting, like, a metal pole in the ground.  That's what it sounded like anyway. . . . I got knocked out.  I got – I was so dazed and confused, I didn't know what happened at first.  I remember – I remember opening up my eyes and . . . it looked as if stuff was kind of like falling around me . . . .  And then I heard [SPC] Caron's last breath.  He took, like, his last breath that he had in his lungs.  I heard it go by his voice box, which made this really, really low . . . moaning noise.  As soon as I heard that, it was, like, everything came back to me.  My senses came back to me, and I realized, oh, crazy, we just got blown up.

Tr. II at 221:23–222:20.  SGT Lemon then saw his injuries:  "I looked over and it was just – I remember seeing nothing but red, like, just tons of blood coming out."  Id. at 223:23–224:5.  The bones in his right arm had been pulverized by shrapnel from the IED.  Id. at 225:14–19.  Fellow soldiers applied a tourniquet to SGT Lemon's arm and called for air support, but because the

helicopter could not land in the orchard where the attack occurred, SGT Lemon had to travel to the landing zone.  Id. at 224:25–225:3.  SGT Lemon's squad leader told him he would "have to carry [his] own arm," and SGT Lemon recalled that his arm was "heavy, really heavy and jiggly and that's kind of when I realized it was messed up."  Id. at 225:3–10.

SGT Lemon was airlifted to Kandahar Airfield, where doctors woke him from sedation "mainly to ask me if I wanted to save my right arm.  And, of course, you know, yeah, yes."  Tr. II at 226:23–24.  After undergoing initial "limb-salvage operations," he was transported to Germany, where he underwent "surgeries every day," id. at 227:2–228:6, before finally arriving at Walter Reed Medical Center in Washington, D.C. for more operations, id. at 229:17–23.  These surgeries included a "lat flap," where muscle from his back was flipped to cover the missing triceps muscle in his shoulder, and the installation of an "ex fix" brace to stabilize his arm.  Id. at 227:2–17.  But the efforts to save his arm failed:  "[o]ver time, the pulse got weaker and weaker.  And one morning I woke up to my trigger finger from the nail down was black.  So, I mean, that – it was dead."  Id. at 230:3–7.  Doctors recommended amputation, and SGT Lemon agreed.  Id. at 231:19–232:22.  His right arm was amputated, and he spent "four and a half years" recovering.  Id. at 233:9–13.  This included additional surgeries like a skin graft from his thigh to his shoulder; SGT Lemon described that surgery and the ensuing daily cleaning as "more painful than the actual amputation." Id. at 240:3–14.

In addition to the loss of his right arm, SGT Lemon sustained internal injuries from the "blast wave that rippled throughout [his] whole body."  Tr. II at 234:10–13.  He was "peppered" with shrapnel as if "someone took a shotgun" to him, and his eardrums were blown out.  Id. at 234:14–22.  He suffers from phantom limb pain from his amputated arm.  Id. at 235:12–14, 235:20–236:2 ("I can feel my whole [right] hand all the way down to my fingerprints.  And when

I got blown up, I had my hand holding my rifle . . . . And so it got stuck in that position, and . . . it's still stuck there.  And it's painful.").  He also endured heterotopic ossification, or the growth of bone spurs from the amputated limb into surrounding soft tissue.  Id. at 237:6–23 ("[T]hese spikes and almost knife-looking blade parts . . . . would stab into me and, like, just poke my soft tissue on my arm.  So it was tremendously painful.").  He continues to feel pain every day on a level of "2 to 3" out of 10, with monthly "flare-ups that . . . get as high as 10."  Id. at 236:15–21.

SGT Lemon also suffered a traumatic brain injury ("TBI"), which continues to affect his memory and concentration.  Id. at 238:8–24.  He is currently a third-year mechanical engineering student, and he explained that his TBI has made school "difficult."  Id. at 209:11–21, 238:21–24.  Throughout his recovery, SGT Lemon has experienced severe depression:

> I mean, mentally it's – I almost think the mental aspect is worse than the physical aspect.  It's – I was an artist.  I was a right-handed artist before.  I always thought I was going to go back to that.  I had my identity stripped from me.  I had – I had who I was taken from me.

Id. at 240:15–24.  At one point in recovery, he was suicidal and would "fall asleep with a gun on [his] chest."  Id. at 241:16–19.  The attack also affected his relationship with his family, id. at 242:25–243:21, and his wife left him while he was recovering at Walter Reed, id. at 243:22–244:5.  He continues to see a therapist weekly.  Id. at 241:2.  SGT Lemon does not anticipate making a full recovery:  "For one, they can't regrow arms.  For two, it's just – you can't take away – you can't go to war and then not have it affect you."  Id. at 242:1–22.

### 2.  Mr. Kevin King

Mr. King was kidnapped by the Taliban in Kabul City in 2016, and he spent "three years, three months, and 12 days" as a captive.  Wood Report ¶ 301; Tr. III at 283:20–21 (King).  Before the attack, Mr. King worked as an English and political science teacher since the 1990s, in countries including "Northern Iraq . . . [and] Saudi Arabia."  Tr. III at 273:12–17.  He had taught

in Afghanistan on four previous occasions, beginning in 2007, with the "Rule of Law Project," which was focused on "training Afghan lawyers, prosecutors, political figures, [and] law professors." Id. at 273:18–274:10. He lived in university-provided housing and traveled between secured facilities in university-supplied vans with security guards. Id. at 274:23–275:19. He was 59 years old at the time of his kidnapping. Id. at 275:20–24.

On August 7, 2016, Mr. King and a fellow teacher, an Australian man named Timothy Weeks, were kidnapped at gunpoint by four Taliban members dressed as members of the Afghan military. Tr. III at 277:2–278:5. They were transported out of Kabul to another group of Taliban terrorists. Id. at 278:17–280:4. Mr. King described his journey from that point at the bellwether hearing:

> We kept walking, and we had to come down this hill that was not easy footing; and whenever I lost my footing and fell down, they would give me a few shots. They would punch me and say, don't do that again, and then they'd pick me up and they'd keep walking. But they kept threatening me with that. Anytime I fell down they would just start punching me. . . . I could hear them talking and even laughing, and occasionally they would fire a bullet or fire their machine gun and just sort of laugh because – you know, I thought maybe that was it; they were going to shoot us.

Id. at 280:19–281:13. Eventually, the captives arrived at a "Taliban stronghold," where the Taliban forced them to make the first of many hostage videos produced during Mr. King's years-long captivity. Id. at 282:9–283:2; see generally Pls.' Exs. 288–91.

In one of the hostage videos, Mr. King stated that he was being treated well. Pls.' Ex. 290. When asked at the bellwether hearing whether this was true, he explained that after being kidnapped, "you're grateful for anything short of being decapitated," Tr. III at 292:15–17; according to Mr. King, the Taliban "kept us alive[ b]ut that was all they did. . . . [C]ompared to what ISIS might have done to us, that's an improvement. . . . But by any civilized standard, this is a war crime," id. at 292:22–293:1; see also id. at 293:3–6 ("If you're a dog in a kennel and you

just stay there and they feed you every once in a while, but you're not constantly beating the dog, you could say you're treating the dog well.  But we were basically treated like animals in a kennel.").  For most of his captivity, Mr. King and his co-captive were bound by the wrist and ankles for 23 hours per day and chained together while sleeping.  Id. at 286:12–16.  They were not "even allowed to talk to each other" and were "threatened . . . with beatings."  Id. at 285:21–23. They were fed twice a day and there was "very little to do"; eventually, Mr. King's captors "could see that [he] was deteriorating, so they got an exercise bike," but the captives would generally "just sit there and hope for it to end."  Id. at 285:24–286:11.  Mr. King was threatened, dragged through the snow, questioned at gunpoint, and exposed to external dangers like scorpions.  Id. at 293:18– 296:2.  The captives were also in danger of being caught in cross-fire between their captors and anti-Taliban forces, including the Afghan police.  Id. at 296:3–21.  During some of these airstrikes, the Taliban hid Mr. King and his co-captive on the ground in small underground tunnels, often with little oxygen.  Id. at 296:9–298:21.

Mr. King's health declined significantly, largely because of poor nutrition.  Tr. III at 298:22–25.  By the end of his captivity, he experienced seizures where his hand "would lock and it would just be stuck there for, whatever, 20, 30 minutes"; Mr. King believes he would not have survived for another three months.  Id. at 299:6–14.  When the Taliban released him in a prisoner exchange, Mr. King weighed only 135 pounds.  Id. at 306:6–8.  Following his release, he received substantial medical treatment in a variety of locations, including Bagram Airfield and a military hospital in Germany.  Id. at 302:21–303:7.  Mr. King had a long list of medical problems.  See Pls.' Ex. 286 (Mr. King's sealed medical records listing his conditions upon release).  "March of 2021 . . . was the first time [he] got a blood test that came back with no flags."  Tr. III at 305:4–6. Although he was an avid runner before his kidnapping, he has only recently been able to run again

because of the lack of feeling in his feet.  Id. at 305:17–306:8, 306:15–24.[24]  He suffers from peripheral neuropathy and low bone density, and he never expects to recover fully.  Id. at 305:9–306:14.  In addition to his physical injuries, Mr. King's mother died while he was a Taliban prisoner, id. at 307:10–16, and he reports "nightmares" and anxiety about the fate of Afghan citizens he knew who resisted the Taliban, id. at 307:17–25.

### 3.  Cpt. Ryan Gregory Timoney

CPT Ryan Timoney served for five years in the Army; at the time of his attack, he was an artillery officer with training in close air support.  Tr. III at 310:2–20 (Timoney).  He served in one combat deployment, to Afghanistan, beginning in 2012, where he worked with a local Afghan police force in Tarin Kowt, in Uruzgan Province.  Id. at 310:21–311:3, 312:4–7.  On May 20, 2012, he attended a "key leader engagement" where American soldiers met with the local police chief at a substation in Tarin Kowt.  Id. at 314:1–7.  "The risk level [for this mission] was extremely high," and CPT Timoney had been "told that there were . . . two suicide bombers [that] had been brought into the area from somewhere else."  Id. at 314:10–15.  Unfortunately, that intelligence proved to be correct.  After being asked to leave the station by the Afghan police chief, id. at 317:2–10, CPT Timoney's unit prepared to leave the police station, forming "a line up against the east wall," with CPT Timoney towards the front of the line, id. at 317:12–19.  CPT Timoney testified that, as the unit walked back towards their transports, he

> heard a male voice that . . . said something pretty loudly.  My translator replied with concern.  He had like a raised voice.  He didn't quite yell but he was clearly concerned just the way he said it.  And then the other person was approaching us.  He was much closer, and he yelled "Allah Akbar." . . .  A big red light went off in my head.  I'm like, this is the enemy; we're about to get engaged.  So I started turning, and I was raising my weapon to engage, but all of a sudden I'm on the

---

[24] Indeed, at the bellwether hearing, Mr. King wore a brace on his left arm because he tripped over a brick in the sidewalk; when he runs, he must constantly remind himself to pick up his feet.  Tr. III at 306:5–307:7

ground.  I can't see anything; I can't hear anything; I can't breathe. . . . So I tried to grab my rifle and get up but could not move at all.

Id. at 318:25–320:1.  CPT Timoney's companions "dragged" him into a vehicle, where his sight started to come back; with it came what he described as "outrageous pain, worst pain in my life, [in] my bottom left leg."  Id. at 320:6–10.  He remembers "looking down there and I screamed as loud as I could, and I blacked out."  Id. at 320:10–11.

CPT Timoney's injuries were grievous.  The suicide bomber "used ball bearings as shrapnel," and, as CPT Timoney explained,

> my lower left leg just got totally shattered, essentially.  The lower half of my left leg was in no way – like the bones were in no way attached to the bones above them.  I got one ball bearing in my upper left leg, two ball bearings in my abdomen, one ball bearing went through my chest . . . . It hit my spine between the T3 and T4.  One ball bearing went in my left bicep. One ball bearing went through the left side of my skull, straight through my brain.  It like hit my optic nerve a little bit and then it hit the interior of the right side of my skull and it rolled down a little bit.

Id. at 322:9–21.  Doctors in Afghanistan decided not to amputate his leg, in the hope that the bones would "heal naturally"; they attached an "ex fix" to keep the bones stabilized.  Id. at 322:24–323:8. CPT Timoney was transported, unconscious, to Germany.  Id. at 323:15–17.  He was placed on a ventilator due to a collapsed lung, and doctors were forced to "remove[] a big chunk of [his] skull" to relieve pressure on his brain.  Id. at 324:3–21.

CPT Timoney was then transferred first to Walter Reed, where he became conscious and was reunited with his parents, although he could not speak because of his tracheotomy and was unable to interact meaningfully due to his TBI.  Tr. III at 325:7–326:15.  Next, he was transferred again to a Veterans Administration hospital in Florida to be near his family.  Id. at 326:17–24.  At the Florida facility, he "really started waking up," but he did not understand what had happened; his first memory after arriving is that he "thought [he] was at a basketball game and gotten into a

67

fight and [he] was going to have to tell [his] parents." Id. at 320:15–321:3, 327:1–3.  He underwent multiple therapies to treat his vision (from the damage to his optic nerve), his brain injury (including motor skills, reading, and voice therapy), and his leg (including re-learning to walk). Id. at 327:5–329:11.

Cognitively, CPT Timoney was "a wreck": he "couldn't finish whole sentences" because he did not know the words; reading was difficult because his "short-term memory was a total wreck" and he could not see some of the letters because of his optic nerve injury; and his memory was so bad that he could not remember his own middle name, or even that he had a girlfriend (let alone who she was).  Tr. III at 328:16–329:24.  Emotionally, his experience was "brutal," in part because he knew he did not want to be dependent on his parents; although he was incapable of any work at the time, he set himself a "high goal": to be a "bagger at a grocery store."  Id. at 330:12–25.  Eventually, CPT Timoney got an "implant in [his] skull," which dramatically improved his short-term memory and other cognitive functions.  Id. at 331:3–24.  But the "ex fix" on his leg became infected, endangering his other progress.  Id. at 332:1–18.  Although he underwent several surgeries to stop the infection, id. at 332:19–333:17, his doctors eventually recommended that his leg be amputated, id. at 334:2–5.  The amputation was "the second worst pain" he ever experienced, and he did not respond to the painkillers he received.  Id. at 334:8–335:9.

CPT Timoney married his girlfriend and moved close to Walter Reed, and his cognitive skills improved to the point that he hoped to be a "software developer."  Tr. III at 335:12–336:4. Things were "looking pretty good" until February 2014, when CPT Timoney experienced a severe seizure while teaching himself to code; he collapsed, was unable to move the left side of his body, and could not form a thought.  Id. at 336:10–337:6.  Doctors informed him that they did not know what would happen, whether he would ever recover, or how well he would recover.  Id. at 337:13–

17.  He was prescribed several different medications to stave off seizures, all of which caused dramatic cognitive affects:  one drug affected his cognitive skills to the point that he became a "zombie," id. at 337:24–338:8, while another made CPT Timoney "drop[] self-censoring," so he was "totally straightforward," id. at 339:7–17.  Ultimately, he chose to use the "zombie" drug "at a lower dosage and just accept the risk of seizures" so he could function.  Id. at 339:18–22.

CPT Timoney medically retired from the Army at the end of 2014, after spending "about 10 months inpatient in different hospitals."  Tr. III at 340:1–3.  He suffers from PTSD, which has affected his employment, and he experiences physical limitations from his amputation.  Id. at 340:6–341:17.  Most significantly, and despite his medication, fluorescent lights trigger his seizures:  he "can't stay too long at a mall or a Walmart or Home Depot or a gas station"; he struggles to "look at screens" and uses a specialized computer monitor and lights at work; and he feels "constant paranoia" about experiencing another seizure in public.  Id. at 341:18–342:19.  His reading ability remains "awful," though his vocabulary is improving.  Id. at 342:20–343:7.  The aftermath of the attack has been "brutal" for his parents, id. at 344:15–345:6, and his wife is constantly vigilant for flickering and fluorescent lights when they "go see a movie or to a hotel," id. at 346:5–17.  CPT Timoney feels that he "can't be the kind of dad" he wants to be, and he struggles to do things like read aloud to his "two wonderful little girls."  Id. at 345:9–346:1, 346:18–20.  CPT Timoney does not believe he will ever recover fully from the attack.  Id. at 343:9–344:12.

### 4.  *Ms. August Wildman*

Ms. August Wildman, formerly August Cabrera, married LTC David Cabrera on October 19, 2002.  Tr. V [ECF No. 67] at 549:22–23 (Wildman).  They had two biological children, M.C. and R.C., and LTC Cabrera had two children from his first marriage, Corbin and Gillian, whom

69

Ms. Wildman describes as her "bonus kids." Id. at 554:2–3, 556:1–3. LTC Cabrera was a "behavioral health specialist" in the Army, a role that included working as a clinical social worker (LTC Cabrera held a master's degree in social work and a related Ph.D), a therapist, and a psychological health researcher. Id. at 558:11–13, 559:7–15. LTC Cabrera served in various positions, including providing "behavioral health support for an entire brigade that went to Iraq," and later as the individual "in charge of all behavioral health for all of Europe." Id. at 559:16–21. At the time of his deployment to Afghanistan, he had received a research grant to study "why medics in the Army have such better numbers, lower suicide rates, lower addiction, lower divorce rates" than other servicemembers; this was a "nondeployable position," and he was "supposed to retire" at the end of it, with only "three years left" in his term of service. Id. at 559:22–560:3. He deployed to Afghanistan voluntarily to pursue this research. Id. at 560:18–19, 562:1–4.

When LTC Cabrera informed her that he was going to deploy, Ms. Wildman was "so mad" that she "threw up." Tr. V at 561:22–562:6. He explained that his deployment in Iraq "had really messed him up, and he felt that every soldier that didn't make it, every divorce, every suicide, every addiction, every PTSD, every arrest was his fault, that he hadn't done a good enough job for them." Id. at 562:9–13; see also id. at 562:14–22. By the time LTC Cabrera deployed, Ms. Wildman "supported him" and "understood why he needed to go," in part because LTC Cabrera was "so good at his job" and "so passionate about it" that she "knew he could help" by applying new therapeutic techniques he had learned. Id. at 563:10–17.

Ms. Wildman spoke to LTC Cabrera on the phone on October 28, 2011. Tr. V at 564:19–20. He told her that he was "convoying out again to" a forward operating base because soldiers "don't get a day off to see [their] therapist," so he would "see 15, 16, 18 kids coming in off the line in a row, just one after the other, and he would sleep on the airfield" afterward. Id. at 564:24–

565:13.  Ms. Wildman asked about her husband's safety, and he responded, "I'm in a Rhino, and IED impervious, and gun trucks on both sides, and we do this trip all the time."  Id. at 565:14–23. But at 4:11 a.m. on October 29, 2011, Ms. Wildman's youngest son awoke screaming; he looked at Ms. Wildman and said, "there's been a horrible explosion and everybody's died in a fire."  Id. at 566:2–13.  According to Ms. Wildman, she "knew Dave was dead at that point."  Id. at 566:18. Three months later, her son told her that he "saw the attack" in a dream.  Id. at 567:1–5.

The next morning, on October 30, 2011, Ms. Wildman "broke the cardinal rule . . . .  If your husband is down range you never look at the news."  Tr. V at 567:7–10.  When she saw a news report of 17 people killed by a suicide bomber outside of Kabul, she "collapsed."  Id. at 11– 13.  She texted a friend in the military asking for news but heard nothing; she later learned that her contact had already been notified, but it was too late in the day to notify the family.  Id. at 568:1– 12.  The following day, Ms. Wildman "saw dress blues walking up [her] driveway" and was officially notified of LTC Cabrera's death.  Id. at 569:4–570:8.  Her children went to stay with a friend for a few days, while she went to Dover Air Force Base to be present when the Army brought LTC Cabrera's body home, while she tried "to speed-read [a] book about grief and kids."  Id. at 570:4–20.  The following day, she told her sons about their father's death.  She testified:

> [O]n the 1st [of November], my boys came home . . . .  I met them at the front door, and I took them up the stairs, set them on our bed.  I said, guys, there's been an accident, and Daddy was killed.  He's not coming home.  [R.C.] screamed "no" just like I had done.  So loud . . . .  And then he just started sobbing.  And [M.C.] who was seven, just turned seven, started to cry.  But like completely silently, just these – he has these big blue eyes and just these tears, right, and he never said anything. It's been 10 years and he still won't say anything.

Id. at 570:25–571:18.

Ms. Wildman has been diagnosed with PTSD.  Tr. V at 575:17–19.  She has received extensive therapy to work through her grief and the "guilt" she feels for giving her husband

"permission to go" to Afghanistan.  Id. at 575:20–576:16.  She is a "mentor for new widows" and has built a "beautiful life," but she is only now "finally stopping and just letting [her]self be sad." Id. at 576:11–22.  Her children have also suffered in the wake of their father's death.  Id. at 576:25– 577:2.  M.C. "got Dave's smart genetics" and is "[t]op of the class everywhere he goes," but he "has absolutely no ability to name an emotion.  None.  Sort of terrifying."  Id. at 577:2–7.  Ms. Wildman's "biggest fear for [M.C.] is that when he crashes, I'm not going to be close enough to get him . . . . [W]hen it hits him, I need to be able to get to him fast enough to hold him together"; she warned him, "you're either going to have to deal with it or your life is going to be miserable." Id. at 577:8–15.  Ms. Wildman's other son, R.C., has "kind of just been screaming 'no' for 10 years."  Id. at 578:4–5.  He has received extensive therapy, including a "wilderness intervention program in the mountains . . . for 104 days," followed by a "therapeutic boarding school . . . for a year."  Id. at 578:5–579:3.  He returned from those programs and Ms. Wildman "[t]hought we were good," but R.C. has continued to struggle—he recently returned to the wilderness program after telling Ms. Wildman that he might be suicidal.  Id. at 579:4–580:6.  When he arrived at the program, Ms. Wildman saw "just this sense of relief on his face.  I didn't realize that he'd been struggling to keep himself safe for so long . . . ."  Id. at 581:21–23.

Ms. Wildman testified that she is participating in this case to continue LTC Cabrera's mission of "helping soldiers and their families" and to "give a voice to all of us that have lost people we should never have lost, or people that are injured that never should have been injured." Tr. V at 584:12–19.  LTC Cabrera is buried at Arlington National Cemetery.  Id. at 585:8–10.  Ms. Wildman could not decide what to put on his tombstone:

> How do you summarize?  Summarize Dave of all people?  Beloved husband, whatever.  None of that worked.  And I didn't know what to do.  And so the boys were there, five and seven, and I said what should we put on Daddy's tombstone? And [M.C.], without missing a beat, looked at me and said, a soldier of kindness.

Done.  So that's what his tombstone says at Arlington.  He's a soldier of kindness.
And that's true.

Id. at 586:15–587:2.

## IV.     Conclusions of Law

Plaintiffs contend that Iran is liable for the bellwether attacks because it is a state sponsor of terrorism that provided material support for the Syndicate's attacks.  See Proposed Conclusions at 1.  After briefly addressing personal jurisdiction, the Court will turn to whether it possesses subject-matter jurisdiction, a question which, in this context, collapses with the ultimate question of whether Iran is liable for the bellwether attacks.  See, e.g., Est. of Doe v. Islamic Republic of Iran, 808 F. Supp. 2d 1, 19 (D.D.C. 2011) ("[L]iability under section 1605A(c) will exist whenever the jurisdictional requirements of section 1605A are met." (citation omitted)).  Finally, the Court will determine whether plaintiffs have established a cause of action for their claims.

### A.  Personal Jurisdiction

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of this title."  28 U.S.C. § 1330(b).  "In other words, 'under the FSIA, subject matter jurisdiction plus service of process equals personal jurisdiction.'"  GSS Grp., Ltd. v. Nat'l Port Auth., 680 F.3d 805, 811 (D.C. Cir. 2012) (cleaned up) (quoting Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 95 (D.C. Cir. 2002)).  As explained above, see supra Part I.A, plaintiffs were unable to serve Iran by special arrangement, see 28 U.S.C. § 1608(a)(1), international convention, see id. § 1608(a)(2), or foreign mailing, see id. § 1608(a)(3), but they successfully served Iran through diplomatic process, see id. § 1608(a)(4); see generally Zambon Return of

Service; Cabrera Return of Service.  Accordingly, so long as the Court has subject-matter jurisdiction over plaintiffs' claims, it also has personal jurisdiction over Iran.[25]

### B.  Subject-Matter Jurisdiction and Liability

"The FSIA provides a basis for asserting jurisdiction over foreign nations in the United States."  Price, 294 F.3d at 87 (citing Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443 (1989)).  Although foreign states are generally "immune from" the jurisdiction of American courts, the FSIA provides exceptions to that immunity in "sections 1605 to 1607" of Title 28.  28 U.S.C. § 1604.  Federal district courts have original jurisdiction over claims brought within these exceptions.  28 U.S.C. § 1330(a).

In this case, plaintiffs allege that the Court has jurisdiction pursuant to the FSIA's terrorism exception, 28 U.S.C. § 1605A.  That exception provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

Id. § 1605A(a)(1).  Thus, to satisfy this exception, plaintiffs must show that their personal injuries or death were "caused by," as relevant here, "an act of . . . extrajudicial killing . . . , hostage taking, or the provision of material support or resources for such an act," and that the support was provided by "an official, employee, or agent" of a foreign state acting within the scope of his official position.  Id.  Plaintiffs must also satisfy the requirements of § 1605A(a)(2):  that the foreign state was a designated state sponsor of terrorism at the time of the attack and at the time the claim was

---

[25] There are no due process concerns raised by this exercise of personal jurisdiction over Iran because "foreign states are not 'persons' protected by the Fifth Amendment."  Price, 294 F.3d at 96.

filed, and that the claimant or victim was a United States national, a member of the armed forces, or a U.S. government employee or contractor at the time of the attack.[26]

At the outset, plaintiffs clearly satisfy several of these threshold requirements.  Iran was a designated state sponsor of terrorism at all relevant times, see Determination Pursuant to Section 6(i) of the Export Administration Act of 1979–Iran, 49 Fed. Reg. 2836-02 (Jan. 23, 1984), and the victims were United States nationals and/or members of the armed forces at the time of the attacks, see infra Part V.A.  Thus, the Court will focus on four other necessary elements of the terrorism exception:  whether plaintiffs have suffered personal injury or death; whether Iran provided material support for the attacks that caused those injuries or deaths; whether the attacks constituted "extrajudicial killings" or "hostage takings"; and whether the plaintiffs' injuries or deaths were caused by Iran's material support for the attacks.

### 1.  Personal Injury or Death

First, the Court concludes that each plaintiff associated with the bellwether attacks suffered "personal injury or death."  28 U.S.C. § 1605A(a)(1).  Lt. Col Wood opined, based on government reporting and first-hand interviews, that each of the 30 direct victims was injured or killed in one of the eleven bellwether attacks.  See generally supra Part III.D.2–12.  SGT Lemon, CPT Timoney, and Mr. King testified about the significant physical and mental injuries they suffered as a result of the Syndicate's attacks against them.  See generally supra Part III.E.1–3.

The FSIA also "encompass[es] claims by family members of those injured or killed for the distress caused by their relative's injuries, also known as solatium actions."  Force v. Islamic

---

[26] Section 1605A(a)(2) also requires that the foreign state have received "a reasonable opportunity to arbitrate" a plaintiff's claim, but only if the act of terrorism "occurred in the foreign state against which the claim has been brought."  28 U.S.C. § 1605A(a)(2)(A)(iii).  This requirement is inapplicable here because none of the alleged acts of terrorism took place in Iran.

Republic of Iran, 464 F. Supp. 3d 323, 359 (D.D.C. 2020). "Solatium is awarded to compensate 'the mental anguish, bereavement, and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent's society and comfort." Murphy v. Islamic Republic of Iran, 740 F. Supp. 2d 51, 78 (D.D.C. 2010) (cleaned up) (quoting Belkin v. Islamic Republic of Iran, 667 F. Supp. 2d 8, 22 (D.D.C. 2009)). Family members bringing solatium claims "are considered to be bringing a particular variety of an intentional infliction of emotional distress claim . . . and are considered to be bringing 'claims for personal injury.'" Force, 464 F. Supp. 3d at 359 (internal citation omitted); cf. Oveissi v. Islamic Republic of Iran, 879 F. Supp. 2d 44, 50–51 (D.D.C. 2012) (Oveissi II) (explaining that claims by grandson of murder victim "clearly involve 'personal injury or death' under . . . § 1605A(a)(1)"). In this case, Ms. Wildman provided moving testimony about the mental and emotional injuries she and her children suffered because of the October 29, 2011 vehicle-borne suicide bombing that killed her husband, LTC Cabrera. See generally supra Part III.E.4. And plaintiffs have submitted affidavits establishing the same kind of injuries suffered by the family members of SGT Lemon, CPT Timoney, LTC Cabrera, and Mr. King, which will be discussed in more depth below. See generally Ex. A to Proposed Damages Findings [ECF No. 72-1] ("Damages Decls."). The Court concludes that the bellwether plaintiffs are seeking damages for "personal injury or death" within the meaning of § 1605A(a)(1).

### 2. Material Support

Under the FSIA's terrorism exception, Iran is not entitled to sovereign immunity for claims stemming from the provision of "material support or resources" for extrajudicial killings and hostage takings if that support was provided by an Iranian "official, employee, or agent . . . while acting within the scope of his or her office, employment or agency." 28 U.S.C. § 1605A(a)(1).

The FSIA adopts the definition of "material support or resources" from 18 U.S.C. § 2339A: "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . , and transportation, except medicine or religious materials." See 28 U.S.C. § 1605A(h)(3).

This Court has already found that Iran provided many kinds of material support for the bellwether attacks committed by the Syndicate. Iran provided active support in the form of weapons and explosives, training, financial support, safe haven, and the facilitation of the Taliban's lucrative drug-trafficking operations, all of which are discussed in depth in Part III.B of this Opinion. See generally Roggio Report ¶¶ 149–257. Iran provided the Syndicate with a range of "weapons, lethal substances, [and] explosives," 18 U.S.C. § 2339A(b)(1), including AK-47s, 107mm rockets, mortars, RPGs, recoilless rifles, PKM machine guns, light machine guns, anti-tank missiles, ammunition, IEDs, EFPs, and materials, including explosives needed to make suicide vests and VBIEDs, see Tr. I at 83:14–94:14 (Roggio); Roggio Report ¶¶ 182–201. Iran also provided the Syndicate with "training [and] expert advice or assistance," 18 U.S.C. § 2339A(b)(1), both by bringing Taliban fighters into Iran for training and by sending Iranian trainers into Afghanistan; indeed, Iran's trainers sometimes even assisted directly with attacks, see Tr. I at 94:15–98:19 (Roggio); Roggio Report ¶¶ 202–22.

Iran also supported the Syndicate's attacks financially by providing the Taliban with "currency," 18 U.S.C. § 2339A(b)(1), both with the direct provision of cash to Taliban leaders and by paying bounties to terrorists who killed or wounded troops or damaged equipment., see Tr. I at 98:20–104:2 (Roggio); Roggio Report ¶¶ 223–46. Iran offered classic safe haven, 18 U.S.C.

§ 2339A(b)(1), by permitting Taliban leaders to flee American forces into Iran, Tr. I at 104:22–

105:13 (Roggio); and, perhaps more importantly for this case, it also "allowed and/or encouraged

[the Syndicate] to operate [its] terrorist enterprises within its borders, and thus provided a base of

operations for the planning and execution of terrorist attacks," Owens v. Republic of Sudan, 412

F. Supp. 2d 99, 108 (D.D.C. 2006) (Owens I), aff'd, 531 F.3d 884 (D.C. Cir. 2008); see generally

Roggio Report ¶¶ 202–06, 212, 217–21.[27]   Finally, Iran's assistance for the Taliban's drug trade,

which helped to fund the Syndicate, was the provision of a "service" within the meaning of 18

U.S.C. § 2339A(b)(1).   Drug trafficking was extremely lucrative for the Taliban, funding its

terrorist activities, see Tr. II at 152:12–153:17 (Clarke); Clarke Report at 74–77, and the Iranian

government facilitated this trafficking by permitting Taliban drugs to cross the Iranian border,

even providing special license plates to alert the Iranian Border Patrol not to stop Taliban vehicles

containing drugs, see Tr. II at 153:12–154:19, 156:1–160:8 (Clarke); Clarke Report at 74–82.[28]

Iran also provided the Syndicate with material support through the IRGC and Qods Force.

Roggio Report ¶¶ 126–36.   In Afghanistan, Iran used the Qods Force to support the Syndicate

through the Ansar Corps.   Id. ¶ 132.   From its headquarters in Mashhad (also the headquarters of

the Taliban's Mashhad Shura), the Ansar Corps directed Iranian operations in Afghanistan.   Tr. I

at 75:1–20 (Roggio); Roggio Report ¶¶ 152–53.   Many government documents that detail Iran's

support for the Taliban identify the IRGC, Qods Force, or Fourth Corps as the source of that

support.   E.g., Pls.' Ex. 227 at 3, 6; Pls.' Ex. 228 at 19; see Tr. I at 90:9–92:1, 92:22–94:14

---

[27] Accord, e.g., Force, 464 F. Supp. 3d at 366 (interpreting the term "safehouse" to include "foreign governmental encouragement or assent to terrorist organizations setting up shop within their borders").   As relevant in this case, the Taliban opened at least two formal offices:  in Mashhad, Iran in 2007 and in Zahedan, Iran in 2009. Tr. I at 105:14–106:3 (Roggio); Roggio Report ¶ 221.

[28] In addition to its support for the broader Syndicate, Iran also provided material support specifically to al-Qaeda, with which it has long shared a particularly close relationship.   See generally Roggio Report ¶¶ 231–47.   Iran provided a safe haven for al-Qaeda leaders fleeing Afghanistan after the American invasion in 2001, and Iran permitted those leaders to move freely throughout the country.   See, e.g., Tr. I at 111:24–114:11 (Roggio).

(Roggio).  And at all times relevant to this case, Iran's central government controlled the Qods Force and approved its support for terrorist proxies:  General Qassem Soleimani—commander of the Qods Force until he was killed in Baghdad in 2020—reported directly to Iran's Supreme Grand Leader Ayatollah Ali Khameini.  Tr. I at 72:13–73:16 (Roggio); Roggio Report ¶¶ 131, 133 & fig. 6.  The Supreme Leader intentionally directed the Qods Force's provision of material support to the Syndicate, and the Qods Force did not act without his approval.  Tr. I at 82:5–17 (Roggio).  Every member of the Qods Force who provided material support to the Syndicate was thus an "official, employee, or agent" of Iran "acting within the scope of his or her office, employment, or agency."  28 U.S.C. § 1605A(a)(1).[29]

Finally, the Taliban is not the only terrorist organization to which Iranian officials provided material support, nor are the attacks at issue in this litigation the only acts of terrorism for which Iran has been held liable on the basis of material support.  The record demonstrates that Iran supports terrorist groups throughout the Middle East, including Hezbollah in Lebanon, the Houthis in Yemen, and Shia terrorist groups in Iraq.  Pls.' Ex. 198 at 68; see also Roggio Report ¶¶ 137–48; Tr. I at 62:15–68:10 (Roggio).  Other Courts in this District have sustained FSIA claims against Iran arising from its provision of material support for many of those groups.  See, e.g., Ewan v. Islamic Republic of Iran, 466 F. Supp. 3d 236, 241, 246 (D.D.C. 2020) (Iran provided material support for Hezbollah's bombing of the U.S. embassy in Beirut); Force, 464 F. Supp. 3d at 337 (Iran's material support for several attacks committed by Hamas and Palestinian Islamic Jihad in Israel); Karcher, 396 F. Supp. 3d at 23–25, 56–57 (Iran's material support for attacks committed

---

[29] Further, "[c]ourts in this district have held on multiple occasions that the IRGC is part of the Iranian government."  Schertzman Cohen v. Islamic Republic of Iran, Civ. A. No. 17-1214 (JEB), 2019 WL 3037868, at *3 (D.D.C. July 11, 2019) (citing Ben-Rafael v. Islamic Republic of Iran, 718 F. Supp. 2d 25, 32 (D.D.C. 2010)).  Thus, to the extent any of the material support provided to the Syndicate in this case was provided directly by the IRGC and its Qods Force, that material support was provided by agents or employees of Iran itself.

by Shia terrorist groups in Iraq); <u>Hamen v. Islamic Republic of Iran</u>, 401 F. Supp. 3d 85, 103–04 (D.D.C. 2019) (Iran's material support for two kidnappings and one extrajudicial killing committed by the Houthis in Yemen).  Based on the weight of evidence in this case, and Iran's clear practice of providing material support to similar terrorist groups, the Court concludes that Iran provided material support for the Syndicate's terrorist attacks.

### 3.  Acts of Extrajudicial Killing and Hostage Taking

The FSIA's terrorism exception applies against Iran if Iran provided material support for an "act of torture, extrajudicial killing, aircraft sabotage, [or] hostage taking."  28 U.S.C. § 1605A(a)(1).  Plaintiffs assert that each bellwether attack was either an extrajudicial killing or, in the case of Mr. King's kidnapping, a hostage taking, and that all of the attacks were committed by the Taliban-led Syndicate.  As explained in greater depth in the findings of fact, the Court agrees with this assertion:  the Syndicate committed each of the eleven bellwether attacks in this case.  <u>See generally</u> <u>supra</u> Part III.D.2–12.  With that issue resolved, the Court will assess whether each bellwether attack was, as plaintiffs claim, an act of "extrajudicial killing" or "hostage taking" within the meaning of the FSIA.

<u>Extrajudicial Killings</u>:  The FSIA incorporates the definition of "extrajudicial killing" from that in the Torture Victim Protection Act of 1991 ("TVPA").  28 U.S.C. § 1650A(h)(7).  The TVPA defines "extrajudicial killing" to mean "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples," but does not include "any such killing that, under international law, is lawfully carried out under the authority of a foreign nation."  Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992) (codified at 28 U.S.C. § 1350 (note)).  There are three

elements to this definition:  "(1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court."  Owens, 864 F.3d at 770.

The terrorism exception to sovereign immunity also applies to allow claims by injured plaintiffs if an attack kills some victims and physically injures others.  This is so because "§ 1605A covers 'personal injury or death that was caused by an act of . . . extrajudicial killing,' and the same act of killing one person can quite obviously injure another."  Owens v. Republic of Sudan, 174 F. Supp. 3d 242, 266 (D.D.C. 2016) ("Owens III") (alteration in original) (quoting 28 U.S.C. § 1605A(a)(1)).  Thus, plaintiffs "need only establish that [the attack] was unauthorized, deliberate, and that there were casualties"; "[i]t is not necessary . . . for one of the plaintiffs to have died in the attack in order for the state-sponsor-of-terrorism exception to apply."  Cohen v. Islamic Republic of Iran, 238 F. Supp. 3d 71, 81 (D.D.C. 2017); accord, e.g., Karcher, 396 F. Supp. 3d at 58 (collecting cases and agreeing "that material support for an attack that extrajudicially killed someone other than the injured servicemember represented in this case is sufficient for jurisdictional purposes").

Additionally, even where an attack killed no one—i.e., where it caused only physical injuries—the terrorism exception continues to apply.  Although "[t]he text of § 1605A(a)(1) does not expressly address attempts to commit acts" such as extrajudicial killing, courts in this District have concluded that injuries "resulting from 'deliberated' attempts to kill fall within the scope" of the terrorism exception.  Karcher, 396 F. Supp. 3d at 58; accord Gill v. Islamic Republic of Iran, 249 F. Supp. 3d 88, 99 (D.D.C. 2017).  In construing the TVPA's definition to include attempted killing, the Court is mindful of the D.C. Circuit's direction to interpret the FSIA's "ambiguities flexibly and capaciously," Van Beneden v. Al-Sanusi, 709 F.3d 1165, 1167 (D.C. Cir. 2013), in

order to "prevent state sponsors of terrorism . . . from escaping liability for their sins," Han Kim, 774 F.3d at 1048.

Ten of the eleven bellwether attacks in this case were "extrajudicial killings" within the meaning of the FSIA.  In nine of those ten attacks, at least one individual died.  See Wood Report ¶¶ 109, 122–25 (July 13, 2008 complex attack in Nuristan Province); id. ¶¶ 147, 151 (August 16, 2009 IED-triggered complex attack in Herat Province); id. ¶¶ 168, 172 (April 11, 2010 IED attack in Kandahar Province); id. ¶¶ 184, 194, 207 (August 6, 2011 attack on helicopter in Wardak Province); id. ¶¶ 209, 212, 226 (October 29, 2011 vehicle-borne suicide bombing in Kabul); id. ¶¶ 228, 232, 241 (May 20, 2012 suicide vest bombing in Uruzgan Province); id. ¶¶ 260, 273 (June 18, 2013 indirect fire attack in Parwan Province); id. ¶¶ 275, 282 (July 15, 2013 recoilless rifle attack in Paktia Province); id. ¶¶ 319, 325, 345 (June 10, 2017 insider attack in Nangarhar Province).  Most of the plaintiffs associated with each bellwether attack are family members of individuals who were killed.

Two more plaintiffs were severely injured in attacks that killed others:  SGT Lemon in the April 11, 2010 IED attack in Kandahar Province, which killed SPC Caron, whose family members are plaintiffs, Wood Report ¶¶ 168, 172; and CPT Timoney in the May 20, 2012 suicide vest bombing in Uruzgan Province, which killed CPT Jesse Ozbat and 2LT Tobias Alexander, id. ¶¶ 228, 232, 241.  And in the tenth bellwether attack—the May 31, 2012 IED attack in Helmand Province which severely wounded SGT Hunter—no one was killed.  Tr. IV at 462:13–463:9 (Wood).  But, as explained above, a successful killing is not required to defeat foreign sovereign immunity under the "extrajudicial killing" element of the terrorism exception.  E.g., Gill, 249 F. Supp. 3d at 99.  The attack that injured SGT Hunter was an attempted killing.  The Syndicate planned the attack in advance by constructing an IED and placing it on a path where American

forces would likely trigger it, even calibrating its trigger to detonate only under the weight of a fully armed soldier, and the Syndicate's goal in conducting this attack was to kill American soldiers.  See Wood Report ¶¶ 255–57; Tr. IV at 466:19–20, 468:12–470:6 (Wood).

All ten attacks involving extrajudicial killings were "deliberate."  A deliberated attack is one "undertaken with careful consideration, not on a sudden impulse."  Lee v. Islamic Republic of Iran, 518 F. Supp. 3d 475, 491 (D.D.C. 2021) (citation omitted).  Lt. Col. Wood testified that the Syndicate planned each of the attacks in advance.  Tr. IV at 395:19–20 (Wood) (July 13, 2008 complex attack in Nuristan Province); id. at 414:5–6 (August 16, 2009 IED-triggered complex attack in Herat Province); id. at 424:4–5 (April 11, 2010 IED in Kandahar Province); id. at 435:4–5 (August 6, 2011 attack on helicopter in Wardak Province); id. at 446:5–6 (October 29, 2011 vehicle-borne suicide bombing in Kabul); id. at 458:10–11 (May 20, 2012 suicide vest bomber in Uruzgan Province); id. at 468:12–13 (May 31, 2012 IED in Helmand Province); id. at 477:23–24 (June 18, 2013 indirect fire in Parwan Province); id. at 489:21–22 (July 15, 2013 recoilless rifle attack in Paktia Province); id. at 506:4–5 (June 10, 2017 insider attack in Nangarhar Province).

In some instances, the Syndicate may not have known in advance that it would have the opportunity to conduct a particular attack—consider, for example, the August 6, 2011 RPG attack on a helicopter in Wardak Province.  The attack was nevertheless "deliberated" because the Syndicate planned its tactics in advance should the opportunity to kill Americans arise.  Lt. Col. Wood testified that the Taliban climbed to an elevated position to shoot at American helicopters they knew would be moving through the valley, and that they had attempted to use the same tactic in the preceding months, shooting at any potential targets.  Tr. IV at 435:6–16 (Wood); see Wood Report ¶ 200.  Even for these relatively spontaneous attacks, it is clear from the record before the Court that they were nonetheless "undertaken with careful consideration, not on a sudden

impulse."  Owens III, 174 F. Supp. 3d at 263 (collecting cases and sources); accord Colvin v. Syrian Arab Republic, 363 F. Supp. 3d 141, 158 (D.D.C. 2019) (collecting cases).  Indeed, all of these bellwether attacks were part of an extended terrorist campaign by the Taliban-led Syndicate to kill American servicemembers in order to achieve its overarching goal of driving the United States of Afghanistan by killing and wounding American soldiers and civilians—a goal which the Syndicate achieved with its successful overthrow of the Afghan government in August 2021. See Tr. I at 26:2–21, 37:1–6 (Roggio); Tr. II at 162:11–15 (Clarke).

Finally, these ten bellwether attacks were neither "authorized by a previous judgment pronounced by a regularly constituted court" nor "lawfully carried out under the authority of a foreign nation."  Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992); cf. Han Kim, 774 F.3d at 1050–51 (requiring plaintiffs to prove only that the terrorist-sponsor state "killed the [plaintiff] without due process" and accepting uncontested affidavits as sufficient evidence).  Mr. Roggio testified that neither the United States, the United Nations, nor the international community recognized the Taliban as a lawful government after September 11, 2001; that the lawful Afghan government never authorized the Taliban's attacks on U.S. forces in Afghanistan; and that no regularly constituted Afghan court ever authorized such attacks.  Tr. I at 31:4–18 (Roggio).[30]  By 2006, the start of the relevant period for this case, the Islamic Republic of Afghanistan was the rightful Afghan government.  Id. at 31:10–12.  The Taliban was neither a foreign nation nor a military force.  Accordingly, the Court concludes that the ten attacks discussed in this paragraph were "extrajudicial killings" within the meaning of the FSIA.

---

[30] Before 2001, even though the "Taliban controlled about 90 percent" of Afghanistan, Tr. I at 30:17–19 (Roggio), it did not function as a government:  it "neglected critical infrastructure such as roads, schools, and health clinics"; "supported the illegal drug trade by prioritizing opium crops, which exacerbated the humanitarian crisis . . . by reducing available farmland for food crops"; "refused to allow international aid to reach Afghan areas under its control"; and stripped rights from women and girls, Roggio Report ¶ 40.

Hostage Taking:  The FSIA incorporates the definition of "hostage taking" from "Article 1 of the International Convention Against the Taking of Hostages," 28 U.S.C. § 1605A(h)(2), which defines a hostage taker as "[a]ny person who seizes or detains and threatens to kill, to injure or to continue to detain another person . . . in order to compel a third party, namely, a State, . . . to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage," International Convention Against the Taking of Hostages art. 1, ¶ 1, Dec. 18, 1979, 1316 U.N.T.S. 205.  "The Convention does not proscribe all detentions, but instead focuses on the intended purpose of the detention," Price, 294 F.3d at 94; "[t]he essential element of a hostage-taking claim is that the intended purpose of the detention be to accomplish the sort of third-party compulsion described in the Convention."  Hekmati v. Islamic Republic of Iran, 278 F. Supp. 3d 145, 161 (D.D.C. 2017) (cleaned up) (quoting Simpson v. Socialist People's Libyan Arab Jamahiriya, 470 F.3d 356, 359 (D.C. Cir. 2006)).

The August 7, 2016 kidnapping of Mr. King in Kabul City was a "hostage taking."  His Taliban captors informed Mr. King that he and his co-hostage "had been kidnapped by Mujahideen and that they want[ed] to trade [the hostages] for some prisoners at Bagram or [Guantanamo Bay]."  Tr. III at 282:25–283:2 (King).  They forced King to make multiple hostage videos to encourage the U.S. government to exchange prisoners.  Id. at 288:11–14, 289:10–24; see generally Pls.' Exs. 288–91.  As Lt. Col. Wood explained, the Taliban's goal in kidnapping Mr. King "was to gain bargaining chips in order to release some of their own people who had been captured."  Tr. IV at 491:23–492:1 (Wood); see Wood Report ¶ 317.  Mr. King and his co-hostage eventually were released in direct exchange for high-ranking Taliban prisoners.  Tr. IV at 496:8–497:23 (Wood); Wood Report ¶ 317.  Thus, because the Taliban-led Syndicate kidnapped Mr. King in order to

compel a third party, the United States, to exchange Taliban prisoners, the kidnapping was a "hostage taking" within the meaning of the FSIA.

### 4.  Causation

Finally, plaintiffs must demonstrate that each "personal injury or death" involved in the eleven bellwether attacks "was caused by" Iran's provision of "material support or resources" for the attacks in question.  28 U.S.C. § 1605A(a)(1).  The FSIA does not require plaintiffs to show that "a state's material support [was] directly for the specific act" that caused their injuries; such a limitation "'would likely render [the] material support provision ineffectual' because material support 'is fungible' and 'terrorist organizations can hardly be counted on to keep careful bookkeeping records.'"  Owens, 864 F.3d at 799 (quoting Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1130 (D.C. Cir. 2004)).  Thus, the terrorism exception strips immunity from a foreign state that "specifically instructs" a terrorist organization to carry out an attack and from a foreign state that "only provides general support, but was not involved with the" specific act.  Kilburn, 376 F.3d at 1128.  Under the causation standard imposed by the FSIA, a plaintiff need not establish but-for causation and instead may articulate a claim by showing (1) the defendant's actions were "a 'substantial factor' in the sequence of events that led to the plaintiff's injury"; and (2) the plaintiff's injury was "'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct."  Owens, 864 F.3d at 794 (citations omitted).

Substantial Factor:  The material support Iran provided to the Syndicate was a substantial factor in the Syndicate's ability to conduct these bellwether attacks.  Courts in this District, including this Court, have reached the same conclusion in many similar cases where a state sponsor of terrorism provides material support that enhances a terrorist group's ability to attack, even where that support is not directly traceable to a specific attack.  In Owens v. Islamic Republic of Sudan,

826 F. Supp. 2d 128 (D.D.C. 2011) (Owens II), for example, this Court concluded that Sudan was liable for terrorist attacks because it "provided the safe harbor necessary to allow al Qaeda to train and organize its members for acts of large-scale terrorism from 1992 to 1996," and facilitated this safe harbor "through constant vigilance by its security services and the provision of documentation required to shelter al Qaeda from foreign intelligence services and competing terrorist groups." 826 F. Supp. 2d at 151.  That Sudan's support for al-Qaeda was not directly traceable to the 1998 embassy bombings in Kenya and Tanzania was not dispositive because "the safe haven that Al Qaeda had in Sudan was absolutely integral for its ability" to conduct the bombings.  Id. at 146 (citation omitted).

Similarly, in Force, Judge Moss considered claims against Iran and Syria for their material support of Hamas and Palestinian Islamic Jihad, which committed several attacks in that case.  464 F. Supp. 3d at 334–35.  Judge Moss found, as in this case, that Iran provided Hamas with "finances and weapons," and that it "overs[aw] training camps in its own territory and [elsewhere] for the purpose of training" terrorists.  Id. at 338.  He further found that Iran established "an incentive system in which millions of dollars in cash bonuses [were] conferred to [Palestinian Islamic Jihad] for successful attacks," as well as providing "weapons, training, and funding."  Id. at 340.  And, as here, Judge Moss found that Syria provided material support to Hamas and Palestinian Islamic Jihad by allowing the groups to "conduct[] significant aspects of their operations from within Syrian territory," which "helped both groups grow in their operations and influence."  Id. at 366. Although the plaintiffs did "not offer[] evidence that either Iran or Syria's support was tied to each of the attacks that caused their injuries," Judge Moss explained that "such a 'nexus' is not necessary because funds—and, in certain instances, arms and other support—are fungible."  Id. at 368.  Thus, because "Iran's financial and military aid . . . was essential to each group's operating

capacity," id., and because "the continuous support which Syria provided to Hamas . . . contributed to giving the group the military edge and sophistication it needed to . . . conduct and carry out successful violent operations," the material support provided by Syria and Iran was a substantial factor in the attacks that caused the injuries in that case, id. (citation omitted).[31]

Other courts in this District have come to similar conclusions:  that terrorist sponsors' material support can be a substantial factor in a given terrorist attack even without a direct link between the support and the particular attack at issue.  See, e.g., Sotloff v. Syrian Arab Republic, 525 F. Supp. 3d 121, 139 (D.D.C. 2021) ("Syria's material support to ISIS—its release of prisoners, financial relationship with ISIS, and military coordination with it—was a substantial factor in its development into a wealthy proto-state with sophisticated, battle-hardened leadership that controlled large swaths of territory. . . .  And it was only under those conditions that ISIS could" commit the attacks at issue.  (citations omitted)); Hamen, 401 F. Supp. 3d at 103–04 (Iran's provision of "weapons, financial support, and training" was a substantial factor in plaintiffs' attacks because it "put the Houthis in a position of power to commit acts of terrorism like the ones at issue in this case"); Est. of Hirshfeld v. Islamic Republic of Iran, 330 F. Supp. 3d 107, 120, 136 (D.D.C. 2018) (concluding that Iran's provision of "weaponry, munitions, training, and millions of dollars in financial support" to Hamas "was a substantial factor in the events that led to" Hamas's attack on plaintiffs).

The same conclusion is justified in this case.  Iran provided the Syndicate with weapons, explosives, training, financial support, safe haven, and assistance with the Syndicate's drug-trafficking operations.  See generally supra Part III.B.  As Mr. Roggio testified,

---

[31] Judge Moss concluded that this was so even though Syria withdrew its support from Hamas more than four years before the first attack at issue in the case.  See id. at 365, 368.  By contrast, Iran continued to support the Syndicate throughout the attacks at issue in this case.

> Iran's support was critical from the very beginning. It allowed the Taliban syndicate to reconstitute after the U.S. drove the Taliban and its allies off the battlefield from the 2001–2002 time period. It gave the Taliban syndicate everything it needed. It gave them the safe haven, the weapons, the support. It permitted the Taliban to kill and wound American troops and ultimately forced the U.S. to leave the country.

Tr. I at 122:4–10 (Roggio). Iran's support was fungible between members of the Syndicate, and it eliminated the need for those members to compete with each other for resources. Id. at 123:8–20 ("Support for one element of the syndicate that came from Iran didn't have to be distributed to the others. They all received the support. So it was a cumulative effect. There was a synergy."). This multifaceted approach—Iran's "blueprint" for support, which "it has developed over the past 40 years," id. at 122:14–15—empowered the Syndicate to carry out attacks on U.S. forces and civilians more effectively, id. at 123:17–20. And in Lt. Col. Wood's opinion, Iran's material support for the Taliban substantially contributed to the Syndicate's ability to commit each of the eleven bellwether attacks. Tr. IV at 407:9–15, 416:11–17, 425:13–19, 438:12–16, 453:5–12, 462:6–12, 472:15–19, 481:19–25, 490:19–23, 498:2–7, 510:3–7 (Wood). The Court agrees: Iran's provision of resources and aid to the Syndicate substantially contributed to its ability to conduct these attacks.

Reasonably Foreseeable or Natural Consequence: To establish proximate causation, plaintiffs must also demonstrate that their injuries were "reasonably foreseeable or anticipated as a natural consequence of" Iran's material support for the Syndicate. Owens, 864 F.3d at 794 (citation omitted). In this case, plaintiffs' injuries were not only foreseeable: they were the intended result of Iran's support. See Tr. I at 120:14–18 (Roggio) ("Iran sought to kill and wound American troops in Afghanistan in order to get the U.S. to leave the country . . . —it wanted to end the U.S. presence on its border, so it supported the Taliban syndicate in order to do this."). And this is not the first occasion on which Iran has provided material support to a terrorist proxy in

order to achieve its own political goals.  E.g., Hamen, 401 F. Supp. 3d at 105–06 ("That one of

Iran's proxies acted to abduct and detain Americans is not only a 'reasonably foreseeable' 'natural

consequence,' but a desired result of Iran's training and directives.  That one of the Americans was

also brutally killed was, 'by any reasonable measure, a foreseeable consequence of Iran's

support.'" (citation omitted)); cf. Foley v. Syrian Arab Republic, 249 F. Supp. 3d 186, 204 (D.D.C.

2017) (applying similar reasoning with respect to Syria's support for a terrorist group).

"In assessing reasonable foreseeability, moreover, the Court must consider 'the broader

context' of Iran's conduct."  Fritz v. Islamic Republic of Iran, 320 F. Supp. 3d 48, 86 (D.D.C.

2018) (Fritz I) (quoting Owens, 864 F.3d at 797).  Iran's relationship with the Syndicate was part

of its broader "comprehensive campaign to deter the U.S. from maintaining a presence in the

Middle East by terrorizing and intimidating coalition forces."  Id.; accord, e.g., Frost v. Islamic

Republic of Iran, 383 F. Supp. 3d 33, 48 (D.D.C. 2019) ("Iran, through the Quds Force, has

provided training, weapons, and money to militant groups for decades for the express purpose of

advancing its interests through violence and terrorism.").  In short, Iran intended for its material

support for the Syndicate to enable lethal attacks on American and Coalition forces, and it provided

that support to further its own long-term geopolitical goals.  By any measure, plaintiffs' injuries

and deaths were a reasonably foreseeable consequence of Iran's provision of material support to

the Syndicate.

### C.  Cause of Action[32]

The FSIA provides a private right of action against state sponsors of terrorism for plaintiffs

who are United States nationals, members of the armed forces, government employees or

---

[32] Because this Memorandum Opinion concerns the damages of only twenty-three bellwether plaintiffs—
those associated with the four plaintiffs who testified at the hearing—the Court will only address the existence of a

contractors, or legal representatives of those people, "for personal injury or death caused by" acts including extrajudicial killing and hostage taking.  28 U.S.C. § 1605A(c).  The available damages include "economic damages, solatium, pain and suffering, and punitive damages."  Id.  But although the FSIA "provides a private right of action, it does not provide guidance on the substantive bases for liability to determine [p]laintiffs' entitlement to damages."  Hirshfeld, 330 F. Supp. 3d at 137.  Because § 1650A(c) "does not spell out the elements of these claims," courts must "apply general principles of tort law," Owens II, 826 F. Supp. 2d at 157 n.3 (citation omitted); plaintiffs must "prove a theory of liability which justifies holding the defendants culpable for the injuries that the plaintiffs allege to have suffered," Selig v. Islamic Republic of Iran, Case No. 1:19-cv-02889 (TNM), 2021 WL 5446870, at *12 (D.D.C. Nov. 22, 2021) (quoting Oveissi II, 879 F. Supp. 2d at 53–54).  District courts "may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)."  Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affs., 892 F.3d 348, 353 (D.C. Cir. 2018).

### 1.  Survivor Plaintiffs

SGT Lemon, CPT Timoney, and Mr. King bring claims for the physical and emotional pain and suffering caused by the terrorist attacks in which they were injured.  First Am. Compl. [ECF No. 8] ¶¶ 1015, 1556, 1708–09; Second Am. Compl. ¶ 2118.  They may recover for pain and suffering from physical injuries based on general tort principles governing battery.  Iran is "liable for battery if, when [it] provided material support and resources to [the Syndicate], [it] acted 'intending to cause a harmful or offensive contact with, or an imminent apprehension of such a

---

cause of action for that twenty-three-person subset.  However, the principles stated here will apply to the cause-of-action analyses for other plaintiffs as well.

contact by, those attacked and a harmful contact with those attacked directly or indirectly resulted.'" Bluth v. Islamic Republic of Iran, 203 F. Supp. 3d 1, 20–21 (D.D.C. 2016) (quoting Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 76–77 (D.D.C. 2010)).  Plaintiffs have demonstrated that Iran provided material support to the Syndicate with the intent to kill and wound Americans in attacks just like those that injured SGT Lemon, CPT Timoney, and Mr. King, see supra Part III.D.2–12, and SGT Lemon, CPT Timoney, and Mr. King have all amply demonstrated that harmful contacts occurred in each of their cases, see supra Part III.E.1–3.  These three plaintiffs are accordingly entitled to damages for their physical injuries.

The survivor plaintiffs may also recover for their emotional injuries under a theory of intentional infliction of emotional distress if Iran, "by extreme and outrageous conduct[,] intentionally or recklessly caused severe emotional distress" to them.  Est. of Heiser v. Islamic Republic of Iran, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (Heiser II) (quoting Restatement (Second) of Torts § 46(1) (Am. Law Inst. 1965)).  Terrorist acts—and, by extension, material support for such acts—are "'by their definition' extreme and outrageous conduct," Ewan, 466 F. Supp. 3d at 245 (citation omitted), and Iran intended to cause severe emotional distress by facilitating the Syndicate's attacks, see supra Part III.D.2–12.  Finally, SGT Lemon, CPT Timoney, and Mr. King testified about the extreme emotional distress they experienced—and continue to experience—as a result of the Syndicate's attacks.  See generally supra Part III.E.1–3.  Thus, all three survivor plaintiffs are entitled to damages for their emotional injuries.

### 2.   Family Member Plaintiffs

Ms. Wildman and the 19 other plaintiffs who are family members of SGT Lemon, CPT Timoney, Mr. King, and LTC Cabrera all bring claims for solatium damages resulting from the attacks on their family members.  Solatium is "the mental anguish, bereavement[,] and grief that

those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort." Belkin, 667 F. Supp. 2d at 22.  It also includes mental suffering as a result of injury to a loved one. E.g., Valore, 700 F. Supp. 2d at 85.  A solatium claim under § 1605A(c) is "indistinguishable" from a claim for intentional infliction of emotional distress, Hirshfeld, 330 F. Supp. 3d at 140 (citation omitted), and courts have applied elements of intentional infliction of emotional distress from the Second Restatement of Torts to FSIA solatium claims, see, e.g., Selig, 2021 WL 5446870, at *12. Although, in a traditional tort context, a family member must generally be present at the time of an attack to recover for intentional infliction of emotional distress, Restatement (Second) of Torts § 46(2)(a) (Am. Law Inst. 1965), FSIA claimants need not meet this requirement because "a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families," Salazar v. Islamic Republic of Iran, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005); accord, e.g., Valore, 700 F. Supp. 2d at 80 ("[T]errorism [is] unique among the types of tortious activities in both its extreme methods and aims . . . . One . . . need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result." (citation omitted)).

"[I]mmediate family members—parents, siblings, spouses, and children—are entitled to solatium awards." Wamai v. Republic of Sudan, 60 F. Supp. 3d 84, 94 (D.D.C. 2014) (footnote omitted), aff'd in part, vacated in part sub nom. Owens v. Republic of Sudan, 864 F.3d 751 (D.C. Cir. 2017), vacated & remanded on other groups sub nom. Opati v. Republic of Sudan, 140 S. Ct. 1601 (2020).  This category of family members also "include[s] members of the victim's household who are viewed as the functional equivalents of immediate family members," even if they are not legally or biologically related. Fritz v. Islamic Republic of Iran, 324 F. Supp. 3d 54,

63 (D.D.C. 2018) (Fritz II) (cleaned up; citation omitted); accord Heiser II, 659 F. Supp. 2d at 29. All of the family-member bellwether plaintiffs fall into one of these two categories[33] and accordingly may bring claims under the private right action afforded by § 1605A(c).

## V.   **Damages**

No amount of money will ever fully compensate the plaintiffs for the losses they suffered because of the Syndicate attacks. The plaintiffs in this case lost limbs, years of their lives, and the ability to work at their chosen jobs; they suffered the loss of loved ones, the agony of watching family members suffer from grave injuries, and the terror of not knowing whether a relative would ever return home. They will continue to suffer from the emotional and psychological scars of these attacks for years to come. But, as Congress has recognized, awarding monetary damages to victims of terrorist attacks at least partially redresses their injuries and can provide some measure of justice.

---

[33] Three of the family-member plaintiffs are the "functional equivalents" of immediate family. Robert Cabrera is LTC David Cabrera's foster father and the functional equivalent of his biological father. Damages Decls. at 32–33. LTC David Cabrera, born David Hopkins, moved in with Robert when David was 11 years old; Robert was a family friend of David's biological mother. Id. Robert provided for David without any compensation and raised David as part of his family. Id. When he was 18 years old, Robert legally changed his last name to Cabrera in honor of Robert, and they remained close throughout David's adulthood. Id. at 33–34. Robert considered David his biological son, id. at 33, and David even listed Robert as his father on his license to marry August Wildman, Pls.' Ex. 310; see Tr. V at 550:5–19 (Wildman).

Gloria Diane Trelfa, born Gloria Diane Cabrera, is LTC Cabrera's foster sister and the functional equivalent of his biological sister. Damages Decls. at 70–71. She is Robert Cabrera's daughter, and she was 13 when David moved into her family's home. Id. at 70. Gloria lived with her father and David for part of the year throughout her childhood, and she and David lived together for two years while they were both in college. Id. at 70–71. Gloria and David shared a close relationship and stayed in touch throughout his adulthood, and Diane considers David to be her brother. Id.

Finally, Daniel Cabrera is LTC Cabrera's foster brother and the functional equivalent of his biological brother. Damages Decls. at 40–41. Daniel is Robert Cabrera's son, and he lived with David for three years. Id. Although their relationship was initially strained, Daniel treated David as a little brother and protected him throughout high school and in their neighborhood. Id. at 41. They also spent significant time together while Diane and David lived together during college. Id. Daniel considers David to be his brother. Id.

Robert Cabrera, Gloria Diane Trelfa, and Daniel Cabrera are thus the functional equivalent of LTC Cabrera's immediate family members, and they satisfy the immediate-family test to recover solatium damages. See Valore, 700 F. Supp. 2d at 80 (considering a stepbrother "who remembers fishing and swimming with and was treated like a brother by" the victim of a terrorist attack to be "the functional equivalent of a brother").

Moreover, awarding damages also serves national security interests by deterring those foreign nations that sponsor terrorism.

Damages under the FSIA's private right of action "may include economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). As explained above, the three bellwether direct victims (SGT Lemon, CPT Timoney, and Mr. King) are all entitled to damages for their physical injuries on the theory of battery and for their psychological injuries under the theory of intentional infliction of emotional distress. See supra Part IV.C.1. The 20 bellwether family-member plaintiffs (relatives of SGT Lemon, CPT Timoney, Mr. King, and LTC Cabrera) may recover solatium damages under the theory of intentional infliction of emotional distress because they are immediate family members, or the functional equivalent of immediate family members, of victims of terrorism. See supra Part IV.C.2; Fritz II, 324 F. Supp. 3d at 62–63.

"Upon obtaining a default judgment, successful plaintiffs may recover damages by proving 'that the projected consequences are reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate.'" Fraenkel, 892 F.3d at 353 (quoting Hill v. Republic of Iraq, 328 F.3d 680, 684 (D.C. Cir. 2003)). The Court has already concluded that Iran's material support was reasonably certain to result in terrorist attacks that caused the killing, maiming, and kidnapping of American citizens. See supra Part IV.B.4. The bellwether survivor plaintiffs are therefore entitled to pain-and-suffering damages, and the bellwether family-member plaintiffs are entitled to solatium damages. E.g., Ewan, 466 F. Supp. 3d at 245–46. The only question remaining is the amount of those damages.

95

### A.  Compensatory Damages

#### 1.  *Pain and Suffering*

It is difficult to quantify the pain and suffering of survivors of terrorist attacks; a court's "primary consideration is to ensure that 'individuals with similar injuries receive similar awards.'" Moradi v. Islamic Republic of Iran, 77 F. Supp. 3d 57, 70 (D.D.C. 2015) (citation omitted).  "In light of the need for uniformity, judges in this district have developed a general framework for assessing pain and suffering damages for direct victims of terrorist attacks . . . ."  Sheikh v. Republic of Sudan, 485 F. Supp. 3d 255, 268 (D.D.C. 2020).  Under this so-called "Peterson II framework," the baseline award for surviving direct terrorist attack victims is $5 million.  Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25, 52 (D.D.C. 2007) (Peterson II).  As plaintiffs note, see Proposed Damages Conclusions at 10, courts "depart upward from this baseline to $7.5–$12 million in more severe instances of physical and psychological pain."  Valore, 700 F. Supp. 2d at 84 (noting that the court in Peterson II departed upward where, for example, "victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead").  However, this Court is also mindful of the need to assess each plaintiff's injuries individually, as well as the need "to ensure that individuals with similar injuries"—even between cases—"receive similar awards."  Peterson II, 515 F. Supp. 2d at 54.

In this case, plaintiffs contend that substantial upward adjustments are warranted as to all three of the survivor plaintiffs; they seek $12 million in pain-and-suffering damages each for SGT Lemon and CPT Timoney, and $15 million for Mr. King.  Proposed Damages Conclusions at 10.  The Court agrees that an upward adjustment is warranted for each of the three direct-victim plaintiffs, though it disagrees as to the extent of the upward adjustments.  The Court will award

pain-and-suffering damages of $9 million each to SGT Lemon and CPT Timoney, and $11 million to Mr. King.

SGT Lemon & CPT Timoney:   Plaintiffs request $12 million in pain-and-suffering damages each for SGT Lemon and CPT Timoney.  Proposed Damages Conclusions at 12, 16. Before assessing these requests, the Court will briefly revisit the description of each plaintiff's injuries.

SGT Lemon was a U.S. citizen at the time of his deployment in August 2009, and he remains a U.S. citizen.  Tr. II at 213:2–5, 214:2–6 (Lemon).  He was 29 years old when he was injured in the terrorist attack.  See id. at 219:14–19; Pls.' Ex. 292 at 1.  SGT Lemon's attack and his ensuing injuries are described in detail above.  See supra Parts III.D.4, E.1.  For purposes here, suffice it to say that SGT Lemon's injuries were grievous:  a chunk of shrapnel shattered the bone in his right arm, leaving it connected to his body only by flesh.  Tr. II at 225:7–19 (Lemon).  In the process of trying to save his arm, he underwent many painful limb-salvage operations which were ultimately unsuccessful.  After the amputation, SGT Lemon suffered from excruciating heterotopic ossification, and surgeries to address that condition, as well as phantom limb pain and a skin graft.  All told, SGT Lemon spent four and a half years at Walter Reed receiving treatment. He is in pain every day.  SGT Lemon continues to suffer from a TBI, which affects his memory and concentration, making it difficult for him to attend school.  He also suffers from PTSD and feelings of survivor's guilt and depression.  He does not think he will ever make a full recovery, either emotionally or physically.  The attack also affected SGT Lemon's relationships with his family.  While he was in the hospital, his father started to cry every time he entered SGT Lemon's room; this made SGT Lemon frustrated, and he testified that he and his father now argue and disagree.  Tr. II at 242:25–243:21 (Lemon); Damages Decls. at 86.  SGT Lemon's first wife

divorced him while he was recovering from his amputation.  Tr. II at 243:22–244:5.  Because of

their divorce, SGT Lemon's daughter now lives with her mother in Alaska, while SGT Lemon

lives in California to be near his family for assistance with his recovery.  Damages Decls. at 78.

CPT Timoney was a U.S. citizen when he was attacked in Afghanistan, and he remains a

U.S. citizen.  Tr. III at 311:6–9 (Timoney).  He was 26 years old when he was injured by a suicide

bomber.  Id. at 311:2–4.  His injuries and conditions are described in detail in Parts III.D.7 and

E.3, and they are severe:  he endured the excruciating amputation of his lower left leg and multiple

internal injuries from shrapnel, including damage to his optic nerve and his brain.  He spent over

10 months inpatient at hospitals while doctors tried to save his vision and reduce the swelling on

his brain, and he underwent many forms of therapy to improve his physical and cognitive

conditions.  At the time of the bellwether hearing, CPT Timoney was under constant threat of

seizures induced by fluorescent and flickering lights; this condition dramatically affects his

personal life and his work as a software engineer.  He suffers from PTSD and the continuing effects

of his TBI.  Like SGT Lemon, CPT Timoney's attack affected his relationships with his family.

While he was hospitalized, he felt guilty for being dependent on his parents, and he could not

remember his then-girlfriend's name when he first regained awareness.  See generally supra Part.

III.E.3.  His parents' efforts to participate in his recovery "caused a lot of strife or conflict," and

there is "a lot of friction" between them.  Tr. III at 345:3–6.  CPT Timoney's wife is constantly

vigilant for things that could trigger his seizures, and his amputation and cognitive conditions limit

their ability to do things like going to the movies.  CPT Timoney struggles to "be the kind of dad

that" he wants to be for his two daughters.  See generally supra Part III.E.3.

The requested damages awards of $12 million each represent a very significant departure

upward from the Peterson II baseline award of $5 million for injured surviving victims, see 515 F.

Supp. 2d at 52, but plaintiffs contend that such an adjustment is warranted in light of awards to plaintiffs with similar injuries and similarly lengthy hospitalizations in other FSIA cases, see Proposed Damages Conclusions at 10–11.  They cite, for example, Peterson II's awards of $7.5 million to a victim who suffered "loss of sight in one eye, a perforated right eardrum resulting in some hearing loss," "a shrapnel injury to the back of his right thigh," and "lasting and severe psychological problems," and of $12 million to a victim who suffered a broken neck resulting "in permanent quadriplegia" and "lasting and severe psychological problems." 515 F. Supp. 2d at 54–55; see Proposed Damages Conclusions at 10–11.  Plaintiffs also point to Estate of Doe v. Islamic Republic of Iran, 943 F. Supp. 2d 180 (D.D.C. 2013), where this Court awarded $7 million to a plaintiff who "remained in the hospital for eight months" to undergo "several surgeries for severe injuries," including a crack in the roof of her mouth, broken teeth, and vision and hearing damage. 943 F. Supp. 2d at 187.  Even after facial reconstructive surgery, though, that plaintiff's injuries continued to plague her:  because the roof of her mouth did not heal correctly, she was in constant pain and was unable to eat certain foods, and she experienced "constant dizziness" and an inability to "tolerate loud noises."  Id.  The Court also awarded $7 million to a plaintiff who was trapped in a collapsed building for eleven hours and underwent several surgeries before his leg was amputated; that plaintiff's arm "never fully healed, and he never regained his physical strength." Id.; see also Opati v. Republic of Sudan, 60 F. Supp. 3d 68, 78 (D.D.C. 2014) (Bates, J.) (awarding $7.5 million to an individual who was severely burned, "spent two years recovering in hospitals," suffered "total vision loss in one eye and severely impaired vision" in the other, was left with shrapnel in her skin and eyes, and never regained use of her right hand).

Plaintiffs cite additional cases where other judges in this District awarded "$11–12 million to individuals who," like SGT Lemon and CPT Timoney, "had lengthy hospitalizations and

multiple surgeries, leaving them with disfiguring scarring . . . and significant brain injuries—resulting in difficulty concentrating, headaches, and other neurological effects."   Proposed Damages Conclusions at 11; see Haim v. Islamic Republic of Iran, 425 F. Supp. 2d 56, 73–75 (D.D.C. 2006) (Lamberth, J.) (awarding $11 million to victim who was hospitalized for over ten days, suffered vision impairments, disfiguring and painful scarring, continuing neurological problems, headaches, and PTSD); Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 274–75 (D.D.C. 2003) (Urbina, J.) (awarding $12 million to victim who suffered "severe burns and blast injuries, scarring, permanent hearing loss, walking difficulties, difficulty breathing, and PTSD"); Mousa v. Islamic Republic of Iran, 238 F. Supp. 2d 1, 12–13 (D.D.C. 2001) (Bryant, J.) (awarding $12 million to victim who was deafened; blinded in one eye; lost substantial use of her right hand and arm, resulting in chronic pain; and suffered burns and disfiguring scarring, cranial fractures and permanent brain injury, and permanent breathing impairment).   All of these cases, however, are more than 15 years old, and none was decided after Peterson II established a general framework for compensatory pain-and-suffering damages in FSIA cases.

More recent decisions hew closer to the Peterson II framework.   See, e.g., Wamai, 60 F. Supp. 3d at 93 ("[F]or a few plaintiffs, who suffered even more grievous wounds such as lost eyes, extreme burns, severe skull fractures, brain damage, ruptured lungs, or endured months of recovery in hospitals, upward departures to $7.5 million are in order."); Mwila v. Islamic Republic of Iran, 33 F. Supp. 3d 36, 43 (D.D.C. 2014) ("Where plaintiffs suffer severe physical injuries, such as compound fractures, serious flesh wounds, and scars from shrapnel, as well as lasting and severe psychological pain, courts generally award $5 million for pain and suffering."), aff'd in part, vacated in part sub nom. Owens v. Republic of Sudan, 864 F.3d 751 (D.C. Cir. 2017), vacated & remanded on other grounds sub nom. Opati v. Republic of Sudan, 140 S. Ct. 1601 (2020).   The

Court will do the same here.  The Court in no way wishes to diminish the severity of SGT Lemon's and CPT Timoney's physical and emotional injuries, and it agrees that an upward departure is warranted for those injuries and the continuing—and lifelong—effects.  Because SGT Lemon and CPT Timoney both suffered excruciating injuries which will have lifelong effects—including pain, loss of mobility, neurological issues, and mental and emotional trauma—the Court considers their injuries to be greater than those suffered by the plaintiffs in Doe who were awarded $7 million, 943 F. Supp. 2d at 187, or the plaintiffs in Wamai who were awarded $7.5 million, see 60 F. Supp. 3d at 93–94.  SGT Lemon spent almost four and a half years in the hospital recovering, and he will continue to suffer from the pain of his amputation and bone injuries, as well as neurological side effects, every day of his life.  And CPT Timoney can no longer move through the world freely both because of his physical injuries, including his amputated leg, and the high possibility of devastating seizures, which may further exacerbate his existing complications.  Accordingly, the Court will award $9 million each in pain-and-suffering damages to SGT Lemon and CPT Timoney.

Mr. King:  Mr. King was a U.S. citizen when he was kidnapped by the Taliban, and he remains a U.S. citizen now.  Tr. III at 274:11–15 (King).  He was 59 years old when he was kidnapped, id. at 275:20–24; he was held hostage for 3 years, 3 months, and 12 days (or exactly 1,200 days), from August 7, 2016 until November 19, 2019, id. at 283:18–21.[34]  The details of his kidnapping and resulting injuries and conditions are set out fully in Parts III.D.11 and E.2.  The conditions of his confinement were extremely poor:  Mr. King was regularly threatened, beaten, kicked, and dragged through the snow by his captors.  He was forced to make hostage videos

---

[34] Although Mr. King did not testify about the date on which he was released, his testimony regarding the length of his imprisonment corresponds with contemporaneous reporting of his release.  See, e.g., Sayed Salahuddin & Sharif Hassan, U.S., Australian Hostages Held by Taliban in Afghanistan Are Freed in Exchange for Haqqani Commanders, Wash. Post (Nov. 19, 2019, 2:49 PM), https://www.washingtonpost.com/world/three-taliban-militants-flown-to-qatar-hinting-at-possible-prisoner-swap/2019/11/19/9ea56ed0-0a8b-11ea-8054-289aef6e38a3_story.html (noting that King was released "Tuesday," or November 19, 2019).

pleading with the U.S. government to release Taliban prisoners in exchange for his release.  He was fed only enough to keep him alive and, at times, forced to live in underground tunnels with little oxygen.  Mr. King's health deteriorated dramatically—by the time he was released, he weighed just 135 pounds and suffered from malnourishment, severe vitamin D deficiency, an electrolyte imbalance, heart issues, scurvy, posterior rib fractures, peripheral neuropathy, and sensorineural hearing loss.  Mr. King was 63 years old when he was released.  For more than eighteen months, he showed vitamin deficiencies and other effects from his captivity.  He has only recently begun to regain partial feeling in his feet and ankles, which has limited his ability to run.  He also continues to suffer mentally and emotionally:  Mr. King's mother died while he was a hostage, and he was never able to say goodbye.  He has coped by blocking out memories of his captivity, but he began to experience nightmares in August 2021, in response to news reports about Kabul falling to the Taliban.  See generally supra Part III.E.2.

Plaintiffs request a total of $15 million in compensatory damages as to Mr. King:  "$12 million for the time that Mr. King was in captivity," Proposed Damages Conclusions at 16, and "$3 million to compensate for the pain and suffering he has experienced, and will continue to experience, following his release," id. at 17.  In hostage-taking cases, courts in this District have generally awarded "approximately $10,000 per day for the pain and suffering [hostages] experienced while captive."  Price v. Socialist People's Libyan Arab Jamahiriya, 384 F. Supp. 2d 120, 134 (D.D.C. 2005); see, e.g., Abedini v. Gov't of Islamic Republic of Iran, 422 F. Supp. 3d 118, 136–37 (D.D.C. 2019) (collecting cases and awarding $12.268 million in pre-release damages to plaintiff held captive for 1,268 days); Doe A-1 v. Democratic People's Republic of Korea, No. 18-cv-0252 (DLF), 2021 WL 723257, at *2–3 (D.D.C. Feb. 24, 2021) (awarding baseline of $3.35 million to plaintiffs held hostage for 335 days); Sutherland v. Islamic Republic of Iran, 151 F.

Supp. 2d 27, 51 (D.D.C. 2001) (awarding $23.54 million for plaintiff held hostage for "an unconscionable 2,354 days").  Although the Court understands plaintiffs' $12 million request, based on a $10,000 per diem rate multiplied by 1,200 days, the Court will award Mr. King $9 million in damages for his suffering while he was a Taliban hostage.[35]

As to the additional $3 million request for Mr. King's continued injuries and suffering following his release, there is "no such formula . . . for calculating post-release damages," so, as with damages for survivors of terrorist attacks, courts generally look to "awards granted to similarly situated plaintiffs in FSIA lawsuits."  Abedini, 422 F. Supp. 3d at 137.  The key factors in assessing the amount are "the victim's age at the time of release (the length of time he will be experiencing pain and suffering) and the extent of the victim's long-term injuries (the level of pain and suffering)."  Hekmati, 278 F. Supp. 3d at 164 (awarding $10 million in post-release damages to plaintiff with "severe" injuries who was 32 years old and had a life expectancy of "over 45 years"); see Abedini, 422 F. Supp. 3d at 137 (awarding $9.63 million in post-release damages to plaintiff who was 35 years old and had a life expectancy of 43.2 years); Azadeh v. Gov't of Islamic Republic of Iran, Civ. A. No. 1:16-cv-1467 (KBJ), 2018 WL 4232913, at *20 (D.D.C. Sept. 5, 2018) (awarding $8.889 million post-release damages to plaintiff who was 42 when released and had a life expectancy of 40 years).  Although some courts also look to the conditions of a plaintiff's confinement, see, e.g., Abedini, 422 F. Supp. 3d at 137; Azadeh, 2018 WL 4232913, at *20, this

---

[35] Although plaintiffs have sought a much greater damages award for Mr. King ($15 million) than for SGT Lemon or CPT Timoney ($12 million each), the Court is not comfortable with this discrepancy.  CPT Timoney and SGT Lemon will spend years suffering the brutal aftereffects of their attacks, while Mr. King's captivity has ended, fortunately, with his release, his continuing injuries are less severe, and his remaining expected lifespan is shorter than either of the other direct victims.  Accordingly, the Court will exercise its discretion to reduce any discrepancy between the awards for Mr. King and for the direct-victim plaintiffs.

Court considers damages for the severity of a victim's confinement more properly to be part of the $10,000 per diem award for captivity and accordingly will not consider them here.

Mr. King was 63 years old when he was released, see Pls.' Ex. 286 at 1, and he had an average life expectancy of around 21.1 additional years, see Elizabeth Arias & Jiaquan Xu, United States Life Tables, 2019, 70 Nat'l Vital Stats. Reps., No. 19, 11 (Mar. 22, 2022).[36] He was thus older and had a shorter life expectancy than the hostage plaintiffs in Hekmati (32 years old, 45-year life expectancy, $10 million award), Azadeh (42 years old, 40-year life expectancy, $8.89 million award), and Abedini (35 years old, 43.2-year life expectancy, $9.63 million award). See Abedini, 422 F. Supp. 3d at 137 (collecting cases). And his continuing injuries are less severe than those of these other victims of kidnappings. All told, considering Mr. King's age and life expectancy, which were respectively much higher and much lower than those of the victims in Hekmati, Azadeh, and Abedini, and the extent of Mr. King's injuries, the Court concludes that Mr. King is entitled to an additional $2 million in post-captivity damages. Accordingly, the Court will award Mr. King a total of $11 million in damages: $9 million for the time he spent in confinement and an additional $2 million in post-release damages.

### 2. *Solatium*

Solatium damages "are by their very nature unquantifiable." Moradi, 77 F. Supp. 3d at 72. Thus, as with pain-and-suffering awards, courts generally calculate solatium damages by looking to prior decisions for guidance. See Acosta v. Islamic Republic of Iran, 574 F. Supp. 2d 15, 29 (D.D.C. 2008). "Judges in this District have established two primary frameworks, sometimes called the 'Peterson II' or 'Heiser'[37] frameworks, for evaluating solatium damages for terrorist

---

[36] The 2019 United States Life Tables are available at https://www.cdc.gov/nchs/data/nvsr/nvsr70/nvsr70-19.pdf.

[37] Est. of Heiser v. Islamic Republic of Iran, 466 F. Supp. 2d 229 (D.D.C. 2006) (Heiser I).

victims and their family members." Sheikh, 485 F. Supp. 3d at 270. For family members of deceased victims, both frameworks provide a baseline of $8 million for spouses, $5 million for parents and children, and $2.5 million for siblings; those numbers are halved for the family members of surviving victims ($4 million for spouses, $2.5 million for parents and children, and $1.25 million for siblings). Peterson II, 515 F. Supp. 2d at 52; see, e.g., Valore, 700 F. Supp. 2d at 85.[38] The values in the Peterson II framework "are not set in stone," Murphy, 740 F. Supp. 2d at 79,[39] but this Court has "previously endorsed" that framework, and it will do so in this case, see, e.g., Kinyua v. Republic of Sudan, 466 F. Supp. 3d 1, 10–11 (D.D.C. 2020); Sheikh, 485 F. Supp. 3d at 270–72.

Courts may "presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish" and may accept "testimony proving a close emotional relationship" between siblings as sufficient for entitlement to solatium damages. Roth v. Islamic Republic of Iran, 78 F. Supp. 3d 379, 403 (D.D.C. 2015). In addition to this presumption, plaintiffs here have presented evidence of their mental pain and suffering as a result of the deaths or injuries of their immediate family members. Ms. Wildman testified at the bellwether hearing about the impact of her husband's killing on herself and their two sons, see supra Part III.E.4, and the other family-member plaintiffs have submitted declarations detailing their injuries, see generally Damages Decls. (filed under seal). Although the brief summaries in this Opinion cannot convey

---

[38] In addition, "courts have also been mindful not to award family members a greater solatium award than the award received by individuals directly injured in the attacks," and so "have reduced family members' awards 'in rough proportion' to the directly affected victims' awards." Sheikh, 485 F. Supp. 3d at 270–71 (citation omitted).

[39] As the Murphy court noted, however, upward "departures are usually relatively small, absent 'circumstances that appreciably worsen' a claimant's 'pain and suffering, such as cases involving torture or kidnapping' of the" direct victim. 740 F. Supp. 2d at 79 (citation omitted).

the full depth of each plaintiff's suffering, the Court has read and was moved by each of the submissions described below.

Spouses:  Plaintiffs seek $10 million in solatium damages for Ms. Wildman, the widow of LTC Cabrera.  Proposed Damages Conclusions at 19.  Without revisiting her testimony in detail, the Court reiterates that Ms. Wildman was profoundly affected by her husband's death, both personally and as a parent of two minor children who lost their father.  She has struggled for years to deal with her own grief and to help her children do the same, a process that remains ongoing. Ms. Wildman suffers from PTSD and has received regular therapy since LTC Cabrera's death, but she testified that she has only recently been able to process her own grief and her feelings of guilt.

The $10 million request is above the Peterson II framework amount of $8 million in solatium damages, but plaintiffs contend that this upward departure is warranted for three reasons. First, plaintiffs note that the court in Peterson II found "the damages framework set forth in Heiser [I] to be an appropriate measure of damages" for family-member plaintiffs, 515 F. Supp. 2d at 51, and the court in Heiser I recognized that then-existing caselaw supported solatium awards "between $8 million and $12 million for pain and suffering resulting from the death of a spouse," 466 F. Supp. 2d at 269; see Proposed Damages Conclusions at 19–20.  Second, plaintiffs note that the Heiser I and Peterson II frameworks "provide guidance" but "are almost fifteen years old and do not set forth mandatory awards"; plaintiffs urge the Court to "exercise its discretion under 28 U.S.C. § 1608(e)" to grant a greater award.  Proposed Damages Conclusions at 20 (quoting Fraenkel, 892 F.3d at 351 (stating that Heiser I "may serve as a useful reference point, but it is not binding precedent," and that district judges "have discretion under 28 U.S.C. § 1608(e) to grant solatium awards based on the particular facts of each case")).  Relatedly, plaintiffs note that "[e]ven just accounting for inflation since" the date of the decision in Peterson II, "an $8 million award

106

would now be equivalent to a more than $10.5 million award." Proposed Damages Conclusions at 20. And third, even if the Court adopts $8 million as a baseline for spouses of victims killed in terrorist attacks, plaintiffs urge the Court "to award $10 million to Ms. Wildman and other spouses left to raise a minor child (or children) on their own due to the unique hardships of raising a child, particularly one who has suffered the trauma of losing a parent, alone." Id.

Although the Court accepts plaintiffs' point that some courts—including in Peterson II and Heiser I—have awarded spouses more than $8 million in solatium damages, Proposed Damages Conclusions at 19–20, subsequent decisions by this Court, e.g., Wamai, 60 F. Supp. 3d at 95–96,[40] and other courts in this District, e.g., Ayres v. Islamic Republic of Iran, Case No. 1:18-cv-00265-RCL, 2022 WL 1438605, at *12–13 (D.D.C. May 3, 2022); Selig, 2021 WL 5446870, at *18; Valore, 700 F. Supp. 2d at 85–87, have adhered closely to the Peterson II framework in assessing solatium damages for spouses. And despite plaintiffs' point about inflation in the years since Peterson II was decided, some of these decisions are quite recent. See, e.g., Ayres, 2022 WL 1438605, at *12. The Court is well aware that the Peterson II framework is not mandatory, but is mindful of the importance of providing similar solatium awards to similarly situated plaintiffs. See Oveissi v. Islamic Republic of Iran, 768 F. Supp. 2d 16, 26 (D.D.C. 2011) (Oveissi I).

Finally, given the need to consider each plaintiff's loss individually, Fraenkel, 892 F.2d at 362 ("While past solatium awards from comparable cases are appropriate sources of guidance for district courts, 'different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damage awards.'" (citation omitted)), the Court declines plaintiffs'

---

[40] Plaintiffs point specifically to Salazar v. Republic of Iran, 370 F. Supp. 2d 105 (D.D.C. 2005), where this Court awarded $10 million in solatium damages to a victim's spouse who was left to raise her thirteen-month-old daughter on her own. 370 F. Supp. 2d at 111, 116; see Proposed Damages Conclusions at 20. But that case predates both Peterson II and Heiser I, as well as numerous other cases applying the Peterson II framework.

invitation to conclude categorically that all "spouses left to raise a minor child (or children) on their own" are entitled to $10 million in solatium damages in these consolidated cases, Proposed Damages Conclusions at 20.  Instead, the Court concludes that Ms. Wildman is entitled to the Peterson II framework baseline solatium damages of $8 million.  See, e.g., Selig, 2021 WL 5446870, at *18 (declining to award upward adjustment for plaintiff who "presented no evidence of a unique circumstance that differentiates her suffering from the pain most spouses endure when they lose one they love, especially in a terrorist attack"); cf. Belkin, 667 F. Supp. 2d at 23–24 (awarding $10 million in solatium damages "due to the extreme shock [a plaintiff] experienced when he had to view his wife's severely disfigured body shortly after" the attack).[41]

Children:  Plaintiffs request solatium awards of $6.25 million for each of LTC Cabrera's four surviving children (Corbin Cabrera, Gillian Cabrera, M.C., and R.C.), Proposed Damages Conclusions at 21, and $3.125 million for SGT Lemon's minor daughter, K.L., id. at 23.  Each of these requests represents "an upward departure of 25%" from the Peterson II baseline amounts ($5 million for the children of deceased victims and $2.5 million for the children of surviving victims).  Proposed Damages Conclusions at 21–22, 23–24.  Plaintiffs assert that upward adjustments are warranted "because of the additional suffering of minor children, who depend on their parent 'for financial, emotional, and spiritual support, unlike adult children.'"  Id. at 21 (quoting Selig, 2021 WL 5446870, at *19).  The Court will address plaintiffs' requests by family.

Cabrera Family:  All four of LTC Cabrera's children were minors at the time of his death.  Damages Decls. at 1, 9, 17, 24.  M.C. was seven years old when LTC Cabrera died.  Id. at 17.  When Ms. Wildman informed M.C. that his father had died, M.C. cried silently, and he has not

---

[41] Further, the Court is reluctant to provide Ms. Wildman with a greater damages award that CPT Timoney or SGT Lemon, both of whom were severely maimed and will spend the rest of their lives dealing with their injuries.  Cf. Sheikh, 485 F. Supp. 3d at 270–71.

talked about his feelings at any point since then.  Id. at 18.  Ms. Wildman reported that M.C. does not remember what it feels like to have a father.  Id. at 17.  Although Ms. Wildman and family friends have stepped in to support M.C., there have been gaps; for example, Ms. Wildman did not know how to dress M.C. properly for little league baseball, a task that LTC Cabrera would have handled.  Id. at 17–18.  M.C. has moved eight times in the last sixteen years, attending three schools in three separate states.  Id. at 18.  Although M.C. is academically gifted, Ms. Wildman fears that he will "fall apart" when he eventually faces the trauma of losing his father.  Id. at 18–19.

R.C. was five-and-a-half years old when LTC Cabrera died.  Damages Decls. at 24.  He was too young to truly understand the loss; on the way to LTC Cabrera's funeral, M.C. asked Ms. Wildman when he was "getting a new daddy."  Id. at 24–25.  Like his brother, R.C. has experienced multiple moves, and he has not handled the transitions well.  Id. at 25.  R.C. has faced intense emotional trauma because of the loss of his father:  he has been a target for bullying, has experienced extreme depression and repeated suicidal ideation, and has attended and participated in multiple expensive therapeutic schools and programs.  Id. at 25–26.

Corbin Cabrera was 13 years old when his father died.  Damages Decls. at 1.  He was "very close" to his father before the attack; they would speak on the phone for hours, and Corbin's "favorite times of the year were when" he visited LTC Cabrera.  Id. at 1–2.  LTC Cabrera was the person Corbin "could always lean on and trust" and "the highlight of [Corbin's] life."  Id. at 2.  When he learned of LTC Cabrera's death, Corbin "collapsed," and his world "came to a screeching halt."  Id. at 3.  He has struggled with grief, depression, and suicidal thoughts, and he has received "heav[y]" counseling and medication.  Id. at 3–4.

Gillian Cabrera was 12 years old when LTC Cabrera was killed.  Damages Decls. at 9.  Her father was her "hero," and the person she turned to for advice.  Id.  When Gillian learned that her

father had been killed, she felt "sick" and like her "entire life crumbled." Id. at 11.  She has struggled with her mental health, particularly depression, anxiety, and grief.  Id.  She was deeply depressed during her first year of college and stopped participating in scholastic and family activities.  Id.  She continues to attend counseling, although she is only able to access it for "limited" times.  Id.  Gillian regrets that LTC Cabrera will not be able to walk her down the aisle at her wedding, and she misses her close connection to Ms. Wildman and her half-brothers.  Id. at 12.  LTC Cabrera's death has also strained her relationship with her brother Corbin, though they have since begun to reconcile.  Id.

All of LTC Cabrera's children have suffered enormously from his loss.  All four continue to address their grief through counseling, though it has only been partially effective for each.  But although the Court is loath to distinguish between the suffering of these four siblings and half-siblings, the Court concludes that LTC Cabrera's death has affected his children differently.  In determining whether to enhance awards, courts generally consider factors that "fall into one of three categories":  (1) "evidence establishing an especially close relationship between the plaintiff and the decedent" beyond that of a normal familial relationship; (2) "medical proof of severe pain, grief, or suffering on behalf of the claimant;" and (3) "circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing."  Oveissi I, 768 F. Supp. 2d at 26–27.  Here, all four of LTC Cabrera's children have suffered emotionally, but only R.C. has presented evidence of the kind of "severe pain, grief, or suffering" warranting an enhancement.  See, e.g., Selig, 2021 WL 5446870, at *18–19 (awarding a 25% upward enhancement for a child who went from a successful student to "failing in school," was involuntarily committed for mental treatment twice for suicide attempts, and suffered from multiple panic attacks per week); Thuneibat, 167 F. Supp. 3d at 52–53 (awarding a 25% upward enhancement for two children who

"became unable to learn in a classroom setting, requiring one-on-one instruction for two-thirds of his curriculum," "became prone to violent outbursts," and/or "would take his anger out on his" family members and their possessions (citations omitted)).  Like the plaintiffs who received upward enhancements in Selig and Thuneibat, R.C. has been unable to attend traditional schools and has struggled with suicidal thoughts and attempts.  See Damages Decls. at 25–26; Tr. V at 578:4–582:6 (Wildman).  Accordingly, the Court concludes that he is entitled to solatium damages of $6 million, a 20% upward adjustment from the Peterson II baseline.

Although M.C. has indisputably suffered from the loss of LTC Cabrera, the Court concludes that his suffering has differed in degree from that of R.C. and is instead more similar to that of children who have been awarded the Peterson II baseline amount of damages.  See, e.g., Winternitz v. Syrian Arab Republic, Civ. A. No. 17-2104 (TJK), 2022 WL 971328, at *10–11 (D.D.C. Mar. 31, 2022) (concluding that baseline damages were appropriate for children who suffered from "mental anguish" because of their father's injury); Pennington v. Islamic Republic of Iran, Civ. A. No. 19-796 (JEB), 2022 WL 168261, at *3 (D.D.C. Jan. 19, 2022) (declining to adjust upward for children and other relatives whose "lives spiraled downward after the attack, leading to . . . mental-health issues").  Accordingly, the Court will award $5 million in solatium damages to M.C.

Finally, neither Corbin nor Gillian Cabrera lived with their father before his death; although he was involved in both of their lives, his role was comparatively smaller than it was in the lives of M.C. and R.C., with whom he lived full-time.  Cf. Selig, 2021 WL 5446870, at *22 (noting that children who were "living with their parents are likely to feel the sting of loss more harshly" than children who were not).  For that reason, the Court will award $4 million in compensatory damages each to Corbin and Gillian Cabrera.

*Lemon Family*:  SGT Lemon's daughter, K.L., was four years old when her father was injured; she celebrated her fifth birthday at the hospital with him.  Damages Decls. at 78.  Before the attack, K.L. lived with both of her parents in Alaska; she was SGT Lemon's only child, and they shared "a solid, emotionally healthy relationship." Id. at 77.  K.L. was "very confused" when her mother told her that SGT Lemon had been injured, and when she visited him at the hospital, she was "nervous and timid" around him and was afraid to touch him. Id. at 78.  Shortly after SGT Lemon's arm was amputated, he and K.L.'s mother divorced, and K.L. returned to Alaska to live with her mother. Id.  SGT Lemon has been unable to be present for "meaningful events" in K.L.'s life. Id.  Although deeply sympathetic to K.L.'s suffering, the Court concludes that K.L. is not entitled to the upward enhancement she requests.  As explained above, the Court will not adjust upward solely on the basis that a child was a minor at the time of his or her parent's attack, and there is no evidence in the record before the Court that K.L. suffered extraordinary, lasting emotional trauma (for instance, like that of R.C.).  See, e.g., Winternitz, 2022 WL 971328, at *10–11; Pennington, 2022 WL 168261, at *3.  Accordingly, the Court will award K.L. the baseline solatium damages of $2.5 million for the trauma she has experienced.

Parents:  Plaintiffs seek solatium damages of $5 million for Robert Cabrera, LTC Cabrera's foster father, Proposed Damages Conclusions at 24, and $2.5 million each for Frank and Jackie Lemon, SGT Lemon's parents, and for Gregory and Diane Timoney, CPT Timoney's parents, id. at 25.  The Court will again address these requests by family.

*Cabrera Family*:  Robert Cabrera is LTC Cabrera's foster father.[42]  Damages Decls. at 32. When LTC Cabrera was 11 years old, his parents sent him to live with Robert after his biological

---

[42] The Court has already concluded that Robert Cabrera is the "functional equivalent" of a biological relative and is therefore entitled to recover solatium damages.  See supra Part IV.C.2 n.33; Fritz II, 324 F. Supp. 3d at 63.

parents divorced and his biological mother moved to a different state.  Id. at 32–33.  Robert promised LTC Cabrera that he would never have to move again, and LTC Cabrera thrived after he learned to trust Robert.  Id. at 33.  When LTC Cabrera turned 18, he legally changed his name to match Robert's surname.  Id.  Robert and LTC Cabrera saw each other often, including right before LTC Cabrera's last deployment to Afghanistan, and Robert states in his declaration that he had a "wonderful relationship" with LTC Cabrera.  Id. at 33–34.  When he learned of LTC Cabrera's death, Robert was "numb with grief."  Id. at 34.  He experiences "insomnia and anxiety," for which he takes medication.  Id. at 34–35.  Although the Court by no means wishes to diminish the suffering Robert Cabrera endured because of LTC Cabrera's death, LTC Cabrera was "41, almost 42" years old when he died, Tr. V at 573:20–22 (Wildman)—and hence Robert likely was at least in his sixties—so the amount of time Robert must suffer with this loss is comparatively less than the suffering of other family-member victims.  Accordingly, the Court will award $4 million in solatium damages to Robert Cabrera.

*Lemon Family*:  Frank Lemon shared a "typical father-son" relationship with SGT Lemon before the attack.  Damages Decls. at 84–85.  After receiving the "dreaded" call from the military, Frank felt "great relief" that SGT Lemon was alive.  Id. at 85.  But the attack has made their relationship "difficult" as SGT Lemon struggles with the effects of his TBI, PTSD, and chronic pain; this was particularly challenging while Frank cared for SGT Lemon in the hospital and at the family home, where SGT Lemon lived during his recovery.  Id. at 86–88.  Frank has himself suffered from PTSD "from seeing the trauma and pain" his son experienced, and the attack has had a significant "emotional impact" on Frank.  Id. at 88.  Jackie Lemon, SGT Lemon's mother, also shared a "loving, respectful relationship" with her son.  Id. at 93.  When she learned of the attack, she was "overwhelmed by grief, fear and shock."  Id. at 94.  Since then, her relationship

with SGT Lemon has "required a lot more physical and emotional support and patience" because of the work required to assist him in his recovery.  Id.  Jackie has also worked with a psychologist to deal with the trauma of the attack.  Id. at 95.  She now provides significant physical, emotional, and financial care for SGT Lemon, which has altered her life.  Id.  The Lemons' requests for $2.5 million are consistent with solatium damages generally awarded to the parents of wounded victims.  E.g., Peterson II, 515 F. Supp. 2d at 52.  Because of the Lemons' loving relationship with their son and the emotional trauma they have suffered, and in part because SGT Lemon was only 29 years old at the time of his attack, see Tr. II at 219:14–15; Pls.' Ex. 292 at 1, the Court agrees that such damages are warranted here.  Accordingly will award $2.5 million in solatium damages each to Frank and Jackie Lemon.

_Timoney Family_:  Diane Timoney, CPT Timoney's mother, shared a "close and loving" relationship with her son before his attack.  Damages Decls. at 121–22.  She read about an attack in Tarin Kowt before she was officially notified and felt "uneasy."  Id. at 122.  When the call came, she was overwhelmed, "shaking and . . . hyperventilating"; she thought she was having a heart attack and went to the hospital for treatment.  Id.  Diane later developed a heart condition, which a doctor told her was caused by increased levels of adrenaline in her body during the months after the attack.  Id. at 123.  Like his wife, Gregory Timoney had "a very close" relationship with his son before the attack, and he supported CPT Timoney's decision to deploy voluntarily to Afghanistan.  Id. at 131–32.  Immediately after learning about the attack, Gregory spent time caring for his wife; the emotional stress of the first three weeks was "very intense" because CPT Timoney's condition was "precarious."  Id. at 132.  While at Walter Reed, Gregory wrote a eulogy for his son, a memory that will remain with him for the rest of his life.  Id.  The attack has affected Gregory's relationship with CPT Timoney in many ways.  Id. at 133–34.  Both Gregory and Diane

have had to change jobs and move across the country to participate in CPT Timoney's care, which has strained both their relationship and the family's finances.  Id. at 124–25, 133–36.  Like the Lemons, the Timoneys request $2.5 million each in solatium damages, awards that are consistent with the Peterson II framework.  515 F. Supp. 2d at 52.  Given the Timoneys' close relationship with their son and the life-altering decisions they have made to support him, and the fact that CPT Timoney was only 26 years old at the time of his attack, see Tr. III at 311:4–5, the Court concludes that the baseline amount is appropriate and accordingly will award $2.5 million each to Gregory and Diane Timoney.

Siblings:  Finally, plaintiffs request solatium awards of $2.5 million for LTC Cabrera's five siblings, Daniel Cabrera, Ronald "Paul" Hopkins, Suzanne "Rene" Martinez, JD Prosser, and Gloria "Diane" Trelfa,[43] Proposed Damages Conclusions at 27; $1.25 million for Matthew and Nathan Lemon, and $1.562 million for Benjamin Lemon, SGT Lemon's brothers, id. at 28; and $2 million for Stephanie Miller, Mr. King's sister, id. at 29.  The Court will address each family's requests in turn.

*Cabrera Family*:  Daniel Cabrera is LTC Cabrera's foster brother.  Damages Decls. at 40. The two met when Daniel was seventeen and LTC Cabrera was about thirteen.  Id. at 40–41. Although their relationship initially was not "great," they became close, and Daniel protected LTC Cabrera in their neighborhood.  Id. at 41.  As adults, Daniel enjoyed spending time with LTC Cabrera and saw him often while LTC Cabrera lived with their sister during college.  Id.  Daniel learned about the attack from his sister, and he was "devastated" by the "surreal" news of LTC Cabrera's death.  Id. at 41–42.  He grieved and watched his parents and LTC Cabrera's family deal

---

[43] The Court has already concluded that LTC Cabrera's foster siblings—Daniel Cabrera and Diane Trelfa— are the "functional equivalent" of biological family members and may recover solatium damages.  See supra Part IV.C.2 n.33; Fritz II, 324 F. Supp. 3d at 63.

with "a great deal of hardship and pain." Id. at 42. He has also struggled to maintain his relationship with LTC Cabrera's family due to his and their grief. Id.

Paul Hopkins is LTC Cabrera's biological brother. Damages Decls. at 47. Before LTC Cabrera went to live with the Cabrera family, Paul and LTC Cabrera shared "a very hard upbringing," which made their relationship strong. Id. They were "best friends" and talked several times a month even while LTC Cabrera was deployed. Id. They spoke shortly before LTC Cabrera was killed. Id. at 48. Paul learned of LTC Cabrera's death from Ms. Wildman; he "hung up on" her and spent several weeks dealing with the "extreme emotional pain and loss" of the news. Id. Paul has struggled with depression and suicidal thoughts, and medication has not helped. Id. at 48–49. His relationship with his family has also been affected by LTC Cabrera's death, particularly because LTC Cabrera was the "counselor and peacemaker" for the family, and their relationships have "deteriorated" in his absence. Id. at 49.

Suzanne Martinez is LTC Cabrera's biological sister. Damages Decls. at 54. Before the attack they had a "great relationship," and LTC Cabrera made a point to have a close relationship with Suzanne's children. Id. at 54–55. LTC Cabrera helped Suzanne to deal with the PTSD she suffered from their shared difficult childhood. Id. at 55. Suzanne saw news reports about the VBIED attack in Kabul and called Ms. Wildman, who had not yet heard of LTC Cabrera's death. Id. at 55–56. The following day, Ms. Wildman called Suzanne, but Suzanne ignored the call because she was "in denial"; Suzanne learned of LTC Cabrera's death from another family member. Id. at 56. She was "angry at everyone and angry at God." Id. LTC Cabrera's death "continues to profoundly affect" Suzanne, and she misses him "horribly." Id. at 56–57.

JD Prosser is LTC Cabrera's biological sister. Damages Decls. at 62. She was the oldest child and the "protector and mother figure" for her siblings and especially for LTC Cabrera. Id.

They developed a "very strong bond" and kept in touch as adults.  Id. at 62–63.  LTC Cabrera took on the role of protector and brought "peace" to the family; JD even lived with LTC Cabrera and Ms. Wildman in Germany for six months.  Id. at 63.  When Ms. Wildman called to inform JD of the attack, JD dropped to her knees and "huddled underneath" her desk.  Id. at 63–64.  She felt "helplessness, loneliness, desperation, and disbelief," and she desperately wanted to see LTC Cabrera one last time.  Id. at 64.  JD is in "extensive therapy" and has had to "go on long term disability" after suffering a nervous breakdown she connects to LTC Cabrera's death.  Id. at 64–65.

Diane Trelfa is LTC Cabrera's foster sister.  Damages Decls. at 70.  She was thirteen when LTC Cabrera came to live with her family, and they lived together as roommates during college.  Id. at 70–71.  Diane learned of LTC Cabrera's death from a phone call with her father; she was "very upset" but tried to be strong for her family.  Id. at 71.  Diane has received grief counseling through her church, and she misses LTC Cabrera especially at holidays and family events.  Id. at 71–72.  His death has been "traumatic" and "shocking" for her family.  Id. at 72.

All of LTC Cabrera's siblings enjoyed a close and loving familial relationship with him, and all of them have struggled to deal with the loss of an important member of their family.  The harm suffered by each of the siblings is consistent with that suffered by many siblings of terrorist victims.  See, e.g., Pennington, 2022 WL 168261, at *3 (awarding baseline damages to relatives whose "lives spiraled downward after the attack, leading to . . . mental-health issues" because the "already-substantial" baseline awards "take into consideration the likelihood of serious detrimental effects from these events on families"); Hirshfeld, 330 F. Supp. 3d at 148 (awarding baseline solatium damages to siblings of a terrorist victim who had a "large and loving family").  Because of the loss of the close relationships and the suffering each of LTC Cabrera's siblings has endured

following his death, the Court finds that the <u>Peterson II</u> baseline amount of $2.5 million is an appropriate award for each of them.

*Lemon Family*:   Matthew Lemon "always looked up to" his brother, SGT Lemon. Damages Decls. at 107.  He learned about the attack from his parents and flew out to see SGT Lemon as soon as he could.  <u>Id.</u> at 108.  The attack has changed the brothers' relationship, and SGT Lemon's recovery has been a "source of pain and challenge" for them.  <u>Id.</u>  Matthew has also "spent a great deal of time" helping his brother with his recovery, delaying his enrollment in college and his entry into the workforce; he states that he was "emotionally traumatized" by witnessing the effects of SGT Lemon's injuries and that he has struggled to deal with his pain and anger over the attack.  <u>Id.</u> at 108–09.

Before the attack, SGT Lemon was Nathan Lemon's "confidant" and "best friend."  <u>Id.</u> at 114.  Nathan learned of the attack from a phone call with their mother; he felt "stark, intense fear" and "hatred and intense resentment" for SGT Lemon's attackers.  <u>Id.</u> at 115.  Since the attack, Nathan's relationship with his brother has been "difficult," and it has been hard for the family to support SGT Lemon.  <u>Id.</u>  Nathan talks to his brother "nearly daily" and worries about him often. <u>Id.</u> at 115–16.  The Court concludes that Matthew and Nathan Lemon are each entitled to the baseline award of $1.25 million for siblings of a surviving victim.

Benjamin Lemon was 17 years old when his brother was injured.  Damages Decls. at 100. Before the attack, he had a "healthy, loving" relationship with SGT Lemon, who is eleven years older, and looked up to him as a "role model."  <u>Id.</u> at 100–01.  Benjamin learned of the attack from a text message while he was in class; he began to cry and was "beside [him]self with shock, grief, and confusion."  <u>Id.</u> at 101.  His relationship with SGT Lemon has "changed dramatically," and it is "painful" for Benjamin to see his brother struggle.  <u>Id.</u>  Because of the attack, Benjamin missed

school and delayed his entry into West Point in order to "deal[] with [his] anger and grief."  Id. at 102.  Plaintiffs request a 25% upward adjustment from the $1.25 million baseline for Benjamin because he was "still a minor living at home when his brother was injured."  Proposed Damages Conclusions at 28.  The Court has already explained that it will not categorically award 25% enhancements to account for the fact that a family member was a minor at the time of the attack, and the Court does not see sufficient reason based on this record to depart upward.  SGT Lemon was neither a father figure nor caretaker for his younger brother, and indeed, SGT Lemon was apparently living in Alaska, outside the family home.  See Damages Decls. at 77 (explaining that SGT Lemon lived in Alaska with his wife and daughter); id. at 101 (noting that Benjamin lived at home with his parents).  Thus, the Court will award solatium damages of $1.25 million to Benjamin Lemon.

*King Family*:  Stephanie Miller is Mr. King's older sister.  Damages Decls. at 159.  She has "many happy memories" of growing up with Mr. King; before the kidnapping, she kept in touch with him by email during his travels and saw him when he was in the United States.  Id. at 159–60.  When she learned that Mr. King had been abducted, she "almost collapsed from shock." Id. at 160.  She describes the three years of Mr. King's captivity as "the darkest years" of her life as she constantly waited for news of his release; in particular, she made the difficult decision not to tell their mother, who was "in her nineties with progressing dementia," that Mr. King had been abducted.  Id.  When their mother would ask about Mr. King, Ms. Miller told her that "he had emailed recently" and once "even sent her chocolates from" Mr. King.  Id. at 159–60.  Meanwhile, she met regularly with federal agents and "became obsessed with having access" to her phone and email.  Id. at 161.  Tragically, their mother was placed in hospice care and died before Mr. King was released.  Id.  Stephanie's relationship with her brother has changed since his return:  although

he used to be "very independent," he now lives with Stephanie and her husband, who help him with his continuing medical appointments. Id. at 161–62. In sum, Stephanie has "experienced an extreme amount of stress and anxiety" related to Mr. King's kidnapping and recovery. Id. at 162.

Plaintiffs request $2 million in solatium damages for Stephanie Miller, a 60% upward departure from the baseline amount for siblings of surviving victims of terror attacks, because she endured additional pain and suffering as the family member of a kidnapping victim. Proposed Damages Conclusions at 29. They cite several cases where courts in this District have explained that family members of kidnapping victims are entitled to greater solatium awards "because the afflicted party not only had to cope with the grief that follows the loss of a loved one, but—at the time of the event—was also forced to endure unending anxiety and an extended period of extreme distress over the health and safety of their captive family member." Id. (quoting Oveissi I, 768 F. Supp. 2d at 27); see also Foley, 281 F. Supp. 3d at 156, 159 (departing upward to award $7 million to parents of victim who was kidnapped for four years and later killed). In Fritz II, for example, Judge Moss adopted the recommended $8 million award (a 60% upward departure) for parents of a victim who was kidnapped, held for between three and five years, tortured, and eventually killed, 324 F. Supp. 3d at 62, in part because, as the Special Master explained, "[t]he anguish of not knowing [the victim]'s fate, of waiting every day for news, of seeking out information and pleading with the terrorists for mercy is indescribable," Fritz v. Islamic Republic of Iran, Civ. A. No. 15-456 (RDM), 2018 WL 5046229, at *23 (D.D.C. Aug. 13, 2018).

The Court agrees that Ms. Miller is entitled to an upward departure because she waited for over three years not knowing whether her brother would live or die. And Ms. Miller endured all of this agony while supporting her mother and making the difficult and painful decision to withhold the news of Mr. King's kidnapping as her dementia worsened. But unlike the victims in Fritz and

<u>Foley</u>, Mr. King did survive his kidnapping, and he was not subjected to the same kind of torture as the victim in <u>Fritz</u> (who was "beaten repeatedly" and "suffered severe and persistent pain during his captivity," 2018 WL 5046629, at *2).  Accordingly, the Court will award Ms. Miller $1.562 million in solatium damages, an upward adjustment of 25% from the <u>Peterson II</u> baseline for siblings of surviving terror victims.

### B.  Prejudgment Interest

Plaintiffs also seek prejudgment interest for their damages.  Whether to award prejudgment interest "is a question that rests within this Court's discretion, subject to equitable considerations." <u>Oveissi II</u>, 879 F. Supp. 2d at 58.  "This Court and several others in this District have previously awarded prejudgment interest on similarly situated plaintiffs' awards, including pain and suffering and solatium."  <u>Ewan</u>, 466 F. Supp. 3d at 250 (collecting cases).  Other judges in this District, however, have concluded that awards under the <u>Heiser</u> or <u>Peterson II</u> frameworks already "represent the appropriate level of compensation, regardless of the timing of the attack."  <u>Oveissi II</u>, 879 F. Supp. 2d at 59 (quoting <u>Oveissi I</u>, 768 F. Supp. 2d at 30 n.12) (collecting cases); <u>e.g.</u>, <u>Wyatt v. Syrian Arab Republic</u>, 908 F. Supp. 2d 216, 232 (D.D.C. 2012) ("[P]ain and suffering and solatium damages are both designed to be fully compensatory," so "[p]rejudgment interest is not appropriate and will be denied.").

Despite this conflicting authority, the Court concludes—as it has done in the past, <u>see</u> <u>Ewan</u>, 466 F. Supp. 3d at 250—that an award of prejudgment interest is appropriate.  "Awards for pain and suffering and solatium are calculated without reference to the time elapsed since the attacks."  <u>Id.</u> (citation omitted).  "A solatium award is therefore best viewed as fixed at the time of the loss," so plaintiffs "were theoretically entitled to the full amount of their solatium awards" at the time of the attacks that caused their damages.  <u>Fritz II</u>, 324 F. Supp. 3d at 64.  Failure to award

prejudgment interest "would also allow the Iranian defendants 'to profit from the use of the money'" in the intervening time.  Ewan, 466 F. Supp. 3d at 250 (citation omitted).[44]

The Court will calculate the interest amount by following the D.C. Circuit's recommendation in Forman v. Korean Air Lines Co., 84 F.3d 446 (D.C. Cir. 1996):  in Forman, the court explained that using the prime rate is "more appropriate" than the Treasury Bill rate because the prime rate is "a market-based estimate" of what a victim would have had to pay to borrow money at the time of the relevant attack, 84 F.3d at 450–51 (citation omitted).  As it has done previously, see Ewan, 466 F. Supp. 3d at 250–51, the Court will use the Federal Reserve's data for the average annual prime rate in each year from the date of the respective attacks through 2022, id. at 250 n.3.  Using the prime rates for the years from the date of the attack,[45] and discounting for the percentage of the year elapsed at the time of each attack, yields the following multipliers:[46]

---

[44] Plaintiffs acknowledge that the United States Victim of State Sponsored Terrorism Fund, from which they anticipate recovering a portion of their damages, does not allow for recovery of prejudgment interest.  Proposed Damages Conclusions at 31 n.11 (describing the fund as plaintiffs' "only realistic near-term prospect for collecting on any judgment against Iran"); see 34 U.S.C. § 20144(j)(3) ("The term 'compensatory damages' does not include pre-judgment interest or post-judgment interest or punitive damages.").  Although plaintiffs concede that "they do not expect to actually collect prejudgment interest (or punitive damages)," they nevertheless request both in addition to compensatory damages.  Proposed Damages Conclusions at 30–31 & n.11.  The Court agrees; even if the award of prejudgment interest and punitive damages is, at present, largely symbolic, the award is warranted both to compensate the plaintiffs for the injuries they have suffered  and to ensure that Iran faces appropriate consequences for its support of terrorist attacks on American victims.

[45] This data is available on the Federal Reserve's website.  Bd. of Governors of Fed. Reserve Sys., Data Download Program, https://www.federalreserve.gov/datadownload/Download.aspx?rel=H15&series=8193c94824192497563a23e378787 8ec&filetype=spreadsheetml&label=include&layout=seriescolumn&lastObs=50 (last accessed May 10, 2022).

[46] Specifically, the Court calculated this multiplier—using SGT Lemon as an example—as follows.  First, the Court multiplied $1.00 by the prime rate in 2010 (3.25%); discounted that interest by the percentage of the year remaining from April 11, 2010 to December 31, 2010 (72.23%); and added that amount to $1.00, for a result of $1.02357.  The Court then took that amount and multiplied it by the prime rate in 2011 (3.25%) and combined that amount with $1.02357, for a result of $1.056771.  The Court continued this iterative process through July 19, 2022, resulting in a total multiplier of 1.562336.  See Ewan, 466 F. Supp. 3d at 250 n.3.  Because the four attacks relevant to the bellwether plaintiffs were committed on different dates, the Court repeated this process for LTC Cabrera, CPT Timoney, and Mr. King.  To approximate the 2022 prime rate, the Court averaged the prime rates for the past six years—approximately 4.10%—and again discounted the interest by the percentage of the year that has elapsed as of July 19, 2022.  See id.

| Plaintiffs | Attack Date | Multiplier |
|---|---|---|
| SGT Lemon and family | April 11, 2010 | 1.562336 |
| LTC Cabrera family | October 29, 2011 | 1.486699 |
| CPT Timoney and family | May 20, 2012 | 1.460478 |
| Mr. King and family | August 7, 2016 | 1.022344 |

Applying those multipliers, the Court concludes that plaintiffs are entitled to the following amounts as compensatory damages (solatium or pain-and-suffering damages, plus prejudgment interest):

| Plaintiff | Pain-and-Suffering or Solatium Damages | Compensatory Damages Plus Prejudgment Interest |
|---|---|---|
| SGT Jared Lemon | $9,000,000 | $14,061,020.56 |
| K.L. | $2,500,000 | $3,905,839.04 |
| Frank Lemon | $2,500,000 | $3,905,839.04 |
| Jackie Lemon | $2,500,000 | $3,905,839.04 |
| Benjamin Lemon | $1,250,000 | $1,952,919.52 |
| Matthew Lemon | $1,250,000 | $1,952,919.52 |
| Nathan Lemon | $1,250,000 | $1,952,919.52 |
| August Wildman | $8,000,000 | $11,893,588.62 |
| Corbin Cabrera | $4,000,000 | $5,946,794.31 |
| Gillian Cabrera | $4,000,000 | $5,946,794.31 |
| M.C. | $5,000,000 | $7,433,492.89 |
| R.C. | $6,000,000 | $8,920,191.47 |
| Robert Cabrera | $4,000,000 | $5,946,794.31 |
| Daniel Cabrera | $2,500,000 | $3,716,746.45 |
| Robert Hopkins | $2,500,000 | $3,716,746.45 |
| Susan Martinez | $2,500,000 | $3,716,746.45 |
| JD Prosser | $2,500,000 | $3,716,746.45 |
| Gloria Trelfa | $2,500,000 | $3,716,746.45 |
| CPT Ryan Timoney | $9,000,000 | $13,144,298.58 |
| Diane Timoney | $2,500,000 | $3,651,194.05 |
| Gregory Timoney | $2,500,000 | $3,651,194.05 |
| Kevin King | $11,000,000 | $11,245,787.72 |
| Stephanie Miller | $1,562,500 | $1,597,413.03 |

### C.  Punitive Damages

The private right of action in 28 U.S.C. § 1605A(c) also authorizes "punitive damages," which "serve to punish and deter the actions for which they are awarded."  Valore, 700 F. Supp. 2d at 87.[47]  Courts balance four factors to determine the appropriate amount of punitive damages: "(1) the character of the defendants' act; (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants."  Oveissi II, 879 F. Supp. 2d at 56 (quoting Acosta, 574 F. Supp. 2d at 30).

In this case, all four factors weigh strongly in favor of awarding significant punitive damages.  Iran provided support to the Taliban-led Syndicate, which enabled it to conduct a series of 11 violent attacks that killed and wounded dozens of victims and caused anguish and grief for many family members.  Further, Iran has a "demonstrated policy" of funding similar terrorist campaigns, Campuzano, 281 F. Supp. 2d at 278, and the Court has already found that Iran intentionally caused the bellwether plaintiffs to suffer significant and continuing physical and psychological trauma as a result of these attacks, see supra Part IV.C.1; see also Acosta, 574 F. Supp. 2d at 31 ("[T]his Court has no doubt that Iran's intention, in supporting terrorist groups such as the one involved here, is to create maximum harm through terrorist acts.").  Accordingly, there is a substantial need to deter Iran from further supporting terrorist attacks against American victims.  Finally, Iran "is a sovereign nation that can be presumed to possess significant wealth." Ewan, 466 F. Supp. 2d at 251.  The four-factor test outlined in Oveissi II and elsewhere thus supports awarding substantial punitive damages in this case.

---

[47] Although the D.C. Circuit had previously concluded that plaintiffs could not recover punitive damages before the 2008 enactment of § 1605A, Owens, 864 F.3d at 818, the Supreme Court later concluded "that punitive damages are permissible for federal claims" based on past conduct under § 1605A, Opati, 140 S. Ct. at 1610.  In this case, punitive damages are thus available regardless of the year Iran provided support to the Syndicate.  Cf. Proposed Damages Conclusions at 32 n.13 (noting that "[m]uch of Iran's support for the Taliban occurred after § 1605A was enacted in 2008").

Courts in this District have used two methodologies to calculate punitive damages awards in cases like this.  The first involves calculating "the amount of Iran's annual expenditures on terrorist activities" and multiplying it by a factor to "yield the desired deterrent effect."  <u>Valore</u>, 700 F. Supp. 2d at 88; <u>accord</u> <u>Murphy</u>, 740 F. Supp. 2d at 80–81 (applying this framework).  But that approach has its drawbacks:  "Recurrent awards in case after case arising out of the same facts can . . . over-punish[] the same conduct . . . with little additional deterrent effect, and awards in several cases arising out of the same facts can differ, creating anomalous results."  <u>Murphy</u>, 740 F. Supp. 2d at 81; <u>see also</u> <u>Doe</u>, 943 F. Supp. 2d at 190 (noting similar concerns).  Under the other method, courts award "punitive damages in an amount equal to the total compensatory damages awarded."  <u>Sheikh</u>, 485 F. Supp. 3d at 273 (quoting <u>Opati</u>, 60 F. Supp. 3d at 82).  This "compensatory-damages-value" approach "has the virtue of straightforwardly scaling as additional sets of plaintiffs come forward . . . and is both 'consistent with the punitive damages awards in analogous cases' and a forceful deterrent."  <u>Id.</u> (quoting <u>Opati</u>, 60 F. Supp. 3d at 82).  Under the latter standard, punitive damages are calculated "by reference to the entire compensatory award," including prejudgment interest.  <u>Wamai</u>, 60 F. Supp. 3d at 98; <u>see</u> <u>Ewan</u>, 466 F. Supp. 3d at 252 & n.4 (calculating punitive damages based on the amount of compensatory damages including interest).

In this case, plaintiffs ask the Court to "award punitive damages in an amount equal to the total compensatory damages award."  Proposed Damages Conclusions at 34.  But at this juncture, with the claims of so many plaintiffs still outstanding, the Court is not prepared to enter a punitive award against Iran at this time.  Accordingly, the Court will defer ruling on punitive damages until the compensatory damage awards of all plaintiffs in this case have been decided.

## **CONCLUSION**

For the foregoing reasons, final judgment on liability will be entered against Iran as to the eleven bellwether attacks relevant to this proceeding, and the twenty-three bellwether plaintiffs will be awarded damages in the amounts set forth above.  Plaintiffs' remaining claims—both the claims of the other plaintiffs associated with the bellwether attacks and those of plaintiffs injured in other attacks—will be referred to a Special Master, who will receive evidence and prepare proposed findings and recommendations for the disposition of each claim in a manner consistent with this Opinion.  The Court will consider punitive damages after all of the compensatory damages awards in this case have been decided by this Court.  A separate Order will issue on this date.


_____/s/_____

JOHN D. BATES
United States District Judge


Dated:  July 19, 2022