## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AUGUST CABRERA, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 19-3835 (JDB)** |
| **ISLAMIC REPUBLIC OF IRAN,** | |
| **Defendant.** | |
| **MARK ZAMBON, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 18-2065 (JDB)** |
| **ISLAMIC REPUBLIC OF IRAN,** | |
| **Defendant.** | |

## <u>MEMORANDUM OPINION</u>

Between 2006 and 2019, a terrorist syndicate comprising, among other groups, al-Qaeda, the Taliban, and the Haqqani Network (the "Syndicate") perpetrated numerous terrorist attacks against American servicemembers and civilians in Afghanistan. Victims of those attacks and their family members brought these coordinated suits against the Islamic Republic of Iran under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, alleging that Iran provided material support for extrajudicial killings to the Syndicate responsible for these attacks.

The Court previously granted default judgment to twenty-three bellwether plaintiffs associated with eleven bellwether attacks.  July 19, 2020 Order [ECF No. 77][1]; see Cabrera v. Islamic Republic of Iran, Civ. A. No. 18-2065 (JDB), 2022 WL 2817730, at *57 (D.D.C. July 19, 2022).  One bellwether attack was an attempted extrajudicial killing in which no one died.  In its Memorandum Opinion, the Court followed the typical approach of judges in this District and concluded that "even where an attack killed no one—i.e., where it caused only physical injuries— the terrorism exception continues to apply."  Cabrera, 2022 WL 2817730, at *37.  Shortly thereafter, the Court expressed "concern[]" about the scope of the terrorism exception in light of a contemporaneous opinion from another judge in this District, who had concluded that the exception "does not include attempted extrajudicial killings when no one is, in fact, killed in the attack."  Aug. 23, 2022 Order [ECF No. 106] at 1–2 (quoting Force v. Islamic Republic of Iran ("Force II"), Civ. A. No. 16-1468 (RDM), 2022 WL 2452606, at *4 (D.D.C. July 5, 2022)).  At the Court's request, plaintiffs submitted additional briefing on the issue.  See id. at 3; Pls.' Suppl. Br. Regarding Terrorist Exception to FSIA for Injuries Sustained in Cases of Incomplete Acts of Extrajudicial Killing [ECF No. 108] ("Suppl. Br.").

The Court now reaffirms its prior decision and concludes that the terrorism exception to foreign sovereign immunity under the FSIA, § 1605A(a)(1), does encompass injuries occurring in nonfatal attacks, so long as those injuries are the foreseeable result of a defendant nation's material support for acts of extrajudicial killing.

I.     **Background**[2]

---

[1] Unless otherwise indicated, all ECF citations will refer to the filings in Cabrera v. Islamic Republic of Iran, No. 19-cv-3835.  The Court will cite filings in Zambon v. Islamic Republic of Iran as "Zambon ECF No. #."

[2] For a more complete procedural history of this litigation and the Court's factual findings, see Cabrera, 2022 WL 2817730, at *1–33.

The Zambon and Cabrera plaintiffs filed these suits on August 31, 2018 and December 27, 2019 respectively, alleging in part "that Iran provided material support, in the form of 'sophisticated weapons, critical training, financial assistance, safe haven, and assistance with drug trafficking,' to a 'terrorist syndicate' operating in Afghanistan from 2006 to 2019." Cabrera, 2022 WL 2817730, at *1 (quoting Pls.' Proposed Conclusions of Law [ECF No. 70-2] at 1). They seek damages for the personal injuries and deaths of victims of the Syndicate's attacks and the emotional distress suffered by victims' families. Id. On May 28, 2021, the Court consolidated these actions' Afghanistan-based claims. See Order on Coordinating Afghanistan-Based Claims [ECF No. 43]; Order on Coordinating Afghanistan-Based Claims [Zambon ECF No. 30]. After plaintiffs served Iran through diplomatic channels and Iran failed to respond, they sought and obtained an entry of default from the Clerk of Court. Cabrera, 2022 WL 2817730, at *2.

The Court adopted a case management plan under which it would first "make findings of fact and liability conclusions on eleven bellwether attacks, and would then make damages conclusions as to a subset of the victims injured in those attacks," after which it would "appoint[] Special Masters to make liability and damages determinations as to the remaining plaintiffs." Cabrera, 2022 WL 2817730, at *2. The bellwether attacks were meant "to 'represent[] each of the geographies and each of the attack types' at issue in this case." Id. (quoting Case Management Order [ECF No. 28] at 2).

The Court held a three-day evidentiary hearing from October 18 to 20, 2021. See Cabrera, 2022 WL 2817730, at *3. At the hearing, plaintiffs presented evidence supporting Iran's liability in each of the eleven bellwether attacks, including testimony from five fact witnesses and three expert witnesses, expert reports, military service records, and medical records. See id.

3

On July 19, 2022, the Court issued a Memorandum Opinion detailing factual findings and legal conclusions for the eleven bellwether attacks and the related claims of twenty-three bellwether plaintiffs.  See Cabrera, 2022 WL 2817730.  The Court determined "that the Syndicate committed all eleven [bellwether] attacks, . . . that Iran's material support substantially contributed to the Syndicate's ability to do so," and that Iran's support was the proximate cause of the deaths and injuries that formed the basis for the bellwether plaintiffs' claims.  Id. at *15; see id. at *41 ("[P]laintiffs' injuries were not only foreseeable: they were the intended result of Iran's support.").  After determining that each bellwether plaintiff was entitled to bring claims under the private right of action afforded by § 1605A(c), id. at *41–42, the Court awarded damages and prejudgment interest to those twenty-three plaintiffs, id. at *43–56.

As relevant here, one bellwether attack was a May 31, 2012 IED attack by the Taliban in Zombalay District, Helmand Province.  See Cabrera, 2022 WL 2817730, at *23.  SGT Eric M. Hunter, a plaintiff injured in that attack, was a cook assigned to a special forces unit in the region who accompanied the unit in a support role during missions.  Id.  The Court described the horrific attack in its prior opinion:

> On the day of the attack, SGT Hunter was participating in a mission where American troops were moving in two separate columns to converge on the village of Zombalay.  SGT Hunter was in the western column.  The other column began taking direct fire as they approached the village, and SGT Hunter ran to the top of a roof to provide suppressive fire.  He stepped on a pressure plate IED placed beneath a path in the village and the device detonated; the IED did not kill anyone, but it severely wounded SGT Hunter, ultimately requiring the amputation of his right leg below the knee, causing serious damage to his left leg, and resulting in a traumatic brain injury and post-traumatic stress disorder.

Id. (citations omitted).  The Court acknowledged that "no one was killed" in this attack but emphasized that it "was an attempted killing."  Id. at *37.  The Court explained that

> [t]he Syndicate planned the attack in advance by constructing an IED and placing it on a path where American forces would likely trigger it, even calibrating its

> trigger to detonate only under the weight of a fully armed soldier, and the Syndicate's goal in conducting this attack was to kill American soldiers.

Id.  The Court found that Iran was liable for this attack because its "material support for the Taliban, including the provision of finances, training in advanced IED tactics, and weapons materials, substantially contributed to the Taliban's ability to conduct this attack."  Id. at *23.

The Court further concluded that the May 31, 2012 IED attack fell within the scope of the terrorism exception to the FSIA.  The Court reasoned that

> even where an attack killed no one—i.e., where it caused only physical injuries—the terrorism exception continues to apply.  Although "[t]he text of § 1605A(a)(1) does not expressly address attempts to commit acts" such as extrajudicial killing, courts in this District have concluded that injuries "resulting from 'deliberated' attempts to kill fall within the scope" of the terrorism exception.

Cabrera, 2022 WL 2817730, at *37 (quoting Karcher v. Islamic Republic of Iran, 396 F. Supp. 3d 12, 58 (D.D.C. 2019)) (citing Gill v. Islamic Republic of Iran, 249 F. Supp. 3d 88, 99 (D.D.C. 2017)).

But then on August 23, 2022, the Court entered an Order instructing plaintiffs to file a supplemental brief "addressing whether the terrorism exception to the FSIA applies in cases of attempted extrajudicial killing where no one was actually killed" and "inform[ing] the Court of the existence and number of other attacks in these consolidated cases that did not involve the death of any person, and the plaintiffs involved in those attacks."  Aug. 23, 2022 Order at 3 (citation omitted).  The Court explained that it was "concerned about the scope of the terrorism exception" after "review[ing] the recent opinion in [Force II]."  Id. at 1–2.  In Force II, 2022 WL 2452606—which was decided shortly before this Court's opinion in Cabrera—another judge in this District "concluded that 'the state-sponsored terrorism exception to the FSIA's grant of sovereign immunity does not include attempted extrajudicial killings when no one is, in fact, killed in the attack.'"  Aug. 23, 2022 Order at 2 (quoting Force II, 2022 WL 2452606, at *4).

5

On September 27, 2022, plaintiffs filed supplemental briefs identifying 60 relevant attacks in which no one was killed and 153 plaintiffs whose claims relate to those attacks,[3] see Suppl. Filing Identifying Attacks & Pls. [ECF No. 107], and advancing two textual arguments for applying the terrorism exception to attempted but unsuccessful extrajudicial killings, see Suppl. Br.  In their first argument (the "act-of" argument), plaintiffs assert that—although the FSIA adopts the definition of "extrajudicial killing" from the Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 ("TVPA")—the FSIA uses the term "an act of . . . extrajudicial killing," § 1605A(a)(1) (emphasis added), which should encompass a broader scope of activity than the TVPA does and should include attempted extrajudicial killings.  See Suppl. Br. at 4–6.  In their second argument (the "material-support" argument), plaintiffs emphasize that the terrorism exception applies when injuries are caused by a nation's "provision of material support or resources for [acts of extrajudicial killings]," and they assert that Iran's material support to terrorists for the purpose of extrajudicially killing Americans was the proximate cause of their injuries, regardless of whether the injury-causing terrorist acts successfully killed anyone. See id. at 6–8.

## II.   Analysis

The terrorism exception to the FSIA provides that

> [a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

---

[3] Hence, this is an issue of substantial significance in these cases.

28 U.S.C. § 1605A(a)(1).  Thus, the terrorism exception waives the sovereign immunity of foreign states sued for money damages in two instances: (1) when a plaintiff's "personal injury or death . . . was caused by an act of . . . extrajudicial killing" (or any other enumerated act) or (2) when that "personal injury or death . . . was caused by . . . the provision of material support or resources for such an act."  Id.

On its face, the first prong of the terrorism exception (the "direct-causation" prong) applies when the defendant state itself carries out an act of extrajudicial killing.  See § 1605A(a)(1) (indicating that the direct-causation prong applies "if such act . . . is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency").  Here, plaintiffs do not allege that Iran committed the attacks at issue. Accordingly, the direct-causation prong does not control this case.

Like most cases invoking the terrorism exception, this case implicates the second prong (the "material-support" prong).  Plaintiffs allege—and have proven as to the bellwether attacks, see Cabrera, 2022 WL 2817730, at *9–12; *15–27; *35–36—that Iran provided material support to the terrorist organizations that attacked them.  The question before the Court is whether the material-support prong applies to attempted but unsuccessful extrajudicial killings.  That is, can a plaintiff's "personal injury or death" still be "caused by . . . the provision of material support or resources for [an act of extrajudicial killing]," § 1605A(a)(1), when the injury occurs in a state-supported attempted killing that did not result in death?  For the reasons discussed below, the Court answers that question in the affirmative and concludes that the material-support prong of the terrorism exception extends to injuries occurring in nonfatal attacks because such injuries can still be caused by a defendant nation's provision of material support for acts of extrajudicial killing, regardless of whether the specific attack was successful.

7

### A.  Prior Rulings in this District

Every judge in this District to consider this issue prior to 2022—and several who addressed it in the past year—has concluded that the material-support prong of the terrorism exception extends to injuries caused by a defendant nation's material support for a nonfatal, attempted extrajudicial killing.  However, the reasoning varies somewhat from case to case.

Two of the most frequently cited cases that discuss attempted extrajudicial killings are Gill v. Islamic Republic of Iran, 249 F. Supp. 3d 88 (D.D.C. 2017), and Karcher v. Islamic Republic of Iran, 396 F. Supp. 3d 12 (D.D.C. 2019).  Gill concluded "that the Torture Victim Protection Act's definition of extrajudicial killing allows plaintiffs to assert liability for a defendant's attempted extrajudicial killing, even if no one died as a result of that attempt," and "because the [FSIA's] terrorism exception adopts the Torture Victim Protection Act's definition of extrajudicial killing . . . [an] attempted extrajudicial killing of the plaintiff constitutes an extrajudicial killing under the terrorism exception."   249 F. Supp. 3d at 99.   In reaching this conclusion, Gill emphasized the purposes of the TVPA and the FSIA: "Congress passed both statutes in order to aid victims in their pursuit to prosecute claims of particular types of torture and terrorism against foreign states."   Id. at 98.   The court was further "guided by" the D.C. Circuit's instruction that "given the [FSIA's] 'text and purpose,' its 'ambiguities [should be interpreted] flexibly and capaciously.'"   Id. at 99 (quoting Van Beneden v. Al-Sanusi, 709 F.3d 1165, 1167 (D.C. Cir. 2013)).

Karcher reached a similar conclusion, not by broadly construing the TVPA's definition of "extrajudicial killing," but by emphasizing the manner in which the term is incorporated into the FSIA.  Karcher noted that the terrorism exception "strips immunity for, in pertinent part, 'personal injury or death that was caused by an act of . . . extrajudicial killing . . . or the provision of material

support or resources for such an act.'"  396 F. Supp. 3d at 57 (emphasis and alterations in original) (quoting § 1605A(a)(1)).  Based on its reading of the material-support prong, the Karcher court concluded that "[n]othing on the face of Section 1605A(a)(1) requires that the material support or resources for an intended extrajudicial killing actually result in someone's death, as long as the victim represented in the case was injured." Id.  The court also engaged in a "brief foray" into the legislative history of the terrorism exception, and, "[b]ased on the 'text and purpose' of the FSIA, as well as relevant legislative history, the Court conclude[d] that material support for an incomplete act of extrajudicial killing falls within the scope of Section 1605A(a)(1)." Id. (citation omitted).

The majority of other opinions that address the issue in this District—including the original Memorandum Opinion in this case, see Cabrera, 2022 WL 2817730, at *37—cite Karcher or Gill and adopt those cases' approaches of emphasizing both the broad purpose of the terrorism exception and the D.C. Circuit's interpretive guidance.  See, e.g., Fissler v. Islamic Republic of Iran, Civ. A. No. 18-3122 (CKK), 2022 WL 4464873, at *5 (D.D.C. Sept. 26, 2022) (citing Karcher for the proposition that "injuries resulting from 'deliberated' attempts to kill fall within the scope" of the terrorism exception); Hake v. Bank Markazi Jomhouri Islami Iran, Civ. A No. 17-114 (TJK), 2022 WL 4130837, at *8 (D.D.C. Sept. 12, 2022) (citing Karcher for a similar proposition); Lee v. Islamic Republic of Iran, 518 F. Supp. 3d 475, 491 (D.D.C. 2021) (citing Karcher when "conclud[ing] that the text of Section 1605A(a)(1) and the [D.C. Circuit]'s mandate to construe ambiguities in the FSIA broadly permits the court to exercise jurisdiction where a designated state supplies material resources in an attempt to commit an extrajudicial killing").

Recently, a few courts have performed more in-depth analyses to reach the same conclusion.  First, Roberts v. Islamic Republic of Iran, 581 F. Supp. 3d 152 (D.D.C. 2022), agreed that "attempted extrajudicial killings may still constitute 'act[s] of . . . extrajudicial killing' under

§ 1605A(a)(1)."  Id. at 169.   The Roberts court's reasoning—which resembles the Cabrera plaintiffs' "act-of" argument—hinged on the fact that "[t]he FSIA does not waive immunity when a foreign state supports an extrajudicial killing, but rather an 'act of' extrajudicial killing," and thus the words "act of" must be "significant" because "courts 'must give effect, if possible, to every clause and word of a statute.'"  Id. (quoting Loughrin v. United States, 573 U.S. 351, 358 (2014)).  The court accordingly determined that the phrase "act of . . . extrajudicial killing" was ambiguous because it could plausibly "encompass (1) the specific deed of an extrajudicial killing or (2) the process of committing an extrajudicial killing."  Id. at 170.   Under that second interpretation, "the process of committing an extrajudicial killing does not imply that death results—meaning that an attempted extrajudicial killing could constitute an 'act of extrajudicial killing.'"  Id.  Roberts adopted this broader interpretation of the purportedly ambiguous language in light of the D.C. Circuit's instruction to "interpret [the FSIA's] ambiguities flexibly and capaciously."  Id. (quoting Van Beneden, 709 F.3d at 1167).[4]

Another recent decision, Borochov v. Islamic Republic of Iran, 589 F. Supp. 3d 15 (D.D.C. 2022), relied on reasoning that mirrors the Cabrera plaintiffs' material-support argument to conclude that the terrorism exemption covers attempted killings.  Although the court recognized that "an attack cannot be a 'killing,' deliberated or otherwise, if nobody dies," Borochov's textual analysis of the terrorism exception emphasized that "[t]he FSIA waives sovereign immunity for injuries caused by 'material support for' an extrajudicial killing" and "[t]he word 'for' matters." Id. at 33 (quoting § 1605A(a)(1)).  That is, the word "for" indicates the "object or purpose of an action or activity," and a state's material support for the purpose of acts of extrajudicial killing

---

[4] Judge Lamberth, who authored Roberts, subsequently applied the same reasoning in Stearns v. Islamic Republic of Iran, Case No. 1:17-cv-131-RCL, 2022 WL 4764905, at *48–50 (D.D.C. Oct. 3, 2022).

"can therefore cause personal injury, even if a resulting attack is not deadly."  Id. (internal quotation marks omitted).

Although most cases addressing this issue have reached consistent conclusions about the scope of the terrorism exception—albeit with differing reasoning—three recent opinions in this District have disagreed, instead determining that the terrorism exception cannot apply to injuries that occur during nonfatal attacks.  The first case to reach this outcome was Force II, 2022 WL 2452606.  Although the Force II court had previously adopted Karcher's conclusion about the broad scope of the material-support prong in an earlier opinion, see id. at *7 (describing the decision in Force I, 464 F. Supp. 3d 323, 360–61 (D.D.C. 2020)), "[o]n reflection, . . . the Court [was] no longer convinced that the material-support prong of the exception can be read so broadly," id.  The court therefore reversed course and held "that the state-sponsored terrorism exception to the FSIA's grant of foreign sovereign immunity does not include attempted extrajudicial killings when no one is, in fact, killed in the attack."  Id. at *4.  To reach this conclusion, Force II relied on a careful textual interpretation of the TVPA's definition of "extrajudicial killing."  See id. at *4–9.  This opinion addresses Force II in more detail below.[5]

Another judge in this District subsequently adopted Force II's reasoning in Burks v. Islamic Republic of Iran, Civ. A. No. 16-1102 (CRC), slip op. at 19 (D.D.C. Sept. 30, 2022) ("Burks Op.") (concluding that "Congress chose to abrogate sovereign immunity for an 'act of . . . extrajudicial killing,' but did not expressly abrogate sovereign immunity for an attempted extrajudicial killing").  Burks went further and explicitly rejected both the "act-of" and material-support arguments adopted by other courts, stating that "[t]hese interpretations stretch the text of the statute too thin."

_____

[5] Judge Moss, who authored Force II, also reached the same outcome in a subsequent related case, Jakubowicz v. Islamic Republic of Iran, Civ. A. No. 18-1450 (RDM), 2022 WL 3354719, at *3–6 (D.D.C. Aug. 9, 2022).

Id. at 20; see id. at 20–21 (suggesting that "adding the words 'an act of' [to the FSIA] would be a very oblique way" to sweep in attempted killings and emphasizing that "both the phrase 'act of . . . extrajudicial killing' and the phrase 'material support or resources for such an act' ultimately refer back to the same, defined act: an extrajudicial killing").

To summarize, most judges in this District who have considered this issue have determined that the material-support prong of the FSIA's terrorism exception extends to attempted extrajudicial killings, but two judges have recently reached the opposite conclusion after engaging in a close statutory review.

### B.  The Scope of the Material-Support Prong

As explained above, this case implicates the material-support prong, which applies when a plaintiff's "personal injury or death . . . was caused by . . . the [defendant nation's] provision of material support or resources for" "an act of . . . extrajudicial killing." 28 U.S.C. § 1605A(a)(1).

To begin, the Court must resolve what the statute means by "the provision of material support or resources for" something.  § 1605A(a)(1) (emphasis added).  The Borochov court carefully analyzed this statutory phrase:

> The FSIA waives sovereign immunity for injuries caused by "material support for" an extrajudicial killing.  28 U.S.C. § 1605A(a)(1) (emphasis added).  The word "for" matters.  As used in the provision, "for" "indicate[s] the object or purpose of an action or activity." For, Am. Heritage Dictionary 329 (3d ed. 1994).  One dresses "for" dinner or studies "for" an exam even if the dinner or exam never occurs.  Thus, a foreign state's support with the object or purpose of an extrajudicial killing constitutes support "for such an act" under the statute.  28 U.S.C. § 1605A(a)(1); accord Force [I], 464 F. Supp. 3d at 360–61. And support with that intention or objective can therefore cause "personal injury," even if a resulting attack is not deadly.  28 U.S.C. § 1605A(a)(1).  This interpretation faithfully considers Congress's inclusion of "for" in the statute and abides by the D.C. Circuit's guidance to "interpret [the FSIA's] ambiguities flexibly and capaciously." Van Beneden v. Al-Sanusi, 709 F.3d 1165, 1167 (D.C. Cir. 2013).

589 F. Supp. 3d at 32.

The Court agrees with Borochov's textual analysis. Although one could plausibly read the word "for" to mean "resulting in"—such that the material-support prong would require that a defendant nation provided support that ultimately resulted in a successful extrajudicial killing[6]— the Borochov court's interpretation is preferable for several reasons. For one, interpreting "for" as a reference to the intended purpose of a defendant's material support results in a more natural reading—i.e., the nation must have provided the material support with the intent that such support would be used to bring about acts of extrajudicial killing. Further, given the two possible interpretations, any ambiguity should be resolved in favor of Borochov's more expansive reading in accordance with the D.C. Circuit's guidance for resolving ambiguities in the FSIA. The broader interpretation is also more faithful to the text and structure of the terrorism exception as a whole. Unlike the direct-causation prong, the material-support prong does not ask whether the plaintiff's injury was caused by an act of extrajudicial killing. Instead, it is the defendant's act of providing support that triggers liability under this prong, not the character of the attack that directly caused the injury.

Next, a plaintiff's injury must be "caused by" a defendant nation's material support. It is well established that a plaintiff must show proximate cause under the material-support prong. That is, a plaintiff must demonstrate that the defendant's provision of material support was a "substantial factor in the sequence of events that led to the plaintiff's injury" and that the plaintiff's injury was "reasonably foreseeable or anticipated as a natural consequence" of the defendant's material support. Owens, 864 F.3d at 794 (internal quotation marks omitted). The FSIA does not, however, require plaintiffs to show that "a state's material support [was] directly for the specific

---

[6] To continue with an example from Borochov, under this alternate interpretation of "for," one did not study for an exam if that exam gets canceled at the last minute. Rather, because no exam-taking ultimately occurred, one only studied for a canceled exam.

act" that caused their injuries; such a limitation "'would likely render [the] material support provision ineffectual' because material support 'is fungible' and 'terrorist organizations can hardly be counted on to keep careful bookkeeping records.'"   Id. at 799 (emphasis added) (quoting Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1130 (D.C. Cir. 2004)).   As a result, a defendant nation "may not avoid liability for supporting known terrorist groups by professing ignorance of their specific plans for attacks," and the mere fact "that the evidence failed to show [that the defendant nation] either specifically intended or directly advanced the [precise injury-causing attack] is irrelevant to proximate cause and jurisdictional causation."   Id.

Thus, based on the FSIA's text, courts should use a two-step inquiry when analyzing material-support claims: (1) did the defendant nation provide material support or resources "for" the purpose of bringing about acts of extrajudicial killing, and (2) if so, was that provision of material support the proximate cause of the plaintiff's personal injury or death?   Undertaking this inquiry, the Court is satisfied that the terrorism exception should apply to SGT Hunter and similarly situated plaintiffs whose "personal injur[ies]" were "caused by" Iran's "provision of material support or resources for [acts of extrajudicial killing]," § 1605A(a)(1), even though the attack in which they were injured did not result in fatalities.

To the first step, Iran provided funds and lethal arms to the Syndicate for the purpose of aiding terrorists in extrajudicially killing Americans, see Cabrera, 2022 WL 2817730, at *35–36, and issued bounties on the lives of American soldiers, see id. at *12.   As the Court already determined, this funding, arming, and issuing of bounties clearly qualifies as "material support or resources for [acts of extrajudicial killing]."   § 1605A(a)(1); see Cabrera, 2022 WL 2817730, at *35–36.   To the second step, Iran's material support was the "proximate cause" of plaintiffs' injuries because it was a "substantial factor in the sequence of events that led to" their injuries, and

14

their injuries—including those suffered by SGT Hunter in the IED attack—were highly "foreseeable" and "anticipated as a natural consequence" of Iran's support for terrorists' efforts to kill Americans. Owens, 864 F.3d at 794 (internal quotation marks omitted); see Cabrera, 2022 WL 2817730 at *41. Plaintiffs thus meet the requirements of the material-support prong of the FSIA's terrorism exception.

In adopting this approach, this Court agrees with other recent decisions holding that the TVPA's definition of "extrajudicial killing" likely does not, standing alone, extend to attempts. However, the Court concludes that the manner in which the FSIA incorporates that term does not preclude the material-support prong from reaching attempted extrajudicial killings. Force II closely examined the TVPA's definition of "extrajudicial killing" and determined that under that statute an "'extrajudicial killing' cannot occur without a death." 2022 WL 2452606, at *5. The Force II court found support for this conclusion in the structure of the TVPA—which authorizes a victim's "legal representative," but not the victim, to recover damages for a wrongful death—and through comparisons to statutory definitions of other acts like "aircraft sabotage" and "hostage taking" which suggest that Congress will explicitly include attempted acts in a definition when desired. Id. at *5–6. However, when Force II applied the TVPA's definition to the FSIA, it concluded that

> the material-support prong applies only if the foreign state provides "material support or resources for such an act"—that is, as relevant here, for "an act of . . . extrajudicial killing," and, **without a killing, the Court cannot conclude** that the asserted injury was caused by "an act of . . . extrajudicial killing" or **that the material support was provided for** "**such an act**."

Id. at *7 (first emphasis in original) (bolding added) (citation omitted) (quoting § 1605A(a)(1)). In other words, Force II held that courts cannot determine that a defendant nation provided material

support to terrorists for acts of extrajudicial killing unless the injury-causing act resulted in a victim's death.

Accordingly, Force II and similar recent decisions asked: (1) was the specific injury-causing act an extrajudicial killing, and (2) if so, did the defendant provide material support for that act?  But that logic is incompatible with D.C. Circuit precedent holding that the FSIA does not require plaintiffs to show that "a state's material support [was] directly for the specific act" that caused their injuries.  See Owens, 864 F.3d at 799.

Hence, this Court disagrees that the nature of a defendant's material support can only be defined by the outcome of the attack that directly caused a plaintiff's injury.[7]  By requiring plaintiffs to prove that someone died in the attack that caused their injuries, Force II conflates the terrorism exception's two avenues for waiving sovereign immunity: the direct-causation prong and the material-support prong.  Force II held that, without a death, "the Court cannot conclude that the asserted injury was caused by 'an act of . . . extrajudicial killing,'" 2022 WL 2452606, at *7 (emphasis added) (quoting § 1605A(a)(1)), but that statutory restriction comes from the direct-causation prong and would only apply if plaintiffs had alleged that Iran itself committed the attacks at issue.  When plaintiffs invoke the material-support prong—as in both the instant case and Force II—they need only show that a nation provided material support for acts of extrajudicial killing and that said support proximately caused their injuries.  Congress could have written the terrorism exception to require that a plaintiff's injury must be caused by an act of extrajudicial killing that

---

[7] To reach the opposite conclusion, the Court would need to adopt the alternate interpretation of "for" that it previously rejected.  The term "for" would have to mean "resulting in," such that the phrase "material support for [acts of extrajudicial killings]" would require that a defendant nation provided support that ultimately resulted in an extrajudicial killing.

was either committed by the defendant or materially supported by the defendant, but it did not.[8] Instead, it created two routes for waiving sovereign immunity: one for injuries caused by acts of extrajudicial killings, and another for injuries caused by the defendant's provision of material support.  The Court declines to impute the restrictions of the direct-causation prong to claims brought under the material-support prong.[9]

Although the Court is cognizant that adopting this broader approach means the terrorism exception will continue to apply to a wider range of claims, it is comforted that the limits of the proximate causation standard would preclude recovery in fringe cases.  Force II warned of a slippery slope:

> Were § 1605A to reach any personal injury caused by the provision of material support to a terrorist organization that engages in torture, extrajudicial killings, aircraft sabotage, or hostage taking—regardless of whether the direct, personal injury was itself the product of one of those acts—the provision would sweep far too broadly and would cover, for example, everyday (but foreseeable) torts committed by terrorist organizations that bear no connection to the repressive practices that Congress intended to redress.

2022 WL 2452606, at *7 (internal quotation marks omitted).  That fear is understandable but unwarranted.  Proximate cause requires "some reasonable connection between the act or omission

---

[8] One could imagine many simple ways that Congress could have drafted the terrorism exception to ensure the construction that Force II and similar cases adopt.  For example, the terrorism exception could have read:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for, and resulting in, such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

§ 1605A(a)(1) (underlined words added).

[9] Even if the Court determined that the interpretation adopted in Force II and subsequent cases was reasonable, it would at best render the meaning of the material-support prong ambiguous.  Then, the D.C. Circuit's instruction that courts should "interpret [the FSIA's] ambiguities flexibly and capaciously" would still counsel in favor of the Court's conclusion.  Van Beneden, 709 F.3d at 1167 & n.4 ("The text, history, and purpose of the statute make clear that the statute does not counsel a narrow reading." (quoting Doe v. Bin Laden, 663 F.3d 64, 70 (2d Cir. 2011))).

of the defendant and the damage which the plaintiff has suffered." Owens, 864 F.3d at 794 (internal quotation marks omitted). For this reason, "[i]t normally eliminates the bizarre" and "preclud[es] liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." Id. (internal quotation marks omitted). When someone suffers an "everyday . . . tort[]" at the hands of a terrorist organization, Force II, 2022 WL 2452606, at *7—say a slip-and-fall on the steps of a terrorist training facility— it is highly unlikely that a nation's material support for unlawful killings was a "substantial factor in the sequence of events that led to the plaintiff's injury" or that the plaintiff's injury was "reasonably foreseeable or anticipated as a natural consequence" of that material support. Owens, 864 F.3d at 794 (internal quotation marks omitted).

The proximate-causation requirement also limits waivers of sovereign immunity based on the nature of the support provided. For example, if Iran only provided rifles to a terrorist group, a plaintiff injured by that same terrorist group's use of anti-aircraft missiles may have trouble establishing proximate causation because his injury was not a foreseeable outcome of that material support. The identities of the recipients of a nation's material support serve as a further limiting factor. If a nation provided support to one terrorist group, a plaintiff's injury caused in an attack by a different organization would probably not be foreseeable. Cf. Owens v. Republic of Sudan, 374 F. Supp. 2d 1, 13 (D.D.C. 2005) ("It is enough, the D.C. Circuit held [in Kilburn], to show that the material support or resources went to the terrorist organization that perpetrated the act, and that the support was a 'proximate cause' of the terrorist act." (emphasis added) (citing Kilburn, 376 F.3d at 1127–30)). Moreover, Force II's astute analysis of the TVPA's definition of "extrajudicial killing" imposes additional restrictions on the breadth of the FSIA because a defendant's support must be offered to support acts of extrajudicial killing. For example, a

18

plaintiff's claim may not succeed if Iran attempted to encourage a withdrawal of American troops in Afghanistan by offering a bounty for injuring but not killing Americans; under those facts, Iran's provision of material support might not be <u>for acts of extrajudicial killing</u>.

For these reasons, the Court reaffirms its prior determination that the terrorism exception extends to <u>Cabrera</u> and <u>Zambon</u> plaintiffs whose claims derive from injuries that occurred in attempted extrajudicial killings.

### C.  The "Act-Of" Argument

Plaintiffs raise a second argument that focuses on another textual difference between the FSIA and the TVPA.  The TVPA creates a cause of action against an individual who, under the authority of a foreign nation, "subjects an individual to extrajudicial killing."  TVPA § 2(a)(2).  The FSIA, on the other hand, applies when "personal injury or death" results from "<u>an act of</u> . . . extrajudicial killing" or the provision of material support for "such <u>an act</u>."  28 U.S.C. § 1605A(a)(1) (emphasis added).  Plaintiffs argue that by including the words "act of," the FSIA employs "a different, and more expansive phrase," suggesting that the relevant question "is not whether an 'extrajudicial killing' can occur without a death, but whether an 'act of . . . extrajudicial killing' can."  Suppl. Br. at 4.  This argument encourages the Court to adopt the reasoning of <u>Roberts</u>, which concluded that the term "an act of . . . extrajudicial killing" is ambiguous and could plausibly mean "the process of committing an extrajudicial killing."  581 F. Supp. 3d at 170.  Because "the process of committing an extrajudicial killing does not imply that death results," the <u>Roberts</u> court reasoned that "an <u>attempted</u> extrajudicial killing could constitute an 'act of extrajudicial killing.'"  <u>Id.</u>

The Court is not persuaded by plaintiffs' "act-of" argument.  <u>Roberts</u> interpreted "an act of [something]" to mean, not only "a thing done" or a specific "deed," but also "[t]he process of

doing" something—i.e., either doing a thing or attempting to do it.[10]  581 F. Supp. 3d at 170

(quoting various dictionaries).  The Court recognizes that, in isolation, "[t]he term 'act of' could

be read multiple ways," id. at 169, but within the context of the terrorism exception, Roberts's

broader interpretation is strained.  First, in common parlance, one uses the construction "in the act

of" to connote the process of doing something, while "an act of" typically references an event or

occurrence.  See Act, Webster's Third New International Dictionary (1993) (emphasizing that the

definition of "act" that means "process of doing" is "used chiefly in the phrase in the act").  For

example, we say that a child spotted in the process of sneaking a snack was caught in the act of

stealing a cookie.  On the other hand, a deed or event might be described as an act of bravery or

an act of aggression.  Accordingly, the FSIA's reference to "an act of . . . extrajudicial killing"

would not naturally be understood to mean the process of killing someone—it more naturally refers

to the event that causes killing.

Further, as noted in Force II, several "acts" covered by the terrorism exception, including

aircraft sabotage and hostage taking, are already defined to include attempts.  See Convention for

the Suppression of Unlawful Acts Against the Safety of Civil Aviation, Sept. 23, 1971, 974

U.N.T.S. 178, art. I § 2 (defining "aircraft sabotage" to include attempt); § 1605A(h)(1)

(incorporating this definition of "aircraft sabotage"); International Convention Against the Taking

of Hostages, Dec. 17, 1979, 1316 U.N.T.S. 205, art. I § 2(a) (defining "hostage taking" to include

attempt); § 1605A(h)(2) (incorporating this definition of "hostage taking"); see also Force II, 2022

WL 2452606, at *6 (noting these definitions).  Accordingly, if the Court adopted plaintiffs'

---

[10] To offer an everyday example, under the Roberts interpretation, "an act of reservation making" could mean either (1) making a reservation, or (2) the process of making a reservation—i.e., picking up the phone, calling the restaurant, and asking if they have availability at a specified time.  If one attempts to make a reservation but fails to do so because the restaurant is fully booked, one has nevertheless engaged in "an act of reservation making" since one underwent the process of attempting to doing so.

interpretation—under which the words "act of" expand the modified term to include attempts—the use of "act of" would be superfluous in phrases like "an <u>act of</u> . . . aircraft sabotage" and "an <u>act of</u> . . . hostage taking." § 1605A(a)(1).

There is a more natural reading that does not suffer these same problems yet still "give[s] effect" to each word in the statute. <u>Roberts</u>, 581 F. Supp. 3d at 169 ("[I]t is a 'cardinal principle' of statutory interpretation that 'courts "must give effect, if possible, to every clause and word of a statute."'" (quoting <u>Loughrin v. United States</u>, 573 U.S. 351, 358 (2014))). The Court concludes that the term "an act of . . . extrajudicial killing" expands beyond the unauthorized killing of an individual to include the entire act that caused that death. For example, if a soldier is killed in a terrorist bombing, her death is an extrajudicial killing and the bombing in which she died is <u>an act of</u> extrajudicial killing that also encompasses injuries to others. This Court previously adopted this interpretation in a related context in <u>Owens v. Republic of Sudan</u>, 174 F. Supp. 3d 242 (D.D.C. 2016), <u>aff'd</u>, 864 F.3d 751 (D.C. Cir. 2017), <u>vacated and remanded sub nom</u>. <u>Opati v. Republic of Sudan</u>, 140 S. Ct. 1601 (2020). In <u>Owens</u>, Sudan argued "that plaintiffs who did not die [in an attack that killed others] cannot sue under § 1605A because their injuries were not caused by the extrajudicial killing of others." <u>Id.</u> at 266 (internal quotation marks omitted). This Court rejected that argument because "§ 1605A covers 'personal injury or death that was caused by <u>an act of</u> . . . extrajudicial killing,'" and "the same <u>act</u> of killing one person can quite obviously injure another." <u>Id.</u> (quoting § 1605A(a)(1)).

Accordingly, the use of "act of" in the terrorism exception expands the scope of plaintiffs beyond those who died in an attack to those injured by that same attack. But, standing alone, the phrase "an act of . . . extrajudicial killing" is not so broad as to encompass acts in which no one

died.  Thus, plaintiffs' "act-of" argument—as one judge has opined—"stretch[es] the text of the statute too thin."  Burks Op. at 20.

In any event, the Court's rejection of the "act-of" argument does not affect the ultimate conclusion here because the argument is rendered redundant by the Court's preceding interpretation of the material-support prong.  For the reasons described above, plaintiffs' "personal injur[ies] . . . w[ere] caused by . . . [Iran's] provision of material support or resources for [an act of extrajudicial killing]."  § 1605A(a)(1).  It is thus irrelevant whether the phrase "act of . . . extrajudicial killing" encompasses attempted extrajudicial killings because there is no doubt that Iran provided material support for the purpose of aiding terrorists in killing Americans.[11]  The outer limits of the term "an act of . . . extrajudicial killing" would be more relevant if an officer of Iran had attempted an extrajudicial killing.  In that instance, the Court might need to decide whether the plaintiff's "personal injury or death . . . was caused by an act of . . . extrajudicial killing . . . engaged in by an official, employee, or agent" of Iran "while acting within the scope of his or her office, employment, or agency."  § 1605A(a)(1).[12]  But those circumstances are not at issue here.

---

[11] Given the definition of "for" adopted in this opinion, cases brought under the material-support prong will never realistically hinge on whether Owens or Roberts identified the correct interpretation of "act of."  In fact, in the context of the material-support prong, there is no daylight between the practical implications of the two interpretations.  Owens and Roberts agree that acts that result in any deaths qualify as "acts of extrajudicial killing."  Thus, any time a plaintiff argues that the defendant nation provided material support for the purpose of furthering (i.e., "for") a third party's commission of acts resulting in a death, any distinction between the Owens and Roberts interpretations is irrelevant: both agree that the terrorism exception applies.  And, as laid out in this opinion, under a broad definition of "for," injuries from attempted killings fall within the scope of the material-support prong even assuming that the narrower definition of "act of" is correct.

The Roberts interpretation of "act of" extends a bit further—it holds that an act that results in no deaths but that was committed with the intent to kill someone is also an "act of extrajudicial killing."  But that "bonus" definition does not matter here because plugging it into the material-support prong results in nonsense.  Logically, a nation would never provide material support for the specific purpose of furthering ("for") a third party's commission of acts that are intended to kill someone but fail to do so.  In other words, a nation never funds terrorism with the intent to commit attempted but unsuccessful killings; rather, it realistically only provides material support with the intent to help terrorists commit deadly attacks, even though those terrorists may not always succeed.  Thus, every imaginable case brought under the material-support prong will have the same outcome under either the Roberts or Owens definition of "act of."

[12] At first glance, it may seem odd that the material-support prong of the terrorism exception would apply to both completed and attempted killings, while the direct-causation prong would only reach completed extrajudicial

Accordingly, the Court declines to rely on plaintiffs' "act-of" argument to resolve this issue.

## III.    <u>Conclusion</u>

For the foregoing reasons, the Court concludes that the material-support prong of the terrorism exception in the FSIA encompasses injuries from nonfatal attacks, so long as those injuries are the foreseeable result of a defendant nation's material support for acts of extrajudicial killing.  Hence, the Court's prior opinion addressing bellwether attacks that reached the same conclusion regarding attempted extrajudicial killings, <u>see</u> <u>Cabrera</u>, 2022 WL 2817730, remains in full effect.


                                            _____/s/_____

                                            JOHN D. BATES
                                            United States District Judge


Dated:  <u>January 27, 2022</u>

---

killings.  In other words, why would Congress leave individuals who were injured in attempted extrajudicial killings by state agents without recourse?  <u>But see</u> <u>Force II</u>, 2022 WL 2452606, at *6 ("There may—or may not—be good reasons for including some attempted terrorist acts and not others.  But that choice is one for Congress, and not the courts, to make.").  Upon closer review, those victims likely do not fall outside of the terrorism exception's scope—the material-support prong should still apply to them.  Victims of attempted extrajudicial killings by a state's agents should be able to bring a civil action against that nation because a nation essentially always provides material support to its own agents when they act within the scope of their agency.  Those plaintiffs would, however, need to meet the distinct requirements of the material-support prong.