# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AUGUST CABRERA et al.,**<br><br>  **Plaintiffs,**<br><br>  **v.**<br><br>**ISLAMIC REPUBLIC OF IRAN,**<br><br>  **Defendant.** | **Civil Action No. 19-3835 (JDB)** |
| **MARK ZAMBON et al.,**<br><br>  **Plaintiffs,**<br><br>  **v.**<br><br>**ISLAMIC REPUBLIC OF IRAN,**<br><br>  **Defendant.** | **Civil Action No. 18-2065 (JDB)** |

## MEMORANDUM OPINION

Between 2006 and 2019, a terrorist syndicate comprising, among other groups, al-Qaeda, the Taliban, and the Haqqani Network (the "Syndicate") perpetrated numerous terrorist attacks against American servicemembers and civilians in Afghanistan.  Victims of those attacks and their family members brought these coordinated suits against the Islamic Republic of Iran under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, alleging that Iran provided material support for extrajudicial killings to the Syndicate responsible for these attacks.

The Court previously granted default judgment to twenty-three bellwether plaintiffs associated with eleven bellwether attacks.  July 19, 2022 Order [ECF No. 77];[1] Cabrera v. Islamic Republic of Iran, Civ. A. No. 18-2065 (JDB), 2022 WL 2817730, at *57 (D.D.C. July 19, 2022).  The next step in this case is to assess and award damages to additional plaintiffs associated with those same bellwether attacks, and the Court has been aided by several special masters in this task.  As discussed in detail in this Opinion, the Court will adopt the recommendations of the special masters in large part, with the modifications noted herein.

## Background[2]

The Zambon and Cabrera plaintiffs filed these suits on August 31, 2018 and December 27, 2019, respectively, alleging in part "that Iran provided material support, in the form of 'sophisticated weapons, critical training, financial assistance, safe haven, and assistance with drug trafficking,' to a 'terrorist syndicate' operating in Afghanistan from 2006 to 2019."  Cabrera, 2022 WL 2817730, at *1 (quoting Pls.' Proposed Conclusions of Law [ECF No. 70-2] at 1).  They seek damages for the personal injuries and deaths of victims of the Syndicate's attacks and the emotional distress suffered by victims' families.  Id.  In May 2021, the Court consolidated these actions' Afghanistan-based claims.  See Order on Coordinating Afghanistan-Based Claims [ECF No. 43]; Order on Coordinating Afghanistan-Based Claims [Zambon ECF No. 30].  After plaintiffs served Iran through diplomatic channels and Iran failed to respond, plaintiffs sought and obtained an entry of default from the Clerk of Court.  Cabrera, 2022 WL 2817730, at *2.

---

[1] Unless otherwise indicated, all ECF citations will refer to the filings in Cabrera v. Islamic Republic of Iran, Civ. A. No. 19-3835.  The Court will cite filings in Zambon v. Islamic Republic of Iran, Civ. A. No. 18-2065, as "Zambon ECF No. #."

[2] For a more complete procedural history of this litigation and the Court's factual findings, see Cabrera, 2022 WL 2817730, at *1–33.

The Court adopted a case management plan under which it would first "make findings of fact and liability conclusions on eleven bellwether attacks, and would then make damages conclusions as to a subset of the victims injured in those attacks," after which it would "appoint[] Special Masters to make liability and damages determinations as to the remaining plaintiffs." Cabrera, 2022 WL 2817730, at *2.[3]  The Court held a three-day evidentiary hearing from October 18 to 20, 2021 at which plaintiffs presented evidence supporting Iran's liability in each of the eleven bellwether attacks, including testimony from five fact witnesses and three expert witnesses, expert reports, military service records, and medical records.  See id. at *3.

On July 19, 2022, the Court issued a Memorandum Opinion detailing factual findings and legal conclusions regarding the eleven bellwether attacks and the related claims of twenty-three bellwether plaintiffs.  See Cabrera, 2022 WL 2817730.  The Court determined "that the Syndicate committed all eleven [bellwether] attacks, . . . that Iran's material support substantially contributed to the Syndicate's ability to do so," and that Iran's support was the proximate cause of the deaths and injuries that formed the basis for the bellwether plaintiffs' claims.  Id. at *15; see id. at *41 ("[P]laintiffs' injuries were not only foreseeable: they were the intended result of Iran's support.").

The Court then determined that each bellwether plaintiff was entitled to recover under the FSIA's "private right of action against state sponsors of terrorism for plaintiffs who are United States nationals, members of the armed forces, government employees or contractors, or legal representatives of those people," which allows suits "'for personal injury or death caused by' acts including extrajudicial killing and hostage taking."  Cabrera, 2022 WL 2817730, at *41–42

---

[3] The bellwether attacks are a subset of the many attacks implicated in this case.  They were selected for initial evaluation by the Court because they "'represent[] each of the geographies and each of the attack types' at issue in this case."  Cabrera, 2022 WL 2817730, at *2 (quoting Case Management Order [ECF No. 28] at 2).  Thus, once the Court made determinations on this representative sample of bellwether attacks, future special masters could then rely on the Court's guidance to recommend liability decisions for other similar attacks.

(quoting 28 U.S.C. § 1605A(c)).  The three bellwether plaintiffs who were directly injured in the attacks were entitled to "recover for pain and suffering from physical injuries based on general tort principles governing battery" and "for their emotional injuries under a theory of intentional infliction of emotional distress."  Id. at *42.  Immediate family members of victims—and functional equivalents of immediate family members who are not legally or biologically related—were entitled to recover "solatium awards," which offer compensation for "the mental anguish, bereavement, and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent's society and comfort."  Id. (cleaned up).  "A solatium claim under § 1605A(c) is indistinguishable from a claim for intentional infliction of emotional distress."  Id. (internal quotation marks omitted).

After determining that each bellwether plaintiff was entitled to bring claims under the private right of action afforded by § 1605A(c), the Court awarded damages and prejudgment interest to each of those twenty-three plaintiffs.  See Cabrera, 2022 WL 2817730, at *43–56.  The Court noted that its "primary consideration is to ensure that 'individuals with similar injuries receive similar awards.'"  Id. at *43 (quoting Moradi v. Islamic Republic of Iran, 77 F. Supp. 3d 57, 70 (D.D.C. 2015)).  To determine those damages, the Court "endorsed" the "Peterson II framework," which establishes baseline awards for victims of terrorist attacks and their families, id. at *43, *47 (citing Peterson v. Islamic Republic of Iran ("Peterson II"), 515 F. Supp. 2d 25, 52 (D.D.C. 2007)), but granted both upward and downward variances to some bellwether plaintiffs based on individualized circumstances, see, e.g., id. at *43 (determining that "an upward adjustment is warranted for each of the three direct-victim plaintiffs" based on the severity of their suffering); id. at *50 (providing an upward variance to a victim's child based on evidence of "severe pain, grief, or suffering"); id. (varying downward for awards to children who never "lived

4

with their faither before his death"); <u>id.</u> at *51 (varying downward for older relative of one victim because "amount of time [he] must suffer with this loss is comparatively less than the suffering of other family-member victims").  The Court also determined "that an award of prejudgment interest [wa]s appropriate" and calculated that interest using the prime rate.  <u>Id.</u> at *55.

Finally, the Court instructed that "[p]laintiffs' remaining claims—both the claims of the other plaintiffs associated with the bellwether attacks and those of plaintiffs injured in other attacks—will be referred to a Special Master, who will receive evidence and prepare proposed findings and recommendations for the disposition of each claim in a manner consistent with this Opinion."  <u>Cabrera</u>, 2022 WL 2817730, at *57.

The Court entered a separate Order adopting an administrative plan to "govern further proceedings as to the damages awards" for plaintiffs whose claims are related to the eleven bellwether attacks.[4]  Order Adopting Admin. Plan Concerning Special Masters [ECF No. 79] ("Admin. Plan") at 1.  The Court instructed the special masters to "assess[] each plaintiff's standing under the private right of action in 28 U.S.C. § 1605A(c)," which requires that each plaintiff must (1) be a U.S. national or member of the armed forces (or meet other qualifications not relevant here), and (2) "prove that they are an immediate family member, or the functional equivalent, of an individual killed or physically injured to be entitled to solatium damages."  <u>Id.</u> at 2–3.  Then, the special masters would recommend findings of fact on "the scope of each plaintiff's compensatory damages . . . guided by the provisions of 28 U.S.C. § 1605A, this Court's Memorandum Opinion, and any further orders that this Court may enter."  <u>Id.</u> at 3 (citation

---

[4] For ease of reference, the Court will refer to the plaintiffs whose claims were before the special masters as "associated plaintiffs" (or some subset thereof, <u>e.g.</u>, "associated family-member plaintiffs").  The associated plaintiffs' claims are all associated with the eleven bellwether attacks, but they were not among the twenty-three bellwether plaintiffs whose claims were previously adjudicated by the Court.

omitted).   The Court appointed four special masters to assess damages for these associated plaintiffs: the Hon. Wayne D. Brazil (Ret.), the Hon. Rosalyn Chapman (Ret.), Paul Griffin, Esq., and Stephen A. Saltzburg, Esq.  See Order Appointing Special Masters [ECF No. 80] at 1.[5]

Each special master carefully considered the evidence presented by associated plaintiffs and issued Reports and Recommendations, which plaintiffs filed with the Court on November 4, 2022.  See Special Master Rs. & Rs. [ECF No. 115].  Special Master Brazil considered the claims of thirty associated plaintiffs—two surviving direct victims and twenty-eight family members of direct victims—and recommended awards to each.  See Special Master Wayne D. Brazil's R. & R. for Damages Awards for Thirty Bellwether Pls. [ECF No. 116-1] ("Brazil Rep.").  Special Master Chapman recommended monetary awards to each of the ten associated family-member plaintiffs whose claims she considered.  See R. & R. of Special Master Hon. Rosalyn Chapman (Ret.) [ECF No. 116-2] ("Chapman Rep.").  Special Master Griffin also reviewed the claims of ten associated family-member plaintiffs and recommended awards to each.   See Rep. of Special Master Paul G. Griffin with Proposed Findings of Fact & Conclusions of Law [ECF No. 116-3] ("Griffin Rep.").   Finally, Special Master Saltzburg analyzed the claims of forty associated plaintiffs, all of whom are family members of direct victims, and similarly recommended damages awards for each.  See Special Master Stephen A. Saltzburg's R. & R. Regarding Damages for 40 Bellwether Pls. [ECF No. 116-4] ("Saltzburg Rep.").

## Analysis

The special masters have thoroughly analyzed the evidence presented by associated plaintiffs, and the Court thanks them for their diligent work.  In large part, the Court will adopt the

---

[5] The Court originally appointed a fifth special master for this task, but he became unavailable shortly thereafter.  Rep. on Allocation of Bellwether Pls. to Special Masters & Compendium of Signed Special Master Decls. [ECF No. 82] at 2.

findings of fact and conclusions of law made by the special masters, with a few exceptions noted throughout this Opinion.

## I.    Standing

The Court first instructed the special masters to "assess[] each plaintiff's standing under the private right of action in 28 U.S.C. § 1605A(c)."  Admin. Plan at 2.  "The FSIA provides a private right of action against state sponsors of terrorism for plaintiffs who are United States nationals, members of the armed forces, government employees or contractors, or legal representatives of those people, 'for personal injury or death caused by' acts including extrajudicial killing and hostage taking." Cabrera, 2022 WL 2817730, at *41 (quoting § 1605A(c)); see Admin. Plan at 2 (noting that each plaintiff must fall into one of these four categories to have standing under § 1605A(c)).  "Because § 1650A(c) does not spell out the elements of these claims, courts must apply general principles of tort law," which impose additional standing requirements— discussed below—depending on the nature of the tort claim.  Cabrera, 2022 WL 2817730, at *41 (internal quotation marks omitted).

The special masters have concluded that each plaintiff before them has standing to bring a claim under the private right of action in 28 U.S.C. § 1605A(c).  The Court will adopt these determinations as to each associated plaintiff except one family-member plaintiff, K.E.F.V., whom the Court concludes does not have standing to bring a solatium claim as an after-born plaintiff.

### A.  Survivor Plaintiffs

The Court first addresses the standing of associated survivor plaintiffs, i.e., those who were directly injured in the attacks.  The Court previously concluded that the bellwether survivor plaintiffs—who were all armed forces members—could "recover for pain and suffering from physical injuries based on general tort principles governing battery" because "Iran provided

material support to the Syndicate with the intent to kill and wound Americans in attacks just like those that injured" them.  Cabrera, 2022 WL 2817730, at *42.  To recover damages for physical injuries, associated survivor plaintiffs must "demonstrate[] that harmful contacts occurred in each of their cases."  Id.  The Court also allowed bellwether survivor plaintiffs to "recover for their emotional injuries under a theory of intentional infliction of emotional distress" because "[t]errorist acts—and, by extension, material support for such acts—are by their definition extreme and outrageous conduct, and Iran intended to cause severe emotional distress by facilitating the Syndicate's attacks."  Id. (internal quotation marks and citation omitted).  Accordingly, associated survivor plaintiffs will have standing to recover for emotional injuries if they "experienced" "severe emotional distress . . . as a result of the Syndicate's attacks."  Id.

The special master reports addressed the claims of two associated survivor plaintiffs, and the Court agrees with Special Master Brazil's conclusion that those two plaintiffs, Staff Sergeant ("SSG") Jonathan Richard Colton Benton and Sergeant ("SGT") Eric M. Hunter, have standing to seek damages under § 1605A(c)'s private cause of action.  Both plaintiffs are (and always have been) U.S. citizens, and they have "amply demonstrated that harmful contacts occurred in each of their cases" and that "they experienced—and continue to experience"—"extreme emotional distress" "as a result of the Syndicate's attacks."  Cabrera, 2022 WL 2817730, at *42; see Brazil Rep. at 2–3, 25–26.

## B.  Family-Member Plaintiffs

The remaining associated plaintiffs before the special masters are family members of direct victims who bring claims for solatium damages.  The Court will now address the claims of all but one of those associated family-member plaintiffs—the next section will discuss the unique

situation presented by K.E.F.V., who was not yet born when her father Senior Chief Petty Officer ("SCPO") Kraig Vickers died in a bellwether attack.

As the Court previously explained, a solatium claim—which seeks compensation for "the mental anguish, bereavement, and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent's society and comfort"—is "indistinguishable from a claim for intentional infliction of emotional distress." Cabrera, 2022 WL 2817730, at *42 (cleaned up).[6]  A plaintiff may only bring a solatium claim if they are an immediate family member of a direct victim—i.e., "parents, siblings, spouses, and children" or the "functional equivalent" thereof, "even if they are not legally or biologically related."  Id. (internal quotation marks omitted).

The special masters thoroughly recounted the devastating impacts of the Syndicate's attacks on the associated family-member plaintiffs, and the Court has no doubt that each associated family-member plaintiff suffered emotional distress as a result of the Syndicate's attacks on their loved ones.  The special masters also determined that each of these plaintiffs was an immediate family member of a victim or the functional equivalent of an immediate family member.[7]  The Court adopts those findings in full.

---

[6] As the Court explained, "[a]lthough, in a traditional tort context, a family member must generally be present at the time of an attack to recover for intentional infliction of emotional distress, FSIA claimants need not meet this requirement because a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families."  Cabrera, 2022 WL 2817730, at *42 (internal quotation marks and citation omitted).

[7] The Court agrees with the special masters' determinations that certain plaintiffs are the functional equivalent of immediate family members.  For example, Judith Darrough, the stepmother of SGT James M. Darrough, is the functional equivalent of his mother, see Griffin Rep. at 11; Donald Newman, Sr., the grandfather of SSG Christopher R. Newman, is the functional equivalent of his father, see id. at 16–17; Karen Caron, the stepmother of Specialist Joseph T. Caron, is the functional equivalent of his mother, see Brazil Rep. at 17–18; and Jessie Baldridge, the stepmother of SGT Dillon C. Baldridge, is the functional equivalent of his mother, see Chapman Rep. at 6–7.

The Court also notes that one plaintiff is the estate of Kurt E. Zwilling, who passed away in 2021 but was alive when his son, Corporal (CPL) Gunnar Zwilling, was killed in a bellwether attack.  See Saltzburg Rep. at 95–98. As noted by Special Master Saltzburg, "[c]ourts in this District routinely recognize claims by the legal representative of estates under 28 U.S.C. § 1605A."  Id. at 97–98; see, e.g., Doe v. Democratic People's Republic of Korea Ministry of Foreign Affs. Jungsong-Dong, 414 F. Supp. 3d 109, 128–29 (D.D.C. 2019) (holding that "'legal representatives'

The special masters also found that each plaintiff is a U.S. citizen, which they concluded satisfies the standing requirements of the FSIA's private right of action.  See Brazil Rep. at 1; Chapman Rep. at 5–11, 13–16; Griffin Rep. at 2;[8] Saltzburg Rep. at 2.  The Court accepts the factual determination that each plaintiff is a U.S. citizen.  It also ultimately adopts the conclusion that each plaintiff's citizenship suffices to confer standing under § 1605A(c).  The Court will, however, briefly address the unique circumstances of one plaintiff—Jasmin Bays.

Nearly all of the associated family-member plaintiffs have been U.S. citizens since birth, but a few are naturalized citizens.  Jasmin Bays is the widow of SGT William M. Bays, who was killed in a Taliban attack on June 10, 2017.  Chapman Rep. at 2, 9; see Cabrera, 2022 WL 2817730, at *26–27 (describing the attack).  Ms. Bays became a U.S. citizen on June 27, 2018, just over a year after the attack that killed her husband.  Chapman Rep. at 9.  This raises the issue of whether the private right of action in § 1605A(c) is available to the widow of an armed forces member killed in a terrorist attack if she did not become a citizen until after the attack.

The Court will begin with whether Ms. Bays's citizenship status impacts its subject matter jurisdiction over her claims, as the FSIA's private right of action extends only to those claims "for which the courts of the United States may maintain jurisdiction under this section for money

---

of . . . close relatives [of terrorism victims]—here, their estates—also may bring solatium claims on their behalf") (citation omitted)); see also Cohen v. Islamic Republic of Iran, 268 F. Supp. 3d 19, 26–27 (D.D.C. 2017) (awarding estate of victim's father solatium damages in accordance with the established framework for parents of a surviving victim); Akins v. Islamic Republic of Iran, 332 F. Supp. 3d 1, 45 (D.D.C. 2018) (awarding estate of victim's sibling solatium damages in accordance with the established framework for siblings of a surviving victim).  Accordingly, that a plaintiff is an estate of an immediate family member is not a bar to that plaintiff bringing a solatium claim under the private right of action.

[8] Special Master Griffin's report states in a footnote that "the Special Master recommends that all employee and contractor victims, along with all U.S. national family members, be awarded damages for wrongful death and/or pain and suffering under the private right of action in 28 U.S.C. § 1605A(c) and that all other family members be awarded damages for [intentional infliction of emotional distress] under District of Columbia law."  Griffin Rep. at 4 n.3 (emphases added).  However, he did not review the claims of any employee or contractor victims, nor was he presented with claims from any family members who were not U.S. nationals.  See id. at 2 ("Each of these ten Plaintiffs submitted sufficient evidence of their respective citizenship . . . .").  Nor does any of his actual analysis appear to implicate District of Columbia law.  This inapposite commentary thus does not alter the Court's conclusions.

damages."  § 1605A(c)(4).  Courts can only hear claims under the terrorism exception if "the claimant or the victim was, at the time the act [of terrorism] . . . occurred," a U.S. national, member of the armed forces, or a government employee.  § 1605A(a)(2)(A)(ii) (emphases added).  As other courts have held, when the direct victim of the attack is a member of the armed forces—as SGT Bays was, see Cabrera, 2022 WL 2817730, at *26—the family-member plaintiff's citizenship "is non-consequential" "[f]or jurisdictional purposes . . . because the waiver of foreign sovereign immunity applies so long as [either] 'the claimant or the victim . . . , at the time of the' terrorist attack," fell into a covered category.  Fritz v. Islamic Republic of Iran, 320 F. Supp. 3d 48, 87 (D.D.C. 2018) (quoting § 1605A(a)(2)(A)(ii)).  Accordingly, the Court has subject-matter jurisdiction over Ms. Bays' claim.

The remaining issue is whether § 1605A(c)'s private cause of action otherwise excludes people—like Ms. Bays—who were not U.S. nationals at the time of the attack but later gained U.S. citizenship.  In one sense, § 1605A(c)'s "federal cause of action . . . is more restrictive" than the FSIA's jurisdictional inquiry because it "limits liability to those who are themselves U.S. nationals, members of the armed services, . . . government employees," or legal representatives of such an individual.  Fritz, 320 F. Supp. 3d at 87.  In another sense, however, the private right of action is less restrictive, because it does not contain the same express temporal requirement that the claimant must fall into one of those categories when the terrorist attack occurred.  Compare § 1605A(a)(2)(A)(ii) (granting jurisdiction over the claims based on the status of "the claimant or the victim . . . at the time the act [of terrorism] . . . occurred"), with § 1605A(c) (granting private right of action to "a national of the United States" or "a member of the armed forces" without temporal limits).  "Where Congress includes particular language in one section of a statute but omits it in another, it is generally presumed that Congress acts intentionally and purposely in the

disparate inclusion or exclusion." Keene Corp. v. United States, 508 U.S. 200, 208 (1993) (quoting Russello v. United States, 464 U.S. 16, 23 (1983)) (cleaned up).  Hence, it is nonconsequential that Ms. Bays did not become a citizen until after the attack that killed her husband.  See, e.g., Taitt v. Islamic Republic of Iran, Civ. A. No. 20-1557 (RC), 2023 WL 2536518, at *7 n.9 (D.D.C. Mar. 16, 2023) (noting that because "all Plaintiffs have demonstrated that they are United States citizens . . . they are eligible to bring suit under the private right of action established under 18 U.S.C. § 1605A(c)" (emphasis added)); Bernhardt v. Islamic Republic of Iran, Civ. A. No. 18-2739 (TJK), 2023 WL 2598677, at *13 (D.D.C. Mar. 22, 2023) ("'[A] plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law' [under § 1605A(c)] if the plaintiff is a citizen of the United States." (quoting Fritz, 320 F. Supp. 3d at 86–87) (emphasis added)).  Because Ms. Bays is now a citizen and the Court otherwise has jurisdiction over her solatium claim, she may rely on § 1605A(c)'s private right of action.[9]

Accordingly, the Court is satisfied that each of the family-member plaintiffs before the special masters—excepting K.E.F.V., discussed below—have met the standing requirements for the private cause of action in § 1605A(c) and are entitled to seek solatium damages under that provision.

_____

[9] This distinction—between the jurisdictional inquiry's temporal restriction and the private right of action's lack thereof—was on display in this Court's recent decision in Kar v. Islamic Republic of Iran, Civ. A. No. 19-2070 (JDB), 2022 WL 4598671, at *17 (D.D.C. Sept. 30, 2022).  In Kar, the Court considered intentional infliction of emotional distress claims brought by immediate family members of an Iranian journalist who was the victim of hostage taking, torture, and extrajudicial killing by Iran.  See generally id.  Although "all plaintiffs [were] . . . U.S. citizens" at the time of the Court's decision, two of them "did not become citizens until" after some of the relevant acts occurred.  Id. at *16.  Because "Section 1605A(a)(2)[(A)](ii)'s plain text requires the claimant or victim to be a U.S. national . . . 'at the time the [hostage taking, torture, extrajudicial killing, etc.] occurred,'" and—unlike SGT Bays—the direct victim was not a U.S. national or member of the armed forces, "the Court lack[ed] jurisdiction to award [those plaintiffs] damages for injuries that occurred before they became U.S. nationals."  Id. at *16–17 (second emphasis added).  However, when analyzing the availability of § 1605A(c)'s private right of action, the Court merely noted that the plaintiffs were "all currently U.S. nationals, . . . and meet the requirements for [§ 1605A(c)'s] application."  Id. at *17.

### C.  After-Born Plaintiff

As previously noted, one plaintiff, K.E.F.V., was not yet born when her father, SCPO Vickers, was killed.  <u>See</u> Saltzburg Rep. at 77–79.  Rather, SCPO Vickers's wife was seven months pregnant at the time of the attack.  <u>Id.</u> at 77.  Special Master Saltzburg concluded that it was appropriate under the circumstances to grant standing to K.E.F.V. and recommended awarding her $2.5 million—50% of the <u>Peterson II</u> baseline—as a solatium award.  <u>Id.</u> at 79.  Although the Court acknowledges that the impact of these terrorist attacks on the victims and their families—including those born after the attacks—continues to this day, the Court disagrees with the legal conclusion that K.E.F.V. has standing to seek solatium damages and will, regretfully, dismiss her claim.

As this Court has recognized, "in similar cases courts have found that children born following terrorist attacks are not entitled to damages under the FSIA."  <u>Wamai v. Republic of Sudan</u>, 60 F. Supp. 3d 84, 96 (D.D.C. 2014), <u>aff'd in part, vacated in irrelevant part sub nom. Owens v. Republic of Sudan</u>, 864 F.3d 751 (D.C. Cir. 2017); <u>see, e.g.</u>, <u>Davis v. Islamic Republic of Iran</u>, 882 F. Supp. 2d 7, 15 (D.D.C. 2012) (denying recovery to "after-born plaintiffs"); <u>Wultz v. Islamic Republic of Iran</u>, 864 F. Supp. 2d 24, 36 (D.D.C. 2012) (same).  In <u>Davis</u>, another judge explained the issue presented by "after-born" plaintiffs in detail.  Intentional infliction of emotional distress "requires that the [terrorist attack] be '<u>directed at</u> a third person.'"  <u>Davis</u>, 882 F. Supp. 2d at 15 (quoting Restatement (Second) of Torts § 46).  And, while "[i]t is true that a terrorist attack—by its nature—is directed not only at the victim but also at the victims' families," it is less clear that such attacks are "'directed at' both the family members then-alive—who may clearly recover—while also being 'directed at' unborn family members, a potentially unlimited class."  <u>Id.</u> (internal quotation marks omitted); <u>see id.</u> ("This class of after-born plaintiffs eligible to recover

could remain open for decades after a terrorist attack.").  The <u>Davis</u> court accordingly held "that a plaintiff bringing an action under § 1605A must have been alive at the time of the attack in order to collect solatium damages."  <u>Id.</u>  In <u>Wamai</u>, this Court adopted the <u>Davis</u> court's holding on after-born plaintiffs and dismissed the claims of a family-member plaintiff born one month after the relevant attack.  60 F. Supp. 3d at 96.

Under this Court's holding in <u>Wamai</u>, K.E.F.V.—who was born two months after the attack that killed her father—lacks standing to bring a solatium claim under § 1605A(c).  K.E.F.V.'s claims do not present any special circumstances that might warrant departure from this Court's prior approach.[10]  Accordingly, the Court will dismiss her claims.

\*          \*          \*

 For these reasons, the Court adopts the special masters' conclusions that these associated plaintiffs—with the exception of K.E.F.V., whose claims will be dismissed—have standing to bring claims under the private right of action in § 1605A(c).

## II.    Compensatory Damages

As the Court has just concluded, the associated survivor plaintiffs are entitled to recover for physical and emotional injuries, and associated family-member plaintiffs are entitled to recover

---

[10] In <u>Goldstein v. Islamic Republic of Iran</u>, 383 F. Supp. 3d 15 (D.D.C. 2019), a court considered the claims of a decedent's brother who was born only two days after the relevant attack.  <u>See</u> 383 F. Supp. 3d at 22–23.  The court recognized that "[t]he bulk of authority in FSIA cases adopts the view that children born after a terrorist incident are not entitled to solatium damages" and noted that "[t]he reasoning of those cases is not without force."  <u>Id.</u> at 22. Although the <u>Goldstein</u> court "agree[d]" with the <u>Davis</u> court "that 'some lines must be drawn,'" <u>id.</u> at 23 (quoting <u>Davis</u>, 882 F. Supp. 2d. at 15), it found that "special circumstances" justified granting a solatium award in the case before it, <u>id.</u>  "For one thing, [the brother] was born just two days after" the attack at issue, and "there is little difference between a child born two days after the attack and a child who was only [a] month old at the time of the attack."  <u>Id.</u> (cleaned up).  Perhaps more importantly, "there [wa]s evidence that [the brother] was born prematurely <u>as a result</u> of his mother's emotional shock and distress . . . and therefore it [wa]s reasonable to conclude that this child's life experience was and is affected not only by the experience of his brother that occurred before his birth but also by the circumstances of his birth."  <u>Id.</u> (cleaned up).  The <u>Goldstein</u> court held that "[t]hat fact alone makes this an exceptional case justifying a solatium award to [the brother], despite the prevailing approach in this district to deny such awards for after-born plaintiffs."  <u>Id.</u>  No such special circumstances exist here that would warrant departure from the norm for K.E.F.V.

for emotional injuries.  See also Cabrera, 2022 WL 2817730, at *43.  The Court will now assess each plaintiff's damages under those theories.

### A. Pain and Suffering

In assessing pain and suffering damages, "a court's 'primary consideration is to ensure that "individuals with similar injuries receive similar awards."'"  Cabrera, 2022 WL 2817730, at *43 (quoting Moradi, 77 F. Supp. 3d at 70).  Given this need for uniformity, judges in this district apply the Peterson II framework, a "general framework for assessing pain and suffering damages for direct victims of terrorist attacks."  Id. (quoting Sheikh v. Republic of Sudan, 485 F. Supp. 3d 255, 268 (D.D.C. 2020)).  Under the Peterson II framework, "the baseline award for surviving direct terrorist attack victims is $5 million."  Id.; see Peterson II, 515 F. Supp. 2d at 52. However, "in more severe instances of physical and psychological pain," it may be appropriate to depart from this baseline, Cabrera, 2022 WL 2817730, at *43 (quoting Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 84 (D.D.C. 2010)), and the Court must be "mindful of the need to assess each plaintiff's injuries individually, as well as the need 'to ensure that individuals with similar injuries'—even between cases—'receive similar awards.'"  Id. (quoting Peterson II, 515 F. Supp. 2d at 54).

This tranche of associated plaintiffs includes two surviving direct victims—SSG Benton and SGT Hunter—both of whose claims were presented to Special Master Brazil.  First, for SSG Benton, Special Master Brazil recommended an award of $8 million, which represents a $3 million upward departure from the Peterson II baseline, based on the severe injuries he suffered and the consequences of those injuries.  See Brazil Rep. at 2–3.  The Court agrees with Special Master Brazil's assessment, and appreciates his careful effort to ensure that the upward variance recognized that SSG Benton's injuries "were not as severe as those of SGT Lemon and [Captain

("CPT")] Timoney"—to each of whom the Court awarded $9 million—"but were much more severe than a baseline award would fairly and appropriately compensate." <u>Id.</u> at 3.

Second, Special Master Brazil considered the circumstances of SGT Hunter, a surviving victim of an IED attack who lost his right foot and suffered significant additional permanent physical and emotional harm. <u>See id.</u> at 25–26 (explaining that SGT Hunter has had over 60 surgeries and is still likely to lose his left leg). The Court agrees with Special Master Brazil's recommendation of awarding SGT Hunter $9 million in damages, an upward variance that would parallel the award given to SGT Lemon and CPT Timoney, who suffered similarly traumatic injuries. <u>Id.</u> at 26.

Thus, the Court agrees with Special Master Brazil's thoughtful recommendations for these two associated survivor plaintiffs and will adopt his conclusions in full.

### B.  Solatium

Because "[s]olatium damages 'are by their very nature unquantifiable,' . . . courts generally calculate solatium damages by looking to prior decisions for guidance." <u>Cabrera</u>, 2022 WL 2817730, at *47 (quoting <u>Moradi</u>, 77 F. Supp. 3d at 72). The Court again has "endorsed" the use of the <u>Peterson II</u> framework, which provides "[f]or family members of deceased victims, . . . a baseline of $8 million for spouses, $5 million for parents and children, and $2.5 million for siblings," and under which "those numbers are halved for the family members of surviving victims ($4 million for spouses, $2.5 million for parents and children, and $1.25 million for siblings)." <u>Id.</u> (citing <u>Peterson II</u>, 515 F. Supp. 2d at 52). As with pain and suffering awards to survivor victims, the solatium baselines are subject to upward or downward variances, as warranted by individual circumstances. <u>See id.</u> at *47 & nn. 38–39.

The special masters have considered the evidence presented by family member victims and recommended damages awards, most of which are in line with the <u>Peterson II</u> baselines but some of which reflect modest variances.[11]  The Court will now highlight a few plaintiffs with unique circumstances and will explain any divergence from the special masters' recommendations.

### i.   Upward Variances for Exceptionally Severe Harm

Terrorist attacks nearly always have drastic impacts on victims' loved ones.  As this Court has previously noted, the "'already-substantial' [<u>Peterson II</u>] baseline awards 'take into consideration the likelihood of serious detrimental effects from these events on families.'" <u>Cabrera</u>, 2022 WL 2817730, at *53 (quoting <u>Pennington v. Islamic Republic of Iran</u>, Civ. A. No. 19-796 (JEB), 2022 WL 168261, at *3 (D.D.C. Jan. 19, 2022), <u>vacated in part,</u> Civ. A. No. 19-796 (JEB), 2022 WL 18814284 (D.D.C. May 3, 2022)).  Accordingly, "[w]hen courts award upward departures, they usually do so because of an unusual circumstance beyond the ordinary anguish that results from losing a family member" or having a family member injured in a terrorist attack. <u>Selig v. Islamic Republic of Iran</u>, Civ. A. No. 19-02889-TNM, 2021 WL 5446870, at *15 (D.D.C. Nov. 22, 2021).

---

[11] This Court instructed the special masters to use the <u>Peterson II</u> framework.  See <u>Cabrera</u>, 2022 WL 2817730, at *47 (noting that two frameworks exist—one from <u>Peterson II</u> and another from <u>Est. of Heiser v. Islamic Republic of Iran</u>, 466 F. Supp. 2d 229 (D.D.C. 2006)—and "endors[ing]" the <u>Peterson II</u> framework); <u>see also</u> Admin. Plan at 3 ("To assess and evaluate plaintiffs' damages claims and the applicable law, the Special Master shall be guided by . . . this Court's Memorandum Opinion . . . .").  Yet, Special Master Griffin confusingly indicates that "the well-established <u>Heiser</u> framework . . . is the proper basis for assessing the damages to be awarded to Plaintiffs," Griffin Rep. at 3–4, evidently because it was adopted by a different judge in a prior case in which Special Master Griffin also served as a special master, <u>see id.</u> (citing <u>Barry v. Islamic Republic of Iran</u>, 437 F. Supp. 3d 15, 52–53 (D.D.C. 2020)).  Had Special Master Griffin used the <u>Heiser</u> framework, the difference in approach likely would not have mattered significantly, as both frameworks offer the same baselines for these types of plaintiffs.  See <u>Cabrera</u>, 2022 WL 2817730, at *47.  But despite his initial statement, Special Master Griffin appears to have actually applied the <u>Peterson II</u> framework to each plaintiff's damages assessment, <u>see</u> Griffin Rep. at 10, 12, 14–16, 18, 20, (determining baselines based on this Court's "endors[ement of]" the <u>Peterson II</u> framework"), so the Court will disregard his comments on the <u>Heiser</u> framework.

Special Master Brazil recommended an upward departure for Kenna Hunter, whose husband, SGT Eric Hunter, sustained extremely severe physical injuries in a bellwether attack. See Brazil Rep. at 26–28. Ms. Hunter has suffered particularly heavy emotional tolls of caring for her husband and coping with his injuries. She remained by his side through 60 surgeries and spent four years of her life with SGT Hunter at Walter Reed National Military Medical Center. Id. at 27. Her two young children needed to be sent away to live with their grandmother in Alabama, and they only occasionally saw their parents over the course of two years. Id. She has suffered anxiety, depression, PTSD, and insomnia and has had to set aside her own career plans. Id. Special Master Brazil recommended a $5 million award, which is a $1 million (25%) upward departure from the Peterson II baseline. In recognition of the particularly brutal suffering Ms. Hunter has endured and the years spent at the hospital caring for her husband, all of which has resulted in significant negative impacts on her relationship with her own children, the Court finds that Special Master Brazil's recommendation of a $5 million award is appropriate.

The special master recommended Peterson II baseline awards of $2.5 million for each of SGT Hunter's adopted children, K.H. and J.H., see Brazil Rep. at 28–30, but the Court concludes that modest upward variances are warranted given their individualized circumstances and the need to ensure equivalent awards for similarly situated plaintiffs. K.H. and J.H. had to live away from their parents during formative years and have suffered heightened effects due to their father's injuries. See id. They have been moved from school to school as they have been shipped across the country based on their parents' ability to provide care. Id. at 29–30. Both have suffered from depression. Id. J.H.'s depression has led to suicidal ideations and has required medication. Id. at 30. K.H. later decided to spend two years living with a grandparent because she felt abandoned by her parents. Id. at 29.

18

Aspects of K.H. and J.H.'s circumstances resemble those of R.C., the son of Lieutenant Colonel ("LTC") David Cabrera, who suffered "extreme depression and repeated suicidal ideation," and whose ability to live a normal childhood and pursue a traditional education was especially disrupted by the emotional harms of his father's death. Cabrera, 2022 WL 2817730, at *49. In light of R.C.'s circumstances, the Court awarded him solatium damages of $6 million, a 20% upward adjustment from the Peterson II baseline for children of deceased victims. Id. at *50. The Court concludes that it is appropriate to provide a similar adjustment to K.H. and J.H. and will award them each $3 million in solatium damages, a 20% upward variance from the Peterson II baseline.

      ii.   Older Family Members

In its prior opinion addressing bellwether plaintiffs, the Court issued a slight downward variance from the baseline award to one older bellwether family-member plaintiff. LTC Cabrera was "41, almost 42" years old when he was killed in a bellwether attack, and his foster father, Robert Cabrera, was therefore older than the other bellwether plaintiffs before the Court. Cabrera, 2022 WL 2817730, at *51 (internal quotation marks omitted). Because "the amount of time Robert must suffer with this loss is comparatively less than the suffering of other family-member victims," the Court awarded him $4 million in solatium damages—a 20% downward variance from the Peterson II baseline for parents of deceased victims. Id.

The Court therefore concludes that it is appropriate to make a similar reduction to the award of Donald Edward Newman Sr., the grandfather (who is the functional equivalent of a father) of SSG Newman, who was 69 years old when his grandson died. See Griffin Rep. at 16–17. Special Master Griffin recommended the Peterson II baseline award of $5 million, id. at 17, but to maintain

consistency among the awards of similarly situated individuals, the Court will award Donald Newman, Sr. $4 million in solatium damages.

The Court must also address another plaintiff, the estate of Kurt E. Zwilling.  Kurt Zwilling passed away in 2021 but was alive when his son, CPL Gunnar Zwilling, was killed in a bellwether attack.  See Saltzburg Rep. at 95–98.  Special Master Saltzburg recommended the Peterson II baseline award of $5 million.  Id. at 98.  The Court does not wish to understate the "tremendous" suffering that Kurt Zwilling endured after his son's death, id. at 96; however, he passed away thirteen years later, which is only slightly longer than the time that Donald Newman, Sr. has had to cope with the loss of SSG Newman.  In the interest of ensuring equivalence across awards, the Court will also award the estate of Kurt E. Zwilling $4 million in solatium damages, a 20% downward variance.

### iii.   Certain Young Children with Less Close Relationships to Direct Victims

In its prior opinion, the Court certainly did not decline to give significant awards to bellwether plaintiffs merely because they were young.  See Cabrera, 2022 WL 2817730, at *51 (granting baseline award to an injured victim's four-year-old daughter).  The Court did, however, conclude that 20% reductions from the Peterson II baseline awards were warranted for two of LTC Cabrera's children because they did not live with their father before his death, even though he was involved still in both their lives.  See id. at *50.  The Court reasoned that his "role [in the lives of those two children] was comparatively smaller than it was in the lives of [his other children], with whom he lived full-time."  Id.; see id. (citing Selig, 2021 WL 5446870, at *22, for the proposition that "children who were 'living with their parents are likely to feel the sting of loss more harshly' than children who were not").  Accordingly, when determining solatium damages, it is necessary

to consider whether a family-member plaintiff's relationship with a direct victim was further removed than traditionally expected.

Special Master Chapman considered the claims of family members of SGT Baldridge, who was killed in the same Taliban attack as SGT Bays.  See Cabrera, 2022 WL 2817730, at *26; Chapman Rep. at 2–3.  She recommended awarding each of SGT Baldridge's three half-siblings the Peterson II baseline award of $2.5 million.  See Chapman Rep. at 17–18.  SGT Baldridge had notably different relationships with each of his half-siblings at the time of his death.  E.B. was six years old when SGT Baldridge died, but they "had a strong relationship and loved to spend time together."  Chapman Rep. at 7.  L.B. was only three years old when SGT Baldridge was killed, so he has "no personal memories" of his half-brother.  Id. at 8.  S.B. was three months old when her half-brother SGT Baldridge was killed, and she "never got to meet [SGT Baldridge] or to develop a relationship with him."  Id. at 9.

The Court finds it necessary to reduce the awards recommended by Special Master Chapman for two of SGT Baldridge's siblings.  The Court does not wish to diminish the difficulties that each of SGT Baldridge's siblings face, as his tragic death has clearly impacted their lives.  However, the Court must be "mindful of the need to assess each plaintiff's injuries individually, as well as the need 'to ensure that individuals with similar injuries' . . . 'receive similar awards.'" Cabrera, 2022 WL 2817730, at *43 (quoting Peterson II, 515 F. Supp. 2d at 54).  The Court concluded it was necessary to vary downward from the Peterson II baseline awards for some of LTC Cabrera's children because of their comparatively less close relationship to him.  Id. at *49.  L.B.'s circumstances raise somewhat analogous concerns, as he was so young at the time of SGT Baldridge's death that he has no memory of his half-brother.  And S.B.'s relationship with SGT Baldridge was significantly less developed than LTC Cabrera's was with his children.  While LTC

Cabrera's children did not live with him, he was at least "involved in both of their lives." Id.  S.B., on the other hand, was only three months old when SGT Baldridge was killed, and SGT Baldridge "was already deployed when S.B. was born," so "S.B. never got to meet [him] or to develop a relationship with him."  Chapman Rep. at 9 (citation omitted).

Hence, the Court will adopt the recommendation of the special master with regards to E.B., who was six at time of his half-brother's death and shared "a strong relationship" with him, Chapman Rep. at 7, and will award him the Peterson II baseline of $2.5 million in solatium damages.  However, it will vary downward from the baseline for L.B., to whom it grants an award of $1.75 million (70% of the baseline), and for S.B., to whom it grants an award of $1 million (40% of the baseline).

Two other young family-member plaintiffs considered by Special Master Saltzburg present similar situations.  C.C.V. and R.C.V. are the minor children of Chief Petty Officer ("CPO") Aaron C. Vaughn, who died in a Taliban attack on a helicopter in Afghanistan on August 6, 2011.  See Cabrera, 2022 WL 2817730, at *20.  C.C.V., CPO Vaughn's daughter, was two months old when her father died.  See Saltzburg Rep. at 69–71.  Special Master Saltzburg found that "[s]ince C.C.V. was only 9 weeks old when CPO Vaughn was killed, she had no idea what was going on."  Id. at 69.  R.C.V., CPO Vaughn's son, was one year old at the time of his father's death.  Id. at 71–72.  His circumstances are similar to those of his sister.  See id. at 71 ("Because R.C.V. was so young at the time, he did not fully grasp what had happened.").

The Court thus disagrees with Special Master Saltzburg's recommendation to award C.C.V. and R.C.V. the Peterson II baseline for children of deceased victims of $5 million.  This is not to minimize the terrible impact of their father's death.  See Saltzburg Rep. at 70 (noting that "C.C.V. has struggled without her father in her life" and "feels she was robbed of an amazing

father"); id. at 71 (same with respect to R.C.V.).  But their situation is largely comparable to that of S.B., the three-month-old who never knew her half-brother, except that losing a parent arguably leads to greater lasting harm.  The Court will accordingly apply a slightly lesser downward variance to their awards and will grant C.C.V. and R.C.V. each $3 million in solatium damages (60% of the Peterson II baseline).

*     *     *

For these reasons, the Court adopts the special masters' recommendations for compensatory damages with the exceptions noted above.  These awards are reflected in the Appendix table.

## III.    Prejudgment Interest

The Court previously concluded that "an award of prejudgment interest is appropriate" in this case.  Cabrera, 2022 WL 2817730, at *55.  The Court calculated the bellwether plaintiffs' "interest amount by following the D.C. Circuit's recommendation in Forman v. Korean Air Lines Co., 84 F.3d 446 (D.C. Cir. 1996)," id., and will use the same methodology here.  The prejudgment interest amounts for these associated plaintiffs is reflected in the Appendix table.

<u>Conclusion</u>

For the foregoing reasons, the Court concludes that all but one of the plaintiffs considered by the special masters has standing to bring claims under the private right of action in 28 U.S.C. § 1605A(c).  The Court will dismiss K.E.V.F.'s claims because she lacks standing as an after-born plaintiff.  The Court also largely adopts the special masters' recommendations for compensatory damages to each eligible plaintiff, with the handful of modifications noted herein, and it will award prejudgment interest to each plaintiff as reflected in the attached Appendix.  A separate Order specifying each plaintiff's award will be issued on this date.

23

_____/s/_____
JOHN D. BATES
United States District Judge

Dated:  May 16, 2023