UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA


* * * * * * * * * * * * * *    )
AUGUST CABRERA, et al.,        )    Civil Action
                               )    No. 19-03835
            Plaintiffs,        )
                               )
   vs.                         )
                               )
ISLAMIC REPUBLIC OF IRAN,      )    Washington, D.C.
                               )    October 18, 2022
            Defendant.         )    11:00 a.m.
                               )
* * * * * * * * * * * * * *    )


- - - - - - - - - - - - - - - - - - - - - - - - - - - -


                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA


* * * * * * * * * * * * * *    )
MARK ZAMBON, et al.,           )    Civil Action
                               )    No. 18-02065
            Plaintiffs,        )
                               )
   vs.                         )
                               )
ISLAMIC REPUBLIC OF IRAN,      )    Washington, D.C.
                               )    October 18, 2022
            Defendant.         )    11:00 a.m.
                               )
* * * * * * * * * * * * * *    )



      TRANSCRIPT OF STATUS CONFERENCE CONDUCTED VIA ZOOM
            BEFORE THE HONORABLE JOHN D. BATES,
               UNITED STATES DISTRICT JUDGE

```
 1      APPEARANCES:

 2      FOR THE PLAINTIFFS:        JOSHUA D. BRANSON, ESQ.
                                   ANDREW E. GOLDSMITH, ESQ.
 3                                 JAMES RUCK, ESQ.
                                   KELLOGG, HANSEN, TODD, FIGEL &
 4                                    FREDERICK, PLLC
                                   1615 M Street, Northwest
 5                                 Suite 400
                                   Washington, D.C. 20036
 6

 7                                 NICHOLAS M.H. REDDICK, ESQ.
                                   DEVIN RINGGER, ESQ.
 8                                 WILLKIE, FARR & GALLAGHER, LLP
                                   One Front Street
 9                                 San Francisco, California 94111

10

11                                 ROBERT W. COWAN, ESQ.
                                   BAILEY, COWAN & HECKAMAN, PLLC
                                   1360 Post Oak Boulevard
12                                 Suite 2300
                                   Houston, Texas 77056
13

14      REPORTED BY:              LISA EDWARDS, RDR, CRR
                                   Official Court Reporter
15                                 United States District Court for the
                                     District of Columbia
16                                 333 Constitution Avenue, Northwest
                                   Room 6706
17                                 Washington, D.C. 20001
                                   (202) 354-3269
18

19

20

21

22

23

24

25
```

1          THE COURTROOM DEPUTY:  Your Honor, we have Civil

2     Action 19-3835 and Civil Action 18-2065.

3          I'll ask that counsel in the 2019 case identify

4     yourselves first, followed by those -- the individuals in

5     the other cases to identify yourself as lead counsel.  Thank

6     you.

7          MR. BRANSON:  Good morning, Judge Bates.  This is

8     Josh Branson from Kellogg, Hansen on behalf of the

9     Afghanistan-based victims.

10          With me on the line are my colleagues, Andy

11     Goldsmith and James Ruck.

12          THE COURT:  Good morning.

13          Is there anyone else who needs to identify him or

14     herself?

15          MR. REDDICK:  Good morning, your Honor.  This is

16     Nick Reddick.  I am from Willkie, Farr & Gallagher along

17     with my colleague, Devin Ringger.  And we are co-counsel

18     with Robert Cowan in the Zambon case for the Iraq-injured

19     Plaintiffs.

20          THE COURT:  And good morning to you as well.

21          MR. REDDICK:  Good morning, your Honor.

22          THE COURT:  Now, the purpose of this proceeding --

23     and I apologize for any confusion as to whether it was going

24     to be held on this date.  I think the lack of communication

25     was due to -- quite frankly, I'll take the responsibility.

 1    But it was due to the transition of law clerks, one law

 2    clerk leaving, another law clerk not getting in, and perhaps

 3    we didn't have complete communication within chambers.  But

 4    here we are.

 5            The purpose of this status is really driven by the

 6    status report received with respect to the Afghanistan-based

 7    injuries and what we're going to do with the non-bellwether

 8    proceedings.

 9            Now, there are other issues percolating.  There's

10    the issue that's been briefed relating to whether there were

11    no deaths in the attack and how that impacts certain

12    provisions of the Foreign Sovereign Immunities Act as they

13    apply here.  I don't intend to address that today.

14            There's also a motion that has been filed in the

15    Iraq-based injuries case in Zambon, portions of Zambon, that

16    Mr. Reddick and the Willkie, Farr folks are handling.  And I

17    may address that motion to consolidate briefly at the end of

18    this proceeding.  But "address it," I don't mean decide, but

19    by addressing it I mean ask a question or two.

20            But let's stick to the main subject.  I'm going to

21    turn that over to you, Mr. Branson, because this is really

22    driven by the status report and your desire to have the

23    Court opine or weigh in on certain issues as you put

24    together the non-bellwether Afghanistan-based claims.

25            MR. BRANSON:  Yeah.  Thank you, Judge Bates.  And

1    I appreciate the Court making time this morning.

2            We are, I think, very close.  Hopefully, next week

3    we will have the special master reports for the remaining

4    bellwether damages claims ready to file with your Honor.  I

5    believe we have until November 7th.  We're aiming to get

6    those in in advance.

7            And at that point, I believe we will have

8    addressed 113 total Plaintiffs.  So the 90 that are coming

9    your way next week and then the 23 that your Honor already

10    decided in your memorandum opinion in July.  That leaves

11    roughly 439 direct victims and about 1,270 Plaintiffs to

12    litigate on the non-bellwether phase of the proceeding.

13            And what I had wanted to talk with your Honor this

14    morning about was a process for doing that in a way that's

15    efficient, that doesn't overload your Honor, obviously, but

16    that still gets our clients into the victims' fund in a

17    timely fashion.  And so what I thought I would do is lay out

18    our thinking and get your Honor's feedback.  And I'm happy

19    to talk through the various permutations as we've been

20    thinking it through.

21            THE COURT:  That's fine.  That sounds fine.  Let

22    me just ask one question.

23            MR. BRANSON:  Sure.

24            THE COURT:  The number you just threw out, the

25    1,270, I thought I had been operating on the basis of an

1      1,164 number.

2              MR. BRANSON:  I'm sorry, your Honor.  I misspoke.

3      The 1,270 is the total Plaintiffs in the case.  So you're

4      absolutely right.  I think it's 1,164 that are left in the

5      case after the bellwether Plaintiffs that you've

6      adjudicated.  So it's a good correction.  It's 409 direct

7      victims and 1,164 Plaintiffs that I believe will be covered

8      in the non-bellwether phase.

9              The 439 and 1277 are the total numbers.  So

10     apologies for the confusion.

11             THE COURT:  And another number that may or may not

12     be relevant as you chart out your proposal is something on

13     the order of 330 separate attacks?

14             MR. BRANSON:  That is correct.  That's an

15     estimate.  As you know, your Honor, it's sometimes difficult

16     until you dig into the 56 and other reports to always know

17     exactly how many attacks there are.  But 330, I believe, is

18     our best estimate as of right now.  I think that's going to

19     be pretty accurate.  It may vary a little bit as our experts

20     finish their work.

21             So the way we'd like to do this, your Honor, is I

22     think in two tranches, because we think waiting to do all

23     these people in one tranche is going to take a long time and

24     potentially overload the Court as well as the special

25     master.  So we were planning to do what I'll call a large

1    tranche and then a smaller tranche to cover the

2    non-bellwether phase of the case.  And what I thought I'd do

3    to help you understand our thinking is walk you through our

4    understanding of the timing.

5          So we believe that the victims' fund is likely

6    going to have deadlines of August 1st each year.  Now, that

7    has varied in the past.  But August 1st was the most recent

8    deadline.  And so what we're doing is we're targeting August

9    1st, 2024, as the date we're hoping to get our first tranche

10   into the fund by, which would then make them eligible for a

11   2025 distribution.

12         And in terms of the shape of the tranche, we are

13   currently thinking roughly 290 victims and roughly 900

14   Plaintiffs, so a large proportion of the people that we have

15   left in the case.

16         And I'll just tell you how we came up with those

17   numbers.  Those are the people for whom we think we have all

18   the documents that we need at this point.  So where we have

19   acquired a 56 or some equivalent military record or factual

20   declaration that we think will give the special masters and

21   your Honor a sufficient basis to make a liability finding,

22   so that's the size of what I think we have the documents we

23   need.  So it's just a question then of doing the litigation,

24   putting together the expert reports and going through the

25   process.

1          And so to work backwards from August 1st, 2024, I

2     think that we probably need to allocate about six months on

3     the back end to serve the final judgment, which is one thing

4     about these cases.  To get into the victims' fund, you need

5     to actually serve the final judgment on Iran.

6          If the various mailing companies are still

7     delivering to Iran, that won't be that hard.  But if they're

8     not -- as your Honor knows, periodically the mail stops

9     being directed to Iran.  Then you have to go through the

10    State Department, and that can take up to six months.  So we

11    were targeting February 1st, 2024, to get final judgments to

12    the extent the Court awards final judgments for this first

13    tranche.  And so kind of targeting that date.

14         In turn, we were going to target roughly August of

15    2023 to get special master reports for all of these folks,

16    which would then give your Honor six months to review what I

17    acknowledge will be a lot of paper.  But, you know, trying

18    to balance the various exigencies here and moving in a

19    timely fashion while not of course putting unrealistic

20    demands on chambers.  We thought August of 2023 might make a

21    good deadline for getting the special master reports for

22    this first tranche.

23         And then working backwards from there, we were

24    targeting potentially April of 2023 for us to make our

25    submissions to the special masters, which I acknowledge

1    leaves only four months in that window for the special

2    masters to do both liability and damages reports.

3           And that, I think, leads to something we said in

4    the status conference, which we think the most efficient way

5    to do this will be to appoint more special masters so that

6    we have more people looking at these so that we don't have

7    to overload any person with an unreasonable number of

8    Plaintiffs or attacks.  So we had in our heads potentially

9    targeting ten special masters, which I know is a large

10   number.

11          THE COURT:  A total of ten?

12          MR. BRANSON:  Yeah.  A total of ten.  Yes.

13          So I don't know if all four that we currently have

14   will be available to do this next phase.  I think most of

15   them will.  There may be one who has other obligations.  But

16   that would require us, of course, to go find six or seven

17   more to propose to your Honor.  And we are working on that

18   now.  And once we have a revised case management order that

19   your Honor is comfortable with, we were going to aim to

20   propose new special masters by December of this year.

21          THE COURT:  How different will the task for the

22   special masters on this first tranche be than the task for

23   the current special masters is?  Will it be an identical

24   task or will it be a different task?

25          MR. BRANSON:  I think it will be different.  As I

1    understand your Honor's order from July, you were

2    anticipating that for this phase the special masters would

3    do not only the damages adjudication, which is all they're

4    doing now, because your Honor already made liability

5    findings for the bellwether Plaintiffs, but they would also

6    be doing the liability analysis.  So that is obviously a

7    different task.  It's something extra they would have to do.

8           I would submit, given the thorough and very

9    descriptive opinion that your Honor issued over the

10   summer -- obviously, a lot of hard work went into that -- I

11   don't think the special master liability task is going to be

12   too difficult because your Honor has given a lot of

13   guidance.

14          And as you remember, we took care to select the

15   bellwether attacks so that we would have some representative

16   attack that would be able to slot into virtually every

17   attack in the case.  So I hope it's not going to be too

18   difficult, but it is going to be a different task on top of

19   the damages tasks that they're currently performing.

20          And I think, Judge Bates, that actually leads to

21   an important point, which is I wanted to propose that we

22   have the special masters do liability and damages for these

23   Plaintiffs in the same report rather than doing liability,

24   having your Honor look at it and then going back several

25   months later and looking at it again and doing damages.

1    From our perspective, that would be most efficient and

2    certainly the most speedy way to do it.

3            THE COURT:  I think it does sound like the most

4    efficient and most expeditious way to do it.  It requires me

5    and everyone else, I guess, to assume that there will not be

6    any liability determinations that are rejected by me.

7            If they're rejected by the special master, there

8    isn't the same inefficiency.  But if I reject them, then the

9    special masters will have gone to the trouble of doing the

10   damages portion related to that attack, let's say, and

11   there's --

12           MR. BRANSON:  True.

13           THE COURT:  -- a possibility of inefficiency.

14           But on the other hand, I think that, given what

15   we're dealing with here, that may not be a high risk.

16   There's some risk, but it may not be a high risk.

17           MR. BRANSON:  That's absolutely right, Judge

18   Bates.  That is a potential inefficiency.

19           We obviously -- we certainly hope that won't be

20   the case.  And we've taken great care in our work to date so

21   that hopefully we will not be presenting any attacks to your

22   Honor that liability would not be found for.  But of course

23   that is a possibility.

24           I think in my view the efficiencies of doing this

25   all at once will outweigh the potential hypothetical

1    inefficiency of the scenario that you just described.

2         THE COURT:  And I agree with that, although I

3    don't necessarily accept as a likelihood that you're going

4    to decide not to present some cases.  Maybe you are.  But

5    you represent Plaintiffs; and I'm not sure that even if you

6    decide that the case is weak you can decide not to present

7    it.

8         MR. BRANSON:  That is true, your Honor.

9         What I more meant is if we put the case together

10   and decided which Plaintiffs to represent, we have taken

11   what I hope is significant care to ensure that everybody

12   falls within the liability period that we've already

13   presented to your Honor at the bellwether trial.  You're

14   absolutely right.

15        THE COURT:  Understandably.  But you don't have

16   the -- you haven't had the evidence on everyone from the --

17        MR. BRANSON:  That's true.

18        THE COURT:  You're just developing and gathering

19   that evidence.

20        MR. BRANSON:  That is true.  And if we have a

21   good-faith case to make, we will make it of course on behalf

22   of our clients.  So you're correct, Judge Bates.  That is a

23   hypothetical possibility that could come up, all things

24   considered.

25        THE COURT:  I'm willing to accept the possible

1    inefficiency.

2            By the way, how are special masters being paid?

3    And are they being paid when they're doing their work?

4            MR. BRANSON:  I think they're paid at the

5    completion of their work.  This is in the Court's

6    administrative order.

7            Now, I think the current set of special masters

8    will have to be paid -- they will have to wait until the end

9    of the case to be paid.  My understanding is they'll be paid

10   once they finish the reports that we hope to finish soon.

11   But in general, I believe the Court's administrative order

12   has called for at the completion of their reports we submit

13   a voucher to your Honor, and it goes through a process where

14   it's reimbursed by the Attorney General under the FSIA.

15           THE COURT:  All right.  Continue, please.

16           MR. BRANSON:  So that, I think, really takes me

17   through what I envision for Tranche 1, which is -- so the

18   first step after we had the case management order would be

19   for us to propose hopefully if we can find ten that are

20   qualified and willing to do it and have time, ten special

21   masters for you in December.  And then assuming your Honor

22   is comfortable with them, then we would plan to proceed

23   along the path I just described for Tranche 1; and of course

24   at the end, we would ask your Honor to enter a 54(b)

25   judgment for that tranche for anybody that prevails so that

1    we could go to the fund right away.

2              And then the thought would be we would then do a

3    Tranche 2, which would just be everybody that would follow

4    roughly a year behind everybody else.

5              I do think it's likely, Judge Bates, that some of

6    the Plaintiffs will ultimately drop out.  There are

7    Plaintiffs that I think will just end up being nonresponsive

8    or that will decide they don't want to go through the hassle

9    of collecting documents.

10             And so currently our plan is for people who are in

11   that boat right now, we are moving them to Tranche 2.  We're

12   going to continue to work with them to give them every

13   opportunity they have.  But I think at the end of the day we

14   should expect some voluntary dismissals so that Tranche 2

15   won't literally be every other Plaintiff in the case.  It

16   will be some subset of people that have decided to continue

17   pursuing their claims.

18             THE COURT:  I understand.

19             MR. BRANSON:  So that really was the plan that we

20   had for the non-bellwethers.  You know, we're certainly

21   alive to the large logistical burden this is going to impose

22   on your Honor and on the special masters and on the experts.

23   So I think that the timetable we just laid out is

24   aggressive, but I think it's feasible, I hope, for all

25   involved.  And obviously, our main priority is getting our

1   clients, as many as we can, the opportunity to get into the

2   fund in a timely fashion.  So that's what we're trying to

3   do.

4          THE COURT:  And I'm prepared to give a nod of

5   approval to that, understanding -- number one, to the

6   additional special masters.  I think it will be necessary in

7   order to approach the cases this way and to the tranches,

8   the phases, if you will, and also a nod of approval to the

9   timeline that you've identified, although I want to be

10  cautious here:  There are lots of things that could happen

11  that could disrupt that timeline on my schedule, on your

12  schedule, on the special masters.  And while the goal of

13  August 1st, 2024 is a laudable one and I think all,

14  including myself, should be conscious of and work towards

15  it, we don't have any guarantees.  And if things slip, then

16  we'll be faced with the possibility of not making that date.

17  But we can set it up to try to make it.

18          MR. BRANSON:  That's fair enough, Judge Bates.  I

19  appreciate the Court's reaction.

20          I would say one thing from our perspective that we

21  would like to aim for is as we go through this process, if

22  it seems like that date is not going to be feasible, I think

23  from our perspective we would rather slightly narrow the

24  size of the first tranche rather than keep it the same and

25  have everybody in it miss that deadline because, I mean,

1    it's a difficult balancing act, of course, but there are

2    certainly a substantial number of Plaintiffs, I think, that

3    we will be able to make our case by that date.

4            And I guess one thing that I want to keep an open

5    dialogue with your Honor about is if it seems like we can

6    still meet it but we might need to reduce the size of the

7    tranche, from our perspective, I think that would be

8    preferable to insisting on it being literally the same, but

9    then everybody misses the date in the funding cycle.

10           THE COURT:  The concern I have -- I'll be blunt

11   about it -- is that a six-month period, just focusing on the

12   Court, rather than the special masters for the moment --

13   they have their own set of issues and concerns, I would

14   think.

15           But focusing on the Court, a six-month period to

16   review all the liability down to determinations for

17   something in the neighborhood of 900 Plaintiffs, there won't

18   be 900 liability determinations, but there will be maybe 300

19   separate attacks.  And that's a lot of work.  And as you put

20   it, that's a lot of paper.  I would say it's a lot of work

21   on that paper.

22           I intend to review the recommendations of the

23   special masters that are about to come to me pretty closely,

24   and I will do the same with this non-bellwether first

25   tranche.  But six months is -- I mean, you're basically

1    saying I think, Judge, you're going to have to devote

2    probably a third or more of your workload to this for a

3    six-month period.

4              MR. BRANSON:  It certainly -- it will be a lot of

5    work, your Honor, which is why I candidly wanted to have

6    this conversation this morning.  We certainly appreciate the

7    work your Honor has put into this already.  And we wanted to

8    work with you to keep the workload manageable.

9              So, you know, we could potentially reduce the size

10   of the tranche or aim to try to get the special master

11   reports in a little bit earlier to give your Honor more

12   time.  I certainly don't want to put unreasonable demands on

13   your Honor.  I know your Honor has other things to do as

14   well.

15             THE COURT:  I don't think it's practical to put

16   unreasonable demands on the special masters either because

17   the quality of their product will be relative at least to

18   the amount of time that I have to invest in it.  So let's

19   not be unreasonable with respect to the time that they'll

20   need.

21             So I'm comfortable with this approach and the

22   timeline, although I do have some concerns with whether we

23   will make it based on the volume of cases that will have to

24   be resolved.

25             MR. BRANSON:  So in terms of the next steps, Judge

 1    Bates, I want to -- maybe we'll give a little bit more

 2    thought to the timeline and that concern that your Honor

 3    just expressed.

 4            I guess in terms of next steps, would it make

 5    sense for us to submit a motion for a revised -- or a

 6    non-bellwether case management order to codify this plan in

 7    some way?

 8            THE COURT:  Absolutely.

 9            I have two questions based on things that were

10    mentioned in your status report that haven't been discussed

11    here.

12            Number one would be just this general question of

13    how evidence is to be submitted.  You identified that as an

14    issue.  Did that mean only whether it's going to go to the

15    special master or go to the Court or is there something more

16    in terms of the "how" with respect to the submission of the

17    evidence?

18            And the second issue that was mentioned in the

19    report but hasn't been mentioned here is the possibility of

20    adding new Plaintiffs.  Is that just an incidental thing of

21    a handful of new Plaintiffs or are we talking about

22    something more consequential?

23            MR. BRANSON:  I'll take the questions in order,

24    Judge Bates.

25            The first one, I think it was intended to be just

1    should we go -- I wanted to verify that your Honor intended

2    for the special masters to conduct the liability analysis in

3    the first instance.  It sounds like that is indeed what your

4    Honor intended.

5              THE COURT:  I think that's right.  I think that's

6    doable.  I think that's appropriate here.  It will be all

7    paper.  There will be no witnesses, I take it, before the

8    special masters.  Correct?

9              MR. BRANSON:  That is correct.

10             So it will be primarily expert reports from

11   Colonel Wood, who you may remember from the trial; and

12   because of the volume, we are going to have an additional

13   expert to be helping Colonel Wood with his liability

14   analysis.  But he will perform the same methodology that

15   your Honor approved at the hearing.

16             I think that will be the bulk of the liability

17   showing, will be the expert report, you know, that will

18   attach the 56 or whatever the relevant document is.  And

19   then on the damages side, it will largely be declarations

20   from the Plaintiffs with additional documents as needed.

21             But our plan was just to submit those directly to

22   the special master.  And then my understanding is those

23   would then be filed along with the special masters' ultimate

24   report to your Honor.  So you would have not only the

25   report, but you would have the evidentiary record the

1    special masters had looked at.

2              THE COURT:  I think I will need that.  I hope it

3    all comes electronically.  Otherwise, we'll be burying the

4    courthouse in paper.

5              MR. BRANSON:  I think our plan was to do it

6    electronically.

7              THE COURT:  Good.

8              MR. BRANSON:  The second question about new

9    Plaintiffs, it's much more towards the incidental end of the

10   spectrum than the other end.  This was -- to give you a

11   number, my best guess is between 20 and 50 new Plaintiffs.

12   But these would all need to be cleared.  They would just be

13   additional family members of direct victims that are already

14   in the case.

15             So the hope was that this wouldn't change the

16   liability work at all, because it would be by definition the

17   same attack that was already adjudicated, and really all it

18   would entail is an additional declaration from the relevant

19   family member and then an extra paragraph or two of the

20   special master's damages report.

21             The mechanism that we were going to propose to add

22   them to the case was just going to be an amended complaint.

23   And I think we mentioned in the status report we have a few

24   other ministerial things we need to clean up in the

25   complaint, like some minors have reached the age of

1    majority.  Some Plaintiffs, I think, have died.  So we need

2    to substitute their estates in and things like that.

3         So the proposal we were going to have is to do an

4    amended complaint that would accomplish all of these things

5    potentially early next year because I don't think it should

6    affect the ongoing work in a meaningful way.

7         THE COURT:  That sound fine.

8         MR. BRANSON:  So we'll put that in the case

9    management order.  And I think the plan would be we just

10   file a motion for -- I think we're on a third amended

11   complaint.  We would file that sometime in early next year

12   in advance of when our non-bellwether submissions go to the

13   special masters.  So any of these new Plaintiffs at that

14   point could be part of the special masters' analysis.  But

15   no new direct victims, no new attacks.  Just new family

16   members.

17        THE COURT:  Thank you.

18        MR. BRANSON:  So, Judge Bates, the only other

19   thing I had on our list is we discovered what we believe is

20   an inadvertent error in the Court's calculation of

21   prejudgment interest for Kevin Keen, who is one of the

22   bellwether victims.  And this is -- we believe that the

23   Court may have inadvertently started a prejudgment interest

24   clock on his number beginning in January of 2022, of this

25   year, rather than the day of the attack like we did for all

1     of the other bellwether victims.

2           You know, this isn't going to affect his

3     application to the fund, because as your Honor knows, the

4     fund doesn't convey on prejudgment interest.  But we thought

5     as a matter of form and in case the judgment is ever

6     enforced that we should raise the issue with your Honor.

7           With your Honor's permission, I think our plan was

8     to file a very short Rule 60(a) motion just with respect to

9     him.  And assuming that my folks are doing the math

10    correctly, I think the numbers should go up a little bit.

11    But otherwise, it shouldn't change anything about your

12    Honor's bellwether opinion.

13          THE COURT:  I'll look for that.  I think that

14    sounds like the right approach.  And I will look for that.

15          MR. BRANSON:  I'm just looking through my list.  I

16    guess one -- I don't need another feedback on this, but just

17    so your Honor is aware, I think there may be a couple

18    motions being filed soon to enter protective orders.  My

19    understanding is that CENTCOM is going to be moving for a

20    protective order relatively soon because they have a

21    protective order that they want; and I believe we have

22    agreed to language.  So we're waiting on that.

23          And then I think we will be moving for a separate

24    protective order that was negotiated with DynCorp, who was a

25    private contractor that employed one of our Plaintiffs; and

1    we got kind of an equivalent of a 56 for them, but they've

2    asked for a protective order.  So I think we will be filing

3    those hopefully soon.  So I don't think that should affect

4    the schedule we discussed earlier.

5             THE COURT:  I will look for those as well.  Thank

6    you.

7             MR. BRANSON:  Other than that, your Honor, I think

8    we've covered what I planned to cover this morning.

9             So I think what we will do is take your Honor's

10   feedback this morning, give it a little more thought and

11   then submit a proposed non-bellwether case management order

12   for your approval.  And we'll aim to get that done as

13   quickly as we can.

14            And beyond that, we'll just keep -- we're hard at

15   work on expert reports.  Colonel Wood is plugging away.  And

16   we'll just keep working with kind of the tentative April of

17   next year target date in mind to have all of our work on our

18   end done.

19            THE COURT:  That all sounds good.

20            On the one legal issue that is before me, I can't

21   tell you exactly when I'll get something out on that, but it

22   certainly will be in advance of your actually having to put

23   together materials for various Plaintiffs and relating to

24   various attacks.  We do have a handful of cases now that

25   have touched on that issue in addition to Judge Moss's case

1    and I suppose in addition to my opinion in this case and in

2    the *Owens* case.  But Judge Lamberth's opinion -- and I

3    believe Judge McFadden has issued an opinion relative to

4    this.  I think Judge Cooper has some language in a recent

5    opinion.

6            So I'll try to collect all of this and make sense

7    of the issue, which is an interesting issue.  I won't say

8    anything more about it at this point.  If I feel that I need

9    to have you in to argue it, I will let you know and get you

10   in.  But my hope is and my expectation is that I will not

11   need to have argument on it.

12           MR. BRANSON:  I appreciate that, your Honor.

13           And I think we calculated --

14           THE COURT:  And I know it's not you.  I know

15   you've got other counsel to submit the brief.  I'm aware of

16   that.

17           MR. BRANSON:  I appreciate that, Judge Bates.

18           I believe as we said in our status report there's

19   about 153 Plaintiffs who are implicated by how your Honor

20   rules on that.  I don't know sitting here today exactly

21   where they fall.  But I actually think most of those folks

22   are going to fall into Tranche 2 that I described.  That

23   also, I think, will help with our planning purposes.  So I

24   think for the most part Tranche 1 should be people who are

25   unaffected by the issue.

```
 1            THE COURT:  I'm not planning on waiting until 2024
 2     or 2025 to decide it.
 3            MR. BRANSON:  That's good.
 4            THE COURT:  Mr. Reddick, maybe I can turn to you
 5     for just a moment to talk about the consolidation request.
 6            I haven't dug into that fully.  And just so you
 7     know how I approach such things, I won't dig into it fully
 8     without discussing it with Judge Moss.  And I think that is
 9     how we do things in this Court.  And I don't think he's
10     actually aware of it yet, but I will make him aware of it.
11     And when I say I don't think he's aware of it, I don't think
12     you filed in the Martino case notice of the motion that you
13     filed in Zambon.  If I'm wrong on that, you can correct me.
14     But that's my review of the document.
15            MR. REDDICK:  No.  That's right, your Honor.  We
16     looked at practice in this district and didn't see that that
17     was typically done.  We're happy to do so.  We don't
18     certainly intend to take Judge Moss by surprise.
19            THE COURT:  Right.  You don't have to do it
20     because I will take care of that.
21            So let me just maybe say one or two things and ask
22     one or two things.
23            In Zambon, there are 49, I believe you have
24     identified, Iraq-based Plaintiffs.  I'll just call them --
25     use that term, whereas in Martino there are 639 Iraq-based
```

1    Plaintiffs.  Is the Martino case entirely Iraq-based?

2              MR. REDDICK:  Yes, your Honor.

3              THE COURT:  How many attacks do you think in a

4    very rough calculation are involved in each of those

5    numbers, the 49 in Zambon and the 639 in Martino?

6              MR. REDDICK:  Your Honor, I don't have an exact

7    number, but I believe roughly in Martino it's around 200 to

8    225.  And then in Zambon, I think it's in the teens.  But I

9    haven't confirmed that number.

10             THE COURT:  Just for my thinking, that's good

11   enough.

12             The efficiency issue with respect to this

13   consolidation request is one that's a little difficult to

14   drill into.  And the conversation here today with

15   Mr. Branson with respect to the Afghanistan-based attacks is

16   a good roadmap for the difficulty, because the liability

17   determination with respect to each attack as we approached

18   it in the Afghanistan-based incidents is an attack-by-attack

19   assessment and attack-by-attack evidence with respect to not

20   only damages, but liability.

21             So the efficiency of consolidating is not as great

22   as it might appear at first glance.

23             And I'm a little worried about the idea of

24   consolidating a huge case, 639 Plaintiffs, more than ten

25   times the size of the portion of Zambon that is before me,

1   when the efficiencies to be gained are a little harder to

2   assess than one might believe at first glance because of the

3   attack-by-attack assessment of not just damages, which is

4   Plaintiff by Plaintiff, but liability.  And so I'm just not

5   sure that what at first glance might appear to be a

6   consolidation would improve the efficiency greatly.  It will

7   improve it a little bit, but I'm not sure it will improve it

8   greatly.

9          MR. REDDICK:  Your Honor, yes.  And we're familiar

10  with that approach.

11         I think in our mind, you know, a few efficiencies

12  are clear.  One is that in terms of the different types of

13  attacks, often inferences can be made and liability can be

14  found, I think, more quickly and efficiently.

15         You know, for example, we had a prior case that

16  just recently got a final judgment before Judge Sullivan.

17  And we had nine attacks that involved a certain type of IED

18  that was tied back to Iran.  And the Court was able to make

19  a finding that could apply to all of those EFP attacks, and

20  so it sort of streamlined the Court's work in that respect.

21         I think also in terms of the Plaintiffs, the

22  experts can use a lot of efficiencies to make certain

23  findings about, for example, which specific terrorist cells

24  or units were being supported by Iran that would then apply

25  to all of the victims that were attacked by those specific

1    types of terrorists.  And also in terms of the geographic

2    areas, your Honor, those can apply uniformly to all of the

3    victims who are injured in those areas of the country.

4         So I acknowledge that it's not as efficient as,

5    say, for a class action or something along those lines.  But

6    we still think there are efficiencies; and of course, we'd

7    be willing to work flexibly to make sure that there's as

8    many efficiencies as possible.

9         THE COURT:  I appreciate that.  And I think that's

10   helpful.  As I said, I'm going to look at this and think it

11   through very carefully.

12        Let me ask one question, one other question, with

13   respect to your clients.

14        Even though the Zambon case is two years or three

15   years ahead of the Martino case in terms of when it was

16   filed, and indeed I think a little over two years ahead in

17   terms of the entry of default, am I assuming correctly that

18   you think the Zambon case isn't going to be ready in terms

19   of these 49 Iraq-based Plaintiffs to move forward to

20   judgment until the same time when this much larger group of

21   Plaintiffs in the Martino case would be ready to move

22   forward in terms of your gathering information and so forth?

23        MR. REDDICK:  Yeah, your Honor.  Two things to

24   that question.

25        So first, I think the approach we've had in

1    Martino has been to start early with FOIA litigation, which

2    wasn't a tactic that was done in Zambon.  So we've actually

3    filed a number of FOIA lawsuits against the various federal

4    agencies, which have started to respond to those lawsuits by

5    responding to our FOIA requests.

6        In Zambon, we've had less success getting the

7    various agencies to comply with the FOIAs and hadn't to date

8    filed FOIA litigation in that case.  And so I think in terms

9    of evidence collection, the two may be on similar tracks.

10        I think to the extent some of the Zambon victims

11    will be ahead of some of the Martino victims, we would be

12    able to keep that in mind as we put together a bellwether

13    case and/or various tranches so that certain clients weren't

14    prejudiced by delays from other clients.

15        THE COURT:  And that, too, is helpful.  It's a lot

16    easier for me to contemplate over the course of the next,

17    let's just say, two years being able to address not only the

18    Afghanistan-based attacks in both Zambon and Cabrera, but

19    also the Iraq-based attacks in Zambon than it is for me to

20    contemplate in that two-year period doing all of that plus

21    all of the 639 Plaintiffs in Martino.

22        So in terms of the Court resources, you might be

23    better off with two judges than one in terms of getting

24    things done.  I just need to say that.  I'm not an infinite

25    well of resources; I'm a single judge with a couple law

1    clerks.  And you just heard the kind of demands that

2    Mr. Branson is going to be placing on me as well as on

3    special masters as he moves those Plaintiffs forward.  It's

4    going to take a lot of my time and attention, and there are

5    other myriad matters on my docket as well as

6    responsibilities I have for the federal judiciary more

7    generally.

8            And I'm going to have to think about that, too,

9    because I need to be having efficiencies in mind but also

10   the interests of the various Plaintiffs and various cases.

11   And I know you represent them all, and that makes it a

12   little easier because you have that in mind.  But this is

13   not going to be a simple decision for me with respect to

14   consolidation, primarily because as I said, although you've

15   addressed it somewhat, the efficiencies aren't as great as

16   they might appear given the fact that liability

17   determinations will in all likelihood be attack by attack

18   thus far in Zambon.

19            MR. REDDICK:  Yes, your Honor.  And we appreciate

20   that and understand that the motion is fully within the

21   Court's discretion.  And so we defer to the Court of course

22   in terms of its resources.

23            I think if it's helpful, we expect to be well

24   behind the Cabrera and Zambon Afghanistan-injured clients.

25   I don't think we would be interrupting their process moving

1    forward.  I think we're still likely a year or two away from

2    having sufficient evidence to be able to present a

3    significant tranche of victims.  And by "significant," I

4    mean -- looking at the bellwether case, I think we're still

5    likely two years away from that.

6         Additionally, one of the motivations for

7    consolidating was the idea that we could use some of the

8    efficiencies from the Afghanistan-injured clients going

9    forward and being sort of on the tail end of them because,

10   for example, in the Court's bellwether ruling, there were

11   certain findings regarding Iran's support for Al-Qaeda.  And

12   while our victims were injured in Iraq, many of them,

13   especially Martino, were injured by various Al-Qaeda

14   affiliates in Iraq.  And the Court's work on the

15   Afghanistan-injured clients isn't necessarily wasted in

16   terms of how that would apply to the Iraq-injured

17   Plaintiffs.

18        But again, we defer to the Court.  If the Court

19   feels its docket is -- would be overloaded, we're certainly

20   not meaning to interrupt the flow of the Afghanistan-injured

21   clients.  We are also co-counsel on the Cabrera case for the

22   Afghanistan-injured clients.  So again, we're not looking to

23   interrupt them.  And I don't believe this would.  I think

24   we'd be well behind.  But again, we defer to the Court.

25        THE COURT:  Of course I'm not even mentioning the

1    concerns that Judge Moss might have.  I mean, he has a

2    docket and it's actually a busier docket than mine, given

3    what he has before him.

4            In any event --

5            MR. COWAN:  Your Honor, I'm sorry.  This is Robert

6    Cowan.  My firm originally brought the Zambon claimants

7    before you.  You may remember the first time that

8    Mr. Branson and I were on a telephone conference with you,

9    you suggested that we get together and see how we could

10   create efficiencies by working together.  And the

11   partnership with Willkie, Farr grew out of that same spirit

12   that, as we've indicated, just tail onto what Mr. Reddick

13   just said.

14           As we've indicated in all of our recent status

15   reports, we had always envisioned that the Zambon

16   Iraq-injured Plaintiffs would tail onto -- would follow the

17   Court's adjudication of the Afghanistan-injured to the

18   extent that the Court was unable or unwilling to deal with

19   those simultaneously.

20           And because we are partners with Mr. Branson's

21   firm, our focus has been on getting the information pulled

22   together for the Afghanistan-injured claimants in the

23   Cabrera/Zambon case.  So that really kind of puts the

24   Iraq-injured Zambon Plaintiffs more in line with where the

25   Martino claimants are in terms of case development at this

1     point.  So I just wanted to give that additional color from

2     my firm's perspective.

3              THE COURT:  I appreciate that, Mr. Cowan.  Thank

4     you very much.

5              And the last thing I would say is, one of the

6     efficiencies that sometimes can be gleaned by having

7     liability in two matters joined together is true here, but

8     there's also a means whereby a lot of the evidence that is

9     introduced on liability in one matter can be utilized in

10    another matter.  That happens in these Foreign Sovereign

11    Immunities Act cases every day virtually in this Court.  So

12    some of that efficiency that consolidation otherwise is

13    prompting can happen anyway, because judges do adopt records

14    from other cases that have been established through expert

15    reports and State Department materials and so forth.

16             In any event, I will look at this; and as I said,

17    I will be talking to Judge Moss about it as well, and you'll

18    hear from me sometime in the near future.  I can't promise a

19    particular date because I have a couple things ahead of me

20    that are going to delay my ability to devote full attention

21    to these kind of matters.  But you will hear from me

22    certainly before the end of the year.

23             MR. REDDICK:  Thank you, your Honor.

24             THE COURT:  Thank you.

25             Unless there's anything else, I appreciate the

1    attention and input you've all given to this today and

2    continue to give to it.  And I look particularly on the

3    Afghanistan side for the future filings.  Several have been

4    identified in a case management order, perhaps.  But several

5    upcoming filings.

6              Thank you.

7              MR. REDDICK:  Thank you.

8              MR. BRANSON:  Thank you, Judge Bates.

9              MR. COWAN:  Thank you, your Honor.

10              (Proceedings concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **<u>CERTIFICATE</u>**

2

3                      I, LISA EDWARDS, RDR, CRR, do hereby

4      certify that the foregoing constitutes a true and accurate

5      transcript of my stenographic notes, and is a full, true,

6      and complete transcript of the proceedings produced to the

7      best of my ability.

8

9

10                     Dated this 28th day of July, 2023.

11

12                 <u>/s/ Lisa Edwards, RDR, CRR</u>
                   Official Court Reporter
13                 United States District Court for the
                     District of Columbia
14                 333 Constitution Avenue, Northwest
                   Washington, D.C. 20001
15                 (202) 354-3269

16

17

18

19

20

21

22

23

24

25