# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AUGUST CABRERA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ISLAMIC REPUBLIC OF IRAN, <br><br> Defendant. | Case No. 19-cv-3835-JDB |
| MARK ZAMBON, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ISLAMIC REPUBLIC OF IRAN, <br><br> Defendant. | Case No. 18-cv-2065-JDB |

**AFGHANISTAN-BASED PLAINTIFFS' OBJECTIONS TO
SPECIAL MASTER REPORTS AND RECOMMENDATIONS
<u>FOR TRANCHE 1 PLAINTIFFS</u>**

**INTRODUCTION**

Plaintiffs are American service members and civilians, and their family members, who were injured or killed in Afghanistan by the Taliban-led terrorist Syndicate.  They bring claims against Iran under the FSIA's terrorism exception (28 U.S.C. § 1605A) for providing material support for these attacks.  *See* Second Amended Complaint (Dkt. 30), ¶¶ 1-5, 10-12.  In line with the Court's Administrative Plan (Dkt. 128), Plaintiffs filed Reports and Recommendations from ten Special Masters assessing the claims of the 800 non-bellwether Plaintiffs in Tranche 1.  Dkt. 231.  For 796 of those 800 Plaintiffs, we request that the Court enter final judgment matching the Special Masters' recommendations.  *See id*.  For the remaining four, Plaintiffs object to the recommendations for the reasons described below.  The Court reviews these objected-to recommended findings of fact and conclusions of law de novo.  Fed. R. Civ. P. 53(f)(3)-(4); *see also* Order Adopting Administrative Plan Concerning Special Masters (Dkt. 128),[1] at 5 ("The Court will review the Special Master's findings, conclusions, and recommendations contained in the reports consistent with Federal Rule of Civil Procedure 53.").

**I.    HEATHER DANIELS (STEPMOTHER TO CPL DEVIN DANIELS, KIA, AUGUST 25, 2011)**

Special Master Grubbs recommended a finding that Plaintiff Heather Daniels lacked standing, because he did not consider her to be the functional equivalent of a biological mother to CPL Devin Daniels (KIA).  *See* Tranche 1 Special Master's Report and Recommendation (Shelby R. Grubbs) ("Grubbs Rep."), Dkt. 231-5, at 163-67.  Plaintiffs respectfully disagree.

Heather was an active part of Devin's life for more than two decades.  They first met when Devin was between three and five years old, after Heather started dating his father.  *See*

---

[1] Unless otherwise specified, citations to "Dkt." are to the docket entries in *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835-JDB.

Decl. of Heather Frances Daniels ¶ 4, Dkt. 231-5, Ex. A at 415-18.[2]  By the time Devin was between five and seven, Heather was living with Devin's father, and the couple married three years later.  *Id.*  Devin lived with Heather since he was around five to seven years old—spending every other week, from Friday to Sunday, plus several weeks during the summer break and every other Thanksgiving and Christmas with her.  *Id*.  Heather attended Devin's sporting events.  *Id.*  She and Devin's father paid monthly child support for Devin without fail and regularly paid for additional items like Devin's activities and clothes.  *Id.*  Heather provided for Devin's needs until he finished high school and began attending college.  *Id.*  Heather considers Devin to be her biological son, *id.*, and the two confided in each other about a range of personal subjects, *id*. ¶ 6.  In fact, Devin shared information with Heather that he did not even share with his father.  *Id*. ¶ 5.  Their bond deepened after the birth of Devin's two siblings—they were a tight-knit family.  *Id.*

　　　　Heather's reaction to her son's death speaks volumes about the closeness of their relationship.  *Id*.¶¶ 8-9.  After learning the news, she began to sob and shake uncontrollably and could not drive home.  *Id.* ¶ 8.  Even now, that day remains extremely traumatic for her to relive.  *Id.*  Years later, when the Taliban regained control in Afghanistan, Heather was enraged and inconsolable for days.  *Id.* ¶ 9.  She does not believe she will ever fully heal from the loss of her son.  *Id.*  To this day, she cannot look at a photo of Devin without "dissolving into puddles of tears and intense regret" over what has been lost.  *Id*. ¶ 5.

　　　　Special Master Grubbs recommended that Heather was not the functional equivalent of a biological family member to CPL Daniels.  *See* Grubbs Rep. at 165-67.  To be sure, he found that "she obviously formed a strong and loving relationship with CPL Daniels[.]"  *Id.* at 165.

---

[2] Heather Daniels's declaration states that she met Devin in 1991 when he was "approximately 5 years old."  Devin was born in 1988 and was 3 years old in 1991.  Either way, Heather's declaration establishes that she became a part of Devin's life when we was very young.

But "[c]rucially," in Special Master Grubbs's view, she was not the functional equivalent of a mother because CPL Daniels's "biological mother retained primary custody." *Id.*

But this Court has never required a parent to have primary custody to be found the functional equivalent of a biological family member. Indeed, the Court's bellwether opinions approvingly cited *Valore v. Islamic Republic of Iran*, explaining that it "consider[ed] a stepbrother 'who remembers fishing and swimming with and was treated like a brother by' the victim of a terrorist attack to be 'the functional equivalent of a brother.'" *Cabrera v. Islamic Republic of Iran*, 2022 WL 2817730, at *42 n.33 (D.D.C. July 19, 2022) (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 80 (D.D.C. 2010)). Requiring primary custody never factored into the functional-equivalency test. Instead, determining functional equivalency is a fact-intensive inquiry into the nature of the relationship. *See id.* Satisfying strict custody requirement for functional-equivalent status exceeds what this Court's precedent requires.

Moreover, Special Master Grubbs appears to have made a factual error. As part of his rationale, he stated (at 167) that "Ms. Daniels did not reside in the same household as the decedent." But Heather Daniels in fact did live in the same household as CPL Daniels. As she states in her declaration, and as Special Master Grubbs acknowledges, CPL Daniels spent over ten years living in Heather's household every other weekend, plus extended periods during holidays and summer breaks. Grubbs Rep. at 165; Decl. of Heather Frances Daniels ¶ 4.

Denying Heather recovery would also treat her differently than a similarly situated bellwether Plaintiff. Jessie Baldridge married Chris Baldridge, the biological father of direct victim SGT Dillon Baldridge (KIA). *See* Decl. of Jessie Baldridge ¶ 4, Dkt. 116-2, Compendium of Bellwether Plaintiffs' Damages Declarations Provided to Special Master Hon. Rosalyn M. Chapman (Ret.) at 9. The Court determined that Jessie was the functional equivalent

3

of an immediate family member to Dillon, citing pages 6-7 of Special Master Chapman's report. *Cabrera v. Islamic Republic of Iran*, 2023 WL 3496303, at *5 n.7 (D.D.C. May 16, 2023). As that Report and Recommendation explains, "Jessie, who was 36 years old when Dillon was killed, began living with Chris when Dillon was ten years old. Until Dillon graduated high school, he lived with Chris and Jessie every other weekend, every other holiday and for two weeks each summer. After he joined the military, Dillon stayed with them whenever he was on leave." Report and Recommendation of Special Master Hon. Rosalyn Chapman (Ret.), Dkt. 116-2, at 6 (internal citations omitted). Given the similarity of Heather's and Jessie's living arrangements with their stepsons—and given that Heather lived with her son for about five years more than Jessie did—Heather should also be found to be the functional equivalent of an immediate family member.[3]

Recognizing that the Court might disagree with his analysis, Special Master Grubbs did evaluate evidence of her damages. *See* Grubbs Rep. at 170-71 & n.22. The Court should accept that evidence and award Heather a baseline award of $5,000,000 in solatium damages.

## II.   GEORGIA PRIEST (STEPDAUGHTER TO 1SG JOHN BLAIR, KIA, JUNE 20, 2009)

Similarly, Special Master Byrne found that Plaintiff Georgia Priest lacked standing because he did not consider her to be the functional equivalent of a daughter to 1SG John Blair (KIA). *See* Special Master Christopher A. Byrne's Report and Recommendation for Damages

---

[3] Denying Heather the ability to recover would also treat her differently than Robert Cabrera. As explained above, she and Devin's father paid monthly child support for Devin, in addition to regularly paying for additional items like Devin's activities and clothes. Decl. of Heather Frances Daniels ¶ 4. She provided for Devin's needs until he finished high school and began attending college. *Id*. The Court considered similar factors in finding that Robert Cabrera was the functional equivalent of a father to LTC David Cabrera. *See Cabrera*, 2022 WL 2817730, at *42 n.33 (noting "Robert provided for David without any compensation and raised David as part of his family."). It should do so again here.

Awards for Fifty (50) Non-Bellwether Plaintiffs for Attacks Occurring in Afghanistan in 2007, 2008 & 2009 ("Byrne 2007-2009 Rep."), Dkt. 231-2, at 135-38. Plaintiffs respectfully disagree.

Georgia Priest first met and began living with 1SG Blair when she was around 18 years old. Decl. of Georgia Priest ¶ 4, Dkt. 231-2, Ex. A at 357-359. He became Georgia's stepfather soon after in 2003. *Id.* Georgia describes 1SG Blair as "the best father you could ask for," and "an extraordinarily devoted family man." *Id.* ¶ 5. In part because Georgia's biological father died when she was very young, 1SG Blair was the only father she ever knew. She considers him the functional equivalent of her biological father. *Id.* ¶¶ 4, 6. It took more than 10 years for Georgia to say John's name "without breaking down," because she "truly loved [her] father." *Id.* ¶ 5. Georgia emphasizes that her father was a wonderful grandfather to her son and helped take care of him as well. *Id.* ¶ 6.

Even though 1SG Blair is the only father Georgia has ever known, Special Master Byrne recommends that Georgia not be considered the functional equivalent of 1SG Blair's biological daughter. *See* Byrne 2007-2009 Rep. at 138. He acknowledged that "she has suffered emotional distress as a result of the killing of 1SG John Blair," but because Georgia had reached the age of majority when her mother and 1SG Blair married, and because "there is no record of an official adoption" or detailed overview of their living circumstances in the same household, he did not believe she could be considered a functional equivalent of a biological daughter. *Id.* Special Master Byrne cites no case law supporting these factors, and Plaintiffs have been unable to locate any precedent that categorically limits the functional-equivalency test to children who lived with a victim only before reaching the age of majority.

That is too restrictive a view to take of the functional-equivalency test, especially for Georgia Priest. As discussed, Georgia never knew her biological father. 1SG Blair is the only

5

individual who filled that role in her life.  In her declaration, Georgia continues to refer to him as her father—a fact that Special Master Byrne notes.  *Id.* at 137.  Accordingly, given that Georgia knew no father until 1SG Blair filled that vacuum in her life, this Court should consider her the functional equivalent of a biological family member.

Other FSIA cases support that conclusion.  Georgia's situation is similar to that of Vanessa Chism, a plaintiff in *Fritz v. Islamic Republic of Iran*, D.D.C. No. 15-cv-456 (RDM).  Vanessa was the stepmother of direct victim Johnathan Bryan Chism.  *See* Report and Recommendation of Special Master Regarding Compensatory Damages, *Fritz*, Dkt. 90 at 46.  They lived together in the same household for portions of a three-year period—about one week per month—but "Bryan," as he was known, was over 18 for that whole period.  *Id.*; *see also Fritz v. Islamic Republic of Iran*, 2018 WL 5046229, at *6 (D.D.C. Aug. 13, 2018).  In finding Vanessa to be the functional equivalent of a mother to Bryan, the Court noted that "Vanessa treated Bryan as, and considered Bryan to be, one of her sons," and that "Bryan confided in Vanessa and sought her advice."  *Fritz*, 2018 WL 5046229, at *22.  Georgia's situation parallels Vanessa's.  Like Vanessa, Georgia lived with the direct victim for a period after she turned 18.  Georgia considered 1SG Blair to be the functional equivalent of her biological father and documented her close relationship with him.  Decl. of Georgia Priest ¶¶ 4, 6.

Because Georgia was already 18 when that relationship was established, Plaintiffs request a modified award of $3,000,000 in solatium damages for Georgia Priest.  The *Fritz* Special Master recommended $1,500,000 in solatium damages for Vanessa Chism in part because the duration of her relationship with her son was shorter, and plaintiffs did not object.  *See Fritz*, Dkt. 90 at 46-47; *see also generally* Plaintiffs' Motion for Approval of Damages Award under FRCP 53(f) and Entry of Final Judgment as to the U.S. National Plaintiffs under FRCP 54(b),

6

*Fritz*, Dkt. 91. But unlike Vanessa, who had other sons alongside the direct victim Bryan, Georgia never knew her biological father. 1SG Blair was the only father figure she knew. It took Georgia more than 12 years to say his name without breaking down—even today, she cannot talk about 1SG Blair for long before suffering a panic attack. Decl. of Georgia Priest ¶ 8. Describing her father in her declaration caused Georgia to cry as it was "exceedingly difficult" to talk about her father given their tight bond. *Id.* ¶ 5.

Plaintiffs thus ask the Court to find Georgia Priest the functional equivalent of a biological family member to 1SG Blair and award her $3,000,000 in solatium damages.

### III.    DALLAS BRYANT (STEPSON TO 1SG JOHN BLAIR, KIA, JUNE 20, 2009)

Unlike Georgia Priest, Special Master Byrne recommended that the Court find her younger brother, Dallas Bryant, to be the functional equivalent of a biological son to 1SG John Blair (KIA). Byrne 2007-2009 Rep. at 132-35. But he recommended that Dallas receive only 30 percent of the *Peterson II* baseline amount. Plaintiffs respectfully disagree with this recommendation and request the baseline $5,000,000 in solatium damages.

Dallas Bryant first met and began living with 1SG Blair in around 2002, when Dallas was about 15 years old. Decl. of Dallas Bryant ¶ 4, Dkt. 231-2, Ex. A at 348-351. 1SG Blair became Dallas's stepfather in 2003. *Id.* Dallas does not remember his biological father, who died when Dallas was three. *Id.* 1SG Blair filled this void in his life—he was the only father Dallas has ever known. *Id.* Dallas called him "Dad." *Id.* And Dallas's dad did things any father would do with his son. For example, he made sure he came to all of Dallas's track sessions and cross-country meets. *Id.* ¶ 5. Dallas missed him immensely while his dad was deployed. *Id.* ¶ 7. But even when he was overseas, 1SG Blair would write letters to Dallas, Dallas's sister (Georgia), and Dallas's mother, keeping in touch with them. *Id.*

7

Because 1SG Blair entered Dallas's life when Dallas was about 15 years old, Special Master Byrne concluded a downward departure was appropriate. *See* Byrne 2007-2009 Rep. at 134-35. In particular, Special Master Byrne noted that the Court varied downward for two of LTC Cabrera's children, with whom LTC Cabrera did not live fulltime. *Id.* But those facts do not warrant such a large downward departure here. Unlike LTC Cabrera's children, Dallas did not split custody with another parent—when 1SG Blair became Dallas's father, they lived together fulltime. Indeed, 1SG Blair is the only father that Dallas has ever known. His declaration speaks to the terrible hurt he experienced when that relationship was taken away from him after six years. *See* Decl. of Dallas Bryant ¶¶ 8-10. Under these circumstances, the full baseline should be awarded. But at the very least, Dallas should be entitled to 80 percent of the baseline, like Gillian and Corbin Cabrera. *See Cabrera*, 2022 WL 2817730, at *50.

## IV.         K.F. (SON TO SSG THOMAS FOGARTY, KIA, MAY 6, 2012)

Special Master Byrne also recommended that Plaintiff K.F., who was five years old when his father SSG Thomas Fogarty died, receive an award of $3,000,000 instead of Plaintiffs' requested award of $5,000,000 in solatium damages. Special Master Christopher A. Byrne's Report and Recommendation for Damages Awards for Forty-Nine (49) Non-Bellwether Plaintiffs for Attacks Occurring in Afghanistan in 2010, 2011, 2012, & 2013 ("Byrne 2010-2013 Rep."), Dkt. 231-2, at 83-85; *see also* Decl. of Stephanie Fisher on behalf of K.F. ¶¶ 3, 5, Dkt. 231-2, Ex. A at 636-39. He made this recommendation solely because of K.F.'s age at the time of the attack. *See* Byrne 2010-2013 Rep. at 84-85. Plaintiffs respectfully believe this is a mistake based on this Court's previous awards to bellwether plaintiffs.

K.F. had a strong father-son relationship with his father, SSG Thomas Fogarty. Decl. of Stephanie Fisher on behalf of K.F. ¶ 4. SSG Fogarty was deployed when K.F. was born, but he was able to arrive within 24 hours of his birth and spend time with his son. *Id.* SSG Fogarty

8

returned from his deployment when K.F. was one year old. *Id.* They adored each other and spent a lot of time together. *Id.* K.F. would beam into his father's eyes, with a look of complete wonder and awe and joy. *Id.* With K.F.'s mother battling addiction, K.F. relied on his father for love and stability. *Id.* The two were inseparable, and K.F. could not get enough of his father— he ate with him, slept with him, and sat on his lap at every opportunity. *Id.*

K.F. was five years old when his grandmother told him that his father had been killed in Afghanistan. *Id.* ¶ 5. K.F. understood and burst into tears. *Id.* After his father's death, K.F. became so wrought with anxiety that he began to compulsively wash his hands and developed a stutter in his speech. *Id.* ¶ 6. Because his mother was addicted to drugs and did not have custody, his father was the one constant in his life; without him, his world "shattered." *Id.*

For the first few years after his father's death, K.F. struggled in school. *Id.* ¶ 7. He had so much anxiety resulting from his father's death that K.F. began to attended counseling and art therapy. *Id.* The handwashing and stuttering resolved, but K.F. still struggled with school. *Id.* As he grows older, he becomes more painfully aware that other teenagers have their fathers. *Id.* K.F. continues to "desperately yearn[ ]" for his father's guidance. *Id.* ¶ 8. His grandmother does not believe that K.F. will ever recover from the loss of his father. *Id.*

K.F. was five years old when his father died. Under the Court's previous opinions, he is entitled to a full baseline award. Plaintiffs respectfully submit that Special Master Byrne was mistaken in believing otherwise. *See* Byrne 2010-2013 Rep. at 85. For example, the Court has already considered the claim of Plaintiff K.M.G.V., who was four at the time of her father's death. *See* Dkt. 137-1 at 4; *see also* Special Master Stephen A. Saltzburg's Report and Recommendations Regarding Damages for 40 Bellwether Plaintiffs, Dkt. 116-4, at 75. The Court awarded her the full baseline damages award of $5,000,000. *Id.* Conversely, the Court

9

varied downward for two younger Plaintiffs, ages three years and three months, who were too young to remember or understand what had happened. *See* Dkt. 137 at 21-22. And while varying downwards for these two younger Plaintiffs, the Court specifically noted that it was not varying downward for their six-year-old sibling, E.B., who was old enough to understand. *Id.* Because the Court has previously awarded full baseline awards for a four and a six-year-old Plaintiff, and because K.F. not only remembers his father but immediately grasped the gravity of the situation when his father died (burst into tears and immediately displayed physical manifestations of stress from his father's death), a downward departure for K.F. is inappropriate.

## CONCLUSION

The Court should find that Heather Daniels and Georgia Priest are functional equivalents of biological family members to their loved ones, award Heather Daniels $5,000,000 in solatium damages, award Georgia Priest $3,000,000 in solatium damages, and award both Dallas Bryant and K.F. $5,000,000 in solatium damages.

Dated: August 25, 2023

Respectfully submitted,

*/s/ Joshua D. Branson*
Joshua D. Branson (D.C. Bar No. 981623)
Andrew E. Goldsmith (D.C. Bar No. 1007074)
Grace W. Knofczynski (D.C. Bar No. 1500407)
James A. Ruck (D.C. Bar No. 1739309)
Kellogg, Hansen, Todd,
  Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com
gknofczynski@kellogghansen.com
jruck@kellogghansen.com

Ryan R. Sparacino (D.C. Bar No. 493700)
Sparacino PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com

*Counsel for Cabrera Plaintiffs and Zambon Afghanistan-Based Plaintiffs*

Robert W. Cowan
DC Bar No. TX0148
Bailey Cowan Heckaman PLLC
Four Oaks Place
1360 Post Oak Blvd., Suite 2300
Houston, Texas 77056
Telephone: (713) 425-7100
Facsimile: (713) 425-7101
rcowan@bchlaw.com

*Counsel for Zambon Afghanistan-Based Plaintiffs*

11

**CERTIFICATE OF SERVICE**

      I hereby certify that on this 25th day of August, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

                                            */s/ Joshua D. Branson*
                                            Joshua D. Branson