**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AUGUST CABRERA et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 19-3835 (JDB) |
| ISLAMIC REPUBLIC OF IRAN, | |
| Defendant. | |
| MARK ZAMBON et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 18-2065 (JDB) |
| ISLAMIC REPUBLIC OF IRAN, | |
| Defendant. | |

**MEMORANDUM OPINION**

Between 2006 and 2019, a terrorist Syndicate comprising al-Qaeda, the Taliban, the Kabul Attack Network, and the Haqqani Network (collectively, the "Syndicate") perpetrated numerous terrorist attacks against American servicemembers and civilians in Afghanistan. Victims of those attacks and their family members brought these coordinated suits against the Islamic Republic of Iran under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, alleging that Iran provided material support for extrajudicial killings to the Syndicate. This Court previously entered default judgment for certain "bellwether" plaintiffs, adopted an administrative plan to govern further proceedings, and appointed special masters to make recommendations as to the remaining plaintiffs. The present opinion concerns plaintiffs' motion

1

for default judgment as to the plaintiffs in "Tranche 1." See Afghanistan-Based Pls.' Mot. For Default J. for Tranche 1 Pls. [ECF No. 231] ("Mot."). On May 31, 2024, the Court entered an order granting default judgment to 653 of these "Tranche 1" plaintiffs and indicated that an opinion would be forthcoming. Order [ECF No. 264] ("Tranche 1 Order"). The Court now elaborates on its reasoning as to the claims of those plaintiffs.

## I.   Background

On July 19, 2022, the Court issued a Memorandum Opinion setting out a framework for analyzing the attacks at issue in Cabrera and Zambon, as well as plaintiffs' related claims. See Cabrera v. Islamic Republic of Iran ("Cabrera I"), Civ. A. No. 19-3835 (JDB), 2022 WL 2817730 (D.D.C. July 19, 2022). In laying out this framework, the Court analyzed the claims of twenty-three plaintiffs relating to eleven attacks ("bellwether plaintiffs" and "bellwether attacks"). Id. at *1. The Court determined that "the Syndicate committed all eleven attacks," "Iran's material support substantially contributed to the Syndicate's ability to do so," and Iran's support was the proximate cause of the deaths and injuries that formed the basis for the bellwether plaintiffs' claims. Id. at *15; see id. at *41 ("[P]laintiffs' injuries were not only foreseeable: they were the intended result of Iran's support.").

The Court then determined that each bellwether plaintiff was entitled to recover under the FSIA's "private right of action against state sponsors of terrorism for plaintiffs who are United States nationals, members of the armed forces, government employees or contractors, or legal representatives of those people," which authorizes suits "'for personal injury or death caused by' acts including extrajudicial killing and hostage taking." Id. at *41–42 (quoting 28 U.S.C. § 1605A(c)). Immediate family members of victims—and functional equivalents of immediate family members—were entitled to recover "solatium awards," which offer compensation for "the

mental anguish, bereavement, and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent's society and comfort." Id. (cleaned up).  On May 16, 2023, the Court held that additional plaintiffs associated with the bellwether attacks were entitled to recover solatium awards and awarded damages and prejudgment interest to each plaintiff associated with the bellwether attacks. See Cabrera v. Islamic Republic of Iran ("Cabrera II"), Civ. A. No. 19-3835 (JDB), 2023 WL 3496303, at *4–12 (D.D.C. May 16, 2023).

The Court also entered a separate Order adopting an administrative plan to "govern further proceedings as to the damages awards for the plaintiffs associated with Tranche 1 in this litigation." Order Adopting Admin. Plan Concerning Special Masters [ECF No. 128] ("Admin. Plan") at 1. The Court instructed the special masters to assess each family-member plaintiff's standing under 28 U.S.C. § 1605A(c), which, as relevant here, requires each plaintiff to (1) be a U.S. national, and (2) "prove that they are an immediate family member, or the functional equivalent, of an individual killed or physically injured."  Admin Plan at 2–3.  Then, the special masters would recommend findings of fact on "the scope of each plaintiff's compensatory damages . . . guided by the provisions of 28 U.S.C. § 1605A, this Court's [July 19, 2022] Memorandum Opinion, and any further orders that this Court may enter." Id. at 3 (cleaned up).

The Court appointed David L. Broom, Christopher A. Byrne, Professor Eric D. Green, Paul G. Griffin, Shelby R. Grubbs, Lester J. Levy, Dr. Susan Meek, Brad Pigott, Professor Stephen Allan Saltzburg, and Professor C. Jackson Williams as special masters (the "Tranche 1 special masters").  Order Appointing Special Masters [ECF No. 129].  The special masters submitted their reports on August 1, 2023.  See Mot., Exs. 1–10.  On February 29, 2024, the Court issued an opinion awarding damages to 125 of the Tranche 1 plaintiffs included in Special Master Broom's

report.  Cabrera v. Islamic Republic of Iran ("Cabrera III"), Civ. A. No. 19-3835 (JDB), 2024 WL 864092 (D.D.C. Feb. 29, 2024).  On May 31, 2024, the Court awarded judgment to 653 plaintiffs assigned to the Tranche 1 special masters.  See Tranche 1 Order.  The Court now addresses those judgments, which will resolve the claims of all but sixteen Tranche 1 plaintiffs.[1]

## II.   Subject-Matter Jurisdiction and Liability[2]

This Court previously found that (1) a terrorist Syndicate operated in Afghanistan during the relevant time period of 2006–2017; (2) Iran provided material support for that Syndicate; and (3) the Syndicate was responsible for each of the bellwether attacks in this case.  Cabrera I, 2022 WL 2817730, at *6–27.  The Court further found that the Syndicate was responsible for the thirty-three attacks associated with Special Master Broom's report.  Cabrera III, 2024 WL 864092, at *2–3.  The Court now finds that the Syndicate was likewise responsible for the attacks associated with the plaintiffs listed in the Tranche 1 Order.

From at least 2006 to 2019, multiple terrorist groups—including the Taliban, the Haqqani Network, the Kabul Attack Network, and al-Qaeda—made up a terrorist "Syndicate" in Afghanistan.  The Syndicate shared close strategic, tactical, and operational coordination, as well as a common goal: re-establishing the Islamic Emirate by driving the United States and its allies out of Afghanistan through the killing and wounding of American troops.  Cabrera I, 2022 WL

---

[1] The Court requested and received further briefing regarding nineteen plaintiffs, see Order [ECF No. 262] and Response to Court's Order [ECF No. 268] ("Supp. Dec.").  The Court agrees with plaintiffs' requests of $5 million to Brian Harper, $2.5 million to Holly Harper, $2.5 million to Joseph Hulsey Jr., $5 million to Lisa Rowe Hicks, $3.5 million to Steven Walls Sr., and $4 million to George McClintock III, and will award those amounts in its accompanying Order.  For reasons the Court will discuss, see infra subsection V.C.2., the Court will award Angela Harper $4 million.  The Court is in the process of reviewing the claims of the remaining twelve plaintiffs.  Additionally, the Court is still considering whether to grant solatium damages to plaintiffs A.P., L.R.G., Stephanie Hayhurst, and Georgia Priest.

[2] Under the FSIA, a court has personal jurisdiction over a defendant where the court has subject matter jurisdiction and the defendant has been served.  GSS Grp., Ltd. v. Nat'l Port Auth., 680 F.3d 805, 811 (D.C. Cir. 2012) (citing 28 U.S.C. § 1330(b)).  Plaintiffs successfully served Iran through the diplomatic process.  Cabrera I, 2022 WL 2817730, at *33.  Accordingly, so long as the Court has subject-matter jurisdiction over plaintiffs' claims, it also has personal jurisdiction over Iran.

2817730, at *6.  Iran—a designated state sponsor of terrorism—provided material support to the

Syndicate in the form of weapons, training, financial support, and safe haven.  Id. at *9–12.  The

Syndicate was responsible for each of the following attacks associated with the plaintiffs listed in

the Tranche 1 Order.

1.	July 5, 2007 IED Attack, Paktika Province
2.	July 23, 2007 IED Attack, Paktika Province
3.	August 28, 2007 Suicide Attack, Paktia Province
4.	November 12, 2007 IED Attack, Paktika Province
5.	December 12, 2007 IED Attack, Paktia Province
6.	January 2, 2008 Complex Attack, Khost Province
7.	May 9, 2008 Complex Attack, Paktia Province
8.	May 28, 2008 IED Attack, Khost Province
9.	June 3, 2008 IED Attack, Khost Province
10.	June 18, 2008 RPG Attack, Paktika Province
11.	September 17, 2008 IED Attack, Paktia Province
12.	February 10, 2009 Suicide Attack, Khost Province
13.	March 8, 2009 IED Attack, Paktia Province
14.	June 2, 2009 IED Attack, Paktia Province
15.	June 20, 2009 Complex Attack, Khost Province
16.	September 4, 2009 Complex Attack, Paktika Province
17.	September 30, 2009 Suicide Attack, Khost Province
18.	November 4, 2009  Complex Attack, Paktika Province
19.	July 10, 2010 IED Attack, Paktika Province
20.	December 2, 2010 IED Attack, Khost Province
21.	December 5, 2010 Suicide Attack, Paktia Province
22.	March 19, 2011 Complex Attack, Khost Province
23.	July 10, 2011 Complex Attack, Paktika Province
24.	July 29, 2011 IED Attack, Paktia Province
25.	October 14, 2011 IED Attack, Khost Province
26.	April 3, 2012 IED Attack, Khost Province
27.	May 6, 2012 IED Attack, Paktia Province
28.	June 1, 2012 Complex Attack, Khost Province
29.	August 1, 2012 Complex Attack, Paktika Province
30.	August 7, 2012 Insider Attack, Paktia Province
31.	October 1, 2012 Suicide Attack, Khost Province
32.	November 3, 2012 IED Attack, Paktia Province
33.	November 16, 2012 IED Attack, Paktika Province
34.	June 23, 2013 IED Attack, Paktika Province
35.	September 21, 2013 Insider Attack, Paktia Province
36.	September 26, 2013 Insider Attack, Paktia Province
37.	April 12, 2007 IED Attack, Ghazni Province
38.	May 20, 2008 IED Attack, Ghazni Province

39.   October 16, 2009 IED Attack, Ghazni Province
40.   November 5, 2009 IED Attack, Ghazni Province
41.   February 27, 2011 IED Attack, Ghazni Province
42.   September 1, 2012 Fire Attack, Ghazni Province
43.   July 30, 2013 Fire Attack, Logar Province
44.   August 12, 2013 IED Attack, Logar Province
45.   July 7, 2009 IED Attack, Herat Province
46.   February 5, 2010 IED Attack, Badghis Province
47.   September 18, 2010 Small Arms Attack, Faryab Province
48.   April 24, 2011 IED Attack, Badghis Province
49.   June 14, 2011 IED Attack, Farah Province
50.   April 4, 2012 Suicide Attack, Faryab Province
51.   October 7, 2009 IED Attack, Helmand Province
52.   October 9, 2009 IED Attack, Helmand Province
53.   October 20, 2009 IED Attack, Helmand Province
54.   November 13, 2009 IED Attack, Helmand Province
55.   December 1, 2009 IED Attack, Helmand Province
56.   February 1, 2010 IED Attack, Helmand Province
57.   March 1, 2010 IED Attack, Helmand Province
58.   March 24, 2010 IED Attack, Helmand Province
59.   May 22, 2010 IED Attack, Helmand Province
60.   May 27, 2010 IED Attack, Helmand Province
61.   August 29, 2010 IED Attack, Helmand Province
62.   December 1, 2010 IED Attack, Helmand Province
63.   August 10, 2011 IED Attack, Helmand Province
64.   June 4, 2009 Complex Attack, Kapisa Province
65.   December 9, 2007 IED Attack, Helmand Province
66.   January 9, 2008 IED Attack, Helmand Province
67.   September 29, 2008 IED Attack, Helmand Province
68.   February 8, 2009 IED Attack, Helmand Province
69.   June 8, 2010 IED Attack, Helmand Province
70.   June 10, 2010 IED Attack, Helmand Province
71.   July 19, 2010 IED Attack, Helmand Province
72.   July 27, 2010 IED Attack, Helmand Province
73.   August 21, 2010 IED Attack, Helmand Province
74.   October 15, 2010 IED Attack, Helmand Province
75.   October 19, 2010 IED Attack, Helmand Province
76.   October 23, 2010 IED Attack, Helmand Province
77.   December 14, 2010 IED Attack, Helmand Province
78.   January 29, 2011 IED Attack, Helmand Province
79.   February 5, 2011 IED Attack, Helmand Province
80.   February 17, 2011 IED Attack, Helmand Province
81.   April 7, 2011 IED Attack, Helmand Province
82.   April 28, 2011 IED Attack, Helmand Province
83.   June 6, 2011 IED Attack, Helmand Province
84.   June 12, 2011 IED Attack, Helmand Province

85.     August 25, 2011 IED Attack, Helmand Province
86.     October 27, 2011 IED Attack, Helmand Province
87.     March 27, 2012 IED Attack, Helmand Province
88.     June 13, 2012 IED Attack, Helmand Province
89.     July 19, 2012 IED Attack, Helmand Province
90.     August 1, 2012 IED Attack, Helmand Province
91.     February 22, 2013 IED Attack, Helmand Province
92.     October 23, 2007 Small Fire Arms Attack, Kunar Province
93.     January 7, 2008 IED Attack, Nangarhar Province
94.     September 19, 2008 IED Attack, Kunar Province
95.     January 17, 2009 Complex Attack, Kunar Province
96.     July 24, 2009 Complex Attack, Nuristan Province
97.     June 7, 2010 IED Attack, Kunar Province
98.     June 25, 2010 Complex Attack, Kunar Province
99.     July 10, 2010 Complex Attack, Kunar Province
100.    August 17, 2010 IED Attack, Kunar Province
101.    June 4, 2011 IED Attack, Laghman Province
102.    September 25, 2011 IED Attack, Laghman Province
103.    June 17, 2007 IED Attack, Kandahar Province
104.    August 1, 2009 IED Attack, Kandahar Province
105.    January 3, 2010 IED Attack, Kandahar Province
106.    April 17, 2010 IED Attack, Kandahar Province
107.    July 15, 2010 IED Attack, Kandahar Province
108.    August 8, 2010 IED Attack, Kandahar Province
109.    November 17, 2010 IED Attack, Kandahar Province
110.    September 14, 2011 IED Attack, Kandahar Province
111.    September 18, 2011 IED Attack, Kandahar Province
112.    September 18, 2011 IED Attack, Kandahar Province
113.    September 26, 2011 IED Attack, Kandahar Province
114.    May 23, 2012 IED Attack, Kandahar Province
115.    May 30, 2012 IED Attack, Kandahar Province
116.    June 12, 2012 IED Attack, Kandahar Province
117.    May 14, 2013 IED Attack, Kandahar Province
118.    May 14, 2013 IED Attack, Kandahar Province
119.    June 2, 2013 IED Attack, Nimroz Province
120.    September 4, 2008 IED Attack, Kandahar Province
121.    June 19, 2009 IED Attack, Kandahar Province
122.    August 27, 2009 IED Attack, Kandahar Province
123.    September 14, 2009 IED Attack, Kandahar Province
124.    October 15, 2009 IED Attack, Kandahar Province
125.    October 17, 2009 IED Attack, Kandahar Province
126.    March 30, 2010 IED Attack, Kandahar Province
127.    June 7, 2010 IED Attack, Kandahar Province
128.    August 30, 2010 IED Attack, Kandahar Province
129.    September 9, 2010 IED Attack, Kandahar Province
130.    September 16, 2010 IED Attack, Kandahar Province

131.    September 16, 2010 IED Attack, Kandahar Province
132.    October 4, 2010 IED Attack, Kandahar Province
133.    October 12, 2010 IED Attack, Kandahar Province
134.    February 20, 2011 IED Attack, Kandahar Provinces
135.    May 26, 2011 IED Attack, Kandahar Province
136.    July 16, 2011 IED Attack, Kandahar Province
137.    October 21, 2011 IED Attack, Kandahar Province
138.    May 4, 2013 IED Attack, Kandahar Province
139.    October 5, 2013 IED Attack, Kandahar Province
140.    1/18/2009 Suicide Attack, Kabul Province
141.    5/20/2009 IED Attack, Kabul Province
142.    4/27/2011 Insider Attack, Kabul Province
143.    December 15, 2012 IED Attack, Kabul Province
144.    February 10, 2014 Suicide Attack, Kabul Province
145.    November 24, 2014 IED Attack, Kabul Province
146.    January 29, 2015 Insider Attack, Kabul Province
147.    August 22, 2015 Suicide Attack, Kabul Province
148.    April 18, 2007 Small Arms Attack, Kabul Province
149.    May 30, 2007 Anti-Aircraft Attack, Helmand Province
150.    June 21, 2008 Complex Attack, Kandahar Province
151.    July 2, 2009 Small Arms Attack, Helmand Province
152.    August 18, 2009 Complex Attack, Kandahar Province
153.    October 16, 2009 Complex Attack, Kandahar Province
154.    October 27, 2009 Complex Attack, Kandahar Province
155.    February 13, 2010 Suicide Attack, Kandahar Province
156.    February 21, 2010 Small Arms Attack, Helmand Province
157.    June 9, 2010 RPG Attack, Helmand Province
158.    June 18, 2010 Complex Attack, Helmand Province
159.    July 13, 2010 Complex Attack, Kandahar Province
160.    July 30, 2010 Complex Attack, Kandahar Province
161.    August 11, 2010 Small Arms Attack, Kandahar Province
162.    August 28, 2010 Complex Attack, Kandahar Province
163.    September 6, 2010 Indirect Fire Attack, Kandahar Province
164.    September 17, 2010 RPG Attack, Kandahar Province
165.    April 28, 2011 Complex Attack, Kandahar Province
166.    May 12, 2011 Insider Attack, Helmand Province
167.    June 15, 2011 Complex Attack, Kandahar Province
168.    July 15, 2011 RPG Attack, Helmand Province
169.    July 17, 2011 Complex Attack, Kandahar Province
170.    August 25, 2011 IED Attack, Kandahar Province
171.    August 28, 2011 Complex Attack, Kandahar Province
172.    October 10, 2011 Indirect Fire Attack, Kandahar Province
173.    October 13, 2011 Small Arms Attack, Helmand Province
174.    November 30, 2011 Complex Attack, Helmand Province
175.    March 9, 2012 Complex Attack, Helmand Province
176.    June 22, 2012 Small Arms Attack, Helmand Province

177.   August 16, 2012 Anti-Aircraft Attack, Kandahar Province
178.   September 15, 2012 Complex Attack, Helmand Province
179.   October 13, 2012 Insider Attack, Kandahar Province
180.   February 15, 2014 Complex Attack, Helmand Province
181.   January 5, 2016 Complex Attack, Helmand Province
182.   July 3, 2017 Indirect Fire Attack, Helmand Province
183.   July 29, 2019 Insider Attack, Kandahar Province
184.   May 31, 2008 IED Attack, Nangarhar Province
185.   August 1, 2008 IED Attack, Kunar Province
186.   October 14, 2008 IED Attack, Kunar Province
187.   November 13, 2008 Suicide Attack, Nangarhar Province
188.   October 25, 2009 IED Attack, Laghman Province
189.   February 3, 2012 Insider Attack, Nangarhar Province
190.   May 18, 2012 Indirect Fire Attack, Kunar Province
191.   May 9, 2008 Complex Attack, Kapisa Province
192.   October 27, 2008 Suicide Attack, Baghlan Province
193.   June 21, 2009 Indirect Fire Attack, Parwan Province
194.   July 6, 2009 IED Attack, Kunduz Province
195.   August 7, 2009 IED Attack, Kapisa Province
196.   June 12, 2010 IED Attack, Kunduz Province
197.   June 16, 2010 IED Attack, Kunduz Province
198.   July 2, 2010 IED Attack, Parwan Province
199.   December 12, 2014 IED Attack, Parwan Province
200.   November 12, 2016 Suicide Attack, Parwan Province
201.   May 17, 2010 IED Attack, Badghis Province

The Court has already held that the Syndicate "likely" or "very likely" maintained operational dominance in each of these provinces during the time of these attacks, see Cabrera I, 2022 WL 2817730, at *6–27, and Cabrera III, 2024 WL 864092, at *2–3.  Based on these findings, as well as the special masters' factual findings as to each of the above-listed attacks, the Court concluded that Iran is liable for these 201 attacks associated with the Tranche 1 Order plaintiffs.

## III.   Standing

To satisfy the standing requirements of the FSIA's private right of action, each plaintiff must  be a U.S. national, a member of the armed forces, an employee of the U.S. government, or "an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment." 28 U.S.C. § 1605A(c).  In addition to conferring standing

to direct victims, the FSIA also "encompass[es] claims by family members of those injured or killed for the distress caused by their relative's injuries."  Force v. Islamic Republic of Iran, 464 F. Supp. 3d 323, 359 (D.D.C. 2020).  The special masters determined that each plaintiff listed in the Tranche 1 Order is a U.S. citizen and that each plaintiff was either a service member or U.S. contractor wounded in an attack that resulted in an extrajudicial killing, or else an immediate family member (or the functional equivalent) of a victim of one of the above-listed attacks.  The Court adopted the special maters' standing determinations for each plaintiff listed in the Tranche 1 Order but will further expand on one plaintiff, in light of the D.C. Circuit's recent opinion in Borochov v. Islamic Republic of Iran, 94 F.4th 1053 (D.C. Cir. 2024).

In Borochov, the D.C. Circuit held that 28 U.S.C. § 1605A only confers jurisdiction over a claim if the relevant attack resulted in a completed extrajudicial killing.  Id. at 1060. Accordingly, a plaintiff injured in one of the Syndicate's attacks only has standing to sue if the Syndicate succeeded in committing an extrajudicial killing during the relevant attack, not if the Syndicate merely attempted, but failed, to commit such a killing.  As relevant here, an "extrajudicial killing" means "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."  Han Kim v. Democratic People's Republic of Korea, 774 F.3d 1044, 1045–46 (D.C. Cir. 2014).

The Court therefore considered whether SPC Daus Hempker, the lone U.S. serviceman wounded in a September 16, 2010 attack, has standing under Borochov to bring his claim for pain and suffering.  The Court determined that he has standing.  Although plaintiffs have not provided any evidence that a U.S. service member was killed in the attack that injured SPC Hempker, plaintiffs have provided evidence that two Afghani soldiers—members of the Coalition Force—

were killed in the attack.  Rep. & Recs. by Special Master Brad Pigott [231-8] ("Pigott Rep.") at *89.  The Court is satisfied that the killings of any Coalition Force members were "not authorized by a previous judgment pronounced by a regularly constituted court."  Han Kim, 774 F.3d at 1045–46.  And this Court previously found that "Iran intended for its material support for the Syndicate to enable lethal attacks on American and Coalition forces, and it provided that support to further its own long-term geopolitical goals."  Cabrera I, 2022 WL 2817730, at *41.  Because the Syndicate intended to kill Coalition Force members, whether or not the member was American, the September 16, 2010 attack did not "fail[] to kill any of its intended victims," Borochov, 94 F.4th at 1056, but rather successfully resulted in an extrajudicial killing.  SPC Hempker's injuries were thus "caused by an act of extrajudicial killing," id. at 1060–61 (cleaned up), so he has standing to bring his claim.

## IV.    Pain and Suffering Damages

To determine pain-and-suffering awards, courts consider factors such as "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life."  O'Brien v. Islamic Republic of Iran, 853 F. Supp. 2d 44, 46 (D.D.C. 2012) (cleaned up).  It is difficult to quantify the pain and suffering of survivors of terrorist attacks; a court's "primary consideration is to ensure that 'individuals with similar injuries receive similar awards.'" Moradi v. Islamic Republic of Iran, 77 F. Supp. 3d 57, 70 (D.D.C. 2015) (citation omitted); Peterson v. Islamic Republic of Iran ("Peterson II"), 515 F. Supp. 2d 25, 54 (D.D.C. 2007) ("[T]he Court must take pains to ensure that individuals with similar injuries receive similar awards.").  In light of the need for uniformity, this Court—along with other judges in this District—has endorsed the Peterson II framework as a "general framework for assessing pain and suffering damages for direct victims of terrorist

attacks." <u>Cabrera I</u>, 2022 WL 2817730, at *47 (quoting <u>Sheikh v. Republic of Sudan</u>, 485 F. Supp. 3d 255, 268 (D.D.C. 2020)).

Under this framework, courts award a baseline of $5 million to "individuals who suffer severe physical injuries, such as compound fractures, serious flesh wounds, and scars from shrapnel, as well as lasting and severe psychological pain," varying upward to $7–$12 million "[w]here physical and psychological pain is more severe . . . such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead," and varying downward to $1.5–$3 million "where the victim suffers severe emotional injury accompanied by relatively minor physical injuries." <u>Wamai v. Republic of Sudan</u>, 60 F. Supp. 3d 84, 91 (D.D.C. 2014).

The special masters considered the evidence presented by direct-victim plaintiffs and recommended damages awards. Most of the recommendations are in line with the <u>Peterson II</u> baselines but some reflect modest variances. The Court adopted the recommendations of the special masters as to the Tranche 1 Order plaintiffs except as outlined below.

- Special Master Saltzburg recommended awarding $5 million to SPC Jesse Watson, who suffers from "severe combat-related PTSD," traumatic brain injury ("TBI"), head pain, and neuropathy due to nerve damage. Special Master's Rep. & Recs. Regarding 187 Pls. [ECF No. 231-9] ("Saltzburg Rep.") at *46–47. Because SPC Watson's injuries are primarily emotional and mental, rather than physical, the Court awarded him $3 million in line with the plaintiffs in <u>Peterson</u> who suffered relatively minor physical injuries but had lasting and severe psychological injuries. <u>Peterson II</u>, 515 F. Supp. 2d at 55; <u>see also</u> <u>Wamai</u>, 60 F. Supp. 3d at 92 (awarding $3 million to plaintiff who suffers "severe hearing loss in both ears" and has "severe

emotional damage"); <u>id.</u> (awarding $2 million to plaintiff who "escaped with only lacerations" but "suffer[s] from severe emotional damage").

- Special Master Saltzburg recommended awarding $9 million to CPL Raul Olivares Jr, who suffered facial laceration, compound fractures to both his left and right fibula and tibia bones, and a calcaneus fracture to his right ankle.  Saltzburg Rep. at *144–46.  CPL Olivares spent close to two years rehabbing at the Wounded Warriors Battalion.  <u>Id.</u> at *145.  The Court awarded him $7.5 million, in line with the award given to similar <u>Peterson II</u> plaintiffs. <u>See</u> 515 F. Supp. 2d at 54–56 (awarding $7.5 million to plaintiffs who, in addition to suffering "lasting and severe psychological problems," also suffered "a broken femur, hand and pelvis bone, and . . . a left foot [that] was turned completely backwards," or "loss of sight in one eye, a perforated right eardrum resulting in some hearing loss, and a shrapnel injury to the back of his right thigh," or "a subdural hematoma, a perforated right eardrum, crushed left ankle, collapsed left lung, and other shrapnel wounds that became infected").

- Special Master Byrne recommended awarding $9 million to CPL Jonathan Cleary, who was in a coma for two months, underwent the amputation of one leg, and suffers from PTSD and TBI.  Special Master Christopher A. Byrne's Rep. & Recs. [ECF No. 231-2] ("Byrne Rep.") at *231–34.  Special Master Byrne reached this recommendation by comparing CPL Cleary's injuries to the injuries of two servicemembers included in the Court's bellwether opinion, CPT Timoney and SGT Lemon.  <u>Id.</u>  But the Court finds that CPL Cleary's injuries are more similar to, though slightly more severe than, the plaintiffs in <u>Estate of Doe v. Islamic</u>

Republic of Iran, 943 F. Supp. 2d 180 (D.D.C. 2013), and Wamai v. Republic of Sudan, 60 F. Supp. 3d 84, and so awarded him $8 million.  See Doe, 943 F. Supp. 2d at 187 (awarding $7 million to plaintiff who "underwent several surgeries in the months after the bombing" and "had his leg amputated"); Wamai, 60 F. Supp. 3d at 93–94 (awarding $7.5 million to plaintiffs who spent weeks in a coma, suffer from brain trauma, and have permanent physical injuries).

- Special Master Byrne recommended awarding $9 million to SGT Brandon William Tilson Korona, who relies on his wife as a daily caregiver due to his mental and physical injuries, which includes the amputation of one of his legs.  Byrne Rep. at *286–88.  The Court awarded him $8.5 million due to his inability to function on his own.

- Special Master Saltzburg recommended awarding $11 million to SSG Darius Johnson, who was severely burned, lost his right arm, stayed in the hospital for over two months, and suffers from nerve pain, among other injuries.  Saltzburg Rep. at *191–93.  SSG Johnson also suffered for hours after the IED explosion while he waited for assistance.  Id. at *191.  The Court awarded him $8.5 million due to his ongoing injuries and surgeries, which prevent him from fully functioning in society.

- Special Master Grubbs recommended awarding $10.25 million to LCPL Christopher Van Etten, a double amputee who suffers physical and mental injuries but is still able to walk and continues to go camping.  Tranche 1 Special Master's Rep. & Rec. [ECF No. 231-5] ("Grubbs Rep.") at *203–07.  The Court has generally awarded plaintiffs who suffered double leg amputations, without

additional complicating factors, $10 million.  The Court thus awarded $10 million to LCPL Van Etten.

- Special Master Levy recommended awarding $9 million to SGT Ryan J. Newell, who suffered a broken back and a double leg amputation.  Rep. & Rec. Concerning Liability and Damages for Pls. Assigned to Special Master Lester J. Levy [ECF No. 231-6] ("Levy Rep.") at *19–20.  The Court awarded SGT Newell $10 million in line with other plaintiffs who suffered double leg amputations in this case.

- Special Master Grubbs recommended $10.75 million to SGT Bradley Ivanchan. Grubbs Rep. at *198–201.  The Court awarded him $10.5 million, in line with the award the Court adopted for another servicemember in this case, LCPL James Boucher Jr., who—like SGT Bradley Ivanchan—lost both of his legs above the knee and suffered more serious injuries than did other double amputee plaintiffs in this case.  See id. at *157–58, *162–63.

- The Court provided the same $10.5 million award to SGT Adam Hartswick, as opposed to Special Master Meek's recommended $12 million award, in line with other double amputees who also suffered further severe injuries.  See Mem. Op. [231-7] ("Meek Rep.") at *113–15.

- The Court further awarded $10.5 million—rather than the recommended award of $11 million—to LCPL Christopher Billmyer, who underwent amputations on both legs, must use a wheelchair for the rest of his life, and suffers nerve damage in addition to other ailments.  Grubbs Rep. at *112, *114–16.

- Special Master Meek recommended awarding $13 million to PFC Kevin Trimble, who was induced into a coma for a few days while doctors attempted to manage his

blood loss and remove shrapnel and whose injuries include a double amputation above the knee and the loss of his left arm above the elbow.  Meek Rep. at *85–87. The Court awarded him $12 million in line with the award the <u>Peterson</u> court granted to a plaintiff whose injuries resulted in permanent quadriplegia.  <u>See Peterson II</u>, 515 F. Supp. 2d at 55.

- Finally, the Court addresses the Estate of SPC Jonathan O'Neil.  SPC O'Neil survived for approximately 13 days after the attack, although the record cannot confirm his exact level of consciousness during that time. <u>See</u> Byrne Rep. at *103–115.  Special Master Byrne recommended awarding $10 million to SPC O'Neill; the Court awarded him $7.5 million in line with servicemen in <u>Peterson II</u> who died nearly 8 days after the attack.

## V.    Solatium Damages

Section 1605A of the FSIA authorizes family-member plaintiffs to seek solatium damages. 28 U.S.C. § 1605A(c).[3]  Solatium claims are "functionally identical to claims for intentional infliction of emotional distress," and are "intended to compensate persons for mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience . . . as well as the harm caused by the loss of the decedent's society and comfort." <u>Spencer v. Islamic Republic of Iran</u>, 71 F. Supp. 3d 23, 27 (D.D.C. 2014) (internal quotation marks omitted).  In granting these damages, the Court's "primary consideration is to ensure that 'individuals with similar injuries receive similar awards.'"  <u>Cabrera I</u>, 2022 WL 2817730, at *43 (quoting <u>Moradi v. Islamic Republic of Iran</u>, 77 F. Supp. 3d 57, 70 (D.D.C. 2015)).

---

[3] Section 1605 further authorizes economic damages, damages for pain and suffering, and punitive damages. § 1605A(c).  The Court previously concluded that "awarding substantial punitive damages" is appropriate but will defer ruling on punitive damages until the compensatory damage awards of all plaintiffs in this case have been determined.  <u>Cabrera I</u>, 2022 WL 2817730, at *56–57.

Because solatium damages "are by their very nature unquantifiable," Moradi, 77 F. Supp. 3d at 72, this Court has looked to prior decisions for guidance and endorsed the Peterson II framework, Cabrera I, 2022 WL 2817730, at *47.  Under the Peterson II framework, spouses of deceased victims receive $8 million, parents and children of deceased victims receive $5 million, and siblings of deceased victims receive $2.5 million.  Peterson II, 515 F. Supp. 2d at 52.  These awards are reduced by half when the plaintiff is a family-member of a surviving victim.  Id.  This Court has previously awarded qualifying plaintiffs the Peterson II baselines, granting upward and downward variances to certain plaintiffs based on individualized circumstances.  See, e.g., Cabrera II, 2023 WL 3496303, at *9 (granting an upward adjustment where plaintiff experienced "particularly brutal suffering"); id. at *10 (varying downward for awards to older family members, whose amount of time suffering "is comparatively less than the suffering of other family-member victims").

The special masters considered the evidence presented by family-member plaintiffs and recommended damages awards.  Most of the recommendations are in line with the Peterson II baselines but some reflect modest variances.  The Court adopted the recommendations of the special masters as to the Tranche 1 Order plaintiffs except as outlined below.

### A.  Upward Variances for Exceptionally Severe Harm

Because the Peterson II baseline awards "take into consideration the likelihood of serious detrimental effects from these events on families," Pennington v. Islamic Republic of Iran, Civ. A. No. 19-796 (JEB), 2022 WL 168261, at *3 (D.D.C. Jan. 19, 2022), vacated in part, 2022 WL 18814284 (D.D.C. May 3, 2022), courts normally award upward departures only for "an unusual circumstance beyond the ordinary anguish that results from losing a family member," Selig v. Islamic Republic of Iran, 573 F. Supp. 3d 40, 66 (D.D.C. 2021).  The Court now briefly describes

plaintiffs who experienced unusual circumstances warranting upward departures from the Peterson II baselines.[4]

The Court first addresses family members who suffered greater than usual harm in the form of suicide attempts and/or hospitalizations for such attempts. As it did in its earlier opinions in this case, the Court found that such circumstances warrant a 10% enhancement. See Cabrera III, 2024 WL 864092, at *5. Accordingly, although the special masters recommended awarding 20% enhancements to these plaintiffs, the Court awarded 10% enhancements to Joseph Michael Duarte, see Grubbs Rep. at *221–22; Natasha Snyder, see Levy Rep. at *293;[5] Lauren Ashley Culbreth, see Meek Rep. at *311; Patricia Elsner, see id. at *168; Dennis W. Peters, see Pigott Rep. at *56; Joshua Michael Prescott, see id. at *65; Andrew Brown, see id. at *96; A.T.P., see Rep. of Special Master C. Jackson Williams [ECF No. 231-10] ("Williams Rep.") at *337; and April Lyn Anderson, see id. at *383.[6]

The Court also provided a 10% enhancement to A.J.Q., who developed borderline personality disorder, reactive attachment disorder, and PTSD due to the death of her father SPC Ryan Grady. See Williams Rep. at *299–300. A 10% enhancement—rather than the 20% enhancement the Court awarded to R.C.—is proper here: unlike R.C., A.J.Q. has not attempted suicide, nor does the record indicate that she dropped out of school as a result of her grief. See

---

[4] The Court agrees with Special Master Byrne that Lisa Murowski-Dupont is entitled to a 20% enhancement, but then mistakenly awarded Ms. Murowski-Dupont a prejudgment award of $6 million rather $9.6 million. The Court amends that award in its accompanying Order.

[5] The Court determined that a further enhancement to $3.15 million is not warranted because Ms. Snyder's "ability to live a normal childhood and pursue a traditional education" was not as disrupted as were the lives of other minor children who received larger awards. See, e.g., Cabrera I, 2022 WL 2817730, at *50 ("Like the plaintiffs who received upward enhancements in Selig and Thuneibat, R.C. has been unable to attend traditional schools and has struggled with suicidal thoughts and attempts.").

[6] The Court would have also provided the same enhancement to Bobby Gene Anderson, who was hospitalized for suicide ideations after the death of his son, PFC Billy Anderson. Williams Rep. at *383. The Court ultimately decided to award Mr. Anderson the $5 million Peterson II baseline award because the record does not establish whether Mr. Anderson had custody of his son. See infra subsection IV.C.2.

Cabrera I, 2022 WL 2817730, at *50.  And a 10% enhancement is proper for Athena Ann Gordon, the twin sister of SFC Christopher Henderson, Meek Rep. at *37–38.  Various studies demonstrate a special bond between twins, and a 10% enhancement here aligns with previous awards in this case.  Cabrera III, 2024 WL 864092, at *5 (awarding 10% enhancements to two twins).  Finally, the Court concluded that Stephanie Fisher's unique circumstances warrant a 10% enhancement: after the death of her son, SSG Thomas Kent Fogarty, Ms. Fisher began to raise his two young sons—aged five and three at the time of his death—on her own.  Byrne Rep. at *239–40.

## B.  Older Family Members

With regards to the Tranche 1 Broom plaintiffs, the Court issued downward variances to older family-member plaintiffs whose amount of time suffering with the loss of their loved one was "comparatively less than the suffering of other family-member victims."  Cabrera III, 2024 WL 864092, at *5 (citing Cabrera I, 2022 WL 2817730, at *51, and Cabrera II, 2023 WL 3496303, at *10).  To maintain consistency among the awards of similarly situated individuals, the Court imposed a 20% reduction for parent-plaintiffs who were at least sixty-five years old at the time of the relevant attack and to estates of plaintiffs who suffered for shorter periods of time.  Those plaintiffs include Evelyn Taylor (age 69), John Ewy (age 65), William Nevins (age 66), Gabriel Negron (age 65), Marta Torres (age 65), Clifford E. Ausborn (age 75), Janice Proctor (age 78), Harriet Sutton (age 69), John Wayne Goldsmith (age 68),[7] Joe Torian (age 66), Jimmy Smith (age 74), Elma Garza Palomarez (age 68), Charlotte Ann Reeves (age 77), and the Estate of Tomoe Dunning (who died within ten years of the attack).  See Byrne Rep. at *730, *810, *1075; Levy Rep. at *197, *201; Saltzburg Rep. at *363, *673, *703, *1221, *1542, *1550; Williams Rep. at

---

[7] Mr. Goldsmith's pre-judgment award was listed in the Tranche 1 Order as $4.5 million, as was his wife Lorie Goldsmith's award.  The Court amends Mr. Goldsmith's award to $4 million and Mrs. Goldsmith's award to $5 million in its accompanying Order.

*171, *1041; Grubbs Rep. at *184.  The Court further reduced the award to 86-year-old Gertrude Provost by an extra 10%.  See Williams Rep. at *337.  Each of these awards maintains consistency with the awards given to similarly situated plaintiffs.

### C. Individuals with Less Close Relationships to Direct Victims

The Court previously held that "when determining solatium damages, it is necessary to consider whether a family-member plaintiff's relationship with a direct victim was further removed than traditionally expected."  Cabrera II, 2023 WL 3496303, at *10.  Circumstances courts consider include whether the family-member plaintiff lived with the victim, see id. ("Children who were living with their parents are likely to feel the sting of loss more harshly than children who were not." (cleaned up)), and the time they had to develop their relationship, see id. at *11 ("S.B. never got to meet him or develop a relationship with him." (cleaned up)).

### 1. Children of Direct Victims

The Court previously applied downward variances of 40% for children under the age of 1 and 30% for children between the ages of 1–3, see Cabrera III 2024 WL 864092, at *7, and continued to apply those variances absent a showing that a particular plaintiff's relationship with the victim-parent was either stronger or weaker than expected.  The Court thus awarded $3 million to M.B. (11 months old), L.G.A. (8 months old), and A.R.S. (6 months old), and awarded $3.5 million to C.F. (3 years old), T.D.C. (2 years old), A.L.S. (2 years old), A.M.S. (2 years old), C.S.S. (3 years old), Gabriel Brandon Landrum (2 years old), D.L.B. (3 years old), L.A.E.L.B (2 years old), S.L.L.B. (3 years old), B.C.D. (3 years old), and A.L.H. (2 years old).  See Byrne Rep. at *156; Williams Rep. at *1072; Saltzburg Rep. at *495; Byrne Rep. at *933; Special Master Eric Green's Rep. & Recs. [ECF No. 231-3] ("Green Rep.") at *27, *52; Grubbs Rep. at *57; Pigott Rep. at *47; Saltzburg Rep. at *58, *86, *91, *1188.

Similarly, the Court awarded $3.5 million to Tristyn A. Vinson-Hosford, who was raised solely by his great-grandparents. Williams Rep. at *766–67. Mr. Vinson-Hosford last had any contact with his father, SPC Chester W. Hosford, when he was 2 years old. Id. The Court concluded that, for present purposes, Mr. Vinson-Hosford is similarly situated to a plaintiff who was 2 years old at the time of the victim-parent's death.

The Court awarded $4 million to Alyssa Sheridan and Andrew Sheridan, who became GySgt Floyd Holley's stepchildren only one year before his death, but lived with him for several years and demonstrated a close relationship with GySgt Holley. Rep. of Special Master Paul G. Griffin [ECF No. 231-4] ("Griffin Rep.") at *53–54. Due to the limited time Mr. and Ms. Sheridan lived with GySgt Holley as his children, the Court considered departing further in line with plaintiffs who lost their parent prior to the age of three. But the Court concluded that a larger award was proper, given the close familial relationship they shared with GySgt Holley prior to becoming his stepchildren.

The Court departed downward by only 20% for D.R.M., who was 3 years old when her stepfather Cpl Olivares was injured in an attack, due to the close relationship they currently share. See Saltzburg Rep. at *148. The Court awarded her $2 million.

Finally, the Court declined to depart downward for children-plaintiffs who were at least 4 years old at the time of their parent's death and who demonstrated some close relationship and/or memories with their parent. These plaintiffs include K.F. (5 years old), Byrne Rep. at *937; Owen Southworth (6 years old), Grubbs Rep. at *233; and Logan Southworth (7 years old), id.

## 2. Parents of Direct Victims

As in its previous opinions, the Court continued to vary downward for parent-plaintiffs who had a more attenuated parental relationship with the direct victim. See Cabrera III, 2024 WL

864092, at *8.  These departures generally resulted in an award of $3.5 million to $4.5 million, depending on the described relationship and the parent's custody arrangement.

The Court awarded $4.5 million to plaintiffs who had custody of their child for most of the victim's childhood and continued to have regular contact with the victim once they no longer lived together fulltime.  These plaintiffs include Robert Watson, who lived with PFC Jason Watson until PFC Watson was 11 years old and then lived with him two weekends a month, Byrne Rep. at *563–64; Paul Elmer Jayne, who lived with SPC Ryan Paul Jayne until he was 9 years old and regularly saw him after that time, id. at *268; William Michael Burley, who lived with SPC Nicholas Burley until SPC Burley was 10 years old and then saw him every other weekend, Green Rep. at 305–06; Angela Preston, who had primary custody of LCpl Charles Seth Sharp until LCpl Sharp turned 12 years old and then lived with him every other weekend and during the summers, Saltzburg Rep. at 834–35; Lowell Hanson Jr., who lived with his son LCpl Matthias Hanson on weekends and holidays until he gained full custody of LCpl Hanson when LCpl Hanson was 15 years old, id. at *935; and Richard Dennis, who lived fulltime with CPL Preston Dennis until CPL Dennis was 8 years old and then had custody of his son every other weekend and on holidays, id. at *1130–31.

The Court departed further downward and awarded $4 million to plaintiffs who stopped living with their child when the child was young but continued to maintain regular contact with their child.  These plaintiffs include Clifford Taylor, who lived fulltime with SSgt Aaron Taylor until Aaron was 3 years old and thereafter had visitation every other weekend and for six weeks during the summer, Griffin Rep. at 23; Terry Lee Mittler who stopped living fulltime with SSG Shaun Mittler when SSG Mittler was 5 years old but continued to have custody every other weekend and on vacations, Levy Rep. at *169; Jose Alberto Morgado, who had custody of 2LT

Travis Morgado during holidays and summers and lived with him for 2 years after 2LT Morgado graduated college, Meek Rep. at *91; James Bell, who lived with SSgt Vincent Bell until SSgt Bell was 7 years old and regularly saw him after they stopped living together, Saltzburg Rep. at 1385–86; Cedric F. Gordon, who only lived with SPC Brittany Gordon after she graduated college, but until then had custody of her every other weekend, on holidays, and during the summers, id. at *1505; and Glenn Chisholm, who lived with PFC Benjamin Chisholm during the summers, every other holiday, for a brief period in elementary school, and after high school, Levy Rep. at *45, *231–32.[8]

The Court departed even further downward when the record indicates that a plaintiff did not maintain regular contact with his or her child.  See Cabrera III, 2024 WL 864092, at *8.  The Court thus awarded $3.5 million to Duane Schultz, who stopped living with LCPL Nathaniel Schultz when LCPL Schultz was 4 years old, Grubbs Rep. at 443–44, and to Calvin D. Jamison, for whom the record is unclear as to how often he saw his son, SGT Ezra Dawson, Levy Rep. at 89–90.

The Court also granted between $2 million to $4.5 million to stepparents who—while acting as the "functional equivalent" of a parent—did not share as close a traditional child-parent relationship with the victim.  For instance, the Court provided slight downward variances of 10% for stepparent plaintiffs who had full custody of their stepchild for a significant portion of the child's life.  Such plaintiffs include Kent Alan Skeens, who raised SPC Jayne starting when SPC Jayne was 9 years old, Byrne Rep. at *271–72, and Dan Olmstead, who became SPC Nicholas Burley's stepfather when SPC Burley was 11 years old, Green Rep. at *321–22.  The Court also awards $4.5 million to John Gregoire Sr, whose path as a stepparent is more complex than that of

---

[8] In making this determination, Court also considered that Mr. Chisolm and his wife appear to be raising PFC Chisolm's minor child.

Mr. Skeen or Mr. Olmstead, but nonetheless deserves a similar award.  Mr. Gregoire started living with SPC Michael Nance when SPC Nance was 3 years old and officially became his stepfather when SPC Nance was 7 years old.  Saltzburg Rep. at 1680–81.  Mr. Gregoire and his wife divorced when SPC Nance was 14 years old, but he continued to live with SPC Nance on weekends.  Id. at 1681.  The Court found that he is the functional equivalent of SPC Nance's father and is entitled to the same amount as stepparents in similar situations.

In line with the Court's earlier opinion, the Court awarded $3.5 million to stepparents who lived with the victim fulltime for a period of roughly 3 to 4 years.  See Cabrera III, 2024 WL 864092, at *7.  Those plaintiffs include Brad Joseph Halliday, who lived with LCpl Carlos Aragon when he was between 17 and 20 years old, Griffin Rep. at *172–73; Matthew Allen, who became SPC Corey Bertrand's stepfather when SPC Bertrand was 15 years old, Williams Rep. at *482; and Cecilia Stiles, who lived fulltime with SGT Jonnie L. Stiles for approximately 4 years, beginning when he was 13 years old, id. at *517.  The Court provided a slight increase from that amount to Cynthia Hanson, who began living fulltime with LCpl Hanson when he was 15 years old, but who also spent weekends and holidays with him as his stepmother for eight years prior, Saltzburg Rep. at 942–43.  The Court thus awarded her $4 million.[9]

The Court departed further for stepparent plaintiffs whose relationships were even more attenuated.  The Court therefore awarded $2.5 million to Karma Chisholm, who met PFC Chisolm when he was 2 years old and lived with him during the summers and every other holiday (in addition to a few longer periods interspersed), Levy Rep. at *252–53; $2.5 million to Gus Preston, who became LCpl Sharp's stepfather when LCpl Sharp was 12 years old and lived with him every other weekend and during the summer, Saltzburg Rep. at *850–51; $2.5 million to David Humpf,

---

[9] For the same reasons, the Court will award $4 million to Angela Harper, who spent alternate weeks and holidays with LCpl Harper for approximately ten years prior to living with him fulltime.  See Supp. Dec. at *2.

who became SPC Brandon Steffey's stepfather when SPC Steffey was 15 years old and lived with him every other weekend and for one week during the summer, Williams Rep. at *578–79; and $2 million to Rebecca Baker, who became LCpl David Baker's stepmother when he was seventeen years old, at which point she lived with him half the time, Griffin Rep. at *101–02.

### 3. Siblings of Direct Victims

As half-siblings are presumed to recover the same amount as full-blood siblings, Peterson II, 515 F. Supp. 2d at 52, the Court granted $2.5 million to half-siblings who lived with the victim or otherwise demonstrated a close sibling relationship.  But the Court departed downward for half-siblings who rarely, if ever, lived with the victim, but who still demonstrated some close sibling relationship, and departed further downward for half-siblings who never lived with the victim nor indicated a close sibling relationship.  Accordingly, the Court awarded $2.25 million to Anna Maria Banze and Connor Alexian Pladeck-Morgado, who lived with 2LT Morgado during the summers, Meek Rep. at *93–96; $2 million to Azyia Jayne, who never lived with SPC Jayne but credibly describes a relationship with him, Byrne Rep. at *280; $2 million to Emily Torian, who seemingly never lived with MSgt Aaron Torian due to their 13-year age gap but describes them as having "gr[own] up together for a period of time," Saltzburg Rep. at *1557; $1.5 million to Z.R.S., who was only 3 months old when SPC Jayne was killed, Byrne Rep. at *281; and $1.5 million to Jeffrey Scott Kuykendall and Larry Kuykendall, who were already 21 and 24 years old when SPC Christopher Talbert was born and who never lived in the same state as him, Green Rep. at *368–78.

### D. Peterson II Baselines

The Court now briefly describes plaintiffs for whom the special masters recommended upward enhancements, but for whom the Court decided to award the Peterson II baseline amounts.

Special Master Pigott recommended a 20% enhancement for Larry Dean Horns, who suffers from PTSD, suicidal thoughts, high blood pressure, and depression following the death of his son Christopher Horns, Pigott Rep. at *39–41.  He also recommended the same enhancement for Cheryl Brown, who was diagnosed with clinical depression and spent approximately ten days in a mental health facility following the death of her son SPC Timothy Johnson, id. at *43–44. Similarly, Special Master Williams recommended 20% enhancements for Joshua M. Finley, who dropped out of college and suffered from suicidal thoughts after his brother SPC James Finley's death,[10] for Elizabeth Ann Martin, who—due to her extreme distress at the loss of her brother SPC Wyatt Martin—moved back in with her parents and takes several psychotropic drugs, and for Stewart Perry, who has suicidal idealizations and was temporarily hospitalized due to shock after the death of his son SSG John Perry.  Williams Rep. at *18–21, *330–33, *337.  He further recommended a 10% enhancement for Jacob Avneri, who had to leave his job to care for his wife after the death of his stepson PV2 Jair Garcia, which resulted in a difficult financial situation for their family.  Id. at *52–56.  Finally, Special Master Saltzburg recommended a 20% enhancement to Joyce A. Brodeur, who was briefly admitted to the hospital under suspicion of a heart attack following the death of her son, Maj David Brodeur.  Saltzburg Rep. at 60.  While Mr. Horns, Ms. Brown, Mr. Finley, Ms. Martin, Mr. Perry, and Mr. Avneri credibly describe "serious detrimental effects," the Peterson II framework takes such effects into consideration.  See, e.g., Cabrera III, 2024 WL 864092, at *8–9.  Accordingly, the Court concluded that an enhancement from the Peterson II baseline is not warranted and that the baseline award aligns with the awards given to similarly situated plaintiffs.

---

[10] The Special Master also based his recommendation on Mr. Finley's subsequent bipolar disorder, Williams Rep. at *19–20, but without evidence of a direct link between SPC Finley's death and Mr. Finley's diagnosis, the Court declines to provide an enhancement on that basis.

*       *       *

In sum, the Court adopted the recommendations of the special masters subject to the deviations listed above.

## VI.    Prejudgment Interest

The Court previously concluded that "an award of prejudgment interest is appropriate" in this case.  Cabrera I, 2022 WL 2817730, at *55; Cabrera II, 2023 WL 3496303, at *12.  The Court calculated the bellwether plaintiffs' "interest amount by following the D.C. Circuit's recommendation in Forman v. Korean Air Lines Co., 84 F.3d 446 (D.C. Cir. 1996)," Cabrera I, 2022 WL 2817730, at *55, and used the same methodology with these plaintiffs.

## <u>Conclusion</u>

For the foregoing reasons, the Court  largely adopted the special masters' recommendations for compensatory damages to each plaintiff listed in the Tranche 1 Order, with the handful of modifications noted herein, and awarded prejudgment interest to each plaintiff as reflected in the Tranche 1 Order.

_____/s/_____

John D. Bates
United States District Judge

Dated: <u>June 28, 2024</u>