UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AUGUST CABRERA et al., <br><br> Plaintiffs, <br><br> v. <br><br> ISLAMIC REPUBLIC OF IRAN, <br><br> Defendant. | Civil Action No. 19-3835 (JDB) |
| MARK ZAMBON et al., <br><br> Plaintiffs, <br><br> v. <br><br> ISLAMIC REPUBLIC OF IRAN, <br><br> Defendant. | Civil Action No. 18-2065 (JDB) |

## MEMORANDUM OPINION

Between 2006 and 2019, a terrorist Syndicate comprising al-Qaeda, the Taliban, the Kabul Attack Network, and the Haqqani Network (collectively, the "Syndicate") perpetrated numerous terrorist attacks against American servicemembers and civilians in Afghanistan. Victims of those attacks and their family members brought these coordinated suits against the Islamic Republic of Iran under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, alleging that Iran provided material support to the Syndicate for extrajudicial killings. The present opinion concerns plaintiffs' motion for default judgment as to the remaining plaintiffs in "Tranche 1." See Afghanistan-Based Pls.' Mot. for Default J. for Tranche 1 Pls. [ECF No. 232] ("Mot."). Specifically, it addresses ten plaintiffs, on whose claims the Court deferred ruling in its

1

previous opinion. See Cabrera v. Islamic Republic of Iran ("Cabrera IV"), Civ. A. No. 19-3835 (JDB), 2024 WL 3225942, at *2 & n.1 (D.D.C. June 28, 2024).

## I. Background

The background of this case has been recounted at length in numerous opinions over the last two years. See, e.g., Cabrera v. Islamic Republic of Iran ("Cabrera I"), Civ. A. No. 19-3835 (JDB), 2022 WL 2817730 (D.D.C. July 19, 2022); Cabrera v. Islamic Republic of Iran ("Cabrera II"), Civ. A. No. 19-3835 (JDB), 2023 WL 3496303 (D.D.C. May 16, 2023); Cabrera v. Islamic Republic of Iran ("Cabrera III"), Civ. A. No. 19-3835 (JDB), 2024 WL 864092 (D.D.C. Feb. 29, 2024); Cabrera IV, 2024 WL 3225942. Because the facts relating to this case have been set out in greater detail in these prior opinions, the Court's recitation of the facts at this juncture is brief.

On May 31, 2024, the Court awarded judgment to 653 "Tranche 1" plaintiffs. See Order [ECF No. 264] ("Tranche 1 Order"). In an accompanying opinion, the Court explained it was in the process of reviewing the claims of the remaining Tranche 1 plaintiffs, over which the Court had concerns about maintaining jurisdiction. See Cabrera IV, 2024 WL 3225942, at *2 & n.1. The Court now addresses the claims of all but one of the remaining plaintiffs.[1]

## II. Subject-Matter Jurisdiction[2]

"The FSIA provides a basis for asserting jurisdiction over foreign nations in the United States." Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 87 (D.C. Cir. 2002) (citing Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443 (1989)). Although

---

[1] The Court does not discuss the claims arising from the death of HM1 Daniel Brown, as plaintiffs are in the process of filing supplemental briefing on his death.

[2] Under the FSIA, a court has personal jurisdiction over a defendant where the court has subject matter jurisdiction and the defendant has been served. GSS Grp. v. Nat'l Port Auth., 680 F.3d 805, 811 (D.C. Cir. 2012) (citing 28 U.S.C. § 1330(b)). Plaintiffs successfully served Iran through the diplomatic process. Cabrera I, 2022 WL 2817730, at *33. Accordingly, so long as the Court has subject-matter jurisdiction over plaintiffs' claims, it also has personal jurisdiction over Iran.

foreign states are generally "immune from" the jurisdiction of American courts, the FSIA provides exceptions to that immunity in sections 1605 to 1607 of Title 28. 28 U.S.C. § 1604. Federal district courts have original jurisdiction over claims brought within these exceptions. 28 U.S.C. § 1330(a).

In this case, plaintiffs argue that the Court has jurisdiction pursuant to the FSIA's terrorism exception, 28 U.S.C. § 1605A. That exception provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). To satisfy this exception, plaintiffs must show that their personal injuries or death were "caused by," as relevant here, "an act of . . . extrajudicial killing . . . , hostage taking, or the provision of material support or resources for such an act," and that the support was provided by "an official, employee, or agent" of a foreign state acting within the scope of his official position. Id.

This Court has already found that Iran was a designated state sponsor of terrorism at all relevant times and that the victims were United States nationals and/or members of the armed forces at the time of the attacks. Cabrera I, 2022 WL 2817730, at *34. The Court has also found that (1) a terrorist Syndicate operated in Afghanistan during the relevant period of 2006–2017; (2) Iran provided material support for the Syndicate; and (3) the Syndicate was responsible for each of the attacks associated with the plaintiffs discussed in Cabrera I, Cabrera III, and Cabrera IV. See Cabrera I, 2022 WL 2817730, at *6–27; Cabrera III, 2024 WL 864092 at *2–3; Cabrera IV, 2024 WL 3225942, at *2–6. The Court now finds that the Syndicate, and thus Iran, was likewise

3

responsible for the following attacks: the April 18, 2007 Small Arms Attack in the Helmand Province, associated with CPL Zelko III; the October 18, 2010 IED Attack in the Kandahar Province, associated with SPC Stewart; and the September 6, 2010 Indirect Fire Attack in the Kandahar Province, associated with Stephanie Hayhurst.[3]

The Court now addresses whether it has jurisdiction over the claims associated with CPL Zelko and SPC Kyle Stewart, in light of the D.C. Circuit's recent opinion Borochov v. Islamic Republic of Iran, 94 F.4th 1053 (D.C. Cir. 2024). It further addresses whether Georgia Priest, Stephanie Hayhurst, L.R.G., and A.P. have standing to bring their claims as "functional equivalents" of a family member.

### A. Borochov's Impact

In Borochov, the D.C. Circuit clarified the scope of the term "extrajudicial killing" as used in § 1605A. See generally Borochov, 94 F.4th 1053. There, the Circuit made clear that § 1605A only confers jurisdiction over a claim if the relevant attack resulted in a completed extrajudicial killing. Id. at 1060. Accordingly, a plaintiff injured in one of the Syndicate's attacks must establish that the Syndicate succeeded in committing an extrajudicial killing during the relevant attack, not that the Syndicate merely attempted to commit such a killing.

In response to Borochov, plaintiffs submitted a status report "identifying all attacks, and associated Plaintiffs, whose claims are affected" by Borochov. Pls.' Status Rep. Regarding Non-Fatal Attacks [ECF No. 254] ("Status Rep.") at 1. In their report, plaintiffs acknowledged that the Borochov decision raised questions about this Court's jurisdiction over CPL Zelko but argued that jurisdiction was still proper because "he was injured during an extended, multi-day firefight where many individuals were killed . . . [and] the extended firefight was one terrorist 'act' resulting in

---

[3] The Court already found that Iran is liable for the attacks associated with plaintiffs Georgia Priest, L.R.G., and A.P. See Cabrera IV, 2024 WL 3225942, at *2–6.

4

multiple injuries and deaths." Id. at 12–13. They argued similarly for SPC Stewart, who "was injured in an IED explosion that occurred during a prolonged operation," and that resulted in "killing one of his unit members." Id. at 13. The Court requested, and received, supplemental briefing on both of those attacks.

In his supplemental declaration, CPL Zelko explained that between approximately April 1 and April 18, 2007, his unit was working to "take back the Kajaki Dam" from the Taliban. Suppl. Decl. of John Robert Zelko III [ECF No. 268-1] ("Zelko Decl.") at 1. During those eighteen days, CPL Zelko's unit remained in a "troops in contact" designation, which means "that enemy forces were actively engaging [Coalition] forces in a firefight." Id. at 2. On April 18—the day CPL Zelko was injured—his team pursued a specific enemy target in the area and was ambushed by Taliban forces. Id. During the ambush, four Afghan soldiers (and multiple civilians) were killed.[4] Id. CPL Zelko's unit was running out of ammunition and began retreating to resupply while still under fire. Id. at 3. CPL Zelko was returning fire from his unit's truck when it "traversed a narrow area . . . and then suddenly rolled over and into a canal." Id. CPL Zelko remained trapped in the canal until a temporary halt in the "troops in contact" designation was called and his unit "was able to secure a landing zone for a medevac helicopter." Id.

In September–October 2010, SPC Stewart participated in a "large-scale" five-week mission to push the Taliban out of Kandahar. Suppl. Decl. of Kyle James Stewart [ECF No. 268-2] ("Stewart Decl.") at 1–2. On October 18, 2010, the day of his attack, SPC Stewart's team "was tasked with . . . conduct[ing] a sweep of a high value target" in the Kandahar Province. Id. at 2. SPC Stewart's team had completed their security sweeps and were proceeding to a rendezvous point when SPC Stewart unknowingly stepped on an IED, which eventually exploded, injuring

---

[4] This Court previously held that the killing of any Coalition force members, including Afghan soldiers, satisfied Borochov's "extrajudicial killing" requirement. Cabrera IV, 2024 WL 3225942, at *7.

him.  Id.  The next day, SPC Stewart's unit (now without SPC Stewart) continued on the same path and triggered another IED, this time killing a corporal and injuring the other members of SPC Stewart's unit.  Id. at 2–3.

Given these declarations, the Court must determine whether the Syndicate succeeded in committing an extrajudicial killing during the attacks that injured CPL Zelko and SPC Stewart.

In Van Beneden v. Al-Sanusi, the D.C. Circuit considered whether two or more attacks could be deemed part of the same "act or incident," for purposes of the relation-back provision of the FSIA's statute of limitations.  709 F.3d 1165, 1167–68 (D.C. Cir. 2013).  There, the Circuit held that "a single group of people committing two simultaneous attacks planned as part of a coordinated assault on an identifiable group of individuals at similar locations using weapons from the same shipment" constituted the same "incident" under the statute.  Id. at 1168.  Relying on Van Beneden, plaintiffs in other cases have argued post-Borochov that § 1605A's terrorism exception may encompass a set of attacks, even if only one of those attacks resulted in an extrajudicial killing.  See, e.g., Pautsch v. Islamic Republic of Iran, Civ. A. No. 20-3859 (JEB), 2024 WL 3566132, at *4 (D.D.C. July 29, 2024).

But the Van Beneden court based its holding on language in the statute that referred to an "act or incident."  709 F.3d at 1167 (emphasis added).  And while the D.C. Circuit agreed that it must look "to the full spectrum along which discrete actions increasingly relate," it also suggested that the "ordinary meanings of 'act' and 'incident'" differed, with the term "incident" referring to "the totality of [a] terrorist's violence in a single day" and "act" referring to "a single terrorist pulling the trigger a single time."  Id. at 1168.

Although both "act" and "incident" appear in the FSIA's relation-back requirement, only the word "act" appears in the state-sponsor-of-terrorism exception in § 1605A.  Because Congress

6

employed the more inclusive term "incident" in one provision in the statute, but not the other, the omission of "incident" in § 1605A(a)(1) suggests that the terrorism exception has a narrower scope.  Cf. Henson v. Santander Consumer USA Inc., 582 U.S. 79, 86 (2017) ("[W]hen we're engaged in the business of interpreting statutes we presume differences in language . . . convey differences in meaning."); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 107 (2012) ("The expression of one thing implies the exclusion of others.").

Moreover, while Van Beneden interpreted "ambiguities . . . flexibly and capaciously" in the FSIA's non-jurisdictional provisions (there, the relation-back provision), see 709 F.3d at 1167, the provisions regarding the exceptions to sovereign immunity must be "narrowly construed in favor of the sovereign," Borochov, 94 F.4th at 1062 (internal quotation marks omitted).  Hence, the Court concludes that in order to hold that CPL Zelko or SPC Stewart's injuries were "caused by an act of . . . extrajudicial killing," 28 U.S.C. § 1605A(a)(1), it must find that the extrajudicial killing occurred in the same attack, not simply in a series of coordinated attacks.[5]

Of course, the D.C. Circuit's distinctions between "act" and "incident" do not cover attacks that fall between "pulling the trigger a single time" and "the totality of [a] terrorist's violence in a single day," such as an attack by the Syndicate that includes multiple rounds of shooting.  The Circuit itself cautioned against "[m]ining semantics by invoking the ordinary meanings." Van Beneden, 709 F.3d at 1168.  Here, the Court concludes that the attack that caused CPL Zelko's injuries resulted in the extrajudicial killings of Afghan soldiers, while the IED explosion that caused SPC Stewart's injuries did not result in the extrajudicial killing of SPC Stewart's unit

---

[5] Other judges in this District have held similarly.  See Pautsch, 2024 WL 3566132, at *4–5 (rejecting plaintiffs' argument that "a coordinated set of AQI attacks" could be treated "as one extended extrajudicial killing"); Hansen v. Islamic Republic of Iran, Civ. A. No. 22-477 (DLF), 2024 WL 3026517, at *8 (D.D.C. Jun. 17, 2024) ("[T]he FSIA contains a waiver of immunity for discrete 'acts' of terrorism though not necessarily sprawling 'incidents.'").

7

member.

CPL Zelko was injured while his unit attempted to fend off a discrete Syndicate attack. See Zelko Decl. at 2–3. True, he was not injured by the same pulling of the trigger that killed other Coalition forces. But plaintiffs have produced evidence that CPL Zelko was injured during a specific attack in which the Syndicate laid in wait near a small town in the Helmand Province to ambush and kill Coalition forces. Id. at 2. In killing Afghan soldiers during this ambush, the Syndicate completed the extrajudicial killings they set out to commit. And while CPL Zelko estimates that the attack lasted for "an extended period" of time, his estimates reflect that approximately three hours lapsed from the time Afghan soldiers were killed to the time he was injured while attempting to resupply his unit. Id. at 2–3. The temporal proximity between the Afghan soldiers' deaths and CPL Zelko's injuries lends support to plaintiffs' argument that the attack in which CPL Zelko was injured was part of the same attack that killed other Coalition forces. That argument is further supported by CPL Zelko's declaration that his unit attempted to retreat for the purpose of resupplying its ammunition during the ongoing attack. Id. at 3. Given this evidence, the Court agrees that CPL Zelko's injuries stemmed from the same attack in which the Syndicate committed an extrajudicial killing.[6]

But the specific attack that caused SPC Stewart's injuries did not result in an extrajudicial killing. SPC Stewart admits that no one in his unit was killed until a second IED exploded the day after he was already evacuated due to his injuries. Stewart Decl. at 2. Instead, plaintiffs rely on the fact that the IED explosion that actually resulted in a death was 100 meters away on the same

---

[6] The Court is mindful to note that it does not reach this conclusion based on the eighteen-day "troops in combat" designation. That designation would likely place CPL Zelko's eighteen-day ordeal within Van Beneden's "incident" definition but appears to be too extended for the Court to consider it one "act." The Court thus bases its decision only on the specific ambush near the Hemland river that killed Afghan forces and resulted in CPL Zelko's injuries.

8

footpath as the IED that injured SPC Stewart.  Id.; Status Rep. at 13.  They therefore argue that the "death was part of the same terrorist 'act'—a multiday complex attack—that injured Specialist Stewart."  Id. at 13.  The Court is not convinced.

The placement of the two IEDs nearby may indeed have been planned as "coordinated" attacks designed by the same Syndicate forces intended to kill "an identifiable group of individuals" at the same location "using weapons from the same shipment."  Van Beneden, 709 F.3d at 1168.  But that does not mean that the IED explosions—which occurred a day apart and when SPC Stewart was already receiving medical attention in Germany—constituted the same "act" pursuant to § 1605A(a)(1).  See Stewart Decl. at 2.  And plaintiffs have not provided any evidence that the explosions were part of the same act, such as if the IEDs that injured SPC Stewart and killed a U.S. Corporal had been "daisy-chained EFPs" that were linked together.  See Est. of Fishbeck v. Islamic Republic of Iran, Civ. A. No. 18-2248 (CRC), 2024 WL 1931315, at *16 (D.D.C. Apr. 24, 2024).  Instead, the Court is forced to conclude that the two IED explosions were related, but discrete, acts, and thus that SPC Stewart was not injured in the act that caused an extrajudicial killing.  The Court will therefore dismiss his claim.

### B. Immediate Family Members

To bring claims under § 1605A, a plaintiff who is not a direct victim of an attack must (1) be a U.S. national, and (2) "prove that they are an immediate family member, or the functional equivalent, of an individual killed or physically injured."  See 28 U.S.C. § 1605A(c); Cabrera IV, 2024 WL 3225942, at *2.  The "functional equivalent" category of immediate family members "includes members of the victim's household who are viewed as the functional equivalents of immediate family members," even if they are not legally or biologically related.  Fritz v. Islamic Republic of Iran, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) (cleaned up).

9

Family-member plaintiffs are entitled to solatium damages, which are "functionally identical to claims for intentional infliction of emotional distress," and are "intended to compensate persons for mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience . . . as well as the harm caused by the loss of the decedent's society and comfort." Spencer v. Islamic Republic of Iran, 71 F. Supp. 3d 23, 27 (D.D.C. 2014) (internal quotation marks omitted). The Court now turns to four plaintiffs whose standing the Court previously suggested was in question. See Cabrera IV, 2024 WL 3225942, at *2 n.1 ("[T]he Court is still considering whether to grant solatium damages to plaintiffs A.P., L.R.G., Stephanie Hayhurst, and Georgia Priest.").

### 1. Georgia Priest

Plaintiff Georgia Priest was the stepdaughter of 1SG John Blair, who was killed in a complex attack on June 20, 2009. Special Master Christopher A. Byrne's Rep. & Rec. for Damages Awards for Fifty (50) Non-Bellwether Pls. for Attacks Occurring in Afghanistan in 2007, 2008 & 2009 [ECF No. 231-2] ("Byrne Rep.") at *137. 1SG Blair began dating Ms. Priest's mother in 2002 when Ms. Priest was eighteen years old, and they began living together that year. Id. at *658. He became Ms. Priest's stepfather a year later when she was nineteen. Id. at *658–59. 1SG Blair was "the only father [she] ever knew," and she considers him the functional equivalent of her father. Id. at *659. Nevertheless, Special Master Byrne found that Ms. Priest "falls outside the ambit of the relief afforded to immediate family members under 28 USC § 1605A," in part because their "father-child relationship is attenuated and only supported by her mother's marriage at the time Mrs. Priest was an adult" and because her declaration did "not document important factual information to assess the basis for emotional distress . . . for a father-daughter relationship." Id. at *136–39. Plaintiffs objected. Afghanistan-Based Pls.' Objs. to

10

Special Master Reps. & Recs. for Tranche 1 Pls. [ECF No. 237] at 4–7.

The Court agrees with plaintiffs. First, the Court is not aware of any precedent that categorically limits the functional equivalency test to children who began a relationship with the victim only before reaching the age of majority. The closest case this Court can identify is Estate of Heiser v. Islamic Republic of Iran, in which the court noted that two non-adoptive stepfathers satisfied the immediate-family test because "both lived in the same household as their stepsons while the stepsons were still minors and treated them as their own sons in every sense (e.g., financially, emotionally, socially)." 659 F. Supp. 2d 20, 29 (D.D.C. 2009) (internal quotation marks omitted). The court in Heiser arguably drew a line between minor and adult children. But the Heiser court also recognized that, "in those rare cases in which the parties at issue had lived in the victim's immediate household and had been in other important respects like a spouse, parent, sibling, or child to the victim, circumstances may require a slight stretching of the immediate-family requirement." Id. This Court is not prepared to implement a hardline rule regarding the age at which a child developed a relationship with a stepparent; instead the Court will continue to look to factors such as whether the plaintiff lived in the victim's immediate household and was otherwise treated as the functional equivalent of a child.

Indeed, judges in this District have considered relationships formed at the time a child reached the age of majority to be the functional equivalent of a family member. In Fritz v. Islamic Republic of Iran, the court considered the relationship between Vanessa Chism and her victim stepson Bryan. 324 F. Supp. 3d at 63. Bryan first met Vanessa when he was seventeen and became her stepson when he was eighteen. Fritz v. Islamic Republic of Iran, Civ. A. No. 15-456 (RDM), 2018 WL 5046229, at *6 (D.D.C. Aug. 13, 2018), report and recommendation adopted as modified by 324 F. Supp. 3d 54. In the three-year period between Vanessa's marriage and Bryan's

11

deployment, Bryan lived with Vanessa approximately one week per month. Id. Despite Bryan's age, the court agreed that the record established "that Bryan's relationship to Vanessa was functionally equivalent to that of 'son.'" Id. at *22; accord Fritz, 324 F. Supp. 3d at 63 (agreeing with the special master that Vanessa met the "functional equivalent" test). Admittedly, Ms. Priest's case slightly differs because Bryan met Vanessa when he was still technically a minor. But the court focused on the type of relationship the two had, even though Bryan "was over 18 for a period of the time he lived in the same household." Id.; see also id. ("The testimony indicates that Bryan confided in Vanessa and sought her advice."); cf. Fritz, 324 F. Supp. 3d at 63 n.1 ("[T]he Court concludes that Andrew Lucas has demonstrated that his relationship with Shawn was sufficiently close to entitle Andrew to the solatium award of a full sibling. . . . Andrew was also profoundly affected by Shawn's death and was personally involved in the aftermath."). The special master concluded that "the age at which the relationship commenced could be a relevant factor" in determining the amount of damages Vanessa could receive, and the court adopted the special master's recommendation. Fritz, 2018 WL 5046229, at *6; accord Fritz, 324 F. Supp. 3d at 63 (adopting the special master's recommendation regarding the amount of solatium damages to be awarded).

Finally, upon review of the record, the Court concludes that the record does include information establishing that a father-daughter relationship existed between Ms. Priest and 1SG Blair. For those reasons, the Court finds that Ms. Priest has standing to bring her claim. The Court will consider "the age at which the relationship commenced," as well as the duration of the relationship, when awarding solatium damages.

   2. **Stephanie Hayhurst**

Plaintiff Stephanie Hayhurst was the stepdaughter of Mr. Alan Herzel, a U.S. contractor

who was killed on September 6, 2010 in an indirect fire attack. Special Master's Rep. & Recs. Regarding 187 Pls. [ECF No. 231-9] ("Saltzburg Rep.") at *162. She met Mr. Herzel when she was nineteen years old and officially became his stepdaughter six years later when she was twenty-five. Id. Ms. Hayhurst lived with Mr. Herzel for approximately two-and-a-half years with her two young children and credibly describes a close relationship with him. Id. Ms. Hayhurst considers him the functional equivalent of her biological father, and Special Master Saltzburg found that she satisfied the functional-equivalent-of-an-immediate-family-member test to recover solatium damages. Id. The Court agrees and finds that she has standing to seek solatium damages. As with Ms. Priest, the Court will consider "the age at which the relationship commenced," as well as the duration of the relationship, when awarding solatium damages.

### 3. L.R.G.

Plaintiff L.R.G. was the stepsister of SPC Michael "Isaiah" Nance, who was killed in an insider attack on July 29, 2019. Saltzburg Rep. at *263–64. L.R.G. and SPC Nance had a seventeen-year age gap, but their family reports that they "were exceedingly close despite their age difference." Id. at *255–56, *263–64. At the time of L.R.G.'s birth, SPC Nance lived with his mother for a majority of the time but lived in the same house as L.R.G. every weekend. Id. at *263–64. SPC Nance was killed when L.R.G. was only six years old. Id. When L.R.G. learned of his death, "she broke down crying uncontrollably for some time," and she "continues to mourn the loss of her big brother, and often talks about how much she misses him." Id. at *264. Special Master Saltzburg concluded that L.R.G. "satisfies the functional-equivalent-of-an-immediate-family-member test," id., and the Court agrees. To the extent L.R.G.'s age or type of relationship with SPC Nance is relevant here, it is relevant only to the measure of damages she may recover.

### 4. A.P.

Plaintiff A.P. was the brother of LCpl Charles Seth Sharp, who was killed in a small arms attack on July 2, 2009. Saltzburg Rep. at *117. A.P. was only one year old at the time of LCpl Sharp's death and was born after LCpl had already joined the military. Id. Accordingly, he has no personal memories of his brother. Most relevant to the question of A.P.'s standing is that A.P. does not yet know of his brother's death. Id. In order to protect A.P.'s emotional well-being, his parents have decided to wait until he is older to share the news of LCpl Sharp's death. Id. A.P.'s parents represent that "A.P. was subjected to sadness and trauma coming from his mother and the rest of the family," and that they are "worried about how much the stress surrounding A.P. affected him mentally, or if there will be any residual effects." Id. at *117–18. They further claim that "A.P. was and will be unable to experience the joys of having a brother as he continues through his life." Id. at *118. While these claims may be true, solatium damages are "intended to compensate persons for mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience . . . as well as the harm caused by the loss of the decedent's society and comfort." Spencer, 71 F. Supp. 3d at 27 (internal quotation marks omitted). The Court fails to see how it can award solatium damages for the loss and grief caused by a loved one's death when the plaintiff himself is not aware of the death. Plaintiffs have not provided any precedent, and the Court is not aware of any precedent, that permits an individual to recover solatium damages in this type of circumstance. Accordingly, the Court will deny A.P.'s claim without prejudice. A.P. may bring his claim when and if his declaration evinces emotional distress he has actually suffered as a result of LCpl Sharp's death.

## III. Damages

The Court will award damages to plaintiffs over whom the Court has jurisdiction of their claims in the amounts consistent with its previous awards in this case. The Court will award the

following compensatory damages to the following plaintiffs:

| Plaintiff | Pain and Suffering or Solatium Damages |
|---|---|
| CPL Jonathan Zelko III | $7,000,000 |
| John R. Zelko Jr. | $2,500,000 |
| Karen Suzanne Zelko | $2,500,000 |
| Jennifer Marie Zelko | $1,250,000 |
| Trent Donald Zelko | $1,250,000 |
| Georgia Priest | $2,500,000 |
| Stephanie Hayhurst | $2,500,000 |
| L.R.G. | $1,500,000 |

### IV.   Prejudgment Interest

The Court previously concluded that "an award of prejudgment interest is appropriate" in this case. Cabrera I, 2022 WL 2817730, at *55; Cabrera II, 2023 WL 3496303, at *12. The Court calculated the bellwether plaintiffs' "interest amount by following the D.C. Circuit's recommendation in Forman v. Korean Air Lines Co., 84 F.3d 446 (D.C. Cir. 1996)," Cabrera I, 2022 WL 2817730, at *55, and used the same methodology with these plaintiffs.

### Conclusion

For the foregoing reasons, the Court concludes that it has jurisdiction over the claims arising from the attack on CPL Zelko, but not from the attack on SPC Stewart. The Court further concludes that plaintiffs Georgia Priest, Stephanie Hayhurst, and L.R.G. have standing to bring their claims but dismisses without prejudice plaintiff A.P.'s claim for solatium damages. The Court will issue an accompanying Order consistent with this Opinion.

/s/
John D. Bates
United States District Judge

Dated: September 30, 2024