## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AUGUST CABRERA, *et al.*,<br><br>      Plaintiffs,<br><br>      v.<br><br>ISLAMIC REPUBLIC OF IRAN,<br><br>      Defendant. | Civil Action No. 19-3835 (JDB) |
| MARK ZAMBON, *et al.*,<br><br>      Plaintiffs,<br><br>      v.<br><br>ISLAMIC REPUBLIC OF IRAN,<br><br>      Defendant. | Civil Action No. 18-2065 (JDB) |

## <u>MEMORANDUM OPINION</u>

Over the past several years, this Court has awarded default judgment and damages to hundreds of plaintiffs in these coordinated Foreign Sovereign Immunities Act ("FSIA") lawsuits. The lawsuits center around the atrocities that terrorist groups including al-Qaeda, the Taliban, and the Haqqani Network (together, the "Syndicate") committed in Afghanistan between 2006 and 2019. The Court now resolves a motion for default judgment by another 197 plaintiffs. It grants the motion for and awards damages to those plaintiffs whose claims the Court has power to adjudicate.[1]

---

[1] All ECF numbers in this Opinion refer to the docket in <u>Cabrera</u>, Civ. A. No. 19-3825, unless otherwise noted.

## Background

The factual and procedural background of this case is well documented in the Court's prior opinions. See, e.g., Cabrera v. Islamic Republic of Iran ("Cabrera I"), Civ. A. No. 19-3835 (JDB), 2022 WL 2817730 (D.D.C. July 19, 2022); Cabrera v. Islamic Republic of Iran ("Cabrera II"), Civ. A. No. 19-3835 (JDB), 2023 WL 3496303 (D.D.C. May 16, 2023); Cabrera v. Islamic Republic of Iran ("Cabrera III"), Civ. A. No. 19-3835 (JDB), 2024 WL 864092 (D.D.C. Feb. 29, 2024); Cabrera v. Islamic Republic of Iran ("Cabrera IV"), Civ. A. No. 19-3835 (JDB), 2024 WL 3225942 (D.D.C. June 28, 2024); Cabrera v. Islamic Republic of Iran ("Cabrera V"), 752 F. Supp. 3d 183 (D.D.C. 2024).

What is most relevant here is how the Court structured the litigation to accommodate the large number of plaintiffs. In July 2022, the Court issued a memorandum opinion relating to 23 "bellwether plaintiffs" with claims arising from eleven "bellwether attacks." Cabrera I, 2022 WL 2817730, at *1. The Court made numerous findings of fact relevant here, including which regions of Afghanistan the Syndicate dominated during the relevant time; the tactics, techniques, and procedures ("TTPs") the Syndicate used; and that Iran materially supported the Syndicate. Id. at *5–15. The Court then concluded that each bellwether plaintiff was entitled to default judgment— i.e., that the Court had jurisdiction over each plaintiff's claim and each plaintiff had a cause of action under the FSIA—and awarded each plaintiff pain and suffering or solatium damages. Id. at *33–54.

After the bellwether opinion, the Court began issuing administrative plans appointing Special Masters to make recommendations on "all issues related to each plaintiff proving their entitlement to compensatory damages," including their standing, cause of action, and finding of facts as to "the scope of [their] compensatory damages." See, e.g., Order Adopting Admin. Plan

Concerning Special Masters [ECF No. 79] at 2–3; Order Appointing Tranche 2 Special Masters & Adopting Admin. Plan Concerning Special Masters [ECF No. 278] ("Tranche 2 Special Masters Order") at 2–3; 28 U.S.C. § 1605A(e)(1) (empowering federal district courts to "appoint special masters to hear damage claims brought under this section"). In September 2024, the Court resolved the last claims of the Tranche 1 Plaintiffs. See Cabrera V, 752 F. Supp. 3d 183. That leaves the Tranche 2 plaintiffs.

On November 1, 2024, the Tranche 2 plaintiffs filed their motion for default judgment. Afghanistan-Based Plaintiffs' Mot. Default J. Tranche 2 Pls. [ECF No. 288] ("Mot."). These 197 plaintiffs fall into two categories: 55 are "damages-only" plaintiffs who are associated with a direct victim of an attack for which the Court has already found Iran liable, and 142 are "traditional damages-and-liability" plaintiffs associated with 58 direct victims and 57 attacks, the liability for which this Court has not yet ruled. Id. at 3. The 197 claims were divided between five Special Masters: Eric D. Green, Paul G. Griffin, Shelby R. Grubbs, Brad Pigott, and Stephen Allan Saltzburg. See Tranche 2 Special Masters Order at 1. Tranche 2 plaintiffs rely on the Special Masters' reports and recommendations to argue each plaintiff is entitled to default judgment and the damages award suggested by the relevant Special Master.

Upon reviewing the motion for default judgment and the attendant Special Master reports, the Court noticed that the Special Masters had concluded that three attacks that did not result in the immediate death of a U.S. servicemember, member of the Coalition Force, or civilian constituted "extrajudicial killings" within the meaning of the FSIA. See 28 U.S.C. § 1605A(a)(1). These conclusions were not obvious, so the Court ordered supplemental briefing. See Order [ECF No. 292]. Plaintiffs provided that briefing on January 23, 2025. Pls.' Suppl. Br. Resp. Court's

Dec. 19, 2024 Order [ECF No. 294] ("Suppl. Br."). In their view, the Special Masters' conclusions are correct. See generally id.

<u>**Analysis**</u>

The Court begins by determining whether it has subject matter jurisdiction over each Tranche 2 plaintiff's claim. It then determines whether each Tranche 2 plaintiff has a cause of action under the FSIA. Finally, the Court awards compensatory damages.

## I.    Subject Matter Jurisdiction[2]

Under the FSIA, the default rule is that foreign nations are immune from suit in American courts. Borochov v. Islamic Republic of Iran, 94 F.4th 1053, 1057 (D.C. Cir. 2024). One exception to that rule is the so-called terrorism exception: American courts have jurisdiction over claims for "money damages . . . against a foreign state for personal injury or death that was caused by"—as relevant here—"an act of . . . extrajudicial killing . . . or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1).[3] Each liability-and-damages plaintiff alleges she suffered "personal injury or death" that was "caused by" one of 57 terrorist attacks. So the remaining questions are whether Iran is liable for those attacks—i.e., whether the Syndicate committed those attacks and whether Iran provided material support for them—and whether the attacks were "extrajudicial killing[s]" within the meaning of the FSIA.

_____

[2] If the Court has subject matter jurisdiction, it has personal jurisdiction, too. "Under the FSIA, a court has personal jurisdiction over a defendant where the court has subject matter jurisdiction and the defendant has been served." Cabrera IV, 2024 WL 3225942, at *2 n.2. Plaintiffs successfully served Iran through diplomatic process. Id.

[3] In addition to § 1605A(a)(1)'s requirements, subject matter jurisdiction requires satisfying § 1605A(a)(2)'s requirements. The Court has already found that "Iran was designated as a state sponsor of terrorism at all relevant times." Cabrera I, 2022 WL 2817730, at *34; § 1605A(a)(2)(A)(i)(I). Plus, all the attacks at issue in this Opinion took place outside of Iran, so plaintiffs need not have "afforded [Iran] a reasonable opportunity to arbitrate the claim." § 1605A(a)(2)(A)(iii). And the Court adopts the Special Masters' findings that the relevant attack victims were United States nationals, members of the armed forces, and/or United States government employees or contractors at the time the attacks occurred. See § 1605(a)(2)(A)(ii).

### a. Liability

The Court has already made several relevant factual findings. The Syndicate operated in Afghanistan from 2006 to 2019 with a goal of "re-establishing the Islamic Emirate by driving the United States and its allies out of Afghanistan through the killing and wounding of American troops." Cabrera III, 2024 WL 864092, at *2. Iran, in turn, "provided material support to the Syndicate in the form of weapons, training, financial support, and safe haven." Id. During the relevant period, the Syndicate operated in specific regions (Southern Afghanistan, Loya Paktia, Kabul Province, Eastern Afghanistan, North Central Afghanistan, Western Afghanistan, and Southeastern Afghanistan) and used specific TTPs (e.g., complex attacks, improvised explosive devices ("IEDs"), infantry-style tactics, indirect fire attacks, insider attacks, and suicide attacks). Cabrera I, 2022 WL 2817730, at *13–17. Pursuant to those findings and consistent with the Special Masters' recommendations,[4] the Court concludes that Iran supplied material support for the following attacks that the Syndicate committed:

1. September 5, 2006 Complex Attack, Kandahar Province

2. August 26, 2007 Direct Fire Attack, Paktika Province

3. November 10, 2007 Complex Attack, Kapisa Province

4. January 14, 2008 Complex Attack, Kabul Province

5. June 28, 2008 IED Attack, Southeastern Afghanistan

6. July 13, 2008 Complex Attack, Helmand Province

7. July 21, 2008 Complex Attack, Helmand Province

---

[4] To support their liability recommendations, the Special Masters relied on expert reports by Dr. Daveed Gartenstein-Ross, see Expert Witness Report, Dr. Daveed Gartenstein-Ross [ECF No. 289-6], and Lt. Col. Steven A. Wood, see Expert Report of Steven A. Wood, LTC, USA (Ret.) [ECF No. 289-7]. The Court credits those experts' reports as it has done previously. See Cabrera III, 2024 WL 864092, at *3 (crediting report of Dr. Gartenstein-Ross); Cabrera I, 2022 WL 2817730, at *5 (crediting report of Lt. Col. Wood).

8.  August 1, 2008 IED Attack, Khost Province

9.  October 22, 2008 IED Attack, Farah Province

10. January 17, 2009 Suicide Attack, Kabul Province

11. February 20, 2009 Complex Attack, Uruzgan Province

12. May 26, 2009 Suicide Attack, Parwan Province

13. August 20, 2009 IED Attack, Wardak Province

14. August 21, 2009 Complex Attack, Kunar Province

15. August 31, 2009 IED Attack, Kandahar Province

16. September 12, 2009 Complex Attack, Kunar Province

17. October 23, 2009 IED Attack, Kandahar Province

18. October 27, 2009 IED Attack, Kandahar Province

19. November 19, 2009 Suicide Attack, Zabul Province

20. November 22, 2009 IED Attack, Kandahar Province

21. November 23, 2009 Indirect Fire Attack, Kandahar Province

22. December 30, 2009 Insider Attack, Khost Province

23. January 9, 2010 IED Attack, Helmand Province

24. March 16, 2010 Suicide Attack, Kandahar Province

25. May 7, 2010 IED Attack, Helmand Province

26. May 11, 2010 Complex Attack, Logar Province

27. June 21, 2010 Suicide Attack, Kunar Province

28. June 26, 2010 IED Attack, Wardak Province

29. July 24, 2010 IED Attack, Zabul Province

30. August 4, 2010 IED Attack, Helmand Province

31. August 24, 2010 IED Attack, Uruzgan Province

32. August 27, 2010 IED Attack, Paktia Province

33. October 11, 2010 IED Attack, Helmand Province

34. January 20, 2011 Rocket-Propelled Grenade ("RPG") Attack, Baghlan Province

35. January 31, 2011 IED Attack, Wardak Province

36. February 7, 2011 IED Attack, Kandahar Province

37. March 22, 2011 Complex Attack, Logar Province

38. April 13, 2011 IED Attack, Laghman Province

39. April 16, 2011 Insider Attack, Laghman Province

40. May 10, 2011 IED Attack, Khost Province

41. May 29, 2011 Complex Attack, Wardak Province

42. July 31, 2011 IED Attack, Kunar Province

43. September 25, 2011 Insider Attack, Kabul Province

44. January 2, 2012 IED Attack, Helmand Province

45. January 6, 2012 IED Attack, Kandahar Province

46. April 25, 2012 IED Attack, Kandahar Province

47. May 7, 2012 IED Attack, Ghazni Province

48. May 13, 2012 IED Attack, Khost Province

49. July 22, 2012 Insider Attack, Herat Province

50. August 8, 2012 Suicide Attack, Kunar Province

51. September 16, 2012, Insider Attack, Zabul Province

52. May 16, 2013 Suicide Attack, Kabul Province

53. January 17, 2014 Complex Attack, Kabul Province

54. August 24, 2014 Complex Attack, Nangarhar Province

55. August 26, 2015 Insider Attack, Helmand Province

56. December 21, 2015 Suicide Attack, Parwan Province

57. January 14, 2019 Suicide Attack, Kabul Province

### b. Extrajudicial Killings

Even if Iran provided material support for an attack, the Court only has subject matter jurisdiction if that attack constituted "an act of . . . extrajudicial killing." § 1605A(a)(1). The Special Masters concluded that each attack did. While the Court adopts the recommendations as to 54 of the attacks, it concludes that three were not extrajudicial killings within the meaning of the FSIA.

### i. Section 1605A(a)(1) and Borochov

The Court begins by explaining what tees up these extrajudicial-killing questions. In full, the terrorism exception reads:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

§ 1605A(a)(1). "Extrajudicial killing" is defined to mean what it does in the Torture Victim Protection Act of 1991 ("TVPA"): "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." § 1350 note; § 1605A(h)(7). This breaks down into three elements: "(1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." Owens v. Republic of Sudan, 864 F.3d

751, 770 (D.C. Cir. 2017), vacated & remanded on other grounds sub nom. Opati v. Republic of Sudan, 590 U.S. 418 (2020).

But what if the terrorist attack for which a foreign state provided material support was intended to kill its victims, but succeeded only in injuring them?  For some time, this Court and other judges in this District held that the terrorism exception reached a nation that provided material support for such "deliberated attempts to kill."  Cabrera I, 2022 WL 2817730, at *37 (cleaned up); see also, e.g., Gill v. Islamic Republic of Iran, 249 F. Supp. 3d 88, 99 (D.D.C. 2017); Karcher v. Islamic Republic of Iran, 396 F. Supp. 3d 12, 58 (D.D.C. 2019).  Regardless of the outcome of the attack, the reasoning went, the foreign state gave its money, training, weapons, etc. with the intention of supporting an attack that would cause death.  See Karcher, 386 F. Supp. at 57–58.  So the nation still provided "material support" for "an act of . . . extrajudicial killing." § 1605A(a)(1).

Last year, however, the D.C. Circuit rejected that reasoning.  In Borochov v. Islamic Republic of Iran,[5] the Circuit held that an injury or death is only "caused by an act of . . . extrajudicial killing" if "the perpetrator . . . kill[ed] [some]one in the attack" in question.  94 F.4th at 1060–61.  To start, the Circuit looked to the ordinary meaning of the word "killing" and concluded that "the word . . . refers to an action resulting in the death of another."  Id. at 1061.  So terrorists only commit an act of extrajudicial killing if they actually kill someone, not if they merely attempt to do so.  See id. at 1061–62.  Then, the Circuit applied common law aiding-and-abetting principles to conclude that a foreign state can only provide material support for an act of extrajudicial killing if the extrajudicial killing was completed.  See id. at 1063–64 ("The

---

[5] The plaintiffs in Borochov have petitioned the Supreme Court for certiorari.  See Borochov v. Islamic Republic of Iran, Case No. 22-7058.  As of the date of this Opinion, the Supreme Court has requested the views of the Solicitor General.

requirement of a completed crime dates back centuries to the common law, which provided that 'an accessory could not be convicted without the prior conviction of the principal offender.'" (quoting Standefer v. United States, 447 U.S. 10, 15 (1980)); id. at 1064 ("Civil aiding-and-abetting liability follows the same rule: an accomplice is liable only if the principal actually completes the tort."). This narrow reading of the terrorism exception, the Circuit concluded, is also consistent with the principle that courts must read "[e]xplicit waivers of sovereign immunity . . . narrowly." Id. at 1062 (internal quotation marks omitted); see also id. at 1067. As a result, it is not sufficient that the foreign state provided material support for a terrorist intending for that terrorist to commit a killing. Nor is it sufficient that the terrorist intended to commit a killing. The terrorist must succeed: only victims of deadly attacks can sue a foreign state for supporting an extrajudicial killing. See id.

Since Borochov, this Court and other judges in this District have been working to determine what is and is not an extrajudicial killing. See, e.g., Cabrera IV, 2024 WL 3225942, at *7; Pautsch v. Islamic Republic of Iran, Civ. A. No. 20-3859 (JEB), 2024 WL 3566132, at *3–4 (D.D.C. July 29, 2024); Hansen v. Islamic Republic of Iran, Civ. A. No. 22-477 (DLF), 2024 WL 3026517, at *4–6 (D.D.C. June 17, 2024). For example, this Court determined earlier in this case that an attack which kills Afghan soldiers—i.e., non-U.S. members of the Coalition Forces—is an extrajudicial killing, Cabrera IV, 2024 WL 3225942, at *7, and another judge determined the same is true of an attack which kills civilians, see Strauss v. Islamic Republic of Iran, Civ. A. No. 22-52 (RCL), 2025 WL 740456, at *8 (D.D.C. Mar. 7, 2025); see also Cabrera V, 752 F. Supp. 3d at 189.

Three attacks at issue here present situations the Court has yet to face. Those three attacks are the August 24, 2014 Complex Attack in Nangarhar Province, the March 16, 2010 Suicide Attack in Kandahar Province, and the May 7, 2010 IED Attack in Helmand Province. During

those attacks and immediately afterwards, no member of the Coalition Forces, civilian, or U.S. citizen died. But Special Masters Saltzburg and Green concluded—and plaintiffs now argue— that the attacks still constituted extrajudicial killings for two reasons. <u>See</u> Suppl. Br. at 1–2. First, two of the attacks were suicide bombings in which the bomber died. <u>Id.</u> at 10–12. Second, U.S. servicemembers injured in two of the attacks took their own lives years later due at least in part to the injuries they had sustained in the attack.[6] <u>Id.</u> at 3–10.

### i. Death of Suicide Bomber

While serving in Afghanistan, U.S. Army Captain Carey DuVal and U.S. Army Staff Sergeant Allen R. Thomas were both injured in separate suicide bombings. <u>See</u> Expert Report of Steven A. Wood, LTC, USA (Ret.) [ECF 289-7] ("Wood Rep.") at 65–68 (describing the August 24, 2014 Complex Attack in Nangarhar Province that injured CPT DuVal); Expert Witness Report, Dr. Daveed Gartenstein-Ross [ECF No. 289-6] ("Gartenstein-Ross Rep.") at 52–54 (describing the March 16, 2010 Suicide Attack in Kandahar Province that injured SSG Thomas). CPT DuVal now sues to recover for his injuries, and Danica Thomas and L.T., SSG Thomas's family members, sue to recover for their injuries caused by the attack SSG Thomas suffered.[7] Neither attack, however, immediately killed a member of the Coalition Force, a civilian, or a U.S. citizen—only the suicide bomber died.

According to plaintiffs, the Court has jurisdiction over these three claims because the suicide bomber's death made the attack an extrajudicial killing. Indeed, plaintiffs advocate for a "bright-line rule": "[w]hen a foreign state provides material support for a terrorist-group's suicide

---

[6] The Court uses the phrases "took his own life" and "self-inflicted death" to refer to both intentional and accidental death at one's own hand.

[7] As the Court will detail later, SSG Thomas tragically took his own life years after he was injured in Afghanistan.

bombing, and that bombing kills the bomber, the attack is an act of extrajudicial killing." Suppl. Br. at 10. Such a rule is supported by <u>Borochov</u>, say plaintiffs, because suicide bombings deliberately cause the death of the suicide bomber, and that same action causes the injuries of any victims caught in the bomb's blast. See <u>id.</u> at 11–12.

The Court disagrees. <u>Borochov</u> explicitly defined extrajudicial killing to cover only "act[s] [that] result[] in the death of <u>another</u>."[8] 94 F.4th at 1061 (emphasis added); <u>Mamani v. Sánchez Bustamante</u>, 968 F.3d 1216, 1233 (11th Cir. 2020) (an extrajudicial killing "requires, at a minimum, that there be a considered, purposeful act that takes another's life"). So, to be a killing, the act in question—here, the detonation of the bomb—must result in the death of someone <u>other than</u> the person who commits that act. Here, that means that it must kill someone other than the suicide bomber.

Plaintiffs dispute that <u>Borochov</u> requires as much. See Suppl. Br. at 10–11. They point out that the plaintiffs in <u>Borochov</u> argued that the attack in question was an extrajudicial killing because the attacker was killed by an onlooker in self-defense. See <u>Borochov</u>, 94 F.4th at 1062. It was in that context that the D.C. Circuit said that an attacker's death "does not suffice," and that was because neither the terrorists nor their supporters "undert[ook], much less 'deliberated'" the self-defense shooting, "[n]or did the shooting cause" the plaintiffs' injuries. <u>Id.</u> (citations omitted). Thus, in plaintiffs' view, <u>Borochov</u> did not hold that an extrajudicial killing requires someone other than the actor to die. See Suppl. Br. at 10–11. The statement that a killing requires "the death of another" was simply dictum. See <u>id.</u>

Fair enough. But that dictum is persuasive, especially because it is consistent with the plain text of the definition of extrajudicial killing. Moving beyond the dictionaries <u>Borochov</u> cites,

---

[8] The Court takes for granted that terrorist suicide bombings, including the two at issue here, are not "authorized by a previous judgment pronounced by a regularly constituted court."

its statement that a killing must result in the death of another comports with how the noun killing is used in everyday speech. See Mohamad v. Palestinian Auth., 566 U.S. 449, 454 (2012) (ordinary usage informs statutory meaning). If the morning news broadcast pronounces that "there was a killing last night," a listener understands that a homicide occurred, not a suicide. Cf., e.g., United States v. McGill, 815 F.3d 846, 891 (D.C. Cir. 2016) ("[T]hese were not cases . . . where outsiders are unsure whether there was a killing at all. The question was who did the killing."); Patterson v. New York, 432 U.S. 197, 215 (1977) ("[A] killing became murder in Maine when it resulted from a deliberate, cruel act committed by one person against another."); Homer, The Odyssey 411 (Robert Fitzgerald trans., Farrar, Straus and Giroux 1998) ("There will be killing till the score is paid."). It is only when killing is used as a verb with a reflexive pronoun that a listener understands a speaker to refer to the taking of one's own life. Cf., e.g., Taylor v. Barkes, 575 U.S. 822, 823 (2015) (per curiam) ("And he indicated that he was not currently thinking about killing himself."); William Shakespeare, Othello act 5, sc. 2 ("[N]o way but this, Killing myself, to die upon a kiss.").

This ordinary meaning of killing is consistent with the rest of the definition of extrajudicial killing—that the killing is "not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." § 1350 note. That a killing occurred without judicial process implies that the killing is one for which civilized nations would require judicial process before permitting its commission. Voluntary suicide bombings would not so require; indeed, that individual's suicide would not ordinarily be framed as a human-rights violation. See Jesner v. Arab Bank, PLC, 584 U.S. 241, 266 (2018) (explaining that an "extrajudicial killing" is a "human-rights violation[]" under international law). What is a human-rights violation, though, is a state-backed group's taking of another's life without judicial process.

13

Zooming out, the rest of § 1605A(a)(1) confirms that a killing is an act by one person done to another.  The same is true for the other acts that support the terrorist exception: torture, aircraft sabotage, and hostage taking all require a perpetrator that is separate from the victim.  See § 1605A(a)(1).  Take the definition of hostage taking, which in relevant part states "[a]ny person who seizes or detains and threatens to kill, to injure or to continue to detain <u>another person</u> . . . commits the offence of taking of hostages."  International Convention Against the Taking of Hostages art. 1, ¶ 1, Dec. 17, 1979, 1316 U.N.T.S. 205 (emphasis added); § 1605A(h)(2) (incorporating that definition into the FSIA); <u>see also</u> § 1350 note (defining "torture" as "any act, directed <u>against</u> an individual in the offender's custody . . . ." (emphasis added)).  In short, the acts listed in § 1605A(a)(1)—including extrajudicial killing—are not reflexive.  They require a perpetrator who acts upon a distinct victim, not upon him or herself.

Further, the statutory source of the definition of extrajudicial killing, the TVPA, provides fodder to the conclusion that the term requires an act done by one onto another. <u>See</u> <u>Borochov</u>, 94 F.4th at 1061.  The TVPA imposes liability on any "individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to extrajudicial killing." TVPA § 2(a)(2); <u>see also</u> <u>Mohamad</u>, 566 U.S. at 453.  No liability attaches, then, without one individual who acts upon <u>another</u> individual.

Common law and the greater U.S. Code also provide support for this conclusion.  While suicide was a crime at common law in England, it had ceased to be one in the United States long before Congress passed the terrorism exception in 1996.  <u>See</u> 2 Wharton's Criminal Law § 22:22 (16th ed. 2024).  Now, "absent a statute providing otherwise, suicide and attempted suicide are no longer punishable offenses."  <u>Id.</u>  That means that a general murder law—take, for example, the federal murder statute, 18 U.S.C. § 1111(a)—does not reach one who voluntarily takes her own

life.  Yet its language does not explicitly say that; rather, it simply defines murder as "the unlawful killing of a human being with malice aforethought."  § 1111(a).  The takeaway is that Congress uses "killing" to mean the act of one that ends the life of another, not an act by one that ends his own life.

So an extrajudicial killing indeed requires that the act in question "result[] in the death of another."  Borochov, 94 F.4th at 1061.  No matter, say plaintiffs, because a suicide bombing does result in the death of another: "[A] successful suicide attack" by a terrorist organization, plaintiffs say, "always results in the death of 'another'"—an individual terrorist.  Suppl. Br. at 11.  While clever, this reorientation of the question does not work.  When analyzing a terrorist attack under the FSIA, a court views the member of the terrorist organization who carried out the attack as acting on behalf of the organization, not as an actor independent of it.  Never has this Court, or any other court, viewed the terrorist who pulled the trigger as distinct from the greater organization to which the foreign state in question provided material support.  In other words, the individual terrorist is not separate from the terrorist organization itself.  He is not "another," and thus his death cannot amount to an extrajudicial killing.  See Borochov, 94 F.4th at 1061.

Here, the Syndicate surely intended its suicide bombs to kill CPT Duval, SSG Thomas, and their compatriots.  And Iran undoubtedly deliberately supported the Syndicate for the purpose of killing Americans and other members of the Coalition Forces.  See Cabrera III, 2024 WL 864092, at *2.  But under Borochov's reading of the terrorism exception, that is not enough.  The attack must result in the death of another.  Borochov, 94 F.4th at 1061–64.  The text of the terrorism exception is best read to exclude an attack that results in the death only of a suicide bomber.[9]  As

---

[9] At least a voluntary suicide bomber.  One could imagine, for example, a scenario in which terrorists force a person to wear and detonate a bomb against his will.  That is not the situation presented to this Court, and this Opinion's reasoning should not be read to exclude that scenario from the definition of extrajudicial killing.

a result, the attack that injured CPT Duval was not an extrajudicial killing and the Court lacks subject matter jurisdiction over his claim.

Plaintiffs then make an alternative argument as to why the attack that injured SSG Thomas was an extrajudicial killing. The Court turns to that argument now.

### ii. Self-Inflicted Death Years After Attack

Plaintiffs argue that the Court has jurisdiction over six plaintiffs' claims—including those of Danica Thomas and L.T.—because an injured servicemember took his own life years after the attack that injured him. The other four plaintiffs, F.S., Dawn Marie Pattee, Kristen Colleen Luncers, and Jalisa Marie Stark, are family members of U.S. Marine Corps Lance Corporal Randal Paul Wright. Because the details of their injuries and premature deaths are essential to resolving the question presented, the Court begins by briefly recounting the tragic stories of SSG Thomas and LCpl Wright. The Court then moves to the extrajudicial-killing analysis.

### 1. SSG Thomas and LCpl Wright

In 2010, SSG Thomas was serving in Arghandab District, Kandahar Province. Gartenstein-Ross Rep. at 52. On March 16, his "platoon was tasked with a 24-hour patrol of the area and conducting traffic-control points throughout." Id. (internal quotation omitted). The platoon had set up a traffic-control checkpoint when an unidentified male started approaching it. Id. The man did not heed SSG Thomas's signals to stop; instead, he detonated his suicide vest. Id.

Only the bomber was killed. Id. But SSG Thomas and one other Marine were wounded. Id. SSG Thomas "was hit with ball bearings that ripped clear through the left side of his chest and out the other side, taking out his left lung, collapsing his right lung, and leaving searing burns." Decl. of Danica Thomas [ECF 289-5 at 425] ¶ 11. He was in a coma in Germany before returning to the United States. Id. ¶¶ 11–12. Apart from having to recover from his more apparent physical

injuries, SSG Thomas also suffered traumatic brain injury ("TBI"), "night terrors[,] and PTSD as a result of the attack." Id. ¶¶ 14, 16. The PTSD presented as "extreme paranoia and periods where he appeared to mentally check-out or depart from the present situation." Id. ¶ 18.

Just over three years after the attack in Afghanistan, SSG Thomas's suffering manifested in an utterly devasting event. On September 28, 2013, SSG Thomas left his house, and his wife heard him cock his gun. Id. ¶ 20. He proceeded to shoot out her tires and run down the street, where he shot and killed a dog outside a home, then entered the home and shot and killed the dog's two owners. Id. ¶ 22. SSG Thomas later shot and killed himself. Id. ¶ 20. In his wife's view, SSG Thomas was likely startled by the dog, "which, in his extreme state of paranoia compelled him to shoot it. He then moved forward to enter the owner's house to clear it, thinking he was in combat." Id. ¶ 22. She believes that when SSG Thomas "popped back into the present reality . . . [he] realized the horror of what he did" and, "not able to live with himself, he ended his own life." Id.

LCpl Wright also served in Afghanistan in 2010. Gartenstein-Ross Rep. at 89. On May 7, LCpl Wright was conducting a dismounted patrol near Salaam Bazaar, Now Zad District when he struck an IED. Id. His injuries were immense: he lost both legs and the fingers on his left hand and suffered from a TBI, severe PTSD, and mental anguish. Decl. of Dawn Marie Pattee [ECF No. 289-5 at 453] ¶¶ 7–9. Luckily, despite causing these grave injuries, the attack did not immediately kill anyone.

Once LCpl Wright arrived home, Department of Veterans Affairs ("VA") doctors prescribed multiple opioid pain medications for his severe injuries. Id. ¶ 10. But the doctors refused to prescribe him more when he asked, so he began supplementing the prescribed opioids with unprescribed opioids. Id. ¶ 11. Eventually, the VA discovered LCpl Wright's self-help and

cut off his prescriptions—apparently without providing him with any support for overcoming his addiction.  Id. ¶ 12.  On March 9, 2017, LCpl Wright had been clean for four to six months when he turned back to opioids and took the amount he had previously been prescribed.  Id. ¶¶ 10, 13.  Tragically, he overdosed and died.  Id. ¶ 13.  It is his mother's "strong conviction that the [IED] attack directly led to his death" because it led to his opioid use.  Id. ¶ 10.

## 2.  Analysis

Plaintiffs submit that due to SSG Thomas and LCpl Wright's eventual deaths at their own hands, the attacks the two endured in Afghanistan were extrajudicial killings.  The thrust of plaintiffs' arguments is this: a killing is an act that results in the death of another; "the D.C. Circuit has adopted a 'proximate causation' standard for determining whether an act results in death"; that proximate causation standard requires only that there be "'some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered,'" or in other words, that the death be reasonably foreseeable; and it is foreseeable that a victim of a terrorist attack may later take his own life.  Suppl. Br. at 4–5 (quoting Owens, 864 F.3d at 794).  Since the Syndicate and their Iranian supporters intended the attacks in question to be lethal, plaintiffs conclude that the attacks amount to "deliberated killings not authorized by a previous judgment pronounced by a regularly constituted court."  See id. at 4–6.

The problem with this argument is that plaintiffs once again fail to properly orient the question.  Recall the text of 28 U.S.C. § 1605A(a)(1):

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by **an act of** torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

(emphases added).

The proximate cause standard adopted in <u>Owens</u> is used to determine whether the "personal injury or death" a plaintiff asserts "was caused by" a terrorist's act or the material support for it. <u>See</u> 864 F.3d at 793–99.  But the question here is not whether SSG Thomas's and LCpl Wright's deaths were "caused by" the attacks they endured.  The question is whether those attacks amount to "act[s] of . . . extrajudicial killing."  § 1605A(a)(1).  Only if the attacks were killings may the Court turn to the question of whether those acts caused SSG Thomas's and LCpl Wright's injuries and/or deaths.

Plaintiffs in effect argue that the extrajudicial-killing analysis is identical to the causation analysis.  That cannot be the case.  It is a "cardinal principle of statutory construction that [courts] must give effect, if possible, to every clause and word of a statute."  <u>Owens</u>, 864 F.3d at 773 (quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 404 (2000)).  The Court would violate that cardinal principle if it were to engraft on the term extrajudicial killing the same proximate cause analysis that is used to determine whether an injury is caused by one of the terrorism exception's enumerated acts.  Any terrorist "act" that "caused" a person's "death" would be "an act of . . . extrajudicial killing"—whether that act was torture, aircraft sabotage, hostage taking, or anything else.[10]  Put simply, the enumerated acts would be superfluous whenever a death results. The statute could simply say United States courts have jurisdiction over any claim "in which money damages are sought against a foreign state <u>for death that was caused by an act</u> or the provision of material support or resources for such act."  The Court will not read out of the statute

---

[10] <u>Cf., e.g.</u>, <u>Estate of Fakhoury v. Islamic Republic of Iran</u>, Civ. A. No. 21-1218 (JDB), 2024 WL 4771467, at *10–11 (D.D.C. Nov. 13, 2024) (determining that Iranian-supported terrorists committed an act of hostage taking then proceeding to analyze whether that hostage taking caused the hostage's eventual death); <u>Kar v. Islamic Republic of Iran</u>, Civ. A. No. 19-2070 (JDB), 2022 WL 4598671, at *19 (D.D.C. Sept. 30, 2022) (determining that hostage-taking victim who "died in Iran's custody" "was not a victim of an extrajudicial killing").

words duly enacted by Congress and the President.  The enumerated acts—including extrajudicial killing—must do their own work.[11]

So an extrajudicial killing cannot be <u>any</u> act that proximately causes a person's death under the test put forward in <u>Owens</u>—it must apply only to a narrower set of "action[s] resulting in the death of another."  <u>Borochov</u>, 94 F.3d at 1061.  The text and context of the terrorism exception and its definition of extrajudicial killing confirm as much.  They reveal that an extrajudicial killing is an act undertaken with the purpose of killing another and that actually results in death in the manner or a manner similar to that which was intended.[12]

Begin with the definition of extrajudicial killing.  As mentioned earlier, it is not simply an act that results in the death of another (<u>i.e.</u>, a killing).  It is a "<u>deliberated</u> killing." § 1350 note (emphasis added); § 1605A(h)(7).  A killing is deliberated if it is "undertaken with studied consideration and purpose," <u>Owens</u>, 864 F.3d at 770 (quoting <u>Mamani v. Berzain</u>, 654 F.3d 1148, 1155 (11th Cir. 2011)), and "not on a sudden impulse," <u>Owens v. Republic of Sudan</u>, 174 F. Supp. 3d 242, 263 (D.D.C. 2016), <u>aff'd</u>, 864 F.3d 751 (D.C. Cir. 2017) (citing Webster's Third New International Dictionary 596 (1993), 4 The Oxford English Dictionary 414 (2d ed. 1989), and Black's Law Dictionary 492 (9th ed. 2009)).

The concept of a deliberated killing has common law roots.  <u>See</u> <u>Neder v. United States</u>, 527 U.S. 1, 23 (1999) (common law terms in statutes are read to bear their common law meaning unless indicated otherwise).  In criminal law, a killing "ordinarily constitutes murder in the first degree only if the intent to kill is accompanied by premeditation and deliberation."  2 Wharton's

---

[11] That said, the Court is skeptical that plaintiffs would even succeed on their own standard.  <u>See</u> <u>Hansen</u>, 2024 WL 3026517, at *4–6 (explaining that, under common law tort and criminal law principles, self-inflicted death generally breaks the chain of causation).

[12] Once again, the Court presumes a lack of "authoriz[ation] by a previous judgment pronounced by a regularly constituted court."  <u>See</u> § 1350 note; § 1605A(h)(7).

Criminal Law § 21:4. While premeditation is "simply . . . thinking about a proposed killing before engaging in the homicidal conduct," "'deliberation' is the process of carefully weighing such matters as the wisdom of going ahead with the proposed killing, the manner in which the killing will be accomplished, and the consequences" of carrying out the killing. Id. So, to be a deliberated killing, a perpetrator must act "with studied consideration and purpose," Owens, 864 F.3d at 770, "to achieve" the contemplated death of another, "as opposed to merely being aware that his or her actions would bring about that result or that there was a risk that the result might be brought about from his or her action," 2 Wharton's Criminal Law § 5:3.

Common law principles do not stop at dictating the mens rea required to make an act that leads to another's death a deliberated killing. They also require a tight line between the perpetrator's purpose and the actual result of his act. The result must be "within the purpose or . . . contemplation of the" perpetrator—e.g., the act must result in a death in the manner the perpetrator deliberated—or the result must "involve[] the same kind of injury or harm as" was planned and "not [be] too remote or accidental in its occurrence." Model Penal Code § 2:03 (explaining causation requirements for crimes requiring purpose or knowledge). In other words, to be a deliberated killing, it is not enough that the perpetrator's action was a but-for cause of his intended victim's eventual death. If the death occurs "in a manner very different from that contemplated or from that which might have been expected," the perpetrator does not commit a deliberated killing, but rather an attempted killing or a homicide offense that requires a lesser mens rea. See H. Hart & A. Honoré, Causation in the Law 353–54 (1959)[13]; 1 Subst. Crim. L. § 6.4(f) (3d ed. 2024).

---

[13] Hart and Honoré provide a useful example of this principle. If "a man intend[ing] to kill his wife shoots at her, but misses or only slightly wounds her," and she then escapes him by getting on a train only to be "killed in a railway accident in th[at] train," "most people would not only refuse to say that the man had caused his wife's death but would recoil at the prospect of punishing him with the same severity as that reserved for" intentional murder. H.

The conclusion that a deliberated killing only occurs when the perpetrator achieves his aim in (or similar to) the way that he contemplated is further evinced by the other enumerated acts in § 1605A. See Fischer v. United States, 603 U.S. 480, 487 (2024) ("[A] word is given more precise content by the neighboring words with which it is associated." (internal quotations omitted)); cf. Hansen, 2024 WL 3026517, at *4. Each other act—torture, aircraft sabotage, and hostage taking—requires the perpetrator to commit an act that immediately results in the intended harm. Consider torture. Like it does for extrajudicial killing, the FSIA borrows the definition of torture from the TVPA: in relevant part, torture is "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering . . . is intentionally inflicted on that individual." § 1350 note (emphasis added). A fit between the terrorist's intention and the result is thus required: the perpetrator must intend to cause the victim severe pain or suffering, and his action must inflict that severe pain or suffering as intended.[14] That a terrorist's actions may lead to the victim enduring severe pain or suffering years later in a manner that was not contemplated is not enough.

This textual analysis is also consistent with the source of the definition of extrajudicial killing. Congress derived the TVPA's definition of extrajudicial killing from article 3 common to the four Geneva Conventions of 1949, Kadic v. Karadzic, 70 F.3d 232, 243 (2d Cir. 1995), which spoke to "executions" without judicial process, see Geneva Convention for the Amelioration of

---

Hart & A. Honoré, supra, at 354. Contrast that to a man who shoots at his wife to kill her but instead gravely wounds her, and she dies from her wound after a month in the hospital. In that case, the wife's death occurs in the manner the man intended—or at least in a manner very similar to it—and thus the man would be liable for intentional murder.

[14] See also International Convention Against the Taking of Hostages art. 1, § 1, Dec. 17, 1979, 1316 U.N.T.S. 205, 207 (stating that "[a]ny person who seizes or detains and threatens to kill, to injure or to continue to detain another person . . . commits the offence of taking of hostages" (emphasis added)); Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation art. 1, § 1, Sept. 23, 1971, 974 U.N.T.S. 177, 178 (defining aircraft sabotage as "an act of violence against a person on board an aircraft in flight if that act is likely to endanger the safety of that aircraft" or destruction of "an aircraft in service" (emphases added)); § 1605A(h)(1), (2) (incorporating those definitions into the FSIA)

the Condition of the Wounded and Sick in Armed Forces in the Field, art. 3(1)(d), Aug. 12, 1949, 6 U.S.T. 3114, 75 U.S.T.S. 85.  Congress then transposed an edited version of the Convention's definition into the TVPA by substituting "deliberated killing" for "executions," but simultaneously equated the term extrajudicial killing in the TVPA to "summary execution[s]," which "violate standards accepted by virtually every nation."  H.R. Rep. 102-367, 2–3, 1992 U.S.C.C.A.N. 84, 85–87.

The takeaway is that an extrajudicial killing is in the same genre as a summary execution, and the two are often conflated.  See, e.g., Kadic, 70 F.3d at 243 ("[T]he Torture Victim [Protection] Act . . . cover[s] summary executions.").[15]  Summary execution both commonly and in practice connotes that the perpetrator intended to kill the victim and did kill him in the manner contemplated.  Most simply, one would not say a death sentence was successfully carried out if the executor only managed to wound the victim and the victim later died in a manner wholly apart from the noose, bullet, or injection.  Cf. Execution, Black's Law Dictionary (12th ed. 2024).  And technically, the term summary execution (and extrajudicial killing) has its roots in international legal efforts to combat killings where a perpetrator summarily killed individuals in the manner clearly intended.  See Altson et al., Altson and Heyns on Unlawful Killings 4 (2020) (explaining that one event that led to international action to combat unlawful killings was when a Liberian junta "lined up 13 senior officials . . . and shot them dead").

Additionally, the cases that inspired the TVPA—in which plaintiffs asked courts to infer from the Alien Tort Statute a cause of action for summary execution—dealt with terrorist attacks in which the terrorists succeeded in killing their victims in the manner intended.  Take, for

---

[15] To be sure, the definition of extrajudicial killing is "broader" than the definition of "summary execution" in that it does not require the killer to be a state actor.  Owens, 864 F.3d at 771–72.  But that does not undermine the fact that the term was intended to cover similar acts that cause death.

example, Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C. Cir. 1984), one of the cases that prompted Congress to enact the TVPA. See Ali Shafi v. Palestinian Auth., 686 F. Supp. 2d 23, 26 (D.D.C. 2010). There, plaintiffs were survivors and representatives of those killed in a terrorist hijacking of a civilian bus in Israel in which the attackers proceeded to torture, shoot, and otherwise murder many of its occupants before the massacre was halted. See Tel-Oren, 726 F.2d at 776 (Edwards, J. concurring). The 34 decedents undoubtably were killed in the manner the terrorists intended. See id. Upon the D.C. Circuit holding that federal courts lacked subject matter jurisdiction over plaintiffs' claim and Judge Bork airing his skepticism that a cause of action would exist for the plaintiffs regardless, Congress stepped in to enact the TVPA. Though the Court cannot step into the minds of the congressmembers who passed the TVPA, the act's historical basis indicates that it was this type of purposeful and successful killing for which they aimed to provide a remedy.

In addition to the text and context, there are two other reasons why an extrajudicial killing is an act designed to kill and that does kill in the manner or manner similar to that contemplated. First, it works no sea change from how this Court and others have analyzed whether an extrajudicial killing occurred. For example, in Kar v. Islamic Republic of Iran, this Court was presented with a similar question: whether a hostage's suicide while in Iranian custody amounted to an extrajudicial killing. See Civ. A. No. 19-2070 (JDB), 2022 WL 4598671, at *13–14 (D.D.C. Sept. 30, 2022). The Court found it did not because plaintiffs failed to put forward "admissible evidence demonstrating that Iran acted with the intent to kill" him in that manner. Id. at *14. Although the evidence indicated that Iran told the hostage he would die while in custody, there was insufficient evidence that Iran intended him to commit suicide while in custody. See id. (explaining that the hostage's treatment showed Iran "intended to detain him and punish him" like

any other prisoner, "and it cannot be the case that an extrajudicial killing exists whenever an individual dies while under the control of a state sponsor of terrorism").  Simultaneously, the Court made clear that the hostage's suicide was not alone dispositive; instead, it was the lack of evidence that "Iran imposed conditions of confinement on [him] with the intention of forcing him to commit suicide."  Id. at *15 (emphasis added).  And Kar is not the only case to insist that the terrorist's intent and the victim's manner of death must match.  See, e.g., Kilburn v. Islamic Republic of Iran, 699 F. Supp. 2d 136, 152 (D.D.C. 2010) (finding an extrajudicial killing occurred when Iranian-backed Hizbollah sold victim to Libyan agents who summarily shot him because Hizbollah sold him "with the knowledge that he would be murdered"); Han Kim v. Democratic People's Republic of Korea, 774 F.3d 1044, 1050–51 (D.C. Cir. 2014) (concluding that plaintiffs put forward enough evidence of an extrajudicial killing because victim died of starvation and "his North Korean captors" "[d]eliberately caused" his malnutrition (internal quotation marks omitted)); cf. Hansen, 2024 WL 3026517, at *6 (determining that suicide of missile-attack victim 21 months later did not make the attack an extrajudicial killing when there was no "direct causal link" between the missile barrage and the suicide).[16]

Second, the conclusion is consistent with the D.C. Circuit's instruction to read § 1605A(a)(1) narrowly.  Borochov, 94 F.4th at 1062; Hansen, 2024 WL 3026517, at *6.  Were the Court to define extrajudicial killing as expansively as plaintiffs ask, United States courts would

---

[16] In Hansen, another judge in this District faced the question of whether a self-inflicted death months after the relevant attack made the attack an extrajudicial killing.  The court found it did not, holding that, to be an extrajudicial killing, "the foreign state must be the direct cause of another person's death."  See Hansen, 2024 WL 3026517, at *4–6.  This Court does not refute Hansen's holding; rather, the Court believes its conclusion that an extrajudicial killing is an act that is intended to cause death and in fact causes death in the manner contemplated is perfectly consistent with Hansen.  The Court chooses to frame the definition as it does because it believes it is clearer. The term "direct cause" is used in various ways, and the Court sees a risk of it being read to incorporate the same over-expansive proximate-cause standard for which the plaintiffs advocate here.  See, e.g., Cause, Black's Law Dictionary (equating the term "direct cause" to "proximate cause"); Gander v. Mr. Streak of Sun Ray, Inc., 774 F.2d 920, 923 (8th Cir. 1985) (explaining that one definition of "direct cause" is "a cause which had a substantial part in bringing about the injury, either immediately or through happenings which follow one after another").

have jurisdiction over an indefinable and unlimitable number of claims against foreign states. The later death of any victim of an attack, if somehow reasonably connected to the attack, could turn that act into an extrajudicial killing and thus create a sovereign-immunity-waiving claim for all other victims thereof. Say an injured victim dies in a car crash on his way to a physical therapy appointment, or an emotionally-injured victim turns to heavy alcohol use that leads to fatal liver cancer. These events—whether one year or 30 years after the attack—could sweep into United States courts a swath of claims against foreign states, contrary to the default rule of sovereign immunity. The Court declines to open those floodgates. See Ratemo v. Islamic Republic of Iran, Civ. A. No. 19-2067 (JDB), 2025 WL 294934, at *7 (D.D.C. Jan. 24, 2025) (choosing to "hold[] the floodgates closed" instead of adopting plaintiffs' interpretation that "would invite . . . claims from a substantially expanded class of individuals").

For all those reasons, an attack amounts to an extrajudicial killing under § 1605A(a)(1) only if the attack was designed to cause the death of another and in fact caused the death of another in the manner contemplated or a similar manner. Here, however, the attacks SSG Thomas and LCPl Wright endured did not cause the two men's deaths in a manner at all similar to that which the Syndicate intended.

Both the May 16, 2010 attack that injured SSG Thomas and the May 6, 2010 attack that injured LCpl Wright were purposefully designed to kill members of the Coalition Forces through the direct application of lethal force. As the Court explained in an earlier opinion, the Syndicate's use of tactics such as suicide bombers and IEDs—both of which require knowledge of where an intended victim will be, when he will be there, and advance deployment of the means of murder— was "part of an extended terrorist campaign by the Taliban-led Syndicate to kill American servicemembers to achieve its overarching goal of driving the United States out of Afghanistan by

killing and wounding American soldiers and civilians." <u>Cabrera I</u>, 2022 WL 2817730, at *38. These tactics on their face show the manner in which the Syndicate intended to carry out its goal of killing Americans in the two attacks at hand: it intended to kill and injure SSG Thomas and the others at the traffic-control checkpoint through the blast from the bomb on the suicide vest, and it intended the IED that LCpl Wright struck to kill and injure Coalition Forces through the blast of that explosive device.

Neither SSG Thomas nor LCpl Wright died in that intended manner. Their devastating deaths at their own hands occurred in "a manner very different from" the death by lethal explosive force that the Syndicate "contemplated[,] or from that which might have been expected" from a bomb's blast. <u>See</u> H. Hart & A. Honoré, <u>supra</u>, at 353–54; 1 Subst. Crim. L. § 6.4(f). So the Court finds that the attacks SSG Thomas and LCpl Wright endured were not extrajudicial killings, despite the two men's tragic deaths.

As the Court has explained elsewhere, this does not mean that no self-inflicted death could be an extrajudicial killing. <u>See Kar</u>, 2022 WL 4598671, at *15 n.14. But here, plaintiffs put forward no evidence that the Syndicate designed the instant suicide bombing and IED attack with the intention of forcing the targeted servicemembers to take their own lives or ingest substances that would end their lives. <u>See id.</u> Everything before the Court shows that the attacks were instead intended to end the targeted servicemembers' lives via the force of the bombs. That intention fortunately failed. So, although the attacks doubtlessly contributed to SSG Thomas's and LCpl Wright's far-too-premature deaths, they were not extrajudicial killings within the meaning of § 1605A(a)(1).

*          *          *

The attacks that injured CPT DuVal, SSG Thomas, and LCpl Wright were brutal, inhumane, and utterly detestable. Yet the term extrajudicial killing does not reach every act that leads to a person's death. The Court harbors no doubt that CPT DuVal, Danica Thomas, L.T., F.S., Dawn Marie Pattee, Kristen Colleen Luncers, and Jalisa Marie Stark deserve compensation for the atrocities visited upon them and their family members. But this Court does not have the power to provide it. Those plaintiffs' claims are thus dismissed for lack of subject matter jurisdiction.

## II.    Cause of Action

Now that the Court has determined it has subject matter jurisdiction over all but seven of the Tranche 2 plaintiffs' claims, it is simple to conclude that those plaintiffs have a cause of action. The requirements of the terrorism-exception cause of action largely mirror those for subject matter jurisdiction. To have a cause of action, the "plaintiff must show his injury was caused by one of the enumerated acts of terrorism or material support therefor; carried out by a state sponsor of terrorism or an official, employee, or agent of that state; and that the plaintiff is a U.S. national, member of the armed forces, a U.S. employee or contractor, or the legal representative of one of those people." Mem. Op. [Zambon, ECF No. 303] ("Zambon Mem. Op.") at 4–5 (citing § 1605A(c)). In addition to direct victims, the FSIA's cause of action "also 'encompass[es] claims by family members of those injured or killed for the distress caused by their relative's injuries.'" Cabrera IV, 2024 WL 3225942, at *6 (alteration in original) (quoting Force v. Islamic Republic of Iran, 464 F. Supp. 3d 323, 359 (D.D.C. 2020)). The Court already determined that the relevant Tranche 2 plaintiffs' asserted injuries were caused by an act of extrajudicial killing carried out by Iran. Now, the Court adopts the Special Masters' findings that each plaintiff listed in the Order issued on this date is a U.S. national, member of the armed forces, a U.S. employee or contractor,

or the legal representative of one of those people and that each non-direct victim is a family member or a functional equivalent.[17]  See Green R. &. R. [ECF No. 289-1] at 13; Griffin R. &. R. [ECF No. 289-2] at 15–16; Pigott R. &. R. [ECF No. 289-4] at 1; Saltzburg R. &. R. [ECF No. 289-5] at 4; see also 18 U.S.C. § 1605A(c).  So these plaintiffs have a cause of action under the FSIA.

## III.    Damages

The Court now moves to damages.  It first considers the direct victims entitled to pain and suffering damages and then considers family-member plaintiffs entitled to solatium damages.

### a.  Direct Victims: Pain and Suffering

When awarding pain and suffering damages, "a court's primary consideration is to ensure that individuals with similar injuries receive similar awards."  Cabrera I, 2022 WL 2817730, at *43 (cleaned up).  Judges in this District employ the so-called Peterson II framework to achieve that goal of consistency.  See Peterson v. Islamic Republic of Iran ("Peterson II"), 515 F. Supp. 2d 25 (D.D.C. 2007); Cabrera I, 2022 WL 2817730, at *43 (applying Peterson II framework).  "Under this framework, courts award a baseline of $5 million to 'individuals who suffer severe physical injuries, such as compound fractures, serious flesh wounds, and scars from shrapnel, as well as lasting and severe psychological pain,' varying upward to $7–$12 million '[w]here physical and psychological pain is more severe . . . such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead,' and varying downward to $1.5–$3 million 'where the victim suffers severe emotional

---

[17] In accordance with this Court's earlier holding, Special Master Saltzburg determined that plaintiff W.P. did not have standing to sue for solatium damages because he was in utero at the time his father was wounded in Afghanistan.  See Cabrera II, 2023 WL 3496303, at *7; Saltzburg R. & R. [ECF No. 289-5] at 70–72.  Since that recommendation, however, the D.C. Circuit has clarified that in-utero plaintiffs do have standing to seek solatium damages.  See generally K.E.F.V. v. Islamic Republic Iran, Case No. 23-7076 (D.C. Cir. Apr. 29, 2025).  The Court thus determines that W.P. has standing and will award him solatium damages.

injury accompanied by relatively minor physical injuries.'" <u>Cabrera IV</u>, 2024 WL 3225942, at *7 (alterations in original) (quoting <u>Wamai v. Republic of Sudan</u>, 60 F. Supp. 3d 84, 91 (D.D.C. 2014)).

The Special Masters considered each direct victim's evidence and recommended damages awards largely consistent with the <u>Peterson II</u> framework and the opinions applying it. The Court adopts the Special Masters' recommendations as to the Tranche 2 direct victims over whose claims the Court has jurisdiction, except as outlined below.

- **U.S. Army PFC Maggie Mae Bilyeu:** Special Master Saltzburg recommended awarding U.S. Army Private First Class Maggie Mae Bilyeu $9 million in pain and suffering damages due to injuries she suffered in Afghanistan. Saltzburg R. & R.at 152. As a result of the attack, PFC Bilyeu's left leg was amputated, a plate was put in her torso, and she had to have numerous surgeries. Decl. of Maggie Mae Bilyeu [ECF No. 289-5 at *793] ¶¶ 10–19. The Court concludes an $8.5 million award is more consistent with other injured victims who lost a limb and were rendered incapable of functioning on their own and in society. <u>See</u> <u>Cabrera IV</u>, 2024 WL 3225942, at *8.

- **U.S. Air Force SSgt Brian Anthony Williams:** Special Master Saltzburg recommended awarding U.S. Air Force Staff Sergeant Brian Anthony Williams $9 million in pain and suffering damages for his injuries sustained in Afghanistan. Saltzburg R. & R. at 112. SSgt Williams had one leg amputated and suffered other severe injuries, both physical and mental. Decl. of SSG Brian Anthony Williams [ECF No. 289-5 at *585] ¶¶ 8–9. He has since undergone multiple treatments and surgeries, and was in the hospital for 18 months. <u>Id.</u> ¶ 10; Decl. of Lionel Williams [ECF No. 289-5 at *600] ¶ 6. Special Master Saltzburg compared SSG Williams's injuries to CPT Ryan Timoney, to whom the Court awarded

$9 million in damages.  Saltzburg R. & R. at 112.  CPT Timoney, however, suffered graver injuries than SSG William's obviously severe injuries.  See <u>Cabrera I</u>, 2022 WL 2817730 at *29–31 (explaining CPT Timoney's many surgeries and treatments immediately following the attack, that he was "a wreck" cognitively, got an implant in his skull, and had severe seizures, among other complications).  The Court determines an award of $8.5 million for SSG William is more consistent with the Court's past awards for individuals with similar injuries.  See <u>Cabrera IV</u>, 2024 WL 3225942, at *8 (discussing $8.5 million award to plaintiff "who was severely burned, lost his right arm, stayed in the hospital for over two months, and suffers from nerve pain, among other injuries").

- **U.S. Army SFC Gregory Allen Stube:** Special Master Saltzburg recommended awarding $8.5 million to U.S. Army Sergeant First Class Gregory Allen Stube.  Saltzburg R. & R. at 25.  Although Special Master Saltzburg recognized that SFC Stube's physical and mental injuries are similar to those for which the Court has awarded $7.5 million, Special Master Saltzburg reasoned that an additional upward variance was warranted because SFC Stube was also a single father and had to raise his son alone with his injuries.  <u>Id.</u>  This Court has never taken a survivor's parental status into account when awarding pain and suffering damages.  While the Court is sympathetic to SFC Stube's situation as a single parent in light of his injuries, it continues to base its damages awards on the extent to an individual's injuries and thus awards SFC Stube $7.5 million, which is more consistent with other survivors with similar injuries.  See <u>Cabrera IV</u>, 2024 WL 3225942, at *8 (awarding $7.5 million to CPL Raul Olivares Jr., who suffered facial laceration, compound factures to both tibias and fibulas, and a calcaneus fracture to his right ankle, and had to spend nearly two years rehabbing).

- **U.S. Army SFC Marc Yvon Dervaes:** Special Master Green recommended awarding U.S. Army SFC Marc Yvon Dervaes $9.5 million in damages for pain and suffering. Green R. & R. at 32.  SFC Dervaes immediately lost his right arm in the attack and sustained burns and injuries from shrapnel cross his body, then was later diagnosed with a TBI and PTSD.  Decl. of SFC Marc Yvon Dervaes [ECF No. 289-1 at *83] ¶¶ 6, 10–11. Sadly, SFC Dervaes has attempted suicide twice due to the distress of his injuries.  Id. ¶¶ 16–18.  The Court determines SFC Dervaes's injuries are similar to Corporal Jonathan Cleary, to whom the Court awarded $8 million.  Cabrera IV, 2024 WL 3225942, at *8 (explaining that CPL Cleary "was in a coma for two months, underwent the amputation of one leg, and suffers from PTSD and TBI").  However, unlike for SFC Dervaes, the Court did not find that CPL Cleary had attempted to take his own life.  So the Court adjusts upward from CPL Cleary's award by 10 percent and awards SFC Devares $8.8 million. Id. at *10 (explaining that "greater than usual harm in the form of suicide attempts and/or hospitalizations for such attempts . . . warrant a 10% enhancement").

### b.  Family-Member Plaintiffs: Solatium

Under § 1605A, family-member plaintiffs can recover solatium damages.  Cabrera IV, 2024 WL 3225942, at *9.  "Solatium claims are 'functionally identical to claims for intentional infliction of emotional distress,' and are 'intended to compensate persons for mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience . . . as well as the harm caused by the loss of the decedent's society and comfort.'" Id. (quoting Spencer v. Islamic Republic of Iran, 71 F. Supp. 3d 23, 27 (D.D.C. 2014) (omission in original)).  As it does when awarding pain and suffering damages, the Court uses the Peterson II framework to award solatium damages.  See id.  That framework provides that the baseline solatium awards are

32

a function of "both a plaintiff's relationship to the direct victim and whether the direct victim was killed or injured." <u>Zambon</u> Mem. Op. at 49. "If the direct victim was killed, the baseline amounts are $8 million for spouses, $5 million for parents and children, and $2.5 million for siblings," while "the baseline amounts are cut in half" if the direct victim was injured, amounting to baselines of "$4 million for spouses, $2.5 million for parents and children, and $1.25 for siblings." <u>Id.</u>

The Special Masters reviewed each family-member plaintiff's evidence and recommended an award. Because those awards are largely consistent with the <u>Peterson II</u> framework, the Court adopts the Special Masters' recommendations as to the Tranche 2 family-member plaintiffs over whose claims the Court has jurisdiction, except as outlined below.

- **W.P.:** W.P. was in utero at the time his father, SSgt Jack Pierce, was wounded in Afghanistan. Saltzburg R.& R. at 71. While this Court had previously held that in utero plaintiffs do not have standing to seek solatium damages, it also explained that—were the D.C. Circuit to determine such plaintiffs do have standing—the Court would vary downward from the <u>Peterson II</u> baseline by 50 percent for in-utero plaintiffs because they have "not suffered the same mental anguish as most plaintiffs that experienced the loss of a parent." <u>Cabrera III</u>, 2024 WL 864092, at *3 n.2. Since the Circuit has now determined that in-utero plaintiffs have standing, <u>see</u> <u>supra</u>, n.18, this Court awards W.P. $1.25 million in solatium damages.

- **Martha Looney, Leah A. Turner, and Shannon K. McNulty:** Special Master Green recommended awarding Martha Looney, whose son SGT Andrew Looney was killed in Afghanistan, $5.5 million in solatium damages. Green R. & R. at 35. The 10 percent upward adjustment was explained by Martha's hospitalization for several weeks due to depression following her son's death. <u>Id.</u> Similarly, Special Master Griffin recommended

a 10 percent upward adjustment for Leah A. Turner—whose husband was killed in Afghanistan—because Turner was also hospitalized twice due to the grief of her loss. Griffin R. & R. at 25–26.  Lastly, Special Master Pigott recommended the Court award Shannon K. McNulty $2.75 million because she was hospitalized for a month after the death of her brother.  See Pigott R. & R. at 45–46.  The Court acknowledges these women's deep agony but determines an upward adjustment is not consistent with this Court's prior damages awards.  As the Court said in Cabrera IV, the Peterson II baseline amounts "take into consideration the likelihood of serious detrimental effects" such as temporary hospitalization.  2024 WL 3225942, at *10, 14.  So the Court will award Looney the $5 million baseline for parents, Turner the $8 million baseline for spouses, and McNulty the $2.5 million baseline for siblings.

- **Daniel Griffin:** Special Master Green recommended awarding Daniel Griffin $2.25 million.  Green R. & R. at 57.  Daniel's stepbrother, Army Command Sergeant Major Kevin James Griffin, was killed in Afghanistan.  Id. at 55.  Daniel and Kevin met when they were about 9 years old and 8 years old, respectively, because their parents were considering marriage.  Decl. of Daniel Griffin [ECF No. 289-1 at *228] ¶ 4.  They "immediately began developing a bond as siblings," became stepbrothers later that year, and grew up in the same house until Kevin left for college ten years later.  Id.  Special Master Green recommended departing downward by 10 percent because he compared Daniel's relationship to Kevin to a stepparent who had custody of his child for most, but not all his life.  Green R. & R. at 57.  But this Court has awarded the full Peterson II baseline amount of $2.5 million to foster siblings who met the direct victim at ages far beyond 8 and 9 years old.  See Cabrera I, 2022 WL 2817730, at *52–53 (awarding $2.5 million to two foster

siblings of Lieutenant Colonel David Cabrera, one who met LTC Cabrera when LTC Cabrera was 13 years old and the sibling was 17 years old, and the other who met LTC Cabrera when that sibling was 13 years old). The Court thus awards Daniel $2.5 million as well.

- **Taylor Schrock:** Similarly, Special Master Saltzburg recommended awarding Taylor Schrock $2.25 million in solatium damages for the loss of his stepbrother Max, because Taylor and Max met when Taylor was 9 years old and Max 12 years old. Saltzburg R. & R. at 99–101. But, once again, this Court has awarded the full $2.5 million to sibling-equivalents "who lived with the victim or otherwise demonstrated a close sibling relationship." Cabrera IV, 2024 WL 3225942 at *14. Taylor and Max were "inseparable" even before they lived together, and they "did everything together" from there on out. Decl. of Taylor Schrock [ECF No. 289-5 at *525] ¶¶ 4, 6. Taylor even got a tattoo of Max and their other brother's initials. Id. ¶ 6. Given that Taylor and Max lived together for at least three years and had a very close relationship before and afterwards, the Court will also award Taylor the full $2.5 million.

- **Estate of Becky S. Poock:** Special Master Griffin recommended awarding the Estate of Becky S. Poock $4.5 million in solatium damages. Griffin R. & R. at 52–53. Becky's son, Donald Nichols, was killed in an attack in Afghanistan. Id. at 49–50. In addition to the 20 percent downward variance appropriate for an estate plaintiff, see, e.g., Cabrera II, 2023 WL 3496303, at *10, Special Master Griffin varied upward by 10 percent because Becky had suffered a "greater-than-average impact" from her grief, Griffin R. & R. at 52–53. This was in part because Becky suffered "three strokes and one brain aneurysm" after she lost her son and she "attribute[d] these ailments directly to the loss of" Donald. Decl. of Becky

S. Poock [ECF No. 289-2 at *214] ¶ 7. Becky's husband also stated that doctors told him that Becky's aneurysm likely occurred because she "likely always had a weak blood vessel" and it "finally gave up under stress." Decl. of Roger Poock [ECF No. 289-2 at *221] ¶ 15. He then "told [the doctors] about losing" their son and they said "it sounded like" the aneurysm and the loss of Donald "were related." Id. Neither Becky nor Roger give any other evidence of the aneurysm's cause. The Court concludes that this is insufficient to attribute the aneurysm to Donald's death. See Cabrera IV, 2024 WL 3225942, at *14 n.10 (declining to apply upward enhancements "without evidence of a direct link between [the decedent's] death and [the plaintiff's] diagnosis"). As a result, the Court awards the Estate $4 million.

- **Cristinemae Barcel Mittler:** Special Master Griffin recommended awarding Cristinemae Barcel Mittler $4 million in solatium damages for the death of her father because the Special Master compared Cristinemae to Corbin and Gillian Cabrera in Cabrera I. Griffin R. & R. at 67–68. However, the Court awarded Corbin and Gillian $4 million because, although they had never lived with their father, "he was involved in both of their lives." Cabrera I, 2022 WL 2817730, at *50. Cristinemae never lived with or near her father; she lived in the Philippines with her mother, and while her "dad visited . . . a few times . . . [she] can only recall one memory with him from a visit when [she] was five years old." Decl. of Cristinemae Barcel Mittler [ECF No. 289-2 at *305] ¶¶ 3–4. The Court thus concludes that Cristinemae is less like Corbin and Gillian and more like Tristyn A. Vinson-Hosford, "who was raised solely by his great-grandparents" and had little contact with his father. Cabrera IV, 2024 WL 3225942, at *11. The Court therefore awards Cristinemae $3.5 million, the same amount it awarded Tristyn. Id.

- **N.W.:** Special Master Pigott recommended awarding N.W. $3 million in solatium damages. Pigott R. & R. at 51. N.W. was two years old when her mother, Illinois National Guard SGT Simone Asia Robinson, died in Afghanistan. Decl. of Regina Byther on Behalf of N.W. [ECF No. 289-4 at *285] ¶ 3. Instead of varying downward by 30 percent, as the Court as done for children who lost their parents between the ages of 1 and 3, see Cabrera IV, 2024 WL 3225942, at *11, Special Master Pigott varied downward by 40 percent because N.W.'s "actual in-person experience with her mother was limited to her first few months of her life," Pigott R. & R. at 51. While not always living together, N.W. and SGT Robinson were close throughout N.W.'s first two years of life: SGT Robinson spent time with N.W. in person, talked to N.W. on the phone, and the two had a favorite activity together. Decl. of Regina Byther on Behalf of N.W. ¶ 4. The Court therefore concludes that the traditional 30 percent downward variance is appropriate here and awards N.W. $3.5 million.

- **B.H.B.:** Special Master Saltzburg recommended awarding B.H.B. $4.5 million in solatium damages. Saltzburg R. & R. at 48. B.H.B.'s father was killed in Afghanistan when B.H.B. was one-and-a-half years old. Decl. of Enjolie Wallace Bates on Behalf of B.H.B. [ECF No. 289-5 at *260] ¶ 3. When B.H.B. was old enough to understand his father's death, he asked to go to boarding school so no parents would be present. Id. ¶ 10. There, B.H.B. expressed suicidal thoughts and was sent to a psychiatric hospital. Id. He "received inpatient treatment for a while" and was diagnosed with mental illnesses and disorders such as depression, bipolar disorder, and schizophrenia. Id. Since then, B.H.B. has improved and returned to school, where he is doing well. Id. ¶ 11. Special Master Saltzburg varied upward after applying the standard 30 percent reduction for children who lost their parent

between ages 1 and 3 because of B.H.B.'s past hospitalization and diagnoses and "past and ongoing severe emotional suffering and distress."  Saltzburg R. & R. at 47–48.  In Special Master Saltzburg's view, B.H.B. is similar to R.C., son of LTC Cabrera, to whose award the Court applied a 20 percent upward variance.  Id. at 47.  Like R.C., B.H.B. struggled with suicidal thoughts and switched schools.  Cabrera I, 2022 WL 2817730, at *49.  But R.C. also was "a target for bullying" and "unable to attend traditional schools," and he had attempted suicide.  Id.  B.H.B., in contrast, did not switch schools because he was unable to attend a traditional school and does not appear to have attempted suicide.  Additionally, he now is doing well at a normal school.  See Decl. of Enjolie Wallace Bates on Behalf of B.H.B. ¶¶ 10–11.  The better comparator for B.H.B. is A.J.Q., "who developed borderline personality disorder, reactive attachment disorder, and PTSD due to the death of her father," but had "not attempted suicide" nor "dropped out of school as a result of her grief."  Cabrera IV, 2024 WL 3225942, at *10.  The Court will thus vary upward by 10 percent as it did for A.J.Q., see id., rather than 20 percent, and award B.H.B. $4 million.

- **Mark Anthony White:** Special Master Saltzburg recommended awarding Mark Anthony White $2.75 million for the death of his brother.  Saltzburg R. & R. at 134.  The rationale for this 10 percent upward variance was that, following his brother's death, Mark became addicted to drugs and alcohol, and that addiction led to further hardships.  Id.  However, the Peterson II baseline "take[s] into consideration the likelihood of [such] serious detrimental effects . . . on families."  See Pennington v. Islamic Republic of Iran, Civ. A. No. 19-796 (JEB), 2022 WL 168261, at *3 (D.D.C. Jan. 19, 2022), vacated in part, 2022 WL 18814284 (D.D.C. May 3, 2022); see Cabrera IV, 2024 WL 3225942, at *14.  The Court will thus award Mark Anthony the baseline $2.5 million.

## IV.    Prejudgment Interest

Lastly, as the Court has previously concluded, "an award of prejudgment interest is appropriate" in this case.  Cabrera I, 2022 WL 2817730, at *55.  As for its previous damages awards, the Court calculated the interest for each plaintiff here using the methodology laid out in Forman v. Korean Air Lines Co., 84 F.3d 446 (D.C. Cir. 1996).  See, e.g., Cabrera I, 2022 WL 2817730, at *55; Cabrera IV, 2024 WL 3225942, at *14.

## Conclusion

For the above reasons, the Court will enter default judgment and award damages for 190 of the 197 Tranche 2 plaintiffs.  A separate Order consistent with this Opinion shall issue on this date.

/s/
JOHN D. BATES
United States District Judge

Dated:  May 16, 2025